## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STAND UP FOR CALIFORNIA!, 7911 Logan Lane, Penryn, California 95663; | |
| | |
| RANDALL BRANNON, 26171 Valerie Avenue, Madera, California 93638; | |
| | |
| MADERA MINISTERIAL ASSOCIATION, 17755 Road 26, Madera, California 93638; | Civil Action No. _____ |
| | |
| SUSAN STJERNE, 24349 Tropical Drive, Madera, California 93638; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| | |
| FIRST ASSEMBLY OF GOD – MADERA, 22444 Avenue 18 ½, Madera, California 93637; and | |
| | |
| DENNIS SYLVESTER, 18355 Road 25, Madera, California 93638, | |
| | |
| Plaintiffs, | |
| | |
| v. | |
| | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240; | |
| | |
| KENNETH SALAZAR, in his official capacity as Secretary, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240; | |
| | |
| BUREAU OF INDIAN AFFAIRS, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240; | |
| | |
| KEVIN WASHBURN, in his official capacity as Assistant Secretary, Bureau of Indian Affairs, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240, | |
| | |
| Defendants. | |

1.      This "reservation shopping" case involves a dispute over the Secretary of the
United States Department of Interior's decision to acquire 305.49 acres (the "Casino Parcel") in
trust on behalf of the North Fork Rancheria of Mono Indians (the "North Fork Tribe" or the
"Tribe") under 25 U.S.C. § 465 for the purpose of enabling the Tribe to develop and operate a
mega-casino funded by Las Vegas-based Station Casinos, Inc. ("Station Casinos") almost 40
miles from the Tribe's reservation.  The Tribe already has ancestral lands in trust on which
gambling can occur, and therefore the Secretary's decision has been highly controversial and
widely opposed.  As is explained in detail below, the decision was arbitrary, capricious, an abuse
of discretion, and was not in accordance with the federal policy strongly favoring *on-reservation*
gambling, and the limited exception for *off-reservation* Indian gambling.  Indeed, the Casino
Parcel was strategically chosen adjacent to State Route 99 to provide easy access to nearby
metropolitan areas with large numbers of potential gamblers.

## JURISDICTION

2.      This Court has both subject matter jurisdiction over this action and personal
jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 2201, 2202, and 5 U.S.C. §§ 702, 706.

3.      Venue lies in this district under 28 U.S.C. § 1391(b) and (e)(2).  A substantial
portion of the events or omissions giving rise to the claims stated herein occurred in this district.

4.      The United States waived sovereign immunity from suit under 5 U.S.C. § 702.
There is an actual controversy between the parties that evokes the jurisdiction of this Court
regarding decisions by, and actions of, the Defendants that are subject to judicial review.  There
has been a final agency action that is reviewable by this Court.  5 U.S.C. § 704; 25 C.F.R. §§
2.6(c), 151.12(b); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.
Ct. 2199, 2205-10 (2012).

## PARTIES

5.      Plaintiff Stand Up For California! is a non-profit 501(c)(4) corporation organized
under the laws of the State of California.  Stand Up For California! is a community watchdog

group that focuses on gambling issues affecting California citizens, including tribal gaming, card clubs, horse racing, satellite wagering, charitable gaming, and the state lottery.  Stand Up For California! has supporters throughout the State of California and in the City of Madera community, including the Madera Ministerial Association which, either themselves or through their members, live, do business, and own property in the City of Madera and within 5 miles or closer of the Casino Parcel.  Should the Secretary move forward with the fee-for-trust acquisition, Stand Up For California! and its supporters will personally suffer environmental, aesthetic, and economic harm by, among other things, (a) community water wells suffering from groundwater depletion and pollution adversely affecting regional supplies, (b) adverse air pollution impacts, (c) traffic congestion, (d) significant impacts on protected species and habitat in the community, (e) diminished property values, and (f) increased risk of criminal violence.  In addition, Stand Up For California!'s supporters will personally suffer injury by the increased risk of gambling, alcohol, and other personal addictions in their community, the financial strain on local government budgets by increasing demand for social services, and job losses in existing Madera businesses.

6.      Plaintiff Reverend Randall Brannon is the pastor at Grace Community Church in Madera, California, which is located at 17755 Road 26, Madera, California, 93638.  Since 1983, Rev. Brannon has lived in the County of Madera at 26171 Valerie Avenue, Madera, California 93638, which is less than three miles (as the crow flies) from the Casino Parcel.  He has raised his family in Madera and, as a local pastor and through other community positions, is familiar with his community's opposition to the proposed mega-casino and the harm presented to the community if it goes forward.  Since 2005, Rev. Brannon has publicly voiced strong concern against the proposed mega-casino project in the City of Madera by, among other things, submitting written comments and letters of opposition to the Bureau of Indian Affairs, drafting opinion pieces for local newspapers, and expressing his concern at public meetings and to elected officials.  Should the Secretary move forward with the fee-for-trust acquisition, Rev. Brannon will personally suffer environmental, aesthetic, and economic harm by, among other

things, (a) community water wells suffering from groundwater depletion and pollution adversely affecting regional supplies, (b) adverse air pollution impacts, (c) traffic congestion, (d) significant impacts on protected species and habitat in the community, (e) diminished property values, and (f) increased risk of criminal violence.  In addition, Rev. Brannon will personally suffer injury by the increased risk of gambling, alcohol, and other personal addictions in his community, the financial strain on local government budgets by increasing demand for social services, and job losses in existing Madera businesses.

