IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STAND UP FOR CALIFORNIA!, et al.,** | Civil Action No. 1:12-cv-02039-BAH |
| Plaintiffs, | Honorable Beryl A. Howell |
| v. | |
| **UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,** | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION[1]

### I.
### INTRODUCTION

This action challenges the decision of the Secretary of the Interior (the "Secretary" or "DOI") to take certain land into trust on behalf of the North Fork Rancheria of Mono Indians ("North Fork Tribe" or the "Tribe") for a mega-casino. The decision is highly controversial and widely opposed, because it facilitates a practice commonly known as "reservation shopping," which involves developing a casino off existing tribal lands with the financial participation of private interests.

The Tribe already has at least <u>two</u> plots of land where it could develop a casino: (1) an 80-acre tract of Rancheria land; and (2) a 61.5-acre parcel held in trust by the United States. Yet, instead of developing a casino on its existing tribal land – or even seeking a new site close by – the Tribe and its financial partner, Las Vegas-based Station Casinos LLC ("Station Casinos"), have persuaded the Secretary to transfer into trust for the Tribe a 305.49-acre parcel ("Casino Parcel") that is located almost 40 miles away from those lands, and in the heart of an existing urban and suburban area. This parcel borders the City of Madera, and is on State Route 99 – the

---

[1] Exhibits to this motion are sequentially numbered and attached to the concurrently filed Appendix of Evidence.

main north/south arterial highway in California's Central Valley. While the Tribe and Station Casinos "reservation shopped" for the location that would garner their mega-casino maximum commercial advantage, their hand-picked site will have serious detrimental impacts on the surrounding community.

On December 3, 2012, the Secretary published in the Federal Register notice of his intention to transfer the Casino Parcel into trust on January 3, 2013. Defendants agreed to voluntarily stay the transfer only until February 1, 2013, to provide time for this motion to be heard and decided.

Plaintiffs now move this Court for a preliminary injunction enjoining the transfer pending resolution on the merits of this action. This motion should be granted for at least the following reasons:

1. The Secretary lacks authority under the Indian Reorganization Act, 25 U.S.C. §461 *et seq.* (the "IRA"), to take the land into trust for the Tribe, because the Tribe is not a "recognized Indian tribe now under Federal jurisdiction" within the meaning of the IRA. 25 U.S.C. §§ 465, 479; *Carcieri v. Salazar*, 555 U.S. 379 (2009). The Secretary erroneously determined in his Record of Decision that he had such authority, but he based his decision on a single "fact" that does not establish the necessary finding, and he failed to consider and address several other facts that support the opposite conclusion.

2. The Secretary arbitrarily and capriciously found that the proposed mega-casino will not have detrimental impacts on the surrounding community. To accept the Casino Parcel into trust for purposes of developing the mega-casino, the Secretary was required under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), to find that the mega-casino will not have a detrimental impact on the surrounding community. 25 U.S.C. § 2719(b)(1)(A). In making his finding, the Secretary relied on just three factors, and failed to consider and address evidence presented by plaintiffs and others of detrimental impacts that will result from the proposed mega-casino.

3. The Secretary failed to follow the procedures required under the DOI's *own* regulations, by failing to send the Governor of California a copy of the "entire application record" when requesting the Governor's concurrence in his decision. How does the Secretary request the Governor's concurrence, 25 C.F.R. § 292.22(b). Specifically, the Secretary failed to send the Governor a copy of the Secretary's Record of Decision for the fee-to-trust transfer, which included the Secretary's determination under the IRA.

4. Plaintiffs will suffer irreparable harm if the Court does not enjoin the transfer pending the resolution of this action. In the absence of an injunction, on February 1, 2013, the Secretary will transfer the Casino Parcel into trust, divesting state and local government of any jurisdiction over the parcel, and enabling the Tribe to immediately assert full jurisdiction over the property with no regard for local residents or state/local regulations or requirements. Indeed, the defendants are now refusing to abide by their own long standing policy of staying the transfer during judicial review. Should this Court later determine on the merits that the Secretary's decision must be set aside, the Secretary may not be able to "unwind" the transfer. Additionally, given the Tribe's likely assertion of sovereign immunity, this Court may lack jurisdiction to enjoin the Tribe from its activities on the Casino Parcel during the pendency of the case and to order relief necessary to unwind the transfer upon the conclusion of this action. In contrast, the defendants will suffer little, <u>if any</u>, harm by staying the transfer during judicial review.

