not substantially injure other interested parties, and (4) the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *accord National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987). When federal agency action is involved, the Court should balance the actual irreparable harm to the plaintiff and the potential harm to the government. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 428 (2006).

This Circuit applies a sliding scale to these factors, balancing each against the other. *Am. Fed'n of Labor & Cong. of Indust. Organizations v. Chao*, 297 F. Supp. 2d 155, 156 (D.D.C. 2003) (citing *Davenport v. International Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). "A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.' " *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.; see also State ex rel. Graves v. United States*, 86 F. Supp. 2d 1094, 1100-01 (D. Kan. 2000), *aff'd and remanded sub nom. Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) (granting preliminary injunction in a challenge to the Secretary's determination that the land qualifies as Indian land even when "the balance of harms seems to be shared almost equally").

In this Circuit, "[i]njunctive relief may be granted with either a high probability of success and some injury, or vice versa." *Population Institute v. McPherson,* 797 F.2d 1062, 1079 (D.C. Cir. 1986) (citing *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). Under this standard, a party seeking an injunction need not establish an absolute certainty of success on the merits. *See id.* at 1079 (D.C. Cir. 1986) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). Instead, it is ordinarily sufficient if the moving party has raised questions "so serious, substantial, difficult, or doubtful as to make them a fair ground of litigation and thus far more deliberative investigation." *Id.*

In cases such as this one, involving judicial review of agency action when the administrative record is not yet complete, and when other factors weigh in plaintiffs' favor – plus there is little or no harm to defendants – "a colorable claim would constitute a sufficient showing of likelihood of success." *Collagenex Pharms, Inc. v. Thompson*, No. CIV.A. 03-1405(RMC), 2003 WL 21697344, at *7 (D.D.C. July 22, 2003).

IV.

**PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION**

A.      **Plaintiffs Are Likely to Succeed on the Merits**

1.      **Review of Secretary's Action under the APA**

Under the Administrative Procedures Act ("APA") (5 U.S.C. § 500 *et seq*.), the court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The Supreme Court summarized the relevant analysis for review under the "arbitrary and capricious" standard in *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983):

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Thus, "[the Court's] task is to determine whether the agency has articulated a rational connection between its factual judgment and its ultimate policy choice, and whether the underlying factual judgments are supported by substantial evidence." *Center for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 313 (D.C. Cir. 1992) (citations omitted). Additionally, this Circuit requires that "[i]n reviewing the agency's decision, a court must consider any evidence that 'fairly detracts' from the agency's findings and conclusions." *Johnson v. Office of Thrift Supervision*, 81 F.3d 195, 201 (D.C. Cir. 1996) (*citing Universal Camera Corp. v. NLRB*, 340

U.S. 474, 488, (1951)).  In "evaluating the evidence underlying an agency finding, we look to see whether there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Office of Thrift Supervision*, 81 F.3d 195, 201 (D.C. Cir. 1996) (internal quotations omitted).

In issuing the IGRA ROD, the Governor Concurrence Request and the IRA ROD, defendants "relied on factors which Congress has not intended [them] to consider," "offered an explanation for [their] decision that runs counter to the evidence before the agency" and "entirely failed to consider an important aspect of the problems." *Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 43. As a result, plaintiffs can show that defendants have violated the APA.

> **2.  The Secretary's Conclusory Finding That the Tribe Was "Under Federal Jurisdiction" as of June 18, 1934, Violated the APA**

The Secretary's authority to take land into trust on behalf of Indians and Indian tribes is found in the IRA, specifically at 25 U.S.C. § 465.  Section 19 of the IRA defines the terms "Indian" and "tribe."  25 U.S.C. § 479.  The Supreme Court in *Carcieri* held that Section 19 of the IRA, 25 U.S.C. "§ 479 limits the Secretary's authority to take land into trust for the purpose of providing land to members of a tribe that was *under federal jurisdiction* when the IRA was enacted in *June 1934*." 555 U.S. at 382 (emphasis added).

