**b.**   Flawed FEIS Process

First, NEPA's implementing regulations, 40 C.F.R. § 1506.6, require "diligent efforts to involve the public in preparing and implementing th[e] NEPA procedures." Here, throughout the Tribe's application process, the BIA failed to allow adequate participation by the general public. This is evidenced by utilizing a public hearing facility that was too small to accommodate the meeting attendees, giving preference in seating and speaking to proponents of the casino, denying requests to expand the comment period, and refusing to hold additional public hearings. [Brannon Decl., ¶¶ 14-18.] Similarly, the BIA attempted to evade public scrutiny for its unlawful decision by making it difficult for interested parties to review the Secretary's decision. [Schmit Decl., ¶ 12.]   Not surprisingly, as of the date of this motion, the BIA still has not made the IRA ROD available on its website. [Schmit Decl., ¶ 12.]

Second, the FEIS was prepared in violation of the conflict of interest provisions of 40 C.F.R. § 1506.5  Although NEPA allows for delegation of preparation of the EIS to a third party, the federal agency is ultimately responsible for the content of the EIS and is obligated to review and independently evaluate the EIS. 40 C.F.R. § 1506.5(c); *see also* 42 U.S.C. § 4332 (stating that NEPA requires informed and objective decision-making). In this case, it appears that Analytical Environmental Services ("AES") was initially retained by the North Fork Tribe to conduct an environmental assessment project. [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1057 (referring to a study by AES in 2004).] The contract between North Fork and AES apparently then evolved into a contract to prepare an EIS, which reflects that North Fork either solely selected the third-party contractor or at least significantly influenced the decision. [Schmit Decl., ¶ 21.] Indeed, it appears that instead of "solely" selecting the contractor "to avoid any conflict of interest" as required under 40 C.F.R. § 1506.5, the BIA abdicated its role in the entire EIS process. *See NRDC, Inc. v. Callaway*, 524 F.2d 79, 87 (2d Cir. 1975) ("Authorship by such a biased party might prevent the fair and impartial evaluation of a project envisioned by NEPA.")

Finally, defendants failed to take a "hard look" at the impacts of the proposed action, as required by NEPA.  40 C.F.R. § 1502.16. "General statements about possible effects and some

risks" will not suffice as a "hard look." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998)).  A "hard look" demands substance over form and forbids rationalizing decisions that have been predetermined. *Id.* (citation omitted).  As discussed above, Defendants stacked the deck in favor of the Casino Parcel and failed to consider environmental impact, including the socioeconomic impact of the proposed development, including harms associated with crime and problem gambling, and the impacts on public and social services, such as wastewater service, fire and emergency medical services, law enforcement, housing, roads and transportation resources, schools, and other public and social services.  The RODs and the FEIS minimize how the proposed mega-casino development will negatively impact water resources, protected species and associated critical habitat and air quality and land resources. *See See W. Watersheds Project*, 632 F.3d at 491 ("[T]he final EIS must include a discussion of adverse impacts that does not improperly minimize negative side effects") (citations omitted) (internal quotation marks omitted)).

Based on the foregoing, plaintiffs will likely succeed on the merits of their claims that defendants violated NEPA, or can at least make a "colorable" showing of such violations which is sufficient for preliminary injunction purposes.

**B.    Irreparable Harm Will Result If The Transfer Is Not Enjoined**

Because the Tribe wishes to have the Casino Parcel "taken into trust as soon as possible," [Docket 16, p. 10], an injunction is necessary *now* to prevent irreparable harm to plaintiffs and the surrounding community that would result from the transfer.

The Secretary has abandoned the DOI's longstanding policy of staying the transfer of property into trust pending resolution of this judicial challenge.  [*See* Docket 22, Ex. A.]  Not only is this course of action contrary to law, it also raises the distinct possibility that plaintiffs may be left without a remedy. Should this Court ultimately conclude that the Secretary's decision was unlawful, plaintiffs will face potentially insurmountable legal and jurisdictional obstacles in attempting to "unwind" the transfer—if such a reversal is even legally possible.  As

discussed below, once the Casino Parcel is transferred into trust for the Tribe, the Tribe will have full jurisdictional and sovereign governmental rights over the Casino Parcel. With the assistance of its financial partner, Station Casinos, the Tribe can begin the construction and development of the casino, or undertake any other activities on the parcel – while wholly ignoring all local and state laws/regulations as well as any concerns of and detriments to the community.

