# EXHIBIT 6

**29354**      **Federal Register** / Vol. 73, No. 98 / Tuesday, May 20, 2008 / Rules and Regulations

## DEPARTMENT OF THE INTERIOR

**Bureau of Indian Affairs**

**25 CFR Part 292**

**RIN 1076–AE61**

**Gaming on Trust Lands Acquired After October 17, 1988**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Final rule.

**SUMMARY:** The Bureau of Indian Affairs (BIA) is publishing regulations implementing section 2719 of the Indian Gaming Regulatory Act (IGRA). IGRA allows Indian tribes to conduct class II and class III gaming activities on land acquired after October 17, 1988, only if the land meets certain exceptions. This rule establishes standards that the BIA will follow in interpreting the various exceptions to the gaming prohibitions contained in section 2719 of IGRA. It also establishes a process for submitting and considering applications from Indian tribes seeking to conduct class II or class III gaming activities on lands acquired in trust after October 17, 1988.

**DATES:** Effective Date: June 19, 2008.

**FOR FURTHER INFORMATION CONTACT:** George Skibine, Director, Office of Indian Gaming, (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** The authority to issue this document is vested in the Secretary of the Interior by 5 U.S.C. 301 and 25 U.S.C. 2, 9, and 2719. The Secretary has delegated this authority to the Assistant Secretary—Indian Affairs by part 209 of the Departmental Manual.

### Background

The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2701–2721, was signed into law on October 17, 1988. 25 U.S.C. 2719 (a/k/a section 20 of IGRA) prohibits gaming on lands that the Secretary of the Interior acquires in trust for an Indian tribe after October 17, 1988, unless the land qualifies under at least one of the exceptions contained in that section. If none of the exceptions in section 2719 applies, section 2719(b)(1)(A) of IGRA provides that gaming can still occur on the lands if:

(1) The Secretary consults with the Indian tribe and appropriate State and local officials, including officials of other nearby tribes;

(2) After consultation, the Secretary determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community; and

(3) The Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

On September 28, 1994, the BIA issued to all Regional Directors a Checklist for Gaming Acquisitions and Two-Part Determinations under section 20 of IGRA. This Checklist was revised and replaced on February 18, 1997. On November 9, 2001, an October 2001 Checklist was issued revising the February 18, 1997 Checklist to include gaming related acquisitions. On March 7, 2005 a new Checklist was issued to all Regional Directors replacing the October 2001 Checklist. On September 21, 2007 the Checklist was revised and issued to all Regional Directors replacing the March 2005 Checklist.

The regulations implement section 2719 of IGRA by articulating standards that the Department will follow in interpreting the various exceptions to the gaming prohibition on after-acquired trust lands contained in section 2719 of IGRA. Subpart A of the regulations define key terms contained in section 2719 or used in the regulation. Subpart B delineates how the Department will interpret the "settlement of a land claim" exception contained in section 2719(b)(1)(B)(i) of IGRA. This subpart clarifies that, in almost all instances, Congress must enact the settlement into law before the land can qualify under the exception. Subpart B also delineates what criteria must be met for a parcel of land to qualify under the "initial reservation" exception contained in section 2719(b)(1)(B)(ii) of IGRA. The regulation sets forth that the tribe must have present and historical connections to the land, and that the land must be proclaimed to be a new reservation pursuant to 25 U.S.C. 467 before the land can qualify under this exception. Finally, subpart B articulates what criteria must be met for a parcel of land to qualify under the "restored land for a restored tribe" exception contained in section 2719(b)(1)(B)(iii) of IGRA. The regulation sets forth the criteria for a tribe to qualify as a "restored tribe" and articulates the requirement for the parcel to qualify as "restored lands." Essentially, the regulation requires the tribe to have modern connections to the land, historical connections to the area where the land is located, and requires a temporal connection between the acquisition of the land and the tribe's restoration. Subpart C sets forth how the Department will evaluate tribal applications for a two-part Secretarial Determination under section 2719(b)(1)(A) of IGRA. Under this exception, gaming can occur on off-reservation trust lands if the Secretary,

after consultation with appropriate State and local officials, including officials of nearby tribes, makes a determination that a gaming establishment would be in the best interest of the tribe and its members and would not be detrimental to the surrounding community. The Governor of the State must concur in any Secretarial two-part determination. The regulation sets forth how consultation with local officials and nearby tribes will be conducted and articulates the factors the Department will consider in making the two-part determination. The regulation also gives the State Governor up to one year to concur in a Secretarial two-part determination, with an additional 180 days extension at the request of either the Governor or the applicant tribe. Subpart D clarifies that the regulations do not disturb existing decisions made by the BIA or the National Indian Gaming Commission (NIGC).

### Previous Rulemaking Activity

On September 14, 2000, we published proposed regulations in the **Federal Register** (65 FR 55471) to establish procedures that an Indian tribe must follow in seeking a Secretarial Determination that a gaming establishment would be in the best interest of the Indian tribe and its members and would not be detrimental to the surrounding community. The comment period closed on November 13, 2000. On December 27, 2001 (66 FR 66847), we reopened the comment period to allow consideration of comments received after November 13, 2000, and to allow additional time for comment on the proposed rule. The comment period ended on March 27, 2002. On January 28, 2002 we published a notice in the **Federal Register** (67 FR 3846) to correct the effective date section which incorrectly stated that the deadline for receipt of comments was February 25, 2002 and was corrected to read "Comments must be received on or before March 27, 2002." No further action was taken to publish the final rule.

On October 5, 2006, we published a new proposed rule in the **Federal Register** (71 FR 58769) because we have determined that the rule should address not only the exception contained in section 2719(b)(1)(A) of IGRA (Secretarial Determination), but also the other exceptions contained in section 2719, in order to explain to the public how the Department interprets these exceptions. The comment period ended on December 5, 2006. On December 4, 2006, we published a notice in the **Federal Register** (71 FR 70335) to extend the comment period and make

corrections. The comment period ended on December 19, 2006. On January 17, 2007, we published a notice in the **Federal Register** (72 FR 1954) to reopen the comment period to allow for consideration of comments received after December 19, 2006. Comments received during the comment period ending December 5, 2006, and February 1, 2007, were considered in the drafting of this final rule.

**Review of Public Comments**

Stylistic and conforming changes were made to the proposed regulations and are reflected throughout the final regulations. Substantive changes, if any, are addressed in the comments and responses below:

*Subpart A—General Provisions*

Section 292.1   What is the purpose of this part?

One comment regarded the applicability of section 2719 of IGRA to restricted fee lands and suggested a change in § 292.1. Another comment regarded the applicability of section 2719 to trust or restricted lands of individual Indians.

Response: The recommendation to modify § 292.1 was not adopted, because section 2719(a) refers only to lands acquired in trust after October 17, 1988. The omission of restricted fee from section 2719(a) is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at sections 2719(a)(2)(A)(ii) and 2703(4)(B). Section 292.1 was not amended to include land taken in trust after October 17, 1988 for individual Indians, nor land acquired after October 17, 1988 in restricted fee by individual Indians, because the language in section 2719 of IGRA is limited to Indian tribes. Also, it is important to note that the final regulations do not address any restrictions on tribally owned fee land within reservation boundaries, because even though such lands are "Indian lands" pursuant to section 2703(4), they are not encompassed by the prohibition in section 2719. In addition, tribally owned fee land outside of reservation boundaries is not encompassed by section 2703(4) unless a Federal law, other than 25 U.S.C. 177, directly imposes such limitations on the land, and the Indian tribe exercises governmental power over them.

Several comments regarded whether the regulations for section 2719 should include the requirements of "governmental powers" referenced in section 2703(4), and "jurisdiction" referenced in section 2710.

Response: Section 2719 does not specifically reference the "governmental powers" and "jurisdictional" requirements that are referenced in other sections of IGRA. Therefore, the final regulations do not include references to these requirements. The governmental powers and jurisdictional analysis is not required for the specific purpose of determining whether newly acquired lands are otherwise exempt from the general prohibition for lands acquired after October 17, 1988. The governmental powers and jurisdictional requirements are, however, a necessary element for determining whether gaming may be conducted on newly acquired lands. Therefore, depending on the nature of the application or request, the governmental powers and jurisdictional elements may be part of the analysis.

Section 292.2   How are key terms defined in this part?

Appropriate State and Local Officials

Several comments suggested that the 25-mile radius is too narrow and either recommended that the regulation include a larger mile limit or no mile limit at all.

Response: These recommendations were not adopted. From the Department's prior experience implementing section 2719, the 25-mile radius allows for the adequate representation of local officials when conducting an analysis under section 2719(b)(1)(A). *See* discussion of the term "surrounding community" below.

A few comments suggested that the regulation is too broad as it applies to "local officials" and suggested that the regulation qualify the term "local officials" by using examples. A few other comments suggested that the term "local officials" was too vague and similarly suggested that the regulation qualify the term by using examples.

Response: These recommendations were not adopted. The term "local officials" is adequate. Because governmental organization varies from community to community, it is not practical to qualify the term "local officials" in either an effort to broaden or limit its applicability.

One comment suggested that the definition should be broadened to include other State officials or the Attorney General.

Response: This recommendation was not adopted. The only State official recognized under the definition is the Governor. However, the regulation does not limit the Governor from consulting with other State officials.

One comment suggested that the definition should apply to appropriate State and local officials in other States if within the 25-mile radius.

Response: The definition includes local officials from other States if they are within the 25-mile radius. However, the definition only recognizes the Governor of the State in which the proposed gaming establishment is located.

Section 292.2   How are key terms defined in this part?

Contiguous

Several comments related to the definition of contiguous. One comment suggested removing the definition from the section. A few other comments suggested keeping the definition, but removing the second sentence that specifies that contiguous includes parcels divided by non-navigable waters or a public road or right-of-way. A few comments suggested including both navigable and non-navigable waters in the definition. Many comments regarded the concept of "corner contiguity." Some comments suggested including the concept, which would allow parcels that only touch at one point, in the definition. Other comments suggested that the definition exclude parcels that only touch at a point.

Response: The recommendation to remove the definition was not adopted. Likewise, the recommendation to remove the qualifying language pertaining to non-navigable waters, public roads or right-of-ways was not adopted. Additionally, the suggestion to include navigable waters was not adopted. The concept of "corner contiguity" was included in the definition. However, to avoid confusion over this term of art, the definition uses the language "parcels that touch at a point."

Section 292.2   How are key terms defined in this part?

*Federal recognition or federally recognized:*

A few comments suggested modifying the definition to follow the Department of the Interior (DOI) and NIGC definitions of Indian tribe in 25 CFR 290.2 and 502.13.

Response: This recommendation was adopted in part. We maintained the reference to the list of recognized tribes as it provides notice to the public. In response to comments indicating confusion caused by separate definitions of "tribe" and "Federal recognition or federally recognized," the Department deleted the separate definitions and included a single definition of "Indian tribe or tribe."

Section 292.2   How are key terms defined in this part?

*Former reservation:*

One comment suggested deleting the word "last" in the definition.

Response: This recommendation was not adopted because the definition clarifies that the last reservation was in Oklahoma, which is consistent with the language of the statute.

Section 292.2   How are key terms defined in this part?

*Land claim:*

One comment suggested striking the words "any claim" and adding the words "a legal action seeking title or possession of land."

Response: This recommendation was not adopted because a land claim does not have to be filed in court in order to fall under the definition; the land claim does have to allege that the subject land was held in trust or subject to a prohibition against alienation on or before October 17, 1988. IGRA's date of enactment was added to clarify that claims accruing after its enactment are not included within its scope.

One comment suggested modifying paragraph (1) to read, "or a constitutional, common law, statutory or treaty-based right to be protected from government taking of Indian lands."

Response: This recommendation was adopted in part. The words "the Constitution" were added to paragraph (1), but the recommendation to qualify the cause of action to a takings claim was not adopted.

One comment suggested including State law claims in the definition.

Response: The recommendation was not adopted because the land claims within the meaning of IGRA arise under Federal statute, Federal common law, the U.S. Constitution or a treaty and jurisdiction lies in Federal, not State court.

One comment suggested adding language in paragraph (1) that reads, "for the determination of title to lands," and language in paragraph (2) that reads, "or the United States."

Response: The recommendation to modify paragraph (1) was not adopted because it is too narrow; not all claims brought under the definition are for the determination of title to lands—sometimes they are brought for compensation. The recommendation regarding adding the words "or the United States" was not adopted because the United States is included in the word "governmental."

A few comments suggested various modifications to paragraph (1) regarding the words "Indian" or "Indian lands" in order to remove confusion with the definition of Indian lands in IGRA.

Response: These recommendations were adopted and the references to Indian and Indian lands were removed.

Section 292.2   How are key terms defined in this part?

*Legislative termination:*

One comment suggested deleting the brackets around "and/or its members" in order to be consistent with § 292.9(b) and § 292.10(c).

Response: This recommendation was adopted.

Section 292.2   How are key terms defined in this part?

*Nearby Indian tribe:*

A number of comments regarded the 25-mile radius limitation. Some comments suggested the definition include no mile limitation while others offered various extensions of the mile limitation based on whether the area is urban or rural.

Response: These recommendations were not adopted. The 25-mile radius is consistent throughout the regulations and provides uniformity for all the parties involved in the Secretarial Determination process.

One comment suggested that the definition include a tribe's Federal agency service area.

Response: This recommendation was not adopted because a tribe's service area is too difficult to define for purposes of applying a limitation to nearby Indian tribes.

One comment suggested striking the reference to 25 U.S.C. 2703(4).

Response: This recommendation was adopted.

A few comments suggested that the definition should include any tribes with significant cultural or historical ties to the proposed site. One comment suggested that the definition include any tribe within the same county as the proposed gaming site, and another comment suggested that the definition include any tribe within the same State.

Response: These recommendations were not adopted because they are beyond the scope of the regulations and inconsistent with IGRA. The statute specifically uses the word nearby. Therefore, "any" tribe cannot be included in the definition.

One comment suggested that the definition should include tribes whose on-reservation economic interest may be detrimentally affected by the proposed gaming site. Another comment suggested creating a standard for "detrimental impact on nearby tribe."

Response: These recommendations were not adopted. The definition

qualifies a "nearby tribe" in terms of distance to a proposed gaming establishment. Thus, if an Indian tribe qualifies as a nearby Indian tribe under the distance requirements of the definition, the detrimental effects to the tribe's on-reservation economic interests will be considered. If the tribe is outside of the definition, the effects will not be considered. The Department will consider detrimental impacts on a case-by-case basis, so it is unnecessary to include a standard. The definition of "nearby Indian tribe" is made consistent with the definition of "surrounding community" because we believe that the purpose of consulting with nearby Indian tribes is to determine whether a proposed gaming establishment will have detrimental impacts on a nearby Indian tribe that is part of the surrounding community under section 20(b)(1)(A) of IGRA. *See* discussion of the term "surrounding community" below.

Section 292.2   How are key terms defined in this part?

*Newly acquired lands:*

Several comments inquired as to the applicability of section 2719 to restricted fee lands, and to trust or restricted lands of individual Indians.

Response: In response to these inquiries, a definition of "newly acquired lands" was added to the regulations. It encompasses lands the Secretary takes in trust for the benefit of an Indian tribe after October 17, 1988. It does not encompass lands acquired by a tribe in restricted fee after October 17, 1988 as discussed above in a response in § 292.1. It does not include land taken in trust after October 17, 1988 for individual Indians, nor land acquired after October 17, 1988 in restricted fee by individual Indians, because the language in section 2719 of IGRA is limited to Indian tribes.

Section 292.2   How are key terms defined in this part?

*Reservation:*

In response to comments, the definition of reservation is clarified and amended to include four paragraphs. The definition now specifically includes land acquired by a tribe from a sovereign, such as pueblo grant lands, acknowledged by the United States. Such grants occurred prior to the land coming under the jurisdiction of the United States, and is a closed set. The definition also specifically includes land set aside by the United States for Indian colonies and rancherias for the permanent settlement of the tribe, which were encompassed in part by the prior reference to "judicial

determination, or court-approved stipulated entry of judgment to which the United States is a party." Both pueblo grant lands and rancherias are treated as reservations under existing Indian lands opinions.

One comment objected that land acquired under the Indian Reorganization Act (IRA), for purposes of reorganizing the half-bloods residing thereon, would not fall within the meaning of reservation as defined in the proposed rule.

Response: This recommendation was adopted and such land is now specifically included in the definition. If such land was proclaimed a reservation by the Secretary, it would be encompassed within the definition of reservation under both paragraphs (1) and (3). If that land was not proclaimed a reservation, it would nevertheless fall within paragraph (3) of the revised definition, as land acquired by the United States to reorganize adult Indians pursuant to statute.

One comment questioned whether the definition of reservation could be interpreted as including a disestablished reservation, or the area of a reservation that was ceded, leaving a diminished reservation.

