# EXHIBIT 20

Record of Decision

Trust Acquisition of the 305.49-acre Madera site in Madera County, California, for the North Fork Rancheria of Mono Indians

U.S. Department of the Interior
Bureau of Indian Affairs
November 2012

## U.S. Department of the Interior

**Agency:**   Bureau of Indian Affairs

**Action:**   Record of Decision (ROD) for the approval of a fee-to-trust application for the 305.49-acre Madera site (Preferred Alternative) in Madera County, California, for the North Fork Rancheria of Mono Indians (Tribe) pursuant to the Indian Reorganization Act, 25 U.S.C. § 465, and its implementing regulations at 25 C.F.R. Part 151.

**Summary:**   In March of 2005, the Tribe submitted a fee-to-trust application to the Bureau of Indian Affairs (BIA), requesting that the Department of the Interior (Department) accept trust title to land totaling 305.49 acres in Madera County, California (the Madera site). The Tribe plans to construct a gaming facility, hotel, and parking facilities.

Pursuant to section 20 of the Indian Gaming Regulatory Act (IGRA) 25 U.S.C. § 2719(b)(1)(A), on September 1, 2011, the Assistant Secretary – Indian Affairs determined that gaming on the proposed Site in Madera County would be in the best interest of the Tribe and its citizens and would not be detrimental to the surrounding community. The IGRA requires that the Governor concur in the determination which he did by letter dated August 30, 2012. The land can, therefore, be acquired in trust for the Tribe for the purpose of gaming pursuant to Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465, as amended by the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202.

The proposed trust acquisition under the IRA (Proposed Action) was analyzed in an Environmental Impact Statement (EIS) prepared pursuant to the National Environmental Policy Act (NEPA), under the direction and supervision of the BIA Pacific Regional Office. The Draft EIS (DEIS) was issued for public review and comment on February 15, 2008. After a comment period, a public hearing, and consideration and incorporation of comments received on the DEIS, the BIA issued the Final EIS (FEIS) on August 6, 2010. The DEIS and FEIS considered a reasonable range of alternatives and analyzed the potential effects of those alternatives, as well as feasible mitigation measures.

With the issuance of this ROD, the Department announces that the action to be implemented is the Preferred Alternative (Alternative A in the FEIS), which includes acquisition in trust of the 305.49-acre Madera site and construction of a gaming-resort complex including a 247,180 square foot casino facility, 200-room hotel, surface and structured parking facilities, and corresponding mitigation measures. The Department has determined that this Preferred Alternative will best meet the purpose and need for the Proposed Action by promoting the long-term economic self-sufficiency, self-determination and self-governance of the Tribe. Implementing this action will provide the Tribe

# U.S. Department of the Interior

**Agency:**   Bureau of Indian Affairs

**Action:**   Record of Decision (ROD) for the approval of a fee-to-trust application for the 305.49-acre Madera site (Preferred Alternative) in Madera County, California, for the North Fork Rancheria of Mono Indians (Tribe) pursuant to the Indian Reorganization Act, 25 U.S.C. § 465, and its implementing regulations at 25 C.F.R. Part 151.

**Summary:**   In March of 2005, the Tribe submitted a fee-to-trust application to the Bureau of Indian Affairs (BIA), requesting that the Department of the Interior (Department) accept trust title to land totaling 305.49 acres in Madera County, California (the Madera site). The Tribe plans to construct a gaming facility, hotel, and parking facilities.

Pursuant to section 20 of the Indian Gaming Regulatory Act (IGRA) 25 U.S.C. § 2719(b)(1)(A), on September 1, 2011, the Assistant Secretary – Indian Affairs determined that gaming on the proposed Site in Madera County would be in the best interest of the Tribe and its citizens and would not be detrimental to the surrounding community. The IGRA requires that the Governor concur in the determination which he did by letter dated August 30, 2012. The land can, therefore, be acquired in trust for the Tribe for the purpose of gaming pursuant to Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465, as amended by the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202.

The proposed trust acquisition under the IRA (Proposed Action) was analyzed in an Environmental Impact Statement (EIS) prepared pursuant to the National Environmental Policy Act (NEPA), under the direction and supervision of the BIA Pacific Regional Office. The Draft EIS (DEIS) was issued for public review and comment on February 15, 2008. After a comment period, a public hearing, and consideration and incorporation of comments received on the DEIS, the BIA issued the Final EIS (FEIS) on August 6, 2010. The DEIS and FEIS considered a reasonable range of alternatives and analyzed the potential effects of those alternatives, as well as feasible mitigation measures.

With the issuance of this ROD, the Department announces that the action to be implemented is the Preferred Alternative (Alternative A in the FEIS), which includes acquisition in trust of the 305.49-acre Madera site and construction of a gaming-resort complex including a 247,180 square foot casino facility, 200-room hotel, surface and structured parking facilities, and corresponding mitigation measures. The Department has determined that this Preferred Alternative will best meet the purpose and need for the Proposed Action by promoting the long-term economic self-sufficiency, self-determination and self-governance of the Tribe. Implementing this action will provide the Tribe

with the best opportunity for attracting and maintaining a significant, stable, long-term source of governmental revenue, and accordingly, the best prospects for maintaining and expanding tribal governmental programs to provide a wide range of health, education, housing, social, cultural, environmental and other programs, as well as employment and career development opportunities for its members. The Department has considered potential effects to the human environment, including potential impacts to local governments and other tribes, has adopted all practicable means to avoid or minimize environmental harm, and has determined that potentially significant effects will be adequately addressed by these mitigation measures, as described in this ROD.

This decision is based on thorough review and consideration of the Tribe's fee-to-trust application and materials submitted therewith; the applicable statutory and regulatory authorities governing acquisition of trust title to land and eligibility of land for gaming; the DEIS; the FEIS; the administrative record; and comments received from the public, Federal, state, and local governmental agencies; and potentially affected Indian tribes.

**For Further Information Contact:**

Mr. John Rydzik
Chief of the Division of Environmental, Cultural Resources Management and Safety
Bureau of Indian Affairs
2800 Cottage Way, Room W-2820
Sacramento, CA  95825

# TABLE OF CONTENTS

RECORD OF DECISION ...................................................................................................... 1

TRUST ACQUISITION OF THE 305.49-ACRE MADERA SITE IN MADERA COUNTY,
    CALIFORNIA, FOR THE NORTH FORK RANCHERIA OF MONO INDIANS ................ 1

1.0    INTRODUCTION ........................................................................................................ 1
    1.1    Summary ...................................................................................................... 1
    1.2    Description of the Proposed Action ............................................................. 2
    1.3    Purpose and Need ........................................................................................ 2
    1.4    Authorities .................................................................................................. 3
    1.5    Procedural Background ................................................................................ 3

2.0    ANALYSIS OF ALTERNATIVES ............................................................................ 4
    2.1    Alternative Screening Process ..................................................................... 4
    2.1.1    Alternatives Eliminated from Further Consideration ................................. 4
    2.1.2    Non-Casino Alternatives ............................................................................ 9
    2.1.3    Alternative Casino Sites ............................................................................. 9
    2.2    Reasonable Alternatives Considered in Detail .......................................... 11
    2.2.1    Alternative A – Proposed Project ............................................................. 11
    2.2.2    Alternative B – Reduced Casino ............................................................... 13
    2.2.3    Alternative C - Retail Development .......................................................... 14
    2.2.4    Alternative D – North Fork Location ........................................................ 14
    2.2.5    Alternative E - No-Action Alternative ..................................................... 15

3.0    ENVIRONMENT IMPACTS AND PUBLIC COMMENTS ................................... 15
    3.1    Environmental Impacts Identified in the FEIS .......................................... 15
    3.1.1    Land Resources ......................................................................................... 16
    3.1.2    Water Resources ....................................................................................... 17
    3.1.3    Air Quality ................................................................................................ 18
    3.1.4    Biological Resources ................................................................................. 18
    3.1.5    Cultural Resources .................................................................................... 19
    3.1.6    Socioeconomic Conditions and Environmental Justice ............................ 19
    3.1.7    Resource Use Patterns ............................................................................... 20
    3.1.8    Public Services .......................................................................................... 21
    3.1.9    Other Values ............................................................................................. 22
    3.1.10  Indirect Effects ......................................................................................... 22
    3.1.11  Growth-Inducing Effects .......................................................................... 23
    3.1.12  Cumulative Effects ................................................................................... 23
    3.1.12  Unavoidable Adverse Effects ................................................................... 24
    3.2    Comments on the FEIS and Responses ..................................................... 24

4.0    ENVIRONMENTALLY PREFERRED ALTERNATIVE(S) ................................. 24

5.0    PREFERRED ALTERNATIVE ............................................................................. 24

6.0    MITIGATION MEASURES .................................................................................... 26

6.1     Geology and Soils .............................................................................................. 26
Seismicity ................................................................................................................ 26
6.2     Water Resources .............................................................................................. 26
Flooding 26
Construction Impacts ............................................................................................. 26
Operational Impacts .............................................................................................. 28
Groundwater ........................................................................................................... 29
6.3     Air Quality ..................................................................................................... 31
Construction Impacts ............................................................................................. 31
Operational Impacts .............................................................................................. 33
Odor Impacts .......................................................................................................... 35
Toxic Air Contaminants Impacts ........................................................................... 35
Indoor Air Quality Impacts ................................................................................... 35
Climate Change ...................................................................................................... 36
6.4     Biological Resources ...................................................................................... 37
State Special-Status Species ................................................................................... 37
Migratory and Nesting Birds ................................................................................. 38
Waters of the U.S. ................................................................................................... 38
Aquatic Habitat ...................................................................................................... 39
Roosting Bats .......................................................................................................... 39
6.5     Cultural Resources ......................................................................................... 39
6.6     Socioeconomic Conditions and Environmental Justice ................................. 40
6.7     Transportation/Circulation ........................................................................... 41
2010    Alternative A ............................................................................................... 41
2030    Alternative A ............................................................................................... 43
Construction Traffic ............................................................................................... 47
Land Use 48
Agriculture ............................................................................................................. 49
6.8     Public Services ............................................................................................... 49
Off-Site Wastewater Service .................................................................................. 49
Construction-Related Solid Waste ......................................................................... 49
Operational Solid Waste ........................................................................................ 49
Public Health and Safety ....................................................................................... 50
Fire Protection / Emergency Medical Service ....................................................... 50
Schools   50
6.9     Noise   50
6.10    Hazardous Materials ...................................................................................... 51
6.11    Mitigation Measures That are Not Adopted ................................................. 52

7.0     TRUST ACQUISITION DETERMINATION PURSUANT TO 25 C.F.R. ........... 53

PART 151 ................................................................................................................... 53

8.0     DECISION TO IMPLEMENT THE PREFERRED ALTERNATIVE ................ 61
8.1     The Preferred Alternative Results in Substantial Beneficial Impacts ........... 61
8.2     Alternative B Restricts Beneficial Effects ...................................................... 62

**8.3**    Mixed-Use Development Alternative (Alternative C) Severely Restricts Beneficial
Effects62

**8.4**    Alternative D Would Result in Increased Significant Adverse Environmental Effects..... 62

**8.5**    No-Action Alternative Fails to Meet Purpose and Need of Project ................................... 63

**9.0    SIGNATURE** .................................................................................................................................... **63**

## 1.0   INTRODUCTION

### 1.1   SUMMARY

The BIA is the Federal agency that is charged with reviewing and approving tribal applications pursuant to the IRA and its implementing regulations at 25 C.F.R. Part 151 to acquire land in Federal trust status. The BIA analyzed the potential environmental impacts of the proposed trust acquisition of the 305.49-acre Madera site in an Environmental Impact Statement (EIS). The Draft EIS (DEIS), issued for public review on February 15, 2008, and the Final EIS (FEIS), issued August 6, 2010, considered various alternatives to meet the stated purpose and need and analyzed in detail potential effects of various reasonable alternatives. With the issuance of this Record Of Decision (ROD), the Department has determined that Alternative A, consisting of the acquisition of trust title to the 305.49-acre site, construction of an approximately 247,180 square foot casino, a 200-room hotel, ancillary infrastructure, and mitigation measures presented in Section 5.0 of the FEIS is the Preferred Alternative to be implemented. The Department has determined that the Preferred Alternative would best meet the purpose and need for the Proposed Action. The Department's decision to acquire trust title to the Madera site is based on thorough review and consideration of the Tribe's fee-to-trust application and materials submitted therewith; the applicable statutory and regulatory authorities governing acquisition of trust title to land and eligibility of land for gaming; the DEIS; the FEIS; the administrative record; and comments received from the public, Federal, state, and local governmental agencies; and potentially affected Indian tribes.

Three separate Memoranda of Understanding (MOUs) were signed between the Tribe and Madera County (August 16, 2004), the City of Madera (October 18, 2006), and the Madera Irrigation District (MID) (December 19, 2006). Under the County and City MOUs, the Tribe agrees to provide one-time compensation (non-recurring contributions) to mitigate potential and perceived impacts of the proposed project on the County/City. The Tribe also agrees to compensate the County and City annually (recurring contributions) for potential and perceived project related impacts. The Tribe also agrees to a variety of non-monetary obligations to mitigate impacts. Under the MID MOU, the Tribe agrees to compensate MID annually (recurring contributions) for potential and perceived impacts of the proposed project on MID and for aquifer recharge purposes. The Tribe also agrees to various measures aimed at minimizing impacts to water resources and preserving and promoting agricultural land uses.

Pursuant to Section 20 of the Indian Gaming Regulatory Act (IGRA) 25 U.S.C. § 2719(b)(1)(A), on September 1, 2011, the Assistant Secretary - Indian Affairs determined that gaming on the proposed Site in Madera County would be in the best interest of the Tribe and its citizens and would not be detrimental to the surrounding community. The IGRA requires that the Governor concur in the determination which he did by letter dated August 30, 2012. The land can, therefore, be acquired in trust for the Tribe for the purpose of gaming pursuant to Section 5 of the IRA, as amended by the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202.

1

**1.2    DESCRIPTION OF THE PROPOSED ACTION**

Under the Proposed Action, the BIA would accept the 305.49-acre Madera site into trust for the Tribe. On the parcels, the Tribe proposes to develop a gaming facility, a hotel, parking facilities, and associated facilities.

The Madera site is located in southwest Madera County, just north of the City of Madera. The property is located immediately adjacent and west of State Route (SR) 99, which provides regional access to the area. The Madera site is located on unincorporated land within Madera County, within the sphere of influence area of the City of Madera. The casino-resort complex would include Class III gaming conducted in accordance with the Indian Gaming Regulatory Act (IGRA) and Tribal-State Compact requirements and would consist of 83,065 square feet of gaming floor; restaurant and retail facilities and public space; and a 200-room hotel tower. Approximately 4,500 parking spaces would be provided for the project through a combination of surface parking (2,500) and development of a multi-level parking garage (2,000 spaces).

**1.3    PURPOSE AND NEED**

The Tribe requested that the secretary acquire the 305.49 acres in trust for the Tribe in order for the Tribe to conduct tribal government gaming authorized under IGRA. One of IGRA's purposes is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governance" (25 USC §2702(1)). The gaming tools afforded the Tribe by IGRA are among the most effective means by which the Tribe can meet the diverse and urgent economic needs of its members.

Implementation of the Proposed Action would enable the Tribe to meet its need for economic development, self-sufficiency, and self-governance, and to provide its quickly growing tribal member population with employment, educational opportunities and critically needed social services.

The purpose and need is as follows:

- Improve the socioeconomic status of the Tribe by providing an augmented revenue source that could be used to strengthen the tribal government, fund a variety of social, housing, governmental, administrative, educational, health and welfare services to improve the quality of life of tribal members, and provide capital for other economic development and investment opportunities.
- Allow the Tribe to establish economic self-sufficiency.
- Provide employment opportunities to the tribal community.
- Fund local governmental agencies, programs, and services.
- Make donations to charitable organizations and governmental operations, including local educational institutions.

The Proposed Action is consistent with the BIA's mission, as well as the policies underlying the Federal statutory authorities in the IRA, IGRA, and BIA's implementing regulations, of promoting meaningful opportunities for economic development and self-sufficiency of the Tribe and its members, and furthering tribal self-governance and self-determination.

2

**1.4     AUTHORITIES**

Section 5 of the IRA of 1934, 25 U.S.C. § 465, provides the Secretary of the Interior with general authority to acquire land in trust status for Indian tribes in furtherance of the statute's broad goals of promoting Indian self-government and economic self-sufficiency. If a tribe is seeking to acquire land in trust, it must apply to the BIA and comply with the regulations in 25 C.F.R. Part 151, which implement the Secretary's trust acquisition authority in Section 5 of the IRA. This ROD records the decision by the Department to acquire in trust the 305.49-acre Madera site in Madera County, California, for the Tribe.

The IGRA was enacted in 1988 to regulate the conduct of Indian gaming and to promote tribal economic development, self-sufficiency and strong tribal governments. The IGRA generally prohibits gaming on lands acquired in trust after 1988, unless certain exceptions found in 25 U.S.C. § 2719 are met. The Section 20 exceptions are implemented through regulations found in 25 C.F.R. Part 292. Therefore, Section 20 of IGRA does not provide the Secretary of the Interior with the authority to acquire land in trust; rather, it allows gaming on certain after-acquired lands once those lands are acquired into trust. If none of the exceptions in § 2719 apply, § 2719(b)(1)(A) of IGRA provides that gaming can still occur on the lands under the Secretarial two-part determination provision. Under the two-part determination process, the Secretary of the Interior may permit gaming to occur if the Secretary determines that gaming on the trust lands is 1) in the best interest of the Indian tribe and its members, and 2) not detrimental to the surrounding community. The state Governor must concur with the Secretary's determination.

**1.5     PROCEDURAL BACKGROUND**

The regulations in 25 C.F.R. Part 151 require compliance with the National Environmental Policy Act (NEPA). Accordingly, the BIA published a Notice of Intent (NOI) in the *Federal Register* on October 27, 2004, describing the Proposed Action and announcing the BIA's intent to prepare an EIS. The CEQ Regulations for implementing NEPA require a process referred to as "scoping" for determining the range of issues and alternatives to be addressed during the environmental review of a Proposed Action (40 C.F.R. §1501.7). The scoping process entails a determination of issues by soliciting comments from agencies, organizations, and individuals. In addition to accepting written comments, the BIA held a public scoping hearing on November 15, 2004 at the Madera District Fairgrounds, in Madera, California to accept comments. The BIA then published a Notice of Correction (NOC) in the *Federal Register* on April 6, 2005. The NOC amended the October 2004 NOI to include a description of possible project alternatives and also to further extend the scoping comment period to May 6, 2005. During the NOI comment period, the BIA formally requested and received acceptance letters regarding Cooperating Agency participation from the United States Environmental Protection Agency (USEPA), National Indian Gaming Commission (NIGC), California Department of Transportation (Caltrans), the City of Madera and the Madera Irrigation District (MID).

