# EXHIBIT 23



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

**SEP 0 1 2011**

The Honorable Jerry Brown
Governor of California
Sacramento, California 95814

Dear Governor Brown:

On March 5, 2005, the North Fork Rancheria of Mono Indians of California (Tribe) submitted a request to the Bureau of Indian Affairs (BIA) to acquire approximately 305.49 acres of land (Site) in trust on its behalf in Madera County, California, for purpose of establishing a class III gaming facility (Resort) pursuant to the Indian Gaming Regulatory Act's (IGRA) Secretarial determination exception.

The IGRA generally prohibits Indian gaming on lands acquired in trust after October 17, 1988, subject to several exceptions. One exception, known as the Secretarial Determination exception, permits a tribe to conduct gaming on lands acquired after that date where:

1. The Secretary of the Interior (Secretary), after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members; and

2. The Secretary also determines that gaming on the newly acquired lands would not be detrimental to the surrounding community.

25 U.S.C. § 2719(b) (1) (A).

The Governor of the state in which gaming would be conducted must concur in the Secretary's Determination in order for the applicant tribe to conduct gaming on the proposed site.

The Tribe submitted its application to have land acquired in trust on its behalf pursuant to the Indian Reorganization Act, 25 U.S.C. § 465, as amended by the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202. Prior to acquiring land in trust, I must first determine that gaming on the proposed site would be in the best interest of the Tribe and its citizens, and would not be detrimental to the surrounding community. In addition, you must concur in this determination.

I have completed my review of the Tribe's application under 25 U.S.C. § 2719(b)(1)(A), including submissions by state and local officials, and officials of nearby Indian tribes. I have determined that gaming on the proposed site in Madera County would be in the best interest of

1

the Tribe and its citizens and would not be detrimental to the surrounding community.[1]  I have set forth the basis for my decision below.

I request your concurrence in this determination, pursuant to 25 U.S.C. § 2719(b)(1)(A).

The Department's regulations at 25 C.F.R. Part 292 (Part 292 regulations) provide:

> (a) If the Governor provides a written non-concurrence with the Secretarial Determination:
>
> (1) The applicant tribe may use the newly acquired lands only for non-gaming purposes; and
>
> (2) If a notice of intent to take the land into trust has been issued, then the Secretary will withdraw that notice pending a revised application for a non-gaming purpose.
>
> (b) If the Governor does not affirmatively concur in the Secretarial Determination within one year of the date of the request, the Secretary may, at the request of the applicant tribe or the Governor, grant an extension of up to 180 days.
>
> (c) If no extension is granted or if the Governor does not respond during the extension period, the Secretarial Determination will no longer be valid.

25 C.F.R. § 292.23.

Should you concur in this determination, I will proceed with the final review of the Tribe's application to acquire the proposed site in trust on its behalf.  The Tribe may use the site for gaming purposes only after it is acquired into trust.

## I.     BACKGROUND

The North Fork Rancheria of Mono Indians of California (Tribe) consists of the modern descendants of Mono Indians using and occupying lands near and in the San Joaquin Valley for several centuries. The Tribe has approximately 1,750 citizens[2], is headquartered in North Fork, Madera County, California, and has been federally recognized since 1915.

The Tribe currently possesses 80 acres of land (Rancheria) in Madera County, which is held in trust for its benefit by the United States.  The original boundaries of the North Fork Rancheria were restored and declared as "Indian Country" pursuant to the Stipulation for Entry of Judgment (Madera County) in *Tillie Hardwick et al. v. United States*, Civil No. C-79-1710-SW (N.D. Cal.

---

[1] I am authorized to make this determination on behalf of the Secretary pursuant to authority delegated to me under 209 DM 8.1 – Secretarial Officers, AS-IA.
[2] PRO Folder 2, Tribe's Amended & Restated Request, p. 12.

1987).[3]  The Tribe's headquarters are located approximately 4 miles east of its existing trust lands.

The Tribe originally submitted its request to have approximately 305 acres of land in Madera County acquired in trust on March 1, 2005.[4]

The Tribe proposes to construct a resort on this property (Resort), which will include a main gaming hall, food and beverage services, retail space, banquet/meeting space, administrative space, pool, and spa. Fifteen food and beverage facilities are planned, including a buffet, six bars, three restaurants, a five-tenant food court, and a multi-story hotel with 200 rooms, a pool area, and a spa.  Approximately 4,500 parking spaces will be provided for the Resort, with 2,000 in a multi-level parking structure.  The casino floor will be approximately 68,150[5] square feet (sf) and include up to 2,500 gaming devices, table games, and bingo.[6]

## II.   REVIEW OF THE TRIBE'S APPLICATION PURSUANT TO IGRA AND 25 CFR PART 292 SUBPART C

Section 2719 of IGRA generally prohibits gaming on land acquired in trust after October 17, 1988, subject to several exceptions.  The Secretarial Determination exception permits gaming if the Secretary determines that: (1) gaming on the newly acquired lands would be in the best interest of the tribe and its citizens; (2) would not be detrimental to the surrounding community; and (3) only if the Governor of the state in which the gaming establishment is located concurs in the Secretary's determination.  The Department's Part 292 regulations set forth the factors that I must consider in making this determination under Section 2719 of IGRA.

