# EXHIBIT 30

# Calendar No. 1907

| 85TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 1874 |
|---|---|---|

PROVIDING FOR THE DISTRIBUTION OF THE LAND
AND ASSETS OF CERTAIN INDIAN RANCHERIAS AND
RESERVATIONS IN CALIFORNIA

JULY 22, 1958.—Ordered to be printed

Mr. KUCHEL, from the Committee on Interior and Insular Affairs,
submitted the following

## REPORT

[To accompany H. R. 2824]

The Committee on Interior and Insular Affairs, to whom was
referred the bill (H. R. 2824) to provide for the distribution of the
land and assets of certain Indian rancherias and reservations in
California, having considered the same, report favorably thereon with
amendments and recommend that the bill, as amended, do pass.

The amendments are as follows:

On page 1, strike all of lines 7, 8, 9, and 10, and insert the following:

Alexander Valley, Auburn, Big Sandy, Big Valley, Blue
Lake, Buena Vista, Cache Creek, Chicken Ranch, Chico,
Cloverdale, Cold Springs, Elk Valley, Guidiville, Graton,
Greenville, Hopland, Indian Ranch, Lytton, Mark West,
Middletown, Montgomery Creek, Mooretown, Nevada City,
North Fork, Paskenta, Picayune, Pinoleville, Potter Valley,
Quartz Valley, Redding, Redwood Valley, Robinson,
Rohnerville, Ruffeys, Scotts Valley, Smith River, Strawberry
Valley, Table Bluff, Table Mountain, Upper Lake, Wilton

On page 2, line 25, after the period, insert the following new sentence:

It is the intention of Congress that such plan shall be
completed not more than three years after it is approved.

On page 5, line 20, strike all of section 5 (b) and insert in lieu
thereof the following:

(b) For the purposes of this Act, the assets of the Upper
Lake Rancheria and the Robinson Rancheria shall include
the one-hundred-and-sixty-acre tract set aside as a wood

20006

reserve for the Upper Lake Indians by Secretarial order dated February 15, 1907.

(c) The Secretary of the Interior is authorized to sell the five hundred and sixty acres of land, more or less, which were withdrawn from entry, sale, or other disposition, and set aside for the Indians of Indian Ranch, Inyo County, California, by the Act of March 3, 1928 (45 Stat. 162), and to distribute the proceeds of sale among the heirs of George Hanson.

On page 7, line 22, strike the word "members" and insert the words "dependent members".

On page 8, line 18, strike the figure "$110,100" and insert in lieu thereof the figure "$509,235".

## PURPOSE OF THE BILL

The purpose of H. R. 2824, as amended, is to provide for the distribution of lands, minerals, water rights, and improvements on 41 Indian rancherias and reservations in California.  The bill also provides that either the Indians who hold assignments on or occupy each reservation or rancheria, or the Secretary of the Interior, shall prepare a plan for distributing the assets of these properties by (1) transfer to individual Indians, (2) selling such assets and distributing the proceeds to the Indians, (3) conveying such assets to the corporation or legal entity organized or designated by the group, or (4) conveying such assets to the group as tenants in common.  The bill would affect 1,390 Indians residing on 7,617 acres of trust land.

For several years, Congress has had under consideration various proposals to terminate Federal responsibilities for all Indian property and for the 36,000 Indians in California.  Earlier congressional hearings were held during the 82d and 83d Congresses, both in the field and in Washington, but no positive action was taken.  The State legislature memorialized Congress in 1951 to dispense with all restrictions on California Indians (S. J. Res. No. 29, ch. 159, California Statutes, May 18, 1951), and a representative of the Governor's office testified in favor of the termination of the Federal supervision program as early as 1952.  Since that time, the State senate interim committee on California Indian affairs (created by S. Res. No. 115, Senate Journal, June 10, 1953, p. 4125) has conducted extensive investigations throughout the State and sent its representative to speak at hearings on behalf of this legislation.

As passed by the House on August 13, 1957, H. R. 2824 contained a total of 14 rancherias.  During the 2d session of the 85th Congress, many requests have been received by the committee from other rancheria groups asking to be included in, or excluded from, this legislation.  Within the past 3 years, 41 California rancherias have adopted resolutions, copies of which are on file with the committee, requesting that legislation to terminate Federal control over their lands be enacted.  Therefore, the bill has been amended to include all 41 groups.

However, the committee wishes to emphasize that H. R. 2824, as amended, is purely permissive, and does not impose any kind of a program on the 41 rancherias involved unless the individual groups approve the legislation.  It is not the intention of Congress to force

the legislation upon any group, and any rancheria desiring to withdraw may do so.

## SECTIONAL ANALYSIS

Section 1 of the bill specifies the 41 rancherias and reservations involved, and directs the distribution of their assets in accordance with the provisions of the bill.

Section 2 of the bill requires the Indians involved, or the Secretary of the Interior after consultation with the Indians, to prepare a plan for distributing the assets, or for selling the assets and distributing the proceeds of sale, or for conveying the assets to a corporation designated by the group or to the members of the group as tenants in common.   General notice of the plan must be given, and, after the Indians affected have been given an opportunity to object, the plan must be submitted to the vote of the Indians who will participate in the distribution.   If a majority of those voting approve the plan, it will be carried out within 3 years after such approval.   No provision is made for any further action if a plan is not approved.

Attention is directed to the fact that no provision is made for preparing a membership roll for each rancheria or reservation.   The preparation of such rolls would be impracticable because the groups are not well defined.   Moreover, the lands were for the most part acquired or set aside by the United States for Indians in California, generally, rather than for a specific group of Indians, and the consistent practice has been to select by administrative action the individual Indians who may use the land.   The bill provides for the distribution of the land, or the proceeds from the sale of the land, primarily on the basis of plans prepared or approved by these administratively selected users of the land.

Section 3 of the bill requires the Secretary of the Interior to make any surveys that are necessary to convey marketable titles, to complete the construction of any access roads that are scheduled for transfer to the State or local government, to install or rehabilitate the irrigation or domestic water systems that he and the Indians agree within a reasonable time should be completed by the United States, to cancel all reimbursable debts that are charges against the land, and to make any land exchanges that are desirable before the Federal trust is terminated.

Section 4 of the bill affirms present Indian water rights, makes inapplicable for 15 years the California law with respect to loss of water rights by nonuse if the land remains in Indian ownership, and requires the Attorney General of the United States to represent the Indians in any proceedings during that period involving their water rights.

Section 5 of the bill authorizes the disposition of Federal property on the rancherias or reservations that is not needed for the administration of Indian affairs.

Section 6 of the bill requires the distribution of all funds held by the United States in trust for the Indians of the rancherias or reservations.

Section 7 of the bill protects pending claims.

Section 8 of the bill provides for protecting the interest of minors and incompetents by guardianship proceedings or by such other means as the Secretary deems adequate, which includes the use of private trusts, if advisable.

Section 9 of the bill provides for an accelerated program of education and vocational training before the assets are distributed.

Section 10 specifies that, after the Indians have accepted the termination plan and the lands are deeded to them, they, and the dependent members of their immediate families, shall not be eligible to participate in other Federal Indian programs. No Federal programs are planned for the benefit of California Indians. Provisions entitling the Indians of the affected rancherias to continue to participate in any future awards in pending cases are retained in section 7 of the bill.

Section 11 provides that the constitution and corporate charter of 1934, adopted by certain rancherias subject to this act, shall be revoked by the Secretary of the Interior when a plan is approved by a majority of the adult Indians concerned.

Section 12 authorizes the Secretary of the Interior to issue rules and regulations and to execute or approve such conveyancing instruments as may be necessary under this act.

Section 13 authorizes the appropriation of a sum not in excess of $509,235 to carry out the provisions of this act. The Bureau of Indian Affairs has submitted the following costs believed necessary to terminate Federal trusteeship on the 41 rancherias in H. R. 2824, as amended:

*Estimated costs to terminate Federal trusteeship on 41 rancherias in California*

| | | | |
|---|---|---|---|
| Alexander Valley | $1,400 | Nevada City | $2,400 |
| Auburn | 5,900 | North Fork | 4,800 |
| Big Sandy | 30,400 | Paskenta | 5,200 |
| Big Valley | 9,700 | Picayune | 9,000 |
| Blue Lake | 7,400 | Pinoleville | 17,900 |
| Buena Vista | 4,700 | Potter Valley | 5,200 |
| Cache Creek | 1,500 | Quartz Valley | 73,825 |
| Chicken Ranch | 23,000 | Redding | 5,200 |
| Chico | 8,400 | Redwood Valley | 16,500 |
| Cloverdale | 4,700 | Robinson | 6,500 |
| Cold Springs | 5,500 | Rohnerville | 3,750 |
| Elk Valley | 15,400 | Ruffeys | 1,600 |
| Guidiville | 7,500 | Scotts Valley | 10,500 |
| Graton | 4,000 | Smith River | 71,100 |
| Greenville | 40,360 | Strawberry Valley | 700 |
| Hopland | 41,760 | Table Bluff | 3,550 |
| Indian Ranch | 3,000 | Table Mountain | 6,700 |
| Lytton | 2,000 | Upper Lake | 23,900 |
| Mark West | 1,300 | Wilton | 7,000 |
| Middletown | 11,000 | | |
| Montgomery Creek | 2,000 | Total | 509,235 |
| Mooretown | 3,000 | | |

Resolutions requesting this legislation from each of the rancherias and reservations listed above are on file with the Committee on Interior and Insular Affairs.

The favorable reports on H. R. 2824 and H. R. 2576, each dated April 17, 1957, together with two letters from the Commissioner of Indian Affairs to Senator Richard L. Neuberger, are as follows:

DEPARTMENT OF THE INTERIOR,
*Washington, D. C., April 17, 1957.*

Hon. CLAIR ENGLE,
*Chairman, Committee on Interior and Insular Affairs,*
*House of Representatives, Washington, D. C.*

DEAR MR. ENGLE: Your committee has requested a report on H. R. 2824, a bill to provide for the distribution of the land and assets of

certain Indian rancherias and reservations in California, and for other purposes.

We recommend that the bill be enacted. A few minor amendments are suggested below.

Each of the two Indian groups involved has requested by formal resolution the distribution of the rancheria assets, and we believe that the Indians are ready for such action. A background statement regarding each rancheria, and an analysis of the bill, are enclosed. A copy of the resolution from each group requesting the enactment of legislation along the lines of the bill will be furnished for committee files when hearings are held.

For several years the Congress has had under consideration various proposals to terminate Federal responsibilities for all Indian property in California. In response to House Concurrent Resolution 108, 83d Congress, this Department submitted to Congress on January 4, 1954, a proposed bill for that purpose. It was introduced as H. R. 7322 and S. 7249, and extensive hearings were held. Similar bills had been considered by the 82d Congress (H. R. 7490, H. R. 7491, and S. 3005). As was to be expected in connection with a proposal that involved so many people with differing interests (the Indian population of the State is approximately 36,000), a variety of opinions regarding the merits of the proposal were expressed.

Although the State legislature had memorialized Congress in 1951 to dispense with all restrictions on California Indians (S. J. Res. No. 29, Chap. 123, Calif. Stats., May 18, 1951), and a representative of the Governor's office had testified in favor of the bills for that purpose in the 82d Congress, when the congressional hearings were held in 1954 the State representatives asked for a delay in order that some of the details might be considered further. Since that time the State Senate Interim Committee on California Indian Affairs (created by Senate Resolution No. 115, Senate Journal, June 10, 1953, p. 4125) has conducted extensive investigations throughout the State and is currently preparing its recommendations. We understand that the recommendations will probably be in terms of a bill of statewide applicability, as were the bills before the 82d and 83d Congresses.

Meanwhile, plans were worked out for immediate action with selected groups in California who want an immediate termination of Federal trust responsibilities without waiting for the enactment of a bill of statewide applicability. This is the purpose of H. R. 2824. It involves the two rancherias of Strawberry Valley and Wilton. There are two people living at Strawberry Valley and 33 people at Wilton. Strawberry Valley consists of one city lot, and Wilton consists of 39 acres.

The following technical amendments are suggested.

1. On page 2, line 20, before "Indians" insert "adult."

2. On page 3, line 21 to page 4, line 1, delete the first sentence of subsection 3 (b) and insert in lieu thereof "To complete any construction or improvement required to bring Indian Bureau roads serving the rancherias or reservations up to adequate standards comparable to standards for similar roads of the State or subdivision thereof."

3. On page 6, line 10, change the period to a comma and add "without application from such Indians, including but not limited to the creation of a trust for such Indians' property with a trustee selected by the Secretary, or the purchase by the Secretary of annuities for

6     DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

such Indians." This addition clarifies but does not change the meaning of the original language.

4. On page 6, lines 13 and 14, delete "as amended, is hereby revoked", and insert in lieu thereof "shall be revoked by the Secretary when a plan is approved by a majority of the adult Indians of the Community pursuant to subsection 2 (b) of this act."

5. On page 4, line 22, revise section 4 to read as follows:

"SEC. 4. Nothing in this act shall abrogate any water right that exists by virtue of the laws of the United States. To the extent that the laws of the State of California are not now applicable to any water right appurtenant to any lands involved herein they shall continue to be inapplicable while the water right is in Indian ownership for a period not to exceed 15 years after the conveyance pursuant to this act of an unrestricted title thereto, and thereafter the applicability of such laws shall be without prejudice to the priority of any such right not theretofore based upon State law."

This change avoids an ambiguity in the phrase "Indian water right." It also makes clear that at the end of the time specified (a matter of 15 years) the priority of any right based upon Federal law will not be prejudiced. Finally, the authority of the Attorney General to represent the Indians during the 15-year interim period in connection with water right controversies is made permissive rather than mandatory.

The expenditures contemplated by this bill for roads and training will be absorbed in the regular appropriation requests for the Bureau of Indian Affairs. The additional expenditures involved in this bill, together with those involved in the 3 similar bills before your Committee with respect to different rancherias, are estimated at approximately $222,450 for all 4 bills.

The Bureau of the Budget has advised us that there is no objection to the submission of this report to your committee.

Sincerely yours,

O. HATFIELD CHILSON,
*Acting Secretary of the Interior.*

### ANALYSIS OF H. R. 2824

Section 1 of the bill specifies the rancherias and reservations involved and directs the distribution of their assets in accordance with the provisions of the bill.

Section 2 of the bill requires the Indians involved, or the Secretary of the Interior after consultation with the Indians, to prepare a plan for distributing the assets, or for selling the assets and distributing the proceeds of sale, or for conveying the assets to a corporation designated by the group or to the members of the group as tenants in common. General notice of the plan must be given, and after the Indians affected have been given an opportunity to object the plan must be submitted to the vote of the Indians who will participate in the distribution. If a majority of those voting approve the plan, it will be carried out. No provision is made for any further action if a plan is not approved.

Attention is directed to the fact that no provision is made for preparing a membership roll for each rancheria or reservation. The preparation of such rolls would be impracticable because the groups

are not well defined. Moreover, the lands were for the most part acquired or set aside by the United States for Indians in California generally, rather than for a specific group of Indians, and the consistent practice has been to select by administrative action the individual Indians who may use the land. The bill provides for the distribution of the land, or the proceeds from the sale of the land, primarily on the basis of plans prepared or approved by these administratively selected users of the land.

