# EXHIBIT 31

RANCHERIA ACT OF AUGUST 18, 1958

*August 1, 1960.*

*Memorandum*

To:        Commissioner of Indian Affairs
From:      The Solicitor
Subject:   Request for opinion on "Rancheria Act" of August 18, 1958 (72 Stat. 619)

Pursuant to your request, we have considered the questions which appear to prevent the insuring of title to the Rancheria tracts now being conveyed by the United States pursuant to the Act of August 18, 1959 (72 Stat. 619). We believe that this indecision results largely from lack of knowledge of the facts concerning these transactions, so we are setting them forth in detail.

As a result of congressional action commencing about 1893, approximately 58 small tracts of land called "rancherias" were purchased in central California by the Secretary of the Interior, who permitted Indians living nearby, generally in groups, to occupy such tracts. This permissive use was referred to as an "assignment" to such Indians.

The Act of March 3, 1893, 27 Stat. 612, 628, appropriated $10,000 for the acquisition of land at Jackson, California, "for the support of the Digger Indians of Central California. . ."

The first general act of this nature is as follows:

> "* * * That the Secretary of the Interior be, and he is hereby, authorized to expend not to exceed one hundred thousand dollars to purchase for the use of the Indians in California now residing on reservations which do not contain land suitable for cultivation, and for Indians who are not now upon reservations in said State, suitable tracts or parcels of land, water, and water rights in said State of California, and have constructed the necessary ditches, flumes, and reservoirs for the purpose of irrigating said lands, and the irrigation of any lands now occupied by Indians in said State, and to construct suitable buildings upon said lands, and to fence the tracts of land so purchased, and fence, survey, and mark the boundaries of such Indian reservations in the State of California as the Secretary of the Interior may deem proper. One hundred thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any funds in the Treasury not otherwise appropriated, for the purpose of carrying out the provisions of this Act." Act of June 21, 1906, 34 Stat. 325, 333; also the act of April 30, 1908, 35 Stat. 76.

From 1914 to 1929, and again in 1937, Congress made small appropriations, designating them substantially as follows: "for the purchase of lands for the homeless Indians in California, including improvements thereon, for the use and occupancy of said Indians. . . . Said funds to be expended under such regulations and contentions as the Secretary of the Interior may prescribe " (See Act of

August 1, 1914, 38 Stat. 582, 589; Act of August 9, 1937, 50 Stat. 564, 573, ". . . for the relief of homeless Indians of that state . . .")

The "assignment" in the rancheria cases, occasionally referred to as "allotment," differs from the usual "assignment," which is the tribal action of allocating tribal land to individual members. The rancheria assignments are referred to as formal when in writing- informal when oral. They were in the nature of revocable permits, or, at the most, possessory estates, terminating upon abandonment of possession. Actual occupancy was occasionally required. Legal title and ownership interest remains in the United States (Comm. to Representative Lea, 4/4/36). The following assignment is typical:

> "TO WHOM IT MAY CONCERN:
>
> This is to certify that Mollie Wright, the widow of Jim Wright, is hereby given permission to use Lot No. 4 of the Pineliville Rancheria as shown by the plat of the said Rancheria by the files at this office. That this document does not give the said Mollie Wright any right of title, only that of occupancy, but that as long as she resides on the land and makes it her home her right of use and occupancy will not be questioned.
>
> Superintendent of the Sacramento
> Indian Agency, Having Jurisdiction
> over the Pineliville Indian Rancheria
>
> Dated at Sacramento, California, this 21st day of February, 1927."

In connection with this permit, the Commissioner ruled that "right of possession by inheritance cannot be recognized." He also ruled that:

> "2. Tracts relinquished or abandoned should be reassigned. In case of abandonment, absence for a period of two years is regarded as sufficient reason for reassigning the land to another.
>
> "3. The acquisition by individuals of additional tracts through inheritance must not be allowed, except where the survivors are landless and are entitled to land, in which cases formal reassignment should be made.
>
> "4. The leasing by individuals of tracts other than their own, and for their own benefit, should be discontinued. By leasing their own assigned lands for a period of two years would place such cases in the abandoned class and subject them to reassignment. The Office would prefer to have each assignee utilize all of his own land. However, where only part is used and the remainder could leased for a nominal consideration, it is believed such action should not be opposed, but the assignee be permitted

to make the lease, collect the rental and use it as he might see fit." (Comm.
to Supt., Sacramento Agency, April 13, 1927)

