## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STAND UP FOR CALIFORNIA!, et al.** ) | |
| *Plaintiffs* ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 1:12-cv-02039-BAH** |
| ) | Judge Beryl A. Howell |
| ) | |
| **UNITED STATES DEPARTMENT OF THE** ) | |
| **INTERIOR, et al.** ) | |
| ) | |
| *Defendants* ) | |

## UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The United States hereby responds to the Stand Up For California Plaintiffs'("Plaintiffs") Motion for Preliminary Injunction ("Motion"), ECF No. 26-1, 26-2, 26-3, requesting that the Court enjoin the Secretary from placing a 305.49-acre site in Madera County, California ("Madera Site"), into trust for the North Fork Rancheria of Mono Indians ("North Fork" or "Tribe"). Plaintiffs' Motion should be denied because Plaintiffs are not harmed by the mere transfer of the land title to the United States, which will have no on the ground impacts. To the extent that Plaintiffs claim that future gaming on these lands will cause irreparable harm, they have not demonstrated that any gaming is imminent or that any alleged harms from gaming will be irreparable. For this reason alone Plaintiffs' Motion should be denied. As discussed below, in addition to not meeting their burden on irreparable harm, Plaintiffs also fail to demonstrate a likelihood of success on the merits of their claims, that the equities are in their favor, or that the public interest would be served by granting the injunction. For all of these reasons, Plaintiffs are not entitled to any injunctive relief.

## INTRODUCTION

### I.     Factual Background

In September 2011, the Assistant Secretary-Indian Affairs ("Assistant Secretary") of the United States Department of the Interior ("Interior") determined that pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, the construction of a gaming facility on the Madera Site (implementation of preferred alternative, Alternative A), would be in the best interest of North Fork and would not be detrimental to the surrounding community.  Defs.' Ex. B, Secretarial Determination Record of Decision ("SD ROD") at 2.  On September 1, 2011, pursuant to 25 C.F.R. § 292.13(d), the Assistant Secretary formally requested the Governor of the States of California's concurrence in that Secretarial Determination.  Defs.' Ex. S, September 1, 2011, Letter from the Assistant Secretary to the Governor of the State of California.  By letter dated August 30, 2012, the Governor of the State of California concurred in the Secretarial Determination.  Defs.' Ex. C, the Governor of California's August 30, 2012 Concurrence.

Thereafter, on November 26, 2012, the Assistant Secretary approved the acceptance of the Madera Site into trust status pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, its implementing regulations, codified at 25 C.F.R. Part 151, and the Indian Land Consolidation Act, 25 U.S.C. § 2202.  Defs.' Ex. D, Fee-to-Trust Record of Decision ("FTT ROD") at 2.  As a part of that decision the Secretary also prepared an Environmental Impact Statement ("EIS")[1], that satisfied requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370.[2]  On

---

[1] Cited portions of the EIS are attached as exhibits, however, the Final Environmental Impact Statement is available at http://www.northforkeis.com/documents/final_eis/report.htm

[2] The Notice of Availability for the Draft EIS was published in the Federal Register on February 15, 2008, 73 Fed. Reg. 8898 (Feb. 15, 2008), and the Notice of Availability for the Final EIS was

December 3, 2012, pursuant to 25 C.F.R. § 151.12(b), notice of the Secretary's decision to acquire the land in trust was published in the Federal Register, to provide 30 days for any interested party to challenge the decision.  Land Acquisitions; North Fork Rancheria of Mono Indians of California, 77 Fed. Reg. 71611 (Dec. 3, 2012).

On December 19, 2012, a lawsuit was filed against the Secretary in this Court, led by Stand Up For California!, a group that focuses on gambling issues affecting California.  Stand Up For California! Compl. ("Pls. Compl.") at ¶5.  On December 21, 2012, the Stand Up For California! Plaintiffs filed an Emergency Motion for Scheduling Order and Status Conference.  ECF No. 11. Pursuant to this Court's December 21, 2012, Minute Order, the Parties filed a Joint Status Report on December 24, 2012.  In response to the Joint Status Report the Court issued a Minute Order setting the schedule for briefing a motion to transfer the case to the Eastern District of California[3] and a briefing schedule for any motion for preliminary injunction that the Plaintiffs might file. December 24, 2012, Minute Order.  North Fork filed a motion to intervene on December 28, 2012, and that motion was granted by Minute Order on January 17, 2013.

The Picayune Rancheria of Chukchansi Indians ("Picayune") subsequently filed a separate lawsuit challenging the same decision as the Stand Up for California! Plaintiffs.  The Court consolidated the two cases, closing the Picayune case, and directing that all filings be lodged in the above-captioned Stand Up For California! case, pursuant to the briefing schedule set in the

---

published in the Federal Register on August 6, 2010, 75 Fed. Reg. 47621 (Aug. 6, 2010).

[3] The Motion to Change Venue was filed by the United States on January 4, 2013, ECF No. 20, and the Stand Up For California! Plaintiffs filed their opposition on January 10, 2013, ECF No. 22, and Plaintiff Picayune Rancheria of Chukchansi Indians filed its opposition on January 11, 2013, ECF No. 24.

December 24, 2012 Minute Order for any preliminary injunction motions.  January 9, 2013, Minute

Order, <u>Picayune Rancheria of the Chukchansi Indians v. United States</u>, No. 12-02071 (December

31, 2012).

On January 11, 2013, Plaintiffs filed a motion for preliminary injunction.  ECF No. 26.  In

doing so, Plaintiffs seek to delay the trust acquisition beyond February 1, 2013, by enjoining the

Secretary from acquiring the land into trust for North Fork.

## II.   **Statutory Background**

### A.   **The Indian Reorganization Act**

In deciding to accept the Property into trust the Secretary acted pursuant to the IRA.  In 1934,

Congress enacted the IRA to encourage tribes "to revitalize their self-government," to take control

of their "business and economic affairs," and to assure a solid territorial base by "put[ting] a halt to

the loss of tribal lands through allotment."  <u>Mescalero Apache Tribe v. Jones</u>, 411 U.S. 145, 151

(1973).  This "sweeping" legislation, <u>Morton v. Mancari</u>, 417 U.S. 535, 542 (1974), manifested a

sharp change of direction in federal policy toward the Indians.  It replaced the assimilationist policy

at the time of the General Allotment Act, which had been designed to "put an end to tribal

organization" and to "dealings with Indians . . . as tribes."  <u>United States v. Celestine</u>, 215 U.S. 278,

290 (1909).

The "overriding purpose" of the IRA, however, was more far-reaching than remedying the

negative effects of the General Allotment Act.  <u>Morton</u>, 417 U.S. at 542.  Congress sought to

"establish machinery whereby Indian tribes would be able to assume a greater degree of self-

government, both politically and economically."  <u>Id.</u>  Congress thus authorized Indian tribes to adopt

their own constitutions and bylaws, 25 U.S.C. § 476, and to incorporate, 25 U.S.C. § 477.

4

Of particular relevance here, Section 5 of the IRA provides in pertinent part that:

[t]he Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in land, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
…
Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465.

Pursuant to the Secretary's expressly delegated authority to prescribe regulations "carrying into effect the various provisions of any act relating to Indian affairs," 25 U.S.C. § 9; see 25 U.S.C. § 2; 5 U.S.C. § 301, the Secretary has issued regulations governing the implementation of his authority under Section 5 to take land into trust.  25 C.F.R. Part 151.  The Part 151 regulations provide that the Secretary may acquire land into trust "[w]hen the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing."  25 C.F.R. § 151.3(a)(3).  Section 151.10 requires the Secretary to notify the state and local governments having regulatory jurisdiction over the land of the proposed trust acquisition, so that they can provide written comments on the potential impacts on jurisdiction, taxes and assessments.  Id.  The provision also obligates the Secretary to consider factors such as:  the need of the tribe for the land; the purposes for which the land will be used; the impact on the state and its political subdivisions resulting from the removal of the land from its tax rolls; jurisdictional problems and potential conflicts of land use; whether the BIA is equipped to discharge any additional

responsibilities resulting from the trust status; and compliance with NEPA.  See id. § 151.10(b)-(d),

(f)-(h).  Here, the Secretary made the required notifications and considered the appropriate factors.

Finally, Section 19 of the IRA provides an inclusive definition of those who are eligible for

its benefits, including eligibility for land into trust acquisitions.  That section provides that "'Indian'

. . . shall include all persons of Indian descent who are members of any recognized Indian tribe now

under Federal jurisdiction."  25 U.S.C. § 479.  The IRA also includes within its definition of

"Indian" "all persons who are descendants of such members who were, on June 1, 1934, residing

within the present boundaries of any Indian reservation," and "all other persons of one-half or more

Indian blood."  Id.  In, Carcieri v. Salazar, 555 U.S. 379 (2009), the Supreme Court interpreted the

first definition of Section 19 of the IRA to be limited to tribes that were under Federal jurisdiction

in 1934, in overturning the Secretary's decision to take land into trust for the Narragansett Indian

Tribe of Rhode Island.

**B.      The Indian Gaming Regulatory Act**

In 1988, Congress enacted IGRA[4] to regulate gaming operations owned by Indian tribes.

IGRA's purpose is to "provide a statutory basis for the operation of gaming by Indian tribes as a

means of promoting tribal economic development, self-sufficiency, and strong tribal governments."

