## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STAND UP FOR CALIFORNIA!, et al.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,** | Civil Action No. 1:12-cv-02039-BAH |
| | Consolidated with: |
| | Civil Action No. 1:12-CV-02071-BAH |
| **Defendants.** | |
| | Honorable Beryl A. Howell |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### I.   INTRODUCTION

Inconsistent with his longstanding practice, the Secretary of the Interior insists on transferring land into trust while judicial review of his decision is pending. The Secretary will invoke his power to take a 305-acre parcel into trust for a major casino on February 1, 2013, unless this Court enjoins him. This imminent fee-to-trust transfer will fundamentally change the character and the sovereign jurisdiction of land located in the heart of California's central valley.

Plaintiffs challenge the agency's flawed procedure and authority for this extraordinary action. There is no certified administrative record for the Court to review the agency's rationale. Rather, the Secretary's decision is memorialized in two Records of Decision ("RODs") totaling about 150 pages, and the Secretary's action must "stand or fall on the propriety of that finding." *Camp v. Pitts,* 411 U.S. 138, 143 (1973). Defendants make many arguments in their opposition that are not even hinted at in the RODs.  "[P]ost hoc rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539-40 (1981).  Defendants' newly-minted arguments must therefore be disregarded.

Moreover, defendants cannot explain why, for the first time in 16 years, the land transfer cannot wait until this Court properly scrutinizes the Secretary's decision.  Nor do they explain their basis for threatening to violate 25 C.F.R. §151.12(b) without revoking through public notice and

comment rulemaking the regulation, or the Bureau of Indian Affairs Director's directives to all agency personnel for all trust decisions.

Plaintiffs can indeed satisfy the standards of preliminary injunction and are entitled to halt the transfer during this review of the Secretary's faulty decision.

## II.   PLAINTIFFS ARE ENTITLED TO AN ORDER MANDATING THAT THE SECRETARY ADHERE TO HIS REGULATIONS AND STAY THE TRUST TRANSFER DURING THE PENDENCY OF THIS CASE

Federal defendants argue that the Court cannot consider whether the Secretary is adhering to his regulation—section 151.12(b)—because plaintiffs do not raise the issue in their complaint. Plaintiffs do not argue that the trust decision is invalid because the Secretary did not comply with section 151.12(b).  The sole purpose of that regulation is to eliminate the need for emergency motions like the pending preliminary injunction, and an order of the Court that the Secretary comply with his regulation would obviate the need to address on an emergency basis the validity of the trust decision that is challenged in the complaint.  *Adair v. England*, 193 F. Supp. 2d 196 is inapposite because plaintiffs there raised in an emergency motion a different issue going to the merits of the challenged decision, whereas here, enforcing section 151.12(b) does not go to the underlying trust decision, and is simply an alternative means of preserving the status quo ante without addressing the preliminary injunction that the regulation is designed to replace.[1] Defendants attempt to justify the government's threatened violation by arguing: (1) the regulation itself requires only a 30-day stay, and any longer period comes from a non-binding internal guidance which is voluntary; (2) after *Patchak*, the reason for self-staying is no longer applicable; and (3) in any event, the Secretary can rescind a trust acquisition.  They are wrong on all counts.

The preamble to 25 C.F.R. §151.12(b) clearly states that the Department promulgated 25 C.F.R. §151.12(b) for the express purpose of "permitting judicial review *before* transfer of title to the United States." 61 Fed. Reg. 18082 (Apr. 24, 1996) (emphasis added). Immediately upon its

---

[1] Plaintiffs had drafted their complaint before they learned that the Secretary would abandoned his self-stay policy, although the letter so stating arrived approximately 24 hours before filing.  If there were a need to raise section 151.12(b) in the complaint, the complaint can be amended to conform to after-arising events.

promulgation, the Department used section 151.12(b) to persuade the Supreme Court to vacate the Eighth Circuit's holding that the IRA constituted an unconstitutional delegation of legislative authority because trust decisions were not subject to review because of the Quiet Title Act's ("QTA") purported preservation of the Department's sovereign immunity. *See State of South Dakota v. U.S. Dep't of the Interior*, 69 F.3d 878 (8th Cir. 1995). The Department represented to the Supreme Court that "[s]ince the court rendered its decision… the Secretary has issued a regulation that acknowledges the availability of judicial review of such decisions and affords an opportunity for judicial review to be instituted *before the land is actually taken in trust*." Petition for Writ of Certiorari in *U.S. Dep't of the Interior v. State of South Dakota*, No. 95-1956 (June 3, 1996), 1996 WL 34432929, at *15 (emphasis added); *see id.* at *24 n.3 ("As explained in the preamble, the regulation ensures that [judicial] review is available before formal conveyance of title to land to the United States, when the QTA's bar to judicial review becomes operative") (internal quotation marks omitted; brackets in original). There is no reasonable argument that judicial review can be ensured in a 30-day window. For this reason, if section 151.12(b) were construed to allow plaintiffs only 30 days, it would not afford an opportunity for judicial review nor serve its stated purpose. Thus, the regulation itself requires the relief that plaintiffs seek and that is how the Department has interpreted the regulation for 16 years.

In fact, the Department has incorporated its practice of self-staying into its manuals *because the Department interprets 25 C.F.R. § 151.12(b) to require it*. There is no suggestion that preliminary relief is ever required.[2] *See, e.g.*, 2011 FEE-TO-TRUST HANDBOOK, VERSION II, at 15 (in the section discussing 25 C.F.R. § 151.12(b), the manual states that if a lawsuit is filed in the 30-day period, the Department will "take no further action until the judicial review process has been exhausted"); *see*

---

[2] Federal defendants cite to two pieces of "evidence" to suggest that they have not interpreted 25 C.F.R. § 151.12(b) to require stays. Their reference to the December 18, 2012, Berrigan letter in this case– in which they abandon the self stay requirement – is self-serving and provides no evidence of the agency's long-standing interpretation. Second, their reference to a brief before the D.C. Circuit fails to note that the challenger in *Patchak did not* file within the 30-day window. Moreover, when the Department got before the Supreme Court in the same case, it stated that "the purpose of the 30-day window is to permit judicial review before transfer of title to the United States." Brief for Fed. Petitioner at 23, *Patchak v. Salazar*, 132 S.Ct. 2199 (2012) (Nos. 11-246, 11-247) (internal quotation marks and brackets omitted).