7.      Plaintiff Madera Ministerial Association is a 501(c)(3) organization located in Madera County, California.  The Madera Ministerial Association has members who serve as pastors leading congregations and serving in other clergy-related positions throughout the City of Madera and the County of Madera, including many churches that are located within five miles of the proposed Casino Parcel.  Should the Secretary move forward with the fee-for-trust acquisition, the Madera Ministerial Association and its members will personally suffer environmental, aesthetic, and economic harm by, among other things, (a) community water wells suffering from groundwater depletion and pollution adversely affecting regional supplies, (b) adverse air pollution impacts, (c) traffic congestion, (d) significant impacts on protected species and habitat in the community (e) diminished property values, and (f) increased risk of criminal violence.  In addition, the Madera Ministerial Association's members will personally suffer injury by the increased risk of gambling, alcohol, and other personal addictions in their community, the financial strain on local government budgets by increasing demand for social services, and job losses in existing Madera businesses.

8.      Plaintiff Susan Stjerne is a resident of the City of Madera, California and lives at 24349 Tropical Drive, Madera, California 93638, which is approximately one mile (as the crow flies) from the Casino Parcel.  Ms. Stjerne has lived in the City of Madera since January, 1981 and has raised three children in Madera, all of whom still live there.  Ms. Stjerne has owned her home on Tropical Drive for 19 years and her 81-year-old father owns a home across the street and is in that location so that she can care for him. According to her father's last will and

testament, Ms. Stjerne will inherit her father's home upon his death.   She has been a member of
Plaintiff Brannon's congregation at Grace Community Church for over 25 years.  Ms. Stjerne
and neighbors receive their water from wells that draw from the ground water underneath her
property and the Casino Parcel. Ms. Stjerne has signed petitions opposing the casino project.
Should the Secretary move forward with the fee-for-trust acquisition, Ms. Stjerne will personally
suffer environmental, aesthetic, and economic harm by, among other things, (a) community
water wells suffering from groundwater depletion and pollution adversely affecting regional
supplies, (b) adverse air pollution impacts, (c) traffic congestion, (d) significant impacts on
protected species and habitat in the community, (e) diminished property values, and (f) increased
risk of criminal violence.  In addition, Ms. Stjerne will personally suffer injury by the increased
risk of gambling, alcohol, and other personal addictions in her community, the financial strain on
local government budgets by increasing demand for social services, and job losses in existing
Madera businesses.

       9.     Plaintiff First Assembly of God – Madera is a church located at 22444 Avenue 18
1/2, Madera, California 93637, which is approximately one half mile from the Casino Parcel.
First Assembly of God – Madera operates the Madera Christian School, which is part of the
church ministry and located on the church property.  The students at Madera Christian School
range between the ages of 8 and 14 years old.  The church and school obtain their water from
wells on the church property that draws water from the ground water underneath the church
property and the Casino Parcel.  The Casino Parcel is visible from the church and school and
both locations share the same roads.  Should the Secretary move forward with the fee-for-trust
acquisition, First Assembly of God – Madera, including its congregants and its school children,
will personally suffer environmental, aesthetic, and economic harm by, among other things,
(a) community water wells suffering from groundwater depletion and pollution adversely
affecting regional supplies, (b) adverse air pollution impacts, (c) traffic congestion, (d)
significant impacts on protected species and habitat in the community, (e) diminished property
values, and (f) increased risk of criminal violence.  In addition, First Assembly of God –

Madera's congregants and school children will personally suffer injury by the increased risk of gambling, alcohol, and other personal addictions in their community, the financial strain on local government budgets by increasing demand for social services, and job losses in existing Madera businesses.  These impacts will harm First Assembly of God – Madera by, among other things, resulting in diminished affiliation in church membership and school enrollment.

10.    Plaintiff Reverend Dennis Sylvester is the pastor at Plaintiff First Assembly of God – Madera.  Since 2000, Rev. Sylvester has lived in the County of Madera at 18355 Road 25, Madera, California 93638, which is about 1.5 miles (as the crow flies) from the Casino Parcel. As a local pastor and through other community positions, he is familiar with his community's opposition to the proposed mega-casino and the harm presented to the community if it goes forward.  Rev. Sylvester has publicly voiced strong concern against the proposed mega-casino project adjacent to the City of Madera.  Rev. Sylvester receives his water from wells that draw from the ground water underneath his property and the Casino Parcel.  Should the Secretary move forward with the fee-for-trust acquisition, Rev. Sylvester, in his capacity as a resident of the County of Madera and as pastor at Plaintiff First Assembly of God – Madera, will personally suffer environmental, aesthetic, and economic harm by, among other things, (a) community water wells suffering from groundwater depletion and pollution adversely affecting regional supplies, (b) adverse air pollution impacts, (c) traffic congestion, (d) significant impacts on protected species and habitat in the community, (e) diminished property values, and (f) increased risk of criminal violence.  In addition, Rev. Sylvester will personally suffer injury by the increased risk of gambling, alcohol, and other personal addictions in his community, the financial strain on local government budgets by increasing demand for social services, and job losses in existing Madera businesses.

11.    Defendant United States Department of the Interior (the "DOI") is an administrative agency of the United States.

12.    Defendant Kenneth Salazar is the Secretary of the DOI (the "Secretary"), and is sued in his official capacity.

13.     Defendant Bureau of Indian Affairs (the "BIA") is an administrative agency within the DOI and is charged with overseeing Indian Affairs.