A preliminary injunction would simply preserve the status quo of the Casino Parcel until there is proper judicial review of the administrative record of this case. Accordingly, plaintiffs respectfully request that the Court enjoin the transfer pending a resolution of this action on the merits.

## II.

## STATEMENT OF FACTS

On December 3, 2012, the Secretary of the Interior published notice in the Federal Register of his intent to transfer real property into federal trust for the benefit of a group of individuals known as the North Fork Rancheria of Mono Indians. [*See* 77 Fed. Reg. 71,611

(Dec. 3, 2012), *available at* Request for Judicial Notice ("RFJN"), Exhibit ("Ex.") 7, p. 167.] According to the notice, the Secretary intended to take the action 30 days after the notice – i.e., by January 2, 2013. DOI has agreed to stay the transfer only until February 1, 2013, to provide time in which a motion for preliminary injunction can be heard, and thereby avoid the necessity of an application and proceeding on a temporary restraining order. [*See* Declaration of Heidi McNeil Staudenmaier ("Staudenmaier Decl."), ¶¶ 5-6, Ex. 11, pp. 200-205.]

A.   **The Casino Parcel**

The Casino Parcel is 305.49 acres located on the border of the City of Madera, in California's Central Valley. [Declaration of Randall Brannon ("Brannon Decl."), ¶ 22, Ex. 13, p. 212.] The property is located adjacent to State Route 99, which is the main north/south arterial highway running through California's Central Valley connecting the cities of Bakersfield, Fresno and Modesto, and is situated just north of the Madera city limits. [Brannon Decl., ¶ 22, Ex. 13, p. 212.] As shown below, the Casino Parcel is about 4 miles from the city center, and close in proximity to residential neighborhoods.



[*See* Brannon Decl. ¶ 22, Ex. 13, p. 212.]

The Tribe intends to develop, construct and operate a large class III gaming casino-resort. [Declaration of Cheryl Schmit ("Schmit Decl."), ¶ 11, Ex. 19 (September 1, 2011, Record of Decision ("IGRA ROD"), p. 287).] The mega-casino will include, among other aspects, an 83,065 square-foot main gambling hall, a 200-room hotel, and 4,500 parking spaces. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), p. 287); Schmit Decl., ¶ 12, Ex. 20 (November 26, 2012, Record of Decision ("IRA ROD"), p. 341).]

The Tribe and its partner Station Casinos strategically chose the location based not on any historical connection the Tribe has to the land, but rather for the site's proximity to a large base of potential gambling patrons in a rapidly expanding community, and the attendant ability to maximize revenues.[2] Indeed, substantial evidence exists that the North Fork Tribe <u>never</u> occupied this site, but rather that the Valley Yokuts and the Mountain Miwoks occupied the region. [*See* Brannon Decl. ¶ 26, Ex. 17, pp. 223-275.] Station Casinos purchased and currently owns the Casino Parcel through its subsidiary, SC Madera Development, LLC. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), p. 339); Schmit Decl., ¶ 15, Ex. 23 (September 1, 2011, letter from Larry Echo Hawk to Governor Jerry Brown ("Governor Concurrence Request"), pp. 470-472.] As soon as the Secretary formalizes the land-into-trust procedures, the Tribe anticipates that Station Casinos will simultaneously transfer the land to the Secretary to hold in trust for the Tribe. [Schmit Decl., ¶ 19(h), Ex. 34, p. 837.]

---

[2] Through September 30, 2012, Station Casinos has advanced approximately $18 million towards development of the mega-casino at the Casino Parcel. [Schmit Decl., ¶ 17, Ex. 25 (Station Casinos 10-Q), p. 548.] Station Casinos has also entered into a management agreement with the Tribe. Under this agreement, Station Casinos will receive 24% of the Casino's net income. [Schmit Decl., ¶ 17, Ex. 25 (Station Casinos 10-Q), p. 549.]

The Casino Parcel is nearly 40 miles (more than 41 miles by road) from the Tribe's existing historical lands near the town of North Fork. [Schmit Decl., ¶ 15, Ex. 23 (Governor Concurrence Request), p. 471.]



[*See* Brannon Decl. ¶ 23, Ex. 14, p. 214.]