Despite the unambiguous holding of *Carcieri*, the Secretary failed to assemble, develop, or consider a full record in making its finding that the Tribe was recognized and under federal jurisdiction in 1934.  Instead, the Secretary relied on a single factor – to the exclusion of many other, countervailing facts – in reaching his determination.  In his IRA ROD, the Secretary asserted that, because four out of six adults living on the North Fork Tribe's Rancheria voted on June 10, 1935, to reject the IRA, this solitary circumstance "conclusively establishes that the Tribe was under Federal jurisdiction for *Carcieri* purposes."  [Schmit Decl., ¶ 12, Ex. 20 (IRA ROD), p. 437.]  The Secretary's reliance on this sole factor was improper, given the BIA's prior recognition of the complexity of this determination, and given the Secretary's failure to consider and address the countervailing evidence before him.

In the wake of the Supreme Court's 2009 *Carcieri* decision, a Congressional committee asked the BIA whether it had determined which tribes were not under federal jurisdiction as of June 18, 1934. [Schmit Decl., ¶ 16, Ex. 23 (DOI Response to Questions for the Record, October 24, 2011, p. 1).]  On October 24, 2011, the BIA responded, in part:

> The Department has not determined which tribes on the list of recognized tribes published in the Federal Register may not have been under federal jurisdiction on June 18, 1934.  Whether a tribe was under federal jurisdiction on that date requires a ***fact-intensive analysis** of the history of interactions between that tribe and the United States*.  This analysis ordinarily ***requires*** the DOI to examine (1) ***whether there was an action or series of actions before 1934 that established or reflected federal obligations, duties, or authority over the tribe***, and (2) ***whether the tribe's jurisdictional status remained intact in 1934***.

[*Id.* (emphasis added).]

Thus, as a result of *Carcieri,* the DOI recognized the importance of determining which tribes were under federal jurisdiction on June 18, 1934, but it deliberately avoided making any such determination on an objective basis.  It is clear from the Record of Decision the Secretary did not conduct any "fact-intensive analysis of the history of interactions between that tribe and the United States," and did not examine "whether there was an action or series of actions ***before*** 1934 that established or reflected federal obligations, duties, or authority over the tribe," or "whether the tribe's jurisdictional status remained intact in 1934."  To the contrary, the Secretary based his determination solely on an isolated event that occurred almost a year ***after*** the relevant date.  This is not a "fact-intensive analysis."

The Secretary's *Carcieri* "analysis" consists only of three short paragraphs.  [*Compare* Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), pp. 340-341, *with* Schmit Decl., ¶ 12, Ex. 20 (IRA ROD), pp. 436-437.][5]  The sole "fact" relied upon by the Secretary – i.e., the calling of a special election on June 10, 1935 – does not establish whether the Tribe was under federal jurisdiction a

---

[5] To compare, it should be noted that the Secretary devoted more than six pages in analyzing various historical records in an attempt to lay out the tenuous historical connection between the Tribe and the off-reservation Casino Parcel.  [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD at 55-61).]

year earlier.  Moreover, the Secretary failed to consider and address other evidence inconsistent with his determination, including:

- The North Fork Tribe did not have a "reservation," and the Tribe was not recognized through any treaty, including the Treaty of 1851. [Schmit Decl., ¶ 15, Ex. 23 (Governor Concurrence Request), p. 478-480).]

- Congress passed the California "Four Reservations Act" in 1864, which limited to four the number of Indian reservations that could be established within the State of California.  *See Mattz v. Arnett*, 412 U. S. 481, 489 (1973) (discussing the four reservation restriction).  The North Fork Rancheria was not among the four reservations.

- The Congressional Acts of 1906 (34 Stat. 383), 1908 (35 Stat. 70-76) and 1913 (33 Stat. 77, 86), which provided money to purchase land for residential and agricultural use for *homeless* Indians of no specific tribal affiliation. [*See* Schmit Decl. ¶ 19(a), Ex. 27, pp. 664, 665, 676.]