Moreover, as tacitly acknowledged by the Tribe's motion to intervene, the Tribe may argue that sovereign immunity prevents plaintiffs from proceeding in an action against it. Even if the Tribe is found to have waived its sovereign immunity, any litigation involving the Tribe will be complicated by questions of jurisdiction. Finally, as soon as the Casino Parcel is taken into trust, plaintiffs will suffer irreparable environmental and aesthetic harms.

### 1.      Standard for Irreparable Harm

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). An injury is deemed to be "irreparable" if it cannot be undone through monetary remedies. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

### 2.      Plaintiffs Will Suffer Irreparable Harm as a Result of the DOI's Unlawful Repudiation of its Longstanding Policy of Self-Staying Transfers into Trust

The DOI's longstanding interpretation of its regulations—as well as the express purpose of the regulation itself—compels it to stay the transfer of title pending resolution of this judicial challenge.

#### a.      The DOI Promulgated 25 C.F.R. §151.12(b) to Allow Review of Its Decisions Before Land is Taken Into Trust.

In 1996, the Eighth Circuit Court of Appeals held that Congress had provided no intelligible principle to guide the Secretary's discretion in deciding whether to take land into trust, and that the statute authorizing the taking of land into trust was therefore unconstitutional. *See S. Dakota v. Dept. of the Interior*, 69 F.3d 878 (8th Cir. 1995), *vacated, Dept. of the Interior v. S. Dakota*, 519 U.S. 919 (1996).

In response, the DOI promulgated a new regulation, 25 C.F.R. §151.12(b), to allow judicial review of its trust decisions before land is taken into trust. 25 C.F.R. §151.12(b). The regulation requires the DOI to publish notice of its final decision to take land into trust and states that "the Secretary shall acquire title in the name of the United States *no sooner than 30 days* after the notice is published." *Id.* (emphasis added). While the regulation provides a minimum waiting period of 30 days before the Secretary may take land into trust, it does not provide a maximum waiting period. This is consistent with the express purpose of the regulation, which is to "permit[] judicial review *before* transfer of title to the United States." Land Acquisitions, 61 Fed. Reg. 18,082-01 (Apr. 24, 1996) (emphasis added).

Indeed, immediately after promulgating the regulation, the government filed a petition for a writ of certiorari seeking to vacate the Eighth Circuit's decision. In the petition, the government noted that "[t]he court of appeals premised its decision on the assumption that the Secretary's decision to acquire land in trust is not subject to judicial review," and it explained that "[s]ince the court rendered its decision, however, the Secretary has issued a regulation that acknowledges the availability of judicial review of such decisions and affords an opportunity for judicial review to be instituted *before the land is actually taken in trust*." Brief for Petitioner *U.S. Dep't of the Interior v. South Dakota*, 519 U.S. 919 (1996), No. 95-1956, 1996 WL 34432929, at *15 (emphasis added).

Consistent with that purpose, and ever since the DOI's statements in the Federal Register and its petition for certiorari, the DOI has interpreted 25 C.F.R. § 151.12(b) to require it to stay a trust acquisition until the conclusion of judicial proceedings if a challenge is filed during the 30-day period. *See, e.g.*, [Docket 11, Ex. 2 (Bureau of Indian Affairs, Department of the Interior, Fee-to-Trust Handbook, Version II (issued July 13, 2011) ("BIA Handbook"), at 15 (stating that if a lawsuit is filed in the 30-day period, the DOI will "take no further action until the judicial review process has been exhausted").] Less than a year ago, the DOI reiterated its interpretation of Section 151.15(b) in a brief filed in the Supreme Court, citing the preamble to the rulemaking for the proposition that "the purpose of the 30-day window is to permit judicial review before

transfer of title to the United States." *Patchak v. Salazar*, Nos. 11-246, 11-247, Br. Fed. Pet. at 23, 2012 WL 416751, at *23 (Feb. 7, 2012) (internal quotation marks and brackets omitted).[7]

The DOI's statement in the Federal Register and petition for certiorari, its subsequent affirmations of those statements in numerous court documents, and its unequivocal statement in the BIA Fee to Trust Handbook make plain that the DOI has long interpreted 25 C.F.R. § 151.12(b) to require a stay if a challenge is filed during the 30-day period. *See, e.g., Talk Am., Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) ("[W]e defer to an agency's interpretation of its regulations, even in a legal brief[.]"); *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (same).