Response: Reservation within these regulations does not include a disestablished reservation. Reservation does not include land ceded from the reservation that resulted in a diminished reservation. In addition, because the term "reservation" has different meanings under different statutes, the reference to "judicial determination, or court-approved stipulated entry of judgment to which the United States is a party" was deleted as overly broad and likely inconsistent with both the purposes of IGRA and the distinction in IGRA between "reservation" and "trust land."

One comment suggested that the term "reservation" in IGRA be the same as Indian Country in 25 U.S.C. 1151.

Response: We did not adopt this comment because Congress in enacting IGRA chose to use the concept of Indian lands instead of Indian Country. Moreover, Congress in IGRA distinguishes between trust lands and reservations in section 2719. Therefore for the purposes of these regulations that interpret section 2719 of IGRA, "reservation" for purposes of gaming on after acquired lands is limited to the four delineated categories in the definition of reservation and not lands that could be Indian Country for other purposes. Thus for the purposes of determining whether gaming can occur pursuant to section 2719, reservation does not include all property held in trust, as IGRA distinguishes reservation from trust lands in its definitions.

Section 292.2    How are key terms defined in this part?

*Surrounding community:*

Several comments related to the requirement that local governments and nearby Indian tribes be within 25 miles of the site of the proposed gaming establishment. Some comments suggested a greater distance, for example 50 miles; others urged no limit and instead recommended alternate factors, for example the community as defined by the National Environmental Policy Act (NEPA). One comment suggested that the surrounding community include any tribe in the State where the gaming facility is located.

Response: These recommendations were not adopted. The definition was modified so it is consistent with the rest of the regulations and the word radius was added. The 25-mile radius is consistent throughout the regulations and provides uniformity for all parties involved in the Secretarial Determination process. There is no legislative history informing Congressional intent in defining how the term "surrounding community" in section 20(b)(1)(A) of IGRA should be interpreted. However, it is reasonable to assume that Congress did not intend that all possible communities be consulted, no matter how distant, because Congress was concerned with how a proposed gaming establishment would affect those individuals and entities living in close proximity to the gaming establishment, or those located within commuting distance of the gaming establishment. The "surrounding community" is defined in order for the Secretary to determine whether a proposed gaming establishment would be detrimental to the "surrounding community." Since 1994, the BIA has published a "Checklist" to guide agency officials in implementing section 20 of IGRA. The "surrounding community" was first defined to include local governments within 30 miles of the proposed gaming establishment, and nearby Indian tribes within 100 miles of the proposed gaming establishment. The Checklist was subsequently modified in 1997 to include only those local governments whose jurisdiction includes or borders the land, and nearby Indian tribes located within 50 miles of the proposed gaming establishment because our experience with the 1994 standard was that it included communities that were not impacted by the gaming establishment. In addition, this modification was made so that the term "surrounding community" would be similar to the consulted community under 25 CFR part 151. In 2005 the Checklist modified the term "surrounding community" to include local governments within ten miles of the proposed gaming establishment. The 2005 modification was made because the purpose of the consultation with State and local officials is to assess detriment to the surrounding community, and our experience in limiting the consultation to those local governments with jurisdiction over the land or adjacent to the land was too narrow. Ultimately, our objective in the regulation is to identify a reasonable and consistent standard to define the term "surrounding community" and we believe that it is reasonable to define the surrounding community as the geographical area located within a 25-mile radius from the proposed gaming establishment. Based on our experience, a 25-mile radius best reflects those communities whose governmental functions, infrastructure or services may be affected by the potential impacts of a gaming establishment. The 25-mile radius provides a uniform standard that is necessary for the term "surrounding community" to be defined in a consistent manner. We have, however, included a rebuttable presumption to the 25-mile radius. A local government or nearby Indian tribe located beyond the 25-mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment.

One comment suggested changing the definition to "surrounding governmental entities" because it would limit the consultation process to a government-to-government basis.

Response: This recommendation was not adopted because IGRA uses "surrounding community."

One comment suggested that the definition be limited to local governments and nearby Indian tribes within the State of the applicant tribe's jurisdiction.

Response: This recommendation was not adopted. The definition includes local governments and nearby tribes located in other States if they are within a 25-mile radius.

Section 292.2    How are key terms defined in this part?

*Tribe:*

Several comments requested a more elaborate definition of tribe. One comment suggested that all references of "Indian tribe" be changed to "tribe."

Response: The comments recommending a more elaborate definition of Indian tribe were adopted. The definition was renamed "Indian tribe or tribe." It is unnecessary to change all references of "Indian tribe" to "tribe" because they are now both defined.

Section 292.2   How are key terms defined in this part?

*General comments regarding § 292.2:*
One comment suggested adding a definition of trust land.

Response: This recommendation was adopted in part and is addressed in the definition of "newly acquired lands."

One comment suggested adding a definition of "gaming" that includes ancillary structures such as hotels and parking.

Response: This recommendation was not adopted because it is outside the scope of the regulations and inconsistent with IGRA.

One comment suggested adding a definition of "State or States."

Response: This recommendation was adopted in part. The statutory term "State or States" along with some defining language was inserted in §§ 292.4, 292.6 and 292.12 in order to add clarity.

*Subpart B—Exceptions to Prohibitions on Gaming on Newly Acquired Lands*

Section 292.3   When can a tribe conduct gaming activities on trust lands?

The Department received a few comments on this section; mostly related to structure. Additionally, a few comments suggested that this section is an appropriate section to add a paragraph discussing the applicability of these regulations to applications for Secretarial Determinations and requests for lands opinions that tribes submitted before the effective date of these regulations; for those both acted upon and those that are pending.

Response: The recommendation regarding pending and acted upon Secretarial Determinations and requests for lands opinions was adopted and addressed in new § 292.26. The comments related to structure were not adopted because the section was deleted in its entirety and replaced with new § 292.3: "How does a tribe seek an opinion on whether its newly acquired lands meet, or will meet, one of the exceptions in this subpart?" The former section did not offer anything that is not covered in other parts of the regulation. Therefore, in response to comments requesting guidance on the process for seeking opinions under section 2719,

the Department added the new section. Paragraph (a) allows a tribe to submit a request for an Indian lands opinion to either the NIGC or to the Office of Indian Gaming (OIG). As a general matter under this paragraph, a tribe should submit the request to NIGC when newly acquired lands are already in trust and, for example, there is a pending gaming ordinance or management contract before the NIGC Chairman or there is a question whether NIGC has, or would have, regulatory jurisdiction under IGRA. The tribe should submit the request to OIG if the request concerns reservation boundaries or reservation status. Paragraph (b) requires the tribe to submit a request for an Indian lands opinion to the OIG if the tribe must also request a land-into-trust application in order to game on the newly acquired lands or the request concerns whether a specific area of land is a reservation. An opinion provided in response to a request under paragraphs (a) or (b) is not, per se, a final agency action under the Administrative Procedures Act (APA). Final agency action only occurs when agency officials act on a determination pursuant to powers granted them by Congress. Communications from administrative agencies thus range "from obvious agency action, such as adjudications and regulation, to informal pronouncements, such as opinion letters," which are not ?nal agency actions. *See, e.g., Sabella* v. *United States,* 863 F. Supp. 1, 4 (D.D.C. 1994). *Cheyenne-Arapaho Gaming Commission* v. *NIGC,* 214 F. Supp. 2d 1155, 1158 (N.D. Okla. 2002); *Sabella,* 863 F. Supp. at 5.

Section 292.4   What criteria must trust land meet for gaming to be allowed under the exceptions listed in 25 U.S.C. 2719(a) of IGRA?

This section was renamed "What criteria must newly acquired lands meet under the exceptions regarding tribes with and without a reservation?"

For clarity, the references to "trust lands" in this subpart were changed to "newly acquired lands."

One comment suggested a rule in this section that precludes structures and activities that support or are ancillary to gaming operations on contiguous lands.

Response: This recommendation was not adopted because section 2719 of IGRA is concerned with lands on which gaming will occur. Support or ancillary operations to gaming facilities do not play a part in the analysis as to whether gaming will be permitted under this section.

One comment objected to any requirement that would limit a tribe to

acquiring new lands for gaming that are "adjacent" to their original reservation.

Response: The requirement that limits a tribe to contiguous lands for gaming purposes is already written into law and these regulations cannot make a substantive change to that law.

A few comments suggested a substantial revision of this section so that it would eliminate inaccuracies, conform to the statute and add clarity.

Response: The suggestions were adopted in part and the section was revised in order to address the concerns and more closely mirror the statute.

## "Settlement of a Land Claim" Exception

*Section 292.5   What must be demonstrated to meet the "settlement of a land claim" exception?*

This section was renamed "When can gaming occur on newly acquired lands under a settlement of a land claim?"

*Comments on paragraph (a):*
One comment suggested that the rule should require that, along with the State, the affected local governments also must approve a settlement if it is to qualify for the exception.

Response: This recommendation was not adopted because the regulations can neither dictate the language of Congressional legislation nor the parties to a particular settlement agreement; whether it is a final order or some other enforceable agreement. If a local government is a party in a matter concerning a settlement of a land claim, then its approval would be necessary.

One comment suggested that the rule should require that a tribe have a demonstrable historical connection to the site chosen.

Response: This recommendation was not adopted because the regulations can neither dictate the requirements of Congressional legislation nor the terms to a particular settlement agreement; whether it is a final order or some other enforceable agreement.

One comment suggested the following insertion at paragraph (a)(2): "Has been resolved by congressional enactment; or."

Response: This recommendation was addressed through the changes to paragraph (a).

One comment suggested adding a new paragraph (a)(3) as follows: "Relates to the acquisition, transfer or exchange of land to compensate for or replace land within a reservation that is damaged or otherwise rendered uninhabitable by a natural disaster, catastrophic event, or other action."

Response: This recommendation was not adopted because it is unnecessary to either include or exclude, in the

regulations, claims based on particular sets of facts and circumstances.

A few comments suggested that under paragraph (a)(1), the rule should state that land would not be eligible for gaming if the claim is dismissed on procedural grounds.

Response: This recommendation was not adopted because a dismissal on procedural grounds, i.e., laches, does not necessarily mean that a claim lacks merit and may not resolve other issues related to impairment of title or loss of possession.

One comment was concerned that under paragraph (a)(1), the language "has not been dismissed on substantive grounds" is vague and another comment suggested dropping the clause altogether.

Response: This recommendation was adopted.

One comment suggested that paragraph (a)(1) should include actions filed in State court.

Response: The recommendation was not adopted because the land claims within the meaning of IGRA arise under Federal statute, Federal common law, the U.S. Constitution or a treaty and jurisdiction lies in Federal, not State court.

One comment suggested that under paragraph (a)(1), language be added as follows: "wherein the relief sought is (A) return of land, (B) conveyance of replacement land, or (C) monetary and Congress enacts legislation to mandate that a portion of the monetary recovery (i.e., the judgment funds) be used to purchase real property."

Response: The recommendation was not adopted because the regulations cannot dictate the terms of a settlement or the relief a tribe may seek. While the language of the regulation does not specifically address the scenarios addressed in the comment, when a particular land claim otherwise meets the definition, whether for example the legal basis involves the impairment of title or other real property interest such as a lease, and the relief includes the return of land, conveyance of replacement land, or money for the purchase of other real property, the land claim may meet the requirements of this section as long as it is either subject to Congressional enactment or returns to the tribe all of the lands claimed by the tribe.

One comment suggested paragraph (a)(2) be replaced with the following language: "Is a legal claim of a tribe that has not been filed in Federal or State court."

Response: The recommendation was not adopted; however, the definition and regulation allow for a land claim that is not filed in court.

One comment suggested adding a new paragraph (a)(3) to read: "Has been the subject of Federal legislation which allows for acquisition of land."

Response: The recommendation was adopted in part and is in included in paragraph (a) of the reorganized section.

One comment suggested replacing in paragraph (a)(2) "included" with "identified."

Response: Due to a reorganization of this section, the suggestion is no longer relevant.

*Comments on paragraph (b):*

One comment suggested replacing in paragraph (b) "must be covered by" with "must have been acquired pursuant to."

Response: Due to a reorganization of this section, the suggestion is no longer relevant.

One comment suggested the following edits in paragraph (b)(1): "States that the tribe is relinquishing its legal land claim to some or all of the lands claimed by the tribe as part of the settlement, results in the alienation or transfer of title to tribal some or all of the lands claimed by the tribe within the meaning of 25 U.S.C. 177, and has been enacted into law by the United States Congress; or"

Response: Due to reorganization of this section, the suggestion is no longer relevant, but the concepts behind the edits were adopted in part, and incorporated into the reorganized section.

One comment suggested the following edits in paragraph (b)(2): "Returns to the tribe lands identical to the entirety of the exact lands claimed by the tribe, does not involve an alienation or transfer of title to tribal lands claimed by the tribe that is prohibited under 25 U.S.C. 177, and is either:"

Response: Due to a reorganization of this section, the suggestion is no longer relevant.

One comment suggested deleting the following language under paragraph (b)(1): "results in the alienation or transfer of title to tribal lands within the meaning of 25 U.S.C. 177, and has been enacted into law by the United States Congress."

Response: This recommendation was adopted in part as it pertains to 25 U.S.C. 177.

One comment suggested replacing paragraph (b)(2) with "Returns to the tribe lands or allows acquisition of lands that the tribe has a historical connection to and is either * * *"

Response: This recommendation was not adopted because the regulations cannot dictate the terms of the settlement.

One comment suggested modifying the language in paragraph (b)(2)(i) to include both Federal and [S]tate court."

Response: This recommendation was not adopted. The definition precludes actions filed in State court because land claims, within the meaning of IGRA, are based on Federal law. In addition, comments revealed that the proposed regulations could be read to identify settlements between a tribe and State without the involvement of the Federal Government. The final regulations clarify that the U.S. must be a party to the settlement.

One comment suggested adding a new paragraph (b)(2)(iii) that reads: "Acquired pursuant to Federal legislation."

Response: This recommendation was adopted in part and reflected in the reorganized section.

One comment suggested that the exception should be amended to apply to an out-of-court settlement that is approved by the United States and that only requires the non-Indian party to voluntarily vacate the premises, pay damages, or allows the settlement agreement to be implemented through Secretarial approval of some form of conveyance of interest in Indian land under existing law.

Response: The recommendation to amend the exception to apply under the exact scenario described by the comment was not adopted; however, to the extent that the United States is a party, the scenario would fit under the exception.

One comment suggested replacing the introduction with "Under this section, class II or class III gaming may be conducted on trust lands only if the criteria of both (a) and (b) are met."

Response: This recommendation was not adopted. The section was reorganized and the recommendation is no longer relevant.

A few comments suggested that the rule should require a settlement to be ratified either by Congress or consented to by the affected local government.

Response: This recommendation was adopted to the extent that it relates to Congressionally enacted settlements and to the extent an affected local government is a party to a particular settlement agreement, whether it is a final order or some other enforceable agreement.

## "Initial Reservation" Exception

*Section 292.6   What must be
demonstrated to meet the "initial
reservation" exception?*

One comment suggested that
§ 292.6(a) inappropriately restricts the
scope of the "Federal acknowledgment
process" to the regulatory procedures in
25 CFR part 83.
Response: The Department does not
accept the recommendation to apply
these regulations more broadly to
recognition by means other than that
through 25 CFR part 83. The plain
meaning of the statute suggests that it
applies to tribes acknowledged by this
process and no others.
*Comments on paragraph (b):*
Several comments suggested deleting
paragraph (b). One comment stated that
there is no mention of location with
respect to tribal members or tribal
government in IGRA and that it is unfair
to tribes with widely dispersed
populations due to allotment and
termination. One comment
fundamentally disagreed with and
recommended eliminating the 50-mile
majority membership requirement.
Response: These recommendations
were adopted in part. While a so-called
"modern connections" requirement was
not eliminated entirely, the paragraph
was modified in response to a number
of comments that suggested that the
requirement encompass a wider range of
criteria. The 50-mile majority
requirement was eliminated and the
paragraph was amended to reference a
significant number of tribal members or
other factors that demonstrate the tribe's
current connection to the land. The
inclusion of a modern connections
requirement provides an element of
notice to the surrounding community
yet the elimination of the 50-mile
majority requirement recognizes that the
standard is too difficult to apply in
today's mobile work related
environment.
A few comments suggested reducing
the 50-mile majority requirement to 25
miles so the mileage requirements are
the same for both the "tribal majority
test" and the "headquarters test" in
paragraph (b). Another comment
suggested making the "50-mile majority
test" and the "headquarters test"
conjunctive instead of disjunctive, for
example; making the "or" an "and."
Response: These recommendations
were not adopted because the purpose
of the exception is to assist newly
recognized tribes in economic
development. As long as the tribe has a
modern connection to the land, the
surrounding community has notice of
the tribal presence.