The Draft EIS was distributed to Federal, tribal, state, and local agencies and other interested parties for a 45-day review and comment period. The CEQ Regulations (40 C.F.R. §1506.10(c)) require that agencies provide at least 45 days for comments on a Draft EIS, subject to the

3

provisions of 40. C.F.R § 1506.10(d). In this case the comment period for interested parties was actually closer to 50 days since interested parties received an advance copy of the DEIS approximately a week before publication of the notice in the *Federal Register* and the formal start of the 45-day comment period. which began on February 15. 2008 after the Notice of Filing with the USEPA in the *Federal Register*. The Notice of Availability (NOA) published by the BIA on February 15. 2008. provided the time and location of the public hearing on March 12. 2008 to present the proposed project with alternatives to the public. and accept comments. Public notice was also published in *The Fresno Bee* and the *Madera Tribune* on February 15. 2008.

The BIA received a total of 331 comment letters in addition to the comments received during the public hearing. Public and agency comments on the DEIS received during the comment period. including those submitted or recorded at the public hearing. were considered in the preparation of the FEIS. Responses to the comments received were provided in Appendix Volume III of the FEIS and relevant information was revised in the FEIS as appropriate to address those comments. The NOA for the FEIS was published in the *Federal Register* on August 6. 2010 (**Attachment I** of this ROD). Consistent with the BIA NEPA Handbook. the NOA for the FEIS was also published in the local newspapers (*The Fresno Bee* and the *Madera Tribune*) on August 6. 2010 (**Attachment I** of this ROD). The 30-day review period ended on September 7. 2010. The comments received during this period are included in **Attachment II** of this ROD. Responses to each public comment letter are also provided in **Attachment II** of this ROD.

## 2.0    ANALYSIS OF ALTERNATIVES

### 2.1    ALTERNATIVE SCREENING PROCESS

Consistent with the relevant BIA authorities and policies that promote Indian self-government. self-determination. economic self-sufficiency. and tribal economic development. a range of possible alternatives to meet the purpose and need were considered in the EIS. including non-casino alternatives. alternative development configurations. and alternative sites. As described above. the purpose and need for the project is to create a federally-protected land base for the Tribe on which it can engage in the economic development necessary to fund tribal government programs. provide employment opportunities for its members. and allow the tribe to become economically self-sufficient and achieve self-determination. Alternatives. other than the No Action Alternative. were first screened to see if they met the purpose and need of the BIA and the Tribe. Remaining alternatives were selected for the EIS largely based on three criteria: 1) providing an adequate and reasonable range of alternatives. 2) the recommendations of commenters during the scoping process. and 3) ability to reduce environmental impacts.

### 2.1.1    Alternatives Eliminated from Further Consideration

Alternatives that were initially considered but were ultimately removed from further consideration in the DEIS included:

#### *Alternative Sites for Gaming*

HUD Tract - Utilization of a 61.5-acre tract located on a steep hillside was considered in the small town of North Fork (the HUD tract) for development of a casino. The U.S. Department of

Housing and Urban Development (HUD) provided the Tribe with funds to purchase the HUD tract in 2000 on the understanding that the Tribe would use the tract for low income Indian housing, an endangered species conservation reserve, and related uses (Kroll, 2000). In 2001, the Tribe entered into a local cooperative agreement with Madera County for low-income Indian housing on the HUD tract. In late 2002, the BIA placed the HUD tract in trust for the Tribe on the understanding that the Tribe would use the land for tribal housing and related uses. Since then, the North Fork Rancheria Housing Authority has expended nearly $2.5 million of HUD funding to develop the HUD tract. This funding has been used to construct a community center and to develop infrastructure, including roads, water, sewer, and pads for nine single-family homes. One of the nine homes and a youth center being built as an addition to the community center are currently under construction. Once the nine homes are built, the development of additional homes will depend on physical and environmental development constraints, infrastructure, and funding availability. While the Tribe had at one time anticipated the construction of up to 45 homes on the HUD tract, the steep topography has made development of the parcel far more difficult and expensive than anticipated and it is unclear how many additional homes can be built on the HUD tract.

In addition to this intention not to change the use of the HUD tract, development of the HUD tract for commercial purposes (such as a casino) would be very difficult due to the steep and varied topography and sensitive biological features (the presence of habitat for the threatened valley elderberry longhorn beetle habitat, for instance). Also, access to the HUD tract is via a single steep access road from a two-lane County roadway. The topography, biological factors, limited access, and rural location would necessitate the development of a very small facility. Few jobs would be created. The draw to the facility would likely be further limited by the proximity of three existing tribal gaming facilities located within 20 miles of the town of North Fork. The expensive construction costs and limited returns would likely constrain or eliminate the Tribe's options for financing a casino development on the trust land, further limiting the potential revenue stream to fund tribal programs. Therefore, for the reasons stated above, development of the HUD tract for commercial purposes would not meet the purpose and need for the project and has been eliminated from further consideration.

Avenue 7 and Avenue 9 Properties - The Tribe considered the 159-acre Oberti and 138-acre Gunner properties at Avenue 7, and the 106-acre "Juice Plant" and 154-acre Shoemate properties at Avenue 9. These properties were initially selected due to the location near the large Fresno market. preliminary reviews raised few environmental concerns, and there was little concern about the commercial development of the sites.

These properties, however, were removed from further consideration for a variety of reasons. Access to the properties was constrained by the train tracks that run just east and parallel to SR-99. Further, the Tribe was concerned about the impact a development there would have on the gaming operations of neighboring tribes, particularly the Picayune Rancheria and Table Mountain Rancheria. The operations of both tribes draw heavily from the northeast Fresno and Clovis markets. The Tribe was concerned that those patrons would be attracted by the short travel distance to a new development at Avenue 7. Further, the Tribe was concerned that a development near Fresno would inure primarily to the residents of Fresno and not Madera County. Finally, the Tribe was concerned that development of a facility along the southern

5

stretch of SR-99 in Madera County would be inconsistent with existing land uses, as most of the surrounding area was used for agriculture.

Avenue 12 Properties - The Tribe considered the 162-acre Logoluso and 70-acre Bishell properties near the Avenue 12 interchange at Highway 99, in a search for available sites further from Fresno and closer to areas of existing development near the City of Madera. These properties were situated in the County but were understood to be within the City of Madera urban growth boundary, an economically viable area. Development within the urban growth boundary was assumed to be consistent with existing plans to develop the area.

The Tribe was concerned that a gaming facility might not fit with the proposed development of a large retail center surrounded by subdivisions of single-family homes. In addition, there was initial concern that the City of Madera might object to building a gaming facility near the Madera Community College Center located several miles east of the Avenue 12 Properties. Further, the 70-acre Bishell property was deemed too small to provide the area necessary for on-site wastewater spray fields, and the both the Avenue 12 Properties had potential wetland and flood plain issues. Ultimately, the Tribe concluded that a gaming facility on either of the Avenue 12 Properties, coupled with the proposed development, might put too much pressure on existing roads and infrastructure, and conflict with the County and City's vision for the area.

Avenue 17 and Avenue 18½ Properties - Having eliminated the Avenue 12 Properties south of the City, the Tribe considered properties north of the City near Avenue 17 and 18½. Specifically, the Tribe considered the 100-acre Schachen property just north of Avenue 17, the 100-acre Weil property also just north of Avenue 17, and the 232-acre North Ranch property at Avenue 18½. The two smaller properties (Schachen and Weil) were rejected out of concern that they might not be large enough for wastewater sprayfields, in the event they were needed, or to accommodate other potential environmental mitigation needs. Further, the Weil property was located in close proximity to a residential neighborhood, and presented potential environmental issues based on its prior use as a dairy.

Primary reasons for eliminating the North Ranch property from further consideration was the encumbrance by Williamson Act contracts on 232 acres of the property and the close proximity to the Southern Pacific railroad tracks along the property's western boundary. The close proximity of the railroad would result in frequent loud noises, which could disturb patrons of the proposed development.

Finally, potentially hazardous materials were discovered on the North Ranch property. The property contains a 500-gallon aboveground storage tank, with no secondary containment measures and evidence of stained soils in the vicinity of the tank. The property also contains a fairly large debris pile, which appeared to contain mostly non-hazardous wastes, but was not inventoried. Given the above constraints to development, the North Ranch property was eliminated from further consideration.

Old Mill Site - Several commenters during the DEIS comment period mentioned the location of the "Old Mill" in North Fork as a desirable alternative site for the development of a casino. The Old Mill site is a 135-acre site that housed a working lumber mill between 1941 and 1994. The

6

site is currently owned by the North Fork Community Development Council (CDC), a charitable nonprofit California corporation. In 1998 the CDC adopted a Master Plan reflecting the community's desire that 60 percent of the developable land be used for some type of light industry, 30 percent for a recreational vehicle park and Visitor Center, and 10 percent for community serving uses such as picnic areas and trails. Finally, some areas were proposed to remain undeveloped, particularly in riparian areas. More recently the CDC has been overseeing various community development and cleanup related activities on the site.

The BIA carefully considered these comments and independently examined this site but ultimately decided to eliminate this site from further consideration for the reasons stated below.

The site is the location of a long standing mill operation and has been found to be contaminated with petroleum hydrocarbons in the soil and water, pentachlorophenol (PCP) and dioxins, furans, asbestos, and lead-based paint. Groundwater impacts from diesel fuels are believed to be the result of water leaching through impacted surface soils. Although groundwater samples collected in some onsite wells exceeded the Maximum Contaminant Level (MCL) taste and odor threshold of 100 micrograms per liter (ug/L), once the affected soils are removed from the NFLMS, the levels of diesel should decrease to levels that would not require remediation.

In addition to soil affected with diesel fuels, soils remain onsite that contain elevated levels of dioxins, furans, and pentachlorophenol (PCP). The areas affected with dioxins were identified as a former dip tank area and three large soil stockpiles. Samples exceeded the USEPA Preliminary Remediation Goals (PRGs) for PCP, but were below hazardous waste classification. The PCP excursions are not widespread and are limited to the dip tank area. The soil stockpiles were found to have dioxins and furans that would prevent onsite use. Given the presence of these materials onsite, several remedial actions were offered to DTSC to allow unrestricted use of the NFLMS. Remedial options include excavation, off-site disposal and treatment, on-site bioremediation, chemical treatment, and natural attenuation. Based on information provided in the March 2006 Focused Feasibility Study and Focused Health Evaluation prepared by Bryan A. Stirrat and Associates, INC, the NFLMS site has been extensively sampled and constituents have been identified and delineated. As stated above, the primary areas of concern are several soil stockpiles and the former dip tank area. The CVRWQCB case worker was contacted to discuss current remedial options at the site. The remedial action that was chosen is excavation and offsite removal of impacted soils. According to the case worker, Jeff Hammel, a Soil Removal Workplan was expected to be submitted to DTSC and the CVRWQCB before fall of 2008. The workplan will outline soil removal activities for all affected onsite soils. It is believed the removal of affected soils would allow for unrestricted use of NFLMS although the potential for the presence of unknown contamination related to past uses on the site remains.

Given that the Old Mill site is in a relatively remote location near the HUD site, similar disadvantages attracting customers would be present, reducing the potential for job development and the ability of the project to create a revenue stream sufficient to fund tribal programs. Peckinpah Creek and a tributary to this creek run through the Old Mill site, creating constraints to development through the presence of waters of the U.S. and species habitat.

7

Finally. when the CDC learned that the BIA was considering the Old Mill site as an alternative for the Tribe's proposed casino project, it sent two letters to the BIA stating that the site would not be sold for the development of a casino project given that such a use was inconsistent with its Master Plan (**FEIS Section 2.0**).

### Redesign Alternative

The proposed project has been designed to avoid and minimize impacts to the environment. including impacts to any potential jurisdictional wetlands or waters of the U.S.. which are typically sensitive biological habitats. The project facilities have also been sited near the center of the site in order to maximize the distance between project facilities and nearby residences and agricultural operations. Other financially and technically feasible site designs were considered in an attempt to further reduce environmental effects. However. the relative uniformity of natural features and surrounding uses resulted in an inability to devise a site plan that would further avoid or minimize significant environmental effects. Therefore. a redesign alternative was eliminated from further consideration.

### Large Gaming/Hotel Resort on the North Fork Site

After the North Fork site was chosen as an alternative site that would be analyzed in the EIS (see **FEIS Section 2.5**). a site plan was prepared for the development of a casino on the site. Variously sized facilities were considered. A resort of a size proposed under Alternative A was ultimately eliminated from further consideration. for the reasons explained below. in favor of a smaller casino facility.

In an effort to determine whether and what sized development would be feasible. primarily from an environmental and economic standpoint. a civil engineer and a socioeconomic consultant were consulted. According to the civil engineer. although slopes are relatively steep throughout the North Fork site (estimated at 25 percent from the eastern to western boundary). the portion of the property to the west of the existing access road has slightly less steep slopes and would require slightly less cut and fill to prepare a building pad. Development of the western portion of the site would also ensure that existing residences east of the access road would not need to be relocated.

It was the opinion of the proposed management company that due to the remote location of the North Fork site and considering existing competition. any development. and especially a large development. would be difficult to finance and operate profitably. Therefore. in order to determine what size facility could be a feasible alternative on the North Fork site from a profitability perspective. an independent socioeconomic consultant (the Innovation Group) was contacted to make a recommendation.

In April 2005. the Innovation Group completed a market potential and facility sizing analysis for a development on the North Fork site (see **FEIS Appendix R**). This analysis concluded that to accommodate potential gamer visits and to have as competitive a facility as possible. a facility with approximately 275 slot machines and 6 tables would be advised on the North Fork site. According to the Innovation Group. by subtracting more than 25 machines from this number. the scale of the facility would be too small to warrant visitation and provide variety. given the level

8

of competition in the market. Similarly, adding more than 25 devices would provide for diminishing marginal returns, with the level of investment necessary far outweighing any economic benefits that could be received. In fact, the Innovation Group noted that, although a specific analysis of construction costs was not performed, due to the challenges on the site (steep slope, potentially minimal soil depth to bedrock), such costs were estimated at over $20 million (these costs were later estimated at approximately $41 million in the April 2005 Socioeconomic Assessment), which would make it difficult to successfully finance any casino on the site, even the optimally sized 275 slot machine variety. Thus, although a 275-slot facility has marginal potential for profitability on the North Fork site, possibly aided by an effective advertising campaign and a possible reduction in construction costs if financing could be obtained, a facility sized similarly to the proposed project would be far too expensive to construct on the North Fork site considering the potential profitability, and would not constitute a feasible alternative. The Alternative D casino was therefore sized to accommodate approximately 275 slot machines and six table games on the western side of the existing access road. A larger facility on the North Fork site was eliminated from further consideration.

### 2.1.2   Non-Casino Alternatives

The EIS evaluated the following non-gaming alternatives: (1) a mixed-use development and (2) the No-Action Alternative. The proposed mixed-use development was analyzed in detail as Alternative C in the EIS. A No-Action Alternative was analyzed in detail as Alternative E in the EIS.

### 2.1.3   Alternative Casino Sites

Madera site: The Madera site is located in western Madera County, California, adjacent to SR 99, north of the City of Madera. The site includes 7 connected parcels. The approximately 305-acre site is bounded on the north by Avenue 18, rural residential land, light industrial land, and vacant land; on the east by Golden State Boulevard and SR-99; on the south by agricultural and residential land; and on the west by Road 23 and agricultural land. The site is located immediately adjacent and west of SR 99, which provides regional access to the area. The parcels are located on unincorporated land within Madera County. A majority of the project parcels are comprised of vacant agricultural lands which have never been developed, while one has been developed and includes residential and barn structures. Livestock grazing currently occurs on the site. Development on the Madera site was analyzed in Alternatives A, B, and C of the EIS.

North Fork site: The 80-acre North Fork site is located east of the Madera site, approximately three miles east of the community of North Fork, east of Mammoth Pool Road, and 0.5 miles southwest of Hill 3954 (1.5 miles southwest of Cascadel). The North Fork site is situated at an elevation of 2800 to 3400 feet. The North Fork site is currently held in trust by the Federal Government. Thus, the North Fork site is not divided into parcels for local taxation purposes.

The original boundaries of the North Fork Rancheria were restored in 1987 pursuant to the Stipulation for Entry of Judgment (Madera County) in *Tillie Hardwick et al. v. United States of America,* Civil No. C-79-1710-SW (N.D. Cal. 1987). The stipulation provided that the lands within the exterior boundaries of the Rancheria shall be treated as any other federally recognized Indian reservation. Thus, the lands within the North Fork Rancheria are technically eligible for gaming under the IGRA. However, none of the lands within the exterior boundaries of the North

9

Fork Rancheria are owned by, or held in trust for, the Tribe. Instead, all of such lands are held in trust for individual Indians. Neither the stipulation nor case law provides the Tribe with any special right to acquire or lease these lands on behalf of the Tribe. None of the beneficial owners of the North Fork Rancheria lands are required to convey an interest in those lands to the Tribe, and the Tribe would not be able to conduct gaming on the North Fork Rancheria lands unless it was able to obtain beneficial title to or a leasehold interest in those lands.

In addition, many of the same constraints to development of the HUD tract noted above are also present on the North Fork Rancheria (particularly varied and steep topography). Unlike the HUD tract, no development has been completed or is proposed for the North Fork site other than scattered existing rural residences. Also unlike the HUD tract, most of the Rancheria is undeveloped, with numerous and varied biological resources present throughout.

The Tribe also believes that a facility in the North Fork vicinity would generate considerable political opposition while doing little to advance the needs of its many tribal citizens or of the community. A relatively small facility on the North Fork site or the HUD tract would provide few jobs and generate only minimal revenues for the Tribe and even fewer for the larger community. Further, a facility around North Fork would likely be opposed by most local residents, many of whom are retirees who recently moved to North Fork to enjoy the beauty of the Sierra foothills and escape the stress of city living. Based on informal conversations with North Fork residents and community leaders, the Tribe has concluded that local residents would resent the development of gaming operation as threatening the rural character of the North Fork area. Without the ability to cite real benefits to County residents in terms of jobs or revenues, the County Board of Supervisors would likely defer to the local community and possibly end up opposing commercial development in the North Fork area. Finally, any gaming facility in the North Fork area would likely be limited to a small facility with high construction costs, likely constraining or eliminating the Tribe's options for financing a casino development. An independent analysis confirmed that, if construction estimates were correct, a casino development on the North Fork Rancheria could not be successfully financed.

Therefore, for the reasons mentioned above, the Tribe did not consider development of a casino on the North Fork Rancheria. Nonetheless, development of a casino on the North Fork Rancheria (the North Fork site) is fully analyzed in the EIS as Alternative D because commenters during the scoping period recommended that it be included as an alternative site, the site is eligible for gaming, it might be possible to lower construction costs to improve the viability of a casino development on the site, and the disruption of existing development would be limited.

In determining the gaming facility design for Alternative D, it was determined that to best achieve the expected customer experience, the casino would require a minimum of 30-acres of relatively level and vacant land. The North Fork site is characterized by predominantly forested area, scattered small residential developments, and some open spaces. The 80-acre site meets the minimum size requirement; however, the topography, existing conditions, and soil characteristics of the property make it difficult to accommodate a casino and ancillary components, such as a wastewater treatment plant (WWTP).

10

## 2.2   REASONABLE ALTERNATIVES CONSIDERED IN DETAIL

The DEIS and FEIS evaluate the following reasonable alternatives and the mandatory No-Action Alternative in detail.