### SUBPART C – SECRETARIAL DETERMINATION

**§ 292.13  When can a tribe conduct gaming activities on newly acquired lands that do not qualify under one of the exceptions in subpart B of this part?**

**A tribe may conduct gaming on newly acquired lands that do not meet the criteria in subpart B of this part only after all of the following occur:**

**(a)  The tribe asks the Secretary in writing to make a Secretarial Determination that a gaming establishment on land subject to this part is in the best interest of the tribe and its members and not detrimental to the surrounding community.**

The Tribe approved Resolution No. 09-02 on June 28, 2009, requesting that the Secretary accept a 305.49-acre parcel located in an unincorporated area of Madera County (Site), California into trust for the benefit of the Tribe, and to determine that the property is eligible for gaming pursuant to IGRA, 25 U.S.C. § 2719(b)(1)(A).[7]

---

[3] PRO Folder 2, Tab E.
[4] PRO Folder 1, Exhibit 1.
[5] PRO Folder 1, Exhibit 7, p. 1.
[6] PRO Folder 2, Tab M.
[7] PRO Folder 2, Tab H.

3

On March 1, 2005, the Tribe submitted a fee-to-trust application to the Bureau of Indian Affairs' (BIA) Pacific Regional Office (PRO) requesting that the United States acquire the Site in trust for the benefit of the Tribe in accordance with the requirements of the Indian Reorganization Act (IRA) and 25 C.F.R. Part 151. The statutory authority is the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202, which amended Section 5 of the IRA, 25 U.S.C. § 465.

**(b) The Secretary consults with the tribe and appropriate State and local officials, including officials of other nearby Indian tribes.**

I have consulted with the Tribe and State and local officials, including nearby Indian tribes as required under the regulations. *See infra* Section 292.19 at 43.

**(c) The Secretary makes a determination that a gaming establishment on newly acquired lands would be in the best interest of the tribe and its members and would not be detrimental to the surrounding community.**

Based on my review of the record, I have determined that gaming on the Site would be in the best interests of the Tribe and its members and would not be detrimental to the surrounding community. *See infra* Section 292.17 at 7; Section 292.18 at 18.

**(d) The Governor of the State in which the gaming establishment is located concurs in the Secretary's Determination (25 U.S.C. 2719(b)(1)(A)).**

The request seeking your concurrence is presently before you.

**§ 292.14  Where must a tribe file an application for a Secretarial Determination?**

As detailed above, the Tribe submitted its application for a Secretarial Determination with the BIA Pacific Regional Office, which is the BIA Regional Office having responsibility over the land where the gaming establishment is to be located.

**§ 292.15  May a Tribe apply for a Secretarial Determination for lands not yet held in trust?**

The Department's regulations provide that a tribe may apply for a Secretarial Determination at the same time that it requests the Department to acquire land in trust on its behalf. 25 C.F.R. § 292.15.

The Department's regulations governing the fee-to-trust process, at 25 C.F.R. Part 151, require an applicant tribe to set forth the purpose for the proposed trust acquisition. 25 C.F.R. §§ 151.10 and 151.11. For discretionary acquisitions, the Secretary must determine that the proposed purpose of the trust acquisition is lawful.

Where a tribe seeks to have land acquired in trust on its behalf to conduct gaming under IGRA's Secretarial Determination exception, the Secretary must determine, and the Governor

4

must concur, that the conduct of gaming on those lands would be in the best interest of the Tribe and its citizens, and would not be detrimental to the surrounding community. The purpose of the proposed acquisition is only lawful when the Secretary makes this determination, and the Governor concurs. Therefore, when a tribe seeks to have land acquired in trust on its behalf for off-reservation gaming, the Secretarial Determination necessarily precedes the completion of the trust acquisition.

## § 292.16  What must an application for Secretarial Determination contain?

**A tribe's application requesting a Secretarial Determination under §292.13 must include the following information:**

**(a)  The full name, address, and telephone number of the Tribe submitting the application.**

> North Fork Rancheria of Mono Indians of California
> P.O. Box 929
> 33143 Road 222
> North Fork, California  93463
> (559) 877-2461

**(b)  A description of the location of the land, including a legal description supported by a survey or other document.[8]**

The Site is located in an unincorporated area of Madera County, California.

Real property in UNINCORPORATED AREA, County of Madera, State of California, described as follows:

> PARCEL NO. 1: APN: 033-030-(010 THRU 015 AND 017)
>
> PARCELS 1, 2, 3, 4, 5, 6, AND 8 of PARCEL MAP 3426 IN THE UNINCORPORATED AREA OF THE COUNTY OF MADERA, STATE OF CALIFORNIA, AS PER MAP RECORDED SEPTEMBER 7, 1995 IN BOOK 44, PAGES 15 AND 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.[9]

**(c)  Proof of identity of present ownership and title status of the land.**

The land is held in fee with title vested in Fresno Land Acquisitions, LLC, an affiliate of SC Madera Development, LLC.[10]

---

[8] PRO Folder 1, Exhibit 3

[9] Id.

[10] Id.

5

**(d) Distance of the land from the tribe's reservation or trust lands, if any, and tribal government headquarters.**

The 80-acre North Fork Rancheria is located approximately 4 miles east of the town of North Fork in Madera County. The original boundaries of the North Fork Rancheria were restored and declared as "Indian Country" in *Tillie Hardwick v. United States*.

The Site is located approximately 36 miles from the Tribe's current government headquarters, which are located in the town of North Fork, Madera County, California, and approximately 38 miles from the Rancheria.[11]

**(e) Information required by § 292.17 to assist the Secretary in determining whether the proposed gaming establishment will be in the best interest of the tribe and its members.**

*See infra* Section 292.17 at 7.

**(f) Information required by § 292.18 to assist the Secretary in determining whether the proposed gaming establishment will not be detrimental to the surrounding community.**

*See infra* Section 292.18 at 18.