Section 3 of the bill requires the Secretary of the Interior to make any surveys that are necessary to convey marketable titles, to complete the construction of any access roads that are scheduled for transfer to the State or local government, to install or rehabilitate the irrigation or domestic water systems that he and the Indians agree within a reasonable time should be completed by the United States, to cancel all reimbursable debts that are charges against the land, and to make any land exchanges that are desirable before the Federal trust is terminated.

Section 4 of the bill affirms present Indian water rights, makes inapplicable for 15 years the California law with respect to loss of water rights by nonuse if the land remains in Indian ownership, and requires the Attorney General of the United States to represent the Indians in any proceedings during that period involving their water rights.

Section 5 of the bill authorizes the disposition of Federal property on the rancherias or reservations that is not needed for the administration of Indian affairs.

Section 6 of the bill requires the distribution of all funds held by the United States in trust for the Indians of the rancherias or reservations.

Section 7 of the bill protects pending claims.

Section 8 of the bill provides for protecting the interest of minors and incompetents by guardianship proceedings or by such other means as the Secretary deems adequate, which includes the use of private trusts if advisable.

Section 9 of the bill revokes a constitution issued under the Indian Reorganization Act.

Section 10 of the bill provides for an accelerated program of education and vocational training before the assets are distributed.

Section 11 of the bill authorizes the issuance of necessary rules, regulations, and conveyancing instruments.

Section 12 of the bill authorizes necessary appropriations.

———

DEPARTMENT OF THE INTERIOR,
*Washington, D. C., April 17, 1957.*

Hon. CLAIR ENGLE,
*Chairman, Committee on Interior and Insular Affairs,*
*House of Representatives, Washington, D. C.*

DEAR MR. ENGLE: Your committee has requested a report on H. R. 2576, a bill to provide for the distribution of the land and assets of certain Indian rancherias and reservations in California, and for other purposes.

We recommend that the bill be enacted. A few minor amendments are suggested below.

39003°—58   S. Rept., 85–2, vol. 3——67

Each of the Indian groups involved has requested by formal resolution the distribution of the rancheria assets, and we believe that the Indians are ready for such action. A background statement regarding each rancheria or reservation, and an analysis of the bill, are enclosed.

A copy of the resolution from each group requesting the enactment of legislation along the lines of the bill will be furnished for committee files when hearings are held.

For several years the Congress has had under consideration various proposals to terminate Federal responsibilities for all Indian property in California. In response to House Concurrent Resolution 108, 83d Congress, this Department submitted to Congress on January 4, 1954, a proposed bill for that purpose. It was introduced as H. R. 7322 and S. 7249, and extensive hearings were held. Similar bills had been considered by the 82d Congress (H. R. 7490, H. R. 7491 and S. 3005). As was to be expected in connection with a proposal that involved so many people with differing interests (the Indian population of the State is approximately 36,000), a variety of opinions regarding the merits of the proposal were expressed.

Although the State legislature had memorialized Congress in 1951 to dispense with all restrictions on California Indians (S. J. Res. No. 29, ch. 123, California Stats., May 18, 1951), and a representative of the Governor's office had testified in favor of the bills for that purpose in the 82d Congress, when the congressional hearings were held in 1954 the State representatives asked for a delay in order that some of the details might be considered further. Since that time the State senate interim committee on California Indian affairs (created by S. Res. No. 115, Senate Journal, June 10, 1953, p. 4125) has conducted extensive investigations throughout the State and is currently preparing its recommendations. We understand that the recommendations will probably be in terms of a bill of statewide applicability, as were the bills before the 82d and 83d Congresses.

Meanwhile, plans were worked out for immediate action with selected groups in California who want an immediate termination of Federal trust responsibilities without waiting for the enactment of a bill of statewide applicability. This is the purpose of H. R. 2576. It involves 11 rancherias, approximately 455 persons, and approximately 1,288 acres of trust land.

The most densely populated rancheria in this group is Pinoleville with 107 residents. All of the other rancherias have less than 100 residents. There are no people living on the Mark West Rancheria. Upper Lake is the largest rancheria with 561 acres, and Graton is the smallest with 15 acres. Guidiville has 243 acres and the 8 remaining rancherias have less than 100 acres each.

The following amendments are suggested:

1. On page 3, line 21 to page 4, line 1, delete the first sentence of subsection 3 (b) and insert in lieu thereof "To complete any construction or improvement required to bring Indian Bureau roads serving the rancherias or reservations up to adequate standards comparable to standards for similar roads of the State or subdivision thereof."

2. On page 6, line 9, change the period to a comma and add "without application from such Indians, including but not limited to the creation of a trust for such Indians' property with a trustee selected by the Secretary, or the purchase by the Secretary of annuities for such Indians." This addition clarifies but does not change the meaning of the original language.

3. On page 6, lines 12 and 13, delete "as amended, are hereby revoked" and insert in lieu thereof "shall be revoked by the Secretary when a plan is approved by a majority of the adult Indians of the community pursuant to subsection 2 (b) of this Act."

4. On page 3, between lines 13 and 14, insert a new subsection (e) as follows:

"(e) For the purposes of this Act, the assets of the Upper Lake Rancheria shall include the one hundred and sixty acre tract set aside as a wood reserve for the Upper Lake Indians by secretarial order dated February 15, 1907."

5. On page 1, line 9, delete "and", change the period to a comma, and add "Smith River, Cache River, Alexander Valley, Hopland, and Scotts Valley," Each of these groups has asked to be included in the bill, and background statements regarding them are enclosed.

6. On page 4, line 22, revise section 4 to read as follows:

"SEC. 4. Nothing in this Act shall abrogate any water right that exists by virtue of the laws of the United States. To the extent that the laws of the State of California are not now applicable to any water right appurtenant to any lands involved herein they shall continue to be inapplicable while the water right is in Indian ownership for a period not to exceed fifteen years after the conveyance pursuant to this Act of an unrestricted title thereto, and thereafter the applicability of such laws shall be without prejudice to the priority of any such right not theretofore based upon State law."

This change avoids an ambiguity in the phrase "Indian water right." It also makes clear that at the end of the time specified (a matter of 15 years) the priority of any right based upon Federal law will not be prejudiced. Finally, the authority of the Attorney General to represent the Indians during the 15-year interim period in connection with water-right controversies is made permissive rather than mandatory.

The expenditures contemplated by this bill for roads and training will be absorbed in the regular appropriation requests for the Bureau of Indian Affairs. The additional expenditures involved in this bill, together with those involved in the three similar bills before your committee with respect to different rancherias, are estimated at approximately $222,450 for all 4 bills.

The Bureau of the Budget has advised us that there is no objection to the submission of this report to your committee.

Sincerely yours,

O. HATFIELD CHILSON,
*Acting Secretary of the Interior.*

### ANALYSIS OF H. R. 2576

Section 1 of the bill specifies the rancherias and reservations involved and directs the distribution of their assets in accordance with the provisions of the bill.

Section 2 of the bill requires the Indians involved, or the Secretary of the Interior after consultation with the Indians, to prepare a plan for distributing the assets, or for selling the assets and distributing the proceeds of sale, or for conveying the assets to a corporation designated by the group or to the members of the group as tenants in common. General notice of the plan must be given, and after the

Indians affected have been given an opportunity to object the plan must be submitted to the vote of the Indians who will participate in the distribution.  If a majority of those voting approve the plan, it will be carried out.  No provision is made for any further action if a plan is not approved.

Attention is directed to the fact that no provision is made for preparing a membership roll for each rancheria or reservation.  The preparation of such rolls would be impracticable because the groups are not well defined.  Moreover, the lands were for the most part acquired or set aside by the United States for Indians in California generally, rather than for a specific group of Indians, and the consistent practice has been to select by administrative action the individual Indians who may use the land.  The bill provides for the distribution of the land, or the proceeds from the sale of the land, primarily on the basis of plans prepared or approved by these administratively selected users of the land.

Section 3 of the bill requires the Secretary of the Interior to make any surveys that are necessary to convey marketable titles, to complete the construction of any access roads that are scheduled for transfer to the State or local government, to install or rehabilitate the irrigation or domestic water systems that he and the Indians agree within a reasonable time should be completed by the United States, to cancel all reimbursable debts that are charges against the land, and to make any land exchanges that are desirable before the Federal trust is terminated.

Section 4 of the bill affirms present Indian water rights, makes inapplicable for 15 years the California law with respect to loss of water rights by nonuse if the land remains in Indian ownership, and requires the Attorney General of the United States to represent the Indians in any proceedings during that period involving their water rights.

Section 5 of the bill authorizes the disposition of Federal property on the rancherias or reservations that is not needed for the administration of Indian affairs.

Section 6 of the bill requires the distribution of all funds held by the United States in trust for the Indians of the rancherias or reservations.

Section 7 of the bill protects pending claims.

Section 8 of the bill provides for protecting the interest of minors and incompetents by guardianship proceedings or by such other means as the Secretary deems adequate, which includes the use of private trusts if advisable.

Section 9 of the bill revokes a constitution and charter issued under the Indian Reorganization Act.

Section 10 of the bill provides for an accelerated program of education and vocational training before the assets are distributed.

Section 11 of the bill authorizes the issuance of necessary rules, regulations, and conveyancing instruments.

Section 12 of the bill authorizes necessary appropriations.

DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS,
*Washington, D. C., March 26, 1958.*

Hon. RICHARD L. NEUBERGER,
*Chairman, Indian Affairs Subcommittee, Interior and Insular
Affairs Committee, United States Senate, Washington, D. C.*

DEAR SENATOR NEUBERGER: The following California rancherias
have requested that they be included in H. R. 2824, a bill to provide
for the disposition of the land and assets of certain Indian reservations
and rancherias in California, and for other purposes: Alexander Valley,
Auburn, Big Valley, Buena Vista, Cache Creek, Chicken Ranch,
Cloverdale, Hopland, Lytton, Middletown, Mooretown, Redding, and
Scotts Valley.

The occupants of the Big Valley, Buena Vista, Cache Creek, Chicken
Ranch, Lytton and Redding Rancherias have addressed letters to
your subcommittee requesting that they be included in this legislation.
The other rancherias listed above have addressed either letters or
resolutions to the Bureau of Indian Affairs asking for inclusion.

On the 13 rancherias there are 439 people; the total acreage is
2,967. It is estimated by our Sacramento area office that the sum
of $124,350 will be needed to meet the requirements of the legislation
for these thirteen additional rancherias.

Individual background data for each rancheria was submitted to
the House Subcommittee on Indian Affairs when that group was
considering H. R. 2576, H. R. 2824, H. R. 2838 and H. R. 6364
during the first session of the 85th Congress. These four bills were
combined into H. R. 2824 and passed by the House on August 19, 1957.

Sincerely yours,

GLENN L. EMMONS, *Commissioner.*

---

DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS,
*Washington, D. C., March 26, 1958.*

Hon. RICHARD L. NEUBERGER,
*Chairman, Indian Affairs Subcommittee, Interior and Insular
Affairs Committee, United States Senate, Washington, D. C.*

DEAR SENATOR NEUBERGER: This is to request a change in section
5 (b) of H. R. 2824, now awaiting hearings before the Senate Subcom-
mittee on Indian Affairs.

The 160-acre wood reserve referred to in section 5 (b) was set aside
for the Upper Lake Indians. Subsequent to the establishment of
this wood reserve, rancherias were established for the Upper Lake
Indians at two locations: Upper Lake and Robinson. The Indians
on both of these rancherias have used the wood reserve, and each
rancheria asserts an interest in the land. We think that their mutual
interest should be recognized.

We, therefore, recommend that section 5 (b) be changed to read as
follows:

"(b) For the purposes of this act the assets of the Upper Lake
Rancheria and the Robinson Rancheria shall include the 160-acre
tract set aside as a wood reserve for the Upper Lake Indians by
Secretarial order dated February 15, 1907."

We wish to thank your subcommittee for giving this request consideration.

Sincerely yours,

GLENN L. EMMONS, *Commissioner.*

COMMITTEE NOTE.—The Bureau of Indian Affairs has submitted the following background data on each of the Indian rancherias enumerated in H. R. 2824, as amended:

### ALEXANDER VALLEY

*Background data on the Alexander Valley rancheria, Sonoma County*

In 1909, 24 acres were purchased for the Wappo Indians in Alexander Valley. The acreage was increased by 30 acres in 1913, the 2 parcels costing $3,300. Funds appropriated by the act of June 21, 1906 (31 Stat. 325–333), and the act of April 30, 1908 (35 Stat. 70–76), were used to make the purchases.

When the land was bought in 1909–13, there were 74 Alexander Valley residents; by 1950 the number had dropped to 49, and today 1 family of 10 members are the only residents. James R. Adams, with his non-Indian wife and their 8 children, make their home on the rancheria. He is 68 years of age and five of his children are teenagers. They attend public school. The family has a subsistence garden, but Mr. Adams depends on outside labor to support them.

A county road runs adjacent to the rancheria land. Domestic water was developed some years ago and there is a lien against the rancheria in the amount of $1,528 because of this work. Twenty-nine of the rancheria's 54 acres are unassigned. This unassigned land has a potential for grazing use, but is not used for this purpose by the present occupants. There are no Government or community buildings at Alexander Valley and no cemetery.

The only service rendered by the Bureau is in connection with the trust status of the land. The Adams family receives all its social services as residents of California from the State and from Sonoma County.

On January 11, 1957, James Adams and his wife signed a letter to Congressman Scudder requesting that Alexander Valley Rancheria be included in legislation designed to give them fee title to their assignment.

The local Bureau of Indian Affairs' officials estimated the following sums would be needed to effect transfer of title:

| | |
|---|---:|
| Land surveys | $500 |
| Legal assistance | 100 |
| Appraisals of property | 200 |
| Programing and planning | 600 |
| Total | 1,400 |

### AUBURN

*Background data on the Auburn Rancheria, Placer County*

*History.*—The residents of this rancheria belong to the Maidu Tribe of Indians. They are classified as a separate linguistic stock and from earliest times have lived where they are now, in northeastern

California. These Indians are mostly of mixed blood and many who were enumerated as Indians in the 1910 census were enumerated as whites in the 1930 census. Their rancheria was established in 1910 when 20 acres of land were purchased for $400 with funds appropriated by the act of June 21, 1906 (31 Stat. 325–333), and the act of April 30, 1908 (35 Stat., 70–76); which made funds available "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *." An additional 20 acres were purchased in 1953 for $3,000, which completed the present rancheria. The rancheria is not organized under the Indian Reorganization Act.

*People.*—When the rancheria was established by purchase in 1910, the land was bought for 25 Indians belonging to this group. An enumeration in 1913 showed that 50 people were then living on the rancheria, and the number presently living there is 77. There are 27 children of school age who are attending public schools. Each of the family groups has an informally assigned acreage for a total of 39 acres. Nine of the people living on the rancheria are 65 years of age or older. The population uses the rancheria primarily for home sites. The group does not have a current approved roll.