In actual practice, Indians occasionally moved onto the property without any
assignment, occupying a parcel abandoned or never assigned. Such possession was not
disturbed since these occupants were also "Indians of California" for whose use the land
was acquired. The Indians of Central California had not at first been regarded as subject
to Federal guardianship because they were not members of a tribe having treaty relations
with the United States, did not live on reservations, and held no restricted allotments. In
1933, the problem of placing these Indians on lands acquired for them was reconsidered,
since very few had moved to these rancherias or had remained there. It was then believed
that this was because the Indians were too poor to build homes there, or water was not
available. (See report to Comm., Aug. 15, 1933) In some cases, as in the Jackson
rancheria in Amador County, houses had been built for Indian families, who later
deserted them. (Letter Sept. 5, 1933, file 49-75 1-26-308.2 Sacramento) By 1950, it had
be come evident that the rancheria program for the California Indians should be
liquidated.

Few congressional acts have received the amount of consideration as was given to the
problem of liquidating the California rancheria. In response to the congressional
resolution (H. Con. Res. 108, 83d Congress, August 1, 1953) to terminate Federal Indian
supervision in the State of California and elsewhere, the Department of the Interior, on
January 4, 1954, submitted a proposed bill to provide for the distribution of the land and
assets of the rancherias, and extensive hearings were held. Similar bills had been
considered by the 82d Congress. The State of California had, in 1951, requested Congress
to dispense with all restrictions upon California Indians, and the State has also conducted
extensive investigations on this subject.

In 1956, a draft of a proposed bill "to carry out the expressed wishes of the Indian
people on the rancherias" was prepared and submitted to the various rancheria groups. On
October 27, 1956, a conference with over 400 participants was held in San Francisco to
consider termination legislation with respect to California Indians, in which all interested
groups were represented. The principal problem of legislation was to determine who
should be beneficiaries in the decision to distribute among the California Indians this land
originally acquired

1884          DEPARTMENT OF THE INTERIOR          **AUGUST 1, 1960**

or set a-side for their occupation.

On January 14, 1957, Congressman Moss introduced H.R., 2824, which the Secretary
recommended with minor amendments. It included fourteen rancherias when enacted by
the House.

Three other bills were introduced in the House on the same subject, of which two were
withdrawn and one combined with H.R., 2824. The House Subcommittee on Indian

Affairs conducted extensive hearings on this measure in May and June, 1957. The Senate Subcommittee's only change of substance was to add a number of rancherias. The bill as enacted is not mandatory. The Indians "who hold formal or informal assignments on each reservation or rancheria, or the Indians of such reservations or rancherias, or the Secretary of the Interior after consultation with such Indians," will prepare a plan of distribution for approval or rejection by a majority of those voting at each rancheria. Both the Senate and the House report notes that no membership roll is required to identify the beneficiaries because the groups are not well defined." Moreover, the reports state that the lands to be distributed "were for the most part acquired or set aside by the United States for Indians in California, generally, rather than for a specific group of Indians, and the consistent practice has been to select by administrative action the individual Indians who may use the land. The bill provides for the distribution of the land, or the proceeds from the sale of the land, primarily on the basis of plans prepared or approved by these administratively selected users of the land." (Sen. Report No. 1874. July 22, 1958)

The Rancheria Act further provides that "general notice shall be given of the contents" of the plan, and "any Indian who feels that he is unfairly treated in the proposed distribution of the property shall be given an opportunity to present his views and arguments for the consideration of the Secretary." After such consideration "the plan or a revision thereof shall be submitted for approval of the adult Indians who will participate in the distribution of the property. . . ." The plan becomes effective if approved "by a majority of such Indians who vote in a referendum called for that purpose." (Sec. 2 (b) )

Section 2 (c) provides that granters "shall receive an unrestricted title to the property conveyed. . . ." Prior to the conveyance, surveys, of such a nature as "necessary or appropriate for the conveyance of marketable and recordable titles," must be made, and certain other action specified must be taken (Sec. 3).