25 U.S.C. § 2702(1); Citizens Exposing Truth About Casinos v. Kempthorne ("CETAC"), 492 F.3d

---

[4] Under IGRA, gaming is divided into three classes. Tribes have exclusive authority over "Class
I" social and traditional games with prizes of minimal value. 25 U.S.C. §§ 2703(6), 2710(a)(1).
Class II gaming, which includes bingo and certain "non-banking" card games, see id. §
2703(7)(A)(i), can occur if the state allows such gaming for other groups. See id. §§ 2704,
2710(b).  The tribes and NIGC share regulatory duties over Class II gaming.  Id. § 2710(b).
Class III gaming, which includes more traditional "casino" games, can occur lawfully only
pursuant to a tribal-state "compact."  Id. § 2710(d).  Regulatory and enforcement oversight of
Class III gaming activities is also provided under IGRA by NIGC.  Id. §§ 2705(a), 2710(d).

460, 462 (D.C. Cir. 2007) (quoting Taxpayers of Mich. Against Casinos v. Norton ("TOMAC"), 433

F.3d 852, 865 (D.C. Cir. 2006)).

IGRA provides that gaming shall not be conducted on lands acquired by the Secretary in trust

for the benefit of an Indian tribe after October 17, 1988, unless the land meets the requirements of

one of the exceptions to this prohibition listed at 25 U.S.C. § 2719(a)-(b).  The relevant exception

for purposes of this case is the exception commonly known as the "Two-Part Determination," 25

U.S.C. § 2719(b)(1)(A), which states:

> Subsection (a) of this section will not apply when—
>
> (A) the Secretary, after consultation with the Indian tribe and appropriate State
> and local officials, including officials of other nearby Indian tribes, determines
> that a gaming establishment on newly acquired lands would be in the best interest
> of the Indian tribe and its members, and would not be detrimental to the
> surrounding community, but only if the Governor of the State in which the gaming
> activity is to be conducted concurs in the Secretary's determination

Id.  In 2008, the Department of the Interior promulgated regulations implementing Section 20, 25

U.S.C. § 2719, of IGRA.  Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg.

29354, 29355 (May 20, 2008) (codified at 25 C.F.R. Part 292) ("Section 20 Regulations").  Pursuant

to these regulations, the Secretary must consult with appropriate State and local officials and the

officials of a nearby Indian tribe:

> How will the Regional Director conduct the consultation process?
>
> (a) The Regional Director will send a letter that meets the requirements in § 292.20
> and that solicits comments within a 60-day period from:
>
> (1) Appropriate State and local officials; and
>
> (2) Officials of nearby Indian tribes.

25 C.F.R. 292.19(a)(1)-(2).  The Section 20 Regulations define "nearby Indian tribe" as "an Indian tribe with tribal Indian lands located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25-mile radius of its government headquarters," and "surrounding community" as "local governments and nearby Indian tribes located within a 25-mile radius of the site of the proposed gaming establishment."  25 C.F.R. § 292.2.  As discussed in the final publication of the Section 20 Regulations, Interior established the 25-mile because:

> Based on our [Interior's] experience, a 25-mile radius best reflects those communities whose governmental functions, infrastructure or services may be affected by the potential impacts of a gaming establishment.  The 25-mile radius provides a uniform standard that is necessary for the term 'surrounding community' to be defined in a consistent manner.  We have, however, included a rebuttable presumption to the 25-mile radius.  A local government or nearby Indian tribe located beyond the 25-mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment.

73 Fed. Reg. 29354, 29357 (May 20, 2008).

## III.   Legal Standards

### A.   The Standard for a Preliminary Injunction

A request for preliminary injunctive relief is an "'extraordinary and drastic remedy' and 'should not be granted unless the movant, by a clear showing carries the burden of persuasion.'"  Stop This Insanity, Inc. Emp. Leadership Fund v. Fed. Election Comm'n, 2012 WL 5383581, at *3 (D.D.C. Nov. 5, 2012) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  In order to prevail on a motion for a preliminary injunction, a plaintiff must "establish that (1) they are likely to succeed on the merits of their claims; (2) they are likely

8

to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) and injunction is in the public interest." Id., citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) ("Winter"). "Historically, these four factors have been evaluated on a 'sliding scale' in this [the D.C.] Circuit, such that '[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." Id. (citing Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).

Despite this flexible balancing approach, a movant must show "at least some injury," before the court may grant a preliminary injunction, Population Inst. v. McPherson, 797 F.2d 1062, 1078 (D.C. Cir. 1986), because "the basis of injunctive relief in the federal courts has always been irreparable harm." Sampson v. Murray, 415 U.S. 61, 88 (1974) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). Moreover, "the injury must be both certain and great; it must be actual and not theoretical." Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Finally, "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." St. Croix Chippewa Indians of Wis. v. Kempthorne, 535 F. Supp.2d 33, 36 (D.D.C. Feb. 22, 2008) (quoting Dodd v. Fleming, 223 F. Supp.2d 15, 20 (D.D.C. 2002)).

This Court recognizes the questionable viability of the sliding scale test after the Supreme Court's Winter decision, suggesting that the likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction. Id. (citing Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011)). Regardless of the approach taken,

Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims. Plaintiffs will not suffer irreparable harm from the transfer of the land. The equities are not in their favor and the public interest will not be served by granting any injunction. For the reasons set forth herein, Plaintiffs' motion must be denied.

### B.   Review of Agency Action Under the APA

Plaintiffs bring claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §706, which generally provides for judicial review of final agency action. The APA provides that a court may set aside agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard encompasses a presumption in favor of upholding agency action. Accordingly, "[t]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 416 (1971); see also Small Refiner Lead Phase-Down v. EPA, 705 F.2d 506, 520-21 (D.C. Cir. 1983). The reviewing court's task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).

Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted). Under this deferential standard, there is a strong presumption in favor of upholding decisions where agencies have acted within their scope of agency expertise. Marsh, 490 U.S. at 376, 378; Friends of the Earth v. U.S. Army Corps

of Eng'rs, 109 F. Supp. 2d 30, 35–36 (D.D.C. 2000).  "[A]gency action is arbitrary and capricious if an agency has entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id. at 34 (citations omitted).

The Assistant Secretary's decision to approve North Fork's trust application and the Secretarial Determination are entitled to the deference normally accorded agencies deciding matters in their purview.  Lyng v. Payne, 476 U.S. 926, 939 (1986) (agency's construction of its own regulations is entitled to substantial deference); EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64, 83 (1980).  The courts give considerable legal leeway to an agency's interpretation of its own regulations.  See Auer v. Robbins, 519 U.S. 452, 461 (1997) (Secretary's interpretation of own regulations are controlling unless "plainly erroneous or inconsistent with the regulation.").

C.     **Deference to the Agency's Interpretation of a Statute**

The Assistant Secretary's decisions are entitled to Chevron deference.  See Shakopee Mdewakanton Sioux (Dakota) Comty. v. Babbitt, 107 F.3d 667 (8th Cir.1997) (agency interpretation of the IRA deserves Chevron deference) (citing Chevron v. Natural Res. Def. Council, 467 U.S. 837 (1984)).  Under Chevron, the first question is whether the statute is silent or ambiguous on the matter.  See Chevron, 467 U.S. at 843.  If so, the courts will defer to the agency's interpretation so long as it is reasonable.  See United States v. Mead Corp., 533 U.S. 218, 229 (2001) (citing Chevron, 467 U.S. at 842-845).  "The court need not conclude that the agency construction was the only one it permissibly could have adopted to

11

uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding," but only that the agency's interpretation is reasonable and is not contrary to congressional intent. <u>Chevron</u>, 467 U.S. at 843 n.11 (1984) (citations omitted).

The Secretary promulgated regulations to implement the IRA's directive and to provide detailed criteria and procedures for trust land acquisitions. <u>See</u> 25 C.F.R. Part 151. The Secretary also promulgated regulations to implement Section 20 of IGRA. 25 C.F.R. Part 292. Because the Assistant Secretary's decision to acquire the Madera Site was made according to formally promulgated regulations pursuant to an express delegation of authority, the Assistant Secretary's interpretation of the IRA, IGRA, and the implementing regulations of the respective statutes, deserves <u>Chevron</u> deference. <u>See</u> <u>Mead</u>, 533 U.S. at 226-27.

## ARGUMENT

**I.** **Plaintiffs Cannot Show a Likelihood of Success on the Merits of Their Claims**

**A.** **Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits of Their Claim that the Secretary Violated the IRA**

**1.** **Consistent with _Carcieri_, the Secretary Has the Authority to Aquire Land In Trust for North Fork Under the IRA**

Plaintiffs argue that the Secretary lacks authority to take land into trust for the North Fork Rancheria, Motion at 17, because the Tribe was not under Federal jurisdiction in 1934. Plaintiffs' argument is based on an erroneous reading of the Supreme Court decision, <u>Carcieri v. Salazar</u>, 555 U.S. 379. In <u>Carcieri</u>, the Supreme Court was "asked to interpret the statutory phrase 'now under Federal jurisdiction'" in the **_first_** definition of Indian (members

of any recognized Indian tribe now under Federal jurisdiction).  555 U.S. at 382.   The

Supreme Court held that "Section 479 limits the Secretary's authority to taking land into trust

for the purpose of providing land to members of a tribe that was under federal jurisdiction

when the IRA was enacted in June 1934."  Id.  In its decision, the Supreme Court noted that

Section 479 has:

> [T]hree discrete definitions [of the term Indian]:  '[1] members of any
> recognized Indian tribe now under Federal jurisdiction, and [2] all persons
> who are descendants of such members who were, on June 1, 1934,
> residing within the present boundaries of any Indian reservation, and ... [3]
> all other persons of one-half or more Indian blood.'