*also id.* at 68-69 (If "any legal action is filed," the Office of Indian Gaming ("OIG") will "[n]otify the Regional Director to take no further action."); DOI BIA Div. of Real Estate Serv., Acquisition of Title to Land Held in Fee or Restricted Fee (May 20, 2008) ("2008 Fee-to-Trust Handbook") at 57 ("If someone files a lawsuit, BIA must cease all work until the court decides the case."). These authorities make plain that the Department has long interpreted 25 C.F.R. § 151.12(b) to require it to stay if a challenge is filed during the 30-day period.

The Department's new "interpretation" is impermissible. While an agency's interpretation of its own regulation is generally entitled to deference, deference does not apply when "an alternative reading is compelled by … other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The Department's "intent at the time of the regulation's promulgation" was clearly to stay trust conveyances while judicial challenges are pending, as set forth in the preamble to the rule and in the Department's briefs before the Supreme Court. Because the Department's new position "is inconsistent with the intent of the . . . regulations as expressed by the Secretary at the time of final promulgation" of section 151.12(b), it should be rejected. The BIA Handbook is issued by the Director of BIA, and states that "[a]ll future acquisitions of lands into trust shall be processed in accordance with the guidance outlined in this handbook." It is clearly an authoritative interpretation of 25 C.F.R. part 151, including § 151.12(b).

The Department can change its regulation or its interpretation of a regulation through the required process. But it cannot capriciously change its interpretation simply to gain an advantage in pending litigation. "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking," which the Department has not done here. *Paralyzed Veterans of Am. v. D.C. Arena,* 117 F.3d 579, 586 (D.C. Cir. 1997); *accord Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999).

The intervenor incorrectly argues that *Paralyzed Veterans* does not apply without a plaintiff's detrimental reliance. *Mortgage Bankers Ass'n v. Solis*, 864 F. Supp. 2d 193, 207 (D.D.C. 2012)

(quoting *MetWest Inc. v. Secretary of Labor*, 560 F.3d 506, 511 (D.C. Cir. 2009)). Courts and interested parties like plaintiffs have long relied on the Department's compliance with 25 C.F.R. §151.12(b), which allows judicial review to run its course before taking land into trust. Indeed, if not for that promise, parties would routinely have had to seek (and courts would have had to routinely adjudicate) preliminary injunctions. Indeed, the government admits that parties rely on the very manuals in which it sets forth its interpretation of its regulations. *See, e.g.,* 2011 FEE-TO-TRUST HANDBOOK, VERSION II, at 3 ("The BIA will review the content of this handbook periodically to determine the need for revisions. This review may include input from tribes, tribal organizations and DOI; *all of whom rely on the procedures described in this handbook*.") (emphasis added).[3]

It is ironic that the one departure from the self-stay practice the Department cites to (which was not even a departure, given that the challenger filed suit years after notice of decision), *Patchak*, resulted in the Supreme Court's holding that the Department's legal reasoning was deeply flawed. But clarification of the scope of the Quiet Title Act in *Patchak* does not automatically "revoke" 25 C.F.R. §151.12(b), change the regulation's interpretation, or even eliminate the need to preserve the status quo during judicial review. After the Department promulgated section 151.12(b), it regularly argued that trust challenges should be dismissed for the failure to join the Indian tribe as an indispensable party when its sovereign immunity prevented joinder. *Ramah Navajo Sch. Bd., Inc. v. Babbit*, 87 F.3d 1338, 1351-52 (D.C. Cir. 1996), seems to have laid that argument to rest. The Department has frequently argued that it did not possess the authority to rescind a trust acquisition. Although that issue has apparently not been definitively addressed by the courts, it has been addressed within the Department itself. *See Big Lagoon Park Co. v. BIA,* 32 IBIA 309, 321 (1998) ("Thus, the Board does not view the events in *South Dakota* as evidence of any understanding on their part of either the Supreme Court or the Department that the Department itself has the authority

---

[3] Defendants seem to argue that reliance requires economic detriment, as asserted by regulated parties in the cited cases that discuss an exception to *Paralyzed Veterans.* As in *Patchak* itself, seldom does the plaintiff in a trust acquisition challenge claim title to or an economic interest in the land. Defendants' argument that interested parties like plaintiffs here must show economic reliance to prevent the Department from defeating its APA challenge with a convenient change of interpretation would completely abrogate this Circuit's law for all but regulated parties with an economic interest in the changed interpretation.

to rescind a completed trust acquisition. To the contrary, if an inference can be drawn from these events, it is that the Department, at least, considered itself to lack such authority"). The one judicial opinion that any party has cited held that equitable considerations prevented the court from ordering the rescission of a trust transfer. *Prieto v. United* States, 655 F. Supp. 1187 (D.D.C. 1987). It is little reassurance to plaintiffs that litigation counsel now claim that the Secretary will or can rescind a trust transfer, when they can cite to no statutory authority to rescind or a court holding in support.

Plaintiffs rightfully raise concerns that the trust transfer is likely to jeopardize the availability of remedies and the Court's jurisdiction to award them if plaintiffs are successful in their challenge. There is no doubt that once title to the land is transferred, state and local governments are ousted and the laws on which plaintiffs have relied for protections in the use of land are no longer applicable. Litigation counsel for the intervenor claims that the Tribe is subject to relief because it has waived sovereign immunity, but the scope of that waiver is ill-defined and qualified, and it is not clear that the Tribe cannot later change its mind and disavow an argument made by counsel. The land is owned by a Las Vegas corporation that is not a party to this suit, which has made substantial investments and intends to transfer title to the land to the United States only if it will be accepted into trust *and used for gaming.* If the Court were to invalidate the Secretary's decision, on what basis could it order that the land remain in trust for an entirely unrelated use, not considered by any of the parties, the public, the local governments or the State? On what basis could the Court order the land transferred back to North Fork or the Las Vegas corporation, and if it could, what harm would accrue as a result of that decision on the private investor, who is not a party to the litigation?