14.     Defendant Kevin Washburn is Assistant Secretary of the DOI and administers the BIA, and is sued in his official capacity.

## OVERVIEW

15.     The acquisition of land in trust on behalf of a tribe, and its corresponding removal from state and local jurisdiction must be carried out in compliance with certain standards.  As an initial matter, the Secretary may acquire land in trust only for "a recognized Indian tribe…under Federal jurisdiction" as of June 18, 1934 – the date of enactment of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 465, 467, 479 (the "IRA").  Second, the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2701 *et seq*. (the "IGRA"), prohibits gambling on lands taken into trust for Indians after 1988, except under limited exceptions.  Indeed, the IGRA was intended to permit gambling only on *existing* reservation lands *unless* certain limited exceptions are applicable.  Under the exception relied upon by the Defendants in this case, the Secretary must find that the planned mega-casino will not be detrimental to the surrounding community. 25 U.S.C. § 2719(b)(1)(A).  Finally, under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. (the "NEPA"), agencies must take a "hard look" at the environmental consequences of a proposed trust acquisition.  Defendants have failed on every count.

16.     For good reason, Plaintiffs are greatly concerned about the 305.49 acre mega-casino because of the irreversible harm it will cause to their community and surrounding lands. This action seeks to rectify the DOI's unlawful decision to acquire the Casino Parcel, because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## BACKGROUND

### The Secretary's Approval Process

17.     Under federal law, a tribe seeking to have the federal government take land into trust for the tribe for the purpose of developing a casino must comply with legal requirements

imposed by the IRA and its implementing regulations at 25 C.F.R. Part 151, and those imposed by the IGRA and its implementing regulations at 25 C.F.R. Part 292.

18.     The IRA authorizes the Secretary to acquire and hold lands in trust for Indian tribes in the name of the United States.  Under the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379, 129 S. Ct. 1058 (2009), "Section 479 limits the definition of 'Indian,' and therefore limits the exercise of the Secretary's trust authority under § 465 [of the IRA] to those members of tribes that were **under federal jurisdiction** at the time the IRA was enacted [June 18, 1934]." *Id.* at 391(emphasis added).

19.     Under Section 20 of IGRA, 25 U.S.C. § 2719, gambling may not be conducted on lands acquired after October 17, 1988, *unless a specific exception applies*.  In this case, Defendants invoked the exception referred to as the "Secretarial Determination" or "two-part determination," under 25 U.S.C. § 2719(b)(1)(A).  Under that exception, the Secretary must determine, prior to taking the land into trust for the Indian tribe that:  (1) it will be in the "best interest" of the tribe to establish gambling on such land; and (2) establishment of gambling on such land **will not be detrimental to the surrounding community**.  *See* 25 U.S.C. § 2719(b)(1)(A); 25 C.F.R. §§ 292.2, 292.21(a), 292(c).  This exception has been only rarely invoked – prior to September 1, 2011, the exception had only been applied five times in more than 20 years since the IGRA was passed in 1988.

20.     The definition of "surrounding community" includes "nearby Indian tribes located within a 25-mile radius of the site of the proposed gaming establishment."  Otherwise, the regulations provide that a "nearby Indian tribe located beyond the 25-mile radius may petition for consultation if it can establish that its government functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." 25 C.F.R. § 292.2; *see also* 73 Fed. Reg. 29354-01 (May 20, 2008) (BIA explaining that beyond 25-mile radius to establish "surrounding community" is a rebuttable presumption).

21.     Section 20 of IGRA further requires that, in addition to the Secretary making a favorable two-part determination, the governor of the state in which the land is located must

"concur" with the Secretary's two-part determination.  *See* 25 U.S.C. § 2719(b)(1)(A).  In seeking the governor's concurrence, the regulations require that the Secretary provide the "entire application record" to the governor.  *See* 25 C.F.R. § 292.22(b).

22.     Because the Secretary's approval of trust acquisitions constitutes a "major federal action," the DOI must comply with NEPA.  Pursuant to NEPA, before the proposed site may be taken into trust, the DOI must complete an environmental study and issue findings.  In circumstances where the proposed federal action has the potential to significantly affect the quality of the human environment, the Secretary must prepare an environmental impact statement before approving the federal action.

**Brief History of Federal Recognition of the North Fork Tribe**

23.     The Tribe has its historical, archeological, geographical and cultural roots at the North Fork Rancheria, located in North Fork Center, Madera County.  The North Fork Center is almost 40 miles from the Casino Parcel, and the Tribe never had a recognized "reservation" in or near the vicinity of the Casino Parcel.

24.     Plaintiffs are informed and believe that the Tribe was not "a recognized Indian tribe under federal jurisdiction" as of the enactment of the IRA on June 18, 1934.  The DOI's correspondence with members of the United States Senate on December 15, 2010, demonstrates that the Tribe was federally recognized *after* 1934.  Indeed, by 1935, it appears that there were only six individuals claiming ties to the Tribe.  Four of the six individuals apparently rejected the IRA at a special election held on June 10, 1935.  The North Fork Rancheria land could not support these individuals and many continued to intermarry and migrate away from the Rancheria for employment purposes.