The siting of this mega-casino so far from the Tribe's existing lands, coupled with its fusing into an urban/suburban community, make this case a particularly egregious example of "reservation shopping." Indeed, considering the casino will have 4,500 parking spaces, 2,500 slot machines and only a 200-room hotel, the facility is obviously designed to attract local gamblers.[3] [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), p. 287.]

---

[3] In addition to the 4,500 parking spaces, the Tribe (or Station Casinos) apparently will also be funding an extension of the City of Madera's bus system to the casino. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD 79), p. 364.]

B.   <u>The Tribe</u>

The North Fork Tribe was once on the brink of extinction. It now claims to be one of the largest "restored" tribes. [*H.R. 4893 to Amend Section 20 of the Indian Gaming Regulatory Act to Restrict Off-Reservation Gaming*, 109th Cong. 109-46 (April 4, 2006) (statement of Jacquie David-Van Huss, Tribal Secretary, North Fork Rancheria of Mono Indians of California) ("North Fork Congressional Statement"), *available at* RFJN, Ex. 1, p. 28-29.] Historically, the Mono Indians occupied the San Joaquin Valley and various tribal groups used and occupied overlapping territories in the region. [North Fork Congressional Statement, Ex. 1, p. 25.] The United States Army Corps Engineers estimate that the Mono Indians were historically located in the vicinity of Lake Mono, adjacent to the state of Nevada. As such, several other Tribes have long been in closer proximity to the proposed site. [*See* Brannon Decl. ¶ 26, Ex. 17, p. 241.]



CENTRAL CALIFORNIA ETHNOGRAPHIC MAP

[*Ibid.*]

The Mono Indians were not present at the 1851 Treaty signed at Camp Barbour and the Treaty of 1851 was never ratified by Congress. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), pp. 342-43.] Indeed, "Congress passed a separate statute which effectively extinguished Indian title to land through the State of California by 1853, leaving the ancestors of the [North Fork] Tribe, and all other California Indians, landless – without legal rights to their homelands and without formal reservation." [Schmit Decl., ¶ 11, Ex. 19, (IGRA ROD), pp. 342-43).]

The United States, though appropriation bills designed for "landless, homeless or penurious [] Indians," purchased the 80-acre North Fork Rancheria (not a "reservation") on May 17, 1914. [*See Williams v. Gover*, 490 F.3d 785, 787 (9th Cir. 2007); Schmit Decl. ¶ 12, Ex. 20 (IRA ROD), p. 437); Schmit Decl. ¶ 22, Ex. 51, p. 1071.] It appears that the number of individuals residing at the North Fork Rancheria dwindled to "four families" in 1927. [Schmit Decl. ¶ 19(b), Ex. 28, p. 710.] At one point in 1966, only a mother and her two sons occupied the North Fork Rancheria. [*See* Schmit Decl. ¶ 27, Ex. 30, p. 770.]

Then, on December 22, 1983, through a stipulation reached in *Hardwick v. United States*, C-79-1910 SW (N.D. Cal. 1983), the Tribe gained federal recognition. [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD ), 340; Schmit Decl. ¶ 19(f), Ex. 32 (Stipulation), pp. 797-809.] The North Fork Tribe was only recently organized into a *Rancheria* with a tribal government in 1996, at the town of North Fork. [Schmit Decl. ¶ 19(h), Ex. 34 (the Tribe's fee-to-trust application), 837.] In 2000, the Tribe appears to have obtained funding from the United States Department of Housing and Urban Development to purchase a 61.5-acre parcel of land near its Rancheria (the "HUD Parcel"). [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD), pp. 289-290.] In 2002, the Secretary took the HUD Parcel into trust. Since 2002, there have been certain developments on the HUD Parcel, including nearly $2.5 million of HUD funding to develop nine single-family homes, a youth center and a community center. [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD), pp. 289-290.]

In 2006, the Tribe claimed to have 1,386 tribal citizens. [North Fork Congressional Statement, *available at* RFJN, Ex. 1, p. 29.] In 2009, the number of citizens appears to have

increased to 1,750. [Schmit Decl. ¶ 19(h), Ex. 34 (the Tribe's fee-to-trust application), p. 839.] Yet, in its motion to intervene, the Tribe claimed to have "roughly 1,900" citizens. [Docket 16, p. 2.] At least 38% of the Tribe's alleged population, however, lives more than 50 miles away from the Casino Parcel. [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD), p. 337.]