- These Rancherias "were purchased in central California by the Secretary of the Interior, who permitted Indians living nearby, generally in groups, to occupy such tracts." [*See* Schmit Decl. ¶ 19(e), Ex. 31, p. 789.]

- The 80-acre North Fork Rancheria land was purchased under these appropriation acts on May 17, 1914. [*See* Schmit Decl. ¶ 22, Ex. 51, p. 1071.]

- In 1927, the Superintendent of the Sacramento Agency reported that: "[North Fork's] holdings are very scattered and few have taken advantage of the land purchased near North Fork for home site, there being not to exceed four families residing thereon.  No additional land is needed for those Indians." [*See* Schmit Decl. ¶ 19(b), Ex. 28, p 710.]

- The North Fork Tribe was not among the list of tribes recognized under the IRA March 18, 1937, letter by the Commissioner of the Department of Interior to Senator Elmer Thomas, Chairman of the Committee on Indian Affairs.  [*See*

Schmit Decl. ¶ 19(c), Ex. 29, pp. 727-736.]

- On March 10, 1961, an individual named Mrs. Susan Johnson was the *only* resident on the North Fork Rancheria. [31 Fed. Reg. 2911 (February 18, 1966) *available at* Ex. 4, p. 134.]

- The Termination Act of 1958 legally terminated and extinguished the North Fork Rancheria in 1966.  At that time, it appears that only a mother and her two sons occupied the North Fork Rancheria and "the *family* asked that they be given a fee patent to this acreage." [*See* Schmit Decl. ¶ 19(d), Ex. 30, pp. 32-33.]

- The *Hardwick v. United States,* C-79-1910 SW (N.D. Cal. 1983) (unpublished), Stipulation entered on December 22, 1983, resulted in the BIA "recognizing" North Fork – nearly 50 years after the IRA was enacted. [*See generally* GAO-07-23R BLM Indian Allotments (October 20, 2006), *available at* RFJN, Ex. 9, p. 186.] Notwithstanding, the North Fork tribal government was not a party to the suit. [Schmit Decl. ¶ 11, Ex. 19 (IGRA ROD ), 340; Schmit Decl. ¶ 19(f), Ex. 32 (Stipulation), pp. 797-809.]

- The August, 1986, "Peace Officer Law Report" from the California Attorney General indicates that there were *no* Indians with affiliations to the North Fork Tribe. [*See* Schmit Decl. ¶ 19(g), Ex. 33, p. 821.]

- The Tribe did not formally organize its government until 1996 when it officially adopted its constitution.  [(North Fork Congressional Statement *available at* RFJN, Ex. 1, p. 29.]

- The DOI's internal "draft" list of tribes, prepared after *Carcieri*, states that the North Fork Tribe was recognized *after* 1934.  [*See* Schmit Decl. ¶ 19(i), Ex. 35, p. 897.]

At the heart of the Secretary's error is his inability to recognize that federal recognition historically resulted from a course of dealing over time, a treaty, a statute, or an executive order,[6] and that the Tribe's Rancheria lands were established for individual Indians, not for an existing tribe. All "Rancherias," including the North Fork Rancheria, were originally federal property on which *homeless* Indians were placed. As the Ninth Circuit notes:

> Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use from time to time in the early years of [the twentieth] century-a program triggered by an inquiry (in 1905-06) into the landless, homeless or penurious state of many California Indians.

*Williams v. Gover*, 490 F.3d 785, 787 (9th Cir. 2007) (*citing Duncan v. United States*, 667 F.2d 36, 38 (1981)).

It appears that formal federal "recognition" was not extended to the North Fork Tribe until the *Hardwick* Stipulation in 1983. As such, the North Fork Tribe was not "under federal jurisdiction in 1934." Accordingly, the Secretary's determination that he is authorized to acquire land in trust for the Tribe under 25 U.S.C. § 465 was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of his statutory authority. 5 U.S.C. §706(2); *see, e.g.*, *Jicarilla Apache Nation v. United States DOI*, 613 F.3d 1112, 1121-22 (D.C. Cir. 2010) (finding a violation of the APA when the agency "fails to consider an important aspect of the problem and does not reflect the reasoned decisionmaking required of an agency").