      **b.**    <u>The DOI's Repudiation of Its Longstanding Interpretation Must Be Accomplished—if at all—Through Notice and Comment Rulemaking</u>

Until this case, no motion for a preliminary injunction was required because the regulations and guidance compelled the Secretary to stay his hand and because the DOI understood that transferring land may deprive the court of jurisdiction and interested parties of their ability to obtain a remedy. [*See, e.g.*, Docket 11, Ex. 3.]

In 2012, however, the Supreme Court negated just *one* of the grounds that necessitated a self-stay in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, when it rejected the Secretary's argument and held that the Quiet Title Act did not bar APA challenges to trust decisions, even when the land had already been transferred into trust. 132 S. Ct. 2199, 2203 (2012). Because *Patchak* eliminated *one* of the Secretary's jurisdictional arguments, the Secretary now proposes to jeopardize judicial review without regard to other threats to the Court's jurisdiction that flow from agency legal positions. [*See* Docket 22, Ex. A.] In a letter to

---

[7] The Secretary has claimed that the DOI has not always self-stayed until *the judicial process was exhausted*, but can cite to only two exceptions over the past sixteen years. In *Patchak v. Salazar*, 632 F. 3d 702, 703 (D.C. Cir. 2011), Patchak did not file during the 30-day window, but much later after the stay entered in a prior suit expired when that suit was dismissed. In *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 137-38 (D.D.C. 2002), the Secretary self-stayed long enough for a ruling on the merits, but not until the judicial process was exhausted. These two exceptions are anomalies to an otherwise uniform policy. In each exception (a) the plaintiff missed a clear deadline to contest the DOI's action (Patchak) or (b) the Secretary still self-stayed to allow a ruling on the merits (Roseville). Neither (a) nor (b) is at issue in this matter.

plaintiffs' counsel, the DOI announced that it will no longer follow its longstanding policy of self-staying the transfer of land into trust if a challenge is filed during the 30-day period. *Id.* Instead, the DOI agreed to stay the trust acquisition only long enough for plaintiffs to file this motion for preliminary relief. *Id.*

This unjustified policy change is contrary to law. Indeed, this Circuit has been clear that "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking," which the DOI has not done here. *Paralyzed Veterans of Am. v. D.C. Arena,* 117 F. 3d 579, 586 (D.C. Cir. 1997); *accord Alaska Prof'l Hunters Ass'n. v. FAA*, 177 F. 3d 1030, 1033-34 (D.C. Cir. 1999). This rule applies whenever there has "been 'substantial and justifiable reliance on a well-established agency interpretation,' " *Mortg. Bankers Ass'n v. Solis*, 864 F. Supp. 2d 193, 207 (D.D.C. 2012) (quoting *MetWest Inc. v. Secretary of Labor*, 560 F.3d 506, 511 (D.C. Cir. 2009)), a standard which is met here.

The DOI's longstanding practice of self-staying transfers into trust compels a conclusion that the plaintiffs' reliance on such practice is justifiable. Moreover, plaintiffs substantially relied on the interpretation, as they made significant investments of time and resources into this action, believing that they would have the opportunity to carry it to a conclusion and, if successful, actually obtain the relief for which they prayed.

To allow otherwise will cause plaintiffs irreparable harm, as it may—by the defendant's own admission—eliminate plaintiffs' ability to seek a remedy or, at the very least, require the parties and this Court to litigate and resolve a complicated legal issue in less than a month. The Court should thus enjoin the DOI from ignoring its longstanding application of its regulation, and allow this case to be resolved on the merits.

### 3. The Transfer Might Not Be Unwindable

The Secretary's transfer of the Casino Parcel into trust, under color of authority pursuant to 25 U.S.C. § 465, sets in motion a series of events that may ultimately preclude review and redress of his actions.