Several comments suggested that the
"headquarters test" is easily
manipulated and should not be
included. Some comments suggested
increasing the 25-mile limit.
Response: The recommendations to
remove the headquarters test and to
alter the 25-mile radius were not
adopted because the headquarters test is
a useful means of determining whether
a tribe has a modern connection to the
newly acquired land and the 25-mile
radius is both useful and consistent.
(The word radius was added to the
regulation to provide clarity.)
Nonetheless, the concerns raised by
these comments are legitimate because
the version of the headquarters test in
the proposed regulations could be
construed as being open to
manipulation. Therefore, the qualifier
was added in the final regulations that
the tribe's headquarters or other tribal
governmental facilities be in existence
at that location for at least two years at
the time of the application for land-into-
trust. The addition of "other tribal
governmental facilities" was necessary
due to concerns that tribes often operate
out of more than one headquarters or
facility.
One comment suggested that the
"headquarters test" is not in the best
interest of the tribe because it may
separate a headquarters from a tribal
population center.
Response: This concern was
addressed through the modification of
paragraph (b). A tribe may show a
modern connection through not only a
nearby headquarters but also through
other tribal governmental facilities.
*Comments on paragraph (c):*
A few comments suggested deleting
the reference to "cultural connection"
because it is essentially a subset of
historical connections and adds
redundancy and confusion to the
regulation.
Response: This recommendation was
adopted.
One comment suggested adding
specific examples of significant
historical and cultural connections in
paragraph (c), for example, "designated
in a treaty, whether ratified or not."
Another comment stated that the term
"significant historical connection" is
too vague to offer any protection to
tribes or citizens and that the regulation
should not allow gaming on lands to
which a tribe has only a transient
connection. Several comments
specifically suggested a definition for
"significant historical connections."
Response: This recommendation was
adopted in part through the addition of
the new definition "significant
historical connections."

One comment suggested deleting (c).
Response: This recommendation was
not adopted. The significant historical
connection requirement insures that the
tribe has a preexisting connection to the
newly acquired lands proposed to be its
initial reservation. Furthermore, the
Department does not believe it is good
policy to create an initial reservation in
an area where the tribe has no
preexisting connection.
One comment suggested that the word
"area," as it relates to the term
"significant historical connection," is
too broad. The comment suggested that
gaming should be limited to ancestral
homelands and that language should be
inserted to reference 25 CFR 151.11(b)
so that as distance from homeland
increases—nearby local officials, State
officials and tribe's input gains greater
weight.
Response: This recommendation was
not adopted because the actual land to
which a tribe has significant historical
connection may not be available.
Additionally, input from nearby local
officials, State officials and other tribes
is not part of the Initial Reservation
analysis in section 2719.
One comment suggested that the
significant historical connection
requirement should be uninterrupted
connection. Another comment
suggested that the requirement should
show historically exclusive use.
Response: These recommendations
were not adopted. They would create
too large a barrier to tribes in acquiring
lands and they are beyond the scope of
the regulations and inconsistent with
IGRA.
*General comments on § 292.6:*
One comment noted that there is
nothing in the "Initial reservation"
section of the regulations regarding
process so the public has an opportunity
to comment.
Response: Unlike the exception in
IGRA section 2719(b)(1)(A), the
exceptions in section 2719(b)(1)(B) do
not reference an opportunity for public
comment. Because the section
2719(b)(1)(B) exceptions do not require
public comment and since they present
a fact-based inquiry, it is unnecessary to
include a requirement for public
comment in the regulations.
Nonetheless, there are opportunities for
public comment in other parts of the
administrative process—for example, in
the process to take the land in trust and
during the NEPA review process.
Although the regulations do not provide
a formal opportunity for public
comment under subpart B of these
regulations, the public may submit
written comments that are specific to a
particular lands opinion. Submissions

may be sent to the appropriate agency that is identified in § 292.3.

One comment suggested that the regulations include the process by which the BIA will make their decisions. Another comment suggested that the regulations need to include standards by which the Secretary will make a decision.

Response: These recommendations were adopted in part. If the tribe does not have a proclaimed reservation on the effective date of these regulations, § 292.6(d) provides standards that the tribe must demonstrate in order to be proclaimed a reservation under the initial reservation exception.

One comment suggested that the regulations add a section that provides that lands far removed from historical territory shall not be taken into trust for gaming.

Response: This recommendation was not adopted because the comment raises issues pertaining to 25 CFR part 151—Land Acquisitions.

One comment suggested that the tribes should be required to analyze sites that are close to aboriginal homelands.

Response: This recommendation was not adopted. Newly acquired lands with significant historical and cultural connections may or may not include those that are close to aboriginal homelands.

A few comments suggested striking all of paragraphs (b) and (d) along with a large amount of (c) and (e) so that this paragraph would limit "initial reservation" to a tribe acknowledged under part 83 and the condition that "the land is located within the external boundaries of the first reservation of lands set aside for the tribe."

Response: This recommendation was not adopted, as it does not take into account the present circumstances of the tribe's location.

One comment suggested cross-referencing "significant historical connections" in the section to § 292.12(b).

Response: The intent of this recommendation was adopted through adding a definition of significant historical connections to the definition section.

One comment suggested that the request for an opinion should include the distance of the land from the location where the tribe maintains core governmental functions.

Response: The recommendation was not adopted because the distance from the tribal headquarters or other governmental facility is just one of three methods by which a tribe can meet the modern connections requirement and is

therefore not always necessary. Additionally, it is not within the scope of IGRA to restrict such analysis to locations with "core" governmental functions.

One comment suggested that the regulations require a tribe to provide information about the tribe's ancestral ties to the land.

Response: The recommendation was not adopted; however, ancestral ties would be part of the significant historical connection analysis.

One comment suggested that the regulations use only one test for both the "initial reservation" exception and the "restored lands" exception; the test being that a majority of tribal members live within 50 miles of the proposed gaming site.

Response: This recommendation was not adopted. The regulations articulate a "modern connections" test for both the "initial reservation" and "restored lands" exceptions but the 50-mile majority requirement was eliminated from each for the reasons discussed under the comments for paragraph (b).

One comment noted that the BIA does not define what uses can be made of an initial reservation. The commenter was concerned about an initial reservation established solely for casino development.

Response: An initial reservation may be used solely for the establishment of a casino.

One comment suggested a "contemporary ties" test instead of using the "modern connections test" as set forth in the proposed regulations.

Response: This recommendation was adopted in part. The term "contemporary ties" was not used, but the modern connections test as set forth in the proposed regulations was modified using some of the suggestions that were given in relation to the "contemporary ties" test.

One comment suggested striking (e) and replacing it with "the tribe has not conducted gaming on any other lands proclaimed to be a reservation under 25 U.S.C. 467."

Response: This recommendation was not adopted. Gaming is allowed on the initial reservation under this exception. If other newly acquired land is declared a reservation, gaming can occur on it under a two part determination without precluding gaming on the initial reservation. To preclude gaming on the initial reservation would be contrary to the congressional intent in providing this exception.

### "Restored Lands" Exception

*Section 292.7 What must be demonstrated to meet the "restored lands" exception?*

A few comments noted that there are no opportunities for public comment on restored lands decisions.

Response: Unlike the exception in IGRA section 2719(b)(1)(A), the exceptions in section 2719(b)(1)(B) do not reference an opportunity for public comment. Because the section 2719(b)(1)(B) exceptions do not require public comment and since they present a fact-based inquiry, it is unnecessary to include a requirement for public comment in the regulations. Nonetheless, there are opportunities for pubic comment in other parts of the administrative process—for example, in the process to take the land in trust and during the NEPA review process. Although the regulations do not provide a formal opportunity for public comment under subpart B of these regulations, the public may submit written comments that are specific to a particular land opinion. Submissions may be sent to the appropriate agency that is identified in § 292.3.

One comment suggested that the tests for significant historic connections and modern connections are deficient because they allow tribes without true historic ties and with inadequate modern ties to game on lands under the restored lands exception.

Response: The Department received comments suggesting the opposite of this argument as well; suggesting that the historical and modern tests were too restrictive. The final regulations consider both sides of this issue and modifications were made accordingly.

One comment suggested using the term "recognized by the United States" instead of the term "federally recognized" because of a concern of confusion arising from the defined term "federally recognized" in the proposed regulations.

Response: This recommendation was not adopted; however, the potential confusion was remedied through the omission of a defined term "federally recognized" in the final regulation in favor of a modification of the term "Indian tribe or tribe."

One comment suggested adding a paragraph to § 292.7 that the lands acquired in trust for the tribe meet the requirements of § 292.11.

Response: This recommendation was adopted for purposes of clarity.

*Section 292.8   How does a tribe qualify as having been federally recognized?*

One comment suggested that paragraph (a) include more details regarding the treaty negotiations with the tribe. For example, the comment suggested including the following requirements: Detailing who negotiated with a tribe; that the negotiations be authorized by the Department; that the facts and subject matter of the negotiations be memorialized; that the tribe be organized at the time of the negotiation; and that a definition of "negotiates" be included to mean a goal-oriented government-to-government discussion.

Response: These recommendations were not adopted. Paragraph (a) will be applied on a case by case basis.

One comment suggested that paragraph (b) should require that the Department make the opinion formally, in writing, and according to governing regulations.

Response: This recommendation was not adopted. While the opinions are always going to be in writing, in the past they were made with varying degrees of formality depending on the situation presented. Regulatory guidance making these requirements mandatory is not feasible and is unnecessary.

One comment suggested paragraph (b) should not use the word "could" because there is a difference between tribes that could and tribes that actually did organize under the Acts.

Response: This recommendation was not adopted because a Departmental opinion that a tribe could organize is evidence of Federal recognition, regardless of whether the tribe actually organized under the Acts.

One comment suggested that the word "including" in paragraph (c) be removed and that the paragraph be modified to require the legislation to specifically name the tribe in question and to describe the substance of the relationship.

Response: This recommendation was adopted in part. The word "including" was removed and replaced with the word "naming."

A few comments suggested paragraph (d) needs modification. One comment suggested differentiating between land acquired for organized and land acquired for landless Indians without "ethno historic coherence." Another comment argued that the section is too permissive because it qualifies a tribe as having been recognized if the United States acquires land in trust for a tribe's benefit.

Response: These recommendations were not adopted. Paragraph (d), as

written, provides sound guidance to the Department in issuing its opinion regarding whether a tribe was once federally recognized.

One comment suggested paragraph (e) should require certain standards regarding the tribe, the relationship with the Federal Government, and what constitutes evidence.

Response: These recommendations were not adopted because the regulation needs no further elaboration and is clear on its face.

One comment suggested striking the word "federally" from the introduction sentence and the word "Federal Government" from paragraph (e).

Response: These recommendations were not adopted because IGRA is a Federal statute concerning federally recognized tribes, 25 U.S.C. 2703(5).

One comment suggested that the section include a paragraph (f) that requires the tribe seeking a lands opinion to be the political and genealogical successor to the tribe identified through paragraphs (a) through (e).

Response: This recommendation was not adopted because it is unnecessary. These concerns are addressed and inherent in the restored lands analysis under §§ 292.9–12.

One comment suggested using Professor Cohen's test for Federal recognition, which it characterized as Congressional or Executive action and a continuing relationship with the group, and that restored lands opinion should be made by the BIA's Branch of Acknowledgment and Research (BAR), now the Office of Federal Acknowledgment (OFA).

Response: These recommendations were not adopted because OFA's expertise is in analyzing a petitioner under other criteria, such as community, political influence, and genealogy, not land matters. The section already requires Executive or Congressional action. The continuing relationship can be evaluated under (e), but is not required when any of factors (a) through (d) are demonstrated.

*Section 292.9   How does a tribe show that it lost its government-to-government relationship?*

A comment questioned how old a document must be to be considered "historical" and another comment wanted to include as acceptable evidence, documentation from sources other than the Federal Government, including oral histories, to show that the Federal Government either affirmatively terminated its relationship or that the relationship ceased to exist, such as through inaction.

Response: These recommendations were not adopted. Although "historical" is somewhat imprecise, it adds clarity to the type of documentation that is acceptable evidence under this section. Modern documents about events in the past are not acceptable evidence. Acceptable documentation is written documentation from the Federal Government specifically terminating the relationship, or indicating consistently that there is no longer a government-to-government relationship with the tribe or its members. Historical or modern accounts that conclude or assume that there is no government-to-government relationship, or that the relationship has lapsed through inaction of the tribe or the government, are secondary evidence and are not acceptable evidence within the meaning of this section. Similarly, historical or modern accounts that the Federal Government did not or does not acknowledge a specific responsibility with the group because there is no longer a trust asset to protect or disburse, or because the Federal Government did not or does not know who the group is, are not acceptable evidence, even if the account is from the Federal Government.

One comment stated that in paragraph (a), the Congressional action must be clear that the relationship was terminated and that the tribe be identified by name.

Response: This recommendation was not adopted because the commenter did not suggest how to clarify the paragraph. The paragraph, as written, is sufficient to address the commenter's concerns.

One comment suggested adding the phrase "clearly and affirmatively acted to" after "Executive Branch," in paragraph (b), in order to preclude tribes from asserting that administrative errors constitute deliberate acts of termination.

Response: This recommendation was not adopted because the words "show" and "no longer" are adequate.

A few comments argued that the paragraph (b) should give no excessive deference to the Department of the Interior or the Department of Justice and that all branches of the Federal Government should be given equal weight. One comment suggested adding "Federal Government" at the end of the first sentence. In addition to adding "Federal Government," another comment suggested striking everything but the first sentence.

Response: This recommendation was adopted in part and the paragraph was modified by using the words "Federal Government." The second sentence was retained because it is necessary.

One comment stated that in paragraph (b) the rule should make clear that the

documentation include evidence that the tribal government existed at the time of the termination, that the acts constituting the termination were unambiguous, and that the subsequent acts by the Government were consistent with the tribe's termination.

Response: This recommendation was not adopted. Tribe is a defined term and the definition is adequate to address the commenter's concern. The language pertaining to government action requires that the action be unambiguous. When termination is unambiguous, then it is not necessary to review whether subsequent acts are consistent with the termination.

One comment suggested striking the language "or its members" in paragraph (b) because the comment stated that there cannot be a government-to-government relationship with members apart from a tribal government.

Response: This recommendation was not adopted. The language was kept in order to accommodate a wide variety of circumstances.

One comment suggested modifying the preamble of this section with the following: "as having at some later time lost its government-to-government relationship with the United States." The comment stated that the change makes the preamble consistent with the language of § 292.7(b) and the introductions to §§ 292.8 and 292.10.

Response: This recommendation was adopted in general and the section was modified accordingly. The specific words "with the U.S." were not added as they are understood in light of § 292.8.

One comment questioned whether California rancherias should be allowed to qualify as restored lands under IGRA.

Response: While the California tribes indeed share a unique path towards restoration, if the newly acquired lands otherwise meet the requirements of the statute and regulations, the exception pertains to them.

*Section 292.10  How does a tribe qualify as having been restored to Federal recognition?*

One comment suggested changing the term "tribal government" to "tribe," in paragraph (a), in order to be consistent.

Response: This recommendation was adopted.

One comment stated that paragraph (a) should make clear that the statute must be unambiguous as to its intent and identify the tribe being restored.

Response: This recommendation was not adopted because the present language anticipates this clarity and specificity.

One comment stated that 25 U.S.C. 2719(b)(1)(B)(iii) unambiguously restricts application of the restored lands exception to "an Indian tribe that is restored to Federal recognition." Thus, it argues, paragraph (a) is overly broad and should be modified because it allows recognition, acknowledgment or restoration through legislative enactment, including a tribe's initial recognition.

Response: This recommendation was not adopted because Congress has not been clear in using a single term in restoration bills. Additionally, the addition of "(required for tribes terminated by Congressional action)" in paragraph (a) addresses this issue. To the extent this comment concerned "initial" recognition by Congress where no prior relationship existed, legislation would not be encompassed by § 292.9.

Several comments suggested that this section needs to include administrative actions of restoration, recognition, and reaffirmation that are outside the Federal acknowledgment process. For example, one comment suggested modifying paragraph (b) to read; "[r]ecognition through administrative action," and another suggested "recognition through other official action of the Secretary or his/her designee."

Response: This recommendation was not adopted. Neither the express language of IGRA nor its legislative history defines restored tribe for the purposes of section 2719(b)(1)(B)(iii). When Congress enacted IGRA in 1988, it authorized gaming by existing federally recognized tribes on newly acquired lands if those lands were within or contiguous to the boundaries of an existing reservation. If the tribe had no reservation, Congress authorized gaming on newly acquired lands within the boundaries of its former reservation. We can safely infer that Congress understood that a list of federally recognized tribes existed and authorized on-reservation, or on former reservation, gaming for those tribes. We must, therefore, provide meaning to Congress's creation of an exception for gaming on lands acquired into trust "as part of the restoration of lands for an Indian tribe restored to Federal recognition." We believe Congress intended restored tribes to be those tribes restored to Federal recognition by Congress or through the part 83 regulations. We do not believe that Congress intended restored tribes to include tribes that arguably may have been administratively restored prior to the part 83 regulations.