### 2.2.1   Alternative A – Proposed Project

Alternative A, the Proposed Project, consists of the following components: (1) placing approximately 305.49 acres into Federal trust status; (2) approval of a gaming development and management contract; and (3) development of a casino-hotel complex, including ancillary components such as parking and a WWTP. This alternative, which constitutes the Preferred Alternative (with incorporation of mitigation measures identified in the FEIS) and the Tribe's Proposed Project, most suitably meets all aspects of the purpose and need of the Proposed Action by promoting the Tribe's self-governance capability and long-term economic development. Components of Alternative A are described below.

Trust Title Acquisition: Alternative A consists of the conveyance of a 305.49-acre area of land into Federal trust status. The IRA authorizes the Secretary of the Interior to acquire land in trust for recognized Tribes.

The land transfer would be made in accordance with the procedures set forth in 25 C.F.R. Part 151. The Tribes' fee-to-trust application provides detailed information on the land being taken into trust. The regulations in 25 C.F.R. Part 151 implement Section 5 of the IRA, codified as 25 U.S.C. § 465. Section 5 of the IRA provides the Secretary of the Interior with authority to acquire lands in trust status for tribes and individual Indians. Since the Tribe is seeking to acquire off-reservation land in trust for gaming purposes, compliance with Section 20 of IGRA (25 U.S.C. § 2701 *et seq.*) must be included as part of a BIA Part 151 fee-to trust application.

Gaming Development and Management Contract: Congress enacted IGRA with the stated purpose of providing a statutory basis for the operation and regulation of gaming by Native American tribal governments. The NIGC, which was established by IGRA, has the authority to approve management contracts between tribal governments and outside management groups. Implementation of Class III gaming operations under Alternative A would require NIGC approval of the management contract between the Tribe and its management group.

Proposed Facilities: Alternative A would result in the development of a 247,180 square-foot gaming and entertainment facility and a 224,530 square-foot hotel and spa on the 305.49-acre site. The gaming facility would include a casino floor, food and beverage areas (consisting of a buffet, specialty restaurant, steakhouse, food court, two bars, and coffee bar), lounge/banquet areas, offices, and a security area. The multi-story hotel facility would have 200 guest rooms. Regional access to the casino would be provided from SR 99.

The main casino complex would include: food and beverage services, small retail shops, administrative offices for gaming-related tribal activities, and the main gaming hall. The gaming facility would include the casino floor, food and beverage areas, back of house and support services, and public miscellaneous areas and would operate 24-hours per day. Beverages and food would be served within a planned 500-seat buffet, a 200-seat specialty restaurant, a 175-seat

11

food court, a 180-seat Steakhouse, and a 225-seat coffee shop. The casino floor area would provide 83.065 square feet for gaming purposes. The hotel tower would have a total building space of approximately 207,680 square feet. The main casino driveway off Golden State Boulevard would provide primary vehicle access to the hotel.

Alternative A includes surface parking and a multi-level parking structure for a total of 4,500 spaces. Signage identifying the entrances to the facilities would be the minimum size and have the minimum lighting required to safely advertise to vehicles along SR 99 the entrances to the development.

<u>Water Supply</u>: Water for domestic use, emergency supply, and fire protection would be provided by on-site wells or connection to the City of Madera public water system. If the water supply system is contained entirely on-site, two on-site wells would be drilled, one for continuous supply and one for redundancy in case of malfunction or maintenance of the primary well. Each well would have a firm water supply capacity of approximately 400,000 gallons per day (gpd) / 278 gallons per minute (gpm) (without use of water recycling) or approximately 273,000 gpd / 190 gpm (with incorporation of a recycled water distribution system). The approximate depth of the wells would be at least 600 feet below the surface. Water tank capacity would be based on fire flow requirements developed after review by local fire authorities.

<u>Wastewater Treatment and Disposal</u>: One off-site and two on-site options have been identified for treating the wastewater that would be generated by Alternative A. These options are described below.

- <u>Option 1</u>: Connect to the City of Madera sewer system. Treat and dispose of wastewater at the Madera WWTP, located five miles southwest of the Madera site. Recent construction has expanded the WWTP's capacity to 10.1 million gallons per day (MGD) where the treated wastewater is conveyed to percolation beds for disposal.

- <u>Option 2</u>: Construction of an on-site WWTP on the Madera site. The WWTP would use an immersed membrane bioreactor (MBR) system to provide tertiary-treated water. Average day disposal flows would be approximately 270,000 gpd. Treated effluent may be discharged through surface water disposal, spray disposal, sub-surface disposal, or a combination of these methods. Reclaimed water from the on-site wastewater treatment plant would be utilized for casino toilet flushing and landscape irrigation.

<u>Site Drainage</u>: Stormwater runoff generated during the operation of the casino would be conveyed by a combination of open channels, storm drains, and on-site detention basins. A drainage plan has been developed for Alternative A, and is included as Figures 2-4 through 2-6 of the FEIS. Runoff from the project facilities would be directed into vegetated swales or through inlets from buildings or curb inlets on roadways into storm drain pipes. Prior to release into the open channels that lead to Schmitt Creek, runoff would pass through sediment/grease traps that would filter out suspended solids, such as trash and soil sedimentation, oil, grease and other potential materials that could degrade surface water quality. The proposed parking lots would be landscaped with mulched plantings or grass and would serve as bioretention areas to initially treat storm water runoff. Vegetative swales would serve as energy dissipaters and

12

filtering mechanisms for runoff generated on-site prior to release into the site drainage channels. Three on-site detention basins would be developed on-site to reduce the increased peak flows that would result from the introduction of impervious surfaces. The basins would assure that post development runoff peaks during operation will not exceed existing peak runoff volumes.

The Madera site is located almost completely within a Federal Emergency Management Agency (FEMA) defined 100-year floodplain. Projects encroaching within a 100-year floodplain are required by FEMA to be constructed a minimum of 1.0 foot above the estimated floodplain elevation. During construction fill would be placed to elevate the finished floor of the proposed gaming facility and hotel approximately five feet above the FEMA 100-year floodplain. Due to the location within the defined floodplain, the on-site detention basins have been sized to hold both displaced flood storage volumes and increased runoff rated through construction of on-site impervious surfaces.

Utilities: Power lines would be provided by Pacific Gas and Electric (PG&E) as part of the development of Alternative A.

Law Enforcement:  Tribal security personnel would work cooperatively with the Madera County Sheriff's Department, which would provide general law enforcement services to the Madera site on a contract basis through contractual agreements within the MOU. The Madera County Sheriff's Department has jurisdiction to enforce State criminal laws on the proposed trust lands to the extent authorized by Public Law 83-280 (18 U.S.C. § 1162, 28 U.S.C. § 1360). The Tribe would install security cameras and would employ security personnel to provide surveillance of the casino, parking areas, and surrounding grounds. The security cameras would provide coverage of all surface parking areas and exterior areas of the casino and facility support buildings. Security guards would patrol the facilities to reduce and prevent criminal and civil incidents.

Fire Protection Services:  The Tribe would contract with the Madera County Fire Department for fire protection and emergency medical services. The provisions for these services are incorporated into the Memorandum of Understanding (MOU) between the Tribe and Madera County, which additionally provides reasonable and fair share compensation for specific public services render by the County. The Tribe agreed to construct the gaming facility and all supporting buildings in accordance with standards no less stringent than those set forth in the Uniform Fire Code.

### 2.2.2   Alternative B – Reduced Casino

Alternative B consists of a smaller-scale version of Alternative A, without a hotel and pool. Alternative B is approximately 40 percent (198.990 sq feet) of the total square footage of Alternative A.  3,200 parking spaces would be provided on surface lots and a multi-level parking structure.

The WWTP planned for Alternative B would not change in scope from the Proposed Project and would also be designed to comply with standards established by the USEPA.  Wastewater disposal would take place by either Option 1 or Option 2 described above in Section 2.2.1. Water for domestic use, emergency supply, and fire protection would be provided by on-site

13

wells or connection to the City of Madera, similar to Alternative A. Alternative B is estimated to require an average water demand of 251,000 gpd.

The provisions for construction standards, and public safety services (law enforcement, emergency medical services, and fire protection) within the MOUs for Alternative A would also apply to Alternative B.

### 2.2.3   Alternative C - Retail Development

Alternative C consists of the development of an approximately 237,000-square-foot retail park along the eastern edge of the Madera site. Under this alternative the NIGC would not approve a management contract between the Tribe and SC Madera LLC, and the Tribe would likely need to seek another source of development funding as SC Madera LLC and its affiliates are not expected to support a development not related to a gaming operation.

The commercial development would include two large "big box" retail stores of 125,000 and 100,000 square feet, three restaurant pads, with 1,860 parking spaces. The remainder of the site would remain undeveloped and used as open space, pasture, biological habitat, and recycled water sprayfields. A stormwater detention system similar to that planned for Alternative B would be provided on-site to account for the increase in runoff created by increased impervious surfaces. Wastewater disposal would take place by one of two options, similar to those discussed above in Section 2.2.1. Given the different uses proposed for Alternative C, the provisions and payments within the MOUs would not apply to Alternative C.

### 2.2.4   Alternative D – North Fork Location

Alternative D consists of the development of a casino-hotel resort at an alternative off-site location. Alternative D consists of a casino development located in eastern Madera County near the town of North Fork (North Fork site). The casino would be developed on approximately 30 acres in the central portion of the approximately 80-acre North Fork site. The North Fork site is currently held in trust by the BIA.

Alternative D Facilities:  The resort would include a gaming area, food and beverage facilities, a service bar, coffee shop, and a food court/deli. Buildings totaling 26,001 square feet would be constructed, along with 250 surface parking spaces. Unlike development on the Madera site, the current topography of the North Fork site would require a considerable amount of earthwork activity to create a level site.

An on-site detention basin would be provided to reduce increased peak flows that would result from developing the site. The basins would ensure that post-development runoff peaks from the North Fork site would be equal to the existing conditions, reduce erosion, and negative effects to groundwater. A total of 1 acre-foot of storage would be provided in the stormwater detention system.

Infrastructure and Public Services:  Water for domestic use, emergency supply, and fire protection would be provided by on-site groundwater or by Madera County. The Madera County Maintenance District 8A provides water to the town of North Fork and a nearby U.S. Forest

14

Service complex. The water system has one well drilled in 1994 to a depth of 520 feet, which pumps 240 gpm into a 200,000-gallon storage tank. An additional existing well, known as the North Fork Center Well, is currently inactive but available for future use. If on-site groundwater were used, two on-site wells would be drilled. One well would be used for continuous supply and the other for redundancy in case of malfunction or maintenance of the primary well. Each well would have a firm water supply capacity of either 19 (with no on-site water recycling) or 10 (with water recycling) gpm.

Wastewater treatment would occur at either the County-operated WWTP that serves the town of North Fork or at an on-site WWTP constructed in the southern portion of the North Fork site. The North Fork WWTP is located approximately one mile northwest of the North Fork site. Wastewater would travel through a proposed pipeline along Minarets Road and then south along Highway 274 to the North Fork WWTP. However, if the on-site WWTP is created, the treated effluent would be used for both on-site landscaping irrigation and various appropriate water reduction processes.

Electrical service would be provided by PG&E. PG&E has an existing overhead electric 12-kilovolt line near Road 225 and Rainbow Road. The Madera County Fire Department and the Madera Sheriff's Department would provide fire protection and law enforcement services to the North Fork site. The Tribe would additionally employ trained security personnel for surveillance and patrol on-site.

Given the different location of the casino resort proposed for Alternative D, the public service provisions within the Madera County MOU would not apply to Alternative D. Therefore, specific agreements would need to be provided by appropriate area service providers.

### 2.2.5   Alternative E - No-Action Alternative

Under the No-Action Alternative, the Madera site would not be placed into Federal trust for the benefit of the Tribe and the site would not be developed as described under the development alternatives. Land use jurisdiction of the Madera site would remain with Madera County. The existing abandoned residential and barn structures would remain on the Madera site and seasonal livestock grazing activities would continue to occur. The parcels within the County (and within the City's sphere of influence) are designated as agricultural parcels. However, it is foreseeable and highly probable that in the future, some other form of commercial or residential development would occur on the Madera site. The site would be subject to guidelines within the Madera County General Plan. Thus, little restriction exists for future development of the properties.

## 3.0   ENVIRONMENT IMPACTS AND PUBLIC COMMENTS

### 3.1   ENVIRONMENTAL IMPACTS IDENTIFIED IN THE FEIS

Implementation of the Proposed Action and alternatives could result in direct, indirect, and cumulative impacts to the environment. Impacts would occur as a result of the construction and operation of the Proposed Action and alternatives. A number of specific environmental issues

15

were raised during the EIS process.  The categories of the most substantive environmental issues raised during the EIS process include:

- Water Supply.
- Wastewater Treatment.
- Air Quality.
- Biological Resources.
- Cultural and Paleontological Resources
- Socioeconomic Conditions.
- Transportation and Traffic.
- Visual Resources.
- Public Health and Safety. and
- Noise

Each of the alternatives considered in the FEIS was evaluated for the potential to impact environmental issues as required under NEPA. as well as the above environmental concerns raised during the EIS process. The evaluation of these project-related impacts included consultations with entities that have jurisdiction or special expertise to ensure that the impact assessments for the FEIS were accomplished using accepted industry standard practice. procedures. and the most currently available data and models for each of the issues evaluated in the FEIS at the time of preparation.  Alternative courses of action and mitigation measures were developed in response to the identified environmental concerns and substantive issues raised during the EIS process.  A summary of the analysis of the environmental issues within the FEIS. including the issues raised during the EIS process. is presented below.

### 3.1.1   Land Resources

Topography   All development alternatives would involve clearing and grading.  The Madera site is essentially flat. and the result of on-site grading would not alter this characteristic. Approximately 200.000 cubic yards of fill material is anticipated to be excavated during construction of stormwater detention basins. however this material would be incorporated into the site grading.  The overall topography of the Madera site. however. would remain essentially unchanged.  The North Fork site (Alternative D) would use approximately 600.000 cubic yards of displaced or imported fill material to provide a surface appropriate for construction and to facilitate proper drainage.  Operation of the alternatives would not cause significant disturbance to topography.

Soils   All development alternatives could potentially impact soils due to erosion during construction. operation. and maintenance activities. including clearing. grading. trenching. and backfilling.  Obtaining a National Pollutant Discharge Elimination System (NPDES) permit from the USEPA for sediment control and erosion prevention is required for construction projects disturbing more than one acre of soil. as under Alternatives A through D.  Impacts to soils under

16

Alternative A through D would be less than significant with required compliance with the USEPA's NPDES general permit and required Storm Water Pollution Prevention Plan (SWPPP).

Seismicity   Seismic events and related structural damage and resulting hazard to public safety would be considered a potentially significant impact, due to the alternatives location within an area of regional seismic activity. Mitigation measures related to seismicity on the alternative sites appear in the MMEP within **Chapter 2** to reduce any impacts to less than significant levels.

Mineral Resources - Alterations of the land resources use under any of the alternatives would not significantly diminish the extraction of important ores or minerals, as no economically significant mineral resources are known to exist in the project area. Impacts are less than significant.

### 3.1.2   Water Resources

Surface Water Drainage   Impacts from runoff changes from the increase in impervious surfaces resulting from Alternatives A through D would be reduced through minimization of impervious surfaces; incorporation of storm drains, vegetative swales, and a sediment/grease trap in the project design, and development of three detention basins (Madera site) ensure off-site discharge rates would be approximately equivalent to pre-development runoff rates. With the incorporation of these design components into Alternatives A through D, impacts would be reduced to less than significant levels.

Flooding   Alternative D is located outside the 100-year floodplain, thus impacts would be less than significant.

Under Alternative A, B, and C, less than half of the hardscape proposed would be located within the 100-year floodplain. Proposed design plans would elevate the buildings and structures five feet in elevation above the footprint of the 100-year floodplain. The parking areas would be at least one-foot above the floodplain. Mitigation measures related to flooding on these alternative sites appear in the Mitigation Monitoring and Enforcement Plan (MMEP) within **Chapter 2** to reduce impacts to a less than significant level.

Surface Water Quality   Construction of Alternatives A through D would result in ground disturbance, which could increase sediment discharge to surface waters during storm events, reducing water quality. Construction also has the potential to generate waste materials that can be washed into nearby surface waters during storm events. In accordance with the requirements of the NPDES Permit, the tribe would prepare and implement a SWPPP to control discharge of pollutants in stormwater. The plan would incorporate appropriate best management practices (BMPs) to prevent degradation of surface water resources during construction. Through compliance with permit requirements, including incorporation of BMPs, impacts to water quality during construction of Alternatives A through D would be less than significant.

Wastewater Disposal – Under all alternatives, wastewater would either be conveyed to a local off-site WWTP or treated at a constructed on-site WWTP. Compliance with all NPDES permit requirements would provide a less-than-significant impact to water quality from the allowed discharge of tertiary treated wastewater. Nonetheless, mitigation measures have been included

17

within the MMEP within **Chapter 2** that would further reduce impacts from wastewater treatment and disposal.

Groundwater - All development alternatives would increase the demand for groundwater, but would not significantly deplete supplies or degrade water quality in violation of ground water standards or threaten public safety. However, due to drawdown, significant and potentially significant impacts to well operation would occur at wells within the vicinity of the Madera site soon after pumping begins for the project. Mitigation measures contained in the MMEP within **Chapter 2** would reduce these impacts to a less-than-significant level.

### 3.1.3 Air Quality

Construction Emissions – Emissions of ozone precursors nitrogen oxides ($NO_X$) and reactive organic gasses (ROGs) during implementation Alternatives A through D would not exceed Clean Air Act (CAA) General Conformity thresholds; therefore, there would be a minimal adverse effect to air quality from the construction of Alternatives A through D. Through compliance with the National Emissions Standards for Hazardous Air Pollutants (NESHAP) reporting and operating requirements as regulated under the Federal Clean Air Act, the demolition of structures during the development of Alternatives A through D that may contain asbestos would have a less than significant impact on air quality. The impacts to air quality from construction of Alternatives A through D would be less than significant.

Operational Emissions - All development alternatives would result in emissions during operation, primarily from traffic generated by the project. Mitigation has been incorporated to reduce congestion and emissions totals so that significance thresholds are not exceeded, with the exception of ozone precursors. Recent redesignation of the San Joaquin Valley Air Basin to "extreme" nonattainment has lowered Federal air quality conformity de minimus levels. Therefore a final general conformity determination is contained in **Attachment IV**. The general conformity determination recommends mitigation to achieve conformity with the State Implementation Plan and ensure a less than significant impact to air quality. These mitigation measures have been added to the MMEP in **Chapter 2**.

### 3.1.4 Biological Resources

Wildlife and Habitats - Development of all alternatives would result in habitat disturbances, including potential impacts to cultivated fields. Under the various wastewater treatment options proposed for the Madera site, Option 1 and Option 3 would affect a smaller portion of the Madera site, primarily dryland wheat fields. Option 2 would affect approximately 10 percent more of the site, also dryland wheat fields. Alternative D is expected to disturb a smaller percentage of habitat which is much more biologically sensitive than on the Madera site. Mitigation measures are presented within **Chapter 2** to reduce site specific impacts to wildlife and habitat to less than significant levels.

Waters of the U.S - Alternatives A - C have been designed to avoid impacts to jurisdictional Waters of the U.S through project grading or placement of on-site wastewater treatment options. Impacts to jurisdictional waters would be unavoidable for Alternative D. Mitigation measures are presented within the MMEP **(Chapter 2.0)** to avoid or reduce site specific impacts to waters of the U.S. to less than significant levels.