**(g) The authorizing resolution from the tribe submitting the application.**

The Tribe approved Resolution No. 09-02 on June 28, 2009, requesting that the Secretary determine the Site eligible for gaming pursuant to Section 20 (b)(1)(A) of IGRA.[12]

**(h) The tribe's gaming ordinance or resolution approved by the National Indian Gaming Commission in accordance with 25 U.S.C. 2710.**

The Tribe does not have an approved gaming ordinance. However, on April 6, 2009, the Tribe enacted a gaming ordinance and a resolution authorizing submission of the gaming ordinance to the Chairman of the National Indian Gaming Commission (NIGC).[13]

**(i) The tribe's organic documents.**

On May 18, 1996, the Tribe ratified its Constitution at a General Council meeting of the Tribe.[14]

**(j) The tribe's class III gaming compact with the State where the gaming establishment is to be located, if one has been negotiated.**

The Tribe has negotiated a tribal-state gaming compact with the former Governor of the State of

---

[11] PRO, p. 63.
[12] PRO Folder 2, Tab H.
[13] PRO Folder 2, Tab I.
[14] PRO Folder 2, Tab J.

6

California.[15] That compact sets forth the Tribe's proposed scope of gaming.

**(k)  If the tribe has not negotiated a class III gaming compact with the State where the gaming establishment is to be located, the tribe's proposed scope of gaming, including the size of the proposed gaming establishment.**

Not applicable, since the Tribe has negotiated a class III gaming compact with the State.

**(l)  A copy of the existing or proposed management contract required to be approved by the National Indian Gaming Commission under 25 U.S.C. 2711 and 25 CFR Part 533.**

The Tribe has entered into a proposed Management Agreement with SC Madera Management, LLC.[16] On March 23, 2004, the Tribe submitted a copy of the Management Agreement to the NIGC.[17] The Management Agreement is currently under review with the NIGC.

**§ 292.17  How must an application describe the benefits and impacts of the proposed gaming establishment to the tribe and its members?**

**To satisfy the requirements of § 292.16(e), an application must contain:**

**(a)  Projections of class II and class III gaming income statements, balance sheets, fixed assets accounting, and cash flow statements for the gaming entity and the Tribe.**

The Tribe's pro forma income statement, balance sheet, statement of cash flows, seven-year debt repayment schedule, project cost summary, and payroll expense detail for class III gaming at the Resort for the first seven years of operation are provided.[18] The Tribe has not prepared separate financial projections for class II gaming.

The Tribe projects the following financial results:

- **Net Revenue** – The annual Net Revenue is estimated to be:



---

[15] PRO Folder 1, Exhibit 1, Tab L. A valid tribal-state gaming compact is a necessary prerequisite to the operation of a class III gaming facility. Nevertheless, it is not necessary that a tribe negotiate and conclude a valid class III gaming compact prior to requesting and receiving a Secretarial Determination. The State of California has not yet approved the Tribe's compact, and the Tribe has not submitted its compact to the Department for approval. According to the Tribe, it will not submit its compact until such time that the Site is acquired in trust. PRO Folder, Exhibit 7, Tab 1. Since the Tribe's negotiated class III compact has not been formally executed by the State, and since it has not been submitted to the Department, we will not offer substantive comments on the validity of the compact at this time.

[16] Exhibit 2, Tab O.

[17] ASIA Exhibit 2.

[18] PRO Folder 2, Exhibit 1, Tab Q.

7



- **Cash Distribution** – The annual cash distribution to the Tribe from the Resort is estimated to be:



- **Fixed Assets** – The fixed assets for a class III facility, for property, plant, and equipment, are estimated at █████████

## (b) Projected tribal employment, job training, and career development.

According to the 2010 Department of the Interior's American Indian Population and Labor Force Report, more than 16 percent of the Tribe's potential labor force is unemployed. The Tribe projects that the construction and operation of the Resort will lead to a substantial increase in tribal employment, job training, and career development. Direct investment and spending in construction-related activities is expected to generate 2,441 temporary construction jobs. The operation of the Resort is anticipated to generate 1,291 full-time employees and 283 part-time employees. The Resort is expected to create 2,319 permanent jobs in Madera County, including 858 indirect and induced jobs, a significant increase in job opportunities for tribal citizens in and outside gaming.[19]

The Resort will offer substantial employment opportunities to citizens of the Tribe. Seventy-three percent of the adult citizens of the Tribe are located closer to the Site than the original Rancheria; and, 62 percent of tribal citizens live within 50 miles of the Site.[20]

Revenues derived from the Resort will allow the Tribe to expand governmental services. The expansion of the Tribe's governmental services will, in turn, create new, professional job opportunities for tribal citizens seeking employment in the tribal government.

Finally, the Resort is located in relatively close proximity to the Tribe's existing community. The employment opportunities generated by the Resort will provide an opportunity for tribal citizens living far away to return to their community. This is consistent with our overall policy of self-determination, and will help correct the lasting impacts of previous Federal Indian policy eras that encouraged tribal citizens to leave their communities.