*Land.*—The Auburn Rancheria contains only 40 acres of land, the title to which is in the name of the United States Government in trust for the Indians in California. In recent years a domestic water system was completed for the occupants of the rancheria, and at the present time there is a lien against the land in the amount of $11,229.38 because of this improvement. Access roads were also built in recent years and are now a part of the Placer County road system. The assignments on the rancheria are of an informal nature, although the occupants have a definite understanding as to which piece of land is to be used by each of the occupants. The community uses its water system as a community enterprise, and the feeling is that this facility should continue to be owned in common. The same feeling also applies to the property used for church purposes.

*Sources of individual income.*—The main source of income for this group is from migratory, seasonal, farm labor. Those who qualify receive social-security aids and categorical welfare assistance from Placer County with no distinction being made because they are Indians.

*Bureau services.*—The Bureau renders virtually no regular services to the group. Its responsibility is primarily with the 40 acres of land being held in trust status. Adequate roads have been built in the past and have been turned over to the county for administration. There is a Johnson O'Malley educational contract with the State of California and the Auburn School District receives funds through this contract because of the Indian children in the public school.

*Attitude toward withdrawal of Federal trusteeship.*—The group on the rancheria passed a resolution on September 26, 1955, requesting that the present assignees be given fee title to the individual tracts of land they are using. They requested at that time that a survey be made in order that each assignee might have a legal description of his assignment. They also requested that the lien because of the water system in the amount of $11,229.38 be canceled. They asked assistance in the formulation of a legal entity under California laws to take title to and manage their community property.

14    DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

*Special problems in connection with termination of Federal relationships.*—As of September 1955, it was estimated that the following funds would be necessary to carry out this request:

| | |
|---|---|
| Land surveys | $2,000 |
| Legal assistance | 1,500 |
| Appraisal of property | 400 |
| Programing and planning | 2,000 |
| Total | 5,900 |

BIG SANDY

*Background data on the Big Sandy Rancheria, Fresno County*

*History.*—The people living on this rancheria belong to the Mono Tribe of Indians.  The early habitat of the Mono was in Inyo County in western California and neighboring counties in Neavda, a little to the west of the location of the rancheria.  In recent years the tribe has been identified with the Paiutes and were counted with that group in the 1930 census.  The Big Sandy Rancheria (Auberry) was established in 1909 when 280 acres were purchased for $2,800 with funds appropriated by the act of June 21, 1906 (31 Stat. 325–333), and the act of April 30, 1908 (35 Stat. 70–76), which made funds available "to purchase for the use of the Indians of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *." The people of this rancheria are not organized under the Indian Reorganization Act.

*People.*—In 1909 the rancheria was purchased for the use of 114 people.  A census in 1933 enumerated 129 people living here, but at present the population is 54.  Many Indians who are considered members of this group moved away during the war and have not returned. This group does not have a current approved roll.

*Lands.*—Title to the 280 acres comprising this rancheria is in the name of the United States in trust for the Indians in California. The land is generally of poor quality which accounts for the fact that it is used primarily for homesites.  The homesites are scattered throughout a plot of approximately 80 acres.  The remaining land is steep slopes covered with brush and scrub trees.  There is a domestic water system pipeline to the homesites, but it is in bad repair.  The Government owns two buildings on the rancheria, a former school house, and a former teacherage, which are now being used by the Indians as residences.  There is a question as to whether the cemetery is actually located on these trust lands.  The access roads do not extend to all parts of the rancheria.

*Sources of income.*—The income of this group is derived primarily from lumber work.  The workers must leave the rancheria to obtain this employment.  The wages are good and those who follow this trade can adequately support themselves.  No distinction is made by the county between these people and other citizens.  Those who qualify are given social services and other welfare benefits.

*Bureau services.*—The only service rendered by the Bureau is in connection with the trust status of the 280 acres.  The children of school age attend public school in Auberry, which is about 2 miles from the rancheria.  The local school district does not receive additional funds under the Johnson O'Malley Act between the Bureau and the State of California.  The water system was put in by the Bureau

in 1938, but is now in a bad state of repair. There is a lien of $225.75 against the land because of this improvement.

*Attitude toward withdrawal of Federal trusteeship.*—The group on this rancheria passed a resolution on December 7, 1953, requesting that a fee patent be issued to each resident of the Big Sandy Rancheria for their share of the rancheria property.

*Special problems in connection with termination of Federal trusteeship.*—They ask that a road be built at Government expense to the isolated part of their rancheria; that the domestic water system be repaired and enlarged; that the Government buildings be given to the Indians who are now using them as homes; and that, if a survey indicates that their cemetery is not on trust lands, it be acquired to be held in common. As of August 1955, it was estimated that the amount needed to carry out their requests would be as follows:

| | |
|---|---:|
| Roads (1.2 miles) | $17,000 |
| Land survey | 1,700 |
| Domestic water system | 8,000 |
| Assistance to establish legal entity in conformance with California State laws | 1,000 |
| Appraisal of property | 700 |
| Programing and planning | 2,000 |
| **Total** | **30,400** |

## BIG VALLEY

*Background data on the Big Valley Rancheria, Lake County*

*History.*—The Big Valley Rancheria was purchased on September 7, 1911, for the 92 Pomo Indians who were then living in that area. The original cost for the 102 acres comprising the rancheria was $12,000. The land is located on the west shore of Clear Lake in Lake County, Calif. It is about 4 miles south of Lakeport and 3 miles from Finley. Sixteen small homesites were laid out along the south end of the rancheria farthest from the lake shore. The rancheria is organized under the Indian Reorganization Act with a charter ratified on October 19, 1941. The group, however, does not have an approved roll.

*People.*—Twenty-four families live in 21 homes on the rancheria and the total population is 104, of whom half are adults. This group of Pomo Indians is well integrated into the surrounding agricultural economy of the State. They are skilled in the techniques and management necessary for the maintenance of the orchards that flourish in that area. Children of school age attend public school.

*Land.*—The land, considered suitable for agriculture, is divided into 16 assignments; 12 of 4.2 acres, 2 of 6 acres and 2 of 6.41 acres. The balance of the 102 acres lies between the 10-foot level and the 6-foot level of the lake. The rancheria is served by a recently constructed road (1956). A water system was also installed on the rancheria within the past year which needs some additional work to extend to other parts of the rancheria. The group living at Big Valley borrowed $1,500 from the Government in 1942 for orchard development. This loan has been repaid.

*Sources of income.*—Only about 2.5 percent of the total income of this group is derived from the produce of the rancheria. More than 70 percent of the income is in earned wages from seasonal agricultural work in the area.

16     DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

*Attitude toward withdrawal of Federal trusteeship.*—The tribal council, in a letter dated April 5, 1957, to Congressman Scudder transmitting a resolution passed on April 2, requested that the Big Valley Rancheria be included in legislation to terminate Federal trusteeship.

*Estimated cost to terminate Federal trusteeship.*—

| | |
|---|---|
| Land survey | $1,500 |
| Water system (extended) | 3,000 |
| Legal assistance | 1,000 |
| Property appraisals | 1,200 |
| Programing and planning | 3,000 |
| **Total** | **9,700** |

### BLUE LAKE

*Background data on the Blue Lake Rancheria, Humboldt County*

*History.*—The residents of the rancheria belong to the Wiyot Tribe of California Indians, and are generally known as the Humboldt Bay Indians. As far as is known, they have always lived on the northern California coast in the vicinity of Humboldt Bay. At the present time, there are very few fullbloods among the group. The Blue Lake Rancheria was established in 1908 when a 26-acre tract was purchased for $1,500 with funds appropriated by the act of June 21, 1906 (31 Stat. 325–333), and the act of April 30, 1908 (35 Stat. 70–76); which made available funds "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State. * * *" The Indians are not organized under the Indian Reorganization Act.

*People.*—When the rancheria was established by purchase in 1908, there were 45 Indians in the group. By 1933 this number had increased to 70, but at the present time only 27 Indians are living on the rancheria. Of this group, 14 are minors and 3 are over 65 years of age. All of the children attend public school. The Indians use the rancheria primarily for homesites. The group does not have a current approved roll.

*Land.*—The 26 acres of the Blue Lake Rancheria are held in trust by the United States Government for the Indians in California. The domestic water for the group living here is obtained from the city of Blue Lake. The roads on the rancheria are maintained by Humboldt County. The lower end of the rancheria is subject to occasional floods by the Mad River. There are five informal assignments to the lands. The quality of the land is such that it can be used only for homesites, and there is very little subsistence gardening.

*Sources of income.*—The principal source of income for the group is from seasonal farmwork. Those who qualify receive social security aids and categorical welfare assistance from Humboldt County with no distinction being made because they are Indians.

*Bureau services.*—The only service that the Bureau renders the group is in connection with the trust status of the 26 acres of land. There is a Johnson-O'Malley educational contract with the State of California, and the Blue Lake School District receives funds under this contract because of the Indian children attending its public school. For the fiscal year 1958, the Bureau has an item of $11,000 on its budget for roads on the rancheria.

*Attitude toward termination of Federal trusteeship.*—The Indians on the Blue Lake Rancheria passed a resolution on December 15, 1955, requesting that the residents of this rancheria be given an unencumbered fee patent to the rancheria lands. They request that their rancheria be surveyed in order that each assignee may have a legal description of his assignment.

*Special problems in connection with the termination of Federal relationships.*—As of December 1955 the estimated funds necessary to carry out the wishes of the group were—

| | |
|---|---:|
| Domestic water system | $2,000 |
| Land surveys | 1,000 |
| Property appraisals | 400 |
| Soil and moisture conservation | 2,000 |
| Assistance to set up legal entity in conformance with California laws | 500 |
| Programing and planning | 1,500 |
| Total | 7,400 |

### BUENA VISTA

*Background data on the Buena Vista Rancheria, Amador County*

*History.*—The people on the Buena Vista Rancheria are of Miwok stock. The tribe is largely of mixed blood and the people of this group are fast losing their distinction as Indians. They have always made their home in central California. The rancheria was established by purchase in 1926, and is in their original homeland. The acreage of this rancheria was acquired at a cost of $3,000 with funds appropriated by the act of August 1, 1914 (38 Stat. 582–589).

*People.*—There were 20 people on the rancheria when it was purchased in 1926, but at the present time there are only 2 families, composed of 6 people. The group does not have a current approved roll.

*Land.*—Part of the rancheria land is suitable for agriculture. At one time an exploration was made for coal, without apparent success. The families living on the rancheria have made all of their own improvements. This parcel is located near the town of Ione, Calif. The whole rancheria is composed of 67½ acres. There is an Indian cemetery on the land. A recent survey was made along one side of the rancheria to settle a dispute about the lines.

*Sources of income.*—The two families living on the Buena Vista Rancheria make their living from farming. They supplement their farm income with seasonal work.

*Bureau services.*—Bureau services are rendered only in connection with trust status of the lands.

*Attitude toward withdrawal of Federal trusteeship.*—On January 5, 1956, Mr. Lewey Oliver and Mr. Enos Oliver, the two assignees on the rancheria, requested that they be given fee patents to the rancheria.

*Special problems in connection with withdrawal of Federal relationships.*—In October of 1955, it was estimated that the following items were needed to bring about a transfer of the property:

| | |
|---|---:|
| Domestic water system | $1,500 |
| Appraisal of property | 200 |
| Soil and moisture conservation | 1,800 |
| Land surveys | 1,000 |
| Programing and planning | 200 |
| Total | 4,700 |

18    DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

## CACHE CREEK

*Background data on the Cache Creek Rancheria, Lake County*

*History.*—The rancheria was purchased in 1918 with funds appropriated by the act of August 1, 1914 (38 Stat., 582–589), at a cost of $835. The people living here belong to the Pomo Tribe and the rancheria is located in their traditional homeland. The group is not organized under the Indian Reorganization Act.

*People.*—There is only one assignee on the rancheria; a Mr. Charlie MacKay, his wife, and son. When the rancheria was purchased in 1918, there were 32 people here, but by 1933 the number had dwindled to 12. Mr. MacKay works away from the rancheria, but maintains his residence on the trust land.

*Land.*—The rancheria contains 160 acres. It is woodland and grazing land, and has no potential for agricultural purposes or cultivation. The area is adequately served by existing county roads.

*Sources of income.*—Mr. MacKay, sole assignee, is regularly employed by the Bradley Mining Co., Clearlake Oaks, Calif.

*Bureau services.*—The Bureau performs no services for the rancheria. Its primary concern is with the trust status of the land.

*Attitude toward termination of Federal trusteeship.*—On December 5, 1955, Mr. MacKay, Mrs. MacKay, and their son, Marshall, asked that they be given fee title without encumbrance to the land.

*Special problems in connection with the termination of Federal relationships.*—It was estimated on December 5, 1955, that it would cost $1,500 to make the transfer.

| | |
|---|---:|
| Appraisal of property | $200 |
| Soil and moisture conservation | 1,000 |
| Programing and planning | 300 |
| Total | 1,500 |

## CHICKEN RANCH

*Background data on the Chicken Ranch Rancheria, Tuolumne County*

*History.*—The people living on this rancheria belong to the Miwok Tribe. The tribe is largely of mixed blood, and the people of this group are fast losing their distinction as Indians. They have always lived in central California. The rancheria was established for them in 1910 and is in their traditional homeland. It was purchased with funds appropriated by the acts of June 21, 1906 (31 Stat. 325–333), and that of April 30, 1908 (35 Stat. 70–76), "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *"

*People.*—There are 18 people in 5 family groups using this land at the present time. These five families occupy homesites under an informal assignment arrangement. The fathers of two of the families are non-Indians.

*Land.*—The 40-acre tract is used primarily for rural homesites. The land is of poor quality. The people living here have a domestic water system which is in urgent need of repairs. A good road would make the homesites more accessible. The cemetery belonging to this group is not located on trust land.

*Sources of income.*—The seven wage earners earn their livelihood from miscellaneous wage work away from the rancheria. Those who

qualify receive social security aids from Tuolumne County with no distinction being made because they are Indians.

*Bureau services.*—Bureau services are rendered only in connection with the trust status of the land.

*Attitude toward termination of Federal trusteeship.*—On February 13, 1956, the group on this rancheria passed a resolution requesting that fee title to the rancheria be transferred to the assignees. They wish to form a legal entity under the laws of the State of California to take title to the community water system.

*Special problems in connection with termination of Federal trusteeship.*— The Indians on the rancheria have asked that the following work be done before they are given fee title to their land: Estimated costs are:

| | |
|---|---:|
| 1. Land survey | $2, 000 |
| 2. Domestic water system improvement | 4, 000 |
| 3. Establish water rights | 2, 000 |
| 4. Assistance to form a legal entity | 500 |
| 5. Appraisal of property | 500 |
| 6. Programing and planning | 2, 000 |
| 7. Roads | 12, 000 |
| Total | 23, 000 |

CHICO

*Background data on the Chico Rancheria, Butte County*

*History.*—As far back as 1870, the ancestors of the people now living on this rancheria were given permission to live on the land by Gen. John Bidwell, the owner. Upon his death in 1919, his widow, Mrs. Ann E. Bidwell, received the land. Upon the death of Mrs. Bidwell, the land was bequeathed by her to the Board of Home Missions of the Presbyterian Church in trust for the Indians of the Me-Choop-da Indian Village. The Board of Home Missions and Mrs. Bidwell's estate, by deeds dated February 16, 1939, and January 7, 1939, conveyed the land to the United States of America in trust for the Indians of the Me-Choop-da Indian Village, and its assignees. The rancheria consists of 25 acres.