Plans have been approved and deeds issued in the following rancherias: Cache Creek, Buena Vista, Mark West, Paskenta, Ruffeys, Strawberry Valley, Table Bluff.

It has been suggested that the United States cannot dispose of this property in this fashion because it held the property in trust for specific bands, who had a vested interest therein.

The "background" data submitted to and published by the Senate Committee occasionally states that the title to particular rancheria land is "in the name of the United States Government in trust for the Indians of California" (See Auburn, Big Sandy, etc.); or that the lands "are held in trust by the United States Government for the Indians of California" (Blue Lake); or that it is "trust land" (Cache Creek). (See Report No. 1874, 85th Cong., 2d Sess.) These references do not connote a trust in which the United States holds merely a legal title, with equitable ownership elsewhere, as in the case of Indian lands generally; the intention was to indicate that the land, although acquired in fee, was purchased for a special purpose. This is shown both by congressional and administrative action. For instance, the Secretary generally ordered the purchase of a particular California tract "for the use of the band of Indians referred to" in the special agent's report (see file, Ruffey's Band). A special form of "proposal for sale of lands" was employed which states that ". . . . . . . . . hereby propose to sell to the United States, for the use and occupancy of the . . . Indians (*but without restrictions indeed*) the following described

lands: . . ." (See Paskenta.) (Underlining added for emphasis) The Government's voucher authorizing payment generally contains the language "to the purchase of . . . land in . . . . . . . . , said tract to be used for the benefit of the . . band of homeless Indians . . ." (See Mark West.) The deeds issued to the United States contain no restriction, and are in the form of absolute conveyances.

It has been decided, administratively, that these lands are not allottable, even to the members of the band for whom acquired, and that they could not be sold without legislation, even if the purpose was to acquired land more suitable for the same band (see Ruffey's Band, File 74408/07/311). They could be used for any landless California Indians, and not merely for the specific band for whom purchased, since neither the deed conveying the property to the United States nor the act appropriating the purchase money contained "any limitation or provision as to what Indians should be settled thereon." (See Marshal and Sebastapol. File 310, Part 21, letter Comm., July 6, 1937.)

The United States has accepted the fact that it long ago acquired the lands of the California In-

AUGUST 1, 1960   OPINIONS OF THE SOLICITOR                                 **1885**

divans, extinguishing their Indian title. The Act of May 18, 1928, 45 Stat. 602, authorized the attorney general of the state of California to bring suit in the Court of Claims on behalf of the "Indians of California" for claims they might have against the United States "by reason of land's taken from them in the state of California by the United States without compensation . . .," any decree to be based upon the compensation proposed in certain ratified treaties of 1851-1852. Section 3 of that act provides: "Any payment which may have been made by the United States or moneys heretofor or hereafter expended . . . for the benefit of the Indians of California, made under specific appropriations for the support . . . of Indians of California, including purchases of land, . . . may be pleaded by way of set-off ."

The Court of Claims decided October 5, 1942, that the California Indians were entitled to recover as compensation the sum of $10,648,625, for 8,518,900 acres taken, less $764,033.50 for lands "set aside by the United States for the plaintiff Indians as reservations and otherwise, by Executive Orders, Acts of Congress . . ." 98 C. Cls. 583, Cert. Den. 319 U.S. 764, 102 C. Cls. 837. The court held that whatever lands those Indians may have held "became a part of the public domain . . .." because the Indians did not qualify before the Commission set up by the Act of March 3, 1851 (9 Stat. 631) to settle private land claims in California. (p. 592)

It will be noted that this action in favor of the California Indian's is not a payment for money due the Indians, since the basis of the litigation and judgment is that these Indians lost their rights by reason of lathes. Nor did this involve all lands of the California Indians. The payment is in the nature of a gift, equitable because the United States Senate failed to ratify an agreement with the Indians concerning those particular lands. The claims of the California Indians, based upon aboriginal title, is now in process of

litigation. This suit also is based upon acquisition of the Indians' lands by the United States.