Id.  As explained below, North Fork meets both the first and second prong of that definition.

### a.      North Fork was under Federal jurisdiction in 1934 and Thus Meets the IRA's First Defintion of Indian

In this case, the Secretary correctly determined that the North Fork Rancheria was

"under Federal jurisdiction" in 1934, based on the historical fact that, on June 10, 1935,

Interior held a vote among the members of the North Fork Rancheria on whether to reject the

application of the IRA's provisions to the Rancheria pursuant to Section 18 of the Act.  Defs.

Ex. D, FTT ROD at 55.  This vote, as noted by the Assistant Secretary, is documented in a

1947 report prepared by Theodore H. Haas, Chief Counsel, United States Indian Service,

entitled, "Ten Years of Tribal Government Under I.R.A." ("Haas") Defs.' Ex. E; Defs.' Ex.

D, FTT ROD at 55.  This report contains several tables regarding the organization of tribes

under the IRA.  Table A lists the tribes that voted to accept or reject the IRA and North Fork

is listed in that table.  See id. at 18 (noting election results and election date); Defs.' Ex. D,

FTT ROD at 55.  The Secretary is charged by Congress with the responsibility for handling

all public business related to Indians, 43 U.S.C. § 1457, including specifically implementing

the IRA, e.g. 25 U.S.C. §§ 465, 476, 478.  Simply put, if the North Fork Rancheria was not

composed of "Indians," "now under Federal jurisdiction," residing on a "reservation," the

Secretary would not have called a Section 18 election for it.  25 U.S.C. §§ 478-79.[5]

The Secretary correctly concluded that the fact of the 1934 vote is dispositive of the

federal government's jurisdiction over the North Fork Rancheria at the time of the IRA's

enactment.  Id.  Consequently, the Secretary has authority to accept land into trust for the

North Fork Rancheria and Carcieri offers no basis to invalidate the Secretary's decision.[6]

### b.   Post-1934 History Regarding Termination and Restoration is Immaterial as to whether the Tribe was Under Federal Jurisdiction in 1934

Subsequent history regarding termination and restoration does not change the

conclusion that the North Fork Rancheria was clearly under Federal jurisdiction in 1934.

Beginning in 1906, Congress authorized the Bureau of Indian Affairs to purchase land and

water rights for the use of Indians in California who lived outside of reservations or who

lived on reservations that did not contain land suitable for cultivation.  Act of June 21, 1906,

34 Stat. 325; see also Act of March 3, 1925, 43 Stat. 1101-02.  The United States acquired

land for the North Fork Rancheria in 1914 pursuant to Interior's Appropriations Act of June

---

[5]Shawano County, Wisconsin v. Acting Midwest Regional Director, Bureau of Indian Affairs, 53 IBIA 62, 71 (Feb. 28, 2011) ("[I]n 1934, the Secretary necessarily recognized and determined that the Tribe did constitute a tribe under Federal jurisdiction when he called and conducted a special election.").

[6]That the North Fork voted against the IRA is of no moment.  As the Assistant Secretary notes, in ILCA, Congress amended the IRA to allow the Secretary to acquire land into trust for tribes that voted against the application of the IRA to their reservation in the 1930s.  25 U.S.C. § 2202 ("The provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of section 478 [Section 18] of this title."); Defs.' Ex. D, FTT ROD at 55.

30, 1913 (38 Stat. 77, 86).  Def.'s Ex. D, FTT ROD at 55; Defs.' Ex. G, H.R. Rep. No. 82-2503 at 702 (1953) (North Fork established in 1914).  The North Fork Rancheria was comprised of a tract of approximately 80 acres located in Madera County, California.  Def.'s Ex. D, FTT ROD at 55.  The Indians living on the rancheria were descended from the Mono tribe and were residing on the rancheria at the time of the IRA's enactment.  See Defs.' Ex. E, Haas at 15 (detailing population on the rancheria shortly after the IRA's enactment).  The fact that the land was set aside as trust land for the benefit of North Fork and that Interior held a vote on the IRA demonstrates that the North Forth Rancheria was under federal jurisdiction before 1934 and no subsequent event changed that fact.

Post-IRA, Congress initiated efforts to terminate federal supervision over several tribes, including the California rancherias, but termination over North Fork was never completed.  In 1958, Congress passed the California Rancheria Termination Act, Pub. L. No. 85-671, 72 Stat. 619 (1958), in order to terminate federal supervision over forty-one California Indian tribes or rancherias and distribute the assets to individual Indians.  William v. Gover, 490 F.3d 785, 787 (9th Cir. 2007); see also Wilton Miwok Rancheria v. Salazar, 2010 W.L. 693420, *1 (N.D. Cal. 2010).  On July 10, 1979, a number of distributees from the rancherias that had been terminated brought a class action against the United States, asserting that the United States violated the Rancheria Act in its efforts to terminate federal supervision.  Tillie Hardwick v. United States, No. 79-1710 (N.D. Cal. July 10, 1979).  On July 19, 1983, several parties to the litigation, including North Fork, entered into a Stipulation for Entry of Judgment, restoring and confirming the status of seventeen rancherias to the same status that they possessed prior to the distribution of assets under the

Rancheria Act and placing them on the Federal Register list of recognized tribes. See Defs.'

Ex. F, Tillie Hardwick, Stipulation for Entry of Judgment at 2 (N.D. Cal. Dec. 22, 1983).

As a result, the seventeen rancherias, including North Fork Rancheria, were ***restored*** to

federal recognition.

Plaintiffs incorrectly state that the Tillie Hardwick litigation resulted in the

"recognition" of the North Fork Rancheria, Motion at 20-21, ECF No. 26-2, and therefore,

the date of the stipulation is the date that North Fork was first recognized for purposes of

Carcieri (i.e., North Fork could not be under Federal jurisdiction in 1934 because the Tribe

was not recognized until 1983).   However, Plaintiffs' argument defies logic because there

would be no basis for Congress to pass an Act terminating a tribe that was not already

federally recognized and, further, no basis for a civil action challenging that termination.

Plaintiffs also argue that the Secretary erred by failing to recognize that federal

recognition could only result from a course of dealing over time, a treaty, a statute, or an

executive order.   Motion at 21, ECF No. 26-2.   Aside from conflating federal recognition

with eligibility for IRA benefits,[7] Plaintiffs once again ask this Court to accept the history

of California Indians when it supports their argument, Motion at 8, ECF No. 26-1 (discussing

the lack of ratification of the treaties and extinguishment of Indian title), but ignore this

history when it does not (the Congressional establishment of the reservations).   The

rancherias were established through appropriation bills designed for landless and homeless

---

[7] As Justice Breyer notes in his concurring opinion in Carcieri, the IRA does not require a tribe to be federally recognized in 1934, because the word "now" in the IRA modifies "under Federal jurisdiction" not "recognition," and concluded that the IRA "imposes no time limit upon recognition." Carcieri, 555 U.S. at 397-98.

Indians in California pursuant to Congressional action, thereby creating reservations that were eligible to vote on the application of the IRA.  See Defs.' Ex. E, Haas at 14-16.[8]

## 2.   The North Fork Rancheria Also Fits Within the Second Definition of "Indian" in Section 19 of the IRA

The residents of the North Fork Rancheria also satisfy the second definition of Indians in Section 19 of the IRA because they were "person[s] who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation."  25 U.S.C. § 479.  In addition, the North Fork Rancheria satisfies the IRA's statutory definition of a "tribe" as "Indians residing on one reservation."  Id.  Section 18 of the IRA, 25 U.S.C. § 478, provided that the IRA would not apply to any reservation wherein the majority of adult Indians voted against its application.  It required the Secretary to hold an election (Section 18 election) on reservations to give the residents an opportunity to reject the application of the IRA.  Specifically, the Act stated: "[i]t shall be the duty of the Secretary of the Interior, within one year after [the passage and approval of this Act], to call such an election . . . ."[9]  25 U.S.C. § 478 (emphasis added).  On June 10, 1935, the Indians of the North Fork Rancheria voted in an election called by the Secretary pursuant to Section 18.  See Defs.' Ex. D, FTT ROD at 55; Defs.' Ex. E , Haas at 15 (noting election results and election date).  It is clear that the Secretary considered the North Fork Rancheria to be a

---

[8]Another example of a tribe that was not recognized through a treaty, executive order or a statute, but was nonetheless allowed to vote on the application of the IRA to its rancheria is the Sheep Ranch Rancheria.  Cal. Valley Miwok Tribe v. United States, 424 F. Supp. 2d 197, 197-98 (D.D.C. 2008).

[9]The Secretary had a duty to call such elections by June 18, 1935, which Congress later extended by one year to June 18, 1936.  49 Stat. 378 (June 15, 1935).

reservation and, thus, called a Section 18 election on it.  In sum, this authority demonstrates

that the Indians at North Fork qualified under both the definition of "Indian" and  "tribe"

under Section 19, 25 U.S.C. § 479.

### 3.        Rancherias are Reservations

Plaintiffs also assert that rancherias are not reservations.  Motion at 19.  While

rancherias are a unique designation limited to tribes in California, such treatment does not

render California tribes ineligible to have land taken into trust.  The Secretary's treatment of

the North Fork Rancheria as a reservation was consistent with the practice throughout

California and the decisions of the Supreme Court.  While Section 7 of the IRA, 25 U.S.C.