Plaintiffs' arguments reduce to the fact that there are substantial questions regarding available remedies and the Court's authority to grant them once trust title is transferred. On the other side of the scale is federal defendants' abandonment of a longstanding regulation designed to obviate the need for a court to address a host of imponderable questions in the context of emergency relief. This Court has ample authority to require federal defendants to comply with their regulations under Fed. R. Civ. P. 81(b), under the Court's equitable powers or under its inherent authority to issue orders in aid of its jurisdiction. 28 U.S.C. § 1651. Federal defendants argue that the Secretary's failure to

comply with the regulation would simply be a claim of legal error; it would not relieve plaintiffs'

burden of showing entitlement to preliminary relief. Federal defendants are wrong—25 C.F.R §

151.12(b) imposes a non-discretionary duty the Secretary is required to follow and which the Court

may order him to follow, as an alternative to entering a preliminary injunction.

## III.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

### A.      Issues for Judicial Review on this Motion

#### 1.      Preliminary Injunction Must be Based on a "Sliding Scale"

Both the government and intervenor suggest that the District of Columbia Circuit's "sliding

scale" analysis is improper after *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[Gov't Opp. at 9-10; Intervenor Opp. at 1].  They are incorrect. Courts in this Circuit continue to

apply the sliding-scale standard after *Winter*.  "[T]he Court finds that the D.C. Circuit's sliding-scale

standard remains viable even in light of the decision in *Winter*." *Brady Campaign to Prevent Gun*

*Violence v. Salazar*, 612 F. Supp. 2d 1, 12 (D.D.C. 2009)); *see also Safari Club Int'l v. Salazar*, 852

F. Supp. 2d 102, 110 (D.D.C. 2012) (Judge Howell noting that "absent binding authority or clear

guidance from the Court of Appeals, the Court considers the most prudent course to bypass this

unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the

'sliding scale' framework").

Indeed, Justice Ginsberg in *Winter* explicitly noted that "courts have evaluated claims for

equitable relief on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm

when the likelihood of success is very high. *This Court has never rejected that formulation, and I do*

*not believe it does so today*." *Winter, 555 U.S.* at 392 (emphasis added). Courts in the D.C. Circuit

are not alone in concluding that the sliding scale remains viable.  After *Winter*, the Second, Seventh,

and Ninth Circuits continued to apply the "sliding scale" analysis. *See Alliance for the Wild Rockies*

*v. Cottrell*, 632 F.3d 1127, 1130–35 (9th Cir. 2011); *Citigroup Global Mkts., Inc. v. VCG Special*

*Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010); *Hoosier Energy Rural Elec.*

*Coop. v. John Hancock Life Ins. Co*., 582 F.3d 721, 725 (7th Cir. 2009); *Davis v. Pension Ben. Guar.*

*Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (noting that the *Winter* "decision does not squarely discuss whether the four factors are to be balanced on a sliding scale").

Such a sliding scale analysis is especially appropriate here, where the government is threatening to violate 25 C.F.R. § 151.12(b), has not provided plaintiffs an administrative record, and will strip state and local governments of their jurisdiction and authority, when the availability of full remedial measures is highly improbable. Plaintiffs' motion for equitable relief under the APA requires judicial review to be based on the full administrative record before the agency at the time the decision was made. *See* 5 U.S.C. § 706; *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582-83 (D.C. Cir. 2001) (requiring that judicial review under the APA "'be based on the full administrative record that was before the [agency] at the time [it] made [its] decision.'") (*citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). Where plaintiffs do not have the basic necessity of an administrative record when seeking a preliminary injunction, a District of Columbia court has determined that a "colorable claim would constitute a sufficient showing of likelihood of success." *Collagenex Pharms, Inc. v. Thompson*, No. CIV.A. 03-1405(RMC), 2003 WL 21697344, at *7 (D.D.C. July 22, 2003). Plaintiffs clearly have a colorable claim, and more, as set forth below.

**B.     Defendants May Not Resort to Facts and Arguments Not Addressed in the Records of Decision**

The two Records of Decision ("RODs"), comprising more than 150 pages and setting forth the Secretary's decision arbitrarily and capriciously fail to explain critical aspects of his decision. Litigation counsel's post hoc justifications do not convert arbitrary and capricious decision-making of the Secretary into reasonable agency action. Many of the arguments asserted in opposition to the motion for preliminary injunction are not even hinted at in the RODs, and depend on facts not discussed or relied upon in the RODs.

An APA case is to be decided upon an administrative record, certified by the agency as the basis of the decision challenged. 5 U.S.C. § 706. Defendants do not cite to the record to defend their decision. Instead they offer "post hoc rationalizations . . . [which] cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490,

539-40 (1981). The Court should not countenance, and should disregard, arguments or facts that are not included in the RODs.

**C.      Plaintiffs Are Likely to Succeed on the Merits**

      **1.      The Secretary Failed to Adequately Analyze His Authority to Transfer Land Into Trust for the North Fork Tribe.**

            a.      The Section 18 Election for Six "Adult *Indians*" At the Rancheria Does Not Establish That the *Tribe* was Under Federal Jurisdiction in 1934

Before land can be acquired in trust for the North Fork Tribe, they must demonstrate that they were a recognized Indian tribe under federal jurisdiction on June 18, 1934. The Secretary offered virtually no discussion of this critical issue in the ROD. The Secretary argues that "if the North Fork Rancheria was not composed of 'Indians,' 'now under Federal jurisdiction,' residing on a 'reservation,' the Secretary would not have called a Section 18 election for it." Gov't Opp. at 14. Defendants' argument is premised on the notion that the Secretary is either infallible, or if fallible, any errors are irrelevant. Secretarial infallibility is a strange argument to defend against a legal challenge to the Secretary's application of Section 5 of the IRA after the Supreme Court in *Carcieri* concluded that his application had been in error for 75 years.

Defendants ask this Court to accept that the Secretary could not have called an election in error, but if he did, it is irrelevant to a dispositive determination based solely on the fact that six adult Indians were allowed to vote. The ROD does not discuss this approach, and defendants provide no authority or reason why the Court should accept these flawed assumptions. As Justice Breyer recognizes in *Carcieri*: "[A] tribe may have been 'under Federal jurisdiction' in 1934 even though the Federal Government did not believe so at the time." *Carcieri*, 555 U.S. at 398 (Breyer, J. concurring). The converse, then, must also be true: for persons allowed to vote in Section 18 elections in 1935, the government may not have had "the kinds of obligations that the words 'under federal jurisdiction' imply" as of June 18, 1934. *Id.* at 397 (majority opinion).