25.     In 1958, Congress enacted the California Rancheria Termination Act ("Termination Act"), P.L. 85-671 (72 Stat. 619), which called for the distribution of all 41 Rancheria lands and assets to individual tribe members, including the status and lands of the remaining individuals affiliated with the Tribe.  Pursuant to the Termination Act, the North Fork Rancheria was terminated on February 18, 1966.

26.     In 1979, California Legal Services filed a class action suit against the federal government in *Hardwick v. United States*, C-79-1910 SW (N.D. Cal. 1983) (unpublished).  On December 22, 1983, the court entered a Stipulated Judgment (the "Stipulation").  Pursuant to the Stipulation the "status of the named individual plaintiffs and other class members of the seventeen Rancherias … as Indians under the laws of the United States shall be restored and confirmed."  The BIA treated the Stipulation as "recognition" of each of the seventeen Rancherias represented in the *Hardwick* lawsuit, including the North Fork Tribe.  The tribal government of the North Fork Tribe was not a party to the Stipulation.

27.     As a result of the *Hardwick* litigation, the Tribe's original Rancheria lands were restored, which consist of 80 acres in the town of North Fork, located in eastern Madera County – 40 miles away from the Casino Parcel.  The Tribe is not seeking to build a casino on its historical Rancheria lands.  Instead, the Tribe has engaged in blatant "reservation shopping" with the assistance of its Las Vegas backer Station Casinos in finding a more lucrative location for the mega-casino.

28.     Nearly 20 years after the filing of the *Hardwick* lawsuit, in 1996, the Tribe officially adopted its Constitution to formally organize its tribal government and opened enrollment to descendants of the Tribe.

**North Fork Proposal to Acquire *Off-Reservation* Land for a Mega-Casino**

29.     Notwithstanding that the Tribe already has land held in trust at the North Fork Rancheria, on March 5, 2005, the Tribe submitted a request to the DOI to acquire the Casino Parcel for the purpose of establishing an *off-reservation* mega-casino.

30.     The Casino Parcel is located on Avenue 18 and Road 23 adjacent to the City limits of the City of Madera in southwest Madera County, approximately 21 miles north of Fresno, California and adjacent to State Route 99, the main north-south transportation artery in California's Central Valley.

31.     The Tribe seeks to develop its mega-casino on 305.49 acres of *off-reservation* land in Madera County.  The Casino Parcel is currently privately-owned by the Tribe's Las

Vegas-based financial partner, Station Casinos.  The site includes flat agricultural land, with dry land crops, vineyards, and orchards.  A historic alignment of Schmidt Creek transects the property from the southeast corner of the site diagonally to the northwest.  The Casino Parcel also contains seasonal wetland depressions.

32.     The Tribe and Station Casinos propose to construct and operate a mega-casino on the Casino Parcel consisting of, among other things:

     a.   a class III gambling facility, with a main gambling hall, with a casino floor of approximately 68,150 square feet that would include up to 2,500 Las Vegas-style slot machines, table games, and bingo, and retail space, banquet/meeting space, and administrative space;

     b.   food and beverage services, that would consist of fifteen food and beverage facilities, including a buffet, six bars, three restaurants, and a five-tenant food court;

     c.   a multi-story hotel with 200 rooms, a pool area and a spa; and

     d.   approximately 4,500 spaces for parking, including a multi-level parking structure.

33.     Upon information and belief, through September 30, 2012, Station Casinos has advanced approximately **$18.0 million** towards development of the mega-casino at the Casino Parcel.  Station Casinos has also entered into a management agreement with the Tribe.  Under this agreement, Station Casinos will receive 24% of the mega-casino's net income.

**Review of North Fork Tribe's Proposal**

34.     On October 27, 2004, the DOI commenced the required NEPA process by publishing a *Notice of Intent to Prepare an Environmental Impact Statement* in the Federal Register.

35.     The DOI initially issued a Draft Environmental Impact Statement in February 2008 and later issued a Final Environmental Impact Statement in February 2009 (collectively, the "FEIS").  The FEIS identified a number of potentially significant environmental impacts that

the proposed development and operation of the mega-casino complex could cause.

36.     To address potentially significant impacts on governmental services (fire protection, law enforcement, schools), the FEIS states that the Tribe has agreed, pursuant to memoranda of understanding with the City of Madera and Madera County, to provide certain funding to the local jurisdictions.  This funding, however, will not fully cover the anticipated cost of the governmental services.  For example, the total capital costs for fire protection demanded by the mega-casino would be between $2.7 and $3.5 million.  However, pursuant to a memorandum of understanding ("MOU") with Madera County, the Tribe has agreed to provide less than $2 million for constructing and equipping a fire station.  Although the FEIS recommends that the Tribe provide additional funding, there is no assurance that such funding will cover the shortfall or fully mitigate the impacts on governmental services.

37.     The Council on Environmental Quality's Regulations implementing NEPA, 40 C.F.R. Part 1500, requires the federal agency responsible for the action to oversee the NEPA process and to assume responsibility for the document. 40 C.F.R. § 1506.5.  For an EIS, an agency often hires a third party contractor, and charges the applicant for the cost.  The contractor must be selected by the federal action agency after the consideration of candidates and must assert that it is objective and has no interest in the outcome of the project.  For this task, the DOI selected Analytical Environmental Services ("AES") at the recommendation of the Tribe.