C. **The Application and Administrative Process**

On March 1, 2005, the Tribe submitted an application to the DOI and the Bureau of Indian Affairs ("BIA") to have the Casino Parcel taken into trust for purposes of conducting class III gaming at the property. [Schmit Decl. ¶ 19(h), Ex. 34 (the Tribe's fee-to-trust application), p. 831.]

On October 27, 2004 – before the Tribe even submitted its application – the Secretary published in the Federal Register a *Notice of Intent to Prepare an Environmental Impact Statement* under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD), p. 288.] The Secretary issued a Draft Environmental Impact Statement ("DEIS") in February, 2008, and later issued a Final Environmental Impact Statement ("FEIS") in February, 2009. [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD), p. 288.] The FEIS included only a conclusory discussion of alternative sites, and considered only one alternative site – the North Fork Rancheria. The FEIS did not consider the Old Mill site or any other properties in the vicinities of the North Fork Rancheria. [Schmit Decl. ¶ 21, Ex. 50 (Excerpts from the FEIS), pp. 971-1055.]

There has been significant public opposition to the proposed transfer into trust of the Casino Parcel. Citizens of surrounding communities and their elected representatives have specifically pointed out numerous concerns to the Secretary, including the following:

- Increased incidence of incarceration of problem gamblers, as well as financial, physical, and emotional problems resulting from divorce, domestic violence, child abuse, child neglect, drug and alcohol abuse, and school truancy, all stemming from problem gamblers, [Schmit Decl., ¶ 20(g), Ex. 42 (Comment Letters from Poythress 3/7/09, 6/24/11), p. 917, 921; Brannon Decl. ¶ 24, Ex. 15 (Comment

Letters from Brannon 10/18/ 007, 3/12/08), p. 216, 217; ¶ 25, Ex. 16 (Comment Letter from Madera Ministerial Alliance 2/11/10), p. 220];

- Increased regional traffic and air pollution that the mega-casino would have on the Counties of Madera, Fresno, Mariposa and Merced, [Schmit Decl., ¶ 20(c), Ex. 38 (Comment Letter from Wright 3/18), p. 906; ¶ 20(d), Ex. 39 (Comment Letter from Reid 5/9/08), p. 908; ¶ 20(f), Ex 42 (Comment Letter from Poythress 3/7/09), p. 917 ; ¶ 20(h), Ex. 43 ( Comment Letter from Souza 3/23), p. 924-25; ¶ 20(i), Ex. 44 (Comment Letter from Swearengin 3/23/09), p. 929; ¶ 20(n), Ex. 49, (Comment Letter from Galgiani), p. 947; Brannon Decl. ¶ 25, Ex. 16, (Comment Letter from: Madera Ministerial Alliance 2/11/10) p. 219];

- Local water shortages, [Schmit Decl., ¶ 20(h), Ex. 43 Comment Letter from Souza  3/23/09, p. 925; ¶ 20(k), Ex. 46, (Comment Letter from Madera County Farm Bureau 2/2/10),  p. 936;  Brannon Decl. ¶ 24, Ex. 15, (Comment Letter from: Brannon 3/12/08),  p. 216];

- Infringements upon the tribal sovereignty of the North Valley Yokut Indians, who have a closer ancestral and historical connection to the Casino Parcel than does the North Fork Tribe, [Schmit Decl., ¶ 20(f), Ex. 41(Comment Letter from Smith 10/31),  p. 914-15; ¶ 20(g), Ex. 42, (Comment Letter from Poythress 5/31/09], p 920; ¶ 20(m), Ex. 48, (Comment Letter from Feinstein), p. 944];

- Conflicts with zoning regulations and disruption of law enforcement services caused by jurisdictional complexities, [Schmit Decl., ¶ 14, Ex. 21 (Comment Letter from Schmit 9/7/08), p. 450];

- Detrimental socio-economic impacts to the Picayune Rancheria of the Chukchansi Indians ("Picayune Rancheria"), located less than 30 miles from the Casino Parcel [Schmit Decl., ¶ 20(g), Ex. 42 (Comment Letter from Poythress 5/31/09), p. 919; ¶ 20(h) 43 (Comment Letter from Souza 2/23/09), p. 924; ¶ 20(n), Ex. 49 (Comment Letter from Para 2/26/08), p. 947 ; Brannon Decl. ¶ 24, Ex. 16

(Comment Letter from Madera Ministerial Association 2/11/2010), p. 222]; *see also* 73 Fed. Reg. 29354-01 (May 20, 2008) available at RFJN, Ex. 6; and.