### 3. The Secretary's Decision Was Procedurally Defective

The Secretary did not follow his own procedures (mandated by his *own* regulations) in failing to send the California Governor a copy of the *entire record* when requesting the Governor's concurrence in the Secretary's two-part decision. 25 C.F.R. § 292.22(b). The BIA's regulations titled "How does the Secretary request the Governor's concurrence?" require:

> If the Secretary makes a favorable Secretarial Determination, the Secretary will send to the Governor of the State:
> ….

---

[6] *See, e.g.,* Ponca Restoration Act of October 31, 1990, Pub. L. No. 101-484, 25 U.S.C. § 983-983(h) (2000).

   (b) *A copy of the entire application record;*

    …

25 C.F.R. § 292.22 (emphasis added)

   On September 1, 2011, the Secretary issued the Governor Concurrence Request. [See Schmit Decl. ¶ 15 Ex. 23.] The Governor Concurrence Request, however, was sent almost a year *before* the Fee-to-Trust ROD was issued. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), at 340-346).] Consequently, the Fee-to-Trust ROD, including the Secretary's so-called *Carcieri* analysis, and his determination of authority to transfer the property into trust under 25 U.S.C. §465, were not sent to California's Governor. Even more disturbing is the fact that the Tribe's application also does not seem to have been sent to the Governor. As a result, the Secretary did not comply with 25 C.F.R. §292.22(b) by failing to send the Governor the "entire application record."

   **4.**  **The Secretary's Determination that acquiring the Casino Parcel will not be "detrimental to surrounding community" was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the IGRA.**

   Section 20 of the IGRA prohibits gambling on land taken into trust after October 17, 1988, subject to certain limited exceptions. 25 U.S.C. § 2719(a). In this case, the Secretary relied upon the so-called "Secretarial Determination" or "two-part test" exception under 25 U.S.C. § 2719(b)(1)(A). Under that section, the gambling prohibition applicable to post-1988 land acquisitions does not apply when "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, *and would not be detrimental to the surrounding community*…."

25 U.S.C. § 2719(b)(1)(A) (emphasis added).

   In the IGRA ROD, the Secretary relied on only four factors in determining that the proposed mega-casino would not be detrimental to the surrounding community: (1) The casino will pose no significant cost increases to local governments; (b) The FEIS concluded the casino will not have any significant environmental impact, after mitigation; (c) The casino will not

disrupt local land use; and  (4) The economic consequences asserted by the Picayune Indian tribe will result from competition with the proposed North Fork Tribe casino. [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), pp. 369-371.]

The Secretary overlooked and ignored the obvious – a large casino will harm surrounding community because of societal, traffic, and environmental effects.  [*Id.*]

Many members of the community, including plaintiffs, presented defendants with significant and considerable comments identifying such detrimental impacts.   Yet, these comments were not considered or were simply ignored by defendants, including, without limitation:  (a) the destructive and ruinous impacts on families, employers, and community social services caused by gambling; (b) increase in prostitution and other crimes; (c) environmental and economic impacts on Fresno, Mariposa, Merced and Madera Counties; (d) impacts on water supply and water wells on adjacent farms and homes; and (e) infringement upon the tribal sovereignty of other indigenous people, including the North Valley Yokuts and the Picayune Rancheria. [*See* Schmit Decl., ¶ 20(k), Ex. 44, (Comment letter from Swearengin 3/23/09), p. 929; ¶ 20(f), Ex. 41 (Comment Letter from Smith, Calif. Tribal Business Alliance 10/31), p. 914-15; ¶ 20(g), Ex. 42 (Comment Letters from Poythress 3/7/09, 6/24/11), p. 917, 921; ¶ 20(k), Ex 46 (Comment Letter from Madera Co. Farm Bureau 2/2/10), p. 936; Brannon Decl. ¶ 24, Ex. 15 (Comment Letter from Brannon 3/12/08), p. 216; ¶ 25, Ex. 16 (Comment Letter from Madera Ministerial Assn 2/11/10), p. 221-22.]