It is unclear whether a transfer into trust can be reversed.  Indeed, the DOI itself has expressed doubt that its decision could be unwound.  [*See, e.g.*, Staudenmaier Decl., ¶¶ 5-6, Ex. 11 (stating only that, in light of *Patchak*, "the district court in a challenge to the Assistant Secretary's decision to take land into trust *likely* would not lose jurisdiction to adjudicate the APA claims once the land is acquired in trust,") (emphasis added).]  And the DOI's longstanding position was that land cannot be removed from trust.  *See, e.g., Big Lagoon Park Co. v. BIA*, 32 IBIA 309, 321 (1998) ("Thus, the Board does not view the events in *South Dakota* as evidence of any understanding on the part of either the Supreme Court or the Department that the Department itself has the authority to rescind a completed trust acquisition.  To the contrary, if an inference can be drawn from these events, it is that the Department, at least, considered itself to lack such authority.").

Of utmost importance, there is a dearth of case law addressing the process for *removing* land from trust—if such a legal process even exists.  The government has argued for many years that a trust acquisition cannot be reversed or undone.  *See e.g., Prieto v. United States*, 655 F. Supp. 1187, 1192 (D.D.C. 1987) ("The rule established by cases such as these makes it completely clear that the Secretary exceeded his authority in reconsidering and in revoking the trust status of plaintiff's land.").

Once the Secretary acts to place land into trust on behalf of a tribe, this land becomes "Indian country," and therefore "falls under the primary civil, criminal, and regulatory jurisdiction of the federal government and the resident Tribe rather than the states."  *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1006-07 (8th Cir. 2010).  As explicitly recognized by the court in *Podhradsky*, land taken into trust pursuant to 25 U.S.C. § 465 becomes "Indian country."  *Id.* at 1011; *but see United States v. Stands*, 105 F.3d 1565, 1572 (8th Cir. 1997) (tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country); *S. Dakota v. U.S. Dept. of Interior*, 487 F.3d 548, 553 (8th Cir. 2007) (determining on rehearing not to decide the question).

Indeed, the North Fork Tribe has repeatedly stated that it "has vitally important sovereign and financial interest in having the [site] taken into trust *as soon as possible*." [Docket 16, p. 10 (emphasis added).] Similarly, the government also contends that "[t]he North Fork Rancheria needs the subject parcel to be held in trust in order to better exercise its sovereign responsibility to provide economic development to its citizens and strengthen the tribal government by funding a variety of programs…" [Docket 14, p. 10.] The proposed intervener North Fork Tribe will undoubtedly claim that the Secretary does not have the power to unwind a trust acquisition, and that doing so would be an unconstitutional taking of a property right of the Tribe and that removing land from trust violates its obligations as a trustee or other "solemn obligations." *See* Rep. Br. Fed. Pet. *Patchak v Salazar*, Nos. 11-246 and 11-247, 2012 WL 1332578, at *10 (filed Apr. 17, 2012), *available at* RFJN, Ex. 3. To be sure, the defendants or the Tribe could conceivably argue <u>all</u> of these positions, effectively setting up multiple roadblocks to prevent this Court from ordering relief necessary to unwind the Secretary's unlawful act.[8]

In the Tribe's motion to intervene, the Tribe claims its intervention would eliminate plaintiffs' jurisdictional concerns. [Docket 16, p. 11.] However, the Tribe stresses that its intervention would *not* constitute a waiver of any claims plaintiffs may assert against the Tribe. *Id.; see Wichita & Affiliated Tribes of Oklahoma*, 788 F.2d at 777 (a tribe's waiver of sovereign immunity "cannot be implied but must be unequivocally expressed," quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)). Due to the fact that land placed in trust arguably becomes "Indian country," the Tribe may attempt to argue that any claims against the Secretary and involving the status of the land were, in fact, claims against the Tribe and therefore barred by sovereign immunity.