In 1988, Congress clearly understood the part 83 process because it created an exception for tribes acknowledged through the part 83 process. The part 83 regulations were adopted in 1978. These regulations govern the determination of which groups of Indian descendants were entitled to be acknowledged as continuing to exist as Indian tribes. The regulations were adopted because prior to their adoption the Department had made *ad hoc* determinations of tribal status and it needed to have a uniform process for making such determinations in the future. We believe that in 1988 Congress did not intend to include within the restored tribe exception these pre-1979 *ad hoc* determination. Moreover, Congress in enacting the Federally Recognized Indian Tribe List Act of 1994 identified only the part 83 procedures as the process for administrative recognition. *See* Notes following 25 U.S.C. 479a.

The only acceptable means under the regulations for qualifying as a restored tribe under IGRA are by Congressional enactment, recognition through the Federal acknowledgment process under 25 CFR 83.8, or Federal court determination in which the United States is a party and concerning actions by the U.S. purporting to terminate the relationship or a court-approved settlement agreement entered into by the United States concerning the effect of purported termination actions. While past reaffirmations were administered under this section, they were done to correct particular errors. Omitting any other avenues of administrative acknowledgment is consistent with the notes accompanying the List Act that reference only the part 83 regulatory process as the applicable administrative process.

One comment stated that paragraph (c) is contrary to the Federally Recognized Indian Tribe List Act of 1994, which it stated controls the analysis of this rule. The comment argues that a "court-approved stipulated entry of judgment" is not a "decision" on the merits as specified in the Act.

Response: According to Department's analysis, paragraph (c) is not inconsistent with the List Act. The litigation encompassed by § 292.10 concerns challenges to specific actions taken by the Federal Government terminating, or purporting to terminate a relationship, such as the Tillie Hardwick litigation in California. There is no reason under IGRA or the List Act to preclude a settlement concerning challenged termination actions from "restoring" a government-to-government relationship if the U.S. is a party and the court approves it.

One comment suggested adding the following language to paragraph (c):

"Was entered into by the United States which:" and striking paragraph (1).

Response: This recommendation was adopted in part and the paragraph was modified accordingly.

One comment suggested separating (c) into two parts as follows: "(c) Recognition through a judicial determination; or (d) Recognition through a court-approved stipulated entry of judgment or other settlement agreement." The comment stated that recognition through a judicial determination should be sufficient, whether or not the judicial determination satisfies the criteria set forth in paragraphs (1) and (2).

Response: This recommendation was not adopted. While the structure of the paragraph was changed, the criteria set forth in (1) and (2) are still necessary. At issue is the government-to-government relationship between the U.S. and the tribe, and the U.S. must be a party in order to be bound by the court's decision.

One comment suggested that a court-approved "settlement agreement" should be sufficient, whether or not it is styled a "stipulated entry of judgment."

Response: This recommendation was adopted.

One comment suggests striking the word "Provides," in paragraph (2), and replacing it with "Settles claims" in order to remedy a potential scenario where the settlement agreement omits pertinent language but, nonetheless, settles the tribe's claim that it was never legally terminated.

Response: This recommendation was adopted, consistent with prior administrative practice concerning the Tillie Hardwick litigation.

One comment stated that since there are no judicial findings in a court-approved stipulated entry of judgment, such means provide an inadequate basis to restore a tribe.

Response: This concern was addressed through the revision to paragraph (c). The relevant operative language in the Federal court determination or court-approved settlement agreement must include language pertaining to termination rather than restoration.

One comment noted that parties do not enter into judicial determinations. Thus, it argued, paragraph (1) does not make sense as it pertains to paragraph (c).

Response: This concern was addressed and the paragraph was amended accordingly.

One comment suggested that the regulations should provide a mechanism to give notice of any action to affected local communities. Furthermore, the comment suggested that the rule should make clear that the party has standing to intervene if it can demonstrate that it is affected and that the tribe should not be able to raise sovereign immunity as a bar.

Response: These recommendations were not adopted because they are beyond the scope of the regulations and inconsistent with IGRA.

One comment suggested inserting language requiring the applicant group to clearly establish by documented evidence that its current members are directly descended from members of the terminated tribe.

Response: This recommendation was not adopted because requiring genealogies of tribal members is beyond the scope of the regulations, inconsistent with IGRA and not necessary in order to decide whether the applicant tribe is a restored tribe.

*Section 292.11 What are "restored lands?"*

One comment suggested striking the word "specific" in paragraph (a). A few comments suggested striking any language in paragraph (a) and § 292.11 pertaining to a geographical area or parameters.

Response: These recommendations were not adopted. The regulations include a contingency for legislation that requires or authorizes the Secretary to take land into trust for the benefit of a tribe within a specific geographic area because in such scenarios, Congress has made a determination which lands are restored. Because the inclusion or exclusion of specific geographical areas in restoration legislation is beyond the control of the Department, the regulations must address both contingencies.

One comment suggested that language in paragraph (b) should provide expert administrative guidance to Congress when it drafts restoration legislation.

Response: This recommendation was not adopted because it is outside the scope of the regulations and inconsistent with IGRA.

One comment suggested that the criteria in paragraph (b) should apply to land acquired by a tribe that is recognized through 25 CFR 83.8 as well.

Response: This recommendation was adopted and the paragraph was modified accordingly. In order to adopt this and other recommendations, the section was re-organized.

One comment suggested that paragraph (b) and all related paragraphs in § 292.12 should be revised with the requirement that the tribe's modern and historical connection to the land must have been continuous since at least before October 17, 1988.

Response: This recommendation was not adopted because it is inconsistent with the purposes of this provision of IGRA and is thus beyond the scope of the regulations.

One comment suggested inserting the words "recognized, acknowledged or" into both paragraph (a) and (b) because the broader language is consistent with § 292.10(a). Also, the comment suggested adding the words "for the benefit of the tribe" in paragraph (a) and replacing the words "the restoration" with the word "such" in paragraph (b).

Response: These recommendations were adopted in part and the paragraphs were modified accordingly.

One comment suggested modifying paragraph (b) by replacing "modern connection" with "contemporary ties." The comment also suggested striking the word "significant" and removing the temporal requirement.

Response: These recommendations were not adopted. However, the modern connections test as set forth in the proposed regulations was modified using some of the suggestions that were given in relation to the "contemporary ties" test. Striking the word "significant" and removing the temporal requirement would so broaden the benefit to restored tribes that it would be detrimental to other recognized tribes, contrary to Congressional intent.

One comment suggested striking the words "the restoration" from paragraph (b) and striking the language pertaining to the modern, historical and temporal requirements in § 292.12. Instead, the comment suggested replacing the reference to the requirements with: "The land is located within an area where the tribe has connections to the lands that meet the requirements of § 292.12."

Response: These recommendations were adopted in part. The phrase "the restoration" is necessary and therefore retained in the regulations. The recommendation pertaining to referencing § 292.12, instead of listing the requirements, was adopted.

One comment stated that there is a structural ambiguity in § 292.11 because the conjunctions are not clear and that the section needs clarified. For example, the paragraph could be read as requiring (a or b) and c, or it could be read as requiring a or (b and c).

Response: This recommendation was adopted and the section was modified in order to clarify that "the tribe must show at least one of the following" in order for the newly acquired lands to qualify as restored lands.

One comment suggested adding a number of paragraphs in order to address Oklahoma tribes in this section.

Response: This recommendation was not adopted because it in unnecessary to single them out. Limitations on the Oklahoma tribes are specifically addressed in other parts of section 2719 and the regulations.

One comment stated that the rule should conform more closely to applicable law and suggested adding a paragraph (d) to require that the land be the first trust acquisition following restoration.

Response: This recommendation to add a paragraph (d) was not adopted; however, temporal limitations are addressed in § 292.12 of the regulations.

*Section 292.12 How does a tribe establish its connection to the land?*

This section was renamed, "How does a tribe establish its connection to newly acquired lands for the purposes of the 'restored lands' exception?"

*Paragraph (a):*

Several comments concerned the "headquarters test" in paragraph (a). Comments ranged from support to requests to eliminate the test all together. For example, some comments requested that the rule be excluded because it is arbitrary and potentially subject to abuse or manipulation; some suggested removing the test without explanation—one comment suggests that the headquarters test was designed specifically to accommodate a particular tribe. Some comments suggested that if the headquarters test is included, there should be a temporal requirement that requires the headquarters to be located within 25 miles of the proposed lands since before the enactment of IGRA. Another comment suggested the temporal requirement be 30 years. One comment stated that 25 miles is too great a distance, while another comment suggested it should be extended to 50 miles.

Response: The recommendations to remove the headquarters test and to alter the 25-mile radius were not adopted because the headquarters test is a useful means of determining whether a tribe has a modern connection to the newly acquired land and the 25-mile radius is both useful and consistent. (The word radius was added to the regulation to provide clarity). Nonetheless, the concerns raised by these comments are legitimate because the version of the headquarters test in the proposed rule could be construed as being open to manipulation. Therefore, the qualifier was added in the final rule that the tribe's headquarters or other tribal governmental facilities be in

existence at that location for at least two years at the time of the application for land-into-trust. The language of "other tribal governmental facilities" was added to address concerns that tribes often operate out of more than one headquarters or facility.

A few comments suggested adding a paragraph to the modern connection test that allows land that is located within the tribe's service area—as designated by legislation restoring the government-to-government relationship with the tribe, or by the BIA, Department of Health and Human Services or by the Department of Housing and Urban Development. Similarly, one comment suggested including the following language at the end of paragraph (a): "or the land has been designated by the BIA as included within the [t]ribe's service population area."

Response: These recommendations were not adopted because the service area is not necessarily defined by the DOI and would thus add complication to the analysis due to the added necessity of collaboration with other agencies. Furthermore, the tribe's service area is often based on factors not connected with the DOI's section 2719 analysis and is often ill-defined, overlapping and potentially inconsistent.

Several comments suggest removing the "modern connections" test because, for example, the test is not in the plain language of IGRA, and the test is contradicted by case law (e.g., *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F.Supp. 2d 920 (W.D. Mich. 2002), aff'd 369 F.3d 960 (6th Cir. 2004); *Confederated Tribes of the Coos, Lower Umpqua, and Suislaw Indians v. Babbitt*, 116 F.Supp. 2d 155 (D.C. Cir. 2000)) that focuses on whether the lands were historically occupied by the tribe.

Response: This recommendation was not adopted. Though the "modern connections" test is not in the plain language of IGRA, nor is the test for a historical connection. The cases cited by the commenter do not limit the Department from considering a modern connection and only discuss the historical connection in relation to the process by which the Department made its decision. Additionally, the cases cited by the commenter provide guidance for the interpretation of section 2719(b)(1)(B)(iii); lands that are taken into trust as part of the restoration of lands for an Indian tribe that is restored to Federal recognition. The Secretary has discretion to require a modern connection as part of the restoration of lands. The modern connection test remains in the final

regulations because it offers a mechanism to balance legitimate local concerns with the goals of promoting tribal economic development and tribal self-sufficiency, both of which are reflected in IGRA.

Several comments addressed concerns about the "modern connection test" and suggested modifying it. For example, a few comments stated that the test for a modern connection to the land is too permissive and suggested that the casino site must be in the immediate vicinity of the tribe's current population or that the 50-mile majority requirement be narrowed. Several comments suggested that the modern connection test is too narrow and should be broadened to allow the Department to consider a greater degree of facts and circumstances or to expand or eliminate the 50-mile majority requirement. A few comments noted that a hard-line 50-mile majority requirement presents practical difficulties when it comes to implementation.

Response: The recommendations to narrow the modern connection test were not adopted. Given the potential difficulty and confusion in administering the 50-mile majority requirement, the recommendations to eliminate the requirement were adopted in favor of a test that allows for the consideration of a number of different factors. Additionally, in balancing these concerns, the Department added the following language in paragraph (a): "The land is located within the State or States where the Indian tribe is presently located, as evidenced by the tribe's governmental presence and tribal population, and the tribe can demonstrate one or more of the following modern connections to the land."

One comment suggested requiring both a majority population test and a headquarters test.

Response: This recommendation was not adopted. As noted, the 50-mile majority requirement was eliminated. Nonetheless, the purpose of the exception is to assist restored tribes in economic development. As long as the tribe has a modern connection to the land, the surrounding community has notice of the tribal presence.

One comment suggested adding a requirement for a culturally significant modern connection.

Response: This recommendation was not adopted because it is not clear what the commenter intended by "culturally significant." Assuming the commenter suggested a more narrow interpretation of modern connections, the recommendation is not adopted because, while the modern connections

requirement was not eliminated entirely, the paragraph was modified in response to a number of comments that suggested that the requirement encompass a wider range of criteria. As discussed above, the 50-mile majority requirement was eliminated and the paragraph was amended to reference a significant number of tribal members or other factors that demonstrate the tribe's current connection to the land. The inclusion of a modern connections requirement provides an element of notice to the surrounding community yet the elimination of the 50-mile majority requirement recognizes that the standard is too difficult to apply in today's mobile work related environment.

One comment suggested striking (a) and replacing it with the following: "Contemporary ties to the area in which the land is located."

Response: This recommendation was not adopted; however, the modern connections test as set forth in the proposed regulations was modified using some of the suggestions that were given in relation to the "contemporary ties" test.

*Paragraph (b):*

One comment requested a definition of "tribe" that states that an unconnected group of Indians, with no common ethno historic affiliation, does not constitute a tribe for the purpose of paragraph (b).

Response: This recommendation was not adopted. Tribe is defined in the definition section and applies throughout the regulations.

One comment stated that the phrase "significant historical connection" in (b) is interpreted too broadly, and that it should only be found when a tribe has had exclusive use and occupancy of an area. Additionally, the comment suggested that an Indian Claims Commission determination on restored lands should be binding.

Response: This recommendation was not adopted. In response to numerous comments, the term "significant historic connection" is now defined in the definition section of these regulations. While not limited to the tribe's exclusive use and occupancy area, the definition specifies certain criteria that a tribe must show in order to meet the definition, e.g., "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."

One comment suggested that a tribe should not be able to establish a

historical connection if they are a disparate group of traveling Indians traveling through territory at some point in their distant history.

Response: We received comments pertaining to the issue raised by this comment that argue both in favor of and against a tribe's ability to establish a connection to the land when their past contacts were transitory or brief in nature. The definition of "significant historical connection" establishes criteria which require something more than evidence that a tribe merely passed through a particular area.

One comment suggested (b)(2) should reflect advisories in case law that support the general idea that there are limits to what can be included as restored lands. Another comment suggested that the term "significant" in paragraph (b) is too vague.

Response: These recommendations were addressed through the addition of a definition for "significant historical connection."

A few comments suggested modifying (b)(2) by striking the word "documented" and one comment suggested adding "whether evidenced by documentation or oral history."

Response: This recommendation was not adopted because the paragraph was restructured. The definition of "significant historical connection" calls for "historical documentation." Because a significant historical connection would be documented there is no need to include oral history as acceptable evidence. Such oral history is unnecessary when documentation is available; it would be insufficient alone.

One comment suggested adding the words "or by other means" in paragraph (b)(1) because there are other valid means by which a reservation may have been established other than by treaty for purposes of § 292.12(b).

Response: This recommendation was not adopted because it is unnecessary. The reference to reservation under a ratified or unratified treaty is only one manner in which a significant historical connection can be demonstrated according to the definition. There is no need to broaden this portion of the definition because the evidence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land will identify the historical connections without raising the ambiguity that "other means" may create.

One comment suggested modifying the language in the introduction to § 292.12 to read "§ 292.11(b)."

Response: This recommendation was rendered unnecessary by the rewriting of § 292.11.

One comment suggested changing the word "court" to "courts" in paragraph (b)(2).

Response: This recommendation was not adopted because the paragraph was restructured and the reference to specific evidence deleted as unnecessarily restrictive.

One comment stated that the word "significant" in paragraph (b) is insufficient because it is ambiguous and provides little guidance as to temporal requirements. Some comments suggested deleting the word "significant" in paragraph (b) because it seems to create a higher standard for historical ties in comparison to modern ties. A few comments also suggested deleting the language pertaining to giving Federal Government documents significant weight. One comment suggested modifying the language to read, "the land is located in an area to which the tribe has significant documented historical connections; or the tribe can establish any other evidence that demonstrates the existence of a significant historical connection to the land or area in which the land is located."