18

Federally-Listed Special-Status Species – No Federal special-status species were observed or expected to occur on the Madera site, as the Madera site is ruderal and subject to constant human disturbance. Therefore, it does not provide habitat for the Federally-listed special-status invertebrates, fish, amphibians, reptiles, or plant species.

Alternative D has the potential to impact two federally listed species, which have the potential to occur on the North Fork site: Mariposa pussypaws (*Calyptridium pulchellum*) and valley elderberry longhorn beetle (*Desmocerus californicus dimorphus*). Mitigation measures to avoid potential impacts to these special-status plant species are identified in **Chapter 2**.

Migratory Birds – Under Alternatives A, B, C, and D migratory bird nests could be affected by vegetation removal associated with project construction during the nesting season. Development on all alternative sites would result in the loss of a small amount of foraging habitat for migratory bird species. Permanent features associated with proposed facilities under the development alternatives, such as night lighting, may potentially impact migratory bird species. Mitigation listed in **Chapter 2** would reduce potential impacts to migratory bird foraging habitat and nesting locations to less than significant levels.

### 3.1.5   Cultural Resources

Cultural Resources: All alternatives located on the Madera site would have no effect on known cultural resources. Alternative D contains a prehistoric resource composed of two granitic bedrock mortar outcrops and a sparse lithic scatter. One outcrop contains 9 cups and one contains 2 cups. Additional prehistoric resources were found on the North Fork site during the digging of a small pipeline for one of the residences. These resources do not extend into the Alternative D development footprint, but underscore the potential for the presence of subsurface cultural resources on the North Fork site. Mitigation measures are presented within **Chapter 2** to protect and preserve these resources. Additional mitigation measures are presented in **Chapter 2** for the treatment of unanticipated discoveries of archaeological sites at both the Madera and North Fork sites.

Paleontological Resources: Given disturbance over time at the Madera site (Alternatives A, B, and C), primarily due to grading from agricultural operations, the upper layer of soils underlying the Proposed Project are not known to contain paleontological resources and have a low probability of containing unknown paleontological resources. However, the discoveries at the Fairmead Landfill site (approximately 6 miles to the north of the Madera site) discussed in the FEIS contribute to the potential for significant paleontological deposits to be present beneath the ground surface. For the protection and preservation of unanticipated discoveries of paleontological resources, mitigation measures are presented in **Chapter 2** to reduce potential impacts to a less than significant levels.

### 3.1.6   Socioeconomic Conditions and Environmental Justice

Socioeconomic Conditions   Alternative A would result in the greatest economic stimulus to the region and would result in the greatest beneficial economic impact to the Tribe. All development alternatives would result in potential economic benefits for the City and County of Madera, the Tribe, and various other regional municipalities. Benefits to these municipalities would result

19

from the creation of jobs and payments in-lieu of taxes agreed to in the various MOUs. The greatest economic benefit for the Tribe and the most jobs would be created by development alternatives with gaming. The Tribe has agreed to contribute annual funds to compensate problem gambling service programs. With this contribution, effects to problem gambling services would be less than significant. However, the non-gaming alternative (Alternative C) would not cause social impacts potentially attributable to casinos (such as an increase in the incidence of problem/pathological gambling).

Environmental Justice   Development of Alternatives A through D would benefit the Tribe and local communities by creating employment opportunities that would be primarily filled by the local labor market. These communities would not be disproportionately adversely impacted.

### 3.1.7   Resource Use Patterns

Transportation/Circulation – In response to issues raised on the DEIS, a revised Traffic Impact Analysis (TIA) was prepared and included as Appendix M and summarized in Section 4.8 of the FEIS. Specifically, the analysis and study areas were revised in response to comments on the DEIS and in consultation with local jurisdictions. As stated in the revised TIA, development of Alternatives A through D would cause certain roadway segments and intersections in the vicinity of the proposed casino to operate at an unacceptable Level of Service (LOS) (refer to Section 4.8 of the FEIS). Mitigation measures have been developed for the roadway segments and project intersections showing unacceptable LOS during operation of Alternatives A through D. With the incorporation of project mitigation measures described in **Chapter 2**, impacts to project roadways would be reduced to a less-than-significant level.

Land Use   Alternative A through C would replace the existing agricultural land use with development that is inconsistent with the existing planned land use designation. The development of Alternatives A through D would result in a noticeable increase in land use intensity, but no land use conflicts with the exception of potential conflicts with the municipal airport operation located near the Madera site for Alternatives A-C. These impacts would be reduced to a less than significant level through mitigation measures contained in **Chapter 2**.

Agriculture   Due to the inferior quality of land available for farming purposes, impacts to agriculture from the development of Alternative D would be less than significant. Given the generally poor quality of agricultural soils where development is proposed, the combined Farmland Policy Protection Act (FPPA) score of 143, and the retention of a large portion of the Madera site as open space that could be used for agricultural purposes, Alternatives A - C would have a less than significant impact on agriculture. In addition, the Tribe has agreed in the MID MOU to establish arrangements with local providers for the sale and purchase of local agricultural products and to establish an agricultural demonstration project for educational purposes on the Madera site, promoting and benefiting regional agricultural operations. Nonetheless, mitigation measures have been included in **Chapter 2** that would further reduce impacts to agriculture.

20

### 3.1.8    Public Services

All development alternatives (A through D) would increase demands for water supply, wastewater, solid waste, gas and electric, telecommunications, law enforcement, fire protection, and emergency medical services.

Water  Because adequate water is available from the County to serve Alternative D, and the Tribe would pay for all infrastructure upgrades required to serve the site, there would be no significant impact to water supply services. Since water supply for Alternatives A - C would be supplied either wholly from on-site wells or from an on-site well in combination with City Well No. 26 (used solely during maintenance of the primary on-site well or for fire flow), a reduction in available capacity of the City's water facilities would not occur. In addition, the Tribe would pay for the cost of constructing the piping and related facilities required to create a looped system with the City. Therefore, the effect on public water utilities would be less than significant.

Wastewater – On-site wastewater treatment options under Alternatives A - D would have no effect on local public service providers because they would be fully paid for and operated by the Tribe on-site. While the City of Madera has available capacity to accept wastewater from Alternatives A - C, obtaining City of Madera sewer service would require connection to the City sewer lines. An additional sewer line would be needed as well as potential expansion of existing lift stations. This impact would be significant and mitigation is provided in **Chapter 2**, which would reduce impacts to a less than significant level. By adding the Alternative D wastewater flows to the expanded Madera County WWTP for the community of North Fork, the plant would be near capacity. This impact would be significant and mitigation is provided in **Chapter 2**. Implementation of mitigation measures would reduce impacts to a less than significant level.

Solid Waste – Construction waste that cannot be recycled would be disposed of at the Fairmead Landfill under Alternatives A - D, which accepts construction/demolition materials. This impact would be temporary and not significant. Nonetheless an additional mitigation measure as discussed in **Chapter 2** would further reduce effects to the landfill. Solid waste generation resulting during the operation of Alternatives A - D would represent a small percentage of the Fairmead Landfill's remaining daily capacity, which would be a less than significant impact. Mitigation is provided in **Chapter 2** to further ensure a reduction in the amount of waste that is landfilled.

Utilities  Adequate electrical, natural gas, and telecommunications facilities are available to serve Alternatives A - D and any upgrades or extensions would be funded by the Tribe. Thus, no significant impacts to utilities would occur.

Public Health and Safety  Additional costs would be incurred for law enforcement and fire protection services to serve the added demands of Alternatives A - D, resulting in a significant impact. Mitigation measures in **Chapter 2** would reduce this impact to a less than significant level. Given that the Tribal-State Compact would require compliance with state food and beverage handling standards and that the Safe Drinking Water Act (SDWA) would apply to trust land, a significant effect to public health and safety due to inadequate food and water safety precautions would not occur under Alternatives A, B, and D. Given that the SDWA would apply

21

to trust land, a significant impact to public health and safety due to inadequate water safety precautions would not occur under Alternative C. For Alternative C a Tribal-State Compact would not be required and the terms of the County MOU would not apply. Any renegotiated MOU with the County is expected to contain the food and beverage handling and safe drinking water provisions under Alternative A. However, if such terms were not included in a renegotiated MOU or the MOU was not renegotiated, a potentially significant effect to public health could occur if tribal food and beverage handling standards were inadequate. Mitigation measures contained in **Chapter 2** would ensure this effect is mitigated to a less than significant level.

Schools   Existing school facilities would be able to absorb any new student population under Alternatives A - D. Thus, the impact to school services would be less than significant.

### 3.1.9   Other Values

Noise   Construction noise increases and mechanical noise equipment during operation may exceed significance criteria for all alternatives, resulting in a potentially significant noise impact during construction and operation. Mitigation measures contained in **Chapter 2** would reduce these impacts to less than significant levels.

Hazardous Materials – Typical construction management practices limit and often eliminate the effect of such accidental releases including the use of storage areas that are not exposed to rainwater. An accident involving a service or refueling truck would present the worst-case scenario for the release of a hazardous substance. Depending on the relative hazard of the hazardous material, if a spill of significant quantity were to occur, the accidental release could pose a hazard to construction employees as well as to the environment. This impact is potentially significant for all alternatives but is reduced to a less than significant level through mitigation measures in **Chapter 2**. The amount and types of hazardous materials that would be stored, used, and generated during the operation of Alternatives A - D could have a potentially significant impact to the environment and public if not managed properly. Mitigation is included in **Chapter 2** to reduce potential impacts to a less than significant level.

Visual Resources – Alternatives A - D have been designed to avoid architectural features, such as the use of neon, which may be especially incompatible with a non-urban setting. Instead, the use of earth tones in paints and coatings, and native building materials such as stone have been utilized extensively in the project design. Architectural treatments incorporated into the various structures also serves to break up and soften the massing of the proposed buildings. In addition, landscape amenities have been incorporated into the project design to complement buildings and parking areas, including raised landscaped areas and plantings of trees and shrubs. Finally, no local or State-designated scenic corridors would be affected by the implementation of Alternatives A - D. Thus, effects to visual resources would be less than significant.

### 3.1.10   Indirect Effects

Indirect Effects from Off-Site Traffic Mitigation   As described in detail in Section 4.12.2 of the FEIS, implementation of off-site traffic mitigation may indirectly affect the environment; however, off-site activities would be required to comply with Federal, state, and local laws, policies, and ordinances, resulting in less than significant impacts, with the exception of potential

costs to local jurisdictions to pay for land acquisition. Mitigation measures in **Chapter 2** would ensure a less than significant impact.

Indirect Effects from Off-Site Pipeline Construction – As described in detail in Section 4.12.3 of the FEIS, implementation of off-site traffic mitigation may indirectly affect the environment; however, off-site activities would be required to comply with Federal, state, and local laws, policies, and ordinances, resulting in less than significant impacts.

### 3.1.11  Growth-Inducing Effects

The housing demand generated by the EIS alternatives would be met by available and planned housing developments and no housing growth would occur as a result of the alternatives. No significant off-site commercial growth would occur due to any of the EIS alternatives, either from visitors to the sites or from new residents. Office developments to serve the needs of currently planned residential development would not be induced by any of the EIS alternatives, because residential development has already occurred or is planned independent of the project alternatives. Additional industrial jobs that may be created due to increased economic activity would be accommodated by the vacant units in existing industrial areas in the County or in existing industrial operations. These jobs would be dispersed among industrial operations in Madera County and beyond. Thus, no growth in industrial facilities would occur under any of the alternatives and a less than significant impact would occur.

Should the Tribe decide to obtain local water and wastewater services, any water/wastewater pipeline extensions would be sized solely to serve the development proposed by the Tribe. Any other utilities improvements, such as improvements to electrical facilities, would be minor and tailored specifically for the project alternative. Thus, no growth would be induced by the extension of infrastructure or the expansion of utilities resulting from the project alternatives and a less than significant impact would occur.

### 3.1.12  Cumulative Effects

The development alternatives when added to past, present, and reasonably foreseeable future actions would not result in significant cumulative impacts to land resources, water resources, biological resources, socioeconomic impacts, land use, agriculture, public services (except off-site wastewater treatment services), noise, and visual resources.

Potentially significant impacts to air quality would occur from future operational emissions under Alternative A and due to additional greenhouse gas emissions under all development alternatives. Mitigation measures in **Chapter 2** would ensure a less than significant cumulative air quality impact. Significant cumulative cultural resources impacts could occur if unknown cultural resources are discovered during construction. Mitigation measures in **Chapter 2** would ensure a less than significant cumulative cultural resources impact. The development of Alternatives A through D would cause certain roadway segments and intersections in the vicinity of the proposed casino to operate at an unacceptable LOS during future cumulative conditions. Mitigation measures have been developed for the roadway segments and project intersections showing unacceptable LOS during operation of Alternatives A through D. With the incorporation of project mitigation measures described in **Chapter 2**, impacts to project roadways would be reduced to a less-than-significant level. Off-site treatment of wastewater

23

would result in the capacity of the municipal wastewater treatment plant being exceeded earlier than anticipated under all of the alternatives. This impact is considered significant. Mitigation is listed in **Chapter 2** to reduce this impact to a less than significant level. The amount and types of hazardous materials that would be stored, used, and generated during the construction and operation of Alternatives A through D could have a potentially significant impact to the environment and public. Mitigation is included in **Chapter 2** to reduce potential impacts to a less than significant level.

### 3.1.12   Unavoidable Adverse Effects

In accordance with the analysis within the FEIS, there are no unavoidable adverse effects that would occur as a result of the implementation of the Proposed Action and alternatives. All identified impacts can be adequately mitigated.

### 3.2   COMMENTS ON THE FEIS AND RESPONSES

During the 30-day waiting period following issuance of the FEIS on August 6, 2010, the BIA received comment letters from agencies and from other interested parties. During the decision making process for the Proposed Action, all comment letters on the FEIS were reviewed and considered by the BIA and are included within the administrative record. A list of comment letters and a copy of each letter received are included within **Attachment II**. Specific responses to these letters are included in the Response to Comments document, which is also included in **Attachment II**.

## 4.0   ENVIRONMENTALLY PREFERRED ALTERNATIVE(S)

Either the Mixed-Use Development Alternative (Alternative C) or the No-Action Alternative (Alternative E) would result in the fewest effects to the natural and human environment. The No-Action Alternative would be environmentally preferred. The No-Action Alternative, however, would not meet the stated purpose and need. Specifically, it would not provide the Tribe with an area in which the Tribe may engage in economic development to generate sustainable revenue to allow the Tribe to achieve self-sufficiency, self-determination, and a strong tribal government. The No-Action Alternative also would likely result in substantially less economic benefits to Madera County and the City of Madera than the development alternatives.

Of the development alternatives, Alternative C would result in the fewest adverse effects on the human environment. Alternative C would have the fewest effects due to a lesser amount of new development than would occur with any of the other development alternatives. However, Alternative C would generate less revenue, and therefore reduce the number of programs and services the tribal government could offer tribal members and neighboring communities. Alternative C is the Environmentally Preferred Development Alternative, but it would not fulfill the purpose and need for the Proposed Action stated in the EIS.

## 5.0   PREFERRED ALTERNATIVE

For the reasons discussed herein, the Department has determined that Alternative A (the Proposed Project) is the Preferred Alternative. BIA's mission is to enhance the quality of life

24

and to promote economic opportunity in balance with meeting the responsibility to protect and improve the trust resources of American Indians, Indian Tribes, and Alaska Natives. This mission is reflected in the policies underlying the statutory authorities governing this action, namely, the IRA, which was enacted to promote Indian self-government and economic self-sufficiency, and IGRA, which was enacted to govern Indian gaming as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments. Of the alternatives evaluated within the EIS, Alternative A would best meet the purposes and need of the BIA, consistent with its statutory mission and responsibilities to promote the long-term economic vitality, self-sufficiency, self-determination, and self-governance of the Tribe. The tribal government facilities and casino-hotel described under Alternative A would provide the Tribe with the best opportunity for securing a viable means of attracting and maintaining a long-term, sustainable revenue stream for the tribal government. Under such conditions, the tribal government would be stable and better prepared to establish, fund, and maintain governmental programs that offer a wide range of health, education, and welfare services to tribal members, as well as provide the Tribe, its members, and local communities with greater opportunities for employment and economic growth. Alternative A would also allow the Tribe to implement the highest and best use of the property. Finally, while Alternative A would have slightly greater environmental impacts than either of the environmentally preferred alternatives, those alternatives do not meet the purpose and need for the Proposed Action to the same extent as Alternative A, and the environmental impacts of the Preferred Alternative are adequately addressed by the mitigation measures adopted in this ROD.

Alternatives B and C, while slightly less intensive than Alternative A, would require similar levels of mitigation for identified impacts; however, the economic returns would be smaller than under Alternative A and the more limited development is not the most effective use of either the land or the Tribe's capital resources. Based on the limitations of the environmental resources in the area (such as the existing roadway network), the Tribe needs a development option that would ensure adequate capital resources to not only fund tribal programs but fund mitigation measures for identified impacts and payment obligations to local jurisdictions. The reduced revenue anticipated from Alternatives B and C would limit the Tribe's ability to fund both tribal programs and mitigation measures. Additionally, without the development of the hotel and the rural location of the North Fork, Alternative D would provide further limited opportunities for capital development to fund tribal programs.

The competitive market forces associated with commercial development and the amount of competitive commercial development along the Highway 99 corridor within Madera County make Alternative C (mixed-use development) less attractive than Alternative A from the standpoint of securing a long-term, sustainable revenue stream. A retail development on the Madera site would have limited competitive ability to draw patrons from the greater population centers within Madera County and the Highway 99 corridor compared to the gaming alternatives. In addition, based on peak-hour traffic patterns for retail centers compared to gaming operations, Alternative C also would likely have equal to and in certain instances greater traffic impacts during peak hours than would Alternative A.

25

In short, Alternative A is the alternative that best meets the purpose and need of the Tribe and the BIA while preserving the natural resources of the Madera site. Therefore, Alternative A is the Department's Preferred Alternative.

## 6.0   MITIGATION MEASURES

All practicable means to avoid or minimize environmental harm from the Preferred Alternative have been identified and adopted. The following mitigation measures and related enforcement and monitoring programs have been adopted as a part of this decision. Where applicable, mitigation measures will be monitored and enforced pursuant to Federal law, tribal ordinances, and agreements between the Tribe and the appropriate governmental authorities, as well as this decision. Specific best management practices and mitigation measures adopted pursuant to this decision are set forth below and included within the MMEP (see **Chapter 2**).

### 6.1   GEOLOGY AND SOILS

*Seismicity*

    A.    All structures shall be designed in compliance with the California Building Code (CBC) Building Code (Article VI Chapter 6.04) current at the start of construction such that risks to the health or safety of workers or members of the public from earthquake hazards are reduced to a less-than-significant level.

### 6.2   WATER RESOURCES

*Flooding*

    A.    To reduce the project's potential to increase surface runoff, impervious surfaces shall be minimized where feasible. Where feasible, all areas outside of buildings and roads will be kept as permeable surfaces, either as vegetation or high infiltration cover such as mulch, gravel, or turf block. Pedestrian pathways shall use a permeable surface where possible, such as crushed aggregate or stone with sufficient permeable joints (areas between stone or brick if used). Rooftops shall drain to vegetated driplines to maximize infiltration prior to concentrating runoff.