## (c) Projected benefits to the Tribe and its members from tourism.

---

[19] FEIS, 4.7.1, p. 4.7-2.
[20] FEIS, Appendix R – Socioeconomic Assessment, September 2008 § 3.1.3 p.13

8

The Resort will be a destination resort property. The Tribe projects that the Resort will increase visitors to Madera County and will stimulate the existing local tourist industry, thereby benefiting the local economy as a whole. The influx of non-resident consumers will benefit local businesses employing or owned by Tribal citizens, and create new employment and business opportunities for tribal citizens. In addition, increased tourism in Madera County will create opportunities for visitors and local residents to become familiar with the Tribe, its history, and its culture. The Tribe has agreed to the creation of an advisory board to promote local agriculture pursuant to its Memorandum of Understanding (MOU) with the Madera Irrigation District.[21]

**(d)  Projected benefits to the Tribe and its members from the proposed uses of the increased tribal income.**

The primary purpose of Indian gaming, under IGRA, is to generate revenues for tribal governments and advance the social and political development of tribal nations. The net income from gaming at the Resort will greatly benefit the Tribe by stimulating tribal economic development, promoting tribal self-sufficiency, and providing resources for the development of a strong tribal government.

The Tribe is not engaged in any economic development activities, and does not have any source of revenues other than government grants, California Revenue Sharing Trust Fund grants, and payments from its development partner. Income from the Resort will greatly benefit the Tribe and its citizens by establishing a solid economic foundation for the Tribe, promoting tribal self-determination, and a strong tribal government. If the Resort is built, the Tribe may eventually become financially self-sufficient.

The Tribe intends to use gaming income to provide a variety of much needed social, housing, government, administrative, education, health, and welfare services to its more than 1,750 tribal citizens. Tribal income will provide capital for non-gaming economic development and investment opportunities, allowing the Tribe to diversify its economic base over time so that it may improve the quality of life of Tribal citizens for the long-term.

Just as important as economic benefits, tribal income from the Resort will help the Tribe and its citizens strengthen Mono cultural programs and initiatives, thereby helping to sustain the collective and individual efforts of the Tribe and its citizens to revitalize and maintain their unique Mono heritage, language, and traditions for future generations.[22]

**(e)  Projected benefits to the relationship between the tribe and non-Indian communities.**

*Community Outreach*

The Tribe has established a strong relationship with the surrounding community through the Federal trust approval process, and expects that the development and operation of the Resort will strengthen that relationship. From the early stages of the application process to establish a

---

[21] PRO Folder 2, Tribe's Amended & Restated Request, pg 13 & County MOU 6(i).
[22] PRO Folder 2, Tribe's Amended & Restated Request, p. 14.

9

gaming facility, the Tribe has made a substantial effort to involve the surrounding community. The Tribe consulted with officials of Madera County in the process of selecting the location of the Site. Tribal representatives have held dozens of meetings with civic and business leaders, community groups, business and service organizations, industry groups, and employee/trade associations in the County. The Tribe intends to continue its efforts to reach out to the surrounding community.[23]

The Tribe intends to enter into an agreement with the California Department of Transportation (Caltrans) for the road and interchange improvements identified in the FEIS. The Tribe is currently funding an engineering firm to work with Caltrans and local governments to prepare an interchange design.

According to the Tribe's projections, the Resort will provide a much needed boost to the economy of Madera County and the surrounding community. The Tribe's efforts to facilitate such economic growth will positively impact and enhance the Tribe's relationship with the surrounding community.

**(f) Possible adverse impacts on the tribe and its members and plans for addressing those impacts.**

The Tribe has not identified any adverse impacts to itself or its citizens from the operation of the Resort.

**(g) Distance of the land from the location where the tribe maintains core governmental functions.**

The Site is located approximately 36 miles from the Tribe's current government headquarters, which are located in the town of North Fork, Madera County, California.[24]

**(h) Evidence that the tribe owns the land in fee or holds an option to acquire the land at the sole discretion of the tribe, or holds other contractual rights to cause the lands to be transferred from a third party to the tribe or directly to the United States.**

Section 2.1(b) of the Development Agreement[25] between the Tribe and SC Madera Development, LLC, a subsidiary of Station Casinos, Inc., provides that unspecified land will be transferred to the Secretary once the Secretary is prepared to take the land into trust for the Tribe for gaming purposes:



---

[23] PRO Folder 2, Tab S.

[24] This distance was calculated using the shortest point-to-point driving distance between the Tribe's headquarters and the Site.

[25] PRO Folder 2, Tab W.



Based on the terms of the Development Agreement, the Tribe has contractual rights to cause the lands to be transferred and put into trust for its benefit.

**(i)  Evidence of significant historical connections, if any, to the land.**

The IGRA does not require an applicant tribe to demonstrate an aboriginal, cultural, or historical connection to the land in order to receive a positive Secretarial Determination. Nevertheless, the Department's regulations require the Secretary to weigh the existence of a historical connection between an applicant tribe and its proposed gaming site as a significant factor in determining whether gaming on the proposed site would be in the best interest of the tribe and its citizens.

The Department's regulations define the term "significant historical connection" as one in which "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.2.

Subsistence use and occupancy require something more than a transient presence in an area.

11

"Subsistence" is defined as "a means of subsisting as the *minimum* (as of food and shelter) necessary to support life."[26]   Accordingly, activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering and hunting on lands and waters.  "Occupancy" can be demonstrated by a consistent presence in a region supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations.

**Historic use and occupancy**

The Site is located in the eastern plains of the San Joaquin Valley within 2.5 miles of the Fresno River, and near the Sierra Nevada foothills.  Joe Kinsman, an American settler who settled along the Fresno River in 1849 and then married a Mono Indian, had children who are the ancestors of many citizens of the Tribe.  In his autobiography, Kinsman described the eastern San Joaquin Valley at the time of his arrival on the Fresno River in 1849:

> *There was no Madera, no Merced, no Modesto, and no Fresno. All of the settlements were in the foothills.  The entire valley country was desolate of human habitation.  In places where now there are blooming orchards and verdant fields of alfalfa and the homes of many men the valley was a desert without any vegetation. Antelope, deer, elk and wild horses ranged at will over the valley and adjacent foot-hills.*

Although the settlements may not have been permanent, anthropologists and historians have determined that an aboriginal group identified as the Howechi (Howechee, How-a-chez, How-chis, Heuchi, Heuche, Heutsi, Whee-Chee) resided in a settlement located on the north side of the Fresno River four miles downriver from the modern day city of Madera.  It has been estimated that the original population of this group was approximately 450.