*People.*—At the present time 26 people are living on the Chico Rancheria, and 37 members of this group live elsewhere in the vicinity. Of those who live on the rancheria, 3 are over 65 years of age and 3 are of school age. In 1934, there were 24 adults and 30 children who made their homes on the land. This group does not have an approved current roll.

*Land.*—The 25 acres are located on the outskirts of the town of Chico, adjacent to the lands of the Chico State College. The homesites are connected with town water and sewerage systems. There are two town streets, one on the north edge of the property and the other bisecting it. An additional access road is needed. The Indian cemetery is located on these lands.

*Sources of income.*—One of the family heads conducts the Arrowhead Indian Herb Co. and the others work regularly in the area. The steady income of this group is reflected in the general good condition of their homes. These people mingle freely with the other people of the community. They have never received any social services from the Bureau of Indian Affairs because of their status as Indians.

*Bureau services.*—The Bureau renders services only in connection with the trust status of the land.  In the 1958 budget there is an item of $10,000 for road construction on the land.

*Attitude toward withdrawal of Federal trusteeship.*—At a general meeting of the people of this rancheria on December 28, 1955, they voted to request the United States Government to give them fee patent to their rancheria lands.  They also requested that the parcels be surveyed in order that each assignee may have legal descriptions of his lot, and further that assistance be given to set up an entity to take title to and manage whatever land will be held in common.

*Estimated cost to effect withdrawal of Federal trusteeship.*—(Estimate made by local Bureau of Indian Affairs' officials in December of 1955):

| | |
|---|---:|
| Land survey | $1,100 |
| Legal assistance | 3,000 |
| Land appraisals | 1,300 |
| Programing and planning | 3,000 |
| Total | 8,400 |

## CLOVERDALE

*Background data on the Cloverdale Rancheria, Sonoma County*

*History.*—This rancheria was established by the purchase of 27½ acres of land in 1917 with funds appropriated by the act of August 1, 1914 (38 Stat. 582–589), "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State.  * * *"  The original cost was $2,500.  The people living on the rancheria belong to the Pomo Tribe, and the Cloverdale Rancheria was established in the traditional homeland of these Indians.  The group is not organized under the Indian Reorganization Act, but there is a council with elected officers which speaks for the group.

*People.*—The number of Indians on this piece of land when it was purchased in 1917 is not shown on the records, but, in 1933, 19 people were listed as living on the land.  The present population is 25.  The 5 families, each with 1 wage earner, making up the resident population, have informal assignments to one or more of the parcels into which the land is divided.  One of the assignees is over 65 years of age, and there are 6 children of school age.  This group does not have a current approved roll.

*Land.*—Cloverdale Rancheria is a long, narrow strip of land, 377 by 3,081 feet.  A domestic water system was recently installed on the land, running to each of the homesites.  An $11,834.33 lien was placed against the land because of this improvement.  Federal Highway No. 101 runs along the western narrow edge of the parcel and the Northwestern Pacific Railroad right-of-way uses the land on the other end of this strip.  There are small orchards and vineyards cultivated by the assignees, and the land is fairly productive.  A new road will be built along one of the long sides of the strip by the Bureau of Indian Affairs.  The 5 assignees are assigned all but 2 acres of the 25-acre plot.

*Sources of income.*—The principal income of the group is derived from their orchards and vineyards, and other produce raised on the land.  They supplement this income with wagework in the vicinity.

Their average income compares favorably with the average annual income of this community.

*Bureau services.*—The Bureau proposes to improve the present road along the long side of the strip. The amount of $9,000 is set up in the 1958 budget for this purpose. A recently installed domestic water system was financed from Bureau appropriations. There is a Johnson-O'Malley contract payment to Sonoma County for the Indian children attending public schools. The Bureau performs other services necessary because the land is in trust, but provides no direct service to the people living there. They receive social services from the county and State on the same basis as other citizens.

*Attitude toward withdrawal of Federal trusteeship.*—On September 27, 1955, the assignees on the rancheria passed a resolution requesting that the United States transfer to them the fee title to the tract. They ask that a survey be made in order that each allottee may receive a legal description of his property. They requested that the lien based on the installation of the domestic water system be canceled.

*Estimated cost to effect withdrawal of Federal trusteeship.*—The following amounts were estimated to be necessary as of September 27, 1955:

| | |
|---|---:|
| Land survey | $1,000 |
| Legal assistance for forming an entity to manage community property | 1,000 |
| Appraisal of property | 200 |
| Soil and moisture conservation | 1,000 |
| Programing and planning | 1,500 |
| Total | 4,700 |

## COLD SPRINGS

*Background data on the Cold Springs Rancheria, Fresno County*

*History.*—By Executive Order No. 2075 of November 10, 1914, the President excluded 160 acres from the Sierra National Forest for the Cold Springs Band of Indians living in the area. The order did not mention the number of Indians there, but in 1933 there were 90. Today there are 48. These people belong to the Mono Tribe and have habitually made their home in the area where the rancheria was established. In recent years, this group has been identified with the Piautes and they were counted with that group in the 1930 census. These people are not organized under the Indian Reorganization Act, but they have an informal council with recognized officers.

*People.*—The people are occupying this land under 13 informal assignments made with the consent of the group. The rancheria is divided into two 80-acre tracts. One family lives on one of these tracts and the other people make their home on the other 80-acre parcel. They use the land primarily for homesites. Four of the people who make their home here are over 65 years of age, and there are 16 children of school age. There are 13 wage earners among these people. This group does not have a current approved roll.

*Land.*—The two 80-acre parcels are not contiguous. There are steep slopes on both of the parcels, with an elevation rise to 2,041 feet. These pieces of land are isolated from main avenues of traffic, but there is a fairly good road to the nearest town, Tallhouse, some 7 miles distant. The land is not suitable for cultivated agriculture, but it has some grazing potential, and it is used for that purpose, to a limited extent. Each of the parcels has a source of water. In one

location there is a spring, and on the other location there is a dug well. Tungsten may be present on one of the plots, and a mining lease has been issued to some outsiders interested in making explorations. No Indian cemetery is on the rancheria.

*Sources of income.*—One of the assignees has a herd of Hereford cattle and supports his family from income from this herd. Most of the workers, however, earn their livelihood by seasonal work off the rancheria, usually in the agricultural pursuits. Many of the homes are in a bad state of repair, since the average yearly income of the wage earner is below what is considered adequate.

*Bureau services.*—Services extended by the Bureau are limited to the trust status of the land; no social services are performed by the Bureau for the people living here. The Bureau leased part of the land for tungsten explorations, and maintains and IIM account ($60 in 1955) for the group from these rentals. A water system was installed in 1938. There is a lien in the amount of $331.56 against the land because of this improvement. All the children attend public school.

*Attitude toward withdrawal of Federal trusteeship.*—On December 14, 1955, at a general meeting of the assignees, a resolution was passed requesting that the Government give them fee patents to their holdings. They asked that an internal survey be made in order that each assignee would have a legal description of his property.

*Estimated cost to effect withdrawal of Federal trusteeship.*—In December of 1955, it was estimated that the following amounts would be necessary to carry out the wishes of this group:

| | |
|---|---:|
| Land surveys | $1,100 |
| Improvement of domestic water system | 2,000 |
| Legal assistance | 500 |
| Property appraisals | 400 |
| Programing and planning | 1,500 |
| **Total** | 5,500 |

### ELK VALLEY

*Background data on the Elk Valley Rancheria (Crescent City), Del Norte County*

*History.*—The 100-acre rancheria was purchased in 1909 with funds made available under the acts of June 21, 1906, and April 30, 1908, "to purchase for the use of the Indians of the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State. * * *" The cost was $3,500. There were 50 people living on the land when the rancheria was purchased.

The tribal group belongs to the Smith River Tribe and the Athapaskan group, which has always made its home in the area where the rancheria is now located. These people have an informal tribal organization with elected officers, but they are not organized under the Indian Reorganization Act.

*People.*—In 1933, there were as few as 10 people on the rancheria. Today, 61 people make their home on the land. The total acreage is assigned to 24 assignees, and none of it is used as community property. These people do not, ordinarily, function as an Indian community. Each assignee uses his plot of ground as a homesite. The water system is not communal. Nine of the wage earners living on the

rancheria are non-Indians. Nine of the assignees are not living on their assignments, and two plots have been rented to non-Indians. The group does not have a current approved roll.

*Land.*—The rancheria is surveyed into 20 plots, about 5 acres each. The survey does not seem satisfactory for title purposes. There is an improved county road on two sides of the rancheria. The land is, generally, of poor quality. Except for homesite clearings, it is covered with scattered brush growth.

*Sources of income.*—The wage earners work away from the rancheria in the lumber industry. This is practically the only type of work available in the area, and those who want other employment must go elsewhere for it. Those who work in the lumber industry make wages adequate to support their families, since none of them have requested categorical aids from the county. Five of the people here receive old-age assistance.

*Bureau services.*—Services are extended by the Bureau because of the trust status of the land; no social services are performed by the Bureau for the people living on the rancheria. Del Norte County receives payments under the Johnson-O'Malley educational contract because Indian pupils are attending its public schools. The county furnishes bus service. A road costing $19,700 was completed by the Bureau within the past 2 years, which brings the road system on the rancheria up to county standards.

*Attitudes toward withdrawal of Government trusteeship.*—On August 31, 1955, at a general council meeting, the group voted (21 of the 24 assignees were present) to request the Government to issue to them fee title to their assignments. They asked that water be made available to each of the plots, and that an internal survey be made in order that each assignee may have the legal description of his land. It was further requested that the lien of $765.07 against the rancheria be canceled.

*Estimated cost to effect withdrawal of Federal trusteeship.*—On August 31, 1955, it was estimated that the following funds must be expended to meet the needs of the Indians:

| | |
|---|---:|
| Land survey | $1, 000 |
| Domestic water supply | 12, 000 |
| Legal assistance | 500 |
| Property appraisals | 400 |
| Programing and planning | 1, 500 |
| Total | 15, 400 |

## GUIDIVILLE

*Background data on the Guidiville Rancheria, Mendocino County*

*History.*—Guidiville Rancheria was established in 1909 when a 50-acre tract was purchased for $2,000. The plot was enlarged by the purchase of another 34 acres in 1912 for $2,100. Executive order of 1912 added further to the lands. The present acreage is 243. The people living here belong to the Pomo Tribe. This general area is the traditional homeland of these Indians, and the rancheria was established where they have always lived. The group living here now has an informal tribal organization with elected officers. They are not formally organized.

24   DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

*People.*—There were 92 people on the rancheria when it was established. By 1933, the number had dropped to 38, and today 32 people make their home on the land. They consist of 7 family groups with 11 wage earners. They are using the land for homesites, with limited agricultural enterprises. Four of the residents are over 65. The group does not have a current approved roll.

*Land.*—Thirty-eight acres of the rancheria are used for homesites and limited agricultural enterprises by 11 assignees. They have informal assignments to the plots that they are using. These individual assignments have the approval of the group. The remaining 213 acres are leased to a non-Indian. There is a domestic water system built several years ago with a lien of $1,867.22 against the land because of this improvement. An access road is being built during the present fiscal year which will meet the standards set by the county.

*Sources of income.*—Several of the residents have vineyards and make part of their livelihood by this means. They augment this income with wages from seasonal agricultural work and other miscellaneous type of rural employment. If they qualify for public assistance, it is granted to them with no distinctions being made because they are Indians.

*Bureau services.*—An appropriation of $40,176 was made to build an adequate road which will be finished in 1957. Payments are made to the school district under the Johnson-O'Malley contract for the Indian children attending public school. The Bureau renders services in connection with leasing the grazing land and at the present time an IIM account ($300) is maintained by the Bureau from funds derived from this leasing.

*Attitudes toward withdrawal of Federal trusteeship.*—On October 20, 1955, the residents of the rancheria passed a resolution requesting that the United States Government transfer to the individuals the fee title to their individual tracts, and that the mountain and grazing land be patented to the group. They further ask that a survey be made so that each assignee will receive a legal description of his property, that the lien against the land be canceled, and that a legal entity be established to accept and maintain the land that will be leased.

*Estimated cost to effect withdrawal of Federal trusteeship.*—In December of 1955, the local Bureau of Indian Affairs' officials estimated that the following sums would be necessary to effect withdrawal:

| | |
|---|---:|
| Land survey | $3,000 |
| Assistant to form a legal entity | 1,500 |
| Property appraisals | 500 |
| Programing and planning | 2,500 |
| Total | 7,500 |

## GRATON

*Background data on the Graton Rancheria (Sabastapol), Sonoma County*

*History.*—The land of the Graton Rancheria was purchased for $2,100 in 1915 with funds appropriated by the act of August 1, 1914 (38 Stat. 582–589), "to purchase for the use of the Indians of the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *." The Pomo Indians who live here are in their traditional homeland. The group is not organized, either formally or informally.

*People.*—There were 76 Indians of the Pomo Tribe living on the land when the rancheria was established. A check in 1933 revealed no Indians to be living on the land, but at the present time there are 7 people making their home here. They are all adults except for one 10-year-old girl. Four people have informal assignments; 2 of them are over 65. They use the land only as a rural homesite. The group does not have a current approved roll.

*Land.*—The rancheria contains only 15.45 acres. The land is steep timberland and there are probably a few merchantable trees on the tract. It is adequately served by a paved road. There are no liens against the rancheria because of any improvements.

*Sources of income.*—The three wage earners work in the lumber industry of the area. They do not augment their income with subsistence gardening. Their income is only adequate to maintain essential homesites with no modern improvements.

*Bureau services.*—The Bureau renders no services to the group as people; it is only responsible for the trust status of the land.

*Attitude toward withdrawal of Federal trusteeship.*—The people who have assignments to this 15-acre tract asked on December 13, 1955, that they be given fee title to the parcel and that it be surveyed so that each assignee might have legal description to his assignment.

*Estimated cost of withdrawal of Federal trusteeship.*—It was estimated in December of 1955 that the following funds would be necessary to effect the transfer of title:

| | |
|---|---:|
| Land survey | $1,000 |
| Legal assistance | 1,000 |
| Property appraisals | 500 |
| Programing and planning | 1,500 |
| | |
| Total | 4,000 |

## GREENVILLE

*Background data on the Greenville Rancheria, Plumas County*

*History.*—On April 12, 1897, 40 acres were acquired by the Government to be known as the site for the Greenville Indian Industrial School. An Executive order of November 26, 1902, added 160 acres, with 75 additional acres being acquired on August 16, 1916, for a total "reservation" of 275 acres. The Maidu and other Indians living in this general area have used this land, and the Government buildings, since the school was discontinued in the early 1920's. It has thus become a "rancheria" by reason of occupancy since it was not originally purchased for "landless Indians."