The subsequent plan of distribution of the rancheria land was considered with knowledge of the then recent action of Congress and of the Federal courts in subtracting from the amount to be given to the Indians of California, and thus to each such Indian, under the special act of 1928, the amount expended by the Government for all the rancheria land. The result, as Congress must have foreseen, was that some Indians, who would receive no share in rancheria land, had pro rata deductions made from their distributive share under the 1928 Act based upon the value of this rancheria land, where as others received the same amount and also will participate in the actual distribution of this off-set land. It should be noted that deductions were also made for other services rendered by the United States which did not directly benefit all.

A practical answer to this seeming inequity is that the Indians of California had the occupation of this rancheria land during a period when many of them needed it, which was the purpose of the legislation. Moreover, the rancheria distribution is generally regarded, even by the Indians, as the most satisfactory method of terminating this program of governmental aid. From a legal point of view, the acquisition by the United States of the rancheria land was for occupancy during a temporary period of Federal supervision. Congress has indicated that the program has now served its purpose. It is the sole judge of the extent of guardianship and of its duration. See *United States* v. *Hellard,* 322 U.S. 363, 367 (1944); *Lone Wolf* v. *Hitchcock,* 187 U.S. 553 (1903). Moreover, Congress can, under the Constitution, dispose of this property as it pleases, the property belonging to the United States as part of the public domain, U.S. Constitution, Art. IV, sec. 3, cl. 2; *Hallowell* v. *United States,* 221 U.S. 317 (1911); *Alabama* v. *Texas,* 347 U.S. 272 (1954).

It is also suggested that the legislation is so indefinite in its designation of beneficiaries as to be invalid. Congress recognized the difficulty of being specific (see Committee Report, *supra*). It concluded to distribute the property among the assignment holders or other Indians, now occupying the rancherias. The plan would designate the distribution. Although no Indian has a vested right in this land, Congress had provided that notice "of the contents of the plan" shall be given so that "any Indian who feels that he is unfairly treated in the proposed distribution of the property shall be given an opportunity to present his views and arguments for the consideration of the Secretary," (sec. 2 (b) ) The Secretary has the power of approval or rejection of the Plan (sec. 10 (a) ) Thus, the Secretary is Congress' delegated authority to determine whether the plan properly designates the beneficiaries. The Secretary also is authorized to issue the documents necessary to carry out the distribution. This delegation of power to the Secretary is no greater than that given him in many other cases providing for distribution of property to Indians. Regardless of Indian group or tribal action where distributees are members thereof, the Secretary is generally and properly authorized to determine whether the tribal membership roll is accurate. See *Stephens* v. *Cherokee Nation,* 174 U.S. 445, 490 (1899). In the cases in which deeds have so far been issued, there has been no doubt concerning

1886          DEPARTMENT OF THE INTERIOR          **AUGUST 1, 1960**

the beneficiaries, and no objection has been received to the plans formulated.

It is suggested that rights may have been acquired by other Indians in the property. If rights were acquired prior to purchase by the United States, those rights should be disclosed in the abstract. This was one reason for obtaining title insurance then. When passing upon conveyances under the Rancheria Act, title insurance will protect against any rights acquired prior to acquisition by the United States. Since the acquisition by the United States, rights in the property could not be acquired against the owner. "It is beyond the power of a state, either through statutes of limitation or adverse possession, to affect the interests of the United States." *U.S.* v. *7,405.3 acres of land,* 97 Fed. 2d., 417 (1938).

In conclusion, the rancheria properties belong to the United States, in law and equity; the disposition of these rancheria properties has been properly undertaken by Congress in the method usually employed in the distribution of property among groups of Indians temporarily occupying United States property; and the method of determining distributees is clearly set forth, following the customary practice of delegating to the Secretary of the Interior the authority and responsibility of deter mining the individual Indian beneficiaries. This does not relieve a title insurance company from the usual responsibility, for which it is paid, of insuring a distributee's title against any defects not set forth in its policy of insurance.

GEORGE W.

ABBOTT,

*The*

*Solicitor.*

By:

FRANKLIN C.

SALISBURY,

*Assistant Solicitor,*

*Indian*

*Legal Activities.*