§ 467, makes provision for proclaiming reservations, not all lands which are considered

"reservations" for purposes of Federal law are lands which have been formally proclaimed

reservations under that act or another statute.  For example, in Oklahoma Tax Commission

v. Citizen Band of Potawatomi Indian Tribe, the Supreme Court rejected the State's

argument that the tribe's sovereign immunity did not apply to preclude state taxation of

cigarette sales because the tribal convenience store did not operate on a formally designated

"reservation" but on land held in trust for the Potawatomis.  498 U.S. 505, 511 (1991).

Citing its decision in United States v. John, the Court stated that:

> [T]he test for determining whether land is Indian country does not turn upon
> whether that land is denominated "trust land" or "reservation."  Rather, we
> ask whether the area has been validly set apart for the use of the Indians as
> such, under the superintendence of the Government.

Id. (citing John, 437 U.S. 634, 648-649 (1978)) (internal quotation marks omitted).

"Rancheria" is simply another term used to describe Indian land in California and it

is well established that rancherias "are, for all practical purposes, small reservations." Licensing Power of State Over Cal. Rancheria Dog Owners, Solicitor's Op., M-28958 (April 26, 1939); 1 Op. Sol. On Indian Affairs 891 (U.S.D.I. 1979).[10/] Indeed, courts have long recognized that rancherias are treated as reservations. Duncan v. United States, 667 F.2d 36, 38 (Ct. Cl. 1981) ("Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use from time to time in the early years of this century –a program triggered by an inquiry (in 1905-06) into the landless, homeless or penurious state of many California Indians."); Governing Council of Pinoleville Indian Cmty. v. Mendocino Cnty., 684 F. Supp. 1042, 1043 n.1 (N.D. Cal. 1988) (same).  In sum, this authority further demonstrates that the Indians living on the North Fork Rancheria qualified as a "tribe" under Section 19, 25 U.S.C. § 479, because they were "Indians residing on one reservation."

Despite this authority, on pages 8 and 19 of their motion, ECF No. 26.-1, Plaintiffs argue that North Fork did not have a "reservation," but on page 21, ECF No. 26-2, Plaintiffs quote Williams v. Gover, which expressly recognizes that rancherias are reservations, "[r]ancherias are numerous small Indian ***reservations*** or communities in California."  490 F.3d 785, 787 (9th Cir. 2007) (emphasis added), (citing Duncan v. United States, 229 Ct. Cl. 120); Motion at 21, ECF No. 26-2.  Plaintiffs apparently want this Court to ignore the case for purposes of finding that a rancheria is not a reservation, but accept the same case for purposes of arguing that rancherias were only comprised of individual Indians not tribes.  Either way, Plaintiffs argument fails because as discussed supra, North Fork fits within the

---

[10/]1 Op. Sol. On Indian Affairs (U.S.D.I. 1979) is available at HeinOnline.  Solicitor's Op., M-28958 is also available at http://thorpe.ou.edu/sol_opinions/p876-900.html.

definition of "Indian" and "tribe" in Section 479 of the IRA. Indeed, Plaintiffs argument that reservations are not rancherias, Motion at 8, 19, ECF No. 26-1, 26-2, and that only the four reservations listed in the "Four Reservations Act" in 1864 were eligible under the IRA, is undercut by the Haas Report, which lists almost three pages of reservations in California, including rancherias, that voted on the IRA in 1934-35. Defs.' Ex. E, Haas at 14-16, Table A.

In interpreting the IRA and holding an election on the North Fork Rancheria in 1934, the Secretary interpreted the Act contemporaneously with its passage and its implementation immediately thereafter, and this interpretation is entitled to great weight and deference. See Watt v. Alaska, 451 U.S. 259, 272-273 (1981) (the "Department's contemporaneous construction carries persuasive weight"); Runs After v. United States, 766 F.2d 347, 352 (8th Cir. 1985) (the Bureau of Indian Affairs "has special expertise and extensive experience in dealing with Indian affairs"); Qwest Commc'ns Int'l, Inc. v. F.C.C., 398 F.3d 1222, 1230 (10th Cir. 2005) ("Deference is especially due when an agency's interpretation of a statute rests upon its considered judgment, a product of its unique expertise."); Oregon v. Norton, 271 F. Supp. 2d 1270, 1277-78 n.5 (D. Or. 2003) (noting that Congress has delegated "sweeping authority" to the Secretary to interpret and administer laws governing Indian tribes). Therefore, it is too late for Plaintiffs to challenge a decision made by the Secretary in the 1930's that the North Fork Rancheria was under Federal jurisdiction and supervision–a decision made contemporaneous with the passage of the IRA. Therefore, any claim regarding this decision is time-barred.

Because the North Fork Rancheria was unequivocally under Federal jurisdiction and supervision in 1934, the Secretary has the authority to acquire land into trust on behalf of the Tribe.  Therefore, Plaintiffs cannot show the likelihood of success on the merits of their IRA claim.

**B.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits of their Claim that The Secretary Failed to Send the Entire Record of the Two-Part Determination to the Governor of California as Part of the Request for Concurrence**

Plaintiffs allege, Motion at 21-22, that Interior failed to provide the fee-to-trust application to the Governor of California.  As discussed in the attached Declaration of Paula Hart, Defs.' Ex. A, pursuant to 25 C.F.R. § 292.22(b), the Governor was provided with a copy of the entire application record for the Secretarial Determination.  Defs.' Ex. A at ¶ 5.  However, Plaintiffs inexplicably read a requirement into the Section 20 Regulations that the Secretary provide the Governor of California with a copy of the Tribe's land into trust application, Motion at 21-22, ECF No. 26-2, despite the repeated reference in the regulations to the "application for a Secretarial Determination" and lack of reference to land into trust application under Subpart C of the regulations.  See 25 C.F.R. §§ 292.14, 292.16.  The Secretary is not required to provide the entire land into trust application to the Governor; the Secretary is required to provide the entire request for a Secretarial Determination application to the Governor and the Secretary fulfilled that requirement.  See Defs.' Ex. A, Hart Decl.  The Governor's concurrence is a decision regarding North Fork's request to conduct gaming and Plaintiffs' cannot point to any authority by which a governor reviews a land into trust

application.  Therefore, the Secretary complied with the Section 20 regulations and Plaintiffs

cannot demonstrate a likelihood of success on the merits based on this argument.

## C.   Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits of their Claim that the Proposed Gaming Facility Would Be Detrimental to the Surrounding Community[11/]

Pursuant to Section 2719 of IGRA, the Secretary is required to determine if the

proposed gaming establishment would be detrimental to the surrounding community.  25

U.S.C. § 2719(b)(1)(A).  The Section 20 Regulations define "surrounding community" as

"local governments and nearby Indian tribes located within a 25-mile radius of the site of the

proposed gaming establishment." 25 C.F.R. § 292.2.  The Secretary initiated the consultation

with the surrounding community in accordance with 25 C.F.R. § 292.19, by sending letters

to the appropriate officials listed on page 80 of the Secretarial Determination ROD ("SD

ROD"), Defs.' Ex. B.  Of the twelve officials consulted, the Secretary received two responses

in opposition to the proposed resort, one from the Mayor of the City of Fresno and one from

the County of Fresno, both of which asserted general opposition to off-reservation gaming.

Defs.' Ex. B, SD ROD at 80.

Weighing all of the information submitted pursuant to 25 C.F.R. §§ 292.16-292.19,

the Secretary analyzed the impacts on the surrounding community and concluded that

because North Fork has Memoranda Of Understanding with Madera County, the City of

Madera and the Madera Irrigation District, that provide for significant payments ($4.035

million to Madera County; $11.375 million to the City of Madera; annual payments of

---

[11/]The Picayune Rancheria of Chukchansi Indians filed a separate memorandum setting forth their arguments regarding detrimental impact to their competing gaming establishment.  Those arguments are addressed in a separate memorandum in response to Picayune.

$11,500 to the Madera Water District in lieu of fees, assessments, and taxes, and $36,000 to cover other costs), these payments would mitigate any impacts resulting from development of the proposed resort.  Defs.' Ex. B, SD ROD at 84-85.  Combined with the mitigation measures in the Final Environmental Impact Statement ("FEIS"), the Secretary concluded that the evidence strongly indicated that North Fork's proposed gaming facility would not result in detrimental impact on the surrounding community.  Defs.' Ex. B, SD ROD at 85.

Plaintiffs argue that this determination was arbitrary and capricious and allege that the comments they submitted were not considered, the project increases vice-related and violent crimes, problem gambling will increase, and the mitigation efforts are inadequate. Motion at 23-25, ECF No. 26-2.  The Secretary was not required to consider Plaintiffs' comments as part of the Secretarial Determination because they do not fall within the regulatory definition of surrounding community.  25 C.F.R. § 292.2 ("Surrounding community means local governments and nearby Indian tribes located within a 25-mile radius of the site . . .").  Furthermore, Plaintiffs' generalized, anti-gaming concerns are inadequate because they do not provide specific economic or socio-economic data to refute any of the information submitted by North Fork or the surrounding community.

The Assistant Secretary followed the proper procedures pursuant to IGRA and the Section 20 Regulations by consulting with the surrounding community and appropriately concluded that the payments to the local governments and the mitigation measures were sufficient.  Plaintiffs cannot point to any specific statutory or regulatory requirement that the Secretary failed to adhere to or consider.  Plaintiffs generalized anti-gaming allegations are

insufficient and they cannot demonstrate a likelihood of success on the merits of their IGRA claim.

**D.**     **Plaintiffs Cannot Demonstrate a Likelihood of Success on The Merits of Their NEPA claims**

Congress passed NEPA to focus governmental and public attention on the potential environmental effects of any proposed "major federal action." See 42 U.S.C. § 4332(2)(C); Marsh v. Or. Natural Res. Def. Council, 490 U.S. 360, 371 (1989).   Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. §§ 1500–1508, provide guidance to agencies in applying NEPA.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349–53 (1989).