The ROD also fails to explain why the vote to reject the IRA is irrelevant. The government relies upon 25 U.S.C. § 2202, to support its view that the mere calling of a Section 18 election is dispositive. Section 2202 "simply ensures that tribes may benefit from § 465 even if they opted out

of the IRA pursuant to § 478." *Carcieri*, 555 U.S. at 395. Thus, while Indians who voted to reject the IRA are no longer shut out of § 465, this does not necessarily mean that any persons who were allowed to vote in a Section 18 election were "under Federal jurisdiction" as of June 18, 1934.

Further, the intervenor mischaracterizes the Section 18 election as a "tribal vote," and claims that "federal officials contacted the Tribe and called a tribal vote on IRA reorganization." Intervenor Opp. at 8-9. This is incorrect. While defendants conflate "Indian" with "tribe," the IRA distinguishes between the terms. As Justice Stevens notes, "[h]aving separate definitions for 'Indian' and 'tribe' is essential for the administration of IRA benefits. The Statute reflects Congress' intent to extend certain benefits to individual Indians." *Carcieri*, 555 U.S. at 405 (2009) (Stevens dissenting). Provisions of the IRA clearly distinguish when they benefit a *tribe* and when they benefit *Indians*. *Compare, e.g.*, 25 U.S.C. § 471 (offering loans to *Indian* students for tuition at vocational and trade schools) § 472 (granting hiring preferences to individual *Indians* seeking federal employment related to Indian affairs) *with* § 476 (allowing *tribes* to adopt constitutions and bylaws); § 470 (giving loans to Indian-chartered corporations).

By its terms, a Section 18 election is administered to "*any* reservation wherein a majority of the adult *Indians*, voting at a special election duly called by the Secretary of the Interior." 25 U.S.C. § 478 (emphasis added). The election under Section 18 allows only a majority of adult *Indians* residing at "any" reservation to opt-out of the IRA; this IRA election provision makes no mention of "tribes." On the other hand, *Carcieri* compels that the Secretary determine that the North Fork Tribe – not just a handful of Indians – was under federal jurisdiction in 1934. *See Carcieri*, 555 U.S. at 397 ("The Secretary could employ § 465's power to take land into trust favor of *only those tribes* in respect to which the Federal Government already had the kinds of obligations that the words 'under Federal jurisdiction' imply") (emphasis added).

Because the Secretary failed to engage in the sort of "fact-intensive analysis" required to determine whether the North Fork Tribe was a "recognized Indian tribe now under Federal jurisdiction," and because he relied upon the mere calling of a Section 18 election as dispositive of the matter, his ROD lacks support for any conclusion that the persons allowed to vote at the North

Fork Rancheria constituted a "recognized Indian tribe now under Federal jurisdiction" as of June 18, 1934.[4]

           b.      <u>Defendants Raise Arguments and Facts Not Addressed in the RODs</u>

Defendants also contend that the Secretary found the North Fork Tribe qualified under the IRA's second definition of "Indian." The Secretary did not rely on this definition as the basis of his trust decision. The second definition of Indian recites, "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." There are several problems with the Secretary's argument. First, "such members" as a matter of grammar and common sense refers to the antecedent "members" in the prior clause. That clause reads "members of any recognized Indian tribe now under Federal jurisdiction." The second definition cannot broaden the universe of Indians to include descendants of members if those members were not members of a recognized tribe under Federal jurisdiction on June 18, 1934. Second, neither defendants' opposition nor the ROD even asserts that the present day North Fork Indians are descended from "members of a recognized tribe [] under Federal jurisdiction" in 1934, or that such members resided at the North Fork Rancheria on June 18, 1934.[5]

Defendants also offer many pages of arguments and exhibits explaining why the Tribe may have been "under federal jurisdiction" in 1934. In contrast, the ROD considers only the single factor that six persons residing at the Rancheria were allowed to vote in a Section 18 election. That

---

[4] The Government's opposition also asserts that the language "any recognized Indian tribe now under federal jurisdiction" means that although the Supreme Court in *Carcieri* held that a tribe had to be under federal jurisdiction in 1934, it can be recognized at any time before or after 1934. That is to say, unrecognized tribes might have been under federal jurisdiction, or federal recognition and federal jurisdiction over Indians, unlike today, have very different meanings. The only authority for this proposition is a concurring opinion in *Carcieri* that does not reflect the views of the majority of the Court.

[5] The opposition argues "Plaintiffs also assert that rancherias are not reservations." Gov't Opp. at 18. In fact, Plaintiffs asserted that "The North Fork Tribe did not have a 'reservation,' and the Tribe was not recognized through any treaty," which is quite a different point. The focus is on the concept of a tribe. If federal land was awarded to an Indian or a family of Indians to live on, that land may constitute "Indian country," but it surely does not make the people living on it a recognized Indian tribe. The defendants' submission makes clear that the six individuals voting to reject the IRA in 1935 carried the day because four of the six voted against it.

defendants devote dozens of pages of arguments and hundreds of pages of exhibits to address this issue underscores that the Secretary's analysis in the RODs is inadequate, and that they are now providing a post hoc attempt to rescue a decision that fails to meet basic APA requirements.

        c.    The 1947 Haas Report Does Not Show that the Tribe Was Under Federal Jurisdiction in 1934

Defendants erroneously cite to Table A in Theodore H. Hass' 1947 report for their repeated assertion that the 1935 vote was by the "tribe" not "Indians." [Gov't Opp. at 13-14; Intervenor Opp. at 9-10.] Defendants fail to provide any authority for their position that the "list" in Table A is limited to recognized tribes under jurisdiction of the federal government as of June 18, 1934. Rather, the purported "list" is titled "Indian Tribes, *Bands and Communities*" and, by its very title, is not exclusive to only tribes. *See* Docket 30-5, p. 13 (emphasis added). Table A only lists "Northfork" – the name of the town where allegedly six Indians voted on land for homeless Indians.

### 2.    The Secretary Failed to Send the Entire Application Record to the Governor

The Department's own regulations unambiguously require that the "*entire* application record" be submitted to the Governor. *See* 25 C.F.R. § 292.22(b) (emphasis added). In earlier versions of the regulations, "application… refer[red] both to the tribe's initial written request and to the subsequent application package." [*See* 73 Fed. Reg. 29354, 29368 (May 20, 2008).][6] In response, the Secretary stated that "changes were made throughout the regulations accordingly." [*Ibid*.] Thus, "entire application record" refers to all pending requests and encompasses both Secretarial determinations under parts 151 and 292.