38.     Numerous individuals and organizations, including the Plaintiffs, expressed opposition to the Tribe's proposed acquisition of the Casino Parcel and mega-casino complex. These individuals and organizations have highlighted, among other things, that the Tribe's proposed development of the mega-casino:

> a.  fails to consider the Madera, Fresno, and Mariposa County traffic, roadways, water availability, airport and zoning concerns, and air quality;
>
> b.  infringes upon the tribal sovereignty of other indigenous people, including the North Valley Yokuts and the Picayune Rancheria of the Chukchansi Indians;
>
> c.  ignores the societal impact the mega-casino gambling will have on the

surrounding community, including crime, traditional families and social

services;

d.   overlooks unfair competition for local businesses and disruption of law

enforcement services caused by jurisdictional complexities; and

e.   exaggerates the regional economic benefits.

39.     According to a 2011 survey of Madera County voters, more than two-thirds

oppose the North Fork Tribe's mega-casino.  Similarly, the vast majority of Californians oppose

*off-reservation* gaming.  Another 2011 survey of California voters found that 72 percent of

California voters continue to oppose *off-reservation* casinos and say tribes should not be allowed

to build away from their historic tribal lands - which is exactly what the North Fork Tribe seeks

to do here.

40.     The Picayune Rancheria of the Chukchansi Indians ("Picayune Rancheria")

conducts a legal tribal gaming operation on its historical and traditional lands which are

approximately 39 miles from the Casino Parcel.  Unlike the North Fork Tribe, the Picayune

Rancheria did not request the DOI to take additional land into trust so that the Picayune

Rancheria's tribal gaming operations could be better situated in a more lucrative location.

Unlike North Fork, the Picayune Rancheria did not engage in "reservation shopping" and chose

to undertake its tribal gaming operation on its historical and traditional lands.

41.     As a result of the proposed mega-casino, the Picayune Rancheria projects that it

will suffer lost revenues at the Chukchansi Gold Resort and Casino which, in turn, will result in:

(i) the loss of 500 jobs currently held by members of the Picayune Rancheria; (ii) the inability of

the Picayune Rancheria to make per capita payments to its citizens; (iii) the reduction and/or

elimination of a number of existing government programs funded by the tribe for its citizens; and

(iv) decrease in financial support for community initiatives and neighborhood programs.  Even

though the Picayune Rancheria petitioned for consultation, the Secretary concluded that

Picayune Rancheria's concerns "must be accorded less weight."  *See* 25 C.F.R. § 292.2.

**Subsequent Approvals**

42.     Despite the significant public opposition, on September 1, 2011, the BIA issued a Record of Decision ("ROD") which memorialized the Secretarial Determination for the Casino Parcel ("Secretarial Determination ROD") and unjustifiably announced that "[t]he proposed Resort would not be detrimental to the surrounding community, or the Picayune Reservation." The Secretarial Determination ROD specifically stated that "[a] determination whether to acquire the 305.49-acre Casino Parcel in trust pursuant to 25 U.S.C. § 465 of the Indian Reorganization Act and its implementing regulations at 25 C.F.R. Part 151 will be made at a later date."

43.     On the same day, by letter dated September 1, 2011,  Larry Echo Hawk, then Assistant Secretary for Indian Affairs, informed California Governor Jerry Brown ("Governor Concurrence Request") that he had made a favorable "two-part determination," on behalf of the Secretary pursuant to authority delegated to him, as required by IGRA.  Assistant Secretary Echo Hawk requested that Governor Brown approve, by his concurrence, the siting and development of the proposed mega-casino complex at the Casino Parcel.  Assistant Secretary Echo Hawk's 2011 letter included findings purportedly supporting the two-part determination.  Like the FEIS, these findings only identified *some* of potentially significant environmental impacts that could result from the development of the Tribe's mega-casino and/or discounted such detrimental impact.

44.     On August 31, 2012, Governor Jerry Brown concurred with the DOI determination.  When Governor Brown issued his concurrence with the DOI decision, he also announced that he had already negotiated a class III tribal-gaming compact with the Tribe, which he will submit to the California Legislature for ratification.  This compact will permit the Tribe, with the assistance of Station Casinos, to conduct Las Vegas-style gambling at its mega-casino located on the Casino Parcel.  On November 30, 2012, the Picayune Rancheria filed a petition for a writ of mandate in the California Superior Court, County of Sacramento (Case No. 2012-80001326) to set aside Governor Brown's concurrence.  The Picayune Rancheria claims that the Governor failed to comply with the California Environmental Quality Act.

45.     On November 26, 2012, the BIA completed a ROD which memorialized the decision by the Secretary to approve the "fee-to-trust" ("FTT") application by the Tribe requesting that the Secretary acquire the Casino Parcel ("FTT ROD").  The BIA did not make the FTT ROD publicly available on its website or distribute the FTT ROD to the surrounding community or stakeholders.  Plaintiffs were required to repeatedly contact the BIA in order to obtain a copy of the FTT ROD, and were not able to obtain the FTT ROD until December 11, 2012.

46.     On December 3, 2012, the DOI published notice in the Federal Register of its acceptance of the Casino Parcel into trust.  According to the notice, on November 26, 2012, the BIA decided to accept the Casino Parcel in trust for the Tribe under the purported authority of the IRA.  This decision is a final agency action pursuant to 25 C.F.R. § 2.6 and 5 U.S.C. § 704.

47.     Pursuant to 25 C.F.R. Part 151, the Secretary may accept the Casino Parcel in trust for the Tribe on January 3, 2013.  Upon the fee to trust transfer, Station Casinos and the Tribe may immediately begin construction of the mega-casino complex and thereafter commence full blown Las Vegas-style gambling.