BIA held a public hearing for the proposed trust acquisition on March 12, 2008, at the Hatfield Mall, Madera County Fairgrounds. [Brannon Decl., ¶ 14.] The venue was woefully undersized, and the hearing did not allow for full public participation and was conducted with a bias toward the casino. [Brannon Decl., ¶¶ 14-18.] For example,

- The hearing venue could not accommodate all of the attendees, causing BIA to turn away hundreds of individuals who wanted to participate in the public proceeding. [Brannon Decl., ¶ 15.]
- Attempts were made to prevent opponents from bringing materials into the hearing in support of their testimony. [Brannon Decl., ¶¶ 17-18.]
- Supporters were provided with reserved seating, while many opponents were kept out of the hearing altogether. [Brannon Decl., ¶¶ 17-18.]
- Proponents were given a full opportunity to provide comments in support, while opponents were limited to three minutes or less. [Brannon Decl., ¶ 17.]

As a result of these irregularities, the significant interest in the proposed action (over 800 people attended or attempted to attend the public hearing) and the length of the FEIS (four volumes with over 1,000 pages), opponents of the development made several requests for BIA to extend the public comment period and hold additional public hearings. BIA denied all such requests. [Brannon Decl., ¶ 18.]

D. **The Secretary's Approvals and Record of Decisions**

Of critical importance, the Secretary has not provided to plaintiffs or certified to the Court an administrative record, which is necessary for APA review of the Secretary's decision. [Declaration of Heidi McNeil Staudenmaier ("Staudenmaier Decl."), ¶ 4.] On December 5, 2012, within two days after the Secretary's notice of his intent to transfer the Casino Parcel in trust for the Tribe, plaintiffs' counsel submitted a request under the Freedom of Information Act ("FOIA") to obtain all documents that would likely comprise the administrative record.

[Staudenmaier Decl., ¶ 3, Ex. 9, pp. 197-199.] As of the date of this motion, plaintiffs have not received documents responsive to the FOIA request. [Staudenmaier Decl., ¶ 3.] Nor have defendants advised when the administrative record will be provided. [Staudenmaier Decl., ¶ 3.]

### 1. BIA's Piecemeal Decision that the Acquisition Is Authorized Under Both IGRA and IRA

A tribe seeking land taken into trust for gambling purposes must comply with legal requirements imposed by both the IGRA and its implementing regulations at 25 C.F.R. Part 292, and the IRA and its implementing regulations at 25 C.F.R. Part 151. The BIA did not adhere to these legal requirements in this case.

The BIA ignored significant public opposition, and on September 1, 2011, the BIA issued the IGRA ROD, which memorialized the Secretary's determination that the acquisition complies with IGRA and its implementing regulations. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), pp. 281-282.] The Secretary contended in the IGRA ROD that "proposed Resort was in best interest of the Tribe and the proposed Resort would not be detrimental to the surrounding community, or the Picayune Reservation." [*Ibid.*] Prior to September 1, 2011, such a two-part determination had been made only five times in the more than 20 years since the IGRA was enacted. [Schmit Decl., ¶ 13.]

Further, the IGRA ROD *did not* contain any analysis of the Secretary's authority to transfer the land into trust for the Tribe under the IRA. The IGRA ROD specifically stated:

> A determination whether to acquire the 305.49-acre Casino Parcel in trust pursuant to 25 U.S.C. § 465 of the Indian Reorganization Act and its implementing regulations at 25 C.F.R. Part 151 will be made at a later date.

[*Ibid.*]

On the same day, by letter dated September 1, 2011, Larry Echo Hawk, then Assistant Secretary for Indian Affairs, informed California Governor Brown ("Governor Concurrence Request") that he had made a favorable "two-part determination" on behalf of the Secretary pursuant to authority delegated to him, as required by IGRA. [Schmit Decl., ¶ 15, Ex. 22, pp. 462-463.]