Moreover, the Secretary's explanation for many of his findings on the impacts is illogical, irrational, and implausible.  For example, on the issue of crime, the Secretary summarily concludes that the casino "will not result in a significant increase in crime in the surrounding community."  But he bases that conclusion on the FEIS finding "that although an increase in calls for service might be expected as would be the case with any large-scale development, the Resort will not result in an increased *regional* crime rate." [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), p. 347.] Thus, as the Secretary reasons, although the casino is expected to result in increased calls for police service, because the *regional* crime rate is not expected to

increase significantly, there is no impact on the surrounding community. The Secretary irrationally focuses on crime "rates" and ignores not only the increased concentration of crime that will occur around the casino (if his analysis that regional crime will not increase around a mega-casino project is even correct) but also the potentially vice-related and even violent types of crime associated with the proposed casino development and the individuals such a development will attract.

The Secretary recognizes that operation of the casino "could increase the percentage of problem gamblers in the surrounding community, problem gambling may be attenuated, or possibly reduced, through the expansion of problem gambling services offered by the Resort." [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), p. 347.] The only "problem gambling services" identified in the ROD are patently insubstantial, and if anything, they underscore that the casino *will* have detrimental impacts on the surrounding community – (i) the Tribe will make available to the public a list of organizations that are available to provide treatment and counseling to both the problem gambler and those affected by the gambler's problem; (ii) the Tribe's casino employee benefits program will include insurance coverage for the treatment of problem gambling for its employees; (iii) the Tribe will post written materials concerning the nature and symptoms of problem gambling and a toll-free 1-800 problem gambling helpline on or near all gaming and cage areas and ATM machines located within the Resort; (iv) the Tribe will implement a self-limitation policy, enabling gamblers to voluntarily self-limit themselves from certain gaming activities and privileges; and (v) the Tribe has committed to provide $50,000 annually to fund County alcohol and problem gambling prevention and treatment program. [Schmit Decl., ¶ 11, Ex. 19(IGRA ROD), pp. 361-362.]

Aside from the insurance benefits it will provide to casino employees, all the Tribe will do to address the increase in problem gamblers in the surrounding community will be to post or make available information about gambling addiction and available services, as well as allow gambling addicts to self-limit their gambling activities (which, of course, reflects a fundamental misunderstanding of the nature of addiction). The Secretary does not address whether any of

these measures is likely to meaningfully mitigate the increase in percentage of problem gamblers in the community.  Moreover, irrespective of whether these measures might mitigate the impact to some degree, the inescapable conclusion is that the casino *will* have a detrimental impact on the surrounding community by increasing the percentage of problem gamblers in the community.

The Secretary seems to conclude that there is *no* detrimental impact on the surrounding community simply because the Tribe may take *some* steps to lessen the damaging effects of the $200 million casino.  What is more alarming is that even the Tribe concedes that most of these "mitigation" efforts will not eliminate the detrimental impacts related to air quality, seismicity, cultural resources, resource use patterns, public services, impacts from off-site traffic and pipeline construction. [*See* Docket 16-2, p. 32-33.]  The Secretary's decision was, therefore, arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of his statutory authority.  *See* 5 U.S.C. §706; *Motor Vehicle Mfrs. Ass'n, supra,* 463 U.S. at 43.

## 5.   Violation of the National Environmental Policy Act

Defendants issued the IGRA ROD and the IRA ROD approving the proposed casino on the basis of a flawed and inadequate FEIS.  In certifying the FEIS, defendants violated NEPA and its implementing regulations, 40 C.F.R. §§ 1500 *et seq.*

### a.   Inadequate Consideration of Alternatives

Defendants' consideration and evaluation of alternatives was deficient, and defendant's rejected a number of reasonable alternatives without meaningful analysis of the viability of these sites for developing a casino resort facility or the ability of these sites to meet the stated purpose and need.  *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 803 (9th Cir. 1999) (reversing district court's finding that Forest Service properly rejected viable alternatives).  An environmental impact statement must discuss reasonable alternatives to the proposed action.  42 U.S.C. § 4332(C)(iii).  Defendants were thus obligated under NEPA and the APA to "[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.