Even if the transfer can be unwound, the administrative and financial investment required would be substantial. At a minimum, the transfer out of trust and back into the state's jurisdiction would require an additional investment of significant time and resources to

---

[8] The government also insists that any Court order after the transfer be "narrowly tailored to avoid having to take the land out of trust." [Docket 14, p. 15.]

administratively restore the land to its previous state. [*See, e.g.*, Docket 11, Ex. 2 (BIA Handbook at 16-18) (extensively outlining procedures related to the recording of title documents in a fee-to-trust transfer).]

As such, there is significant risk that plaintiffs may be left without a legal recourse against the Tribe if the ministerial act of transferring title to the Casino Parcel is not immediately halted. *See Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehab. Serv.*, 31 F.3d 1536, 1543 (10th Cir.1994) (plaintiffs' injury was irreparable when defendant was immune from monetary damages and no adequate remedy existed); *Feinerman v. Bernardi*, 558 F. Supp .2d 36, 51 (D.D.C. 2008) (where "the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity," any loss of income suffered by a plaintiff is irreparable *per se*); *Wisconsin v. Stockbridge–Munsee Cmty.*, 67 F. Supp. 2d 990, 1019 (E.D. Wis. 1999) (finding irreparable harm when plaintiff would be unable to recover money damages from defendant tribe because of tribe's sovereign immunity); *Crowe & Dunlevy, P.C. v. Stidham*, 609 F. Supp. 2d 1211, 1223 (N.D. Okla. 2009) *aff'd*, 640 F.3d 1140 (10th Cir. 2011) (finding irreparable harm where plaintiff may be forced to litigate in a tribal district court, could face inconsistent judgments, and may be unable to recover fees due to tribal sovereign immunity).

4. **The Court May Lack Jurisdiction to Enjoin the Tribe's Activities on the Land During the Pendency of This Action.**

If the Secretary is allowed to take the land into trust, the Tribe may immediately begin offering gambling or begin construction. Although the Tribe claims that "is not presently ready to begin construction on the land in question," the Tribe and Station Casinos have strategically positioned themselves to commence the development of the mega-casino immediately after the transfer. The Tribe already has enacted a gaming ordinance and a resolution authorizing submission of the class III gaming ordinance to the Chairman of the National Indian Gaming Commission. [Schmit Decl., ¶ 15, Ex. 23 (Governor Concurrence Request), p. 471.] In this regard, the Tribe's application indicates that the gaming ordinance is "being submitted" to the National Indian Gaming Commission Chairman for approval. [Schmit Decl. ¶ 19(h), Ex. 34 (the

Tribe's fee-to-trust application), p. 838.] The Tribe is also currently funding an engineering firm to work with the California DOI of Transportation for road and interchange improvements to commence development of the Casino Parcel. [Schmit Decl., ¶ 15, Ex. 23 (Governor Concurrence Request), p. 475).] The Tribe and Station Casinos also have entered into a Management Contract and other ancillary transaction documents pertinent to development, construction and operation of the $200 million casino. To this end, Station Casinos has already advanced at least $18 million to the casino project. [Schmit Decl., ¶ 17, Ex. 25 (Station Casinos), pp. 548-49.]

If plaintiffs attempt to bring an action against the Tribe, the Tribe may claim that any suit to enjoin the development on the Casino Parcel or to reverse the trust acquisition is barred by tribal sovereign immunity. The Supreme Court has been clear in that a tribe's waiver of sovereign immunity "cannot be implied but must be unequivocally expressed," *Wichita & Affiliated Tribes of Oklahoma*, 788 F.2d at 773 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)); *see also Id. at* 777 ("[S]ociety has consciously opted to shield Indian tribes from suit without congressional or tribal consent.").

For instance, in *Florida v. Seminole Tribe of Florida*, the State of Florida sued to enjoin the tribe from operating the casino without a compact. 181 F.3d 1237, 1239 (11th Cir. 1999). The district court granted the Tribe's motion to dismiss on grounds of the Tribe's sovereign immunity, and the court of appeals affirmed. *Id.* The Court noted that although the IGRA expressly waives tribal sovereign immunity when a tribe conducts casino gambling in violation of an existing tribal-state compact, the exception is inapplicable where the state and the tribe did not have a compact. *Id.* at 1242-44; *accord Dawavendewa*, 276 F.3d at 1161-62.