Response: These recommendations were adopted in part and addressed by the changes to the definition of significant historical connection. The suggestion to delete "significant" was not adopted because the word reinforces the notion that the connection is something more than "any" connection. The definition does not include a temporal requirement because such inquiry is highly dependant on the facts and circumstances of each tribe's historical connection to the land. The suggestion regarding the weight given to Federal Government documents was adopted as unnecessarily restrictive.

One comment suggested adding aboriginal language in paragraph (b).

Response: This recommendation was not adopted because it is unclear what the comment was meant to accomplish.

*Paragraph (c):*

One comment requested that the rules put all restored tribes on an even playing field by incorporating the, so called, *Grand Traverse* standard into the rule.

Response: This recommendation was adopted in so far as we followed the Grand Traverse standard that if the tribe is acknowledged under 25 CFR 83.8, and already has an initial reservation proclaimed after October 17, 1988, the tribe may game on newly acquired lands under the restored lands exception provided that it is not gaming on any other land.

One comment suggested that the rule further define "temporal connection"

because the degree of temporal connection to the land varies among tribes, especially since their post-termination relations with State and local governments likewise varies, depending on the level of hostilities.

Response: This recommendation was not adopted. The paragraph, as written, takes into account a wide range of variables.

One comment suggested change the temporal limit from 25 to 20 years.

Response: This recommendation was not adopted. The Department received numerous comments arguing for both less than and more than 25 years. The 25 year number is both a practical and reasonable number based on the Department's experience under section 2719.

One comment stated that (c) is inadequate because (c)(1) allows anywhere from a 6 minute to a 100 year span and (c)(2) gives a 25 year period. One comment suggested changing the conjunction between paragraph (1) and (2) under (c) from an "or" to an "and" because the commenter suggested that this would make the section consistent with court decisions.

Response: These recommendations were not adopted. Paragraph (c)(1) considers that there are often a number of impediments involved in a tribe's efforts to acquire restored lands after the event officially restoring the tribe. Also, placing a time cap on the ability of a tribe to acquire land for gaming, when it is their first attempt to acquire a site for gaming, is contrary to Federal Indian policy as stated in IGRA. However, a cap of 25 years, as discussed in (c)(2), addresses the concerns about a tribe's open ended ability to acquire lands for gaming. If a tribe already has newly acquired lands, then a time cap and its limiting effect to acquire a site for gaming does not undermine IGRA's stated policy goals.

One comment suggested modifying paragraph (c)(1) by striking "tribe has" and adding "United States * * * in trust status for the tribe."

Response: This recommendation was addressed by the addition of the definition for "newly acquired lands."

One comment suggested striking (c)(1)&(2). One comment suggested striking (c)(2) and replacing it with the following: "if a tribe has acquired no other land for gaming purposes since its restoration without regard to how much time has passed since the tribe's restoration."

Response: These recommendations were not adopted because the temporal limitation effectuates IGRA's balancing of the gaming interests of newly acknowledged and/or restored tribes

with the interests of nearby tribes and the surrounding community.

One comment suggested modifying paragraph (c)(1) to read, "The land is the first land that the tribe has acquired pursuant to the Department of the Interior's regulations or procedures for gaming acquisitions since the tribe was restored to Federal recognition and the tribe is not gaming on any other trust lands; or." The comment stated that the phrase "trust land" should be added because § 292.12(c)(1) should only apply to land which has been acquired in trust; not to land which a tribe has acquired in fee. The phrase "pursuant to the Department's * * *" should be added because a tribe should not lose its chance to satisfy the criteria in § 292.12(c)(1) if it acquires land in trust for housing which is not intended for gaming and had not been acquired pursuant to the procedures for gaming acquisitions. The phrase "and the tribe * * *" is added to ensure that this paragraph in not used by a tribe which is already gaming.

Response: The recommendation regarding the phrase "trust land" was adopted in part through use of the term "newly acquired lands," clarifying the type of land contemplated under (c). The recommendation to exclude trust land used for housing was unnecessary because paragraph (c)(2) allows a tribe that already has newly acquired lands, to acquire a site for gaming as long as the tribe submits an application within 25 years of its restoration. The recommendation to qualify (c)(1) with the phrase "the tribe is not gaming on any other trust lands" was adopted in part and added to (c)(2). The definition of newly acquired lands includes tribal land acquired in trust but does not include tribal fee land.

*General Comments on § 292.12:*

One comment suggested that the rule specify what role the NIGC plays in the restored lands opinion. One comment stated that there is nothing in the rule that discusses the process the BIA will use to make restored lands opinions.

Response: These comments are addressed with the addition of § 292.3 discussing the application process.

One comment suggested adding a geographical nexus requirement to § 292.12 in addition to the historical and temporal requirements.

Response: This recommendation was not adopted as the regulation's requirement of a modern, historical and temporal connection adequately implements the policy goals of IGRA.

One comment suggested that the regulations should require a tribe to acquire their former reservation land if it is available. One comment suggested

that tribes should not be permitted to acquire restored lands if they were already compensated for such lands by some other means.

Response: These recommendations were not adopted because they do not have a basis in IGRA.

One comment suggested making the language in §§ 292.11 & 292.12 consistent with § 292.6.

Response: This recommendation was adopted. The Department made efforts to make these sections consistent where uniformity is necessary.

## Subpart C—Secretarial Determinations and Governor's Concurrence

*Section 292.13   When can a tribe conduct gaming activities on lands that do not qualify under one of the exceptions?*

This section was renamed "When can a tribe conduct gaming activities on newly acquired lands that do not qualify under one of the exceptions in subpart B of this part?"

Several comments suggested restricting the scope of consultation required under paragraph (b) by deleting "local officials, including officials of nearby tribes" thereby preventing excessive complication of the application process and promoting tribal self-determination.

Response: This recommendation was not adopted because the statute requires consultation with nearby tribes and local officials, 25 U.S.C. 2718(b)(1)(A).

One comment recommended that no land be taken into trust without the consent of the State and the affected county.

Response: This recommendation was not adopted because the comment raises issues pertaining to 25 CFR part 151—Land Acquisitions. Nonetheless, section 2719 of IRGA only requires the Governor's concurrence. Since this section of IGRA requires consultation with the Governor, local officials and nearby tribes, but only specifies the concurrence of the Governor, Congress has implicitly rejected the need for concurrence by other officials.

One comment suggested that citizen input and State legislative participation should be included in the Secretary's determination that the casino will not be detrimental to the community. One comment, on behalf of a concerned citizen, opposed the Secretary's authority to permit gambling in communities without her input.

Response: These recommendations were not adopted because the regulations already require consultation with appropriate State and local officials, consistent with the statutory

language. Further, there are various opportunities for local input in the process, depending on which exception is at issue.

One comment suggested that the regulations impose additional restrictions on gaming on lands acquired after October 17, 1988.

Response: The regulations were designed to conform to and interpret section 2719 of IGRA; every effort was made to stay consistent in that regard. Additional restrictions are inconsistent with 25 U.S.C. 2719.

One comment suggested that paragraph (b) use the phrase "nearby Indian tribes" and paragraph (d) read "The Governor of the [S]tate in which the gaming establishment is to be located concurs in the Secretary's Determination" in order to conform to IGRA.

Response: This recommendation was adopted and language was modified accordingly.

One comment stated that the two-part Secretarial Determination exception cannot be interpreted as requiring a tribe to have an ancestral tie to the lands they seek to acquire.

Response: The two-part Secretarial Determination does not require a tribe to have an ancestral tie to the lands they seek to acquire.

*Section 292.14   Where must a tribe file an application for a Secretarial Determination?*

The Department did not receive any comments regarding this section.

*Section 292.15   May a tribe apply for a Secretarial Determination for lands not yet held in trust?*

One comment stated that requiring a tribe to file its application for a two-part Secretarial Determination at the same time as its land-into-trust application precludes the tribe from using the land they have placed into trust for economic development. Accordingly, the comment suggested modifying § 292.15 in light of this concern.

Response: This recommendation was not adopted. The requirements in § 292.15 address land that is not yet held in trust. The section does not address a tribe's existing trust land.

**Application Contents**

*Section 292.16   What must an application for a Secretarial Determination contain?*

Several comments suggested that a tribe be required to submit only the information required under § 292.16, paragraphs (a) through (d) at the time it submits its land-into-trust application.

The information required by § 292.16 paragraphs (e) and (f) could be submitted as the information becomes available.

Response: This recommendation was not adopted because the application for a Secretarial Determination must include all of the information in § 292.16 for the application to be complete.

One comment suggested that an additional requirement in paragraph (d) be added to require the tribe to submit "evidence of an aboriginal or significant historical connection to the land, including cultural ties based upon actual inhabitance." This would, according to the commenter, bring the regulation into conformance with section 2719.

Response: This recommendation was not adopted because it is beyond the scope of the regulations and inconsistent with IGRA.

One comment observed that, throughout the regulations, "application" is used to refer both to the tribe's initial written request and to the subsequent application package developed by the BIA Regional Office for submission to the Secretary, creating confusion.

Response: In consideration of the comment, changes were made throughout the regulations accordingly.

Several comments suggested striking paragraphs (d) and (k).

Response: These recommendations were not adopted because paragraphs (d) and (k) inform the decision making process.

One comment suggested striking paragraphs (j) and (k) because these documents are not site specific and are either already on file with the BIA or do not apply.

Response: These recommendations were not adopted because paragraphs (j) and (k) inform the analysis. The word "Any" was deleted from the beginning of former paragraph (k) and the words "if any" were added to modified paragraph (l) for clarification.

Several comments noted that, while the Regional Director is required by § 292.20(a)(2) to provide officials with information regarding the proposed scope of the gaming, §§ 292.16–292.18 do not require the applicant tribe to submit this information.

Response: In response to these comments, language was added in (j) regarding the proposed scope of gaming and the size of the proposed gaming establishment.

*Section 292.17   How must an application describe the benefits of a proposed gaming establishment to the tribe and its members?*

Several comments suggested changing "benefits" in the title of § 292.17 to "impacts."

Response: This recommendation was adopted in part. The words "and impacts" were added to the title of § 292.17. The section was renamed "How must an application describe the benefits and impacts of a proposed gaming establishment to the tribe and its members?"

Several comments suggested that paragraph (f) require a more specific identification of adverse impacts.

Response: This recommendation was not adopted because an adverse impacts analysis is fact specific and will vary depending on the given facts and circumstances.

One comment suggested that § 292.17 require consideration of land use, development alternatives to gaming, whether the proposed project is consistent with the tribe's economic needs (if any), and how fulfillment of such needs will be balanced against off-reservation environmental impacts.

Response: This recommendation was not adopted because development alternatives and environmental impact are addressed in the National Environmental Policy Act (NEPA) process.

One comment noted that paragraph (i) is a new requirement not previously contained in the discussion draft circulated prior to the publication of the proposed regulation.

Response: The concern raised by the commenter does not violate any standards or procedures.

Several comments suggested that paragraph (h) be amended to read "* * * or holds other contractual rights to cause the land to be transferred to the United States, or to the [t]ribe."

Response: This recommendation was not adopted because it is unnecessary. The first clause of paragraph (h) covers the commenter's concern.

One comment suggested that "if any" be stricken from paragraph (i) to require the applicant tribe to establish that it "aboriginally" used and occupied the land where it wishes to build a gaming establishment.

Response: This recommendation was not adopted because historical connections are not mandatory under IGRA for purposes of this subpart of the regulations.

Several comments suggested striking, in their entirety, paragraphs (a), (e), (g), and (j), and striking "from the proposed

uses of the increased tribal income" from paragraph (d).

Response: These recommendations were not adopted because all of the paragraphs are necessary in order to determine what is in the tribe's best interest.

One comment suggested striking "and the tribe" from paragraph (a), as it would be "voluminous and time consuming."

Response: This recommendation was not adopted because the words "and the tribe" must be included in the paragraph in order to conduct a thorough analysis under the two-part determination.

Several comments suggested replacing "facility" in paragraph (j), subparagraph (3) with "establishment."

Response: This recommendation was adopted, and the word "facility" was replaced with the word "establishment."

One comment suggested adding "Any information provided within the application that is of a commercial or financial nature shall be protected from release to the public pursuant to the exemptions of the Freedom of Information Act [("FOIA")], 5 U.S.C. 522(b)(4)."

Response: This recommendation was not adopted because the FOIA provisions that protect commercial and financial information and the corresponding procedures stand on their own and need not be specifically referenced in these regulations.

One comment suggested requiring the information provided under § 292.17 be shared with State and local governments, who should be accorded the opportunity to respond to the information supplied by the tribe.

Response: This recommendation was not adopted because the Secretary can evaluate the financial information without having comments or analysis by the State or local governments. Nevertheless, the Department will provide financial information to the Governor under § 292.22 if there is a favorable Secretarial Determination.

*Section 292.18   What information must an application contain on detrimental impacts to the surrounding community?*

Several comments argued that tribal gaming by an out-of-State tribe is *per se* detrimental to the community.

Response: This recommendation was not adopted. While the regulations allow for a finding that gaming by an out-of-State tribe is detrimental to the community, such a finding will be made on a case-by-case basis.

Several comments suggested that "detrimental to the surrounding

community" in paragraph (c) should be defined to consider the adverse impacts on self-sufficiency and economic development of other tribes in the State.

Response: This recommendation was not adopted because the definition of "surrounding community" already includes Indian tribes. Extending consideration to other tribes in the State goes beyond the Department's interpretation of the statute.

One comment raised the concern that § 292.18 did not limit the Secretary's discretion to consider "detrimental information" regarding non-Indian gaming interests.

Response: The Secretary can consider detrimental information regarding non-Indian gaming interests; it is considered within paragraph (c). While such interests can be considered, they are limited to surrounding community consistent with section 2719.

One comment suggested it was premature to require an environmental assessment (EA) or environmental impact statement (EIS) before the Secretary makes his decision.

Response: An EA or EIS are products of the NEPA process. The Secretary must have the results of NEPA analysis in order to consider whether or not there is detriment to the surrounding community.

Several comments proposed the following subsection: "An analysis by a qualified traffic engineer of the traffic impacts on the surrounding community and the mitigation measures necessary to alleviate the traffic impacts which would be caused by the proposed gaming establishment."

Response: This recommendation was not adopted because it is unnecessary; it is implicit in (a) and (b).

One comment recommended that the regulation specify that "surrounding community" includes communities across State lines.

Response: This recommendation was not adopted because it is not necessary. The definition of surrounding community is defined by mileage, and is not limited by State boundaries.

Several comments suggested that paragraph (e) implied that the treatment program rather than compulsive gambling is a detrimental impact, and that there are no detrimental impacts to the surrounding community from compulsive gamblers who are not enrolled in treatment programs. It was suggested that paragraph (e) be changed to read, "Costs of compulsive gambling attributable to the proposed gaming establishment, including the cost of treatment programs and the primary and secondary social costs attributable to

compulsive gamblers enrolled and not enrolled in treatment programs."

Response: This recommendation was adopted in part, and (e) was revised in order to clarify that the potential detrimental impact is any anticipated costs of treatment programs.

One comment suggested striking "if any" from paragraph (d).

Response: This recommendation was not adopted because the words "if any" do not appear in paragraph (d) of this section.

Several comments suggested amending paragraph (c) to read, "Impacts on the economic development, income, and employment of the surrounding community, including any significant impacts on the income and employment generated by Indian gaming of nearby Indian tribes."

Response: This recommendation was not adopted because tribes are already included in "surrounding community."

Several comments suggested adding further specificity to the information that is required in the application and set forth in paragraphs (a) through (f) of § 292.18.

Response: These recommendations were not adopted because the regulations, as written, provide sufficient specificity.

Several comments suggested striking paragraphs (d) and (e).

Response: The recommendation was not adopted because paragraphs (d) and (e) are required, according to the Department's definition and understanding of detriment.

Several comments suggested amending paragraph (a) to add a proviso "if required pursuant to NEPA" following the reference to an EA or an EIS.

Response: This recommendation was adopted and paragraph (a) was modified accordingly.

One comment suggested striking from paragraph (a) " e.g. an Environmental Assessment * * * Statement (EIS)."

Response: This recommendation was not adopted because the examples provide useful guidance.

One comment suggested striking paragraph (f) to give tribes discretion to include, rather than the Secretary discretion to mandate, any additional information.

Response: This recommendation was not adopted because a well informed Secretary will promote sound decision making.

One comment suggested amending paragraph (a) to read, "Information regarding environmental impacts and plans for mitigating detrimental impacts on the surrounding community * * *" to conform to statutory language.

Response: This recommendation was not adopted because the NEPA uses "adverse."

One comment noted that "social structure" in paragraph (b) is vague and undefined.

Response: This recommendation was not adopted because the term "social structure" is necessary in order to interpret the statute.

**Consultation**

*Section 292.19   How will the Regional Director conduct the consultation process?*

Several comments suggested that 60 days was not a sufficient time for State and local officials to collect the necessary information to prepare a consultation letter.