*Construction Impacts*

    B.    An erosion control plan will be developed with the primary intent to decrease pollutants entering the water columns, with a secondary intent of trapping pollutants before they exit the site.

    C.    The Tribe shall comply with all provisions stated in the Clean Water Act (CWA). As required by the General Construction National Pollutant Discharge Elimination System (NPDES) permit issued by the U.S. Environmental Protection Agency (USEPA) under the CWA, a Storm Water Pollution Prevention Plan (SWPPP) shall be prepared that will address water quality impacts associated with construction of the project. Water quality control measures identified in the Storm Water Pollution

26

Prevention Plan shall include, but not be limited to, Best Management Practices (BMPs) described below:

a. Existing vegetation shall be retained where possible. To the extent feasible, grading activities shall be limited to the immediate area required for construction.

b. Temporary erosion control measures (such as silt fences, staked straw bales, and temporary revegetation) shall be employed for disturbed areas.

c. No disturbed surfaces shall be left without erosion control measures in place during the winter and spring months.

d. Sediment shall be retained on-site by a system of sediment basins, traps, or other appropriate measures.

e. A Spill Prevention Control and Countermeasure Plan (SPCC) shall be developed, if necessary, which will identify proper storage, collection, and disposal measures for potential pollutants (such as fuel, fertilizers, pesticides, etc.) used on-site.

f. Petroleum products shall be stored, handled, used, and disposed of properly.

g. Construction materials, including topsoil and chemicals, shall be stored, covered, and isolated to prevent runoff losses and contamination of groundwater.

h. Fuel and vehicle maintenance areas shall be established away from all drainage courses and designed to control runoff.

i. Sanitary facilities shall be provided for construction workers.

j. Disposal facilities shall be provided for soil wastes, including excess asphalt produced during construction.

k. All workers and contractors shall be educated in the proper handling, use, cleanup, and disposal of all chemical materials used during construction activities.

l. All contractors involved in the project shall be educated on the potential environmental damages resulting from soil erosion prior to development by conducting a pre-construction conference. Copies of the project's erosion control plan shall be distributed at this time. All construction bid packages, contracts, plans and specifications shall contain language that requires adherence to the plan.

m. Construction activities shall be scheduled to minimize land disturbance during peak runoff periods. Soil conservation practices shall be completed during the fall to reduce erosion during the rainy seasons.

27

n.  Construction zones shall be created and only one part of a construction zone shall be graded at a time to minimize exposed areas. If possible, grading on a particular zone shall be delayed until protective cover is restored on the previously graded zone.

o.  Utility installations shall be coordinated to limit the number of excavations.

p.  Disturbed soils shall be protected from rainfall during construction by preserving as much natural cover, topography, and drainage as possible. Trees and shrubs shall not be removed unnecessarily.

q.  Disturbed areas shall be stabilized as promptly as possible, especially on long or steep slopes. Recommended plant materials and mulches shall be used to establish protective ground cover. Vegetation such as fast growing annual and perennial grasses shall be used to shield and bind the soil. Mulches and artificial binders shall be used until vegetation is established. Where truck traffic is frequent, gravel approaches shall be used to reduce soil compaction and limit the tracking of sediment off site.

r.  Surface water runoff shall be controlled by directing flowing water away from critical areas and by reducing runoff velocity. Diversion structures such as terraces, dikes, and ditches shall collect and direct runoff water around vulnerable areas to prepared drainage outlets. Surface roughening, berms, check dams, hay bales, or similar devices shall be used to reduce runoff velocity and erosion.

s.  Sediment shall be contained when conditions are too extreme for treatment by surface protection. Temporary sediment traps, filter fabric fences, inlet protectors, vegetative filters and buffers, or settling basins shall be used to detain runoff water long enough for sediment particles to settle out.

t.  Topsoil removed during construction shall be carefully stored and treated as an important resource. Berms shall be placed around topsoil stockpiles to prevent runoff during storm events.

u.  The disturbance of soils shall be avoided and minimized as fully as possible.

### Operational Impacts

D.  Fertilizer use shall be limited to the minimum amount necessary, taking into account any nutrient levels in the recycled water source. Fertilizer shall not be applied prior to a rain event.

E.  Landscape irrigation shall be adjusted based on weather conditions and shall be reduced or eliminated during the wet portion of the year in order to prevent excessive runoff.

28

F.   The sprayfield shall be designed so that any wastewater runoff is captured and not allowed to run off the site or enter waters of the U.S.

G.   At least 15 percent of surface parking areas shall be constructed of pervious surfaces.

*Groundwater*

H.   Stormwater BMPs that promote infiltration of water from stormwater runoff and on-site disposal of treated wastewater shall be implemented. BMPs for enhancing infiltration of stormwater runoff have the potential to increase the rate of natural recharge at the site, while on-site disposal of treated wastewater will return groundwater originating from the casino wells back to the aquifer. The effectiveness of these measures to reduce drawdown impacts is directly proportional to the rate of new recharge compared with the pumping rate (see **FEIS Appendix L**). Given the limited amount of rainfall received in Madera County, additional recharge from stormwater BMPs would have a minimal effect on the drawdown effects of on-site pumping, offsetting such effects by only 1.6 percent. Irrigating on-site landscaping combined with the use of on-site sprayfields and/or leachfields would have a far greater offsetting effect on the aquifer, reducing drawdown from 7 to 67 percent. Under each alternative, if treated wastewater is disposed via a leachfield, the recharge rate would be at the upper end of this range; whereas, if the treated wastewater is disposed in a sprayfield, the recharge rate would be in the lower end of the range (see **FEIS Appendix L** for a detailed breakdown of potential recharge rates for each disposal option).

I.   If on-site groundwater resources are used for water supply, groundwater sampling and analysis shall be performed to determine if treatment is necessary. If treatment is necessary, an on-site water treatment plant shall be constructed to treat drinking water to USEPA standards.

J.   The Tribe shall adopt water conservation measures, such as electronic dispensing devices in faucets, low flow toilets, low flow showerheads, and the use of native plants in landscaping, to reduce the consumption of groundwater as recommended by the regional groundwater management plan.

K.   Effects to regional overdraft shall be reduced by tribal contributions to a reserved water bank or groundwater recharge area in an amount at least equivalent to property pumping rates. Possible groundwater recharge areas include areas operated or proposed by the Madera Irrigation District (MID) (**FEIS Appendix L**). The Tribe has executed a Memorandum of Understanding (MOU) with MID (**ROD Attachment V**) that provides for equivalent water contributions to a MID recharge area should development under Alternative A occur. Therefore this mitigation measure would not apply to Alternative A.

L.   The Tribe shall implement a groundwater monitoring program (described in **FEIS Appendix L**) as soon as is feasible after project approval and preferably at least one

29

year before opening of the project facilities to the public (to allow for baseline monitoring).

M.     The Tribe shall implement a program to compensate neighboring well owners for impacts to well operation. The actual amount of interference drawdown associated with the project and the future rate of regional groundwater level decline shall be estimated from the groundwater monitoring program (**FEIS Appendix L**). At least one year of baseline data and one year of data after project pumping begins should be collected prior to implementation of the following well impact compensation program:

a. Reduction in usable well life – The tribe shall reimburse the owners of wells that become unusable within 30 years of the onset of project pumping for a portion of the prevailing, customary cost for well replacement, rehabilitation or deepening. In order to be eligible, the well owner will need to provide the tribe with documentation of the well location and completion data, and prove that the well was constructed and usable before project pumping was initiated. The percentage of the cost reimbursed by the tribe shall depend upon the degree to which the well's usable life is shortened as determined from data gathered during the groundwater level monitoring program and water level data gathered by others. Specifically, the following approach shall be used:

i. Regional groundwater monitoring data for the period between the time that pumping for the project begins and the well becomes unusable will be analyzed using a best-fit line approach to determine the regional rate of groundwater level decline in feet per year;

ii. Groundwater monitoring data for the project will be used to assess the amount of drawdown in feet experienced by the affected well for which the project is responsible;

iii. The number of years by which the well's life is shortened due to the project will be calculated by dividing the amount of drawdown induced by the project by the calculated annual rate of regional water level decline; and

iv. The Tribe shall reimburse the well owner for the cost of replacing or deepening the unusable well at a rate of 10 percent of the customary and prevailing cost for each year that the well life is shortened due to the project.

b. Groundwater level falling near or below pump intake – The concept of usable well life can also be applied to this impact, except that the well's usable life is extended by lowering the pump intake. The impact of project pumping on shortening this time period would be similar to the impact on shortening well life, and shall be determined using the same methodology described above. The tribe shall reimburse the owners of wells with pumps that require lowering within 30 years of the onset of project pumping for a portion of the prevailing, customary

30

cost for this service. The percentage of the cost reimbursed by the tribe shall depend upon the degree to which the time period until a well's pump intakes require lowering at a rate of 10 percent of the cost of lowering the pump or pump intake for each year that the well's life with the pump at the original position is shortened. In order to be eligible, the well owner will need to provide the tribe with documentation of the well location and completion data, including pump intake depth, and prove that the well was constructed and usable before project pumping was initiated. The Tribe must be made aware of the cost reimbursement claim prior to lowering of the pump intake, so that the need for possible well deepening, replacement or rehabilitation can be assessed and inefficiencies can be avoided. At the Tribe's discretion, compensation may be paid toward well deepening, replacement or rehabilitation in lieu of toward lowering the pump intake.

c. Increased Electrical and Maintenance Cost – The Tribe shall reimburse well owners pumping more than 100 AF/year for their additional annual electrical costs (for no longer than 30 years) at the prevailing electrical rate based on the following formula:

$$KWhr/year = \frac{(gallons\ Pumped/year)\ x\ (feet\ of\ interference\ drawdown)}{1621629}$$

In order to qualify for reimbursement, the well owner must provide proof of the actual annual volume of water pumped. As an alternative to annual payments, a one-time lump sum payment of a mutually agreeable amount could be made.

d. No reimbursement would be made available for wells installed after operation of the project.

e. For any of the above impacts, the Tribe may choose at its discretion to provide the well owner with a connection to a local public or private water supply system in lieu of the above mitigation measures, at a reduced cost in proportion to the extent the impact was caused by project pumping.

f. The known owners of identified wells within two miles of the project pumping well shall be notified of the well impact compensation program outlined above before project pumping begins.

g. The Tribe shall contract with a third party such as the County of Madera to oversee this well impact compensation program.

## 6.3   AIR QUALITY

### Construction Impacts

A.   All construction mitigation measures shall be incorporated into a Construction Emissions Mitigation Plan.

31

B.     During construction, the Tribe shall comply with San Joaquin Valley Air Pollution
       Control District (SJVAPCD) Regulation VIII (Fugitive Dust Rules).

C.
       Prior to the start of any construction activity on the site, the Tribe shall create a Dust
       Control Plan pursuant to SJVAPCD Rule 8021. Implementation of SVAPCD Rule
       8021 would limit visible dust emissions to 20 percent opacity.

D.
       In addition to full compliance with all applicable Regulation VIII requirements, the
       Tribe shall implement the following dust control practices, drawn from Tables 6-2
       and 6-3 of SJVAPCD's *Guide for Assessing and Mitigating Air Quality Impacts*
       (GAMAQI), during construction:

       a.  All disturbed areas, including soil stockpiles, which are not being actively utilized
           for construction purposes, shall be effectively stabilized of dust emissions using
           water, chemical stabilizer/suppressant, or vegetative ground cover.

       b.  All on-site unpaved roads and off-site unpaved access roads shall be effectively
           stabilized of dust emissions using water or chemical stabilizer/suppressant.

       c.  All land clearing, grubbing, scraping, excavation, land leveling, grading, cut and
           fill, and demolition activities shall be effectively controlled of fugitive dust
           emissions utilizing application of water or by presoaking.

       d.  When materials are transported off-site, all material shall be covered, effectively
           wetted to limit visible dust emissions, or at least six inches of freeboard space
           from the top of the container shall be maintained.

       e.  All operations shall limit or expeditiously remove the accumulation of mud or dirt
           from adjacent public streets at least once every 24 hours when operations are
           occurring. (The use of dry rotary brushes is expressly prohibited except where
           preceded or accompanied by sufficient wetting to limit the visible dust emissions.)
           (Use of blower devices is expressly forbidden.)

       f.  Following the addition of materials to, or the removal of materials from, the
           surface of outdoor soil stockpiles, piles shall be effectively stabilized of fugitive
           dust emissions utilizing sufficient water or chemical stabilizer/suppressant.

       g.  Limit traffic speeds on unpaved roads to 15 mph; and

       h.  Install erosion control measures to prevent silt runoff to public roadways from
           sites with a slope greater than one percent.

E.     The Tribe shall prepare an inventory of all equipment prior to construction and
       identify the suitability of add-on emission controls for each piece of equipment before
       groundbreaking. Control technologies such as particle traps control approximately 80
       percent of diesel particulate matter. Specialized catalytic converters (oxidation

32

catalysts) control approximately 20 percent of diesel particulate matter. 40 percent of carbon monoxide emissions. and 50 percent of hydrocarbon emissions.

F.   The Tribe shall ensure that diesel-powered construction equipment is properly tuned and maintained. and shut off when not in direct use.

G.   The Tribe shall prohibit engine tampering to increase horsepower. except when meeting manufacturer's recommendations.

H.   The Tribe shall locate diesel engines. motors. and equipment staging areas as far as possible from the closest residences.

I.   The Tribe shall require the use of low sulfur diesel fuel (<15 parts per million sulfur) for diesel construction equipment. if available.

J.   The Tribe shall reduce construction-related trips of workers and equipment. including trucks. A construction traffic and parking management plan shall be developed that minimizes traffic interference and maintains traffic flow.

K.   The Tribe shall lease or buy newer. cleaner equipment (1996 or newer model). using a minimum of 75 percent of the equipment's total horsepower.

L.   The Tribe shall use lower-emitting engines and fuels. including electric. liquefied gas. hydrogen fuel cells. and/or alternative diesel formulations.

### Operational Impacts

M.   The Tribe shall provide transportation (e.g.. shuttles) to major transit stations and multi-modal centers. The Tribe shall at a minimum provide six shuttles daily to major transit stations and multi-modal centers.

N.   The Tribe shall provide transit amenities such as bus turnouts: shelter benches: street lighting. route signs. and displays in and around the transit shelter benches to encourage public use of the transit service.

O.   The Tribe shall contribute to dedication of land for off-site bicycle trails linking the project to designated bicycle commuting routes in accordance with the regional Bikeway Master Plan.

P.   The Tribe shall maximize the potential of passive solar design principles where feasible.

Q.   The Tribe shall ensure the use of clean fuel vehicles in the vehicle fleet where practicable.

R.   The Tribe shall provide a parking lot design that includes clearly marked and shaded pedestrian pathways between transit facilities and building entrances.

33

S.      The Tribe shall provide amenities such as personal lockers and showers, bicycle lockers and racks, bus pass subsidies and flexible schedules for employees who walk, bike, or utilize public transit to work.

T.      The Tribe shall provide electric vehicle charging facilities.

U.      The Tribe shall provide preferential parking for vanpools and carpools.

V.      The Tribe shall provide on-site pedestrian facility enhancements such as walkways, benches, proper lighting, vending machines, and building access, which are physically separated from parking lot traffic.

W.      A parking structure is proposed in Alternatives A and B. If the parking structure includes mechanical ventilation and exhaust, the exhaust should be vented in a direction away from inhabited areas.

X.      The Tribe shall provide adequate ingress and egress at entrances to the Casino to minimize vehicle idling and traffic congestion.

Y.      The Tribe shall contract only with commercial landscapers who operate equipment that complies with the most recent California Air Resources Board certification standards, or standards adopted no more than three years prior to date of use.

Z.      The Tribe shall adopt an anti-idling ordinance for the facility. To help maintain compliance with this ordinance, the Tribe should consider creating a driver's lounge, where drivers can wait and occupy themselves comfortably instead of sitting in their buses or trucks.

AA.     The Tribe shall implement or fund the implementation of one or more of the following measures to reduce NOx, ROG, and PM10 emissions to less than the SJVAPCD thresholds, which would result in a less than significant impact from Alternatives A, B, and C. **FEIS Table 5-1** shows the reductions necessary for each alternative.

    a. Pave or resurface unpaved roadway(s) or roadway(s) in a deteriorated state within the San Joaquin Valley Air Basin, which have a minimum daily vehicle count of 100 vehicles.

    b. Contribute to a program to retrofit residential fireplaces that do not meet EPA certification standards within the San Joaquin Valley Air Basin.

    c. Purchase low emission buses to replace older municipal or school buses used within the San Joaquin Valley Air Basin.

    d. Purchase hybrid vehicles to replace existing governmental fleet vehicles within the San Joaquin Valley Air Basin.

34

e. Purchase and install on-site or within the San Joaquin Valley Air Basin; a photovoltaic array, wind powered energy, and/or other form(s) of renewable energy.

f. Contribute a fair share percentage to the synchronization of traffic signals within the San Joaquin Valley Air Basin.

g. Purchase Emission Reduction Credits that are available from sources within an air basin in conformity with 40 CFR 93.

### Odor Impacts

BB. The wastewater treatment plant shall be constructed with comprehensive odor control facilities, including the injection of odor control oxidants at the sewage lift station and construction of covered headworks with odor scrubber at the wastewater treatment plant.

CC. Spray drift from the wastewater treatment plant or spray disposal field shall not migrate out of the disposal field boundaries.

DD. Spray field irrigation shall cease when winds exceed 30 mph.

EE. The WWTP shall be staffed with operators who are qualified to operate the plant safely, effectively, and in compliance with all permit requirements and regulations. The operators shall have qualifications similar to those required by the State Water Resources Control Board Operator Certification Program for municipal wastewater treatment plants. This program specifies that for tertiary level wastewater treatment plants with design capacities of 1.0 MGD or less, the chief plant operator must be a Grade III operator. Supervisors and Shift Supervisors must be Grade II operators. An Operations and Maintenance Program must be followed by the plant operators. Emergency preparedness shall include all appropriate measures, including a high level of redundancy in the major systems.

### Toxic Air Contaminants Impacts

FF. Air intakes associated with the heating and cooling system for buildings shall not be located next to potential TAC-emitting locations (e.g., loading docks) in accordance with CARB's Air Quality and Land Use Handbook.

### Indoor Air Quality Impacts

GG. The casino floor shall be ventilated to at least the standards of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE), *Ventilation for Acceptable Indoor Air Quality*, ASHRAE Standard 62-2001.

35

HH.   The Tribe shall ensure that comfort levels are acceptable to most occupants, and consistent with ASHRAE Standard 55-1992, under all operating conditions.

II.   The Tribe shall ensure that significant expected sources of pollutant emissions are isolated from occupants using physical barriers, exhausts, and pressure controls.

JJ.   The Tribe shall ensure that outdoor air entering the building is protected from contamination from local outdoor sources and from building exhausts and sanitation vents.

KK.   The Tribe shall ensure that provisions are made for easy access to heating, ventilation, and air conditioning (HVAC) equipment requiring periodic maintenance.

LL.   The Tribe shall ensure the use of low-emitting building products pursuant to Integrated Waste Management Board's Section 01350 where feasible.