The Valley floor was an area of intertribal use and occupancy, where neighboring bands hunted large game, fished in the waters of the San Joaquin River, and otherwise shared access to its resources during certain times of the year. Accordingly, ancestors of the Tribe used and occupied the San Joaquin Valley floor and the adjacent Sierra Nevada foothills. One of the Federal treaty commissioners[27] described the relations of aboriginal groups in the San Joaquin Valley in the vicinity of the Fresno and San Joaquin Rivers as follows:

> *The Gentile class [of Indians] constitute the tribe proper, occupying the valleys and low hills near the base of the mountains; the Monos or lost tribes inhabiting the higher mountains back from the Gentiles, or tribe proper, by whose permission and protection they [the Monos] visit occasionally the plains and water-courses for the purposes of hunting and fishing.  In fact, they [the Monos] maintain towards the tribe proper the character of colonies or dependencies, always assisting them in times of war, and at all*

---

[26] Webster's New Collegiate Dictionary 1153 (G. & C. Merriam Co. 1979).
[27] 1852 report from G. W. Barbour to Luke Lea. Exhibit 2, Tab X.

> *times secreting the large bands of animals stolen by the tribe*
> *proper from the members of the country...*

## The 1851 Treaty Negotiations

The Tribe maintained significant historical connections to the areas near the Site during the period following European contact. In 1850, after the discovery of gold in the foothills of the San Joaquin Valley, the Federal Government sent treaty commissioners to the area to negotiate treaties with tribes in the San Joaquin Valley. The goal of the commissioners was to induce those tribes to leave their homelands in the foothills and mountains, where gold had been discovered, and settle on less-valuable land in the Valley. One of the commissioners wrote in the spring of 1851:

> *Our policy is ... to get them down from their mountain fastnesses*
> *and place them on reservations, along the foothills bordering on*
> *the plains. The miners will then be between them and the*
> *mountains, forming a formidable cordon or barrier through which*
> *it would be difficult to take their families unobserved [back to their*
> *foothill homelands]; and in those reservations ... they will there*
> *learn the ways of civilization, and thereby become useful members*
> *in the community, instead of being an expense and dead weight to*
> *the General Government.*[28]

The commissioners signed three treaties with San Joaquin Valley bands in the spring of 1851. Under the terms of the treaties, the bands relinquished all legal title to their homelands. The treaties provided that Indian reservations would be established in the valley lands between the Sierra Nevada foothills and the San Joaquin River in modern day Madera and Fresno Counties.

Historical documents demonstrate that the Tribe's predecessors were represented by signatories to the 1851 Treaty signed at Camp Barbour.[29] The Tribe has also identified direct ancestors of current tribal citizens who participated in those negotiations.[30]

The 1851 Treaty signed at Camp Barbour on the San Joaquin River specifically mentioned the Mono ancestors of the Tribe, who had not yet arrived from the foothills on the day the treaty was signed, and made them express beneficiaries of the reservation contemplated by that treaty. It stated that the "mona [Mono]... which were still in the mountains, shall, when they come in ... receive a fair and equal interest in the land and provisions hereinafter stipulated to be furnished for the whole reservation..."[31]

The Site is within the boundaries of the reservations set aside for the predecessors of the Tribe and other Native groups by the San Joaquin Valley treaties.[32] However, once substantial

---

[28] O.M. Wozencraft to Luke Lea, 05/14/1851, ARCOIA 1851, pp.225-226.

[29] Application of Mary Ann Kinsman for Enrollment with Indians of California, March 8, 1928.

[30] Application of Savage Lewis for Enrollment with Indians of California, March 19, 1929.

[31] Camp Barbour treaty, PRO Folder 2, Tab Y.

[32] ASIA Exhibit 5 - Map of the boundaries of the San Joaquin Valley treaties with explanatory notes, Heather Howard, PhD., 2006, Exhibit 2, Tab Z .

numbers of Indians had physically removed from the foothills to the valley, the United States no longer considered the treaties to be necessary, and the United States Senate refused to ratify them. Therefore, the treaties never became legally effective, and the reservations contemplated by the treaties were never established. Congress passed a separate statute which effectively extinguished Indian title to land throughout the State of California by 1853, leaving the ancestors of the Tribe, and all other California Indians, landless – without legal rights to their homelands and without formal reservations.