*People.*—There are approximately 35 Indians on the rancheria. There is no formal organization, nor is there a tribal membership roll. These people have been independent of direct Bureau services for years, and are accepted as members of the extended community.

*Land.*—The land is located adjacent to a paved road between the towns of Taylorville and Greenville. It is used primarily for homesites and internal roads are needed for all-weather access to the various family plots. The agricultural land that is not used by the Indians is leased with the proceeds accruing to the Indians. The water system serving the rancheria has been in use many years. It has become outdated and extensive repairs are necessary. There is

a reimbursable charge of $1,345 against the land for previous repairs made to this system.

*Attitude toward withdrawal of Federal trusteeship.*—The majority of the Indians using this land have requested that they be given title to the rancheria. They have made their request to the Senate committee considering the "rancheria bill" and the Bureau would like to see the benefits of this legislation applied to the Greenville Rancheria.

*Estimated costs for withdrawal of Federal supervision.*—The Sacramento area office estimates that the following amounts will be needed to improve the rancheria and to effect transfer of title to the Indians:

| | |
|---|---:|
| Roads | $20,000 |
| Water system | 12,000 |
| Land surveys | 1,500 |
| Appraisals | 600 |
| Legal assistance | 1,000 |
| Soil and moisture conservation | 3,260 |
| Program planning | 2,000 |
|     Total | 40,360 |

## HOPLAND

*Background data on the Hopland Rancheria, Mendocino County*

*History.*—In 1908, 630 acres were purchased for $5,750 to form the nucleus for the rancheria. Lands were added with funds appropriated by the act of August 1, 1914 (38 Stat. 582–589), "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *" The present acreage is 2,072, which makes this one of the larger rancherias. The Indians who live here belong to the Pomo Tribe and their rancheria was set up in their traditional homeland. The land was originally purchased for 120 Indians. That same number was listed as using the land in 1933. Today, there are 75 people living on the land. The band has a written land code approved by the Secretary in 1943, which is administered by a board of 5 trustees who serve staggered 3-year terms. A meeting of the band is not considered official unless 10 or more members are present.

*People.*—The latest membership roll for the group was prepared in 1940. Approximately 60 members (children) have been added to the membership since 1934. A total of 17 have been stricken from the rolls because of death since that time. Nearly all of the members of the rancheria are of the Catholic faith and frequently attend church in the nearby town where the congregation is primarily non-Indian. The Indian children attend public school and ride the public school bus daily with non-Indian children from the vicinity of the rancheria. The children usually continue on through high school and then leave the rancheria when they graduate, to establish themselves in all walks of life among non-Indians. All members of the rancheria speak English, and their living habits cannot be distinguished from their non-Indian neighbors.

*Land.*—The rancheria is located approximately 5 miles from the nearest town (Hopland). One thousand nine hundred and forty-two acres of rangeland are used for grazing purposes. There is a tribal herd of between 35 and 45 cattle. There are 38 assignments, all of which are of an informal nature. All of the agricultural land (about

300 acres) is assigned to heads of families. A total of 128 acres of the land is planted in grapes. There is a discrepancy between the number of acres that the tribal group assumes belongs to the rancheria, and the figures shown in the local office of the Bureau of Indian Affairs, which will probably be cleared up by a survey. The land is served with a recently built access road (costing $43,100) and is adjacent to a well-kept county road. The rancheria is not served by a domestic water system. The Government owns an old school building and a teacherage on the rancheria, which are being used by members of the tribe. The tribe has its own community building and there is a cemetery on the land.

*Sources of income.*—The sources of income for the heads of the families are extremely varied and include the sale of grapes from their assignments, miscellaneous wage work (primarily agricultural) and lumbering or subsistence gardening. The people as a group have an income from the tribal herd. The general employment opportunities throughout the surrounding area have increased considerably in the past 10 years, and there is always work available for those who need it. The group lives in good substantial homes which reflect their high income.

*Bureau services.*—The principal service performed by the Bureau is in connection with the trust status of the land. At one time the group had a credit loan from the Bureau, but it has been fully repaid. The group maintains its own bank account in the local bank without individual Indian money services from the Bureau. A major expenditure was made within recent years to bring the roads on the rancheria up to county standards. The school district in the town of Hopland receives payments under the Johnson-O'Malley educational contract for the Indian children attending their public schools. The Bureau extends no social services to the group.

*Attitude toward withdrawal of Federal trusteeship.*—Under date of September 28, 1955, the group voted through its board of trustees to request the United States Government to transfer to them as individuals the fee title to their shares of the rancheria, and that the mountain land be patented to the group. They asked that a water system be installed on their rancheria, and that an internal survey be made to subdivide the tracts, that a lien in the amount of $654.76 be canceled, and that legal assistance be provided to set up a legal entity to manage the tribal property. They further requested that the Government buildings be transferred to the group for community use.

*Estimated cost of withdrawal of Federal trusteeship.*—In September of 1955, the local officials estimated that the following amount would be necessary to effect the withdrawal of Federal trusteeship:

| | |
|---|---|
| Land survey | $6, 000 |
| Enlarge water system | 13, 000 |
| Legal assistance | 2, 500 |
| Appraisal of property | 750 |
| Soil and moisture conservation | 13, 500 |
| Programing and planning | 6, 000 |
| Total | 41, 750 |

### INDIAN RANCH

*Background data on the Indian Ranch Rancheria, Inyo County*

The act of March 3, 1928 (45 Stat. 162), provided that "the following described lands in California be, and they are hereby withdrawn from entry, sale, or other disposition and set aside for the Indians of Indian Ranch, Inyo County, California: *Provided*, That the withdrawal hereby authorized shall be subject to any prior, valid right of any persons to the land described: * * * containing 560 acres, more or less."

At that time, Mr. George Hanson was given an assignment to the total acreage.

There are no Indian people living on the land. The original occupant has died and left eight heirs.

The land has not been occupied for several years since there is no work in the valley, and the Indians must seek employment elsewhere. The land is leased to a non-Indian for grazing purposes.

The Bureau renders services only because of the trust status of the land. It approves the leasing of the land to the non-Indian and distributes the proceeds among the heirs.

On October 27, 1955, the eight heirs of Mr. George Hanson requested in writing that the land be sold and the proceeds divided among them.

As of January 1956 the local Bureau of Indian Affairs listed the following amounts as necessary to effect withdrawal of Federal trusteeship:

| | |
|---|---:|
| Land survey | $1, 100 |
| Legal assistance | 500 |
| Appraisal of property | 300 |
| Programing and planning | 1, 100 |
| Total | 3, 000 |

### LYTTON

*Background data on the Lytton rancheria, Sonoma County*

*History.*—The 50 acres comprising the rancheria were purchased in 1925 at a cost of $10,000. Like most of the rancherias in California it was purchased with appropriated funds "To purchase for the use of the Indians in the State of California * * * suitable tracts of land, water, and water rights in the said State * * *." The two family groups who make their home here belong to the Pomo Tribe. The rancheria is located in the traditional homeland of these people. The Indians living at Lytton Rancheria have no tribal organization.

*People.*—When the land was purchased in 1925, there were 92 people using it. By 1933, the number had dwindled to 20, and now there are 24 people living there. The 2 families have 5 wage earners. Three of them are non-Indians. The wage earners leave the rancheria for employment, but consider the land to be their home. These two families are well-integrated into the local community.

*Land.*—The land is generally of poor quality, although the assignees do have livestock and raise limited crops. A water system that was installed several years ago by the Bureau of Indian Affairs has been replaced by the assignees, but there is a lien against the land in the amount of $5,264.66 because of the original improvement. The

necessary roads to make use of the land as homesites have been built, and they are being maintained by the county.

*Sources of income.*—The wage earners find wage work in the surrounding area in agricultural and other rural pursuits. They would be considered to be of the low-income group because the work is seasonal. However, their wages are augmented by what they receive from their limited farming.

*Bureau services.*—The Bureau renders services because of the trust status of the land. There are no social services rendered by the Bureau because these people are Indians. The local school district receives funds under the Johnson-O'Malley educational contract because of the Indian children attending their public schools. No road construction is being contemplated by the Bureau.

*Attitude toward the withdrawal of Federal trusteeship.*—The two assignees asked in October of 1955 that they be given fee title to their assignments. They asked that an internal survey be made to determine the land descriptions, and that the lien against the land be canceled. During the year 1954, these assignees gave testimony to the Senate Interim Committee on California Indian Affairs that they would be inclined to make improvements of their homesites if they had clear title to the lands.

*Estimated cost to effect withdrawal of Federal trusteeship.*—(By local Bureau of Indian Affairs officials in September of 1955):

| | |
|---|---:|
| Land surveys | $1,000 |
| Legal assistance | 500 |
| Land appraisals | 100 |
| Programing and planning | 400 |
| Total | 2,000 |

### MARK WEST

*Background data on the Mark West Rancheria, Sonoma County*

The records indicate that this rancheria was acquired in 1916. It consists of 35 acres assigned to Mr. William B. Steele. Mr. Steele has a wife, a stepson who is 24 years old, 2 daughters (15 and 10 years old), and a son 12 years of age. The family lives at 126 Scott Street, Santa Rosa, Calif. Mr. Steele is the sole assignee to the rancheria.

The acreage is brush-hillside land with some trees and grazing land. The external boundaries need to be surveyed. Water is obtained from a spring and there are no apparent water-right problems. There are no roads and there is no lien. The rancheria has been unoccupied for several years. The Steele family recently did some improvement work on the rancheria, and apparently intends to build a home there and use the land within the near future. Mr. Steele is employed in Santa Rosa and expects to keep his regular job if he uses the rancheria as a homesite.

On December 12, 1955, Mr. Steele requested that he be given fee title to this tract of land after a survey had been made to determine the legal description of the property. At that time it was estimated that the following amount would be necessary to effect transfer of title:

| | |
|---|---:|
| Land survey | $400 |
| Appraisal of property | 200 |
| Legal assistance | 200 |
| Programing and planning | 500 |
| Total | 1,300 |

## MIDDLETOWN

*Background data on the Middletown Rancheria, Lake County*

*History.*—The rancheria was purchased in 1909 when 109.70 acres were bought with appropriated funds for the amount of $2,650 under authorities contained in the acts of June 21, 1906 (31 Stat. 325–333), and April 30, 1908 (35 Stat. 70–76), which appropriated money "to purchase for the use of the Indians of the State of California * * * suitable tracts or parcels of land, water, and water rights for the Indians of said State * * *." The Indians using the land belong to the Pomo Tribe and their rancheria was set up in their traditional homeland. They have always lived in this part of California. The group is not organized, either formally or informally.

*People.*—There are 21 people in 6 family groups who live on the tancheria and use it as a rural homesite. When the land was purchased in 1909, there were 51 Indians in the area, but by 1933 the number had dwindled to 24. All of the members living here are interrelated, although they do not have an approved current roll.

*Land.*—Thirteen individual informal assignments cover the use of all but 43 acres of the rancheria. The 43-acre plot is rough, broken, mountainside, unsuited for homesites, and is used for a woodlot and a hunting reserve. There is a recently installed domestic water system, and an access road to the homesites was also recently completed. A lien in the amount of $12,504.01 stands against the rancheria because of the water-system improvement. When one of the assignees dies, the group gets together and elects who shall receive the assignment; they usually decide that it be given to the children of the assignee so that the improvements stay in the family. They have a community Indian-type building.

*Sources of income.*—The wage earners work on surrounding farmlands and return to their homesites after the day's work. Their income is supplemented by garden products from the garden land around their homesites. One of the assignees has a vineyard and an orchard, which afford him income and afford some seasonal work for the other assignees. One of the assignees is a recipient of old-age assistance.

*Bureau services.*—The Bureau recently installed a road to serve the homesites on this land, and completed the domestic water system. It does not provide any social services for these Indians. They receive these services from the county. The school district at Middletown receives payments under the Johnson-O'Malley Act because Indian children are attending their public schools.

*Attitude toward withdrawal of Federal trusteeship.*—On September 30, 1955, the group requested fee patents to their assignments, and requested that a survey be made to determine legal descriptions. They want the lien against the land to be canceled, and would like legal assistance in setting up an entity to take over and manage their community property.

*Estimated cost of withdrawal of Federal trusteeship.*—By local officials of the Bureau of Indian Affairs in September 1955):

| | |
|---|---:|
| Land survey | $2,000 |
| Domestic water system | 2,500 |
| Legal assistance | 2,000 |
| Land appraisals | 500 |
| Soil and moisture conservation | 2,000 |
| Programing and planning | 2,000 |
| Total | 11,000 |

## MONTGOMERY CREEK

*Background data on the Montgomery Creek Rancheria, Shasta County*

The Hardin family has lived on this rancheria since the 1860's. It was purchased with appropriated funds in 1914 for $400. At that time there were 72 Pit River Indians living in this area, but by 1933 the Hardin family remained alone. Today, Mr. William Hardin, age 70, is the sole occupant. There is no current official approved roll of the Indians who belong to this group.

Mr. Hardin is the recipient of old-age assistance and augments his pension with produce from a clearing he has made at the homesite.

This land is located about 3 miles from the village of Montgomery Creek. The land is of poor quality, rough, and covered with brush. The water supply is from a spring. There is only a token road to the homesite. There are no liens against the lands because of any improvements. There is an Indian cemetery on this parcel.

The Bureau has rendered services only in connection with the trust status of the land. There is an item in the 1958 budget of $26,000, to build a standard road.

Mr. Hardin has asked in writing that fee title to the land be given to him. His assignment covers the total acreage. The local Bureau of Indian Affairs officials estimated that the following sums would be necessary to effect the withdrawal of Federal trusteeship:

| | |
|---|---|
| Land survey | $600 |
| Legal assistance | 200 |
| Established water rights | 500 |
| Appraisal of property | 200 |
| Programing and planning | 500 |
| Total | 2,000 |

## MOORETOWN

*Background data on the Mooretown Rancheria, Butte County*

Mooretown Rancheria is located about 1½ miles from the town of Feather Falls in Butte County, Calif. It consists of two 80-acre tracts, one-half mile apart. The eastern tract (N½ of NE¼ sec. 23, T. 20 N., R. 6 E., Mount Diablo meridian) was purchased on October 8, 1915, for $700 from the Central Pacific Railway. It is presently occupied by Mr. Fred Taylor and family, who have lived continuously on the rancheria since prior to its purchase by the Federal Government. The second house on this tract belongs to Mr. Taylor's stepdaughter, Mrs. Katy Archuleta, who presently lives in the neighboring town of Oroville, but whose non-Indian husband and, occasionally, some of their children, continue to occupy the house.

The western tract (N½ of NE¼ sec. 22, T. 20 N., R. 6 E., Mount Diablo meridian), which was set aside by Executive order of June 6, 1894, has been occupied for the past 18 years by Mr. and Mrs. Robert Jackson.