NEPA is an "essentially procedural" statute.  Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558 (1978).   NEPA does not mandate particular results, but instead prescribes a process to ensure that federal decision-makers consider, and that the public is informed, about a proposed action's potential environmental consequences.  Robertson, 490 U.S. at 350; Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).  To achieve those twin aims, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  An EIS is a statement regarding "the environmental impacts of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] alternatives to the proposed action."  Id. § 4332(2)(C)(i)–(iii).  CEQ regulations include

several requirements for public involvement in the development of an EIS.  See, e.g., id. §§ 1503.1(a)(4), 1506.6.

### 1.    The Department of the Interior Considered a Reasonable Range of Alternatives

Plaintiffs argue that the Department of the Interior did not properly consider and evaluate alternatives to the proposed action.  Motion at 25-29, ECF No. 26-2.  Plaintiffs' argument does not demonstrate a likelihood of success on the merits.  The FEIS analyzed five potential alternatives in detail.    Defs.' Ex. H, EIS Section 2, Alternatives ("Alternatives") at 2-1 to 2-68, and, as NEPA requires, briefly discussed those alternatives not chosen for detailed analysis.  Id. at 2-68 to 2-83.  The public and the decision-maker were fully informed as to the potential alternatives to North Fork's proposed action, and Interior therefore complied with NEPA.

An agency need not consider alternatives which do not meet the proposed action's purpose and need, or which can be rejected as "too remote, speculative, or impractical or ineffective."  Custer Cnty., 256 F.3d at 1039; Busey, 938 F.2d at 195–96.  "[T]he Court will 'uphold an agency's . . . discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail.'"  Theodore Roosevelt Conservation P'ship, 744 F. Supp. 2d at 161 (citation omitted).  NEPA requires federal agencies to analyze a reasonable range of alternatives, and Interior's analysis of these alternatives "is the heart of the environmental impact statement."  40 C.F.R. § 1502.14.   An agency is required to evaluate in detail "reasonable" alternatives and to "briefly discuss" its decision to eliminate other alternatives from detailed study.  Id. §1502.14(a).  Agency decisions as to the

alternatives proposed and those that were considered in detail are subject to review based on

a rule of reason and should be afforded substantial deference.  <u>Busey</u>, 938 F.2d at 196; <u>Vt.</u>

<u>Yankee</u>, 435 U.S. at 551-52.  The agency's analysis of alternatives is closely tied to the

purpose and need for agency action,  <u>Slater</u>, 198 F.3d at 867 (agency's "objectives . . .

provide the point of reference for a determination whether an alternative is 'reasonable' in

the first place"), which in turn is tied to the agency's congressional authority.  <u>See</u> <u>Busey</u>,

938 F.2d at 196.  Most importantly, alternatives "must be moored to some notion of

feasibility," <u>id.</u> at 195 (quotation and citations omitted), and are not reasonable if they are not

feasible.  <u>Vt. Yankee</u>, 435 U.S. at 551.

    Here, Interior examined a reasonable[12] set of alternatives that were appropriately

shaped by the North Fork Rancheria of Mono Indian's application.  The FEIS's alternatives

discussion was comprehensive, detailed, and thorough.  Defs.' Ex. H, Alternatives.  The

FEIS analyzed in detail the potential effects of five alternatives, including:  the North Fork

Rancheria of Mono Indians' proposed project, (Alternative A), <u>id.</u> at 1-37; a reduced

intensity version alternative that did not include a hotel or pool with approximately 40% of

the square footage (Alternative B), <u>id.</u> at 2-1 to 2-37; a mixed-use retail non-gaming use

---

[12]The reasonableness of an agency's selection of alternatives is determined with reference to the action's objectives.  NEPA requires that an agency briefly specify the underlying purpose and need for the proposed action.  40 C.F.R. § 1502.13.  An agency may not define its objectives "in terms so unreasonably narrow that only one alternative . . . would accomplish the goals" or "in terms so unreasonably broad that an infinite number of alternatives would accomplish [its] goals . . . ."  <u>Citizens Against Burlington, Inc. v. Busey</u>, 938 F.2d 190, 196 (D.C. Cir. 1991); <u>See</u> <u>Nat'l</u> <u>Comm. for the New River, Inc.</u>, 373 F.3d at 1332 (agency could rely on applicant's selection of location for pipeline extension); <u>Busey</u>, 938 F.2d at 199 (an agency's evaluation of reasonable alternatives is "shaped by the application at issue."); <u>City of Grapevine v. U.S. Dep't of Transp.</u>, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (entirely proper for agency, in defining the purposes of the project, "to consider the economic goals of the project's sponsor.").

alternative (Alternative C), id. at 2-45 to 2-54; development of the North Fork site (Alternative D), id. at 2-54 to 2-67; and a no-action alternative (Alternative E), id. at 2-67 to 2-68.   In addition, Interior analyzed many other potential sites and eliminated them from detailed study.  Id. at 2-68 to 2-83.  One site was eliminated because North Fork has already developed the 61.5 acre-tract, on a steep hill-side, into low income Indian housing and an endangered species reserve.  Id. at 2-68.   The site is limited by its current uses for a community center and housing, as well as "steep topography" that has "made development of the parcel far more difficult and expensive . . . ."  Id.  The 80-acre North Fork Rancheria site was eliminated because its steep terrain would drive up construction costs and it would fail to generate enough revenue to meet the needs of the Tribe.  Id. at 2-71.  Moreover, that site is held in trust for individual Indians, not the North Fork Rancheria itself.  Id.[13]

### i.      Interior Considered a Reasonable Range of Alternatives

Plaintiffs cannot demonstrate a likelihood of success for their contention that "the range of alternatives is unreasonably narrow."  Motion at 25, ECF No. 26-2.  Plaintiffs do not articulate the detailed objections to the FEIS's selection of the five alternatives considered in detail.  Motion at 26, ECF No. 26-2.  Instead, Plaintiffs merely assert that the "central focus on casino gambling as necessary to meet the needs of the Tribe makes alternatives B and C irrelevant."  Id.  However, Alternative C involved retail development, not a casino, and Alternative B involved a smaller development without a hotel or pool.

---

[13]"The Governor's Office also points out that the Tribe's reservation is located near the environmentally sensitive Yosemite National Park and Sierra National Forest as justification for the Resort to be located off-reservation on land in Madera County." Defs.' Ex. B, SD ROD at 80.

27

The FEIS's purpose and need appropriately considered a reasonable range of alternatives.  An agency's evaluation of alternatives is "shaped by the application at issue," Busey, 938 F.2d at 199, and it is entirely proper for an agency to "consider the economic goals of the project's sponsor."  City of Grapevine, 17 F.3d at 1506.  The FEIS makes clear that the need for the project derives from providing employment opportunities, funding to support housing, governmental, administrative, educational, health, and welfare services to Tribal members, capital for other economic development, and funding so that the North Fork Rancheria of Mono Indians may establish economic self-sufficiency.  Defs.' Ex. I, EIS Section 1, Purpose and Need ("Purpose") at 1-10.  The stated purpose and need is in accord with the statutory authority under which Interior would be acting here.  See Busey, 938 F.2d at 926, Defs.' Ex. I, Purpose at 1-10.  Moreover, the FEIS did not use the feasibility criteria to define the purpose and need; rather, it used them to determine which, if any, of the other potential locations were reasonable alternatives.  See Defs.' Ex. H, Alternatives.  Accordingly, Plaintiffs cannot show a likelihood of success on the merits for this issue.

### ii.   Interior Reasonably Rejected the Old Mill Site, North Fork Site, and Other Sites

Plaintiffs contend, at length, that Interior should not have rejected a variety of other sites for the project.  Motion at 25-30, ECF No. 26-2.  Interior reasonably selected five alternatives and discussed them in detail; thereby fully informing the decision-maker and the public about the potential alternatives to North Fork's proposal.  Therefore, Plaintiffs' argument lacks any likelihood of success on the merits.  Plaintiffs' claims that the Old Mill site more completely meets the project purpose, that the preferred alternative will "have a

28

devastating economic impact on the Chukchansi Gold facility," Motion at 28, ECF No. 26-2, and that rejection of the North Fork Rancheria site would "destroy the economic interests of the Picayune Rancheria," id. at 29, all lack merit because NEPA is not an outcome determinative statute.  Robertson, 490 U.S. at 350.  Instead, NEPA fosters an informed decision and public that considers the potential environmental effects of a proposed action and that action's reasonable alternatives.  Balt. Gas, 462 U.S. at 97.  That is exactly what occurred here.

Plaintiffs' economic arguments—which focus on impacts to the Chukchansi Gold casino, Motion at 28-29, ECF No. 26-2—claim that the project will have a "devastating economic impact" to existing casinos.  The Stand Up For California! Plaintiffs lack standing to assert this injury[14] because economic harm is not a cognizable harm under NEPA.  "Only when socioeconomic effects somehow result from a project's environmental impact must they be considered.  Whether an impact on the 'human environment' must be addressed depends on 'the closeness of the relationship between the change in the environment and the "effect" at issue.'"  Hammond v. Norton, 370 F. Supp. 2d at 243 (D.D.C. 2005) (quoting Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 771–72 (1983)).  As the Supreme Court has articulated:

---

[14]The nature of Plaintiffs' relationship to the parties whose alleged interest they repeatedly assert, Picayune, is unclear.  Motion at 28-29, ECF No. 26-2 ("the proposed site will have a devastating economic impact on the Chukchansi Gold facility," "the Tribe received the best of both worlds in regard to economic competition, and the Picayune Tribe's concerns were negated in the process" and "[o]n this site, the Tribe would simply compete with rather than destroy the economic interests of the Picayune Rancheria").  Picayune has filed its own lawsuit and is not represented by the same attorneys as the Stand Up For California! Plaintiffs.  Furthermore, Picayune operates its own gaming facility, so its interests are contrary to those of the gaming watchdog group, Stand Up For California!.