Further, the regulations specify that the Tribe can apply under both parts 151 and 292. *See* § 292.15. Thus, under part 292, the Tribe applied "at the same time that it applied under part 151 of this chapter to have the land taken into trust." [Schmit Decl., ¶ 19(h), Ex. 34 (the Tribe's application).] Because the Tribe's application was for both the fee-to-trust transfer and the Secretarial determination, the Secretary was required to submit his decisions memorialized in both the IRA ROD and the IGRA ROD to the Governor.

---

[6] This is available at Request for Judicial Notice ("RFJN"), Exhibit ("Ex.") 6, pp. 139-165.

### 3.    The Secretary's Flawed Analysis on Detriment to the Surrounding Community

The Secretary improperly ignores numerous comments on the record about the detrimental effects of the casino on the community. The intervenor, on the other hand, offers counsel's explanations – arguments not made in the *four* pages memorializing the Secretary's decision – for the determination that there is no detrimental impact on surrounding community.

### a.    The Secretary Was Required to Consider Plaintiffs' Comments

The government argues that "[t]he Secretary was not required to consider Plaintiffs' comments as part of the Secretarial Determination because they do not fall within the regulatory definition of surrounding community." Gov't Opp. at 23. The government contends that the DOI was only required to consult with surrounding governmental entities.

During the notice and comment period for section 292 regulations, the DOI considered a comment that "suggested changing definition [of 'surrounding community'] to 'surrounding governmental entities' because it would limit the consultation process to government-to-government basis." [*See* 73 Fed. Reg. 29354, 29357 (May 20, 2008).][7] The DOI explicitly *rejected* this request because, in the DOI's own words, "IGRA uses 'surrounding community'." *Ibid.* The DOI's regulations further note that "Congress was concerned with how a proposed gaming establishment would affect those *individuals and entities living in close proximity to the gaming establishment,* or those located within commuting distance of the gaming establishment." *Ibid.* (emphasis added). Finally, the DOI also specifically notes that "[a]lthough the regulations do not provide a formal opportunity for public comment under subpart B of these regulations, ***the public may submit written comments that are specific to a particular lands opinion.*** Submissions may be sent to the appropriate agency that is identified in § 292.3." *Id.* at 29373 (emphasis added).

Pursuant to the DOI's own regulations, nearby citizens and organizations (including plaintiffs) submitted comments to the Secretary. The DOI was required to consider concerns of these community organizations and citizens, including plaintiffs, in evaluating whether the proposed mega-

---

[7] This is available at RFJN, Ex. 6, pp. 139-165.

casino would be "detrimental to the surrounding community" under IGRA. Yet the Secretary's finding in his ROD on the lack of detriment to the surrounding community is based on only four points, and fails to consider many of the other detrimental impacts raised by plaintiffs and others.

        b.    <u>Intervenor Attempts to Substitute Counsel's Interpretation of the Agency's Decision that is Not in the Record of Decision</u>

The intervenor utilizes the environmental reports required under the NEPA process to offer post hoc justification for the Secretary's failure to consider concerns of nearby citizens and organizations. These arguments and reasons are not addressed in the ROD. The Secretary's determination that the mega-casino would not detrimental to the surrounding community under IGRA is memorialized in only *four pages* [Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD at 84-87), pp. 369-371.] As the government concedes, the discussion of surrounding community is limited to only local governments and the Picayune Rancheria.

Nonetheless, the intervenor can point to only monetary contributions that the Tribe intends to make to local governments to "mitigate" the impacts of the proposed development. These monetary payments cannot mitigate detrimental impacts that the citizens in the surrounding community will suffer. *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998) (finding mitigation measures inadequate where it was "impossible to determine where, how, and when they would be used and how effective they would be" (citations omitted) (internal quotation marks omitted)).

Moreover, what the Tribe gives with one hand, it takes with the other. The revenue from the mega-casino will come directly out of the pockets of members of the surrounding community. The intervenor mischaracterizes congressional intent behind IGRA by incorrectly stating that "[p]laintiffs' generic concerns about effects of gambling run counter to IGRA's express goal…" [Intervenor Opp. at 21.] This incomplete expression of Congressional intent ignores that IGRA disfavors off-reservation gaming, and it completely writes off Congress's express concern about detrimental impacts that off-reservation gaming can pose to surrounding communities. [*See*

Schmit Decl., ¶ 11, Ex. 19 (IGRA ROD at 86), p. 371 (noting that "IGRA favors on-reservation gaming over off-reservation gaming").]; 25 U.S.C. § 2719(b)(1)(A).]

### 4.     The Secretary Ignored the Procedures Required by NEPA

NEPA procedures must be doggedly followed, and forbid rationalizing decisions that have already been made. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (citations omitted). The FEIS and both oppositions confuse results with procedure, and ultimately rationalize a foregone conclusion – that the Casino Parcel is the only viable site.

### a.     The Department Identified the Old Mill as a Reasonable Alternative and Improperly Rejected It

Defendants focus on the fact that the Old Mill site would not be sold for gambling purposes as determinative of a reasonable decision to discard the site as an alternative.[8] The veiled claim that the owner would not sell the property for the purposes of a casino, however, has no bearing on the site as a reasonable alternative, and its inclusion as a factor in rejecting the site violates NEPA.