**Review of the Tribe's Status Under Carcieri**

48.     The IRA authorizes the Secretary to acquire land and hold it in trust "for the purpose of providing land for Indians."  48 Stat. 985, 25 U.S.C. § 465.  The IRA defines the term "Indian" to "include all persons of Indian descent who are members of *any recognized Indian tribe now under Federal jurisdiction*."  25 U.S.C. § 479 (emphasis added).

49.     In 2009, the Supreme Court held that the term "now," as it is used in 25 U.S.C. § 479, unambiguously refers to the date when the IRA was first enacted – June 18, 1934. *Carcieri v. Salazar*, 555 U.S. 379 (2009).  The *Carcieri* decision thus clarifies that the Secretary's authority is limited to acquiring land in trust only for federally recognized tribes that were under federal jurisdiction as of June 18, 1934.

50.     In the Secretarial Determination ROD the Secretary did not make specific findings as to whether the Tribe was under federal jurisdiction in 1934.  Although 25 C.F.R.

§ 292.22(b) requires "a copy of the *entire* application record" to be sent to the Governor, the Governor Concurrence Request did not include the FTT ROD, and summarily stated that the Tribe has been under federal jurisdiction since 1915 without providing *any* specific findings pursuant to the IRA.

51.     In the FTT ROD completed as of November 26, 2012, the Secretary failed to assemble and develop a full record on its conclusory assertion that the Tribe was under federal jurisdiction in 1934.  To the contrary, the FTT ROD alleged that, even though "a majority of the adult Indians residing at the Tribe's Reservation voted to *reject* the IRA at a special election duly held by the Secretary on June 10, *1935*," the mere calling of an election with six participants (a year after the IRA) "conclusively establishes that the Tribe was under Federal jurisdiction for *Carcieri* purposes."  (emphasis added.)

52.     Among other things, the Secretary failed to consider and address evidence showing:  (1) the Tribe was not recognized in 1934 at the time of the enactment of the IRA, and was only recognized after 1934; (2) pursuant to the Termination Act of 1958, the North Fork Rancheria was terminated in the 1960s; (3) the BIA re-recognized the Tribe after the Stipulation entered on December 22, 1983, although the tribal government was not a party to the Stipulation; and (4) the Tribe did not formally organize its government until 1996 when it officially adopted its constitution.  Moreover, the Secretary ignored the DOI's own letter of December 15, 2010, advising the United States Senate that the North Fork Tribe had been recognized *after* 1934.

## FIRST CLAIM FOR RELIEF

**DOI's Lack of Authority Under the Indian Reorganization Act of 1934 and the Violation of the Administrative Procedures Act**

53.     The paragraphs set forth above are realleged and incorporated herein by reference.

54.     Under the IRA, the DOI has power to take land into trust and proclaim reservations only for Indian tribes that were federally recognized and under federal jurisdiction as of June 18, 1934, when the IRA was enacted.  25 U.S.C. §§ 465, 467, and 479; *Carcieri v. Salazar*, 555 U.S. 379 (2009).

55.     Plaintiffs are informed and believe that the North Fork Tribe was not federally recognized and was not under federal jurisdiction as of June 18, 1934.  The Secretary therefore has no authority under 25 U.S.C. § 465 to acquire land in trust on behalf of the Tribe.

56.     In the FTT ROD issued on November 26, 2012, the Defendants summarily referenced the applicability of *Carcieri* to the Tribe's application, and opined that the Secretary is authorized to acquire land in trust for the Tribe under 25 U.S.C. § 465.  The Defendants based that determination on only one circumstance – that in 1935 four out of the six individuals claiming ties to the Tribe voted to reject the IRA.

57.     The sole "fact" relied upon by Defendants in making this determination does not support a finding that the Tribe was a recognized Tribe under federal jurisdiction as of June 18, 1934.  Moreover, Defendants failed to consider and address other evidence inconsistent with their determination.  Accordingly, Defendants' determination that the Secretary is authorized to acquire land in trust for the Tribe under 25 U.S.C. § 465 was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority.

## SECOND CLAIM FOR RELIEF

### DOI's Violation of the Administrative Procedures Act

58.     The paragraphs set forth above are realleged and incorporated herein by reference.

59.     The Secretary failed to provide the Governor of California with the FTT ROD and thereby failed to provide the Governor with the "entire application record" in its September 1, 2011, Governor Concurrence Request, as required under 25 C.F.R. § 292.22(b).

60.     The Secretary also unlawfully published the notice in the Federal Register of its acceptance of the Casino Parcel into trust on December 3, 2012, without properly making the FTT ROD available to interested parties.

61.     The Secretary further improperly applied a "diminished weight" standard in evaluating the concerns of the Picayune Rancheria, contrary to 25 C.F.R. §§ 292.2, 292.21.  *See* Secretarial Determination ROD, at 85-86.

62.     Defendants' failure to comply with the requirements of the Administrative

Procedures Act and the regulations governing the fee-to-trust transfer constitute a failure to observe procedures required by law, and require that Defendants' actions be held unlawful and set aside under 5 U.S.C. § 706.