Assistant Secretary Echo Hawk requested that Governor Brown approve, by his concurrence, the siting and development of the proposed mega-casino at the Casino Parcel. [Schmit Decl., ¶ 15, Ex. 23 (Governor Concurrence Request), p. 517.] While Assistant Secretary Echo Hawk's 2011 Governor Concurrence Request included findings purportedly supporting this extraordinary two-part determination, it ***did not*** include the Secretary's determination regarding the IRA and its implementing regulations at 25 C.F.R. Part 151. [Schmit Decl., ¶ 15, Ex. 23 (Governor Concurrence Request), pp. 466-517.] The request also failed to include the Tribe's application. [*Ibid.*]

On August 31, 2012, Governor Brown concurred with the Secretary's determination. [Schmit Decl., ¶ 18, Ex. 26, p. 662.] When Governor Brown issued his concurrence, he also announced that he had already negotiated a class III tribal-gaming compact with the Tribe, which he intended to submit to the California Legislature for ratification.[4] [*Ibid.*]

More than 14 months *after* submitting the Governor Concurrence Request, on November 26, 2012, the BIA completed the IRA ROD, which memorialized the decision by the Secretary to approve the fee-to-trust application by the Tribe. The IRA ROD was not published on the BIA's website or distributed to the surrounding community or stakeholders. [Schmit Decl., ¶ 12.] Plaintiffs had to repeatedly contact the BIA to obtain a copy of the IRA ROD, and were not able to obtain the IRA ROD until December 11, 2012. [*Ibid.*]

### 2.     The Imminent Fee-to-Trust Transfer of the Casino Parcel

On December 3, 2012, the Secretary published notice in the Federal Register of acceptance of the Casino Parcel into trust. [*See* 77 Fed. Reg. 71,611 (Dec. 3, 2012).] According to the notice, on November 26, 2012, the BIA decided to accept the Casino Parcel in trust for the Tribe under the purported authority of the IRA. This decision is a final agency action pursuant to 25 C.F.R. § 2.6 and 5 U.S.C. § 704. Pursuant to 25 C.F.R. Part 151, the Secretary contends he is

---

[4] On November 30, 2012, the Picayune Rancheria filed a petition for a writ of mandate in the California Superior Court, County of Sacramento (Case No. 2012-80001326), to set aside Governor Brown's concurrence on the ground that the Governor failed to comply with the California Environmental Quality Act.

authorized to accept the Casino Parcel in trust for the Tribe on January 3, 2013. On December 19, 2012, plaintiffs requested that defendants agree to a "voluntary stay" pending the adjudication of this case. [Staudenmaier Decl., ¶¶ 5-6, Ex. 11, pp. 201-205.] In response, defendants noted that, while "[t]he Department has made the decision to self-stay in the face of legal challenges to a number of prior decisions to take land into trust on a case-to-case basis…the principal reason that the [Department of] Interior chose to self-stay in prior cases is no longer extant." [Staudenmaier Decl., ¶¶ 5-6, Ex. 11, pp. 205.]

The defendants cited the Supreme Court decision in *Match-E-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012), for a reversal of this long-standing policy and stated that the federal court "in a challenge to the Assistant Secretary's decision to take the land into trust *likely* would not lose jurisdiction to adjudicate the APA claims once the land is acquired into trust" (emphasis added). [Staudenmaier Decl., ¶¶ 5-6, Ex. 11, pp. 205.] The defendants, however, did *not* explain whether a trust decision can be rescinded or how the doctrine of sovereign immunity would apply to a legal dispute *after* the land is acquired into trust. [Staudenmaier Decl., ¶¶ 5-6, Ex. 11, pp. 205.]

Upon the fee-to-trust transfer, Station Casinos and the Tribe are free to begin construction – notwithstanding the resulting significant harm to the surrounding community. The defendants have agreed to stay the fee-to-trust transfer of the Casino Parcel only until February 1, 2013, yet provide no rationale why they would be damaged by following their regulation and staying until there is a final judicial resolution. [Staudenmaier Decl., ¶¶ 5-6, Ex. 10, p. 201.] Indeed, the Tribe has stated that it seeks to have the Casino Parcel "taken into trust as soon as possible," [Docket 16, p. 10], but it "is not presently ready to begin construction on the land in question." [Staudenmaier Decl., ¶ 7, Ex. 12, p. 208.]

### III.

### STANDARD OF REVIEW FOR PRELIMINARY INJUNCTION

Injunctive relief is appropriate when: (1) there is a substantial likelihood of success on the merits, (2) irreparable injury will occur if the injunction is not granted, (3) an injunction would