The stated purpose and need of the project determines the "range of reasonable alternatives." *Muckleshoot Indian Tribe*, 177 F.3d at 812 (quoting *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997)). An environmental impact statement that fails to include a viable alternative must be found inadequate. *Id.* at 814; *Surfrider Found. v. Dalton*, 989 F. Supp. 1309, 1326 (S.D. Cal. 1998), *aff'd sub nom.* 196 F.3d 1057 (9th Cir. 1999) ("[I]f the agency unreasonably failed to include a viable alternative among its list of finalists, its alternatives analysis would be inadequate even if the selected site was clearly superior."). Where, as here, the range of alternatives considered consists of variations of a single alternative based on "levels and intensity of use" the range of alternatives considered is not "truly meaningful." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1089 (N.D. Cal. 2009) vacated in part, C 06-4884 SI, 2011 WL 337364 (N.D. Cal. Jan. 29, 2011).

Here, the EIS only really considered two alternatives. Alternatives A, B, and C involved variations of use and intensity at the Casino Parcel. Alternative D was the North Fork Rancheria, and Alternative E represented the status quo. [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 971-1055]. Thus the only actual sites considered were the Rancheria and the Casino Parcel. The FEIS goes to great lengths to rule out casino development on the Rancheria. The central focus on casino gambling as necessary to meet the needs of the Tribe makes alternatives B and C irrelevant. Consequently the FEIS stacks the deck to make Alternative A the only viable option and a foregone conclusion. Therefore, the range of alternatives is unreasonably narrow and reasonable alternatives were improperly rejected.

<u>(1)</u>   <u>Reasonable Alternatives Rejected</u>

(a)   Old Mill Site

The Old Mill is viable as a site for a casino. [*See* Schmit Decl., ¶ 21, Ex. 40, p. 912 (DOI admitting that the Old Mill cite "may provide a viable location for a destination resort and casino."] In fact, the current owner had previously discussed the possibility of a casino on the site but rejected it because of the Mill's "remote location" and anticipated local community

objections. [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1053.] The Secretary also rejected the Old

Mill site as a viable alternative. While the Secretary noted that the site had been listed for sale,

the Secretary focused on environmental problems with the site and the purported claim that the

site's owner would not sell the property for the purposes of developing a casino. [Schmit Decl., ¶

21, Ex. 50 (FEIS), pp. 1052-1053] None of these reasons, however, was a proper basis for

eliminating this alternative from consideration. First, despite the environmental cleanup

concerns associated with the location, the Secretary ultimately concluded that removing

impacted soils "would allow for unrestricted use" of the site. [Schmit Decl., ¶ 21, Ex. 50 (FEIS),

pp. 1052]. Second, the objections based on the remote location and community objections were

also present in the North Fork Rancheria alternative, which was a reasonable alternative under

NEPA despite these objections. Third, the statement by the current owner that it would not sell

the land for the purposes of a Casino is insufficient to reject the site without listing it as an

alternative and fully analyzing its potential. NEPA clearly demands that a site such as the Old

Mill, which meets the stated purpose and need, be listed as an alternative. *See Muckleshoot

Indian Tribe*, 177 F.3d at 814 (rejecting the argument that questions about the ability to purchase

land were sufficient to reject an otherwise viable alternative). Thus, whether the owner would

likely sell the land should have been an aspect of a full analysis of a viable alternative rather than

a reason for rejection.