The Tribe has already foreshadowed such complex immunity issues in its motion to intervene. Offering a token concession to bolster its argument for intervention, the Tribe concedes that its intervention would subject the Tribe to the jurisdiction of this Court "for matters directly related to the questions at issue in this case." [Docket 16, p. 11.] The Tribe offers no clarity regarding the scope of "matters directly related to this case." *Id.*

Indeed, plaintiffs' complaint asserts no allegations or claims against the Tribe, but rather challenges the Secretary's decision to take the Casino Parcel into trust. *See* Docket 1; *see also Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) ("If the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion.") (*citing Devose v. Herrington*, 42 F. 3d 470, 71 (8th Cir. 1994); *Stewart v. U.S. I.N.S.*, 762 F.2d 193, 198-99 (2d Cir. 1985)).

What is even more troubling is that the North Fork Tribe unequivocally insists that its intervention "would not constitute a waiver of its sovereign immunity that would allow plaintiffs to directly assert claims against the Tribe." [Docket 16, p. 11.]  Therefore, sovereign immunity and the scope of this Court's jurisdiction remain formidable obstacles to the Court's ability to enter any necessary provisional relief and order any relief necessary to unwind the transfer if plaintiffs prevail in this action. This may be the reason why the Tribe insists that the Casino Parcel be "taken into trust as soon as possible." [Docket 16, p. 10.]  Accordingly, an injunction is necessary *now* if there is ever to be meaningful review of Defendants' actions.

5.      **Without an Injunction, Significant Environmental Harms will Occur**

Injuries in environmental cases are often effectively irreparable, for environmental disruption and damage can rarely be undone through monetary remedies. *See New Mexico v. Watkins*, 969 F.2d 1122, 1137 (D.C. Cir. 1992) ("Money damages ... would not be responsive to the environmental ... concerns complainant raises."). Similarly, the Supreme Court held in *Amoco Production Co. v. Village of Gambell* that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often ... irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." 480 U.S. 531, 545 (1987).

Here, the Tribe has full authority and power to commence development and construction of the casino immediately after the fee-to-trust transfer occurs, thereby irreparably altering the aesthetics of the Casino Parcel. *See* 25 C.F.R. § 151.12 (b).  As explained above, once the Casino Parcel is taken into trust by the United States, it arguably becomes "Indian lands" and

Station Casinos and the Tribe can immediately undertake plans to offer Class II gambling such as bingo and poker and also move forward with ratification and approval of the Class III compact which permits Las Vegas-style slot machines and more expanded gambling. *See* 25 U.S.C. §§ 2703(4); 2710(b); *United States v. Sisseton-Wahpeton Sioux Tribe*, 897 F. 2d 358, 360 (8th Cir. 1990) (stating that Class III gaming is permitted if, "among other requirements, it is conducted in conformance with a Tribal-State compact" (internal quotations omitted)).

Construction of the casino will cause significant impairment and detriment to the surrounding environment. The Secretary's failure to adequately consider such detrimental impacts of these planned gambling activities to the surrounding community is one of the bases for this action. Therefore, immediate injunctive relief is appropriate. *See also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220–22, 238 (D.D.C. 2003) (granting a preliminary injunction where plaintiffs would suffer "substantial irreparable harm" to their "aesthetic" interests in their "ability to view, interact with, study, and appreciate mute swans").

**C.**  **There is Little Possibility of Harm to Defendants if Relief is Granted.**

To sustain a motion for injunctive relief, a moving party must show that the injunction "would not substantially injure other interested parties." *FTC v. Mallett*, 818 F. Supp. 2d 142, 146 (D.D.C. 2011). Here, it is clear that defendants will suffer no cognizable injury from staying the transfer until proper judicial review. Both the Supreme Court and this Circuit have repeated the policy of "*maintain[ing] the status quo* by injunction pending review of an agency's action." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (emphasis added). If this Court provides the injunctive relief requested, the Secretary will merely be required to maintain the status quo. Preliminary injunctive relief is thus proper. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 406 (1971) (remanding for review of the administrative record but "grant[ing] a stay that halted [the challenged] construction" until the legal issues were resolved).