Response: The State and local officials are not being asked to prepare a consultation letter, they respond to the Regional Director's letter. The relevant information is available at the time when the regulations require a consultation letter and therefore 60 days is adequate time for State and local officials to comment.

Several comments recommended that the Regional Director be required to notify appropriate officials if the tribe addresses or resolves any issue pursuant to paragraph (c)(2), and that such officials should be accorded a reasonable time to respond.

Response: This recommendation was not adopted because such a procedure would inject unnecessary delay into the process.

One comment requested that the Department exempt from the requirements of § 292.19 pending applications that have already completed the required consultations with the surrounding community under the current checklist procedures.

Response: This recommendation was not adopted. We are not including a general exemption in the regulations, but the Department will make a case-by-case determination whether pending applications have completed the necessary consultation.

One comment suggested the 25-mile radius for tribes to be included in the consultation process be expanded to 100 miles.

Response: This recommendation was not adopted as the focus on section 2719 is the surrounding community.

One comment suggested including the applicant tribe in the § 292.19 consultation process.

Response: This comment was not adopted because the tribe is already included in the process in paragraph (c) where the tribe can respond to issues raised in the responses.

Several comments suggested that, "Citizens within a 50-mile radius (Public notices posted)" be added to the requirements of paragraph (a) so as to solicit comments from the community. One comment suggested rewriting paragraph (b), in its entirety, with a focus on notice requirements.

Response: These recommendations were not adopted. The Department consults with appropriate State and local officials and nearby tribes. Therefore, the Department is not amending the regulations to solicit citizen comments directly. It is most appropriate that citizen comments funnel through appropriate State, local and tribal officials. Also, public comments are provided for in the NEPA process.

One comment suggested that 30 days was a sufficient comment period.

Response: This recommendation was not adopted because the 60-day comment period provides a balance between those wanting a longer period and those wanting a shorter time for comment.

One comment suggested changing "nearby tribes" in paragraph (a)(2) to the previously-defined "nearby Indian tribes."

Response: This recommendation was adopted and the paragraph was modified accordingly.

Several comments suggested that the BIA be required to meet with local officials throughout the acquisition process and that the comment period was not a legitimate consultation process.

Response: This recommendation was not adopted because the Secretarial Determination in section 2719 is not a negotiation process. Creating additional opportunities for back-and-forth is unnecessary, causes delay and is inconsistent with IGRA.

One comment suggested that the term "consultation comments" in paragraph (c)(1) was unclear and should be defined to include any comments received from residents and businesses.

Response: This recommendation was adopted and corresponding edits were made in order to clarify the paragraph.

Several comments suggested that officials of whom consultation is requested have access to information provided by the applicant pursuant to § 292.17.

Response: Consistent with the protection Congress affords financial, commercial or proprietary information under the FOIA, this recommendation was not adopted.

Several comments suggested requiring the information provided under § 292.18 be shared with State and local governments, who should be accorded the opportunity to respond to the information supplied by the tribe.

Response: This recommendation was not adopted because the requested process would add unnecessary delay at this stage of the process.

*Section 292.20   What information must the consultation letter include?*

One comment considered it "absurd" to require local communities and nearby tribes, rather than the applicant tribe, to provide funding to mitigate problems that might emerge from the proposed casino and to propose programs to address compulsive gambling (paragraph (b)).

Response: This comment misconstrues paragraph (b)(5). In order to clarify the paragraph, it was modified to make clear that the consultation letter is only requesting information regarding the anticipated costs, if any, of treatment programs. The paragraph does not consider the issue of who will bear such costs.

One comment suggested that paragraph (b)(4) be changed to, "Reasonable estimates of costs of impacts * * *" to eliminate the implication that all costs will be reimbursed by the applicant tribe.

Response: This recommendation was adopted in part. The word "anticipated" was inserted wherever necessary.

Several comments suggested that paragraph (b)(4) be changed to, "Costs of impacts to the surrounding community, including nearby Indian tribes* * *" and that the tribes be consulted in this determination.

Response: This recommendation was not adopted because "nearby Indian tribes" are included in the definition of surrounding community.

One comment suggested amending paragraph (b)(6) to read, "Any other information that may assist the Secretary in determining whether gaming is or is not detrimental to the surrounding community" to avoid sounding conclusory.

Response: This recommendation was adopted.

One comment suggested adding, "such as the size of the proposed gaming establishment" to paragraph (a)(3).

Response: This recommendation was not adopted because the proposed language is already included in the paragraph.

One comment suggested striking paragraph (b)(4) and (5).

Response: This recommendation was not adopted because the paragraphs are necessary to the evaluation.

One comment suggested that paragraph (b) should not apply to entities that do not intend to file a protest against the proposed establishment.

Response: This recommendation was not adopted because it is not necessary. The paragraph does not compel recipients to comment.

One comment suggested that the consultation letter and the published notice should specify the studies (including one on crime and one on impacts on existing gaming) and provide the Web site where these studies can be viewed.

Response: This recommendation was not adopted because it is unnecessary. The information is routinely available should an individual decide that they want such data.

**Evaluation and Concurrence**

*Section 292.21   How will the Secretary evaluate a proposed gaming establishment?*

Several comments suggested that the regulations should provide that lands "far from the tribe's existing reservation will be disfavored for taking into trust for the purposes of gaming."

Response: This recommendation was not adopted because it refers to an issue that is considered when the Secretary takes lands into trust under 25 CFR part 151.

Several comments suggested that the Secretary, when making his determination pursuant to paragraph (b), must not consider the financial effects of competition on other Indian or non-Indian gaming establishments, in accordance with the Congressional intent of IGRA.

Response: This recommendation was not adopted because the Secretary does not necessarily include in the analysis the financial effects of competition on other gaming establishments; however, the Secretary does examine detrimental effect on the surrounding community and nearby tribes, including detrimental financial effects.

Several comments suggested that all appropriate State, local, and nearby tribal officials should also be notified of a disapproval pursuant to paragraph (c).

Response: Because of restructuring, this comment addresses § 292.21(b). This recommendation was not adopted because it is unnecessary. Interested parties can make individual inquiries if there is a need.

One comment suggested that community disapproval of a casino should require the Secretary to disapprove an application.

Response: This recommendation was not adopted because it is not consistent with IGRA.

One comment suggested rewriting § 292.21 to read:

(b) The Secretary will consider all the information submitted or developed under § 292.18 and all the documentation received under § 292.19 in evaluating the proposed gaming establishment's detrimental impacts on the host-community and surrounding counties. (c) If the Secretary disapproves of the gaming proposal, the Secretary will inform the tribe and set forth the reasons for the disapproval. (d) If the Secretary approves of the gaming proposal, the Secretary will proceed under § 292.22.

Response: This recommendation was not adopted because the changes are unnecessary. The paragraph, as amended, is sufficient to address the commenter's concerns.

One comment suggested adding a new paragraph:

The Secretary will make a presumption that the proposed project will have a detrimental effect on the surrounding community if the proposal negatively impacts the stewardship, economic development, or cultural preservation plans of a federally recognized tribe that does have a strong ancestral or cultural nexus to the lands in question. That presumption may be overcome only by compelling evidence.

Response: This recommendation was not adopted because it is beyond the scope of the regulations and inconsistent with IGRA.

One comment recommended that the regulation establish specific standards by which the Secretary must abide in making his two-part determination.

Response: This recommendation was not adopted because the regulations provide the necessary procedures and standards for the Secretary to make a decision.

One comment suggested that any findings must be supported by substantial evidence in the record and that the findings include the evidence that is contained in the record.

Response: This recommendation was not adopted because it is unnecessary. Including a standard of proof adds a layer of potential ambiguity to the analysis.

*Section 292.22   How does the Secretary request the Governor's concurrence?*

Several comments suggested that the Governor's retention of a silent veto power over the proposal (paragraph (d)) is inconsistent with the Congressional intent of IGRA, and that the State must therefore be required to respond to the tribe's proposal.

Response: This recommendation was not adopted because the Governor's silent veto is consistent with IGRA.

Several comments suggested that a lack of response from the Governor should be interpreted as a concurrence.

Response: This recommendation was not adopted because there is no statutory basis on which to create a regulation that says a Governor's silence means concurrence.

One comment recommended that the Governor and the State legislature must concur in the decision.

Response: This recommendation was not adopted because IGRA specifically identifies the Governor and not the State; this provision is distinguished from other sections of IGRA that specifically mention the State.

One comment suggested that, if the Governor does not respond to a request for concurrence within the established period, the tribe should be permitted to reinstate the findings of fact within a reasonable period of time or, in the alternative, the tribe can provide information to supplement the material provided under §§ 292.16–292.18.

Response: This recommendation was not adopted. As a courtesy, however, the Department will notify the tribe when the time period has passed without a response from the Governor.

One comment disapproved of the Governor's power to approve or veto the proposal.

Response: The power is specifically detailed in IGRA.

One comment suggested replacing, "makes a favorable Secretarial Determination" in paragraph (a) with, "approves the tribal gaming proposal."

Response: This recommendation was not adopted because it is an unnecessary change.

One comment suggested striking paragraph (b), subparagraph (2), because the regulations do not require that the Governor be given notice of the intent to place a gaming facility on land already held in trust.

Response: This recommendation was not adopted because it is premised on a misreading of the statute and it is no longer applicable because the section was reorganized.

One comment suggested amending paragraph (b), subparagraph (1), to read, "The land is not eligible for gaming pursuant to 25 U.S.C. 2719(b)(1)(A)" so as to not preclude gaming pursuant to the exceptions set forth in 25 U.S.C. 2719(b)(1)(B).

Response: This recommendation was adopted in part. An additional section, now § 292.23, was added to the regulations in order to clarify what happens if the Governor does not affirmatively concur with the Secretarial Determination.

**29372** **Federal Register** / Vol. 73, No. 98 / Tuesday, May 20, 2008 / Rules and Regulations

Several comments suggested that the 18-month period is too long.

Response: This recommendation was not adopted because the one-year time period with a possibility of a six-month extension is reasonable.

*Section 292.23   Can the public review the application for a Secretarial Determination?*

This section was renamed "What happens if the Governor does not affirmatively concur with the Secretarial Determination?" and reorganized.

One comment suggested clarifying former § 292.23 by indicating whether a formal FOIA request must be filed to review the application or if the application is immediately available, subject to the limitations on disclosure in the FOIA, the Privacy Act, and the Trade Secrets Act, upon request.

Response: This recommendation was not adopted because it is implicit that the application is available for review.

One comment suggested replacing, "the tribe's application * * * over the land" with the following:

The local BIA agency or Regional Office will provide a minimum of two copies of the tribe's application and all supporting documents for public review to: (1) Governor of the [S]tate's office; (2) Public County Office within the proposed host-community; and (3) the tribe's application and all material will also be available at the local BIA agency or Regional Office having administrative jurisdiction over the land.

Response: This recommendation was not adopted because the modification is unnecessary.

Several comments suggested that § 292.23 explicitly provide that the BIA will consult with the applicant tribe regarding what information should be protected from disclosure.

Response: This recommendation was not adopted; however, it will be suggested that the tribe submit a suggested redacted version of its documentation along with the full application, in order to speed the Department's identification and review of the material the tribe considers protected from disclosure.

One comment stated that § 292.23's public review provisions are, "inadequate in the digital age."

Response: This recommendation was not adopted because the provisions set forth in this section are adequate to provide public review.

*Section 292.24   Do information collections in this part have Office of Management and Budget approval?*

This section was renamed—"Can the public review the Secretarial Determination?" and reorganized.

One comment suggested that former § 292.24 is in violation of the Paperwork Reduction Act (PRA), which requires the agency to include in its burden estimate all collections of information that will be solicited (even if voluntary) by "ignoring" the financial burden imposed on State and local governments and private entities.

Response: This recommendation was not adopted because this section is compliant with the PRA. The information collection requirements, along with a corresponding comment period, were published in the **Federal Register** on January 19, 2007. The requirements were approved by the OMB on February 27, 2007 and expire on February 28, 2010.

**General Comments on the Section 2719 Regulations**

Several comments suggested adding a so-called, "grandfather clause" in the regulations. For example, one comment suggested adding the following language: "This regulation shall apply prospectively and existing Indian gaming on Indian lands recognized as eligible for gaming by the Secretary, the National Indian Gaming Commission, Congress or a Federal court shall not be disturbed." Some comments suggested waiving the regulations for complete applications that have been actively reviewed. Other comments suggested the regulations only apply to applications received after a certain date. Finally, several comments suggested that the regulations should apply to all pending applications with an opportunity to amend.

Response: This recommendation was adopted in part. A new § 292.26 was added in order to address these issues. During the course of implementing IGRA section 20, the Department and the NIGC have issued a number of legal opinions to address the ambiguities left by Congress and provide legal advice for agency decisionmakers, or in some cases, for the interested parties facing an unresolved legal issue. These legal opinions typically have been issued by the Department's Office of the Solicitor or the NIGC's Office of General Counsel. In some cases, the Department or the NIGC subsequently relied on the legal opinion to take some final agency action. In those cases, section 292.26(a) makes clear that these regulations will have no retroactive effect to alter any final agency decision made prior to the effective date of these regulations. In other cases, however, the Department or the NIGC may have issued a legal opinion without any subsequent final agency action. It is expected that in those cases, the tribe and perhaps other

parties may have relied on the legal opinion to make investments into the subject property or taken some other actions that were based on their understanding that the land was eligible for gaming. Therefore, section 292.26(b) states that these regulations also shall not apply to applicable agency actions taken after the effective date of these regulations when the Department or the NIGC has issued a written opinion regarding the applicability of 25 U.S.C. 2719 before the effective date of these regulations. In this way, the Federal Government may be able to follow through with its prior legal opinions and take final agency actions consistent with those opinions, even if these regulations now have created a conflict. However, these regulations will not affect the Department's or the NIGC's ability to qualify, modify or withdraw its prior legal opinions. In addition, these regulations do not alter the fact that the legal opinions are advisory in nature and thus do not legally bind the persons vested with the authority to make final agency decisions.

One comment suggested including the Checklist for Gaming Acquisitions Gaming-Related Acquisitions and IGRA Section 2719 Determinations, in the regulations.

Response: This recommendation was not adopted. To the extent that the Checklist is inconsistent with the regulations, the regulations control. Matters in the Checklist that are not covered by the regulations, and are not otherwise inconsistent with the regulations, remain in effect.

One comment suggested that the regulations include a provision that says an application is still eligible for consideration even if a tribe is unable to include all the itemized information in the application.

Response: In order to promote informed decisionmaking, this recommendation was not adopted.

One comment suggested that the regulations clearly define the role of NIGC.

Response: Other than the changes to § 292.3, this recommendation was not adopted. The roles and responsibilities of the NIGC cannot be addressed by the Department of the Interior regulations and instead must be defined by that agency's own regulations.

One comment suggested adding an evidentiary standard to subpart B stating that the burden rests on the applicant tribe to demonstrate that a section 2719 exception applies.

Response: This recommendation was not adopted. It is understood that the burden is on the applicant tribe to establish its eligibility for an exception.

These regulations establish the standards that the applicant must meet.

One comment suggested that subpart B be revised to provide clarity and consistency by specifying which agency or official will issue opinions covered by § 292.4.

Response: This recommendation was adopted in the revised § 292.3.

One comment suggested that the regulations indicate what constitutes final agency action and that the regulations specify what constitutes a record and what is the appeals process, if any.

Response: This recommendation was not adopted. The standard provisions of the Administrative Procedure Act apply.

Several comments suggested that the regulations be rejected in their entirety because they promote "casino shopping."

Response: This recommendation was not adopted. The standards included in these regulations will limit the concerns addressed by the commenter consistent with the existing provisions of IGRA.

One comment suggested that if the local community does not want a casino, that should be the end of the inquiry.

Response: This recommendation was not adopted because IGRA requires only a Governor's concurrence, not a local community concurrence.

Several comments suggested that there be a role for public comment and participation in the initial reservation and restored lands to restored tribes processes.

Response: Unlike the exception in IGRA section 2719(b)(1)(A), the exceptions in section 2719(b)(1)(B) do not reference an opportunity for public comment. Because section 2719(b)(1)(B) presents a fact-based inquiry, it is unnecessary to include a requirement for public comment in the regulations. Nonetheless, there are opportunities for public comment in other parts of the administrative process—for example, in the process to take the land in trust and during the NEPA review process. Although the regulations do not provide a formal opportunity for public comment under subpart B of these regulations, the public may submit written comments that are specific to a particular lands opinion. Submissions may be sent to the appropriate agency that is identified in § 292.3.

One comment suggested including a "fair-play" clause to ensure that speculators do not use tribes and that there are no misrepresentations in the process.

Response: This recommendation was not adopted because it is beyond the scope of the regulations and inconsistent with IGRA.