MM.   The Tribe shall ensure that occupant exposure to construction contaminants is minimized using protocols for material selection, preventive installation procedures, and special ventilation and pressure control isolation techniques.

NN.   A non-smoking gaming area shall be provided.

OO.   Signage shall be displayed or brochures made available to casino patrons describing the health effects of second-hand smoke.

PP.   The Tribe shall provide notice of the health effects of secondhand smoke exposure to employees upon hire.

QQ.   The Tribe shall seek LEED certification for project components, where possible.


***Climate Change***

As noted in the FEIS, a less than significant cumulative impact to global climate change would result after the implementation of Mitigation Measure QQ. In addition, the implementation of mitigation measures RR through YY are recommended to further reduce project climate change impacts.

RR.   Buses and other commercial diesel-fueled vehicles shall comply with the California Air Resource Board's (CARB) Airborne Toxic Control Measure to Limit Diesel-Fueled Commercial Motor Vehicle Idling (California Code of Regulations, Title 13, Division 3, Article 1, Chapter 10, Section 2485), which requires that the driver of any diesel bus shall not idle for more than five minutes at any location, except in the case of passenger boarding where a ten minute limit is imposed, or when passengers are onboard. Furthermore, the Tribe will provide a "Drivers Lounge" for bus and truck drivers to discourage idling.

36

SS.　The Tribe shall ensure the use of low-emitting building products pursuant to Integrated Waste Management Board's Section 01350 where feasible.

TT.　The Tribe shall ensure use of low-emission, central, or tankless water heaters and install wall insulation that shall exceed Title 24 requirements.

UU.　The Tribe shall use energy efficient appliances in the hotel and casino.

VV.　Environmentally preferable materials shall be used to the extent practical for construction of facilities.

WW.　Implementation of Mitigation Measures P, Q, U, and V

XX.　The Tribe shall maintain all vehicles to manufacturers' specifications. This mitigation measure would reduce emission that occurs when vehicles are not maintained.

YY.　The Tribe shall ensure that the project will provide multiple and/or direct pedestrian access to adjacent, complementary land uses and throughout the project. This mitigation measure would encourage walking to destinations adjacent to the proposed project and thus, reducing vehicle trips.

## 6.4    BIOLOGICAL RESOURCES

### *State Special-Status Species*

### Swainson's Hawk

A.　The pre-construction survey shall be conducted within 30 days prior to initiation of construction activity, and coverall all potential nesting trees. If active nests are found, consultation with USFWS shall occur. Appropriate measures shall be adopted similar to California Department of Fish & Game (CDFG) mitigation guidelines, regarding losses of suitable foraging habitat. Impacts within 10 miles of a Swainson's hawk nest site shall be mitigated by protecting or creating equally suitable foraging habitat elsewhere within the territory's 10-mile radius (CDFG 1994). The acreage of Habitat Management (HM) lands provided shall be derived from the 1994 CDFG staff report.

　　Projects within five miles of an active nest tree but greater than one mile from the nest tree shall provide 0.75 acres of HM land for each acre of urban development planned(0.75:1 ratio). All HM lands protected under this requirement shall be protected through fee title acquisition or conservation easement (acceptable to the CDFG) on agricultural lands or other suitable habitats that provide foraging habitat for Swainson's hawks. Management Authorization holders·project sponsors shall provide for the long-term management of the HM lands by funding a management endowment (the interest on which shall be used for managing the HM lands).

37

B.   Informal consultation with CDFG shall occur prior to construction activities to discuss potential on-site impacts to state special-status species.

### Migratory and Nesting Birds

C.   If feasible, vegetation removal activities shall occur outside of the nesting season (approximately March through September) for migratory birds. If vegetation removal activities are to be conducted during the nesting season, a qualified biologist shall conduct a pre-construction survey for active migratory bird nests in and around proposed disturbance areas within one month prior to vegetation removal. If vegetation removal activities are delayed or suspended for more than one month after the pre-construction survey, the site shall be resurveyed. If a migratory bird nest is present, consultation with USFWS shall occur. A disturbance-free buffer of 250 feet shall be established around the nest and demarcated with fencing or flagging. No project-related construction activities, including vegetation removal, shall occur within the buffer zone until a qualified biologist determines the young have fledged and are independent of the nest.

D.   A pre-construction survey for Western burrowing owls shall be conducted to ensure that impacts to burrowing owls, if present, do not occur during the nesting season. The pre-construction survey shall be conducted within 30 days prior to initiation of construction activity. If active burrows are found prior to the nesting season, consultation with USFWS shall occur. If feasible, passive relocation measures shall be provided for each burrow in the area of the Madera site that is rendered biologically unsuitable. Passive relocation measures shall include the creation of two natural or artificial burrows for each burrow rendered biologically unsuitable. Daily monitoring will be implemented until the owls have been relocated to the new burrows. This measure will reduce potential impacts to burrowing owl species.

E.   The following measures shall be implemented to minimize the effects of lighting and glare:

   a.  Install downcast lights with top and side shields to reduce upward and sideways illumination. This shall reduce potential disorientation affects from non-directed shine to birds and wildlife species.
   b.  Turn off as many exterior and interior lights as possible during the peak bird migration hours of midnight to dawn to reduce potential building collisions with migratory birds.

### Waters of the U.S.

F.   Permanent fencing shall be installed around areas of wetlands and identified jurisdictional waters of the U.S., as shown on the U.S. Army Corps of Engineers (USACE) verified, waters of the U.S. map. Fencing shall be located no closer than a minimum of 50 feet from boundaries of waters of the U.S. Fencing shall be installed

38

prior to any construction to protect water quality and shall remain in place after construction to maintain the wetlands and waters of the U.S.

G.   Construction staging areas shall be located at least 50 feet away from the wetlands and identified jurisdictional waters of the U.S. Temporary stockpiling of excavated or imported material shall occur only in approved construction staging areas. Excess excavated soil shall be used on site or disposed of at a regional landfill or other appropriate facility. Stockpiles that are to remain on the site through the wet season shall be protected to prevent erosion (e.g. seeding and silt fences or straw bales).

### *Aquatic Habitat*

H.   To prevent impacts to aquatic habitat due to a change in water temperature, the water temperature of Dry Creek above its confluence with Schmidt Creek shall be monitored. Measures such as a cooling pond or cooling tower shall be used if necessary to decrease the temperature of the effluent to within five degrees Fahrenheit of the temperature of the creek. In accordance with the RWQCB Basin Plan, at no time shall the temperature of the receiving body of water be altered more than five degrees Fahrenheit.

### *Roosting Bats*

I.   Within one month prior to tree removal, a qualified bat biologist shall conduct surveys to determine whether special-status bat species are roosting in the trees. If tree removal activities are delayed or suspended for more than one month after the pre-construction survey, the trees shall be resurveyed. If special-status bat species are roosting in trees at the site, a qualified bat biologist will remove or relocate the bats.

### 6.5   CULTURAL RESOURCES

A.   Any inadvertent discovery of archaeological resources, shall be subject to Section 106 of the National Historic Preservation Act as amended (36 CFR 800), the Native American Graves Protection and Repatriation Act (NAGPRA) (25 USC 3001 et seq.), and the Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa-mm). Specifically, procedures for post review discoveries without prior planning pursuant to 36 CFR 800.13 shall be followed.

All work within 50 feet of the find shall be halted until a professional archaeologist, can assess the significance of the find. If any find is determined to be significant by the archaeologist, then representatives of the Tribe, the NIGC and the BIA shall meet with the archaeologist, to determine the appropriate course of action, including the development of a Treatment Plan, if necessary. All significant cultural materials recovered shall be subject to scientific analysis, professional curation, and a report prepared by the professional archaeologist, according to current professional standards.

39

B.   If human remains are discovered during ground-disturbing activities on tribal lands, work shall remain in the vicinity, the Madera County Coroner should be notified immediately, and, pursuant to NAGPRA, Section 10.4 Inadvertent Discoveries, a tribal official and BIA representative will be contacted immediately. No further ground disturbances shall occur until the tribal official and BIA representative have examined the findings and agreed on the appropriate course of action.

C.   Monitoring of construction activities by a qualified paleontologist shall occur during any trenching or excavation associated with development under the Alternatives.

D.   Should paleontological resources be unearthed, a paleontological resource impact mitigation plan (PRIMP) shall be created prior to further earthmoving in the vicinity of the find. The PRIMP shall detail the procedures for collecting and preserving the discovered fossils. Any fossils discovered during construction shall be accessioned in an accredited scientific institution for future study.

**6.6   SOCIOECONOMIC CONDITIONS AND ENVIRONMENTAL JUSTICE**

A.   The Tribe shall pay the fair-share cost of traffic mitigation, including the cost of any required land acquisition.

B.   The Tribe shall contract with a gambling treatment professional to train management and staff to develop strategies for recognizing and addressing customers whose gambling behavior may strongly suggest they are experiencing serious to severe difficulties.

C.   The Tribe shall refuse service to any customer whose gambling behavior convincingly exhibits indications of problem or pathological gambling.

D.   The Tribe shall respectfully and confidentially provide the customer (as described above) with written information that includes a list of professional gambling treatment programs and self-help groups.

E.   The Tribe shall implement procedures to allow for voluntary self-exclusion, enabling gamblers to ban themselves from a gambling establishment for a specified period of time.

F.   The Tribe shall prominently display (including on any automatic teller machines (ATMs) located on-site) materials describing the risk and signs of problem and pathological gambling behaviors. Materials shall also be prominently displayed (including on any ATMs located on-site) that provide available programs for those seeking treatment for problem and pathological gambling disorders, including, but not limited to a toll-free hotline telephone number.

G.   The Tribe shall offer insurance coverage for problem/pathological gambling treatment programs to its casino employees.

40

H.    The Tribe shall reimburse Madera County in the following amounts: $835.110 (one-time, prior to the opening of the Alternative A developments to the public) and $1.038.310 (annually) for fiscal impacts.

## 6.7    TRANSPORTATION/CIRCULATION

Mitigation measures for the improvement of the following intersections have been recommended in 2010 and 2030. Where roadway segments and intersections are shown as having an unacceptable LOS with the addition of traffic from the project alternatives (and caused at least in part from project traffic) the Tribe shall pay for a proportionate share of costs for the recommended mitigation.

### *2010 – Alternative A*

### Avenue 17 – SR-99 to Road 27

*   Restripe/widen from two (2) lanes to four (4) lanes

### SR-99 between Avenue 18 ½ and Avenue 17

*   Restripe/widen the NB leg from two (2) lanes to three (3) lanes
*   Restripe/widen the SB leg from two (2) lanes to three (3) lanes

### SR-99 south of Avenue 17

*   Restripe/widen the SB leg from two (2) lanes to three (3) lanes
*   Restripe/widen the NB leg from two (2) lanes to three (3) lanes

### SR-99 north of Avenue 18½

*   Restripe/widen the SB leg from two (2) lanes to three (3) lanes

### Avenue 18½ at SR 99 NB ramps

*   Signalize the intersection

### Avenue 18½ at SR 99 SB ramps/Road 23

*   Signalize the intersection with one year traffic monitoring. The traffic signals may be turned off if the signal warrants are not met within one year.

### Avenue 17 at SR 99 NB ramps

*   Signalize the intersection
*   Restripe/widen the NB approach, south leg, from one (1) shared left-through lane and one (1) right-turn lane to one (1) left-turn lane, one (1) shared left-through lane and two (2) right-turn lanes.
*   Restripe/widen the EB approach, west leg, from one (1) left-turn lane and one (1) through lane to one (1) left-turn lane and two (2) through lanes.
*   Restripe/widen the WB approach from one (1) through lane and one (1) right-turn lane to two (2) through lanes and one (1) right-turn lane

41

**Avenue 17 at SR 99 SB ramps**

- Signalize the intersection
- Restripe/widen the EB approach, west leg, from one (1) through lane to two (2) through lanes
- Restripe/widen the WB approach, east leg, from one (1) through lane to two (2) through lanes

**Avenue 17 at Golden State Boulevard**

- Signalize the intersection
- Restripe/widen the SB approach, north leg, from one (1) shared left-through-right lane to two (2) left-turn lanes and one (1) shared through-right lane
- Restripe/widen the EB approach, west leg, from one (1) left-turn, one(1) through lane, and one (1) right-turn lane to one (1) left-turn lane, one (1) through lane, and one (1) shared through-right lane
- Restripe/widen the WB approach, east leg, from one (1) left-turn lane and one (1) shared through-right lane to one (1) left-turn lane, two (2) through lanes, and one (1) right-turn lane

**Avenue 17 at Road 23**

- Signalize the intersection

**Olive Avenue/Avenue 14/SR 99 SB on-ramp at SR 145**

- Restripe/widen the EB approach, west leg, from one (1) shared left-through and one (1) right-turn lane, to one (1) left-turn lane, one (1) through lane, and one (1) right-turn lane

**Olive Avenue/Avenue 14 at SR 99 SB off-ramp**

- Restripe/widen the SB approach, north leg, from one (1) left-turn lane and one (1) right-turn lane, to two (2) left-turn lanes and one (1) right-turn lane

**Avenue 12/Golden State Boulevard at SR 99 SB off ramps**

- Signalize the intersection
- Restripe/widen the SB approach, north leg, from one (1) shared left-through to one (1) left-turn lane and one (1) through lane
- Restripe/widen the WB approach, east leg, from one (1) left-turn lane and one (1) right-turn lane, to dual (2) left-turn lanes and one (1) right-turn lane

**Avenue 12 at Golden State Boulevard**

- Restripe/widen the SB approach, north leg, from one (1) left-turn lane, one (1) through lane and one (1) right-turn lane to dual (2) left-turn lanes, one (1) through lane and one (1) right-turn lane

**Avenue 12 at SR 99 NB ramps**

42

- Restripe/widen the WB approach, east leg, from a shared through-right lane to one (1) through lane and one (1) right-turn lane

### *2030 – Alternative A*

### Avenue 17 – Road 23 to SR-99

- Restripe/widen from two (2) lanes to six (6) lanes

### Avenue 17 –SR-99 to Road 27

- Restripe/widen from four (4) lanes to six (6) lanes

### SR 99 north of Avenue 18½

- Restripe/widen the NB leg from three (3) lanes to four (4) lanes
- Restripe/widen the SB leg from three (3) lanes to four (4) lanes

### SR 99 between Avenue 18½ to Avenue 17

- Restripe/widen the NB leg from three (3) lanes to four (4) lanes
- Restripe/widen the SB leg from three (3) lanes to four (4) lanes

### SR 99 south of Avenue 17

- Restripe/widen the NB leg from three (3) lanes to four (4) lanes
- Restripe/widen the SB leg from three (3) lanes to four (4) lanes

### Avenue 18½ at SR 99 NB ramps

- Restripe/widen the EB approach, west leg, from one (1) left-turn lane and one (1) through lane, to dual (2) left-turn lanes and one (1) through lane

### Avenue 18½ at SR 99 SB ramps/Road 23

- Restripe/widen the SB approach, north leg, from one (1) left-turn lane and one (1) through lane, to dual (2) left-turn lanes and one (1) through lane

### Avenue 18½ at Pistachio Drive

- Although the Avenue 18½ at Pistachio Drive intersection is projected to meet the urban peak hour volume signal warrant, it will not be signalized due to its proximity to the SR 99 SB off-ramp. The intersection will be restricted to right-in/right-out/left-in access, which reduces the need for a signal and allows the intersection to operate at an acceptable level of service without a signal.

### Avenue 18½ at Golden State Boulevard/Road 23

- Signalize the intersection

43

- Restripe/widen the NB approach. south leg. from one (1) left-turn lane and one (1) through-right lane. to one (1) left-turn lane. one (1) through lane. and one (1) right-turn lane
- Restripe/widen the WB approach. east leg. from one (1) shared left-through lane and one (1) right-turn lane. to dual (2) left-turn lanes and one (1) shared through-right lane
- Restripe/widen the SB approach. north leg. from one (1) shared left-through-right lane. to one (1) left-turn lane and one (1) through-right lane

**Avenue 18 at Road 23**
- Signalize the intersection

**Avenue 17 at SR 99 NB ramps**
- Restripe/widen the NB approach. south leg. from one (1) left-turn lane. one (1) shared left-through lane. and two (2) right-turn lanes to three (3) left-turn lanes. one (1) shared through-right lane. and two (2) right-turn lanes.
- Restripe/widen the EB approach. west leg. from one (1) left-turn lane and two (2) through lanes to two (2) left-turn lanes and three (3) through lanes.
- Restripe/widen the WB approach. east leg. from two (2) through lanes and one (1) right-turn lane to two (2) through lanes and one (1) shared through-right lane
- Widen the NB off-ramp to two (2) lanes with a NB auxiliary lane on SR 99

**Avenue 17 at SR 99 SB ramps**
- Restripe/widen the SB approach. north leg. from one (1) left-turn lane. and one (1) right-turn lane to two (2) left-turn lanes and two (2) right-turn lanes
- Restripe/widen the EB approach. from two (2) through lanes to four (4) through lanes
- Restripe/widen the WB approach. east leg. from two (2) through lanes to three (3) through lanes

**Avenue 17 at SR 99 SB ramps**
- Restripe/widen the SB approach. north leg. from one (1) left-turn lane. and one (1) right-turn lane to two (2) left-turn lanes and two (2) right-turn lanes
- Restripe/widen the EB approach. from two (2) through lanes to four (4) through lanes
- Restripe/widen the WB approach. east leg. from two (2) through lanes to three (3) through lanes

**Avenue 17 at Golden State Boulevard**
- Restripe/widen the NB approach. south leg. from one (1) left-turn lane. one (1) through lane. and one (1) right-turn lane to one (1) left-turn lane. one (1) through lane. and two (2) right-turn lanes

44

- Restripe/widen the SB approach, north leg, from two (2) left-turn lanes and one (1) shared through-right lane to two (2) left-turn lanes, one (1) through lane and one (1) right-turn lane
- Restripe/widen the EB approach, west leg, from one (1) left-turn , one (1) through lane, and one (1) shared through-right lane to two (2) left-turn lanes, two (2) through lanes, and one (1) shared through-right lane
- Restripe/widen the WB approach, east leg, from one (1) left-turn lane, two (2) through lanes, and one(1) right-turn lane to tow (2) left-turn lanes, two (2) through lanes, and one (1) shared through-right lane

The intersection improvements listed above for the Avenue 17 at Golden State Boulevard intersection may not meet appropriate queuing lengths under 2030 conditions (FEIS: **Appendix N**). Therefore, the interchange and surrounding circulation system would require additional reconstruction to provide adequate queuing lengths. Measures required to ensure adequate queue lengths include either requiring limiting movements to right turns only onto and off of Golden State Boulevard and Airport Drive at Avenue 17 or relocating the Golden State Boulevard/Airport Drive/Avenue 17 intersection to the west.