**The 1850s Fresno River Farm**

The Federal Government established the "Fresno River Farm" in 1851 along the banks of the Fresno River. (The Fresno River Farm later became the headquarters of what was referred to in historical records as the Fresno River Reservation or Agency.) Although the exact boundaries of the Fresno River Farm are difficult to determine, and may have changed over time, it is clear that it was located near or within the boundaries of the modern day City of Madera. The Site is located within 7.6 miles of the City of Madera's northern boundary, in the vicinity of where the Fresno River Farm was located.[33]

Citizens of the modern North Fork Rancheria Tribe can trace their ancestry to Mono Indians listed among those people at the Fresno River Farm.[34] Contemporary records prepared by the Federal Indian agents confirm that, although some ancestors of the Tribe remained in the foothills, other Mono and non-Mono ancestors of the Tribe used and occupied the Fresno River Farm and surrounding lands. In a July 1856 report, the Federal Indian agent counted the "Monos" as among the "number of Indians which live on, visit, and recognize this place [the Fresno River Farm] as their home and headquarters." In an August 1857 report, the Federal Indian agent reported that there were various San Joaquin Valley Native groups which included ancestors of the Tribe and which "visit and recognize this [Fresno River] reservation", including 360 "Monos" and other Native groups which included ancestors of the Tribe. In an August 1858 report, the Federal Indian agent reported that the Mono "have more recently made frequent visits to the farms for counsel and presents, never failing to tender their service to labor". The Monos were substantially the largest Native group identified in these reports.[35]

A close reading of the reports also shows the devastating effect of disease on the San Joaquin Valley tribal population. An August 1857 report notes that the "How-a-chez", a Native group which used and occupied lands in the immediate vicinity of the modern day City of Madera, *"live permanently on this farm, once the great ruling tribe, now only sixteen"*. An August 30, 1859 report discussing the "How-chis" stated, *"This tribe of Indians within the vicinity of Farm was a ranking people, now the smallest Tribe within the bounds of this Agency.... Their native land is this Fresno River and they have known no other home since the Treaty made by them and other tribes with the commissioners in the year 1851 [at] this Fresno Farm. The numbers of Males are 8, Females 10 [total] 18."* Another August 1859 Federal Indian agent report states that, except for the Chukchansi and Mono Native groups, *"there have been many deaths but few births, which unnatural consequence is mostly attributed to the social intercourse between the women of the*

---

[33] Id.

[34] Alta California, February 7, 1858.

[35] Federal Indian agent reports, PRO Folder 2, Tabs AA, BB, and CC.

*latter and the men of other [i.e. white] denominations.* "[36]

Thus, many of the original bands that lived in the San Joaquin Valley area were decimated within several decades after contact with American settlers.

The Fresno River Farm was closed in 1859. In an August 1859 report, the Federal Indian agent[37] stated that the Indians who used and occupied the Fresno River Farm, influenced by hunger and paternal attachment for their native land, commenced leaving this place by tribes and smaller parties:

> *And I do at this time feel called upon, in the name of peace and prosperity of these people, and the interest of the Indian Department, to recommend their removal from that section of country [near the Fresno River Farm] into the mountains, where they will be less expense to the government, less subject to abuse of ill-disposed white men; where the land is better and seasons more reliable. The growing of the Foot-hills from north to south within the bounds of this agency,... more especially the immediate vicinity of this [Fresno River Farm/Reservation] and King's river farm, with the various kinds of [live] stock and the various classes of [non- Indian] men, has made apparent the policy and necessity of moving the entire Indian population higher up in the mountains...*"

Thus, many of the Mono Indians who had survived the devastating diseases of the 1830's and 1850's, and who used and occupied the Fresno River Farm and surrounding area, moved to the Sierra Nevada foothills where they rejoined, or were absorbed into, various bands living in the foothills.

Other historical records demonstrate the connection between the Tribe's predecessors and the areas near the Site. For example, trust allotment patents and 1928 roll numbers were issued by the United States to many ancestors of current citizens of the Tribe.[38] Many tribal citizens can trace their lineage to San Joaquin Valley Native bands in addition to the "Mono" band, including: Chowchilla, (a Valley Yokuts, Madera and Mariposa County, band); Mariposa, (a Mariposa County band and possibly the same as Chowchilla); Choak-chan-cee (Chukchansi) (a foothills Yokuts, Madera County, band); and Cas-sons (a.k.a. Gashowu, a foothills Yokuts band).[39]

The Tribe has not identified any reference in the historical record after the 1850's to the Howechi tribe, which used and occupied the Fresno River Valley area in aboriginal times. The only reference in the Madera County 1900 census records to a Valley Yokuts group is the identification of the Lewis family as "Mariposa" (which is sometimes used in reference to Chowchilla). Mary Lewis and Mary Blackhawk, ancestors of many citizens of the Tribe who were granted the Indian allotments nearest to Madera, were originally from the Chowchilla

---

[36] M.B. Lewis to James Y. McDuffie, August 27, 1859, S. Exec. Doc. 2 (36-1) 1023, pp 809-811.
[37] Indian agent report, Exhibit 2, Tab DD.
[38] PRO Folder 2, Tab EE
[39] Id..

-480-

band.[40]

### Late 19th and Early 20th Century

Primary documents from the latter half of the nineteenth century provide a picture of the ancestors of the Tribe traveling from the Valley floor – often passing through Madera to the foothills and back again – as they herded sheep for local ranches. Ancestors of the Tribe also worked in the timber industry. The lumber they cut was transported by an elaborate flume system from the watershed of the Fresno River to Madera. Joe Kinsman, an ancestor to many tribal citizens, and other men from the foothills area would drive their hogs to a store in Borden, which was located along the Southern Pacific rail line within 600 yards of the border of Madera.[41]

By the late 1800's, many of the ancestors of the Tribe worked picking grapes at the Minturn vineyards, which are described in historical records as five miles from Madera, in the direction of the present village of Minturn, which is north of the City of Madera. This location would place the vineyards in very close proximity to the Site. Throughout much of the twentieth century, up until the 1960's, numerous families associated with the Tribe traveled to these vineyards, which were north of Madera and extending to the banks of the Chowchilla River. Many of the Tribe's oldest citizens have personal recollections of working in these vineyards, and all of the early photographs of Tribal citizens in personal collections of Tribal citizens were taken in the area of these vineyards. In the midst of a typhoid epidemic among the Indians at North Fork in 1924, an administrator serving at the North Fork Indian School reported that she was "glad to see they did not get the germs here [in North Fork] but down at Minturn where they went to pick grapes and figs."[42]