Both portions of the rancheria are presently served with adequate roads. Both the Taylor and Jackson homes have electricity and obtain domestic water from good springs which have been developed and are pumped to the houses. Both residents have rights to irrigation water from a ditch crossing the rancheria. Both Mr. and Mrs. Jackson and Mr. Taylor receive old-age security payments from the Butte County Welfare Department.

32    DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

The exterior boundaries of the rancheria were surveyed by the Government in March of 1954.   There are no liens against this land because of any improvements made by the Government.

The land is used primarily for homesites, and is not arable except for a small plot adjoining each house.  Should title to the rancheria be transferred to the resident occupants, no particular problem or difficulties are foreseen, except the possible need for internal surveys.

On January 9, 1958, Mr. and Mrs. Robert Jackson asked that they be given title to the property they occupy by letter addressed to Congressman Clair Engle.  On March 26, 1958, Mr. Fred Taylor, by letter addressed to the Sacramento area director, requested title to the land his family occupies.

The Sacramento area office has estimated that the following amounts would be needed to transfer title from the United States to the occupants:

| | |
|---|---:|
| Legal assistance | $650 |
| Land surveys | 500 |
| Appraisals of property | 450 |
| Programing and planning | 1,400 |
| Total | 3,000 |

### NEVADA CITY

*Background data on the Nevada City Rancheria, Nevada County*

By Executive Order 1772, of May 6, 1913, the President set aside 75.48 acres for the Nevada or Colony Indian Tribe, which is the present Nevada City Rancheria.

The land is composed of forests and hillsides and is used primarily for a homesite and family gardening plot.  It is assigned to the Pete Johnson family.  The rancheria is located on an improved county road.

The children of the Pete Johnson family (3 daughters and 1 son) are grown, and no longer live on the rancheria.  Mr. Johnson receives old-age assistance, and he and his wife live on that income, with some garden produce as a supplement.  These old people get their water from a well.  There are no liens against the lands because of any improvements.

Mr. Johnson has asked in writing that he be given a fee patent to that part of the rancheria which he is using—some 40 acres.  The local Bureau of Indian Affairs officials have estimated that the following sums will be necessary to effect the transfer of title.

| | |
|---|---:|
| Land survey | $1,000 |
| Legal assistance | 200 |
| Property appraisal | 200 |
| Programing and planning | 1,000 |
| Total | 2,400 |

### NORTH FORK

*Background data on the North Fork Rancheria, Madera County*

The 80 acres making up this rancheria were purchased in 1914 for $550.  At that time there were an estimated 200 Mono Indians living in this area.  By 1933, however, the number had dropped to a mere 7,

and today only a mother and her 2 sons occupy the land as a rural homesite.

The land has a very limited grazing value. It is not used for that purpose. The domestic water is obtained from a spring. The land does not have a lien against it because of any improvement. The homesite is about 2 miles from an improved road. The Susan Johnson family has an assignment to the entire 80 acres. There is no approved membership roll for this group.

On December 13, 1955, the family asked that they be given fee patent to this acreage with the request that a domestic water system be installed.

The local Bureau of Indian Affairs officials estimated that the following sums would be necessary to effect transfer of title:

| | |
|---|---|
| Land survey | $1,000 |
| Water system | 2,000 |
| Legal assistance | 500 |
| Property appraisal | 300 |
| Programing and planning | 1,000 |
| Total | 4,800 |

## PASKENTA

*Background data on the Paskenta Rancheria, Tehama County*

In 1914 there were 2 purchases to establish the rancheria for the Wintun Indians in the area: 111.12 acres were purchased for $2,240 and 148.16 were purchased for $1,000. At that time, 134 Indians were said to be living in that area. In 1922, 11 families, consisting of 27 people, lived on the rancheria. In 1933, the number had dropped to 18. Today, only one family uses the land for a homesite in the summertime.

Paskenta is in a dry, isolated area, many miles from any development, and consequently has few employment opportunities. This no doubt accounts for the fact that it is used only by one family at this time. Mr. and Mrs. William Freeman and their granddaughter have an assignment covering 180 acres. Eighty acres are unassigned. There is no current roll of the other Indians who may have an interest in this land.

The Bureau has an item of $22,000 in the 1958 budget to put an all-weather road on the tract of land.

There is a lien of $226 against the land because of the water system that was installed several years ago.

The Freeman family receives old-age assistance and the Bureau provides them with no service because of their status as Indians. Mr. and Mrs. Freeman asked in writing on December 28, 1955, that they be given fee title to their assignment. This would leave 80 acres unassigned.

The following amounts would be necessary to effect withdrawal of Federal trusteeship and transfer of title:

| | |
|---|---|
| Land survey | $1,000 |
| Irrigation system | 2,000 |
| Legal assistance | 500 |
| Establishment of water rights | 500 |
| Appraisal of property | 200 |
| Programing and planning | 1,000 |
| Total | 5,200 |

### PICAYUNE

*Background data on the Picayune Rancheria, Madera County*

This rancheria was established in 1912 by Executive order. It consists of 2 contiguous 40-acre parcels.

There are 18 people living on this land today. All members belong to one family group. Three of the people receive old-age assistance. Five are of school age and attend the public school in the district. These people live in crowded housing conditions. They must seek elsewhere for employment and depend upon seasonal work, usually agriculture, for their livelihood.

This rancheria is located in the foothills area, about a mile from a paved road. The land is rocky and covered with brush, and is used primarily for homesites with some truck gardening and fruit produce for subsistence. Water is obtained from two springs, but is not piped to the individual homes. There is no lien against the land for improvements. The group living here has no property held in common and neither is there a currently approved roll of membership.

On December 15, 1955, the family using this land asked that their assignment be deeded to them after a domestic water system had been installed.

It was estimated by local Bureau of Indian Affairs' officials that the following sums would be necessary to effect transfer of land title:

| | |
|---|---|
| Land survey | $1,000 |
| Legal assistance | 500 |
| Programing and planning | 1,000 |
| Domestic water system | 6,000 |
| Property appraisals | 500 |
| **Total** | 9,000 |

### PINOLEVILLE

*Background data on the Pinoleville Rancheria, Mendocino County*

*History.*—This rancheria was established in 1911 when 95.28 acres were purchased for $8,500 with funds appropriated by the acts of June 21, 1906 (31 Stat. 325–333), and April 30, 1908 (35 Stat. 70–76);

"to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State. * * *" The 130 Indians who were living in the area at the time of purchase belonged to the Pomo Tribe, and this rancheria was established in their traditional homeland. By 1933, the number had dropped to 75. At the present time there are 107 Indians living at Pinoleville.

*People.*—There are 15 family groups on the land, each with an assignment (one being to the school lot). They form a well-organized community with elected officers who speak for the group. At the present time they hold, through a trustee, additional land adjacent to the rancheria that is not in trust. These Indians have displayed initiative by developing and improving their land into very good vineyards. They live in well-kept homes. At one time the Bureau maintained a school at the rancheria, but now all of the children of school age attend public school in the county. The group prepared a tribal roll in 1947, but it has not been kept current. There are

some tribal members who do not live on the rancheria, having left to work in jobs in the surrounding area.

*Land.*—The land is a short distance from the town of Ukiah, Calif. It is considered improved land with vineyards and orchards. A creek runs through the land, which is subject to annual floods. Some work has been done in cooperation with the other landowners in the area, but the flood conditions are not completely controlled by the revetments. A water system was installed at the rancheria several years ago in connection with the school and teacherage. It remains today, and a lien of $2,585.65 is against the property because of this work. United States Highway No. 101 runs along the east edge of the land and there are access roads to the homesites from the highway. These roads need to be brought up to county standards. The assignees have installed and maintained their own pressure water systems, but it could be improved considerably. The United States Government buildings on the rancheria are being used by the Indians, the schoolhouse as a community building, and the teacherage as a residence, and the shop buildings for storage purposes.

*Sources of income.*—The sources of income for the heads of families are extremely varied and include income from the sale of grapes from the assigned land. Several members of the group have specific trades including welders, mechanics, carpenters, plumbers, etc. One member has been a postal service employee for a number of years. Several members are contractors of farm work including pruning and crop harvesting. Probably one-half of the adult members receive most of their income through wage work on the local farms and in the local timber industry. The economic position of this rancheria has improved since 1934. Many of the assignments have been made productive and many of the families now have substantial homes. Also, work is available for most everyone throughout the year due to a great influx of industry into the immediate vicinity during the last few years.

*Bureau services.*—The public school which the rancheria children attend receives financial assistance under the Johnson-O'Malley educational contract. The Bureau has a cooperative fire control agreement with the California Division of Forestry. The Bureau has an agreement with Mendocino County in which the county agrees to accept full responsibility for future construction and maintenance on Indian roads after these have been constructed and to a mutually agreed standard and rights transferred to the county. There is an item in the Bureau's budget for 1958 amounting to $17,000 for roadbuilding on this rancheria.

*Attitude toward withdrawal of Federal trusteeship.*—At a general council meeting held at their rancheria on September 23, 1955, the group voted to have the United States Government transfer the fee title to their individual tracts. They asked that the roads on the land be brought up to the county standards; that a survey be made of their land so that each assignee could have a legal description of his property; that the lien against the land be canceled. They also ask that a domestic water system be installed.

*Estimated cost to effect withdrawal of Federal trusteeship.*—By local Bureau of Indian Affairs'·officials in September of 1955:

| | |
|---|---:|
| Land survey | $1,500 |
| Water system | 10,000 |
| Legal assistance | 1,000 |
| Property appraisal | 400 |
| Soil and moisture conservation | 2,000 |
| Programing and planning | 3,000 |
| **Total** | **17,900** |

### POTTER VALLEY

*Background data on the Potter Valley Rancheria, Mendocino County*

*History.*—In 1909, 16 acres of land were bought for $2,000 for the 72 Pomo Indians in the area, under the acts of June 21, 1906 (31 Stat., 325–333), and April 30, 1908 (35 Stat., 70–76), which made available funds "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *." An executive order a few years later set aside for this group an additional 80 acres which was not contiguous to the original purchase tract and has never been used by these people as a homesite. The 16-acre tract is located in the general area where the tribe has always made its home. In 1933, the number of people using this land for homesites dropped to 15, and at the present time 18 people live here. The group is not organized under the Indian Reorganization Act.

*People.*—The 16-acre plot is assigned to 7 family groups under informal assignments. One of the assignees is married to a non-Indian. There are only two children of school age living on the rancheria. One of the assignees is over 65 years of age. These people do not have a current roll of their membership.

*Land.*—The 16-acre tract that is used for homesites is in need of access roads to adequately serve the homesites. There are no roads or other improvements on the 80-acre mountain plot. The homesite tract is not especially good land, but the occupants do have family truck gardens. Each assignee has his own water supply from individual wells, and they are not interested in a community water system. At one time the sum of $233 was collected by the Bureau because of either a lease or a trespass and that amount is held in the individual money account of the group in Sacramento. There is no regular source of income for this group. There is no lien against the land because of any improvement.

*Sources of income.*—One of the seven family heads is on an old-age assistance grant; the others work for wages in the surrounding area. The work is seasonal and the average income is only adequate to meet the minimum needs. Their income is augmented somewhat by gardening produce.

*Bureau services.*—The Bureau renders services only because of the trust status of the land; all other services are provided to the people by the county. There is an item of $19,000 in the Bureau's 1958 budget to build necessary roads on the rancheria. The local school district receives payments under the Johnson-O'Malley educational contract for the two children who attend public school.

*Attitude toward withdrawal of Federal trusteeship.*—All of the Indians who have assignments on the rancheria asked by resolution dated December 11, 1955, that they be given fee title to their assignments after the road system has been completed. They also asked that they be given legal assistance in forming a corporation to accept and manage their mountain property.

*Estimated cost to effect withdrawal of Federal trusteeship.*—The local Bureau of Indian Affairs' officials estimated the the following amounts would be necessary to effect withdrawal as of December 14, 1945:

| | |
|---|---:|
| Land survey | $1, 500 |
| Legal assistance | 200 |
| Appraisal of property | 500 |
| Programing and planning | 3, 000 |
| Total | 5, 200 |

### QUARTZ VALLEY

*Background data on the Quartz Valley Rancheria, Siskiyou County*

*History.*—The rancheria was formed in 1937 when 364 acres were bought for $20,000 under the provisions of the Wheeler-Howard Act. In 1939, 240 additional acres were purchased for $16,000 to form the 604-acres area of the rancheria. The group of Shasta and Upper Klamath Indians whose ancestors traditionally lived in this part of California organized as the Quartz Valley Indian Community on June 15, 1939, and were granted a charter on March 12, 1940.

*People.*—There were 48 Indians enrolled when the Quartz Valley Community was formed. A roll completed in 1955 lists 88 names, but only about half of the membership are living in Quartz Valley today. Five of the people living on the rancheria are over 65 years of age and there are the same number of schoolchildren. Most of the workers cultivate their assignments since the land is productive and they are able to make a living from agriculture.

*Land.*—The rancheria lands were purchased for $36,000, or approximately $60 per acre, in 1937 and 1939. Most of the land is favorable to irrigation; and the balance is mountain land which is unassigned. An assignment consists of 20 acres and at present 13 families are holding assignments. A water system, built by the Bureau in past years, is badly in need of repair at this time. There is a lien of $8,107 against the land because of this improvement. The Government owns no buildings at Quartz Valley, but there is a community building used as a church. There is no cemetery on trust lands at Quartz Valley. It is estimated that $50,000 will be needed to build the necessary 2 miles of access roads at Quartz Valley.

*Bureau services.*—Services extended by the Bureau are limited to the trust status of the land; no social services are performed by the Bureau for the people living on the rancheria. The children are attending public school. Health and welfare needs of the Indians are met by local offices on the same basis as these services are extended to non-Indians.

*Attitude toward withdrawal of Federal trusteeship.*—On November 27, 1956, the Quartz Valley Community, through its general council, requested that the Indians be given fee title to their assigned lands and that the unassigned land be conveyed to the community. A

copy of the resolution making the request was sent to Congressman Engle on December 3, 1956. The council asked in their resolution that an internal survey of the rancheria be made, that the lien against the land be canceled, that assistance be given to form a legal entity, and that the roads and water system be brought up to standard.

*Estimated cost to effect withdrawal of Federal trusteeship.*—On January 3, 1957, the local officials of the Bureau estimated the following amounts would be necessary to carry out the request of the council:

| | |
|---|---:|
| Roads | $50,000 |
| Land surveys | 2,625 |
| Water system | 7,000 |
| Irrigation system | 2,500 |
| Legal assistance | 500 |
| Appraisal of property | 600 |
| Programing and planning | 1,000 |
| Soil conservation | 9,600 |
| Total | 73,825 |

## REDDING

*Background data on the Redding Rancheria, Shasta County*

*History.*—In 1922, 30.89 acres of land were purchased for the 50 Pit River and other Indians living in the area. The cost was $3,860.87. Payment was made from funds appropriated by the act of August 1, 1914 (38 Stat. 582–589). The rancheria was established in the traditional homelands of the tribe. By 1933, only 8 Indians were living on the land, but at present the population is 34. They are not organized under the Indian Reorganization Act.