> The theme of § 102 [of NEPA] is sounded by the adjective "environmental":
> NEPA does not require the agency to assess *every* impact or effect of its
> proposed action, but only the impact or effect on the environment. If we were
> to seize the word "environmental" out of its context and give it the broadest
> possible definition, the words "adverse environmental effects" might embrace
> virtually any consequence . . . that some one thought "adverse."

Metro. Edison Co., 460 U.S. at 772. Plaintiffs concerns about the revenues of existing

casinos are neither related to their own alleged interests nor, as purely economic harms,

within the scope of NEPA.

Plaintiffs' concerns about the Old Mill Site fail to note that its owners have stated that

the site "would not be sold for the development of a casino project." Defs.' Ex. H,

Alternatives at 81. For that alone, Interior's decision to not consider the site in detail was

appropriate. Plaintiffs also reject Interior's concerns regarding risks from contamination at

the Old Mill site, but Interior's rejection of the site was reasonable under NEPA. Used for

industrial purposes for over half a century, the Old Mill site is contaminated with petroleum

hydrocarbons in the soil and water – pentacholorpheonal and dioxins, furans, asbestos, and

lead-based paint. Id. at 81-82. The soil also contains diesel fuel, which can be removed, but

there is an elevated risk that more contamination will be discovered on the Old Mill site. Id.

Plaintiffs dismiss Interior's discussion of these environmental pollutants because they believe

the site could be cleaned up, Motion at 27 (ECF No. 26-2), despite the "the potential for the

presence of unknown contamin[ants] related to past uses." Defs.' Ex. H, Alternatives at 81.

Plaintiffs' argument is insufficient under NEPA because NEPA "does not mandate particular

results, but simply prescribes the necessary process." Robertson, 490 U.S. at 350. Interior

reasonably chose not to consider that particular alternative in detail. Likewise, Plaintiffs'

contention that the Old Mill site meets the purpose and need statement of the project better than the preferred alternative lacks merit.  Interior considered, at length, the benefits of the preferred alternative.  Id. at 1-45.

Plaintiffs also assert that Interior should have considered "possible sites closer to the Rancheria that met the stated purpose and need of the project," specifically those along the State Road 41 corridor.  Motion at 28, ECF No. 26-2.  In so doing, Plaintiffs dismiss Interior's analysis as a "mere two sentences," instead of addressing one substantive concern. Id.  The truth is that the FEIS devotes two paragraphs to rejecting development along the State Road 41 corridor.  Defs.' Ex. H, Alternatives at 73; see Tongass Conservatoin Soc. v. Cheney, 924 F.2d 1137, 1141-42 (D.C. Cir. 1991) ("[t]he relevant CEQ regulations provide that an agency need only 'briefly discuss the reasons' why rejected possibilities were not 'reasonable alternatives . . . .'" (citations omitted)).  Interior noted that the sites on the State Road 41 corridor, which runs from the south entrance of Yosemite National Park to Fresno, contained "environmentally sensitive foothills."  Defs.' Ex. H, Alternatives at 73.  These sites were not suitable because they would require "building on steep terrain, loss of habitat for native plants and animals, water scarcity, and other concerns."  Id.  Moreover, those sites would have been in "conflict with the scenic nature of the corridor, which is lined with rolling pastures sprinkled with oaks and large rock outcroppings . . . ."  Id.  The FEIS also notes that development at the State Road 41 sites would raise additional traffic concerns along the two-lane road.  Id.

Interior's rejection of the North Fork Rancheria site[15] was also well-reasoned.  The 80-acre North Fork Rancheria site was eliminated because its steep terrain would drive up construction costs and it would fail to generate enough revenue to meet the needs of North Fork.  Id. at 69, 71.  Moreover, that site is held in trust for individual Indians, not North Fork itself.  Id.  North Fork simply did not meet the project's purpose and needs statement.  See City of Grapevine, 17 F.3d at 1506 (entirely proper for agency, in defining the purposes of the project, "to consider the economic goals of the project's sponsor.").

## 2.    The FEIS Process Included Proper Public Participation

Plaintiffs claim that Interior failed to allow "adequate participation by the general public" but have cited no case law to support specific claims.  Pls.' Br. at 30.  The "regulations governing public involvement adopted pursuant to NEPA 'are general in approach'" with few specific requirements.  Wild West Institute v. Bull, 547 F.3d 1162, 1170 (9th Cir. 2008) (quoting Bering Strait Citizens for Responsible Res. Dev. v. Army Corps of Eng'rs, 524 F.3d 938, 952 (9th Cir. 2008); see also 40 C.F.R. § 1506.6.  There is no doubt that Plaintiffs were afforded a reasonable opportunity to comment—Plaintiff Brannon, ECF No. 26-5 at 3, himself spoke at the public hearing.  The public had a direct opportunity to comment during the public review period for the Draft EIS, via both submitted comments and an actual hearing.  Defs.' Ex. J, EIS Appendix Y, Draft EIS Comments and Responses ("Comments").  Interior responded to the timely comments and considered and provided comments to many of the late responses.  See, e.g., id. at 10-11.  Plaintiffs submitted comments (Letters B-8 and B-9 submitted by Brannon, Id. at 4, Letters B-12 submitted by

---

[15]As discussed supra., the Governor opposes any development on the North Fork Rancheria site.

Schmit, Id.), and over one-hundred individuals spoke at the public hearing.  Id. at 7-10.

There is simply no evidence that Interior failed to involve the public in preparing and

implementing the NEPA process.  See 40 C.F.R. § 1506.6. [16]

### 3.   The NEPA Contractor Did Not Have a Conflict of Interest and the Department of the Interior Managed the Contractor Appropriately

Plaintiffs have not demonstrated a likelihood of success on the merits of their claim

that the NEPA contractor, Analytical Environmental Services ("AES"), was improperly

selected.  Motion at 30, ECF No. 26-3.  Plaintiffs cite no evidence that Interior failed to

"independently evaluate the EIS" nor do Plaintiffs' allegations establish a basis for relief.

Even if there was an error in selection of the contractor, "any error in the selection

of the contractor 'did not compromise the objectivity and integrity of the [NEPA] process'"

there is no reason to invalidate the EIS.  Cmtys. Against Runway Expansion, Inc. v. FAA,

355 F.3d 678, 686 (D.C. Cir. 2004) (quoting Busey, 938 F.2d at 202); Utahns for Better

Transp. v. United States Dep't of Transp., 305 F.3d 1152, 1185 (10th Cir. 2002); Valley

Cmty. Preservation Comm'n v. Mineta, 231 F. Supp. 2d 23 (D.D.C. 2002); 46 Fed. Reg.

18,026, 18,031 (Mar. 23, 1981).  Absent any substantive flaws in the EIS itself, Plaintiffs

allegations do not establish a violation of NEPA or the relevant regulations.  In general,

NEPA guidelines permit an EIS to be prepared by a contractor if (1) the lead federal agency,

or the lead agency "in cooperation with cooperating agencies," selects the contractor; (2) the

contractor executes a disclosure statement specifying that it has "no financial or other interest

---

[16]Plaintiffs also claim that the BIA attempted to "evade public scrutiny" by 'making it difficult for interested parties to review the Secretary's decision."  Motion at 30.  They provide no basis for this claim—indeed their declaration evidence states that the plaintiffs obtained the IRA ROD on December 10, 2012.  Brannon Declaration at 3( ECF No. 26-6).

in the outcome of the project"; and (3) the responsible federal officials furnish guidance and participate in the preparation of the EIS, evaluate the EIS prior to its approval, and take responsibility for its scope and contents.  See Cmtys. Against Runway Expansion, 355 F.3d at 686 (citing 40 C.F.R. § 1506.5(c)).  In addition, NEPA allows for applicants to submit their own information as part of the review process. 40 C.F.R. § 1506.5(a).  In order to show that Interior violated NEPA via selection of the contractor, Plaintiffs must show some sort of actual error that compromised the objectivity and integrity of the NEPA process.

Although there was no conflict of interest in this case, Interior's dogged supervions demonstrates that the issue is irrelevant. Cmtys. Against Runway Expansion, Inc., 355 F.3d at 686.  A decision by the Interior Board of Indian Appeals demonstrates Interior's active role in the NEPA process.  In Picayune Rancheria of the Chukchansi Indians v. Acting Pacific Regional Director, BIA, 48 IBIA 241 (2009), Picayune challenged Interior's directives and oversight of the contractor's selection and rejection of NEPA alternatives. Id. at 242-43.  As demonstrated by that case, Interior actively monitored and provided guidance to the contractor in its preparation of the EIS.  For example, Interior sent a letter to the contractor detailing the varied reasons the Old Mill Site was not a reasonable alternative. See, e.g., June 27, 2008 Letter from BIA to AES, Defs.' Ex. K at 1-2.