In a memorandum from the Regional Director of the Pacific Region to the Assistant Secretary of Indian Affairs, the Regional Director stated that pursuant to "40 C.F.R. Part 1500, . . . [t]he Old Mill is very likely a reasonable alternative that must be considered in the draft and final EIS." [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1053.] The Regional Director went on to outline the proper procedure, stating that the "steps will include preparing and issuing a revised DEIS for public comment." [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1053.] In this memorandum, the Regional Director also noted that the land is currently available for purchase, and makes no mention of a refusal to sell on the part of the owner. *Id.*

The Assistant Secretary's response can be characterized only by its disregard of procedure: "Adding a new alternative, *albeit reasonable*, after scoping sets a dangerous precedent." [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1054(emphasis added).] The Assistant Secretary arbitrarily chose to disregard the proper procedure identified by the Regional Director based on a vague and unfounded

---

[8] Defendants also incorrectly claim that the environmental viability of the site is a matter of plaintiffs' belief. [Gov't Opp. at 30.] Plaintiffs, however, point out in their Motion that this was a determination made in the FEIS. [Motion at p. 27; Schmit Decl., ¶ 21, Ex. 50 (FEIS), pp. 1052]

"slippery-slope" argument. Offering yet another reason to discard the Old Mill site, the Assistant Secretary's stated concerns that the site "may present future . . . liability for the United States should the land be taken into trust." *Id.* Nowhere in the response to the Regional Director does the Secretary suggest that the Old Mill site is unreasonable in light of the purpose and need of the project. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir. 1999) (stating that reasonable alternatives are determined by the purpose and need of the project). Instead the Assistant Secretary focused on possible results – an issue properly addressed by a full analysis of the Old Mill site as a reasonable alternative. Finally, nowhere did the Assistant Secretary state that the owner of the site would not sell.

*Muckleshoot Indian Tribe v. U.S. Forest Service* makes clear that the sale of the land and any negotiations for such sale fall outside the government's jurisdiction and therefore cannot be a factor used to reject an otherwise reasonable alternative. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) ("NEPA regulations state that agencies shall 'include reasonable alternatives not within the jurisdiction of the lead agency.'" (quoting 40 C.F.R. § 1502.14(c))). In *Muckleshoot*, the court was particularly "troubled by the [agency's] *selective willingness* to rely on the availability of funding sources beyond the [Agency's] control." *Id.* (emphasis added). Here, defendants engaged in precisely such selective willingness.

The FEIS's rejection states that the owners had expressed by two letters that they would not sell for purposes of a casino. [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1052]. The reason given in these letters, according to the FEIS, was that "[a]pparently, the concept 'gained no public support to speak of (including from the Rancheria), and actually received widespread community disapproval. The CDC Board feels confident that there is a strong community disposition against there being a casino located at the mill site.'" [Schmit Decl., ¶ 21, Ex. 50 (FEIS), p. 1052 .] The objections by the owner regarding the "local community" are hardly surprising given the Old Mill's proximity to the Rancheria. The same local objections and interests were lodged against the inclusion of the HUD site and serious consideration of the Rancheria – all interests that stood to benefit from the tremendous profit opportunities held out by the Casino Parcel.

In their oppositions, defendants cling to this obvious rationalization to obscure the government's failure to follow procedures required by NEPA. This is most obvious in the intervenor's citation to an IBIA adjudication related to this litigation, that it cites for the proposition that "[a]t bottom BIA officials *carefully scrutinized* the decision to eliminate the Old Mill site." [Intervenor Opp. at 31 (emphasis added)]. The only basis mentioned for rejection in the IBIA adjudication, however, is the owner's reluctance to sell. *Picayune Rancheria v. Acting Pac. Reg'l Dir. BIA,* 48 IBIA 241, 243, 243 n.4 (Jan. 30, 2009).[9]

The intervenor's attempt to discredit plaintiffs' reliance on *Muckleshoot* also fails as part of the same subterfuge. [Intervenor Opp. at 31.] The intervenor argues that this situation is distinguishable, because in *Muckleshoot* it was not clear that funds would be available for purchase, but here the BIA faced "a non-negotiable inability to acquire the alternative site." [Intervenor Opp. at 31.] That is not what the *Muckleshoot* Court says. Here, the government would never face a negotiation over the sale. The government did not "acquire the site." Station Casinos did. The Secretary was obligated to include reasonable alternatives as defined by the purpose and need of the project. Because negotiating the terms of sale was beyond the scope of the Secretary's obligations, the terms of sale could not be the basis for rejection of the site.

> b.     <u>Rejecting Reasonable Alternatives Based on Economic Competition with Chukchansi Gold Facility Violated NEPA</u>

Plaintiffs agree with defendants that "the theme of § 102 [NEPA] is sounded by the adjective 'environmental.'" *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). Plaintiffs further acknowledge that the economic goals of the project's sponsor can be considered in the selection of reasonable alternatives because those goals stem from the purpose and need. [*See* Gov't Opp. at 28.] Plaintiffs merely ask the following of the government: Why, then, was avoiding locations that would compete with other tribes identified as a reason for rejecting reasonable

---

[9] Trying to cover more ground, the government cites "a letter sent to the contractor detailing the varied reasons the Old Mill site was not a reasonable alternative." [Gov't Opp. at 34 (citing Defs' Ex. K at 12).] These detailed and varied reasons, however, merely include the possible cleanup liability facing the government, the "dangerous precedent" of adding another reasonable alternative, and "most importantly" the owners had stated they would not sell. [Defs' Ex. K at 12.]

alternative sites along the SR-41 Corridor? How are the economic needs of other tribes relevant?[10]
Furthermore, the statements regarding such economic competition in the FEIS are concrete and clear
in contrast to vague but ominous sounding terms such as "environmentally sensitive foothills."[11]
Plaintiffs' argument reveals that the reasons stated for rejection of sites again fail to address the
purpose and need of the project and are "economic" beyond the scope of NEPA – that the central
"theme" of the FEIS is profit maximization rather than the "theme . . . sounded by the adjective
'environmental.'" Neither the government nor the intervenor offers any argument against this
proposition. Both offer arguments that lead away from an analysis of the required procedures.

**D.      Plaintiffs will be Irreparably Harmed**

Plaintiffs have met their burden in showing that allowing the Casino Parcel to go into trust
prior to the conclusion of this litigation jeopardizes the plaintiffs' ability for redress based upon
sound legal principles, the application of which reveals irreparable harm that is neither speculative
nor theoretical. Both the government and the intervenor attempt to minimize and even outright ignore
the legal consequences of the transfer.