**THIRD CLAIM FOR RELIEF**

**DOI's Violations of the Indian Gaming Regulatory Act
and the Administrative Procedures Act**

63.     The paragraphs set forth above are realleged and incorporated herein by reference.

64.     Section 20 of IGRA prohibits gambling on land taken into trust after October 17, 1988, 25 U.S.C. § 2719(a), subject to certain limited exceptions.  In this case, the Secretary relied upon the so-called "Secretarial Determination" or "two-part test" exception under 25 U.S.C. § 2719(b)(1)(A).  Under that section, the gambling prohibition applicable to post-1988 land acquisitions does not apply when "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community…."
25 U.S.C. § 2719(b)(1)(A).

65.     In the determination under Section 2719(b)(1)(A), Defendants failed to consider and address various detrimental impacts the 305.49 acre mega-casino would have on the surrounding community.

66.     In both of the RODs, Defendants relied on only three factors in determining that the proposed mega-casino would not be detrimental to the surrounding community:  (a) the casino will pose no significant cost increases to local governments; (b) the FEIS concluded the casino will not have any significant environmental impacts, after mitigation; and (c) the casino will not disrupt local land use.

67.     In conducting their evaluation, Defendants overlooked the obvious – a mega-casino boasting a 68,150 square foot gambling hall, 200-room hotel, and 4,500 parking spaces located adjacent to the City of Madera and adjacent to the main arterial highway in California's

Central Valley will clearly have detrimental impacts on the surrounding community.

68.      Many members of the community, including Plaintiffs, presented Defendants with significant and considerable comments identifying such detrimental impacts that were not considered by Defendants, including, without limitation, the following:  (a) environmental and economic impacts on Fresno, Mariposa, Merced and Madera counties; (b) infringement upon the tribal sovereignty of other indigenous people, including the North Valley Yokuts and the Picayune Rancheria; (c) the impact gambling addicts have on their families, employers, and community social services; (d) impacts on water supply and water wells on adjacent farms and homes; (e) increase in crime and prostitution; and (f) the destructive and ruinous impacts upon families caused by gambling.

69.      Defendants also failed to properly consider the detrimental impact of the proposed mega-casino on the nearby Chukchansi Gold Resort & Casino owned and operated by the Picayune Rancheria.

70.      Defendants' determination was thereby arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and issued in a manner not in accordance with law.  5 U.S.C. § 706 (2).

## FOURTH CLAIM FOR RELIEF

### DOI's Violations of National Environmental Policy Act and the Administrative Procedures Act

71.      The paragraphs set forth above are realleged and incorporated herein by reference.

72.      Overall, DOI violated NEPA by issuing RODs and FEIS that set forth conclusions without obtaining, considering and evaluating sufficient data.  The EIS included a statement of purpose and need that was impermissibly broad and failed to identify or evaluate numerous alternative sites and projects besides development of the Casino Parcel as proposed.  In addition, the RODs and the FEIS did not adequately consider require project mitigation.  Due to the passage of time and changed circumstances, DOI was required to prepare and circulate a Supplemental EIS, which it did not do.  Moreover, there were a number of serious procedural

defects during the review process, including procedural irregularities associated with public participation and the statutory consultation process and procedural irregularities associated with DOI's contractor.

**A.      *"Hard Look" at Environmental and Socio-Economic Impacts***

73.     DOI failed to take a "hard look" at the environmental impacts of proposed major actions raised by Plaintiffs as required by 40 C.F.R. § 1502.  Taking a "hard look" "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Massachusetts v. United States*, 522 F. 3d 115, 119 (1st Cir. 2005); *Baltimore Gas & Electric Company. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983) (citation and internal quotation marks omitted).  In addition, a federal agency's "hard look" does not permit the NEPA process to become "a subterfuge designed to rationalize a decision already made."  *Metcalf v. Daley*, 214 F. 3d 1135, 1142 (9th Cir. 2000).

**1.      *Environmental Impact***

74.     Defendants ignored or failed to adequately consider or mitigate the environmental impacts of the proposed North Fork Casino on the surrounding community, including the socioeconomic impact, such as the impacts associated with crime and problem gambling, and the impacts on public and social services, such as wastewater service, fire and emergency medical services, law enforcement, housing, roads and transportation resources, schools, and other public and social services.

75.     The regulatory and cumulative impacts of removing significant acreage from the sovereign control of state and local governments were not adequately addressed by Defendants.

76.     Defendants' proposed inadequate mitigation failed to take a "hard look" at the environmental impact of the proposed mega-casino development.  42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1508.8.  The RODs and the FEIS minimize how the proposed mega-casino development will negatively impact water resources, protected species and associated critical habitat and air quality and land resources, including:

            a.   the potential impact of relying on regional groundwater to supply drinking and

other water to the Casino Parcel which, in turn, is projected to exacerbate a

regional groundwater overdraft;

b.   loss of habitat for the Swainson's Hawk and nesting patterns of migratory

birds, the Western Burrowing Owls and Roosting Bats, and the aquatic habitat

in Dry Creek and Schmidt Creek;

c.   greenhouse gas emissions from the proposed mega-casino development; and

d.   the impact from traffic, flooding, the impact on visual resources, the impact

on airport safety, and the potential impact to agricultural resources.