Finally, the Old Mill site is a viable alternative that more completely meets the purpose

and need of the project than does the Casino Parcel. *See Muckleshoot Indian Tribe*, 177 F.3d at

813 ("[W]e are troubled that . . . the Forest Service failed to consider an alternative that was

more consistent with its basic policy objectives than the alternatives that were the subject of final

consideration."). While the purpose of the project is to promote the economic self-sufficiency of

the Tribe [FEIS at p. 1-10.], this cannot be separated from, and will not likely occur without, the

promotion and preservation of a strong Tribal identity, government, and culture. Such promotion

and preservation is consistent with the purposes of IRGA. *See* 25 U.S.C. § 2701. Development

at the Casino Parcel would separate benefits such as employment opportunities from the Tribe's

historic area and local community.  With Tribal employment opportunities located far away from not only home but the tribal government, such benefits run as much risk of diminishing and impoverishing a strong tribal identity as they do promoting and preserving it.  Not only will money earned by Tribe members at the Casino Parcel be less likely to end up back in the tribal community, but opportunities so distant from the Tribe's historic area may discourage more active participation in the tribal community.  These concerns are integrally connected to the stated purpose and need and should have been analyzed by including the Old Mill as an alternative.

(b)      Other Viable Alternatives in the Tribe's Historic Area

A review of the FEIS reveals the defendants rejected possible sites closer to the Rancheria that met the stated purpose and need of the project.  "Although the SR-41 corridor is clearly within the Tribe's historic area and a facility there would be economically viable, most of the corridor situated in Madera County lies within the environmentally sensitive foothills." [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1043.]  The FEIS, however, devotes a mere two sentences to explaining why development in such terrain is "problematic."  [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1044.]  Of more importance in rejecting these sites appears to be the Tribe's purported concern that "development along the SR-41 corridor [as well as alternative sites along the SR-99 corridor] would potentially have a very detrimental competitive effect on the gaming operations of the neighboring Tribes."  [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1044.]  The Tribe particularly expressed concern for the potential unfair competitive impact on the "Picayune Rancheria (whose Chukchansi Gold facility is located along SR-41 near Coarsegold)."  [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1044.]

Such concern, however, seems overstated since a mega-casino on the proposed site will have a devastating economic impact on the Chukchansi Gold facility, because the Madera location will be so much closer and more convenient for the populous of gambling patrons living in the Central Valley.  The Secretary rejected alternatives closer to North Fork giving significant weight to what he contends would be the detrimental competitive impact to the Picayune Tribe's

Chukchansi Gold casino.  Yet when the Picayune Tribe complained about the devastating impact the Madera casino would have due to its prime location, the Secretary gave "diminished weight" to its concerns, and ultimately dismissed them as being based merely on concerns about market competition.  [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD), p. 371.]  Thus the Tribe received the best of both worlds in regard to economic competition, and the Picayune Tribe's concerns were negated in the process.

While sites exist that both the Tribe and defendants admit meet the stated needs and purposes of the project – more completely than the Casino Parcel for the same reasons discussed above – these sites were rejected as alternatives to maximize the economic windfall to the North Fork Tribe at the expense of other tribes.  Since maximizing profits at the expense of other tribes is not a stated goal of the project, the defendants failed to meet their obligation to consider all reasonable alternatives within the Tribe's historic area.

### (2)    Rejection of North Fork Rancheria

The FEIS provides an analysis of the North Fork Rancheria as a considered alternative that meets the stated need and purpose of the project.  [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1025-1029.]  The FEIS, however, simultaneously dismisses the Rancheria from considerations in its discussion of rejected alternative sites.  [Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1053-1054]  The discussion of the site's rejection, however, furthers the theme that site choice was ultimately about windfall profits.  In rejecting development on the Rancheria, the Tribe focused on the likelihood that casino operations there would need to be scaled down and that a proposal would precipitate objections from the local community.  [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1042.]  There was no mention in this rejection of concern about competition with other tribes.  On this site, the Tribe would simply compete with rather than destroy the economic interests of the Picayune Rancheria.  As far as objections to development go, the Secretary seemed unconcerned with transferring the objections of the local North Fork community to the Madera community – a community unconnected to the Tribe's historic area.