Moreover, while the Tribe's conduct indicates that it is ready to begin construction immediately after the fee-to-trust transfer, the Tribe itself claims that it "is not presently ready to begin construction on the land in question." [Staudenmaier Decl., ¶ 7, Ex. 12 (Notice of Intent to

Appear by the North Fork Tribe), p. 2.]  In the same vein, the government also states that "there are no on the ground impacts that results from the transfer of title." [Docket 14, p. 10.]  Simply put, if there will be no immediate development on the land, there is no need to transfer the land into trust.  Under both the Tribe and the government's own admission, there is no harm in delaying the transfer until adjudicating this case on the merits.

**D.**     **There is a Strong Public Interest in Granting Plaintiffs' Motion**

It is well established that there is a strong public interest in favor of the enforcement of public laws and regulations.  "[T]here is a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) (issuing preliminary injunction in case of NEPA noncompliance).  "Indeed, the Constitution itself declares a prime public interest that the President and, by necessary inference, his appointees in the Executive Branch 'take Care that the Laws be faithfully executed.' " *Id.* (*quoting* Const. Art. II, § 3).  It is clear that "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Here, public interest favors that the Secretary properly consider the IRA, the IGRA, and their regulations before transferring 305.49 acres into trust for a mega-casino.  Without an injunction, there is a grave threat that this Court may not have the jurisdiction to adjudicate this matter on behalf of the plaintiffs.  *See Ford Motor Co. v. Todecheene*, 221 F. Supp. 2d 1070, 1089 (D. Ariz. 2002) (finding that allowing tribal courts to have unrestricted authority over non-members was not in the public's best interest).

## V.

## PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A SECURITY BOND

Fed. R. Civ. Pro. 65(c) requires an applicant for preliminary relief to post security "in an amount that the court considers proper."  Indeed, "[t]he amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.* 569 F.2d 300, 303 (5th Cir. 1978).  It is well established that "[u]nder

appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chemical, Inc. v. Columbus Agency Service Corp.* 567 F.2d 692, 701 (7th Cir. 1977). Additionally, federal courts have broadly recognized that nominal bond is sufficient and appropriate where public interest groups seek enforcement of environmental laws. *See, e.g., Natural Resources Defense Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) ($100 bond); *Environmental Defense Fund v. Corps of Engineers of the U.S. Army*, 331 F. Supp. 925, 927 (D.D.C. 1971) ($1 bond).

Plaintiffs in this case are concerned citizens and residents of Madera County who seek to stop a Las Vegas-style casino in their neighborhood. Plaintiffs do not have a financial stake in the outcome of the suit. [Schmit Decl., ¶ 8; Brannon Decl., ¶¶ 3,13; Declaration of Susan Stjerne ¶ 4; Declaration of Dennis Sylvester ¶¶ 4, 5.] If they were forced to post thousands of dollars in security, they and other groups around the country would be effectively prevented from bringing this sort of action and questioning the Secretary's decisions to take land into trust for purposes of gambling. Such deterrence would contravene their ability to serve as watchdogs to aid in the enforcement of governmental policy. *See Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1073-74 (1st Cir. 1980); *Wisconsin Heritages, Inc. v. Harris*, 476 F. Supp. 300, 302 (E.D. Wis. 1979). The interests plaintiffs seek to protect here, as well as the absence of any financial benefit to them from this action, argue strongly for waiver of any bond requirement.

## VI.

## CONCLUSION

The Secretary cannot be permitted to predetermine his findings and manipulate the administrative process. For all of the above stated reasons, plaintiffs respectfully request that the Court grant their motion for a preliminary injunction to immediately require the defendants to stay the fee-to-trust transfer of the 305.49-acre Casino Parcel.

Dated: January 11, 2013              By: /s/ Sean M. Sherlock
                                 /s/ Benjamin S. Sharp

Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C.  20005-3960
Telephone:   202.654.6200
Facsimile:    202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone:  602.382.6366
Facsimile:  602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
Harsh P. Parikh
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com
hparikh@swlaw.com

*Attorneys for Plaintiffs Stand Up For
California!, Randall Brannon, Madera
Ministerial Association, Susan Stjerne,
First Assembly of God–Madera, and
Dennis Sylvester*