One comment suggested that cities be given advance notice of gaming related trust land requests and that there be a good faith requirement that the parties negotiate the issues before the application is accepted.

Response: This recommendation was not adopted because it is beyond the scope of the regulations and inconsistent with IGRA.

One comment suggested that the Department should consult with any other tribe that can show historical ties to a particular site.

Response: This recommendation was not adopted. The Department will consult with a nearby Indian tribe at which time it can explain its significant historical connection to the land, and show any detrimental impact on that tribe's traditional cultural connection to the land.

One comment suggested that tribes be required to submit development agreements.

Response: This recommendation was not adopted because it is beyond the scope of the regulations and inconsistent with IGRA.

One comment suggested that the regulations comply with the mandates of *Adams* v. *U.S.*, 319 U.S. 3212 (1943) and *U.S.* v. *Fox*, 94 U.S. 315 (1876) regarding State cession of jurisdiction. The comment argues that State legislatures must give permission to cede jurisdiction to the Federal Government.

Response: This recommendation was not adopted because the comment raises issues pertaining to 25 CFR part 151—Land Acquisitions, not IGRA.

Several comments suggested that the regulations define "gaming" and the scope of gaming, i.e., the range of proposals to which the regulations would apply.

Response: This recommendation was not adopted as outside the scope of these regulations.

Several comments suggested adding a definition for "detrimental to the surrounding community" and including the standards by which the Department will make its decision regarding detrimental to the surrounding community.

Response: This recommendation was not adopted because the Department will evaluate detriment on a case-by-case basis based on the information developed in the application and consultation process.

One comment suggested that the Department of the Interior is without authority to issue these regulations since IGRA grants NIGC rule making

authority and that only the NIGC has authority to make decisions regarding what constitutes Indian lands under IGRA.

Response: The NIGC's rule making authority is not to the exclusion of the Department of the Interior. Section 2719 specifically references the Secretary of the Interior.

## Procedural Requirements

### Regulatory Planning and Review (Executive Order 12866)

The Office of Management and Budget (OMB) has determined that this rule is significant. OMB's guidance on Executive Order 12866 requires that a cost-benefit analysis be done for significant rules and that it contain three elements. These elements are a statement of record, an examination of alternative approaches, and an analysis of costs and benefits.

The anticipated expenses or costs to the public or to the tribes who submit applications for gaming on land acquired after October 17, 1988 will be more than $100 million, therefore the rule is an economically significant regulatory action.

The intent of Executive Order 12866 is to provide decision makers with appropriate information to determine that a regulatory action imposing costs and yielding benefits, or otherwise having the effects sought by authorizing legislation, is both needed and is economically justified.

The Indian Gaming Regulatory Act of 1988 (IGRA) generally prohibits gaming on land acquired in trust after October 17, 1988, but provides several exceptions. Executive Order 12866 applies only to gaming on land under the general exception, which requires a two-part determination by the Secretary that gaming on the land would be in the best interest of the tribe and its members, and not detrimental to the surrounding community.

No cost-benefit analysis is necessary for gaming on newly acquired trust land under the exceptions for lands located within or contiguous to the boundaries of the reservation (former reservation in Oklahoma, or last recognized reservation for tribes outside Oklahoma that have no reservation) of the Indian tribe on October 17, 1988; or lands that are taken into trust as part of a settlement of a land claim, the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or the restoration of lands for an Indian tribe that is restored to Federal recognition. Tribes eligible under these exceptions are permitted to game on

lands acquired in trust after October 17, 1988. For these exceptions the rule establishes regulations for the Secretary in establishing eligibility. Establishing eligibility is a factual analysis and decision that incurs no cost or benefits.

This rule establishes regulations that will impose costs on the tribe, the Bureau of Indian Affairs, State and local governments, and the public in the expectation that gaming revenues will increase for the benefit of the tribe, employees, and the surrounding community.

Tribes wishing to game on land acquired in trust after October 17, 1988 that are not excepted to the Secretary will need to make an application to the Secretary for a two-part determination. The Secretary of the Interior and Federal employees to whom the Secretary's authorities under IGRA are or will be delegated will incur costs for preparing and reviewing the application.

These regulations establish requirements for the submission, review and approval of a land acquisition application and a two-part determination in a timely manner. The anticipated expenses or costs to the public or to the tribes who submit applications will be substantial. Tribes will be required to gather and submit information to the Secretary that substantiates both parts of the two-part determination. The cost of application will vary widely for gaming projects of different size and complexity from two man-years to five man-years, or more for each application.

IGRA requires the Secretary to consult with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes in making a two-part determination. Responding to the consultation will impose costs on State, local, and other tribal governments. In aggregate the cost is estimated at one to two man-years for each application.

Compliance with the National Environmental Policy Act ("NEPA") will be required. While NEPA documents are Federal documents to be used by decision makers in taking major Federal actions, the cost associated with preparing the studies will be primarily a cost of the tribe. Depending on the NEPA document required, preparation is expected to cost between 4 and 20 man-years, or more, and the BIA will expend from one to three man-years reviewing and supplementing the studies for each application.

NEPA requires the consideration of input from all parties on the expected impact on the human environment of the proposed major Federal action. The cost to the public and interested parties

will vary widely. For controversial actions interested parties may prepare parallel studies that are nearly equal in scope to the NEPA document, so the average estimated cost may be one-half the cost of NEPA compliance, therefore from 2 man-years to 10 man-years for each application.

A determination that results in a gaming facility on after-acquired land will result in costs to the surrounding community for roads, police and fire services, reduction of property tax rolls, government services, education, housing, and problem gambling. The NEPA document will address the mitigation of significant impacts. The cost of impacts that are not significant will be borne by the surrounding community at an unknown level.

On September 21, 2007, the Assistant Secretary—Indian Affairs issued a *Checklist for Gaming Acquisitions, Gaming-related Acquisitions, and IGRA Section 20 Determinations.* The Checklist provides a systematic format for Regional Directors to evaluate specified factors for a two-part determination.

The benefits of gaming on newly acquired land will be for the tribe, employees, State and local government, nearby businesses, and local economic conditions. Jobs created by a gaming establishment generally vary from 500 to 5,000. According to economic studies, the new employee payroll spent locally creates secondary jobs at nearby businesses from 75 to 750. Housing demand by new employees increases local property tax collections by amounts that vary widely depending on the existing stock of dwellings and the tax rate. Income tax collections on the new jobs increase depending on State income tax rates. Studies have shown that unemployment and welfare rolls decrease in the counties surrounding new gaming facilities, with the benefit variable depending on existing unemployment and welfare rates. The net gaming revenue that is available to the tribe will vary depending on the location and size of the new gaming facility, and is expected to be from $5,000,000 to $200,000,000.

Currently, there are approximately 225 Indian tribes engaged in class II (bingo) and class III (casino) gaming. Although IGRA permits a tribe to acquire off-reservation land for gaming, it does not require tribes to do so. The cost of an application is completely optional and avoidable for a tribe. Each applicant tribe may evaluate the high cost of applying to game on off-reservation after-acquired trust land against the expected net gaming revenue

to determine whether to incur the cost of complying with this rule.

The alternative considered was continuing to review applications using the *Checklist*. The costs and benefits using the Checklist are essentially the same as under the rule. The alternative was rejected in favor of establishing mandatory factors to be used in making a two-part determination.

*Regulatory Flexibility Act*

The Department of the Interior certifies that this document will not have a significant economic effect on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Indian tribes are not considered to be small entities for the purposes of this Act.

*Small Business Regulatory Enforcement Fairness Act (SBREFA)*

This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. This rule:

(a) Does not have an annual effect on the economy of $100 million or more.

(b) Will not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions.

(c) Does not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This rule does not impose an unfunded mandate on State, local or tribal governments or the private sector of more than $100 million per year. The rule does not have a significant or unique effect on State, local or tribal government or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required because only Indian tribes may conduct gaming activities on land acquired after October 17, 1988, only if the land meets the exceptions in section 2719 of IGRA.

*Takings Implication Assessment (Executive Order 12630)*

In accordance with Executive Order 12630, the Department has determined that this rule does not have significant takings implications. The rule does not pertain to the "taking" of private property interests, nor does it impact private property. A takings implication assessment is not required.

*Federalism (Executive Order 13132)*

In accordance with Executive Order 13132, the Department has determined that this rule does not have significant Federalism implications because it does not substantially and directly affect the relationship between the Federal and State governments and does not impose costs on States or localities. A Federalism Assessment is not required.

*Civil Justice Reform (Executive Order 12988)*

This rule complies with the requirements of Executive Order 12988. Specifically, this rule:

(a) Does not unduly burden the judicial system;

(b) Meets the criteria of section 3(a) requiring that all regulations be reviewed to eliminate errors and ambiguity and be written to minimize litigation; and

(c) Meets the criteria of section 3(b)(2) requiring that all regulations be written in clear language and contain clear legal standards. The rule does not preempt any statute.

*National Environmental Policy Act*

The Department has determined that this rule does not constitute a major Federal action significantly affecting the quality of the human environment and that no detailed statement is required under the National Environmental Policy Act of 1969.

*Paperwork Reduction Act*

The information collection has been reviewed and cleared by the Office of Information and Regulatory Affairs, Office of Management and Budget under the Paperwork Reduction Act of 1995, as amended. The collection has been assigned the tracking number of OMB Control Number 1076–0158. The collection of information is unique for each tribe even though each submission addresses the requirements found in § 292.16.

All information is collected in the tribe's application. Respondents submit information in order to obtain a benefit. Each response is estimated to take 1,000 hours to review instructions, search existing data sources, gather and maintain necessary data, and prepare in format for submission. We anticipate that two responses will be submitted annually for an annual burden of 2,000 hours.

*Consultation With Indian Tribes (Executive Order 13175)*

Under the criteria in Executive Order 13175, we have conducted consultation meetings with tribal leaders regarding the proposed regulations in the following locations: Uncasville, Connecticut on March 30, 2006; Albuquerque, New Mexico on April 5, 2006; Sacramento, California on April 18, 2006 and Minneapolis, Minnesota on April 20, 2006. A notice of the consultation meetings was published in the **Federal Register** on April 11, 2006 (71 FR 18350). In addition, a draft regulation was sent to all tribal leaders in the lower 48 States on March 15, 2006, seeking comments on the draft regulation. Numerous comments were received by the Department. The Department revised the draft regulation in response to written comments and oral comments received at the consultation meetings. No action is taken under this rule unless a tribe submits an application to acquire land under section 2719 of IGRA.

*Effects on the Nation's Energy Supply (Executive Order 13211)*

This rule does not have a significant effect on the nation's energy supply, distribution, or use as defined by Executive Order 13211.

*Information Quality Act*

In developing this rule, we did not conduct or use a study, experiment, or survey requiring peer review under the Information Quality Act (Pub. L. 106–554).

**List of Subjects in 25 CFR Part 292**

Indians—business and finance, Indians—gaming.

■ For reasons stated in the preamble, the Bureau of Indian Affairs amends subchapter N, chapter I of title 25 of the Code of Federal Regulations to add part 292 to read as follows:

**PART 292—GAMING ON TRUST LANDS ACQUIRED AFTER OCTOBER 17, 1988**

**Subpart A—General Provisions**

Sec.
292.1   What is the purpose of this part?
292.2   How are key terms defined in this part?

**Subpart B—Exceptions to Prohibition on Gaming on Newly Acquired Lands**

292.3   How does a tribe seek an opinion on whether its newly acquired lands meet, or will meet, one of the exceptions in this subpart?
292.4   What criteria must newly acquired lands meet under the exceptions regarding tribes with and without a reservation?

**"Settlement of a Land Claim" Exception**

292.5   When can gaming occur on newly acquired lands under a settlement of a land claim?

**"Initial Reservation" Exception**

292.6   What must be demonstrated to meet the "initial reservation" exception?

**"Restored Lands" Exception**

292.7   What must be demonstrated to meet the "restored lands" exception?
292.8   How does a tribe qualify as having been federally recognized?
292.9   How does a tribe show that it lost its government-to-government relationship?
292.10   How does a tribe qualify as having been restored to Federal recognition?
292.11   What are "restored lands"?
292.12   How does a tribe establish its connection to newly acquired lands for the purposes of the "restored lands" exception?

**Subpart C—Secretarial Determination and Governor's Concurrence**

292.13   When can a tribe conduct gaming activities on newly acquired lands that do not qualify under one of the exceptions in subpart B of this part?
292.14   Where must a tribe file an application for a Secretarial Determination?
292.15   May a tribe apply for a Secretarial Determination for lands not yet held in trust?

**Application Contents**

292.16   What must an application for a Secretarial Determination contain?
292.17   How must an application describe the benefits and impacts of a proposed gaming establishment to the tribe and its members?
292.18   What information must an application contain on detrimental impacts to the surrounding community?

**Consultation**

292.19   How will the Regional Director conduct the consultation process?
292.20   What information must the consultation letter include?

**Evaluation and Concurrence**

292.21   How will the Secretary evaluate a proposed gaming establishment?
292.22   How does the Secretary request the Governor's concurrence?
292.23   What happens if the Governor does not affirmatively concur with the Secretarial Determination?
292.24   Can the public review the Secretarial Determination?

**Information Collection**

292.25   Do information collections in this part have Office of Management and Budget approval?

**Subpart D—Effect of Regulations**

292.26   What effect do these regulations have on pending applications, final agency decisions and opinions already issued?

**Authority:** 5 U.S.C. 301, 25 U.S.C. 2, 9, 2719, 43 U.S.C. 1457.

## Subpart A—General Provisions

### § 292.1 What is the purpose of this part?

The Indian Gaming Regulatory Act of 1988 (IGRA) contains several exceptions under which class II or class III gaming may occur on lands acquired by the United States in trust for an Indian tribe after October 17, 1988, if other applicable requirements of IGRA are met. This part contains procedures that the Department of the Interior will use to determine whether these exceptions apply.

### § 292.2 How are key terms defined in this part?

For purposes of this part, all terms have the same meaning as set forth in the definitional section of IGRA, 25 U.S.C. 2703. In addition, the following terms have the meanings given in this section.

*Appropriate State and local officials* means the Governor of the State and local government officials within a 25-mile radius of the proposed gaming establishment.

*BIA* means Bureau of Indian Affairs.

*Contiguous* means two parcels of land having a common boundary notwithstanding the existence of non-navigable waters or a public road or right-of-way and includes parcels that touch at a point.

*Former reservation* means lands in Oklahoma that are within the exterior boundaries of the last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe.

*IGRA* means the Indian Gaming Regulatory Act of 1988, as amended and codified at 25 U.S.C. 2701–2721.

*Indian tribe or tribe* means any Indian tribe, band, nation, or other organized group or community of Indians that is recognized by the Secretary as having a government-to-government relationship with the United States and is eligible for the special programs and services provided by the United States to Indians because of their status as Indians, as evidenced by inclusion of the tribe on the list of recognized tribes published by the Secretary under 25 U.S.C. 479a–1.

*Land claim* means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:

(1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;

(2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and

(3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

*Legislative termination* means Federal legislation that specifically terminates or prohibits the government-to-government relationship with an Indian tribe or that otherwise specifically denies the tribe, or its members, access to or eligibility for government services.

*Nearby Indian tribe* means an Indian tribe with tribal Indian lands located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25-mile radius of its government headquarters.

*Newly acquired lands* means land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988.

*Office of Indian Gaming* means the office within the Office of the Assistant Secretary-Indian Affairs, within the Department of the Interior.

*Regional Director* means the official in charge of the BIA Regional Office responsible for BIA activities within the geographical area where the proposed gaming establishment is to be located.

*Reservation means:*

(1) Land set aside by the United States by final ratified treaty, agreement, Executive Order, Proclamation, Secretarial Order or Federal statute for the tribe, notwithstanding the issuance of any patent;

(2) Land of Indian colonies and rancherias (including rancherias restored by judicial action) set aside by the United States for the permanent settlement of the Indians as its homeland;

(3) Land acquired by the United States to reorganize adult Indians pursuant to statute; or

(4) Land acquired by a tribe through a grant from a sovereign, including pueblo lands, which is subject to a Federal restriction against alienation.

*Secretarial Determination* means a two-part determination that a gaming establishment on newly acquired lands:

(1) Would be in the best interest of the Indian tribe and its members; and

(2) Would not be detrimental to the surrounding community.

*Secretary* means the Secretary of the Interior or authorized representative.

*Significant historical connection* means the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land.

*Surrounding community* means local governments and nearby Indian tribes

located within a 25-mile radius of the site of the proposed gaming establishment. A local government or nearby Indian tribe located beyond the 25-mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment.

## Subpart B—Exceptions to Prohibitions on Gaming on Newly Acquired Lands

### § 292.3 How does a tribe seek an opinion on whether its newly acquired lands meet, or will meet, one of the exceptions in this subpart?