### Avenue 17 at Road 23

- Restripe/widen the NB approach, south leg, from one (1) shared left-through-right lane to one (1) left-turn lane and one (1) shared through-right lane
- Restripe/widen the SB approach, north leg, from one (1) shared left-through-right lane to one (1) shared left-through lane and one (1) right-turn lane
- Restripe/widen the EB approach, west leg, from one (1) shared left-through-right lane to one (1) shared left-through lane, one (1) through lane, and one (1) right-turn lane
- Restripe/widen the WB approach, east leg, from one (1) shared left-through-right lane to one (1) left-turn lane and one 91) through lane, and one (1) shared through-right lane

### Avenue 16/Ellis Street at Aviation Drive

- Restripe/widen the NB approach, south leg, from one (1) left-turn lane and one (1) shared through-right lane to (1) left-turn lane, one (1) through lane, and two (2) right-turn lanes
- Restripe/widen the SB approach, north leg, from one (1) left-turn lane, one (1) through lane, and one (1) right-turn lane to two (2) left-turn lanes, one (1) through lane, and one (1) shared through-right lane
- Restripe/widen the EB approach, west leg, from one (1) left-turn lane, one (1) through lane, and one (1) shared through-right lane to (1) left-turn lane, two (2) through lanes, and one (1) right-turn lane

45

- Restripe/widen the WB approach, east leg, from one (1) left-turn lane, one (1) through lane. and one (1) shared through-right lane to tow (2) left-turn lanes, one (1) through lane. and one (1) through-right lane

**Cleveland Avenue/Avenue 15½ at SR 99 NB ramps**
- Restripe/widen the EB approach. west leg. from one (1) left-turn lane and two (2) through lanes to two (2) left-turn lanes and two (2) through lanes
- Restripe/widen the NB approach. south leg. from one (1) left-turn lane, one (1) shared left-through lane, and one (1) right-turn lane to one (1) left-turn lane, one (1) shared left-through lane, and two (2) right-turn lanes

**Cleveland Avenue/Avenue 15½ at SR 99 SB ramps**
- Restripe/widen the SB approach. north leg. from one (1) shared left-through lane and one (1) right-turn lane to two (2) left-turn lanes and one (1) shared through-right lane

**Avenue 15½ at Road 23**
- Signalize the intersection

**SR 145/Madera Avenue at SR 99 NB ramps**
- Restripe/widen the SB approach. north leg. from one (1) through lane and one (1) shared through-right lane to two (2) through lanes and one (1) right-turn lane
- Restripe/widen the WB approach. east leg. from one (1) left-turn lane and one (1) shared through-right lane to two (2) left-turn lanes and one (1) shared through-right lane

**Olive Avenue/Avenue 14/SR 99 SB on-ramp at SR 145**
- Restripe/widen the NB approach. south leg. from two (2) left-turn lanes, one (1) through lane. and one (1) shared through-right lane. to dual (2) left-turn lanes, two (2) through lanes. and one (1) shared through-right lane
- Restripe/widen the SB approach. north leg. from one (1) shared left-through lane, one (1) through lane. and one (1) right-turn lane. to one (1) left-turn lane, two (2) through lanes. and one (1) right-turn lane
- Restripe/widen the EB approach. west leg. from one (1) left-turn lane, one (1) through lane and one (1) right-turn lane. to dual (2) left-turn lanes. one (1) through lane. one (1) shared through-right lane and one (1) right-turn lane

**Olive Avenue/Avenue 14 at SR 99 SB off-ramp**
- Restripe/widen the SB approach. north leg. from two (2) left-turn lanes and one (1) right-turn lane to one (1) left-turn lane. one (1) shared left-right-turn lane, and one (1) right-turn lane

**Avenue 14 at Road 23**

46

- Signalize the intersection
- Restripe/widen the SB approach, north leg, from one (1) shared left-through-right lane, to one (1) left-turn lane and one (1) shared through-right lane
- Restripe/widen the EB approach, west leg, from one (1) shared left-through-right lane, to one (1) left-turn lane and one (1) shared through-right lane

**Avenue 12/Golden State Boulevard at SR 99 SB off ramps**

- Widen the SB off-ramp to two (2) lanes with a SB auxiliary lane on SR 99

**Avenue 12 at Golden State Boulevard**

- Restripe/widen the SB approach, north leg, from a dual (2) left-turn lanes, one (1) through lane and one(1) right-turn lane, to three (3) left-turn lanes, and one (1) shared through-right lane
- Restripe/widen the WB approach, east leg, from one (1) left-turn lane, one (1) through lane, and one (1) shared through-right lane, to one (1) left-turn lane, three (3) through lanes, and one (1) right-turn lane

**Avenue 12 at SR 99 NB ramps**

- Restripe/widen the NB approach, south leg from a shared left-through lane and a separate right-turn lane, to dual (2) left-turn lanes, a shared through-right lane, and one (1) right-turn lane
- Restripe/widen the EB approach, west leg, from one (1) left-turn lane and two (2) through lanes to dual 92) left-turn lanes and three (3) through lanes
- Restripe/widen the WB approach, east leg, from two (2) through lanes and one (1) right-turn lane, to two (2) through lanes, one (1) shared through-right lane and one (1) right-turn lane

*Construction Traffic*

A.    A Traffic Management Plan (TMP) shall be prepared to identify which lanes require closure, where night construction is proposed, and other standards set forth in the Manual on Uniform Traffic Control Devices for Streets and Highways (US DOT FHWA, 2003). The TMP shall be submitted to each affected local jurisdiction and/or agency.  Also prior to the finalization of construction plans, the Tribe shall work with emergency service providers to avoid restricting emergency response service.  Police, fire, ambulance, and other emergency response providers shall be notified in advance of the construction schedule, exact location of construction activities, duration of construction period, and any access restrictions that could impact emergency response services.  Traffic Management Plans shall include details regarding emergency service coordination.  Copies of the TMPs shall be provided to all affected emergency service providers.

47

B.      Importation of construction material shall be scheduled outside of the area wide
        commute peak hours.

C.      Where feasible. lane closures or obstructions associated with the construction of the
        project shall be limited to off-peak hours to reduce traffic congestion and delays.

D.      Prior to construction. the Tribe shall work to notify all potentially affected parties in
        the immediate vicinity of the North Fork. or the Madera sites. as appropriate.
        Notification shall include a construction schedule. location of construction activities.
        the duration of construction period. and alternative access provisions.

E.      Debris along construction vehicle routes shall be monitored daily during construction
        and the roadways cleaned as necessary.

### Land Use

F.      In order to reduce the amount of light that would otherwise escape from the Madera
        site. the Tribe shall provide nighttime lighting for the parking areas that shines only
        on the parking areas and not surrounding areas. This can be achieved by employing
        down pointing lighting fixtures and low-pressure sodium bulbs.

G.      The Tribe shall either maintain current aviation easements within Zones A. B1. and
        B2 on the Madera site or shall enter into an agreement with the City of Madera to
        allow for the actions contained in the current aviation easement. This will prevent
        impacts to human safety or to airport operations. The easement or agreement shall
        address:

        a.  Overflight: A right-of-way for free and unobstructed passage of aircraft through
            the airspace of the property at any altitude above a surface specified in the
            easement (set in accordance with Federal Aviation Regulations Part 77 and/or
            criteria for terminal instrument approaches).

        b.  Impacts: A right to subject the property to noise. vibration. fumes. dust. and fuel
            particle emissions associated with normal airport activity.

        c.  Height Limits: A right to prohibit the construction or growth of any structure.
            tree. or other object that would enter the acquired airspace.

        d.  Access and Abatement: A right-of-entry onto the property. with appropriate
            advance notice. for the purpose of removing. marking. or lighting any structure or
            other object that enters the acquired airspace.

        e.  Other Restrictions: A right to prohibit electrical interference. glare. misleading
            light sources. visual impairments. and other hazards to aircraft from being created
            in the property.

48

H.     The Tribe shall submit a "Notice of Proposed Construction or Alteration" to the Federal Aviation Administration (FAA) due to the temporary use of a crane to construct the projects on the Madera site prior to construction. Cranes shall not operate unless the FAA determines that their operation will not cause a hazard to air navigation.

### *Agriculture*

I.     If feasible within the first year of operation, an agricultural conservation easement shall be purchased (either directly or through an organization or agency whose purpose includes the acquisition and stewardship of agricultural conservation easements) that is at least as large as the area of agricultural land converted on the Madera site (approximately 85 acres). At least a portion of the agricultural conservation easement site shall be designed as prime farmland, unique farmland, farmland of statewide importance, or farmland of local importance.

### 6.8    PUBLIC SERVICES

### *Off-Site Wastewater Service*

A.     The Tribe shall enter into an agreement with the City of Madera to pay the fair share cost of improvements and upgrades to connect to the City of Madera sewer line. The Tribe shall also pay the fair share cost of future expansion/improvements to increase wastewater capacity of the City of Madera wastewater treatment plant.

### *Construction-Related Solid Waste*

C.     Construction waste shall be recycled to the fullest extent practicable by diverting green waste and recyclable building materials from the solid waste stream.

D.     Environmentally preferable materials shall be acquired to the extent practical for construction of facilities.

### *Operational Solid Waste*

E.     Installation of a trash compactor for cardboard and paper products.

F.     Solid waste shall be recycled to the fullest extent practicable by diverting green waste and recyclable materials from the solid waste stream.

G.     Installation of recycling bins throughout the facilities for glass, cans and paper products.

H.     A solid waste management plan shall be adopted by the Tribe that addresses recycling and solid waste reduction on-site. The plan shall have a goal of at least 50 percent diversion of materials from disposal, which includes reduction, recycling, and reuse measures.

49

***Public Health and Safety***

**Law Enforcement**

I.    The Tribe shall make one-time and annual payments to the City of Madera and Madera County as discussed previously under the mitigation measures for *Socioeconomic Conditions*, **Section 6.6**. These payments would fund increased demands on City and County law enforcement services.

**Fire Protection / Emergency Medical Service**

J.    Any construction equipment that normally includes a spark arrester shall be equipped with an arrester in good working order. This includes, but is not limited to vehicles, heavy equipment, and chainsaws. During construction, staging areas, wilding areas, or areas slated for development using spark-producing equipment shall be cleared of dried vegetation or other materials that could serve as fire fuel. To the extent feasible, the contractor shall keep these areas clear of combustible materials in order to maintain a firebreak.

K.    The Tribe shall make one-time and annual payments to the City of Madera and Madera County as discussed above under the mitigation measures for *Socioeconomic Conditions*, **Section 6.6**. These payments would fund increased demands on City and County fire protection and emergency medical services.

***Schools***

L.    The Tribe shall make annual payments to Madera County as discussed previously under the mitigation measures for Socioeconomic Conditions, **Section 5.2.6**. These payments would fund increased demands on County educational services.

**6.9    NOISE**

A.    Where feasible, construction activities shall be restricted to weekdays and normal daytime hours (7:00 a.m. to 7:00 p.m.).

B.    All mechanical equipment shall be designed, installed, and screened where feasible, so as to generate average noise levels of 52 dBA or less at the property lines of existing sensitive receptors. This sound level reduction can be achieved through the use of sound walls and berms, noise attenuating building materials, and vegetative screening as well as through regular monitoring of noise generating equipment.

50

6.10   HAZARDOUS MATERIALS

A.    In the event that contaminated soil and/or groundwater are encountered during construction related earth-moving activities, all work shall be halted until a professional hazardous materials specialist or a qualified individual can assess the extent of contamination. If contamination is determined to exceed USEPA preliminary remediation goals for residential land use, representatives of the Tribe shall consult with USEPA and BIA to determine the appropriate course of action, including the development of a Sampling Plan and Remediation Plan if necessary.

B.    In the event that suspected hazardous materials are encountered during construction-related earth-moving activities, all work shall be halted until a professional hazardous materials specialist or an equivalent qualified individual can identify the material. If the material is determined, by USEPA standards, to be hazardous to human health and welfare, a representative from the Tribe shall meet with USEPA and BIA to determine the appropriate course of action, including the appropriate disposal of the material according to State and Federal regulations.

C.    To reduce the potential for accidental releases, fuel, oil, and hydraulic fluids shall be transferred directly from a service truck to construction equipment tanks and shall not otherwise be stored on-site. Paint, thinner, solvents, cleaners, sealants, and lubricants used during construction shall be stored in a locked utility building, handled per the manufacturers' directions, and replenished as needed. These materials will be stored at least one foot above the 100-year flood zone in water tight containers away from areas exposed to rain water, surface water, and groundwater.

D.    Personnel shall follow written standard operating procedures (SOPs) for filling and servicing construction equipment, maintenance vehicles, and casino emergency generators. The SOPs, which are designed to reduce the potential for incidents involving hazardous materials shall include the following:

   a.  Refueling shall be conducted only with approved pumps, hoses, and nozzles.

   b.  Catch-pans shall be placed under equipment to catch potential spills during servicing.

   c.  All disconnected hoses shall be placed in containers to collect residual fuel from the hose.

   d.  Vehicle engines shall be shut down during refueling.

   e.  No smoking, open flames, or welding shall be allowed in refueling or service areas.

   f.  Refueling shall be performed away from bodies of water to prevent contamination of water in the event of a leak or spill.

51

       g.  Service trucks shall be provided with fire extinguishers and spill containment equipment, such as absorbents.

       h.  Should a spill contaminate soil, the soil shall be put into containers and disposed of in accordance with local, state, and Federal regulations.

       i.  All containers used to store hazardous materials shall be inspected at least once per week for signs of leaking or failure. All maintenance and refueling areas shall be inspected monthly. Results of inspections shall be recorded in a logbook that would be maintained on-site.

E.    The amount of hazardous materials used in project construction and operation shall be consistently kept at the lowest volumes needed. Project managers shall ensure the lowest volumes are maintained and that their uses are documented to ensure excessive volumes are not being applied as part of the overall hazardous materials and hazardous waste minimization program that would be developed for the project (see below).

F.    The least toxic material capable of achieving the intended result shall consistently be used to the extent practicable.

G.    A hazardous materials and hazardous waste minimization program shall be developed, implemented, and reviewed annually by the Tribe to determine if additional opportunities for hazardous materials and hazardous waste minimization are feasible, for both project construction and operation.

H.    The Tribe shall avoid and minimize the use of hazardous materials during the project's construction to the fullest extent practicable.

I.    The use of pesticides and toxic chemicals shall be minimized or less toxic alternatives shall be used to the greatest extent feasible in landscaping.

J.    If secondary diesel tanks are necessary for the emergency generators, the tanks shall have double walls with integrated leak detection systems. If a leak occurs within the inner tank, the outer tank shall contain the leak, while a pressure sensor signals the leak on the indicator panel of the generator unit. Security personnel and casino managers, trained in emergency response procedures, shall regularly monitor the generator units to ensure they are functioning as intended and no leaks are present.

K.    Excavation and proper disposal of stained soils shall occur on the Madera site as recommended in **FEIS Appendix P**.

## 6.11   MITIGATION MEASURES THAT ARE NOT ADOPTED

CEQ NEPA regulations (40 C.F.R. § 1505.2(c)) call for identification in the ROD of any mitigation measures specifically mentioned in the FEIS that are not adopted. There are no

52

mitigation measures listed in the FEIS for the Preferred Alternative that are not included in this ROD.

## 7.0    TRUST ACQUISITION DETERMINATION PURSUANT TO 25 C.F.R. PART 151

The procedures and policies concerning the Secretary's exercise of discretion for acquiring lands in trust for Indian tribes and individuals are set forth in 25 U.S.C. § 465 and 25 C.F.R. Part 151. The BIA's evaluation of the Tribe's fee-to-trust request based on the applicable criteria is provided below.

### A.    25 C.F.R. 151.3.  Land acquisition policy.

As a matter of statute and regulation, the Secretary may acquire land in trust for a Tribe under 25 C.F.R. Part 151.3(a)(3) when the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The BIA has determined that the acquisition of the 305.49 acres satisfies 25 C.F.R. Part 151.3(a)(3), and that the land is necessary to facilitate tribal self-determination and economic development.

The Tribe intends to use the Madera Parcel to develop a gaming resort and hotel complex. The gaming facility will generate income to fund tribal programs and will generate employment for tribal members. Indeed, IGRA requires that net revenues from the gaming facility be used "to fund tribal government operations or programs...to provide for the general welfare of the tribe and its citizens, [and] to promote tribal economic development." Accordingly, the trust acquisition would promote tribal economic development, self-sufficiency, and strong tribal government consistent with Federal policy as expressed under 25 U.S.C. § 2702, and consistent with the requirements of 25 C.F.R. § 151.3.

### B.    25 C.F.R. 151.10.  Notification of State and Local Governments.

By correspondence dated March 10, 2005, comments on the potential impacts of the proposed acquisition on regulatory jurisdiction, real property taxes, and special assessments were solicited from the following state and local political subdivisions:

California State Clearinghouse, Office of Planning and Research;
Deputy Legal Affairs, Office of the Governor, State of California
Deputy Attorney General, State of California
James Peterson, Office of the Honorable Dianne Feinstein
Madera County Board of Supervisor
Madera County Planning Department
Madera County Treasurer
Madera County Tax Assessor's Office
Madera County Fire Department
Madera County Sheriff's Department.
City of Madera
City of Chowchilla

53

Picayune Rancheria

In response to our notification, we received comments from the following entities:

**1) Letter dated March 16, 2005 from the Resource Management Agency, County of Madera.**

- The proposed acquisitions assessed valuation of $11,838.24 is inconsequential.

**2) Letter dated March 28, 2005 from the Department of Transportation, State of California.**

- They have no objection to the proposed trust acquisition.

**3) Letters dated April 8, 2005 and April 29, 2005 from the Picayune Rancheria of the Chukchansi Indians**

- The Tribe is opposed to the North Fork Rancheria's application for land into trust for gaming purposes in an encroachment into our Tribe's aboriginal homelands.

- Approval by the Department of the Interior of both the North Fork Rancheria's application to take land into trust, and in turn, its approval of the land acquisition for gaming purposes sets an ill-advised precedent in the Director's Region.

- In the future, the approval of North Fork Rancheria's proposed acquisition opens the possibility that Indian tribes will race one another to the most economically feasible location without regard to the impact on another Indian tribe's business or its aboriginal connection.

- Decisions made for economic benefit to the community coupled with non-Indian support undermines the spirit of IGRA's purpose to promote Indian self-sufficiency.

*By letter dated February 23, 2010, the North Fork Rancheria responded to the Picayune Rancheria of the Chukchansi Indians*

The encroachment into aboriginal lands is a misunderstanding of the North Fork Tribe's circumstances, which are detailed in the Amended and Restated Request for A Secretarial Two Part Determination dated April 7, 2009.

- "Racing" to the most economically feasible location has not materialized. The length and cost of the process, the requirements imposed by the Bureau, and the need for strong support by the local community and the state have resulted in very few, if any, off-reservation projects.

- The North Fork Tribe's connection to the Madera parcel is detailed on pages 8-24 of the Two-Part Request.

C.      **25 C.F.R. 151.10(a).  The existence of statutory authority for the acquisition and any**

54

**limitations contained in such authority.**

Section 151.10(a) requires consideration of the existence of statutory authority for the acquisition and any limitations on such authority.

In *Carcieri v. Salazar*, 555 U.S. 279 (2009), the United States Supreme Court held that the Secretary's authority to acquire land in trust for Indian tribes pursuant to Section 5 of the IRA extended only to those tribes that were "under federal jurisdiction" when the IRA was enacted on June 18, 1934. We have evaluated the applicability of *Carcieri* to the Tribe's application and have determined that the Secretary is authorized to acquire land in trust for the Tribe under 25 U.S.C. § 465.