In addition to picking grapes, many Tribal ancestors traveled to the Valley during the twentieth century to work in other industries as well, such as farming and sheep-shearing. In 1916, Indian Agent John J. Terrell, as part of his communication with the Commissioner of Indian Affairs about the purchase of Rancheria lands for the "North Fork Band of Indians" wrote:[43]

> While a number of these Indians have in the past secured more or
> less employment locally [in the foothills], and will likely be able to
> continue to do so, quite a number, likely a majority, temporarily
> leave their mountain habitations and go to the rich San Joaquin
> Valley in proper seasons to secure work on the farms, hay
> meadows, vineyards [sic] and orchards, as well as sheep-shearing
> in its season.

The City of Madera has continued to serve as a hub of activity for the citizens of the Tribe. Madera was considered the closest and most convenient urban center where they could do their shopping and socialize. They were also able to access services there, such as public assistance

---

[40] PRO Folder 2, Tab FF.
[41] Wogaman, *Medicine Man,* p.9; Kinsman Diary, 1876-1894, English Collection, California State.
[42] PRO Folder 2, Tab GG.
[43] PRO Folder 2, Tab HH.

-481-

and health care.

## Cultural Connections

Access to the San Joaquin River and surrounding lands has played an important role in sustaining the culture of the Tribe.  Since aboriginal times, the Tribe and its ancestors have been renowned for the baskets made by the women citizens of the Tribe.  The plants, which grow near the rivers and marshes in the San Joaquin Valley area, have been a rich source of basket-weaving material.  Well into the 20th century, women gathered basket-making material during their trips to work on farms located on the Valley floor along the San Joaquin and Fresno Rivers in the vicinity of Madera.  Tribal citizen and author Gaylen Lee elaborated on this practice in his book Walking Where We Lived, stating that "Although sedgegrass grows in the mountains, the roots aren't as long as those that grows in the San Joaquin Valley.  Mom said her Grandma Lizzie preferred to travel there for white root."[44]

## Conclusion

The Site is located within the reservations contemplated by the San Joaquin Valley treaties for the Tribe's predecessors.  Those treaties were never ratified, and the reservation was never established.  Nevertheless, the Part 292 regulations provide that a tribe may confirm that it has a significant historical connection to land where it is "within the boundaries of the tribe's last reservation under a ratified or *unratified treaty*."  25 C.F.R. § 292.2 (emphasis added).  Based upon this fact alone, I can conclude that the Tribe has a significant historical connection to the Site.

The historical documentation presented by the Tribe also demonstrates that it established a continuous presence in the vicinity of the Site, through occupancy and subsistence activities, over a period of time.  The Tribe's predecessors: hunted game in the areas of the San Joaquin Valley near the Site; they gathered plants and other materials from the areas of the San Joaquin Valley near the Site; they occupied the Fresno River Farm in the vicinity of the Site; and, they earned a living from activities, such as logging and agriculture, conducted on lands in the vicinity of the Site.

These facts also establish that the Tribe has a significant historical connection to the Site, pursuant to the Part 292 regulations.

**(j)  Any other information that may provide a basis for a Secretarial Determination that the gaming establishment would be in the best interest of the tribe and its members, including copies of any:**

> **(1)  Consulting agreements relating to the proposed gaming establishment;**
> **(2)  Financial and loan agreements relating to the proposed gaming establishment; and**
> **(3)  Other agreements relative to the purchase, acquisition, construction, or financing of the proposed gaming establishment, or the acquisition of the land**

---

[44] PRO Folder 2, Tab II.

17

**where the gaming establishment will be located.**

A Development Agreement, dated December 8, 2003, has been signed between The North Fork Rancheria of Mono Indians of California and SC Madera Development, LLC, a California Limited Liability Company. The agreement has not yet been approved by the NIGC.[45]

The Tribe's existing land base, which consists of 80-acres near the town of North Fork, is located on environmentally sensitive lands within the Sierra National Forest, and near Yosemite National Park. Those lands are currently used for residential purposes, such that any economic development at that site would result in the displacement of individuals from their homes. The Rancheria is difficult to access by car, making it difficult to engage in any form of economic development on those lands, whether through gaming or non-gaming activities.[46]

**§ 292.18  What information must an application contain on detrimental impacts to the surrounding community?**

**To satisfy the requirements of § 292.16(f), an application must contain the following information on detrimental impacts of the proposed gaming establishment.**

**(a)  Information regarding environmental impacts and plans for mitigating adverse impacts, including information that allows the Secretary to comply with the requirements of the National Environmental Policy Act (NEPA); e.g., an Environmental Assessment (EA) or an Environmental Impact Statement (EIS), if required by NEPA.**

On October 27, 2004, the Secretary published in the *Federal Register* a Notice of Intent (NOI) to gather information necessary to prepare an EIS under the NEPA in connection with the proposed Federal actions of the Secretary acquiring the Site into trust for the benefit of the Tribe for the purposes of gaming, and the Chairman of the NIGC approving a management agreement between the Tribe and its management partner.[47]  The NOI was published in the Madera Tribune on November 12, 2004.  On November 15, 2004, the BIA conducted a scoping meeting at Hatfield Hall, Madera District Fairgrounds, Madera, California.