*People.*—These people work well as a group. They use their domestic water system in common. Fourteen family heads have informal assignments for the use of their total acreage. There are 6 wage earners among the assignees, 1 being a non-Indian. Seven of the people living here are over 65 years of age. There are four children of school age. These people have both water and electricity in their homes. There is no current roll of the present membership in this group.

*Land.*—Redding Rancheria is 4 miles from Redding, Calif., a city of 12,000 people. United States Highway No. 99 runs along one edge of the land. The land is valuable as homesite property near a city. In the past 5 years, the Bureau has expended $11,200 for roads and $6,644 for the domestic water system. There is a lien against the land because of the last improvement. The well supplying the domestic water has become contaminated and a new one needs to be dug.

*Sources of income.*—The wage earners are employed in the city of Redding where employment opportunities are plentiful. They supplement their wages by produce from their homesite lands. The average annual income compares favorably with the income of the area.

*Bureau services.*—The Bureau performs services because the land is in trust status. It renders no services to these people because they are Indians except that the local school district receives money under the Johnson-O'Malley contract.

*Attitude toward withdrawal of Federal trusteeship.*—On October 15, 1955, the group passed a resolution requesting the Government to

give them fee title to their assignments, and that an internal survey be made in order that each person may have a legal description of his land. They further asked that the lien of $6,644 against their land be canceled.

*Estimated cost to effect withdrawal of Federal trusteeship.*—At that time the local Bureau of Indian Affairs' officials estimated that the following amounts would be necessary to effect the transfer of title:

| | |
|---|---:|
| Finish road work | $2, 500 |
| Land survey | 1, 000 |
| Repair domestic water system | 500 |
| Legal assistance | 500 |
| Appraisal of property | 200 |
| Programing and planning | 500 |
| Total | 5, 200 |

## REDWOOD VALLEY

*Background data on the Redwood Valley Rancheria, Mendocino County*

*History.*—In 1909, 80 acres of land were purchased for $2,000 to form the Redwood Valley Rancheria. There were about 51 Pomo Indians in the area at that time. The rancheria was established in that part of California where the group had always lived. Funds for the purchase of this land were appropriated by the acts of June 21, 1906 (31 Stat. 325–333), and April 30, 1908 (35 Stat. 70–76), which provided money "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State '* '* *.'" The people living on the Redwood Valley Rancheria are organized informally, but not under the Indian Reorganization Act.

*People.*—The rancheria population in 1933 was 31. Today it is 56, comprising 11 families. There is no approved roll for this group, but they consider people who do not have assignments and who live elsewhere as members. Four of the assignees are 65 years of age or over. There are only six children of school age in this group, and the same number of preschool children. The housing standards of this group are poor.

*Land.*—In the past 5 years the Bureau of Indian Affairs has built internal roads on this rancheria at a cost of $15,900. The land is divided into homesite plots of 4.98 acres each and there is no central water system. There is no lien against the land because of any improvement. The land is of a poor quality and affords only homesites with no produce from gardening.

*Sources of income.*—Employment opportunities are nonexistent on this rancheria and are scarce in the area. This makes it necessary for the wage earners to depend upon seasonal work, mostly of an agricultural nature. As a consequence, their annual income is not always adequate and they apply for social welfare from the county.

*Bureau services.*—Services are rendered by the Bureau only because of the trust states of the land.

*Attitude toward withdrawal of Federal trusteeship.*—By resolution dated October 19, 1955, these people asked that the present assignees be given to their parcels after a survey has been made. They also requested that a water system be installed on the rancheria, and that they be given assistance in the formulation of an entity to take over and manage this improvement.

40   DISTRIBUTION OF CERTAIN INDIAN LANDS IN CALIFORNIA

*Estimated cost to effect withdrawal of Federal trusteeship.*—The local officials of the Bureau of Indian Affairs estimated the following amounts would be necessary to effect transfer:

| | |
|---|---|
| Land survey | $1,500 |
| Domestic water system | 10,000 |
| Legal assistance | 1,000 |
| Appraisal of property | 500 |
| Soil and moisture conservation | 2,000 |
| Programing and planning | 1,500 |
| Total | 16,500 |

## ROBINSON RANCHERIA

*History.*—In 1909, 88 acres of land were purchased by the Government for 134 homeless Pomo Indians living in the area at a cost of $6,600 to become known as the Robinson Rancheria. The acts of June 21, 1906 (31 Stat. 325–333), and April 30, 1908 (35 Stat. 70–76), made funds available "to purchase for the use of the Indians of the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *." The Indians on the rancheria are not organized under the Indian Reorganization Act.

*People.*—Today, 45 people, consisting of 13 family groups, make their home on the rancheria. The children of school age attend public school at Lakeport. The Indians use the rancheria primarily as homesites. The group does not have a current approved roll. Welfare aid, when needed, is attained from the local State welfare agencies.

*Land.*—The land is held in trust by the United States Government for the Indians in California. The people are occupying individual parcels under various informal assignments and the land is used primarily for rural homesites. Recently a road system was completed and agreements were made with Lake County to take over the roads. There is a lien of $3,500 against the land because of the installation of a water system.

*Sources of income.*—Robinson Rancheria is used primarily for rural homesites. Family heads earn wages from agricultural work in the surrounding community.

*Bureau services.*—The Bureau renders no services to this group because of their status as Indians. Realty services are extended because of the trust status of the land.

*Attitudes toward withdrawal of Federal trusteeship.*—The Indians on the Robinson Rancheria passed a resolution in May of 1957 requesting that the residents of the rancheria be given fee title to their lands and that their rancheria be surveyed in order that each assignee may have a legal description of his assignment.

*Estimated costs to effect withdrawal of Federal trusteeship.*—As of May 1957, the funds estimated to be necessary to carry out the wishes of the group are as follows:

| | |
|---|---|
| Land survey | $1,000 |
| Water system | 2,000 |
| Legal assistance | 500 |
| Property appraisals | 1,000 |
| Programing and planning | 2,000 |
| Total | 6,500 |

## ROHNERVILLE

*Background data on the Rohnerville Rancheria, Humboldt County*

*History.*—In 1922, 16 acres were purchased with appropriated funds at a cost of $434. An estimated 15 Indians of the Wiyot Tribe, were living on this land at the time the land was purchased. Today, there are 40 people making their homes on the rancheria.

*People.*—There are eight wage earners on the rancheria and each of them has an assignment. Four of them are over 65 years of age. There are 11 children of school age. There are 10 homes (low standard) on the rancheria, constructed by the assignees. These people do not have an approved current membership roll, but they work together as a group and have arrived at the land use by mutual consent.

*Land.*—On the rancheria an assignment consists of a homesite of about 1 acre, and a wood lot of about the same area. The homesites are on the upper half of the strip of land, with the woodlots on the lower half. An adequate road is needed through the woodlot to the homesites. A domestic water system was installed recently and there is a lien against the land in the amount of $1,981.34 because of this improvement. This rancheria does not have a cemetery, and the group holds no other property in common.

*Sources of income.*—The workers depend upon miscellaneous work in the adjacent area, usually in the woods and the lumber industry. They receive welfare aid from the county with no distinction being made because they are Indians.

*Bureau services.*—The Bureau renders services only because the land is in a trust status. A domestic water system was installed recently and there is an item in the 1958 budget in the amount of $23,000 to build a standard road for the rancheria. The local school district receives Johnson O'Malley educational contract funds.

*Attitude toward withdrawal of Federal trusteeship.*—On September 1, 1955, this group, through their informal organization, passed a resolution asking that the United States Government transfer to them the fee title to their individual shares of this tract. They asked that the road system be completed before this is done, and that the land be surveyed so that each assignee may have a legal description of his land. They want the lien to be canceled, and assistance to form a legal entity to take over and manage their water system.

*Estimated costs to effect withdrawal of Federal trusteeship.*—The local Bureau of Indian Affairs' officials at Sacramento estimated that the following amounts would be necessary to transfer title:

| | |
|---|---|
| Land survey | $1,000 |
| Legal assistance | 1,000 |
| Property appraisal | 250 |
| Programing and planning | 1,500 |
| Total | 3,750 |

## RUFFEYS

*Background data on the Ruffeys Rancheria, Siskiyou County*

*History.*—This rancheria was purchased for the Etna Band of Indians in 1907 with funds appropriated under the act of June 21, 1906 (31 Stat. 325–333). Title is in the name of the United States. The original cost for the 441 acres comprising Ruffeys Rancheria was $2,205.

*People.*—As many as 56 people were living in the Ruffeys' area when the land was purchased in 1907. They were locally known as the Etna Band or the Ruffeys Band. They gradually moved elsewhere until today only three people—Mrs. Harry Lippen, Mr. Roy Abernathy and Mr. Edmond Abernathy—appear to have any vested interest in the rancheria. There is no formal organization or a membership roll. Although none of the three people having a vested interest live on the land, Mr. Roy Abernathy has his own home on taxable land adjacent to the rancheria.

*Lands.*—The 441 acres are not suited for ranching or agriculture because they are mostly steep hillsides. The land could be used for homesites since there is sufficient water for domestic use. A State highway runs through the acreage so it is not isolated. Lack of job opportunities in the general area is reputed to be the reason why the Indian people are not using Ruffeys Rancheria for homesites. There are no reimbursable charges against this land because of any improvements made by the Bureau of Indian Affairs.

Since the rancheria is considered uninhabited, the Bureau has made no provision for services to the people. The land is carried on the records of the Hoopa area field office.

*Attitude toward withdrawal of Federal trusteeship.*—The three people who appear to have a primary interest in the rancheria have requested by letter dated May 31, 1958, to the Senate Committee on Interior and Insular Affairs that Ruffeys be included in the "rancheria bill." They also asked the Bureau, in a letter dated March 20, 1958, that they be given the benefits of this legislation.

*Special problems in connection with termination of Federal trusteeship.*—The people who have interest in this rancheria are not asking that the land be developed in any way.

*Estimated cost of withdrawal of Federal trusteeship.*—Our Sacramento area office has estimated that the following amounts will be needed to transfer title or to dispose of the land and divide the proceeds:

| | |
|---|---|
| Land survey (internal) | $800 |
| Appraisal of property | 300 |
| Programing and planning | 500 |
| Total | 1,600 |

### SCOTTS VALLEY

*Background data on the Scotts Valley Rancheria, Lake County*

*History.*—The 56.68 acres on this rancheria were bought for the 60 Pomo Indians living in the vicinity in 1911 at a cost of $2,900, with funds appropriated under the acts of June 21, 1906 (31 Stat., 325–333), and April 30, 1908 (35 Stat., 70–76) "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *." The rancheria was established in the traditional homeland of the group of Indians.

*People.*—By 1933, the number of Indians using this land for homesites had dropped to 26, and today the number is 32, although 3 of the people having assignments are not living on the land. One of the ten assignees is over 65 years of age and the others are in their early 40's. There are comparatively more children living on this rancheria than on others in the State of California. Sixteen are of school age;

seven are of preschool age. This group does not have a current roll of membership. They are not formally organized as a tribe, but they act as a group in deciding about their land.

*Land.*—The land is all assigned to individual members, and none of it is held in common. It is rural-homesite land, and, although it is of poor quality, some of the assignees do have gardens and fruit trees. Within the past 5 years, an adequate road was constructed, joining with the county road that runs along 1 edge of the land. The domestic water supply was rehabilitated recently at a cost of $3,861.08, which amount now stands as a lien against the land.

*Sources of income.*—There are nine wage earners who work in miscellaneous farm jobs in the vicinity. They supplement their wages with limited gardening and orchard produce. Water is piped to each homesite but, otherwise, the homes are not modern.

*Bureau services.*—In the past 5 years, the Bureau spent $3,500 for building roads and $3,861.08 to rehabilitate the water system. Expenditures were made because of the trust status of the land. The Bureau does not render social services to these people, but the local school district receives payments under the Johnson-O'Malley education contract.

*Attitude toward withdrawal of Federal trusteeship.*—By resolution dated September 29, 1955, this group asked that they be given fee title to their individual shares of this tract. They requested legal assistance to form an entity to take over and manage a water system, and asked that the rancheria be surveyed so that each assignee may have a legal description of his plot.

*Estimated cost to effect withdrawal of Federal trusteeship.*—Estimates made by the local Bureau of Indian Affairs are as follows:

| | |
|---|---:|
| Land survey | $2, 600 |
| Complete the water system | 5, 000 |
| Legal assistance | 1, 000 |
| Property appraisal | 400 |
| Programing and planning | 1, 600 |
| Total | 10, 500 |

## SMITH RIVER

*Background data on the Smith River Rancheria, Del Norte County*

*History.*—The Smith River Indians have lived in their present location in the extreme northwestern corner of California from earliest times. In 1864, Congress authorized the establishment of a reservation for them at the mouth of the Smith River (13 Stat. 40), but, by the act of July 27, 1868 (15 Stat. 221), the Smith River Reservation was discontinued and the Indians were removed to the Hoopa Valley Reservation to the south. By Executive Order 1495, dated March 11, 1912, Hunters Rock or Prince Island, lying about three-fourths of a mile north of the mouth of Smith River in the Pacific Ocean, was "reserved from all forms of disposal and set aside for the use of the Smith River Indians * * *." The Indians had continued to live in the vicinity of the mouth of the Smith River, even though their reservation had been discontinued.

The present acreage of the rancheria was purchased in 1908 for $7,200 with funds appropriated by the act of June 21, 1906 (31 Stat. 325–333), and the act of April 30, 1908 (35 Stat. 70–76), which made

funds available "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *."

The Indians at Smith River have organized as the Howonquet Indian Council, with a formal land code. This organization is not under the Indian Reorganization Act, however, and its primary function is for the formal assignment of rancheria lands.

*People.*—There were 163 Smith River Indians in the area when their land was purchased in 1908. In 1950, 113 were reported to be living on the rancheria. Today, 82 people are living there. There are 20 families, with 7 persons over 65 years of age and 12 school-children. This is a close-knit community, but local employment opportunities are lacking, and most of the young people, when they become wage earners, move away from the trust lands in order to earn a livelihood.

*Land.*—There are 163 acres at Smith River in trust status. The land is of poor quality, and is used primarily for homesites. Domestic water is piped from the Lopez Creek, which runs through one section of the land. United States Highway 101 cuts through the rancheria, and good access is afforded to areas away from the rancheria. There is a need for internal roads to the various homesites. Thirty-four assignments have been made by the council, with a 6-acre parcel retained for community use (as a rock quarry). Another ½-acre tract has been retained as the community building site. The cemetery is on trust land. There are no Government buildings at Smith River. In previous years, a domestic water system was installed, and today there is a lien of $4,500 against the land because of this improvement. This system is badly in need of complete overhaul.

*Bureau services.*—Services rendered by the Bureau are limited to the trust status of the land; no social services are performed by the Bureau for the people living on the rancheria. The children all attend public school. Health and welfare needs of the Indians are met by local offices on the same basis as these services are extended to non-Indians.