Additionally, Interior's actions demonstrate that the contractor in this case had no conflict of interest.  Defs.' Ex. L, Three Party Agreement, at 1-3.  Not only does the document state that the contractor has no conflict of interest, the underlying agreement provides that Interior will exercise "technical direction, review, and quality control" over NEPA related issues. Id. at 2.  Plaintiffs have not identified any basis to suggest that Interior

failed to exercise appropriate oversight, nor have Plaintiffs provided any evidence that the contractor was biased.  Accordingly, Plaintiffs cannot show a likelihood of success on the merits of this claim.

**4.      The Department of the Interior Took the Requisite "Hard Look" at the Impacts of this Project**

"NEPA requires that agencies take a 'hard look' at the environmental consequences of the proposed course of action."  Theodore Roosevelt Conservation P'ship, 744 F. Supp. at 159 (citations omitted); see 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.  The court's role is to ensure the agency takes that look, "'not to interject its own judgment as to the course of action to be taken.'"  Wilderness Soc'y v. Salazar, 603 F. Supp. 2d 52, 59 (D.D.C. 2009) (quoting Hammond v. Norton, 370 F. Supp. 2d 226, 240 (D.D.C. 2005)).

Interior's FEIS took the requisite "hard look."  Among others, the FEIS discussed potential impacts: sociological effects. Defs.' Ex. M, EIS Section 4 Environment Consequences at 4.7, impacts on public and social services, id. 4.9, including wastewater, id. 4.3, 4.9, fire, emergency, and police services, id. 4.9, water resources,  id. 4.3, protected species and critical habitats, and air quality and land resources. Id. at 4.2, 4.4, 4.4.26, 4.5. Plaintiffs' claims to the contrary, Motion at 31, ECF No. 26-3, are incorrect, as demonstrated by Plaintiffs' failure to cite any evidence that Interior did not consider these issues in the FEIS.  The FEIS summarized for the public and agency decision-makers the unavoidable adverse effects that would result from the proposed action.

For the foregoing reasons, Interior more than adequately addressed all of the NEPA issues and therefore, Plaintiffs cannot demonstrate the likelihood of success on the merits of

their NEPA claims.

### E.      Plaintiffs' Arguments About Interior's Alleged Obligation to Self-Stay Do Not Appear in Their Complaint

Plaintiffs' complaint is devoid of any allegation or claim that Plaintiffs will suffer irreparable harm as a result of Interior's decision not to enter into a voluntary self-stay or that Interior's decision not to self-stay violates any statute or regulation.  See Motion at 32-38, ECF No. 26-3, Pls.' Compl. at ¶¶ 1-84.  For obvious reasons Plaintiffs are unlikely to prevail on a claim that is not contained in their complaint.[17]  Should the Court reach the merits of Plaintiffs' argument, Plaintiffs have done nothing to rebut the argument the United States already made in the December 24, 2012, Status Report (at 2-8, ECF No. 14).[18]

## II.      Plaintiffs Cannot Show That They Will Suffer Irreparable Harm

Plaintiffs are not harmed by the mere transfer of title to the land to the United States because there are no on the ground impacts that result from this transfer.  To the extent that Plaintiffs claim that future gaming on this land will cause irreparable harm, they have not

---

[17]Preliminary injunctions are used to preserve the status quo pending litigation of the merits, thus, a party seeking a preliminary injunction must establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.  "[I]f the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."  Adair v. England, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) (citing Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994)).

[18]By necessity, if Plaintiffs' argument is correct, Interior would need to engage in notice and comment rulemaking to change any aspect of the Handbook.  That would include notice and comment rulemaking to determine whether administrative staff should enter fee-to-trust applications within four days of receipt instead of three, Defs.' Ex. N, Fee-to-Trust Handbook, at 10, send certain documents via certified mail, e.g. id. at 12, 13, 35, 36, 47, or if it requires a Regional Director to forward his recommendation to the Office of Indian Gaming and the Solicitor's office instead of just the Office of Indian Gaming.  See, e.g. id. at 74.

demonstrated that any gaming is imminent, or that any alleged harms from gaming will be irreparable. "Bare allegations" of harm are insufficient, a plaintiff must "provide proof that the harm has occurred in the past and is likely to occur again, or *proof indicating that the harm is certain to occur in the near future*." Wisc. Gas, 758 F.2d at 674 (Emphasis added). Plaintiffs have failed to come forward with any concrete evidence of imminent, irreparable harm, and as a result, have failed to carry their burden.

To satisfy the requirement of immediate irreparable injury a plaintiff must demonstrate "likelihood of substantial and immediate irreparable injury," City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)), because the "basis of injunctive relief in the federal courts has always been irreparable harm." Sampson v. Murray, 415 U.S. 61, 88 (1974) (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). Plaintiffs have not satisfied this requirement for preliminary injunctive relief.[19]

First, Plaintiffs must show that the injury is irreparable. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." Id. at 90 (quoting Va. Petro. Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)). In fact, the "key word in this consideration is irreparable," if "corrective relief will be available at a later date, in the ordinary course of litigation" Plaintiffs will have great difficulty demonstrating irreparable harm. Id. Second, any actual injury "must be both

---

[19]To the extent that Plaintiffs claim irreparable harm because the Secretary did not enter into a voluntary self-stay, there is no such claim in their complaint. Moreover, even if there were, the argument lacks merit. See infra Section II, Part E; Dec. 24, 2012 Status Report. ECF No. 14 The issue, in any event, is irrelevant because Plaintiffs do not suffer harm if the land is taken into trust.

certain and great; it must be actual and not theoretical." <u>Wisc. Gas v. FERC</u>, 758 F.2d 669,

674 (D.C. Cir. 1985) (per curiam).  Third, the actual injury must be imminent, and Plaintiffs

must show that "[t]he injury complained of is of such imminence that there is a 'clear and

present' need for January 17, 2013 equitable relief to prevent irreparable harm." <u>Id.</u> (quoting

<u>Ashland Oil, Inc. v. FTC</u>, 409 F. Supp. 297, 307 (D.D.C 1976)).

      **A.**     <u>**There is No Irreparable Harm From Acquiring the Land In Trust**</u>

      Prior to the Supreme Court's decision in Patchak v. Salazar, 132 S.Ct. 2199, 2204-05

(2012), the United States maintained that the Quiet Title Act ("QTA"), 28 U.S.C. § 2409(a),

barred challenges to land into trust acquisitions for Indian tribes once the land was taken into

trust.  The United States' position was that although the APA, 5 U.S.C. § 702, generally

waives the United States' immunity from a lawsuit, "seeking relief other than money

damages and stating a claim that an agency or an office or employee thereof acted or failed

to act in an official capacity or under color of legal authority," the APA's waiver of immunity

from suit did not apply because another statute that granted consent to suit, namely the QTA,

expressly or impliedly barred the relief sought.  Id.  The United States argued, Patchak, 132

S.Ct. at 2205, that the QTA provided the sole waiver of immunity from suit that would affect

the United States' title to land, but that the QTA's Indian lands exception prohibited a suit

that would disturb land held in trust for an Indian tribe because it expressly provides that the

QTA's waiver of immunity from suit "does not apply to trust or restricted Indian lands."  28

U.S.C. § 2409a(a).

      Because of the United States' position the Department of the Interior generally was

willing to agree to a self-stay with potential plaintiffs challenging land into trust decisions

so that the parties would have time to brief the case and a court could rule without having the lawsuit barred by the QTA.   However, in Patchak the Supreme Court disagreed with the United States' position regarding the QTA and held that, "[t]he QTA's reservation of sovereign immunity does not bar Patchak's [APA] suit." Patchak at 2212.  Because the QTA does not deprive a court of jurisdiction over a challenge to a decision to take land into trust after the land has been taken into trust, a self-stay for the entire pendency of the litigation is not warranted in this case.   There is no harm to Plaintiffs if the land is taken into trust during the pendency of their lawsuit because they will still have the opportunity for their APA claims to be briefed and decided.   Moreover, Plaintiffs' claims only address future activities that the tribe plans to undertake on the land after it is transferred and this Court maintains the authority to enjoin those activities without reversing or enjoining the land into trust transfer.

As a result, there is no irreparable harm from acquiring the land in trust because the Department of the Interior will take the land out of trust if ordered to do so by the Court.[20] Plaintiffs' illusory irreparable harm rests purely on speculation that if the land is taken into

---

[20] The Department of the Interior has taken land out of trust in other cases.  For example, following the Supreme Court's granting of the petition for a writ of certiorari in United States Dep't of the Interior v. South Dakota, 519 U.S. 919 (1996), the case that led to the promulgation of the regulation, codified at 25 C.F.R. § 151.12, that provides for the 30 day notice period before acquiring land into trust to allow for judicial review, the Department of the Interior reversed the land into trust decision because the district court's judgment was vacated.  See Land Status: Lower Brule Sioux Tribe, 62 Fed. Reg. 26,551 (May 14, 1997).  The Department of the Interior also recently took land out of trust to correct an administrative defect in the publication of the 30 day notice.  See December 24, 2012, Joint Status Report, Ex. 4, ECF No.14-4 (Brief in Support of the United States's Amended Motion to Dismiss or in the Alternative for Summary Judgment, at 32-34, State of South Dakota, v. United States Dep't of the Interior, ECF No. 13-1, Case No. 10-cv-03006-RAL (D.S.D. 2010)).  But see Prieto v. United States, 655 F. Supp. 1187, 1192 (D.D.C. 1987) (based on equitable considerations, "the Secretary exceeded his authority in reconsidering and in revoking the trust status of plaintiff's land.").

trust, the tribe will immediately construct a gaming facility.  However, there are no on-the-ground impacts from the mere transfer of title nor is there evidence that any gaming is immediate.  Therefore, Plaintiffs have failed to establish that any alleged harm is imminent.