**1.      Plaintiffs Will Be Unable to Obtain Permanent Relief if the Casino Parcel
Goes into Trust**

The removal of land from state and local jurisdiction is an extraordinary act. *See Carcieri v.
Kempthorne,* No. 07-526, Oral Arg. Tr. 36:12-17 (Nov. 3, 2008) (Roberts, C.J., describing taking
land into trust as "an extraordinary assertion of power"); *Michigan Gambling Opposition v.*

---

[10] The government includes a footnote implying that it is not clear which side plaintiffs are on and
criticizing their defense of the Chukchansi tribe which also operates a casino and whose interests are
therefore "contrary to those of the gaming watchdog group." [Gov't Opp. at 29 n.14] Plaintiffs' concern is
with the "reservation shopping" phenomenon, by which a tribe and its private financial partner can
acquire and develop a casino far from the tribe's existing lands, and in the heart of an existing
urban/suburban community. The Picayune casino is located on-reservation. Moreover, plaintiff Brannon
asserted detrimental impacts to the Chukchansi in his written comments to the Department, and as
members of the community plaintiffs have an interest in the economic vitality of existing businesses.
[Brannon Decl., ¶ 25 Ex. 16 p. 220 (explaining that "the tribe is leap-frogging the Chukchansi Indian
reservation).]

[11] Notably, the Secretary liberally invokes the "environmentally sensitive" nature of the area near the
North Fork Rancheria as grounds to reject alternative sites, without giving a hard look at specifically what
those sensitivities are, how they can be mitigated, and why they did not prevent development of the North
Fork Tribe's community center or housing.

*Kempthorne*, 525, F.3d 23, 39 (D.C. Cir. 2008) (Brown, J., dissenting in part) ("The consequences of the Indian Country designation are profound."); *Id.* ("A tribal sovereign ousts at state, unless Congress expressly provides otherwise." (*citing California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987)).

In contradiction of such authority, the government characterizes the impending February 1, 2013, transfer as a "mere transfer of title." [Gov't Opp. at 36.] Rather than address the significance of the transfer, the government relies on the mantra that the transfer will result in "no on the ground impacts." [Gov't Opp. at 1, 36.] While the government is not clear as to its definition of "on the ground impacts," what is clear is that the legal status of the ground will be of an *entirely different character* after the transfer, likely beyond the control of the government and this Court.

### 2.       Neither the Government nor the Tribe Offers any Legal Basis that the Trust Can be Unwound if Plaintiffs Prevail

Not only does the government doubt that it has the ability to unwind the transfer [Motion at p. 36], but the limited case law also suggests that the government lacks the authority to do so. *See Prieto v. United States*, 655 F. Supp. 1187, 1192 (D.D.C 1987); *see also Big Lagoon Park Co. v. BIA*, 32 IBIA 309, 321 (1998) ("The Board concludes that it lacks the authority to order divesture of title to land held by the United States in trust for an Indian Tribe"). In its Opposition, the government merely points out and cites, in a detailed footnote, two instances in which the government has taken land out of trust. [Gov't Opp. at 39 n.20 (identifying cases in which the unwinding of the trust was unopposed).] This footnote obscures plaintiffs' sounder argument that the government's having taken land out of trust for reasons unrelated to the present litigation is not equivalent to a legal principle upon which to base such action if the Tribe opposed it.

In *Prieto*, the court determined that the government should be estopped from removing the land from trust because the plaintiff detrimentally relied on the representation by the government. *Prieto*, 655 F. Supp. at 1192 (stating also that an agency is not free to "snatch back vested rights"). The intervenor will certainly make this argument should its "development partner . . . spend millions of dollars . . . to procure detailed architectural plans or engage in other essential pre-construction

costs activities . . . ." [Intervenor Opp. at 43.][12] Furthermore, when the land goes into trust the intervenor's sovereignty over the Casino Parcel will vest, as discussed below.

### 3.   The Transfer of the Casino Parcel Into Trust Will Oust State and Local Government Authority, Causing Plaintiff's Irreparable Harm

"Land held in trust is generally not subject to (1) state or local taxation; (2) local zoning and regulatory requirements; (3) state criminal and civil jurisdiction, unless the tribe consents to such jurisdiction. *Conn. ex rel. Blumenthal v. U.S. Dep't of the Interior,* 228 F.3d 82, 85-86 (citing 25 U.S.C. § 465; 25 C.F.R. § 1.4(a); 25 U.S.C. §§ 1321(a), 1322(a)) (citations omitted). Once the Casino Parcel goes into trust, the Tribe will have sovereign authority to alter the land, disregarding local land-use regulations if it sees fit – free from the strictures of local zoning or other regulatory controls that protect all landowners in the area. The transfer into trust will instantly deprive plaintiffs of these avenues of redress and constitute irreparable harm. *See Gettysburg Battlefield Pres. Ass'n v. Gettysburg Coll.,* 799 F. Supp. 1571, 1576 (M.D. Pa. 1992) *aff'd,* 989 F.2d 487 (3d Cir. 1993) (denying plaintiff's preliminary injunction to block development project because land had been transferred from the government to a private party and the court, therefore, lacked jurisdiction to enjoin the private party).

### 4.   Plaintiffs Cannot Obtain Preliminary Relief Against Actions Taken by the Intervenor Once the Casino Parcel Goes into Trust

Notwithstanding the Tribe's equivocal and partial waiver of sovereign immunity, discussed below, basic requirements for preliminary relief may preclude enjoining the Tribe after the land goes into trust. The government's and intervenor's broad assertions that this Court could enjoin the Tribe at a later date if necessary ignore this principle. The intervenor, however, reveals that it is not unaware of the rule. In agreeing to give notice "'at least 120 days' before opening any gaming facility," the intervenor states, "That period of notice alone would allow plaintiffs ample opportunity to seek judicial relief against the proposed commencement operations (if their allegations provided any substantial basis for such relief, which they do not)." [Intervenor Opp. at 37]. Plaintiffs' claims

---

[12] The Tribe's "development partner," Station Casinos, has already invested approximately $18 million in the project. [Schmit Decl., ¶ 17, Ex. 25, p. 548.]

are against the government. Further, the intervenor carefully preserved that status in its proposed answer filed with its motion to intervene. [Docket 16-4 (Intervenor's Proposed Answer) (offering no affirmative defenses and alleging no counterclaims, in contravention of Fed. R. Civ. Proc. 24(b)).][13]

### 5.   The Intervenor Tribe Has Not Unequivocally Waived Its Sovereign Immunity

Issues regarding the scope of a tribe's waiver of sovereign immunity are complex and unclear. What is simple and clear, however, is that a tribe's waiver of immunity "cannot be implied and must be unequivocally expressed." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 48 (1978); *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 777 (D.C. Cir. 1986). In opposition to plaintiffs' motion, the intervenor is unequivocal only as to what it has **not** waived.