### 2.   *Local Communities*

77.   Defendants also failed to provide support for the RODs' conclusion that

transferring the Casino Parcel into trust is necessary to satisfy the Tribe's goal of self-

determination and other similar needs.  Defendants also failed to fully consider or adequately

assess the impact that this determination will have on local communities, as required by

25 C.F.R. § 151.10(e) and NEPA, and proposed inadequate mitigation for these impacts.

78.   Defendants failed to adequately consider alternatives to taking the Casino Parcel

into trust for gambling purposes, as required by 40 C.F.R. § 1502.14.  Defendants were required

to "[r]igorously explore and objectively evaluate all reasonable alternatives …."  *Id*.  Yet the

Defendants failed to adequately consider even whether the Tribe could develop gambling on the

land it already possesses.

### B.   *"Hard Look" at Human Impact on the Picayune Rancheria*

79.   Defendants failed to conduct a fair, unbiased and complete analysis of the human

impacts that will be caused by transferring the Casino Parcel into trust for gambling purposes, as

required by NEPA.  In particular, Defendants failed to adequately consider the detrimental

economic impacts on tribal governmental operations and member services that the mega-casino

development will have on the Picayune Rancheria, including loss of jobs, inability to make per

capita payments to its citizens, reduction and/or elimination of existing government programs,

elimination of community initiative and contributions to local organizations.

80. Despite this evidence of detriment to the Picayune Rancheria, the Secretary concluded that "competition from the [North Fork] Tribe's proposed gaming facility in an overlapping gaming market is not sufficient, in and of itself, to conclude that it would result in a detrimental impact to Picayune." The RODs essentially ignore the concerns raised by the Picayune Rancheria.

81. DOI's decision to acquire the Casino Parcel and proclaim it the Tribe's reservation available for gambling on the basis of the FEIS is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under the IRA, and issued in a manner not in accordance with law. 5 U.S.C. § 706 (2).

## C.   *Procedural Defects*

82. Defendants failed to comply with 40 C.F.R. § 1506.5 and 1506.6 in conducting public hearings, in conducting the public participation and public hearing process, and in reviewing and approving the FEIS and RODs, in violation of the APA. 5 U.S.C. §§ 702, 704, 706.

83. The DOI failed to ensure complete and proper public participation, including by failing to properly consult under 25 C.F.R. Part 292, properly consider comments of and allow for adequate participation by the general public, by denying access and time to certain participants at the expense of other participants, and by denying requests to extend or reopen the comment period and the public hearing process.

84. The BIA hired AES to prepare the DEIS and the FEIS. At the time AES prepared the DEIS and the FEIS, AES was working with and as a part of tribal consortiums and casino interests. The DEIS and FEIS were not prepared by independent regulators but instead were prepared by consultants representing casino interests. The BIA failed to "furnish guidance and participate in the preparation and independently evaluate the [FEIS] prior to its approval," in violation of 40 C.F.R. § 1506. 40 C.F.R. § 1506.5(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following

relief:

        A.      That the Court declare that the Secretary's decision to accept the Casino Parcel in trust for the North Fork Tribe was in excess of his authority under the IRA and implementing regulations, and order the Secretary to set aside his decision approving the trust acquisition, or alternatively, remand the decision to the Secretary for further consideration;

        B.      That the Court declare that the Casino Parcel does not qualify under the Secretarial Determination exception under 25 U.S.C. § 2719(b)(1)(A), and enjoin the Secretary from accepting the Casino Parcel into trust to be used for gambling purposes;

        C.      That the Court declare that the Secretary's determination under 25 U.S.C. § 2719(b)(1)(A) was arbitrary, capricious, and an abuse of discretion, and issued in a manner not in accordance with law, and thereby set aside and vacate such determination;

        D.      That the Court declare that the DOI acted in an arbitrary and capricious manner by certifying the FEIS for the mega-casino because the final FEIS is legally inadequate under NEPA and the APA, and require the Secretary to comply with NEPA by preparing a new or supplemental FEIS consistent with NEPA's requirements;

        E.      That the Court issue injunctive relief and any other orders necessary to postpone the effective date of the transfer and to preserve the Parties' status and rights pending conclusion of the review proceedings, and enjoining a formalized acceptance of the transfer under 25 C.F.R. § 151.14, and ordering that no official of the United States take the Casino Parcel into trust for the North Fork Tribe until final judgment has been entered and all appeals exhausted;

        F.      That this Court enter judgment and an order awarding Plaintiffs' costs and reasonable attorney's fees; and

        G.      That the Court award such other relief as it deems proper to effectuate the purposes of this action.

Dated: December 19, 2012          By:   /s/ Benjamin S. Sharp
                                         PERKINS COIE, LLP
                                         Benjamin S. Sharp (D.C. 211623)
                                         Elisabeth C. Frost (D.C. 1007632)
                                         Perkins Coie LLP
                                         700 Thirteenth Street, N.W.
                                         Suite 600
                                         Washington, D.C.  20005-3960
                                         Telephone:   202.654.6200
                                         Facsimile:    202.654.6211
                                         BSharp@perkinscoie.com
                                         EFrost@perkinscoie.com

                                         Heidi McNeil Staudenmaier
                                         SNELL & WILMER, LLP
                                         One Arizona Center
                                         400 East Van Buren Street
                                         Suite 1900
                                         Phoenix, Arizona 85004-2202
                                         Telephone:  602.382.6366
                                         Facsimile:  602.382.6070
                                         HStaudenmaier@swlaw.com


                                       *Attorneys for Plaintiffs Stand Up or*
                                       *California!, Randall Brannon, Madera*
                                       *Ministerial Association, Susan Stjerne,*
                                       *First Assembly of God – Madera, and*
                                       *Dennis Sylvester*