(a) If the newly acquired lands are already in trust and the request does not concern whether a specific area of land is a "reservation," the tribe may submit a request for an opinion to either the National Indian Gaming Commission or the Office of Indian Gaming.

(b) If the tribe seeks to game on newly acquired lands that require a land-into-trust application or the request concerns whether a specific area of land is a "reservation," the tribe must submit a request for an opinion to the Office of Indian Gaming.

### § 292.4 What criteria must newly acquired lands meet under the exceptions regarding tribes with and without a reservation?

For gaming to be allowed on newly acquired lands under the exceptions in 25 U.S.C. 2719(a) of IGRA, the land must meet the location requirements in either paragraph (a) or paragraph (b) of this section.

(a) If the tribe had a reservation on October 17, 1988, the lands must be located within or contiguous to the boundaries of the reservation.

(b) If the tribe had no reservation on October 17, 1988, the lands must be either:

(1) Located in Oklahoma and within the boundaries of the tribe's former reservation or contiguous to other land held in trust or restricted status for the tribe in Oklahoma; or

(2) Located in a State other than Oklahoma and within the tribe's last recognized reservation within the State or States within which the tribe is presently located, as evidenced by the tribe's governmental presence and tribal population.

## "Settlement of a Land Claim" Exception

### § 292.5 When can gaming occur on newly acquired lands under a settlement of a land claim?

This section contains criteria for meeting the requirements of 25 U.S.C. 2719(b)(1)(B)(i), known as the "settlement of a land claim" exception.

Gaming may occur on newly acquired lands if the land at issue is either:

(a) Acquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress; or

(b) Acquired under a settlement of a land claim that:

(1) Is executed by the parties, which includes the United States, returns to the tribe all or part of the land claimed by the tribe, and resolves or extinguishes with finality the claims regarding the returned land; or

(2) Is not executed by the United States, but is entered as a final order by a court of competent jurisdiction or is an enforceable agreement that in either case predates October 17, 1988 and resolves or extinguishes with finality the land claim at issue.

## "Initial Reservation" Exception

### § 292.6   What must be demonstrated to meet the "initial reservation" exception?

This section contains criteria for meeting the requirements of 25 U.S.C. 2719(b)(1)(B)(ii), known as the "initial reservation" exception. Gaming may occur on newly acquired lands under this exception only when all of the following conditions in this section are met:

(a) The tribe has been acknowledged (federally recognized) through the administrative process under part 83 of this chapter.

(b) The tribe has no gaming facility on newly acquired lands under the restored land exception of these regulations.

(c) The land has been proclaimed to be a reservation under 25 U.S.C. 467 and is the first proclaimed reservation of the tribe following acknowledgment.

(d) If a tribe does not have a proclaimed reservation on the effective date of these regulations, to be proclaimed an initial reservation under this exception, the tribe must demonstrate the land is located within the State or States where the Indian tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and within an area where the tribe has significant historical connections and one or more of the following modern connections to the land:

(1) The land is near where a significant number of tribal members reside; or

(2) The land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least

2 years at the time of the application for land-into-trust; or

(3) The tribe can demonstrate other factors that establish the tribe's current connection to the land.

## "Restored Lands" Exception

### § 292.7   What must be demonstrated to meet the "restored lands" exception?

This section contains criteria for meeting the requirements of 25 U.S.C. 2719(b)(1)(B)(iii), known as the "restored lands" exception. Gaming may occur on newly acquired lands under this exception only when all of the following conditions in this section are met:

(a) The tribe at one time was federally recognized, as evidenced by its meeting the criteria in § 292.8;

(b) The tribe at some later time lost its government-to-government relationship by one of the means specified in § 292.9;

(c) At a time after the tribe lost its government-to-government relationship, the tribe was restored to Federal recognition by one of the means specified in § 292.10; and

(d) The newly acquired lands meet the criteria of "restored lands" in § 292.11.

### § 292.8   How does a tribe qualify as having been federally recognized?

For a tribe to qualify as having been at one time federally recognized for purposes of § 292.7, one of the following must be true:

(a) The United States at one time entered into treaty negotiations with the tribe;

(b) The Department determined that the tribe could organize under the Indian Reorganization Act or the Oklahoma Indian Welfare Act;

(c) Congress enacted legislation specific to, or naming, the tribe indicating that a government-to-government relationship existed;

(d) The United States at one time acquired land for the tribe's benefit; or

(e) Some other evidence demonstrates the existence of a government-to-government relationship between the tribe and the United States.

### § 292.9   How does a tribe show that it lost its government-to-government relationship?

For a tribe to qualify as having lost its government-to-government relationship for purposes of § 292.7, it must show that its government-to-government relationship was terminated by one of the following means:

(a) Legislative termination;

(b) Consistent historical written documentation from the Federal Government effectively stating that it no

longer recognized a government-to-government relationship with the tribe or its members or taking action to end the government-to-government relationship; or

(c) Congressional restoration legislation that recognizes the existence of the previous government-to-government relationship.

### § 292.10   How does a tribe qualify as having been restored to Federal recognition?

For a tribe to qualify as having been restored to Federal recognition for purposes of § 292.7, the tribe must show at least one of the following:

(a) Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe (required for tribes terminated by Congressional action);

(b) Recognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter; or

(c) A Federal court determination in which the United States is a party or court-approved settlement agreement entered into by the United States.

### § 292.11   What are "restored lands"?

For newly acquired lands to qualify as "restored lands" for purposes of § 292.7, the tribe acquiring the land must meet the requirements of paragraph (a), (b), or (c) of this section.

(a) If the tribe was restored by a Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe, the tribe must show that either:

(1) The legislation requires or authorizes the Secretary to take land into trust for the benefit of the tribe within a specific geographic area and the lands are within the specific geographic area; or

(2) If the legislation does not provide a specific geographic area for the restoration of lands, the tribe must meet the requirements of § 292.12.

(b) If the tribe is acknowledged under § 83.8 of this chapter, it must show that it:

(1) Meets the requirements of § 292.12; and

(2) Does not already have an initial reservation proclaimed after October 17, 1988.

(c) If the tribe was restored by a Federal court determination in which the United States is a party or by a court-approved settlement agreement entered into by the United States, it must meet the requirements of § 292.12.

**§ 292.12   How does a tribe establish connections to newly acquired lands for the purposes of the "restored lands" exception?**

To establish a connection to the newly acquired lands for purposes of § 292.11, the tribe must meet the criteria in this section.

(a) The newly acquired lands must be located within the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and the tribe must demonstrate one or more of the following modern connections to the land:

(1) The land is within reasonable commuting distance of the tribe's existing reservation;

(2) If the tribe has no reservation, the land is near where a significant number of tribal members reside;

(3) The land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

(4) Other factors demonstrate the tribe's current connection to the land.

(b) The tribe must demonstrate a significant historical connection to the land.

(c) The tribe must demonstrate a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration. To demonstrate this connection, the tribe must be able to show that either:

(1) The land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or

(2) The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands.

**Subpart C—Secretarial Determination and Governor's Concurrence**

**§ 292.13   When can a tribe conduct gaming activities on newly acquired lands that do not qualify under one of the exceptions in subpart B of this part?**

A tribe may conduct gaming on newly acquired lands that do not meet the criteria in subpart B of this part only after all of the following occur:

(a) The tribe asks the Secretary in writing to make a Secretarial Determination that a gaming establishment on land subject to this part is in the best interest of the tribe and its members and not detrimental to the surrounding community;

(b) The Secretary consults with the tribe and appropriate State and local

officials, including officials of other nearby Indian tribes;

(c) The Secretary makes a determination that a gaming establishment on newly acquired lands would be in the best interest of the tribe and its members and would not be detrimental to the surrounding community; and

(d) The Governor of the State in which the gaming establishment is located concurs in the Secretary's Determination (25 U.S.C. 2719(b)(1)(A)).

**§ 292.14   Where must a tribe file an application for a Secretarial Determination?**

A tribe must file its application for a Secretarial Determination with the Regional Director of the BIA Regional Office having responsibility over the land where the gaming establishment is to be located.

**§ 292.15   May a tribe apply for a Secretarial Determination for lands not yet held in trust?**

Yes. A tribe can apply for a Secretarial Determination under § 292.13 for land not yet held in trust at the same time that it applies under part 151 of this chapter to have the land taken into trust.

**Application Contents**

**§ 292.16   What must an application for a Secretarial Determination contain?**

A tribe's application requesting a Secretarial Determination under § 292.13 must include the following information:

(a) The full name, address, and telephone number of the tribe submitting the application;

(b) A description of the location of the land, including a legal description supported by a survey or other document;

(c) Proof of identity of present ownership and title status of the land;

(d) Distance of the land from the tribe's reservation or trust lands, if any, and tribal government headquarters;

(e) Information required by § 292.17 to assist the Secretary in determining whether the proposed gaming establishment will be in the best interest of the tribe and its members;

(f) Information required by § 292.18 to assist the Secretary in determining whether the proposed gaming establishment will not be detrimental to the surrounding community;

(g) The authorizing resolution from the tribe submitting the application;

(h) The tribe's gaming ordinance or resolution approved by the National Indian Gaming Commission in accordance with 25 U.S.C. 2710, if any;

(i) The tribe's organic documents, if any;

(j) The tribe's class III gaming compact with the State where the gaming establishment is to be located, if one has been negotiated;

(k) If the tribe has not negotiated a class III gaming compact with the State where the gaming establishment is to be located, the tribe's proposed scope of gaming, including the size of the proposed gaming establishment; and

(l) A copy of the existing or proposed management contract required to be approved by the National Indian Gaming Commission under 25 U.S.C. 2711 and part 533 of this title, if any.

**§ 292.17   How must an application describe the benefits and impacts of the proposed gaming establishment to the tribe and its members?**

To satisfy the requirements of § 292.16(e), an application must contain:

(a) Projections of class II and class III gaming income statements, balance sheets, fixed assets accounting, and cash flow statements for the gaming entity and the tribe;

(b) Projected tribal employment, job training, and career development;

(c) Projected benefits to the tribe and its members from tourism;

(d) Projected benefits to the tribe and its members from the proposed uses of the increased tribal income;

(e) Projected benefits to the relationship between the tribe and non-Indian communities;

(f) Possible adverse impacts on the tribe and its members and plans for addressing those impacts;

(g) Distance of the land from the location where the tribe maintains core governmental functions;

(h) Evidence that the tribe owns the land in fee or holds an option to acquire the land at the sole discretion of the tribe, or holds other contractual rights to cause the lands to be transferred from a third party to the tribe or directly to the United States;

(i) Evidence of significant historical connections, if any, to the land; and

(j) Any other information that may provide a basis for a Secretarial Determination that the gaming establishment would be in the best interest of the tribe and its members, including copies of any:

(1) Consulting agreements relating to the proposed gaming establishment;

(2) Financial and loan agreements relating to the proposed gaming establishment; and

(3) Other agreements relative to the purchase, acquisition, construction, or financing of the proposed gaming establishment, or the acquisition of the land where the gaming establishment will be located.

**§ 292.18   What information must an application contain on detrimental impacts to the surrounding community?**

To satisfy the requirements of § 292.16(f), an application must contain the following information on detrimental impacts of the proposed gaming establishment:

(a) Information regarding environmental impacts and plans for mitigating adverse impacts, including an Environmental Assessment (EA), an Environmental Impact Statement (EIS), or other information required by the National Environmental Policy Act (NEPA);

(b) Anticipated impacts on the social structure, infrastructure, services, housing, community character, and land use patterns of the surrounding community;

(c) Anticipated impacts on the economic development, income, and employment of the surrounding community;

(d) Anticipated costs of impacts to the surrounding community and identification of sources of revenue to mitigate them;

(e) Anticipated cost, if any, to the surrounding community of treatment programs for compulsive gambling attributable to the proposed gaming establishment;

(f) If a nearby Indian tribe has a significant historical connection to the land, then the impact on that tribe's traditional cultural connection to the land; and

(g) Any other information that may provide a basis for a Secretarial Determination whether the proposed gaming establishment would or would not be detrimental to the surrounding community, including memoranda of understanding and inter-governmental agreements with affected local governments.

**Consultation**

**§ 292.19   How will the Regional Director conduct the consultation process?**

(a) The Regional Director will send a letter that meets the requirements in § 292.20 and that solicits comments within a 60-day period from:

(1) Appropriate State and local officials; and

(2) Officials of nearby Indian tribes.

(b) Upon written request, the Regional Director may extend the 60-day comment period for an additional 30 days.

(c) After the close of the consultation period, the Regional Director must:

(1) Provide a copy of all comments received during the consultation process to the applicant tribe; and

(2) Allow the tribe to address or resolve any issues raised in the comments.

(d) The applicant tribe must submit written responses, if any, to the Regional Director within 60 days of receipt of the consultation comments.

(e) On written request from the applicant tribe, the Regional Director may extend the 60-day comment period in paragraph (d) of this section for an additional 30 days.

**§ 292.20   What information must the consultation letter include?**

(a) The consultation letter required by § 292.19(a) must:

(1) Describe or show the location of the proposed gaming establishment;

(2) Provide information on the proposed scope of gaming; and

(3) Include other information that may be relevant to a specific proposal, such as the size of the proposed gaming establishment, if known.

(b) The consultation letter must include a request to the recipients to submit comments, if any, on the following areas within 60 days of receiving the letter:

(1) Information regarding environmental impacts on the surrounding community and plans for mitigating adverse impacts;

(2) Anticipated impacts on the social structure, infrastructure, services, housing, community character, and land use patterns of the surrounding community;

(3) Anticipated impact on the economic development, income, and employment of the surrounding community;

(4) Anticipated costs of impacts to the surrounding community and identification of sources of revenue to mitigate them;

(5) Anticipated costs, if any, to the surrounding community of treatment programs for compulsive gambling attributable to the proposed gaming establishment; and

(6) Any other information that may assist the Secretary in determining whether the proposed gaming establishment would or would not be detrimental to the surrounding community.

**Evaluation and Concurrence**

**§ 292.21   How will the Secretary evaluate a proposed gaming establishment?**

(a) The Secretary will consider all the information submitted under §§ 292.16–292.19 in evaluating whether the proposed gaming establishment is in the best interest of the tribe and its members and whether it would or would not be

detrimental to the surrounding community.

(b) If the Secretary makes an unfavorable Secretarial Determination, the Secretary will inform the tribe that its application has been disapproved, and set forth the reasons for the disapproval.

(c) If the Secretary makes a favorable Secretarial Determination, the Secretary will proceed under § 292.22.

**§ 292.22   How does the Secretary request the Governor's concurrence?**

If the Secretary makes a favorable Secretarial Determination, the Secretary will send to the Governor of the State:

(a) A written notification of the Secretarial Determination and Findings of Fact supporting the determination;

(b) A copy of the entire application record; and

(c) A request for the Governor's concurrence in the Secretarial Determination.

**§ 292.23   What happens if the Governor does not affirmatively concur with the Secretarial Determination?**

(a) If the Governor provides a written non-concurrence with the Secretarial Determination:

(1) The applicant tribe may use the newly acquired lands only for non-gaming purposes; and

(2) If a notice of intent to take the land into trust has been issued, then the Secretary will withdraw that notice pending a revised application for a non-gaming purpose.

(b) If the Governor does not affirmatively concur in the Secretarial Determination within one year of the date of the request, the Secretary may, at the request of the applicant tribe or the Governor, grant an extension of up to 180 days.

(c) If no extension is granted or if the Governor does not respond during the extension period, the Secretarial Determination will no longer be valid.

**§ 292.24   Can the public review the Secretarial Determination?**

Subject to restrictions on disclosure required by the Freedom of Information Act (5 U.S.C. 552), the Privacy Act (5 U.S.C. 552a), and the Trade Secrets Act (18 U.S.C. 1905), the Secretarial Determination and the supporting documents will be available for review at the local BIA agency or Regional Office having administrative jurisdiction over the land.

**29380**      **Federal Register** / Vol. 73, No. 98 / Tuesday, May 20, 2008 / Rules and Regulations

**Information Collection**

**§ 292.25   Do information collections in this part have Office of Management and Budget approval?**

The information collection requirements in §§ 292.16, 292.17, and 292.18 have been approved by the Office of Management and Budget (OMB). The information collection control number is 1076–0158. A Federal agency may not collect or sponsor and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control.

**Subpart D—Effect of Regulations**

**§ 292.26   What effect do these regulations have on pending applications, final agency decisions, and opinions already issued?**

These regulations apply to all requests pursuant to 25 U.S.C. 2719, except:

(a) These regulations do not alter final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations.

(b) These regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before

the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions.

Dated: May 12, 2008.

**Carl J. Artman,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. E8–11086 Filed 5–19–08; 8:45 am]

**BILLING CODE 4310–4N–P**