The IRA is a statute of general applicability. Congress provided an opt-out provision in Section 18 of the Act, where a majority vote of Indians of the reservation voting at a special election called by the Secretary of the Interior could opt out of the Act. 25 U.S.C. § 478. In 1983, Congress enacted the Indian Land Consolidation Act, 96 Stat. 2515 (1983) (codified as amended at 25 U.S.C. § 2202), which amended the IRA to provide that Section 5 of the IRA applies to "all tribes notwithstanding section 18 of such Act," including Indian tribes that voted to reject the IRA. As the Supreme Court stated in *Carcieri*, this amendment "by its terms simply ensures that tribes may benefit from [Section 5] even if they opted out of the IRA pursuant to [Section 18], which allowed tribal members to reject application of the IRA to their tribe." 555 U.S. at 394-95.

As indicated in the report prepared in 1947 by Theodore H. Haas, Chief Counsel for the United States Indian Service, a majority of the adult Indians residing at the Tribe's Reservation voted to reject the IRA at a special election duly held by the Secretary on June 10, 1935.[1] The calling of a Section 18 election at the Tribe's Reservation conclusively establishes that the Tribe was under Federal jurisdiction for *Carcieri* purposes. Despite the vote to reject the IRA at such election, the later-enacted amendment to the IRA makes clear that Section 5 applies to Indian tribes whose members voted to reject the IRA. Thus, the Secretary is authorized to acquire land in trust for the Tribe under Section 5 of the IRA.

**D.    25 C.F.R. 151.10(b).  The need of the individual Indian or Tribe for additional land.**

The North Fork Rancheria was originally established by purchase under the authority of the Interior's Appropriations Act of June 30, 1913 (38 Stat. 77, 86). In 1953, the 85th Congress enacted house concurrent resolution 108 which initiated a termination policy for California Indians. Passage later of House resolution 2824 and Public Law 85-671 (72 Stat. 619) in 1958, known as the California Rancheria Act, called for the termination of Federal trusteeship of the North Fork Rancheria. The original 80 acres of tribal land was subdivided and distributed in accordance with the Distribution Plan of the North Fork Rancheria.

In the late 1970s, a suit was filed against the U.S. for illegal termination and sought restoration of trust status. A judgment was issued on December 22, 1983, in *Tillie Hardwick v. United States*, wherein the Tribe's status was restored and confirmed. In 1987, the Court declared the original boundaries of the North Fork Rancheria restored, and all land within the restored boundaries of

---

[1] Theodore H. Haas, *Ten Years of Tribal Government Under I.R.A.* (1947) at 15.

55

the North Fork Rancheria were declared "Indian Country" as defined by 18 U.S.C. §1151.  To this day, none of the lands within the exterior boundaries of the North Fork Rancheria are owned by, or held in trust for the Tribe.

The only land held in trust for the Tribe is a 61.5 acre tract located in the town of North Fork. The Department of Housing and Urban Development (HUD) provided the Tribe with funds to purchase the 61.5 acre tract in 2000 for tribal housing. The land was subsequently placed in trust by the United States of America in 2002. The housing tract is currently being used by the North Fork Housing Authority to construct a community center and 15 single-family homes.

The Tribe needs the subject parcel held in trust in order to better exercise its sovereign responsibility to provide economic development to tribal citizens. The trust acquisition and development of the proposed hotel and casino project will assist the North Fork Rancheria of Mono Indians by providing land on which to develop a significant revenue source.  This revenue would be used to strengthen the tribal government and fund a variety of programs that would improve the long-term welfare of the Tribe.  The proposed land acquisition and economic development will also provide long-term employment within Madera County.  The proposed hotel and casino project will also allow the Tribe to reacquire historical territory.

B.    **25 C.F.R. 151.10(c).  Purpose for which the land will be used.**

Proposed land use includes the development of a casino and hotel resort on the eastern side of the Madera site adjacent to SR-99. The casino and hotel resort would include a main gaming hall, food and beverage services, retail space, banquet/meeting space, and administrative space. Food and beverage facilities are planned, including a buffet, three restaurants, a food court and several bars/lounges. The resort would also include a multi-story hotel with 200 rooms, a pool area, and spa. Ancillary support facilities would include a central plant (utilities/operations control and storage building) and potentially a wastewater treatment plant. Approximately 4,500 parking spaces would be provided for the casino and hotel resort. The remainder of the Madera site would remain undeveloped and would be used for passive recreation, pastureland, biological habitat, and/or recycled water spray fields.

E.    **25 C.F.R. 151.10(e).  Impact on the state and political subdivisions resulting from the removal of the land from the tax rolls.**

General and special taxes assessed for fiscal year 2006-2007 were $18,920.48. The Tribe and the County of Madera have entered into a Memorandum of Understanding (MOU) to address impacts of the project on County services, with the following agreed upon financial commitments from the Tribe:

· Non-Recurring Public Safety Resources Contribution -$1,915,000

· Non-Recurring Transportation Resources Contribution - $4,000,000 up to $15,000,000

· Non-Recurring Road Contribution Consistent with County Ordinances - $600,000

56

· Non-Recurring Recreation Contribution - $200,000

· Non-Recurring School Contribution - $150,000

· County Legal Fees Reimbursement - $50,000 up to $4,035,000 per annum

· North Fork Rancheria Charitable Foundation Recurring Contribution - $200,000 per annum

· North Fork Rancheria Economic Foundation Recurring Contribution - $250,000 per annum

· North Fork Rancheria Education Foundation Recurring Contribution - $400,000 per annum

· North Fork Rancheria Unincorporated Area Foundation Recurring Contribution - $250,000 per annum

· Supplement County's budget for neighborhood housing or other workforce programs - $250,000 per annum

· Contributions to supplement the County's budget for law enforcement - $415,000 per Annum

· Contributions to supplement the County's budget for fire protection -$1,200,000 per Annum

· Contributions to supplement the County's budget for alcohol education and the treatment and prevention of problem gambling and gambling disorders - $50,000

· Contributions for the maintenance, operation and preservation of open space within the Courthouse Park and Ahwahnee property - $70,000

· Contributions to fund additional public safety support/administrative positions with the County's public protection budget - $100,000.

In lieu of taxes, fees, charges, cost reimbursements, service fees and other assessments   The Tribe and the City of Madera have entered into a Memorandum of Understanding (MOU) to address impacts of the project on City services, with the following agreed upon financial commitments from the Tribe:

· Non-Recurring Law Enforcement Contribution - $200,000

· Non-Recurring Transportation Resources Contribution - $885,000

· Non-Recurring Additional Transportation Resources Contribution - $4,000,000

· Non-Recurring Specific Plan Update Contribution - $200,000

· Non-Recurring Water & Recreation Resources Contribution - $2,500,000

57

· Non-Recurring Madera East side Youth Recreational Contribution - $2,000,000

· Non-Recurring Public Safety Training Contribution - $500,009

· Mitigate possible impacts of the Project on the City, recurring contributions of up    to $1,075,000 per annum

· Law Enforcement Contribution - $640,000 (first year contribution) and Recurring Contribution of $675,000 per annum

· Downtown Redevelopment Recurring Contribution - $100,000 per annum

· Air Quality Resources Recurring Contribution -$50,000 per annum

Additionally, the Tribe and the Madera Irrigation District (District) have entered into a Memorandum of Understanding (MOU2) that anticipates and addresses the impact to this special district's budget and services. The MOU requires the Tribe to make a payment in lieu of special assessments to the District as follows:

· $11,500 per annum in lieu of any stand by or other fees, assessments, and taxes to the district related to the property
·

· $36,000 per annum as an equitable share of costs associated with District activities, such as addressing the overdraft of the groundwater basin associated with Trust Property

In addition, the dollar amounts of the contributions reference above shall be adjusted by the CPI Adjustment as of July 1 following the Opening Date and each July 1st thereafter. In the event the amount of annual water usage exceeds 450 acre feet, within 30 days of the District's receipt of such report, the Tribe shall replace the difference between the actual water usage and 450 acre feet by either (1) paying the District the equivalent of the current market cost, or (2) purchasing and delivering such replacement water to the District. The recurring contributions a will be made on a per annum basis, the contributions will be made in two equal semiannual installments, unless agreed otherwise. Upon acceptance of the acquisition, the first contribution shall be made within thirty days. As previously indicated, the County of Madera Irrigation District has stated that as long as the United States owns the Property in trust for the benefit of the Tribe, Recurring contributions In-Lieu of Tax Assessments shall continue.

## F.    25 C.F.R. 151.10(f). Jurisdictional problems and potential conflicts of land use which may arise.

We do not anticipate any problems or conflicts as a result of the intended land use and removal from State and local jurisdiction. The Madera Parcel is located in an unincorporated area of Madera County, and only the County currently has jurisdiction. The land surrounding the Site is used primarily for agricultural purposes, and such use will not be significantly impacted by the Facility. While there are some rural residential areas near the Site, mostly commercial operations exist immediately adjacent to State Highway 99. (DEIS, § 3.4.4, page 3.4-34.) The

58

nearest residential area is located some distance away on the other side of a two-lane surface road (Golden State Road) and a busy, four-lane divided highway (SR-99) and corresponding rights-of-way. High-value residential properties are not currently in the vicinity of the Site. The proposed Facility will cover only 55 acres of the 305-acre Site, and there will be a land buffer between the Facility and other properties surrounding the Site.

The development of a gaming facility raises issues relating to local land use policies, compliance with health and safety codes, mitigation of project impacts, and the provision of fire, police, and ambulatory services. As previously noted, the County of Madera, the City of Madera and the Madera Irrigation District have all entered into a Memorandum of Understanding with the Tribe which addresses the issues of concern related to the transfer of jurisdiction to the tribe. With the language set forth in each of the Memoranda of Understanding, the Bureau does not see any jurisdictional problems or potential conflicts arising.

**G.    25 C.F.R. 151.10(g).  Whether the Bureau of Indian affairs is equipped to discharge the additional responsibilities resulting from the acquisition.**

The Tribe is a mature contracting tribe and presently contracts to manage and administer the vast majority of BIA's services itself, through Self-determination Act grants. Except for administrative and other services related to ownership of the parcel by the United States, the Tribe does not anticipate any increase in its request for services from the BIA as a result of a trust conveyance. This trust acquisition will result in increased tribal self-sufficiency and, ultimately, less dependence on the Interior Department. As such, the BIA will administer any additional responsibilities that may result from this acquisition.

**H.    25 C.F.R. 151.10(h).  The extent to which the applicant has provided information that allows the secretary to comply with NEPA and hazardous substances determinations.**

*National Environmental Policy Act*

NEPA requires that a public environmental review process be accomplished prior to an agency's approval of any Federal action. Prior to making a decision, the BIA as the lead agency under NEPA and cooperating agencies must ensure that it has analyzed and addressed the environmental effects of acquiring land in trust.

The environmental review of this project under NEPA has been extensive. The process started on October 27, 2004, when the BIA published a Notice of Intent (NOI) in *the Federal Register* which described the Proposed Action, announced the BIA's intent to prepare an Environmental Impact Statement (EIS) and invited comments. A scoping meeting was held on November 15, 2004 in Madera, California. The BIA published a Notice of Correction (NOC) on the *Federal Register* on April 6, 2005. The NOC amended the October 2004 NOI to include a description of possible project alternatives and also to further extend the scoping comment period to May 6, 2005. In July 2005, the BIA published a Scoping Report which summarized the comments received during the scoping period.

59

An administrative version of the Draft EIS was circulated to cooperating agencies for review and comment. Comments were taken into consideration and revisions were made based upon those comments prior to public release of the document. The Notice of Availability (NOA) for the Draft EIS was published in the *Federal Register* on February 15, 2008 by the EPA (Vol. 73, Pg. 8869 - EIS No. 20080045) and BIA (Vol. 73, Pg. 8898). The NOA provided information on the proposed project, advised the public of the 60-day comment period, and provided the time and location of the public hearing for the Draft EIS. Comments received during the comment period, including those submitted or recorded at the public hearing, were considered in the preparation of the Final EIS.

An administrative version of the Final EIS was circulated to cooperating agencies for review and comment. Comments were taken into consideration and revisions were made based upon those comments prior to public release of the document. The NOA for the Final EIS was published in the *Federal Register* on August 6, 2010 (Vol. 75, Pg. 47,621). Comments received on the Final EIS were taken into consideration in the preparation of this ROD.

### 602 DM 2. Land Acquisitions: Hazardous Substances Determination.

In accordance with Interior Department Policy (602 DM 2), we are charged with the responsibility of conducting an environmental site assessment for the purposes of determining the potential of, and extent of liability for, hazardous substances or other environmental remediation or injury. The record includes a negative Phase 1 "Contaminant Survey Checklist" dated December 15, 2008, reflecting that there were no hazardous materials or contaminants found at the property. An additional site inspection will be conducted by BIA staff prior to acceptance of the land in trust.

**I.     25 C.F.R. 151.11(b).  The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation.**

The 80-acre North Fork Rancheria is located several miles east of the town of North Fork in Madera County. The original boundaries of the North Fork Rancheria were restored and declared to be "Indian Country" pursuant to the Stipulation for Entry of Judgment (Madera County) in *Tillie Hardwick v. United States of America*. The subject property is located approximately 36 miles from the Tribe's current government headquarters, which are located in the town of North Fork, Madera County, California, and approximately 38 miles from the North Fork Rancheria. The lands are adjacent to the Sierra National Forest and are approximately 20 miles south of Yosemite National Park and approximately 190 miles from the State's border with Nevada.

**J.     25 C.F.R. 151.11(c).  Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.**

The Tribe intends to develop a casino and hotel resort on the eastern side of the subject property. In conjunction with gaming, the resort would include: a main gaming hall, food and beverage

60

services, retail space, banquet/meeting space, administrative space, pool, and spa. Fifteen food and beverage facilities are planned, including a buffet, six bars, three restaurants, and a five-tenant food court. The resort would include a multi-story hotel with 200 rooms, a pool area, and a spa. Approximately 4,500 parking spaces would be provided for the casino/hotel resort, with 2,000 of those spaces within a multi-level parking structure.

The Tribe has entered into a Purchase and Sales agreement dated December 19, 2003, to purchase the subject property. On December 8, 2003, the Seller and Buyer entered into a Memorandum of Agreement Gaming Development and Management Agreements, pursuant to which Seller and Buyer agreed to jointly develop a tribal gaming operation on a portion of the Seller's property to be acquired by the Tribe. The Tribe presently lacks the resource to acquire tribal land and to develop and operate a tribal gaming facility and enterprise on its own and desires to retain the services of a manager, with knowledge and experience in the gaming industry, to manage and operate a Class II and Class III Gaming facility and related amenities on tribal land.

## 8.0   DECISION TO IMPLEMENT THE PREFERRED ALTERNATIVE

The Department has determined that it will implement the Preferred Alternative (Alternative A). This decision has been made based upon the environmental impacts identified in the FEIS and corresponding mitigation, a consideration of economic and technical factors, as well as the BIA's policy goals and objectives, and the identified purpose and need. Of the alternatives evaluated in the EIS, Alternative A would best meet the purpose and need of the BIA, consistent with its statutory mission and responsibilities, to promote the long-term economic vitality and self-sufficiency, self-determination and self-governance of the Tribe. The casino-hotel complex described under Alternative A would provide the Tribe with the best opportunity for securing a viable means of attracting and maintaining a long-term, sustainable revenue stream for its tribal government and to fund necessary mitigation for development of economic ventures. This would enable the tribal government to establish, fund, and maintain governmental programs that offer a wide range of health, education and welfare services to tribal members, as well as provide the Tribe, its members and local communities with greater opportunities for employment and economic growth. Accordingly, the Department will implement the Preferred Alternative subject to implementation of the mitigation measures identified in **Chapter 2**.

### 8.1   THE PREFERRED ALTERNATIVE RESULTS IN SUBSTANTIAL BENEFICIAL IMPACTS

The Preferred Alternative is reasonably expected to result in beneficial effects for Madera County, City of Madera, and the Tribe. Key beneficial effects include:

- Needed revenues to the Tribe to allow it to begin to meet the Tribe's and its members' significant needs and to help develop the political cohesion and strength necessary for tribal self-sufficiency, self-determination and strong tribal government.

- Estimated construction cost of $350,000,000, with approximately 2,441 jobs generated over the entire construction period.

61

- 1.461 direct full-time equivalent employees are anticipated during operation period.

- $1.915.000 to Madera County to be used to equip and construct a new fire station.

- Madera County would collect increased revenues of approximately $1.008.683 over accrued costs under Alternative A.

- City of Madera would collect increased revenues of approximately $856.771 over accrued costs under Alternative A.

- Generation of annual and one-time revenues to the State of California through the Tribal-State Compact.

## 8.2   ALTERNATIVE B RESTRICTS BENEFICIAL EFFECTS

The reduced intensity alternative (Alternative B) would generate less revenue than the Preferred Alternative. As a result, it would restrict the Tribe's ability to meet its needs and to foster tribal economic development. self-determination. and self-sufficiency. Due to a lesser amount of new development. the effects on the natural and physical environment would be slightly less under Alternative B than those created by the Preferred Alternative. This alternative would result in a similar level of impacts after mitigation. The BIA believes the reduced economic and related benefits of Alternative B make it a less viable option that would fulfill the purpose and need of the Proposed Action to a lesser degree than the Preferred Alternative. Accordingly, the BIA has selected the Preferred Alternative over Alternative B.

## 8.3   MIXED-USE DEVELOPMENT ALTERNATIVE (ALTERNATIVE C) SEVERELY RESTRICTS BENEFICIAL EFFECTS

The Mixed-Use Development Alternative (Alternative C) is the Environmentally Preferred Development Alternative; however, implementation would result in less employment and economic growth for both the Tribe and neighboring communities than from the Preferred Alternative. As a result, it would restrict the Tribe's ability to meet its needs and to foster tribal economic development. self-determination. and self-sufficiency. The BIA believes the reduced economic and related benefits of Alternative C make it a less viable option that would fulfill the purpose and need of the Proposed Action less than the Preferred Alternative. Therefore, selection of Alternative C over the Preferred Alternative is not warranted.

## 8.4   ALTERNATIVE D WOULD RESULT IN INCREASED SIGNIFICANT ADVERSE ENVIRONMENTAL EFFECTS

Unlike the Proposed Action, the Alternative D is reasonably expected to result in potentially significant impacts on biological resources. cultural resources. land use resources. land resources, traffic safety, and noise, as discussed in the **FEIS Section 4**. Accordingly, the BIA has selected the Proposed Project over Alternative D.

62

**8.5    NO-ACTION ALTERNATIVE FAILS TO MEET PURPOSE AND NEED OF PROJECT**

The No-Action Alternative (Alternative E) would not meet the stated purpose and need. Specifically, it would not provide the Tribe a source of net income to allow the Tribe to achieve self-sufficiency, self-determination, and a strong tribal government. This alternative also would likely result in substantially less economic benefits to Madera County and the surrounding communities than the development alternatives.

**9.0    SIGNATURE**

By my signature, I indicate my decision to implement the Preferred Alternative and acquire the Madera site in trust for the North Fork Rancheria of Mono Indians pursuant to the Indian Reorganization Act.

Date **NOV 2 6 2012**

Kevin K. Washburn
Assistant Secretary   Indian Affairs

63