The BIA extended the public scoping comment period to December 15, 2004.  Notices extending the comment period were published in the Madera Tribune and Fresno Bee on November 29, 2004 and December 7, 2004.  The Madera Tribune notice incorrectly listed the extended comment deadline as December 10, 2004. Thus, a correction was published in the Madera Tribune on December 3, 2004.

The BIA published a Notice of Correction (NOC) in the *Federal Register* on April 6, 2005. The NOC amended the October 2004 NOI to include a description of possible Resort alternatives and also to further extend the scoping comment period to May 6, 2005.  The BIA published the NOC in the Madera Tribune on April 8, 2005 and in the Fresno Bee on April 9, 2005.[48]  In July 2005,

---

[45] ASIA Exhibit 2
[46] FEIS 2.0 Alternatives
[47] 69 Fed. Reg. 62721 (Oct. 27, 2004).
[48] 70 Fed. Reg. 17461 (Apr. 6, 2005).

the Department issued a scoping report which summarized the comments received during the scoping period and outlined the expected scope of the EIS.[49]

On February 15, 2008, the Secretary published in the *Federal Register* a Notice of Availability (NOA) of the DEIS. The NOA was also published in the Fresno Bee and the Madera Tribune on February 15, 2008. The NOA provided the public with the time and location of the public hearing on March 12, 2008, held for purposes of presenting the Resort with alternatives and to accept public comments.[50]

In connection with the preparation of the EIS, the BIA has served as the lead agency and the Tribe, the NIGC, the Caltrans, the Madera Irrigation District, the Environmental Protection Agency and City of Madera have served as cooperating agencies. The FEIS was published on August 6, 2010. It analyzes potential environmental impacts of the Resort and makes determinations regarding which potential impacts are less than significant prior to mitigation and which potential impacts are less than significant or are potentially significant after mitigation.

**Recommended Mitigation of Potentially Significant Environmental Impacts**

The environmental impacts which the FEIS determines to be potentially significant before mitigation, and the recommended mitigation measures for those potentially significant impacts, are summarized below.

*Land Resources, Seismicity*

Although the risk of soil liquefaction and seismically-induced flooding is low, the Site is located approximately 40 miles from the seismically active San Andreas Fault. The FEIS recommends that the construction of the Resort adhere to the 1997 Uniform Building Code, including provisions relating to earthquake design.[51]

*Air Quality, Construction-Related Emissions*

During the construction phase, construction-related activities could generate air pollutant emissions, including substantial amounts of fugitive dust. The FEIS recommends development of a Construction Emissions Mitigation Plan that requires compliance with San Joaquin Valley Air Pollution Control District fugitive dust rules, creation of a dust control plan, adoption of certain dust control practices, compliance with certain measures related to construction equipment, and creation of a traffic and parking management plan.[52]

*Air Quality, Emissions Generated by Operation*

The Site is located in the San Joaquin Valley Unified Air Pollution Control District. During the

---

[49] The scoping report is publicly available at www.analyticalcorp.com, which is the website of the BIA's environmental contractor for the EIS.
[50] PRO Folder 2, Tab JJ.
[51] FEIS, section 5.2.1.
[52] FEIS, section 5.2.3.

19

operational phase, operational Reactive Organic Gases and Nitrogen Oxide emissions, primarily resulting from traffic to and from the Resort, are expected to exceed the District's significance thresholds. In order to reduce such emissions, the FEIS recommends that the Tribe adopt the following mitigation measures:

(i)     provide shuttle transportation to major transit stations and multi-modal centers;

(ii)    provide transit amenities, such as bus turnouts, shelter benches, and lighting, route signs and other amenities around the transit shelter benches to encourage public use of transit services;

(iii)   provide for, or contribute to, dedication of land for off-site bicycle trails linking the Site to designated bicycle commuting routes in accordance with the regional Bikeway Master Plan;

(iv)    maximize the potential of passive solar design principles where feasible;

(v)     use clean fuel vehicles in the vehicle fleet where practicable;

(vi)    provide a parking lot design that includes clearly marked and shaded pedestrian pathways between transit facilities and building entrances;

(vii)   provide amenities such as personal lockers, bicycle lockers and racks, bus pass subsidies and flexible schedules for employees who walk, bike or utilize public transit to work;

(viii)  provide electric vehicle charging facilities;

(ix)    provide preferential parking for vanpools and carpools;

(x)     provide on-site pedestrian facility enhancements which are physically separated from parking lot traffic;

(xi)    provide adequate ingress and egress at entrances to the Resort to minimize vehicle idling and traffic congestion; and

(xii)   direct any parking structure ventilation away from inhabited areas.[53]

*Air Quality, Odor Impacts*

The proposed on-site wastewater treatment plant (WWTP) could represent a potentially significant source of odors if not operated properly. In order to reduce such effects, the FEIS recommends that the Tribe adopt the following mitigation measures:

(i)     the WWTP shall be constructed with comprehensive odor control facilities;

(ii)    spray drift for the WWTP or spray disposal field shall not migrate out of the disposal field boundaries;

(iii)   spray field irrigation shall cease when winds exceed 30 miles per hour;

(iv)    and the WWTP shall be staffed with operators who are qualified to operate the plant safely, effectively, and in compliance with all permit requirements and regulations.

*Air Quality, Toxic Air Contaminant Impacts*

The proposed developments under Alternative A would not contribute or generate toxic air contaminants (TAC). However, bus and diesel truck traffic to and from the developments, especially in loading areas, would result in an increased concentration of diesel emissions in those areas, leading to a potentially significant effect. In order to reduce such effects, the FEIS

---

[53] FEIS, section 5.2.3.