*Attitude toward withdrawal of Federal trusteeship.*—On December 7, 1956, the Howonquet Indian Council passed a resolution endorsing a proposed bill to terminate Federal trusteeship over their lands. They sent a copy of this resolution to Congressman Scudder on December 11, 1956. They asked that their lands be surveyed, that their water and road systems be improved, and that they be given assistance to form a legal entity to manage the property they wish to retain in common ownership. They also want the lien against their land canceled.

*Estimated cost to effect withdrawal of Federal trusteeship.*—On January 3, 1957, the local Bureau officials estimated the following amounts necessary to meet the requests of the Smith River Indians:

| | |
|---|---|
| Roads (2 miles) | $52,000 |
| Land surveys | 1,500 |
| Domestic water system | 15,000 |
| Legal assistance | 500 |
| Appraisal of property | 600 |
| Programing and planning | 1,500 |
| Total | 71,100 |

## STRAWBERRY VALLEY

*Background data on the Strawberry Valley Rancheria, Yuba County*

In 1914, a half-acre plot of ground was purchased with appropriated funds for $208.90. Title was taken in the name of the United States of America. This is the Strawberry Valley Rancheria. A Mr. Alex S. Picayune has proposed to buy this lot himself, but the local Bureau official at that time offered to buy it for him. Title was not taken in trust for Mr. Picayune, but he has always been the sole occupant of this lot. As far as can be ascertained, no other Indians claim the land.

Mr. Picayune has one daughter, Mrs. Sophia Wyman, who is married to a non-Indian, and a granddaughter, Josephine Williams, whose parents are dead. Miss Williams makes her home with Mr. Picayune.

This one-half acre is part of the townsite of Strawberry Valley. Mr. Picayune built his own home and installed a well for his use. He had always made his own way without help from the Bureau, and he is a respected member of the Strawberry Valley community. Mr. Picayune asked on December 6, 1955, that he be given a fee patent to this land. There are no liens against the lot. The local Bureau of Indian Affairs' officials estimated that the following sums would be needed to transfer the title:

| | |
|---|---:|
| Land survey | $200 |
| Legal assistance | 100 |
| Appraisal of property | 100 |
| Programing and planning | 300 |
| Total | 700 |

### TABLE BLUFF

*Background data on the Table Bluff Rancheria, Humboldt County*

*History.*—This 20-acre plot was bought in 1908 for $3,000 for the 60 Indians reputed to be living in the area at that time. Appropriated funds were used to buy the land. These funds were made available under the acts of June 21, 1906 (31 Stat., 325–333), and April 30, 1908 (35 Stat., 70–76), which provided money "to purchase for the use of the Indians in the State of California * * * suitable tracts or parcels of land, water, and water rights in the said State * * *."

*People.*—In 1933, the number of people using the land had increased to 75, but at the present time there are 38 people living here. They comprise 14 family groups with 14 wage earners. All of the children of school age attend public school at the town of Lighthouse near the rancheria. These people have no formal tribal organization, but they operate informally in making land assignments. There is no approved current membership roll for these Indians.

*Land.*—This 20 acres of land is served by 2 county roads, with access roads maintained by the users of the homesites. The land serves primarily for rural homesites, but there are some cultivated family gardens. Each assignee has installed and maintains his own well. There are no liens against the property because of any former improvements.

*Sources of income.*—The wage earners here must leave home to find work. They work for wages in the lumber industry and in other miscellaneous work. If the family needs welfare assistance, they receive it from the county on the same basis as other applicants.

*Bureau services.*—The Bureau renders no services to these people except in connection with the trust status of the land. No improvements on the land were made, and there is no lien against it. The local school district receives payments under the Johnson-O'Malley contract because of the Indian children who attend their public schools.

*Attitude toward withdrawal of Federal trusteeship.*—On September 21, 1955, this group asked by resolution that they be given fee title to their individual tracts after a survey had been made to ascertain the legal description of each assignment.

*Estimated cost to effect withdrawal of Federal trusteeship.*—At that time, the local Bureau of Indian Affairs' officials estimated that the amounts needed to effect transfer of title would be as follows:

| | |
|---|---:|
| Land survey | $1,000 |
| Legal assistance | 500 |
| Property appraisal | 550 |
| Programing and planning | 1,500 |
| Total | 3,550 |

### TABLE MOUNTAIN

*Background data on the Table Mountain Rancheria, Fresno County*

*History.*—In 1914, 160 acres of land were purchased for $4,600 in Fresno County to establish the Table Mountain Rancheria. There were 90 Indians in this vicinity at that time. These lands were purchased under the authority of the act of August 1, 1914 (38 Stat. 582–589). The Indians living on this rancheria did not accept the Indian Reorganization Act.

*People.*—Today there are 55 people on the Table Mountain Rancheria, consisting of 12 families. They are a comparatively young group of people, with 32 children (13 of whom are of school age). There are 10 wage earners. None of the inhabitants are over 60 years of age. There is no approved membership roll.

*Land.*—Only part of the rancheria is used for rural homesites. The remaining acres are steep and rocky, but are used by a non-Indian under a grazing lease. The rancheria is adjacent to a paved county road, with access roads leading to the homesites. These access roads are in need of considerable improvements. The cemetery for this group is not located on the rancheria land. The people there are concerned about access to this burial ground. A water system was developed, but the well went dry and another one is needed. There is a lien against the land in the amount of $1,055.07 because of the water system.

*Sources of income.*—These people work at miscellaneous jobs in the area, mostly in farming. Their incomes are uncertain since employment opportunities are definitely limited.

*Bureau services.*—The Bureau proposes to expend $20,000 to complete the road system. This amount was set up in the 1958 budget. The Bureau also proposes to improve the water system. These

projects are being undertaken because of the trust status of the land. The Bureau renders no services to these people because they are Indians. They receive social welfare services from the county and the State. The Bureau maintains in its Sacramento office an individual money account for this group and deposits in its receipts from the grazing lands ($820).

*Attitude toward withdrawal of Federal trusteeship.*—On November 4, 1955, this group, through a resolution, asked that they be given fee title to their individual assignments after the water systems and roads had been completed. They also asked that the lien against the land be canceled.

*Estimated cost to effect withdrawal of Federal trusteeship.*—The local Bureau of Indian Affairs' officials estimated that the following sums would be necessary to effect transfer of titles:

| | |
|---|---:|
| Land survey | $1,000 |
| Domestic water system | 3,000 |
| Legal assistance | 500 |
| Appraisals of property | 700 |
| Programing and planning | 1,500 |
| Total | 6,700 |

### UPPER LAKE

*Background data on the Upper Lake Rancheria, Lake County*

In 1908, 143 acres were bought for the 285 Pomo Indians making their home at Upper Lake at a cost of $5,000. This land forms the nucleus of the present rancheria. Ninety-nine acres were added in 1936 and another 159 acres in 1941, under the Indian Reorganization Act. Each of these parcels cost $11,000. By Secretarial order of February 15, 1907, a 160-acre tract was set aside "as a woodlot for the Upper Lake Indians until such time as it may be secured to them either by Executive order or congressional action." Another rancheria was subsequently established in 1909 at Robinson for a number of Upper Lake Indians. Neither the Upper Lake group nor the Robinson group made exclusive use of the woodlot until 1953 when the group at Upper Lake negotiated to sell some timber on the tract. If proposed legislation designates the parcel as part of the Upper Lake Rancheria there would be no question of title. This group is organized under the Indian Reorganization Act and has an approved roll. The following resolution is quoted to give facts about the rancheria:

"*Be it resolved* by the Upper Lake Pomo Indian Community, Upper Lake, California, a legal community organization established and approved by the Secretary of the Interior November 5, 1941.

"Whereas Federal responsibility for administering the affairs of individual Indian tribes should be terminated as rapidly as the circumstances of each tribe will permit. This should be accomplished by arrangements with the proper public bodies of the political subdivisions to assume responsibility for the services customarily enjoyed by non-Indian residents of such political subdivisions and by distribution of tribal assets among the individual members, or to the tribe as a unit, whichever may appear to be the better plan in each case. In addition, responsibility for trust properties should be transferred to the Indians themselves, either as groups or individuals, as soon as feasible;

"Whereas it is not right to claim that the tribes being subjected to the termination bill are competent to handle their own affairs while the bills vest in the Secretary of Interior final authority to determine in what manner the Indians shall be made to handle their own affairs.

"Now, therefore, the tribal members of the Upper Lake Pomo Indian Community, a legal community organized under the Reorganization Act of June 18, 1934, under the corporate name, Upper Lake Pomo Indian Community, has worked successfully in managing and financing their business and homes under this organized setup, so now we believe we have advanced to where we are competent enough to handle our community and individual affairs when released from under Federal supervision.

"I. Membership consists of 76 adults and children. Adults 39; 37 children, 11 of these children are entered in the local public schools; the rest are under school age.

"II. Tribal property consists of 2 parcels of land which total 561 acres of land. One parcel of land consists of 401 acres; this is where the homesites, farming, and hill pastureland is situated. There are 21 homes on this place; 17 are I. R. and R. houses. One member purchased a small house from the tribe which was included with the purchase of the property; two other members have built their homes on house lots approved through the council. All homes are equipped with modern inside facilities. The domestic water is piped from two deep wells which all houseowners share the right-of-way and pay equally accumulated bills resulting from usage and repairs.

"Farmable land consists of approximately 110 acres of land of which all the land has been assigned through the council to individual tribal members who have qualified under the bylaws and land code set up by the community. Forty-eight acres are planted in pear trees, 20 acres in walnut trees; 42 acres are used for seasonal crops and garden lots.

"Hill pastureland consists of approximately 240 acres which is rented on yearly basis for pasture to neighboring farmers or stockowners and the money is used as a tribal fund, handled through tribal officers of whom the tribal treasurer is bonded, and the money is deposited in our local bank.

"The second parcel of land is a 160-acre woodlot, situated approximately 5 miles north of Upper Lake town, sec. 15, T. 16 N., R. 10 W., S½NE¼; E½SE¼ Mount Diablo meridian. It is used as a wood reserve for fuel and timber growing.

"In July 1953 we assumed the responsibility of cutting timber from a place to build a community building for the tribe; after cutting started we were stopped by the area office in Sacramento stating we were not owners of the woodlot. After all these years, they have given us the impression of ownership. We have signed through our community executive committee annual liability and asset report sheets determining valuation and title of property to our tribal organization. Now it stands as an unsettled question awaiting ownership approval from the Secretary of the Interior.

"III. The Government roads running through the tribal property have been repaired and oiled within the year and the council has approved by a resolution to turn these roads over to the county, which now is awaiting approval by the county and State for acceptance. These roads, we believe, are used more by the non-Indian or

public than the tribe and we believe the care and maintenance should
be the county's responsibility. The school buses drive into the res-
ervation for the Indian schoolchildren, who all attend the public
schools. The county provides bus shelters which consist of two for
the Indian children. School lunches are paid for by the parent or
guardian and those who need assistance are cared for the same as the
non-Indians. Hot lunches are served at the school at a nominal fee.

"IV. The older Indians, which total 11, all have and live in I. R.
and R. houses and either receive social security, veterans, or county
old age benefits.

"Now, therefore, be it resolved, to release the enrolled tribal mem-
bers of the Upper Lake Pomo Indian Community from under Federal
supervision and to assume responsibility like non-Indian residents.
Responsibility of trust property to be transferred over to the members
of our tribal roll of the Upper Lake Pomo Indian Community.

"The above resolution was duly passed and adopted by the execu-
tive committee of the Upper Lake Pomo Indian Community, a duly
elected body to represent and transact business for the Upper Lake
Pomo Indian Community, by a unanimous vote of seven for, none
against, at a meeting assembled at which a quorum was present on
this 16th day of November 1954."

There is a lien of $20,568.40 against the lands of the Upper Lake
Rancheria because of irrigation and domestic water system installa-
tions.

In addition to the above resolution, this group passed a resolution
on September 22, 1955, reiterating their desire for fee title conditioned
upon an internal survey, establishment of water rights, cancellation
of liens against the land, and assistance to form a legal entity to manage
their community property.

It was estimated in September 1955, by local Bureau of Indian
Affairs' officials that the following amounts would be necessary to
effect withdrawal of Federal trusteeship:

| | |
|---|---:|
| Land survey | $3, 500 |
| Legal assistance | 2, 500 |
| Water system | 2, 000 |
| Irrigation system | 1, 000 |
| Establishment of water rights | 2, 000 |
| Soil and moisture conservation | 7, 300 |
| Property appraisal | 600 |
| Programing and planning | 5, 000 |
| | |
| Total | 23, 900 |

## WILTON

*Background data on the Wilton Rancheria, Sacramento County*

*History.*—In 1924, 38.81 acres were bought for the 150 Miwok
Indians living in this area for $5,000. This is the Wilton Rancheria.
The group is organized under the Indian Reorganization Act as the
Me-wuk Indian community of the Wilton Rancheria, Calif. Their
constitution was approved on January 15, 1936, and amended on
May 21, 1956. They have no approved charter.

*People.*—By 1933, the number of Indians living on this rancheria
had dropped to 40, and today 33 make their homes here. There are
9 families: 1 family has 10 children and another has 8. Five of the

assignees are childless.   This is a comparatively young group, although 3 of the assignees are over 65 years of age.   The 13 children attend public school at Wilton.   There is an official roll of membership under the Indian Reorganization Act, but it is not current.

*Land.*—This tract is located near the little village of Wilton along the railroad tract.   The Consumnes River adjoins the tract at the lower end.   There are about 9 or 10 acres of agricultural land which has been cultivated in the past, but which is subject to floods from the river.   There has been some effort on the part of the local district, or the adjoining landowners, to build a dike to protect the Indian land as well as the non-Indian land.   The residents are served with water from a domestic well with an overhead tank and underground distribution system at each of the houses.   There is a lien on account of the water development in the amount of $3,809.47.   There has been no road improvement undertaken, but the Bureau has an item of $11,000 in the 1958 budget for some internal roads.   The rancheria adjoins a paved highway.

*Sources of income.*—The sources of income for heads of the families are extremely varied and include work in nearby Government installations, farm labor, and miscellaneous wage work.

*Bureau services.*—The Bureau renders services only because of the trust status of the land.   There are no payments to the local school district under the Johnson-O'Malley contract.   An item of $11,000 is in the Bureau's budget for 1958 for internal road construction.   These people receive their social services (extension, law and order, vital statistics, welfare, etc.) from the county with no distinction being made because they are Indians.

*Attitude toward withdrawal of Federal trusteeship.*—The 10 assignees on the rancheria asked by resolution dated October 13, 1955, that they be given fee title to their assignments after the road system has been completed, and an internal survey has been made on which to base the subdivision, and that the lien against the land be canceled.

*Estimated cost to effect withdrawal of Federal trusteeship.*—At the time it was estimated by the local Bureau of Indian Affairs' officer that the following sums would be necessary to effect withdrawal of Federal trusteeship:

Land survey_____
Domestic water system_____
Legal assistance_____
Appraisal of property_____
Levee construction_____
Programing and planning_____

     Total_____

O