This Court could also narrowly tailor any future injunctive relief based on other alleged injuries to avoid having to take the land out of trust.  If the Plaintiffs could demonstrate the elements necessary for an injunction, the Court could enjoin specific activities, such as construction or gaming activities on the land to maintain the status quo, all without reversing the land into trust decision.[21]

**B.**      **Plaintiffs Will Not Suffer Any Irreparable Environmental Harms**

Additionally, there is scant evidence that Plaintiffs will suffer any irreparable environmental harms in this case.  Motion at 40-41, ECF No. 26-3.  Plaintiffs allege that the aesthetics of the Madera Site will be altered as a result of gaming and that "[c]onstruction of the casino will cause significant impairment and detriment to the surrounding environment."  Id. at 41.  This will be caused, according to Plaintiffs, by "[t]he Secretary's

---

[21]A similar order was entered in Sac and Fox Nation of Missouri v. Norton, where the court allowed the land transfer to occur, but maintained the status quo for all other purposes:

> ORDER ENTERED - 10CCA: granting the emergency application for stay and hold that the temporary restraining order entered below is dissolved, subject to the conditions which constitute the law of this case, that the respective rights of the parties to obtain judicial review of all issues which have been raised in the complaint below shall be preserved, including standing of all parties, jurisdiction, compliance by the Secretary with all requirements of law, and the ultimate question of whether gaming shall be permitted on the subject land

No. 96-4129 (D. Kan. July 18, 1996) (order dissolving temporary restraining order).  The United States later argued that the Quiet Title Act prevented all of plaintiffs' claims in that case, Governor of Kansas v. Kempthorne, 516 F.3d 833 (10th Cir. 2008), but as discussed supra, the Quiet Title Act no longer bars a plaintiffs' APA claims after Patchak, 132 S.Ct. at 2199 (2012).

failure to adequately consider such detrimental impacts of these planned gambling activities to the surrounding community . . . ."  Id.  Plaintiffs fail to identify any specific evidence of what detrimental impacts they will experience and it is sheer conjecture that construction will start immediately.  Even if construction were to being immediately, Plaintiffs do not address what detrimental harms would occur in the next weeks or months as a result.

For example, Plaintiffs do not claim that any animal species will be irreparably harmed by development.  Compare Motion at 40-41, ECF No. 26-3, with Fund for Animals v. Norton, 281 F. Supp. 2d 209, 220-22, 238 (D.D.C. 2003) (Plaintiffs suffered irreparable harm to aesthetic interest when 67% of mute swans in the Atlantic fly way would be killed and 86% in Maryland would be killed as a result of a permit).  In contrast to Fund for Animals v. Norton, Plaintiffs object to the construction of a casino, an inanimate object that can be removed or closed, not the death of a large group of animals or similar harm.  In the declarations submitted regarding harm, Rev. Brannon objects based on "societal harm caused by casino gaming . . .," not environmental harm caused by construction.  Brannon Declaration, at 4 ECF No. 26-5.  Likewise, Cheryl Schmit, objects to what she perceive as societal ills that she believes may result from gaming.  Schmit Declaration, ECF No. 26-6.

Furthermore, the National Indian Gaming Commission requires a Tribe to give the Commission notice "at least 120 days" before opening any new gaming facility.  25 C.F.R. § 559.2(a).  That period of notice alone would allow plaintiffs ample opportunity to seek judicial relief.  In fact, the State of California has numerous casinos scattered throughout the State, so people wanting to game could easily go elsewhere.  Indeed, the Picayune casino is located approximately 39 miles away.  Defs.' Ex. B, SD ROD at 85.  If gaming is Plaintiffs'

harm, then it is not uniquely related to this particular case given the ubiquity of gaming in California.

Plaintiffs' purely speculative harm and rests on the unsupported notion that if the land is taken into trust, the tribe will immediately construct a gaming facility and begin gaming. "However, as with all other forms of irreparable harm, the showing of [this] harm must be concrete and corroborated, not merely speculative." Trudeau v. Fed. Trade Comm'n, 384 F. Supp.2d 281, 297 (D.D.C.2005), aff'd, 456 F.3d 178 (D.C.Cir.2006). "Injury that is hypothetical or speculative does not rise to the level of irreparable harm." Wisc. Gas v. FERC, 758 F.2d at 674 (injury 'must be actual and not theoretical'). Courts will not grant injunctive relief "against something merely feared as liable to occur at some indefinite time." Henke v. Department of the Interior, 842 F.Supp.2d 54, 59 (D.D.C. 2012). Plaintiffs' concerns about gaming and construction are not concrete or corroborated, and are therefore speculative.

## C.   Plaintiffs Injuries Are Speculative and Not Imminent

Not only are Plaintiffs injuries speculative, Plaintiffs injuries are not imminent. There is no evidence that any gaming is about to occur. There is no evidence that if the land is taken into trust, North Fork will construct a gaming facility overnight or that North Fork intends to initiate construction of a gaming facility prior to having an NIGC approved gaming ordinance. Furthermore, if gaming is the injury, Plaintiffs cannot show that their relief from the establishment of another gaming facility needs to be imminent given the widespread availability of gaming in California and its neighboring state, Nevada.

To the extent that Plaintiffs claim that gaming will cause irreparable harm, they have not demonstrated that any gaming is imminent, or that any alleged harms that will result from gaming will be irreparable.

## III.   The Balance of Equities and Public Interest Do Not Weigh In Favor of Granting Plaintiffs Their Requested Relief

Plaintiffs have not shown that the balance of equities and public interest favor a preliminary injunction.  In considering the extraordinary remedy of an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences . . . ."  Winter, 129 S. Ct. at 376–77 (internal quotations and citations omitted).  With respect to the Government, those two inquiries merge.  See Nken, 129 S. Ct. at 1762.  Here, the United States, the public interest, and North Fork would all be harmed by Plaintiffs' requested injunction.  See Defs.' Ex. O, Decl. of Kevin Washburn, Assistant Secretary-Indian Affairs.

Congress has determined that the IRA and IGRA are important federal interests and the Secretary of the Interior and the State of California, the North Fork, and the local governments have determined that these statutes should be implemented in a particular manner.  Plaintiffs' requested injunction attempts to subvert the implementation of these important interests to the detriment of the North Fork and the United States.  Further, the United States has a long-recognized policy of "furthering Indian self-government."  Morton v. Mancari, 417 U.S. 535, 551 (1974).  Courts may consider whether the issuance of injunctive relief would further this policy.  See Prairie Band of Potawatomi Indians v. Pierce,

43

253 F.3d 1234, 1253 (10th Cir. 2001) (finding that "tribal self-government may be a matter

of public interest"); <u>Seneca-Cayuga Tribe of Okla. v. Oklahoma</u>, 874 F.2d 709, 716 (10th

Cir. 1989) (affirming grant of injunction where "injunction promotes the paramount federal

policy that Indians develop independent sources of income and strong self-government");

<u>Bowen v. Doyle</u>, 880 F. Supp. 99, 137 (W.D.N.Y. 1995) (finding "the public's interest and

the interests of [an Indian tribe] coincide" insofar as "there is a strong federal policy favoring

tribal self-government [and] tribal self-sufficiency").  Here, an historically disadvantaged

tribe, the North Fork Rancheria, is being denied the opportunity to avail itself of the same

economic development that other tribes have relied on for years to promote the economic

self-sufficiency of their people–an economic self-sufficiency that both IGRA and the IRA

are designed to promote and protect.  See Defs.' Ex. O, Washburn Decl.  Granting Plaintiffs'

requested injunction works to foil rather than fulfill that policy by delaying the acquisition

date.

Moreover issuance of a preliminary injunction in this case will add delays to an

administrative process that the federal agency charged with implementing has determined

are unnecessary.  All that a preliminary injunction does is impede the orderly administration

of a governmental responsibility intended to serve the public interest.  <u>Yakus v. United</u>

<u>States</u>, 321 U.S. 414, 440 (1944); <u>see also</u> <u>Committee of Cent. Am. Refugees v. INS</u>, 795

F.2d 1434 (9th Cir. 1986); <u>Sampson v. Murray</u>, 415 U.S. 61, 83 (1974).

The harm from Plaintiffs' requested relief will not stop at the United States' and

public's interest.  As outlined in North Fork's response in opposition to Plaintiffs' motion

for a preliminary injunction, Plaintiffs' injunction would also substantially harm the North

Fork Rancheria.  The harm from delay to the United States and North Fork if an injunction is issued is concrete and clear; whereas, there is no harm to Plaintiffs if a preliminary injunction is not issued.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' request for the extraordinary relief of an injunction.

Dated:          January 18, 2013           Respectfully submitted,

                                           IGNACIA S. MORENO
                                           Assistant Attorney General
                                           United States Department of Justice
                                           Environment and Natural Resources Division

                                           /s/ J. Nathanael Watson
                                           J. NATHANAEL WATSON
                                           Ga. Bar No. 212038
                                           GINA L. ALLERY
                                           D.C. Bar No. 485903
                                           Trial Attorneys
                                           United States Department of Justice
                                           Environment and Natural Resources Division
                                           P.O. Box7611
Of Counsel:                                Ben Franklin Station
                                           Washington, D.C.  20026-7611
Jennifer Turner                            (202) 305-0261
Rebecca Ross                               (202) 305-0475
Attorney-Advisors                          gina.allery@usdoj.gov
Division of Indian Affairs                 joseph.watson@usdoj.gov
Office of the Solicitor
U.S. Dept. of the Interior