The intervenor states, "[t]he Tribe's waiver of immunity would extend to any preliminary injunctive relief the Court *might* enter while it adjudicates *those claims*, including relief that *might restrain* the Tribe from engaging in *particular activities* on the property." [Intervenor Opp. at 39 (emphasis added).] As discussed above, and as the intervenor has also made clear, this Court likely cannot enjoin the tribe because "those claims" it is adjudicating have not been alleged against the intervenor for any "particular activities" the intervenor has engaged in. Furthermore, the intervenor took care in its motion to intervene not to attach itself to any claims currently being litigated by failing to provide any affirmative defenses or counterclaims in its proposed answer. [*See* Docket 16-4.] Thus, this statement of waiver does not unequivocally waive immunity with regard to any specific issue in the current litigation.

On the other hand, the Tribe also states clearly and unequivocally, "[t]he Tribe's waiver would not automatically extend to any new or amended claim that any plaintiff might seek to bring, including any claim a plaintiff might seek to state directly against the Tribe . . . ." [Intervenor Opp. at 39 n.30.] The Tribe is trying to have it both ways: While appearing to offer a limited immunity waiver, the Tribe attempts to retain its immunity from suit.

---

[13] While plaintiffs did not oppose the Tribe's motion to intervene, plaintiffs note that Rule 24(b) requires a "claim or defense that shares with the main action a common question of law or fact." Rule 24(c) requires that motion be accompanied by a pleading setting forth this claim or defense that the intervenor seeks to assert. *See Alvarado v. J.C. Penney Co., Inc.*, 997 F.2d 803, 805 (10th Cir. 1993).

**E.      The Balance of Equities Favors an Injunction**

Before this case, the type of harm that the intervenor claims it will suffer did not exist, because of the government's self-stay practice. [*See* Docket 11, Ex. 2 (BIA Handbook) at 15] Now, for the first time in a fee-to-trust litigation, the intervenor seeks to transform the maintenance of the status quo into a claim that it would suffer substantial harm if the injunction is granted.

Intervenor argues that very costly and detailed plans, as well as the Tribe's intentions to use the property to fulfill the stated purpose and need of the project, depend on the parcel's being taken into trust. [Intervenor Opp. at 43] Irrespective of whether this is true, the intervenor conflates the frustration of delay, most of which is caused by the Secretary, with "*depriv[ing]* it of the very benefits that IGRA *contemplates they should receive.*" [Intervenor Opp. at 44 (emphasis added)]. The intervenor is being deprived of nothing. This is a far different situation from one in which vested rights and associated entitlements have been taken away. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1252 (10th Cir. 2001) (granting preliminary injunction protecting tribal action on tribal land from challenge by state); *Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989) (granting tribe preliminary injunction to protect gaming *already occurring on tribal land* pending outcome of a state challenge (emphasis added)).

The real and imminent harm faced by plaintiffs if the Casino Parcel is taken into trust outweighs the intervenor's frustration associated with delay. Denying this injunction will likely deprive plaintiffs of ultimate relief; granting the injunction will preserve the status quo and postpone the intervenor's plans. But it will assure that a determination based on such a profound and extraordinary exercise of authority as taking the Casino Parcel into trust was executed properly.

**F.      Public Interest Favors Maintaining the Status Quo**

The public interest demands that the government properly consider the IRA, the IGRA, and their regulations before taking an action so extraordinary and so profound as transferring property into trust some forty miles away from the North Fork Rancheria for the purpose of building a casino. *See Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993).

Neither the government nor the intervenor offers any support for their contention that because "tribal self-government may be in the public interest" that interest outweighs the interests of ensuring agency officials comply with regulations. [*See* Gov't Opp. at 44, *and* Intervenor Opp. at 44 (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1253 (10th Cir. 2001), *and Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989).] The cases relied on for this proposition, as mentioned above, involved preliminary injunctions granted to tribes in order to protect tribal sovereignty on tribal land pending the outcome of the litigation. This situation is not the same. Contrary to the position of the government and the intervenor, the cases they cite better support the plaintiffs' position that once land is transferred into trust and becomes Indian land, the intervenor will be free to act in ways contrary to state law and such actions will be protected by tribal sovereignty and immunity. *See Seneca-Cayuga Tribe of Oklahoma*, 874 F.2d at 710 (granting preliminary injunction to protect and continue gaming operations on tribal land, which, as the tribe conceded, violated state law).

The facts of this case fail to show, contrary to intervenor's assertion, a significant public interest in not delaying the transfer because the decision itself reflects that the determination was not made in the public's best interest. [*See* Intervenor Opp. at 44.] In the cases relied on by the intervenor for this position, the agency official's decision garnered such deference because the decision protected a vested interest – an interest that was not in dispute. *See, e.g.*, *Ambach v. Bell*, 686 F.2d 974, 987 (despite a challenge against the Secretary of Education's method for determining disbursal of federal funds to various states, a preliminary injunction enjoining disbursal would prevent the Secretary's "achievement of statutory goals" and deprive children of grant money, their entitlement to which was not in dispute).

The public interest factor should be weighed in relation to the dispute. Here, the plaintiffs dispute the determination of an entitlement under § 465. Because an injunction will not prevent the achievement of statutory goals (to take land into trust for "recognized tribes under federal jurisdiction in 1934") or deprive other interested parties of a vested right or entitlement, the public interest is best served by enjoining the Casino Parcel's being taken into trust pending the outcome of this litigation.

## IV.  <u>CONCLUSION</u>

For all of the above stated reasons, plaintiffs respectfully request that the Court grant their motion for a preliminary injunction to immediately require the defendants to stay the fee-to-trust transfer of the 305.49-acre Casino Parcel.

Dated:  January 22, 2013

By: /s/ Sean M. Sherlock

/s/ Benjamin S. Sharp

Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C. 20005-3960
Telephone:   202.654.6200
Facsimile:   202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6366
Facsimile: 602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
Harsh P. Parikh
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com
hparikh@swlaw.com

*Attorneys for Plaintiffs Stand Up For
California!, Randall Brannon, Madera
Ministerial Association, Susan Stjerne,
First Assembly of God–Madera, and
Dennis Sylvester*