**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STAND UP FOR CALIFORNIA!, *et al.*, | |
| Plaintiffs, | Civil Action No.  12-2039 (BAH) |
| v. | Consolidated with: |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | Civil Action No. 12-2071 (BAH) |
| Defendants, | Judge Beryl A. Howell |
| v. | |
| NORTH FORK RANCHERIA OF MONO INDIANS, | |
| Intervenor-Defendant. | |

**MEMORANDUM OPINION**

The plaintiffs bring this consolidated action, under the Indian Reorganization Act, 25

U.S.C. §§ 461, *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, the Indian

Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.*, and the National Environmental Policy Act,

42 U.S.C. §§ 4321, *et seq.*, to challenge the decision of the Secretary of the United States

Department of the Interior to acquire a 305-acre parcel of land in Madera County, California in

trust on behalf of the intervenor-defendant North Fork Rancheria of Mono Indians and the

Secretary's decision to allow gaming on the land in question.  Pending before the Court are the

government defendants' Motion to Transfer Venue, ECF No. 20, and the Stand Up plaintiffs'

Motion for Preliminary Injunction, ECF No. 26.

I.      **BACKGROUND**

This case challenges two separate but related decisions of the Secretary of the United States Department of the Interior ("the Secretary") regarding a 305.49-acre parcel of land located in Madera County, California ("the Madera Site").  *See* Compl. ¶¶ 1, 31, ECF No. 1.  In particular, the Madera Site is located adjacent to Route 99 in an unincorporated portion of Madera County, just outside the northwest border of the City of Madera.  *See* Intervenor's Opp'n to Pls.' Mot. for Prelim. Inj. ("Intervenor's Opp'n") at 5, ECF No. 34; *see also* Pls.' App. of Evidence ("Pls.' App.") Ex. 13, at 212, ECF No. 27-15.[1]  The first decision, made in September 2011 pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(A), determined that the North Fork Rancheria of Mono Indians ("the North Fork Tribe") would be permitted to conduct gaming on the Madera Site because "a gaming establishment would 1) be in the best interest of the [North Fork] Tribe and its members; and 2) . . . it would not be detrimental to the surrounding community."  Pls.' App. Ex. 19 ("IGRA ROD") at 281, ECF No. 27-24.  This decision under the IGRA also determined that the proposed "Alternative A,"—a "gaming-resort complex" on the Madera Site that would include a 247,180 square-foot gaming and entertainment facility, a 200-room hotel, and a 4,500-space parking facility—would "best meet the purpose and need for the Proposed Action."[2]  *Id.* at 281, 286, 295–97.  The second decision, made over one year later, in November 2012, pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, approved a fee-to-trust application submitted by the North Fork

---

[1] The plaintiffs have submitted a consecutively paginated Appendix of Evidence at ECF No. 27.  When citing evidence within this Appendix, the Court will cite both to (1) the exhibit; and (2) the page number within the Appendix where the cited material is located.

[2] The "Proposed Action" referenced is "that the [Bureau of Indian Affairs] issue a Secretarial Determination and transfer the 305.49 acres into Federal trust for the [North Fork] Tribe in order for the Tribe to conduct tribal government gaming authorized under the IGRA."  IGRA ROD at 287.

Tribe, whereby the United States would acquire the Madera Site to hold it in trust for the benefit of the North Fork Tribe. *See* Pls.' App. Ex. 20 ("IRA ROD") at 378, ECF No. 27-27.

      The plaintiffs in this consolidated action consist of two distinct groups. The first group ("the Stand Up plaintiffs") consists of various individual citizens and community organizations located in and around Madera, California.[3] *See* Compl. ¶¶ 5–10 (No. 12-2039). The other group, the Picayune Rancheria of the Chukchansi Indians ("the Picayune Tribe"), is a federally recognized Indian Tribe located in Madera County that operates a class III gaming facility called the Chukchansi Gold Resort and Casino on its reservation lands, which are located approximately 30 miles from the Madera Site.[4] *See* Compl. ¶ 5 (No. 12-2071).[5] Although all plaintiffs challenge both of the Secretary's decisions described above on a variety of grounds, only the Stand Up plaintiffs have moved for a preliminary injunction.[6] *See* Mot. for Prelim. Inj. at 1, ECF No. 26. Summarized briefly below is the regulatory, factual, and procedural background relevant to the two motions presently pending before the Court.

---

[3] The Stand Up plaintiffs include: Stand Up for California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God–Madera, and Dennis Sylvester. *See* Compl. ¶¶ 5–10.

[4] There are differing accounts of exactly how far the Picayune Tribe's gaming facility is from the proposed Madera Site. Here, the Court cites to the allegations of the Picayune Tribe, as set forth in its Complaint.

[5] The Picayune Tribe filed its Complaint on December 31, 2012—twelve days after the Stand Up plaintiffs filed their Complaint. *See* Compl., ECF No. 1, *Picayune Rancheria of the Chukchansi Indians v. United States*, No. 12-2071. Upon the consent of all parties, the Court consolidated the Picayune Tribe's lawsuit with the Stand Up plaintiffs' lawsuit on January 9, 2013. *See* Minute Order dated Jan. 9, 2013.

[6] The Court observes that the Picayune Tribe would not be able to establish irreparable harm in any event because the only harms that it complains of are economic in nature. *See, e.g.*, *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (noting the "general rule that economic harm does not constitute irreparable injury"); *see also* Compl. ¶ 3, No. 12-2071 (alleging that "[t]hese illegal actions will have a devastating economic impact on the Picayune Tribe"). Furthermore, the Picayune Tribe does not allege that, absent relief, the defendants' actions will "threaten[] the very existence of the [Picayune Tribe's] business," which is the standard for finding irreparable economic harm. *See* *Wis. Gas Co. v. FERC*, 759 F.2d 669, 674 (D.C. Cir. 1985); *see also* *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 182 (D.D.C. 2011) (denying preliminary injunction where plaintiff "[did] not inform the Court that the [agency action] threatens the very existence of his business" (citing *Wisconsin Gas*, 758 F.2d at 674)).

### A.    **Regulatory Framework**

The regulatory framework that pertains to the plaintiffs' claims is set forth in three statutes: fee-to-trust determinations are authorized under the IRA, gaming eligibility determinations are guided by the IGRA, and the development of environmental impact statements are mandated under the National Environmental Policy Act ("NEPA").[7]

### 1.    *The Indian Reorganization Act*

"The intent and purpose of the [IRA] was to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and

---

[7] The defendants do not challenge the standing of the plaintiffs in this action, but "federal courts, being courts of limited jurisdiction, must assure themselves of jurisdiction over any controversy they hear, regardless of the parties' failure to assert any jurisdictional question." *Canning v. NLRB*, Nos. 12-1115, 12-1153, 2013 WL 276024, at *5 (D.C. Cir. Jan. 25, 2013). "The doctrine of standing 'is an essential and unchanging part of the case-or-controversy requirement.'" *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 146 (D.C. Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The "irreducible constitutional minimum of standing contains three elements": (1) an injury in fact; that is (2) fairly traceable to the challenged action of the defendants; and (3) likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. To proceed to the merits of plaintiffs' claims, a court "need only find one party with standing." *Ams. for Safe Access v. DEA*, No. 11-1265, 2013 WL 216052, at *4 (D.C. Cir. Jan. 22, 2013); *accord Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

As discussed above, the plaintiffs consist of three individual citizens of Madera County, three organizations with members who reside in Madera County, and one federally recognized Indian tribe that operates a gaming establishment on its reservation lands located in Madera County. *See supra* Part I (discussing the identity of the plaintiffs). The Picayune Tribe has alleged that the Secretary's action in acquiring the Madera Site in trust for the North Fork Tribe and permitting gaming on that land "will have a devastating economic impact on the Picayune Tribe." Compl. ¶ 3, No. 12-2071. The Court is satisfied that the Picayune Tribe has standing, and therefore, the Court may proceed to consider the merits of the plaintiffs' claims. *See Ams. for Safe Access*, 2013 WL 216052, at *4. The economic injury that would result from the development of the Madera Site, the existence of which the defendants do not contest, is sufficiently concrete to constitute an injury in fact. *See, e.g., Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369 (D.C. Cir. 2004) ("[I]t is well established that '[p]arties suffer cognizable injury under Article III when an agency lift[s] regulatory restrictions on their competitors or otherwise allow[s] increased competition.'" (quoting *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1113 (D.C. Cir. 2001))). Furthermore, this economic injury will be fairly traceable to the defendants' conduct since it will result, if at all, because of the defendants' decision to transfer-in-trust the Madera Site and permit gaming thereon. Finally, the Picayune Tribe's injury in fact is likely to be redressed by a favorable decision because, if the plaintiffs are successful on the merits, the Secretary's determinations will likely be vacated, and the economic injury to the Picayune Tribe will not occur. Despite the fact that the plaintiffs have standing to bring suit, "to show irreparable harm [for purposes of a preliminary injunction], 'a plaintiff must do more than merely allege . . . harm sufficient to establish standing.'" *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (quoting *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991)). Although the Picayune Tribe does not move for preliminary injunctive relief, once a Court has subject-matter jurisdiction over a case, it has the power to hear motions from any party.

paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (internal quotation marks omitted). Pursuant to that purpose, the IRA provides that the Secretary "is authorized, in his discretion, to acquire . . . any interest in lands, water rights, or surface rights to lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 465. The statute further specifies that "[t]itle to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired." *Id.* The IRA defines "Indian" to include, *inter alia*, "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." *Id.* § 479.

The Department of the Interior's ("DOI's") regulations, promulgated pursuant to the IRA, state that "land may be acquired for a tribe in trust status" when, *inter alia*, "the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3(a)(3). In considering an application for the acquisition of off-reservation trust land, the Secretary is required by DOI regulations to consider a number of factors, including "the existence of statutory authority for the acquisition and any limitations contained in such authority," the "need of the individual Indian or the tribe for additional land," the "purpose for which the land will be used," and "[t]he location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservations." *Id.* §§ 151.10–151.11.

## 2.    *Indian Gaming Regulatory Act*

Related to the purposes of the IRA, the IGRA was enacted "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). The IGRA provides that "gaming regulated by [the IGRA] shall not be conducted on lands acquired by the Secretary in trust for the benefit of any Indian tribe after October 17, 1988." *Id.* § 2719(a). This

prohibition on conducting gaming on trust land acquired after 1988, however, does not apply

when, *inter alia*,

> the Secretary, after consultation with the Indian tribe and appropriate State and
> local officials, including officials of other nearby Indian tribes, determines that a
> gaming establishment on newly acquired lands would be in the best interest of the
> Indian tribe and its members, and would not be detrimental to the surrounding
> community, but only if the Governor of the State in which the gaming activity is
> to be conducted concurs in the Secretary's determination[.]

*Id.* § 2719(b)(1)(A).[8]  Relevant to this case, the DOI's regulations define "surrounding

community" to mean "local governments and nearby Indian tribes located within a 25-mile

radius of the site of the proposed gaming establishment."  25 C.F.R. § 292.2.  This same

definition further states that "[a] local government or nearby Indian tribe located beyond the 25-

mile radius may petition for consultation if it can establish that its governmental functions,

infrastructure or services will be directly, immediately and significantly impacted by the

proposed gaming establishment."  *Id.*

### 3.      *National Environmental Policy Act*

A third statutory framework relevant to the Secretary's determinations in this case is that

of the NEPA.  That statute requires all federal agencies to "include in every recommendation or

report on proposals for legislation and other major Federal actions significantly affecting the

quality of the human environment, a detailed statement by the responsible official" on a number

of considerations.  42 U.S.C. § 4332(2)(C).  These considerations include "the environmental

impact of the proposed action," "any adverse environmental effects which cannot be avoided

should the proposal be implemented," and "alternatives to the proposed action."  *Id.*  This

"detailed statement" is commonly known as an Environmental Impact Statement ("EIS").  *See,*

*e.g.*, *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985).  The parties appear

---

[8] The Court will sometimes refer to this as a "two-part determination," which is a term used in the DOI's definitions
relating to the IGRA.  *See* 25 C.F.R. § 292.2.

to agree that the fee-to-trust acquisition at issue in this case qualifies as a "major Federal action" under the NEPA, and therefore the DOI was required to prepare an EIS regarding the environmental impacts of that acquisition. *See* Compl. ¶ 22; United States' Response to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n") at 24–25, ECF No. 30.

**B.    The North Fork Tribe**

The North Fork Tribe, which is an intervenor in this action,[9] "consists of the modern descendants of Mono Indians using and occupying lands near and in the San Joaquin Valley for several centuries." Pls.' App. Ex. 23, at 467. The North Fork Tribe currently consists of approximately 1,900 citizens, many of whom live on or around an 80-acre parcel of land in Madera County ("the North Fork Rancheria"), which is held in trust by the United States for the benefit of individual members of the North Fork Tribe. *See* Intervenor's Opp'n at 4; IGRA ROD at 294. The United States also holds a 61.5-acre tract of land ("the HUD tract") in North Fork, California in trust for the benefit of the North Fork Tribe itself, which contains a community center, basic infrastructure (*i.e.*, roads, water, sewer), and pads for nine single-family homes. *See* IGRA ROD at 289.

In 1906, Congress passed the first in a series of laws that authorized the Secretary of the Interior to purchase land in California for the benefit of individual Indians. *See* Act of June 21, 1906, ch. 3504, 34 Stat. 325, 333. In 1916, pursuant to these statutes, the DOI purchased what is now the North Fork Rancheria "for the use of the North Fork band of landless Indians." *See* Decl. of Judy Bethel-Fink ("Bethel-Fink Decl.") Ex. A at 1, ECF No. 33-1; Intervenor's Opp'n at 4. In 1934, the IRA was passed. *See* Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified at 25 U.S.C. §§ 461, *et seq.*). One of the provisions of the IRA required the

---

[9] *See* Minute Order dated Jan. 17, 2013 (granting motion to intervene).

Secretary to call and hold special elections among Indian tribes on whether the tribes wanted to ratify the IRA and adopt a tribal constitution and by-laws.  *See* 25 U.S.C. § 476(c).[10]  The IRA also contains an opt-out provision regarding these tribal elections, whereby the statute "shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application."  *Id.* § 478.  One of these special elections was held on the North Fork Rancheria on June 20, 1935, and four of the six adult North Fork Indians voted against the application of the IRA.  *See* Bethel-Fink Decl. Ex. B, at 2.

### C.    The Trust Application and Decisionmaking Process

On March 1, 2005, the North Fork Tribe submitted a formal request to the Bureau of Indian Affairs ("BIA") to acquire the Madera Site in trust for "the development and operation of a gaming resort and hotel."  *See* Intervenor's Opp'n Ex. H at 1, ECF No. 34-4.  Several months before this formal request was submitted, the BIA published a notice in the *Federal Register* announcing its intent to prepare an EIS for the North Fork Tribe's proposed trust acquisition of the Madera Site.  *See* Notice of Intent to Prepare an Environmental Impact Statement for the North Fork Rancheria's Proposed Trust Acquisition, 69 Fed. Reg. 62,721 (Oct. 27, 2004).  This notice provided the opportunity for public comment "on the scope and implementation of this proposal" until November 26, 2004.  *See id.*  This "scoping" comment period was later extended until May 6, 2005.  *See* 70 Fed. Reg. 17,461 (Apr. 6, 2005).

In February 2008, the DOI distributed a Draft Environmental Impact Statement ("DEIS") regarding the proposed acquisition of the Madera Site "to Federal, tribal, state, and local

---

[10] This provision also states that such elections were required to be called "within [180] days after the receipt of a tribal request for an election to ratify a proposed constitution and bylaws or to revoke such constitution and bylaws" or "within [90] days after receipt of a tribal request for election to ratify an amendment to the constitution and bylaws."  25 U.S.C. § 476(c).

agencies and other interested parties for a 45-day review and comment period."  IGRA ROD at 288; *see also* Draft Environmental Impact Statement for the North Fork Rancheria's Proposed 305 Acre Trust Acquisition, 73 Fed. Reg. 8898 (Feb. 15, 2008) (providing notice that "[w]ritten comments on the scope and implementation of this proposal must arrive by March 31, 2008"). During the public comment period, the BIA received a total of 331 comment letters, and the BIA also conducted a public hearing on March 12, 2008, at which 101 individuals spoke.  *See* IGRA ROD at 288; Defs.' Ex. J at 7–10, ECF No. 30-10 (listing commenters at public hearing).[11] Following the public comment period on the DEIS, on August 6, 2010, the BIA published a notice in the *Federal Register* announcing its intent to submit a Final Environmental Impact Statement ("FEIS") to the Environmental Protection Agency ("EPA").  *See* Final Environmental Impact Statement for the North Fork Rancheria's Proposed 305-Acre Trust Acquisition, 75 Fed. Reg. 47,621 (Aug. 6, 2010).  This notice also provided 30 days within which to comment on the FEIS and stated that the FEIS was publicly available in a number of locations, including online. *See id.* at 47,621–22.

On September 1, 2011, after the FEIS had been published, the then Assistant Secretary of Indian Affairs, Larry Echo Hawk, issued a Record of Decision ("ROD") under the IGRA, which concluded that "Alternative A," which was the alternative that involved a large gaming/hotel complex on the Madera Site, was the "Preferred Alternative."  IGRA ROD at 281.  This alternative was chosen from among five alternatives because it "will best meet the purpose and need for the Proposed Action, in promoting the long-term economic self-sufficiency, self-determination and self-government of the [North Fork] Tribe."  *Id.*  In reaching this conclusion,

---

[11] The plaintiffs and their representatives were responsible for 40 comments, either written during the comment period or spoken at the public hearing, including three comments from representatives of the Chukchansi Gold Resort Casino, which is owned and operated by plaintiff Picayune Tribe.  *See* Defs.' Ex. J, at 1–11.

the Secretary[12] also concluded that, under 25 C.F.R. Part 292, Alternative A was "in the best interest of the [North Fork] Tribe and its citizens," and "would not result in detrimental impact on the surrounding community." *Id.* at 368–70.  The Secretary's conclusions in the ROD were supported by an analysis of the alternative actions; consideration of the factors laid out in 25 C.F.R. Part 292, which the Secretary is required to consider (*e.g.*, economic impacts of development, impacts on the surrounding community, historical connection to the land); and the mitigation measures that would be taken to lessen any potential negative impacts on the surrounding community and others outside that community.  *See id.* at 289–372.  Generally, the ROD also stated that the Secretary's decision was based on, *inter alia*, "thorough review and consideration of the [North Fork] Tribe's fee-to-trust application and material submitted pursuant to the IGRA . . . the DEIS; the FEIS; the administrative record; and comments received from the public, Federal, state, and local governmental agencies; and potentially affected Indian tribes." *Id.* at 282.

On November 26, 2012, the current Assistant Secretary for Indian Affairs, Kevin Washburn, issued an ROD under the IRA, approving the North Fork Tribe's fee-to-trust application for "Alternative A" on the Madera Site.  *See* IRA ROD at 377.  This ROD announced that "the action to be implemented is [Alternative A], which includes acquisition in trust of the 305.49-acre Madera site and construction of a gaming-resort complex including a 247,180 square foot casino facility, 200-room hotel, surface and structured parking facilities, and corresponding mitigation measures."  *Id.*  Similarly to the decision made under the IGRA, the IRA ROD "determined that this Preferred Alternative will best meet the purpose and need for the Proposed Action by promoting the long-term economic self-sufficiency, self-determination and self-

---

[12] Although the ROD was authored by the Assistant Secretary for Indian Affairs, the Court will refer to the decision as that of the "Secretary," as that term is defined in IGRA regulations:  "the Secretary of the Interior or authorized representative."  25 C.F.R. § 292.2.

governance of the [North Fork] Tribe." *Id.* Likewise, this second ROD analyzed alternative actions; environmental impacts and public comments; and mitigation measures to be taken. *See id.* at 386–435. The ROD also summarized the Secretary's consideration of the factors outlined in 25 C.F.R. Part 151, including an analysis of the Secretary's authority for the acquisition under 25 U.S.C. § 465. *See id.* at 435–43.

Following these Records of Decision, defendant Assistant Secretary Washburn announced his decision to acquire the Madera Site by publishing a notice in the *Federal Register* on December 3, 2012. *See* Land Acquisitions; North Fork Rancheria of Mono Indians of California, 77 Fed. Reg. 71,611 (Dec. 3, 2012). The notice stated that it was being published, *inter alia*, "to comply with the requirements of 25 C.F.R. § 151.12(b) that notice be given of the Secretary's decision to acquire land in trust at least 30 days prior to signatory acceptance of the land into trust." *Id.* As stated in the BIA's *Federal Register* notice implementing 25 C.F.R. § 151.12(b), the 30-day waiting period "procedure permits judicial review before transfer of title to the United States" because "[t]he Quiet Title Act (QTA), 28 U.S.C. [§] 2409a, precludes judicial review after the United States acquires title." *See* Final Rule; Land Acquisitions, 61 Fed. Reg. 18,082 (Apr. 24, 1996) (to be codified at 25 C.F.R. pt. 151). In keeping with the reasoning and purpose underlying 24 C.F.R. § 151.12(b), the DOI has traditionally imposed a self-stay beyond the 30 days set forth in 25 C.F.R. § 151.12(b) for fee-to-trust transfers until any challenges have been resolved on the merits. *See* BUREAU OF INDIAN AFFAIRS, FEE-TO-TRUST HANDBOOK, VERSION II ("BIA HANDBOOK") at 15 (July 13, 2011), *available at* http://www.bia.gov/cs/groups/xraca/documents/text/idc-002543.pdf ("If an action is filed, take no further action [on the fee-to-trust transfer] until the judicial review process has been exhausted.").

On December 19, 2012, within the 30-day window, the Stand Up plaintiffs filed their

Complaint in the instant action.  *See* ECF No. 1.  The day before the Complaint was filed,

however, government counsel notified the plaintiffs' counsel that the BIA would no longer be

following its self-stay procedure because a recent Supreme Court case, *Match-E-Be-Nash-She-*

*Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012), held that the Quiet Title

Act ("QTA") no longer bars challenges to fee-to-trust acquisitions after transfer of title has

already taken place.  *See* Mot. for Expedited Status Conference ("Pls.' Emergency Mot.") Ex. 1,

ECF No. 11-1.  The government agreed to stay the transfer of the Madera Site until February 1,

2013, and also agreed to a briefing schedule for a motion for preliminary injunction to give the

plaintiffs an opportunity to seek relief from the transfer before it takes place.  *See* Joint Status

Report at 3, 8–9, ECF No. 14.  Pursuant to the jointly agreed upon briefing schedule, the

government defendants[13] filed a motion to transfer venue on January 4, 2013, *see* ECF No. 20,

and the Stand Up plaintiffs filed a motion for preliminary injunction on January 11, 2013, *see*

ECF No. 26.  The Court heard oral argument on these motions at a hearing on January 25, 2013.

## II.   LEGAL STANDARDS

### A.   <u>Preliminary Injunction</u>

"The purpose of a preliminary injunction is merely to preserve the relative positions of

the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

(1981).  It is "an extraordinary and drastic remedy" and "should not be granted unless the

movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S.

968, 972 (1997) (emphasis and internal quotation mark omitted).  Plaintiffs seeking a

preliminary injunction must establish that (1) they are likely to succeed on the merits of their

---

[13] The government defendants include:  the United States of America, the United States Department of the Interior, Secretary of the Interior Kenneth Salazar, the Bureau of Indian Affairs, and Assistant Secretary for Indian Affairs Kevin K. Washburn.  *See* Compl. ¶¶ 11–14 (No. 12-2039); Compl. ¶ 6 (No. 12-2071).

claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  Recently, however, the continued viability of that approach has been called into some doubt, as the Supreme Court and the D.C. Circuit have strongly suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction.  *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits." (internal quotation marks omitted)); *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (internal quotation marks omitted)); *see also Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("*Munaf* made clear that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.").  The D.C. Circuit has nevertheless, despite its strongly suggestive dicta, explicitly abstained from deciding this question.  *See Sherley*, 644 F.3d at 393 (observing that "[w]e need not wade into this circuit split today").  Thus, absent binding authority or clear guidance, the Court finds that the most prudent course is to bypass this unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the "sliding scale" framework.  If the plaintiffs cannot meet the less demanding "sliding scale"

standard, then *a fortiori* they cannot satisfy the more stringent standard alluded to by the Supreme Court and the Court of Appeals.

That being said, in meeting the requisite burden for injunctive relief, "[i]t is particularly important for the movant to demonstrate a likelihood of success on the merits." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 132 (D.D.C. 2011); *see also Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) ("In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits.").  Indeed, absent a "substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Assessing the likelihood of success on the merits "does not involve a final determination of the merits, but rather the exercise of sound judicial discretion on the need for interim relief." *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 733 (D.C. Cir. 1984) (internal quotation marks omitted).  "As an extraordinary remedy, courts should grant such relief sparingly." *Konarski*, 763 F. Supp. 2d at 133 (citing *Mazurek*, 520 U.S. at 972).

**B.**   **Review of Agency Action**

Under the Administrative Procedure Act ("APA"), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This is a 'deferential standard' that 'presumes the validity of agency action.'" *WorldCom, Inc. v. FCC*,

14

238 F.3d 449, 457 (D.C. Cir. 2001) (quoting *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999)).

"Although the 'scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency,'" the Court "must nonetheless be sure the [agency] has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In determining whether the agency's action was arbitrary and capricious, the Court must determine whether the agency action was a "product of reasoned decisionmaking" or whether the agency "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43, 52.

"The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments . . . ."  *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). "In circumstances involving agency predictions of uncertain future events, complete factual support in the record for the [agency]'s judgment or prediction is not possible or required since a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency."  *Id*. (internal quotation marks omitted); *see also AT&T v. FCC*, 832 F.2d 1285, 1291 (D.C. Cir. 1987) ("When . . . 'an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer,' [the Court's] role is more limited; we require only that the agency 'so state and go on to identify the

considerations it found persuasive.'" (quoting *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1140 (D.C. Cir. 1984))).

### C.   <u>Venue Transfer</u>

A case may be transferred to another venue "[f]or the convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  "The decision whether or not to transfer the case to another judicial district pursuant to 28 U.S.C. § 1404(a) is discretionary."  *In re DRC, Inc.*, 358 F. App'x 193, 194 (D.C. Cir. 2009).  "A transfer in derogation of proper venue in the District of Columbia must be justified by particular circumstances that render the forum inappropriate by reference to considerations specified in the statute."  *Id.*  In deciding a motion to transfer venue under § 1404(a), a court must first determine whether the transferee district is one where the action "might have been brought," *see* 28 U.S.C. § 1404(a); *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964), and then the statute directs the court to evaluate "the convenience of parties and witnesses" and whether the transfer would be "in the interest of justice," 28 U.S.C. § 1404(a).  The broad "interest of justice" language in § 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622).  Therefore, the statute "calls on the district court to weigh in the balance a number of case-specific factors" in a manner that is "flexible and individualized."  *Id.*

## III.   DISCUSSION

The Court will begin by discussing the government defendants' motion to transfer venue before proceeding to discuss whether the Stand Up plaintiffs have made a sufficient showing to warrant the grant of preliminary injunctive relief.

A.      **Motion to Transfer Venue**

As discussed above, the first requirement for a transfer of venue is that the action "might have been brought" in the transferee venue. *See* 28 U.S.C. § 1404(a).  For venue purposes, a civil action may be brought, *inter alia*, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  28 U.S.C. § 1391(b)(2).  Neither the plaintiffs nor the intervenor-defendant North Fork Tribe, all of whom oppose the motion to transfer, contest that this case "might have been brought" in the Eastern District of California.  This action "might have been brought" in the Eastern District of California both because the land in question, *i.e.*, the "property that is the subject of the action," is located in that district, and also because "a substantial part of the events or omissions giving rise to the claim occurred" in that district, such as the public hearings underlying the fee-to-trust decision and the assessments made regarding the local environmental impacts of the development.  *See id.*

As to whether transfer would be "in the interest of justice," prior cases have traditionally established a list of private and public interests factors for courts to weigh.  *See, e.g.*, *Foote v. Chu*, 858 F. Supp. 2d 116, 121–23 (D.D.C. 2012).  Not all of these factors are statutory, however; rather, they are intended to elucidate the concerns implied by the phrase "in the interest of justice."  *See Stewart Organization*, 487 U.S. at 29.  In evaluating "the interest of justice," the Court is mindful of the Supreme Court's statement that analyses of venue transfer under § 1404(a) are to be done on an individualized, case-by-case basis.  *See id*.  With that flexible standard in mind, the Court notes that the instant case does involve a significant amount of local interest in the use of the Madera Site.  Indeed, this local interest is what the government defendants rely heavily, if not exclusively, upon in advocating for a transfer of venue.  *See* Fed.

17

Defs.' Opposed Mot. to Transfer Venue & Mem. in Supp. ("Defs.' Transfer Mem.") at 8–12,

ECF No. 20.  In this regard, the Court is mindful of the oft-cited "local interest in having

localized controversies decided at home."  *See, e.g.*, *MBI Grp., Inc. v. Credit Foncier Du*

*Cameroun*, 616 F.3d 568, 576 (D.C. Cir. 2010) (internal quotation marks omitted).  The instant

case, however, is not a purely "localized controversy," and, more importantly, considerations of

fairness embedded in the "interest of justice" compel the conclusion that this case must remain in

this forum.[14]

    First, although this case does implicate the use of land in the localized area of Madera

County, there should be no mistake that this is not a land dispute.  Indeed, the Supreme Court has

recently made clear that a challenge to a DOI fee-to-trust acquisition by a party with no

competing interest in the land is "a garden-variety APA claim."  *Patchak*, 132 S. Ct. at 2208.

The controversy in this case also has national implications regarding the scope of the Secretary's

authority to make such acquisitions and the standards by which such acquisition decisions should

be judged.  *See, e.g.*, *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 17 (D.D.C. 2000) (denying

---

[14] The other traditional private and public interest factors are either neutral or weigh slightly against transfer in this particular case.  *See Foote*, 858 F. Supp. 2d at 121–23 (listing factors).  The express statutory factors regarding the convenience of the parties and witnesses are essentially neutral since this is an administrative law challenge that is likely to be resolved through motions practice on the administrative record.  Thus, consideration of any parties' access to proof does not weigh for or against transfer.  The plaintiffs contend that the District of Columbia is more convenient for the parties because "[a]ttorneys for Plaintiffs, as well as for Defendants and the intervening tribe, are based in this District."  Pls. Stand Up for California!, *et al.*'s Opp'n to Defs.' Mot. to Transfer ("Pls.' Transfer Opp'n") at 12, ECF No. 22.  This argument, however, stretches the meaning of "parties" in § 1404(a) too far to cover a party's counsel.  Where counsel resides is of little relevance for purposes of evaluating venue transfer motions.  *See, e.g.*, *Intrepid Potash-N.M., LLC v. U.S. Dep't of Interior*, 669 F. Supp. 2d 88, 98 (D.D.C. 2009) ("The convenience to counsel is of minor, if any, importance under § 1404(a)." (internal quotation marks omitted)).  Moreover, this Court is equally competent to adjudicate federal questions as any other federal district court, and the congestion of the courts weighs against transfer because the Eastern District of California is among the more overworked federal courts in the nation.  *See, e.g.*, U.S. Courts, Judicial Emergencies, http://www.uscourts.gov/JudgesAndJudgeships/JudicialVacancies/JudicialEmergencies.aspx (last updated 1/29/13) (listing two "judicial emergencies" in the Eastern District of California with 1141 weighted filings per vacancy).  Finally, although the plaintiffs and defendants prefer different fora, the plaintiffs' choice is generally entitled to some deference.  *See, e.g.*, *Foote*, 858 F. Supp. 2d at 121 (observing that "[c]ourts normally give considerable deference to the plaintiff's choice of forum," though it is "'conferred less deference by the court when it is not the plaintiff's home forum'").  Thus, to the extent these factors weigh on the scale at all, only the last factor weighs somewhat against transfer.

venue transfer where agency action was "a decision of national significance"); *see also* Pls.'
Transfer Opp'n at 10 (noting that "[t]his case involves similar national issues regarding the
authority of the Secretary to take land into trust").  Finally, the Court notes that the weight given
to the local interest in having localized controversies decided at home is diminished in this case
because the local interests most vocally opposed to the trust transfer (the plaintiffs) as well as the
local interest most interested in seeing the transfer upheld (the North Fork Tribe) are all opposed
to transfer.  *See generally* Pls.' Transfer Opp'n; Proposed Intervenor-Def.'s Response to Fed.
Defs.' Mot. to Transfer Venue, ECF No. 23; Pl. Picayune Tribe's Mem. in Opp'n to Mot. to
Transfer Venue, ECF No. 24.

　　　　Of overarching importance in this particular case, however, is the unfairness that would
inure to the plaintiffs if this case were transferred.  This case is distinguishable from the mine run
of cases because the government defendants in this case have made clear that they will transfer
the Madera Site into trust on February 1, 2013 regardless of whether any court has yet made a
ruling on whether the plaintiffs are entitled to preliminary injunctive relief.  *See, e.g.*, Joint Status
Report at 3.  As a result of the government defendants' position, and due to the congested docket
in the Eastern District of California,[15] transferring this case to the Eastern District of California
would essentially deprive the plaintiffs of any opportunity to have their preliminary injunction
motion decided before the transfer of land is consummated.  Fairness and the "interest of justice"
therefore dictate that the Court deny the government defendants' motion to transfer.  *See* 28
U.S.C. § 1404(a).[16]

---

[15] *See supra* note 14 (citing "judicial emergencies" in Eastern District of California).

[16] Implicitly recognizing the fundamental unfairness of transferring this case in the face of the government' s
declination to postpone the transfer of land into trust, the government has suggested, alternatively, that the Court
transfer this case *following* consideration of the plaintiffs' motion for preliminary injunctive relief.  *See* Defs.'
Transfer Mem. at 15.  Transfer at that procedural juncture would, however, necessitate another district court

B.     **Likelihood of Success on the Merits**

Having decided that this case will remain in this forum, the Court will now analyze the

parties' arguments for and against the preliminary injunctive relief sought by the Stand Up

plaintiffs.  One of the most essential considerations for purposes of preliminary injunctive relief

is whether the Stand Up plaintiffs are likely to succeed on the merits of their claims.  *See, e.g.*,

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006)

(acknowledging "the well-established principle that the party seeking pretrial relief bears the

burden of demonstrating a likelihood of success on the merits").  The Stand Up plaintiffs raise

numerous claims under the Administrative Procedure Act ("APA"), the IRA, the IGRA, and the

NEPA, but for the reasons discussed below the Court concludes that the plaintiffs have not

demonstrated a likelihood of success on the merits of any of these claims.

1.     *The Secretary's Authority to Acquire the Madera Site*

The first and most formidable claim raised by the Stand Up plaintiffs in support of

preliminary injunctive relief is that "the Secretary failed to assemble, develop, or consider a full

record in making [his] finding that the Tribe was recognized and under federal jurisdiction in

1934."  Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mem.") at 17, ECF Nos. 26-1

through 26-3.  This argument goes to the question of whether the Secretary properly considered

his statutory authority to acquire the Madera Site under the IRA.  The plaintiffs argue both that

the North Fork people do not qualify as "Indians" under the IRA and also that, even if the North

Fork Tribe does qualify under the IRA, the Secretary's conclusion in this regard was not

supported by the record and, thus, was arbitrary and capricious.  *See id.* at 17–21.

---

becoming familiar with the underlying facts and claims and would not conserve or be an efficient use of judicial
resources.

As discussed above, the regulations promulgated by the DOI pursuant to the IRA require that, in considering requests for the acquisition of land into trust status, the Secretary must consider "[t]he existence of statutory authority for the acquisition and any limitations contained in such authority." 25 C.F.R. § 151.10(a); *see also id.* § 151.11(a) (requiring same consideration for off-reservation acquisitions). That authority, for purposes of the instant action, is located at 25 U.S.C. § 465, which states that "[t]he Secretary of the Interior is authorized, in his discretion, to acquire . . . any interest in lands . . . for the purpose of providing land for Indians." The plain text of the statute limits the Secretary to acquiring land only "for Indians," and the IRA defines "Indian" as, *inter alia*, "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." *Id.* § 479. This same definition further states that "[t]he term 'tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." *Id.*[17] The Supreme Court has held that "the word 'now' in § 479 limits the definition of 'Indian,' and therefore limits the exercise of the Secretary's trust authority under § 465 to those members of tribes that were under federal jurisdiction at the time the IRA was enacted," *i.e.*, June 18, 1934. *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009).

Although the Supreme Court's *Carcieri* decision clarified the temporal requirement that the Secretary may only acquire lands into trust for the benefit of Indians who are members of tribes that were "under Federal jurisdiction" in 1934, *Carcieri* also left several relevant questions unanswered. The first and most pressing question left open by *Carcieri* is what it means to have been "under Federal jurisdiction" in 1934. Justice Breyer's concurring opinion in *Carcieri* stated that "under Federal jurisdiction" implied a certain government-to-government relationship with a

---

[17] The Stand Up plaintiffs have submitted supplemental authority, which confirms that "a band is 'tribe' within the definition of [25 U.S.C. § 479]." *See* Pls. Stand Up for California!, *et al.*'s Notice of Supplementary Authority ("Pls.' Supplemental Authority") Ex. A at 6, ECF No. 40-1.

tribe that could be evidenced by "a treaty with the United States (in effect in 1934), a (pre-1934) congressional appropriation, or enrollment (as of 1934) with the [Bureau of Indian Affairs]." *Id.* at 399 (Breyer, J., concurring).  The leading treatise on Indian law has similarly observed that

> any tribe subject to federal plenary power over Indian affairs could be considered "under Federal jurisdiction," especially if the federal government has at any time taken some action, such as treaty negotiations, provision of federal benefits, inclusion in a BIA census, or forcible relocation, that reflects and acknowledges federal power and responsibility toward the tribe.

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02 (2012).  In concluding that he had authority to acquire the Madera Site in trust for the North Fork Tribe, the Secretary relied primarily on the fact that "a majority of the adult Indians residing at the [North Fork] Tribe's Reservation voted to reject the IRA at a special election duly held by the Secretary on June 10, 1935."  IRA ROD at 437.  From this, the Secretary reasoned that "[t]he calling of a Section 18 election at the [North Fork] Tribe's Reservation conclusively establishes that the Tribe was under Federal jurisdiction for *Carcieri* purposes." *Id.*

The plaintiffs contend that the Secretary's analysis of his statutory authority was "[c]onclusory" and his "reliance on this sole factor was improper, given the BIA's prior recognition of the complexity of this determination, and given the Secretary's failure to consider and address the countervailing evidence before him."  Pls.' Mem. at 17.  In support of this contention, the plaintiffs cite to a 2011 document submitted by the BIA in response to questions from a congressional committee regarding which federally recognized tribes were under federal jurisdiction in 1934.  *See id.* at 18.  In that response, the BIA stated that "[w]hether a tribe was under federal jurisdiction [in 1934] requires a fact-intensive analysis of the history of interactions between that tribe and the United States."  Pls.' App. Ex. 24, at 520, ECF No. 27-33.  The plaintiffs' argument is unlikely to succeed on the merits, however, because it was rational for the Secretary to conclude that the North Fork Tribe was "under Federal jurisdiction" based solely on

the 1935 IRA election and also because other evidence considered by the Secretary conclusively establishes that the North Fork Tribe was "under Federal jurisdiction" in 1934.

First, the Secretary's conclusion that he had the authority to acquire land for the North Fork Tribe, based solely on the IRA election, was rational because the text of the IRA establishes that the only people eligible to vote in such elections were "adult Indians." *See* 25 U.S.C. § 478 ("This Act shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application."); *see also id.* § 476 (requiring Secretary to call "a special election" at which "adult members" of "[a]ny Indian tribe" were to vote regarding "the right to organize for [the tribe's] common welfare"). As discussed previously, the word "Indian" is a term of art in the IRA,[18] and therefore it was perfectly reasonable for the Secretary to conclude that any persons voting in an IRA election were "adult Indians," *i.e.*, adult "members of [a] recognized Indian tribe now under Federal jurisdiction." *See id.* § 479.[19]

Even more persuasive, however, is another fact that the Secretary considered in his IRA ROD, which is that "[t]he North Fork Rancheria was originally established by purchase under the authority of the Interior's Appropriations Act of June 30, 1913." IRA ROD at 437. As discussed previously, that purchase took place in 1916—well before the IRA was passed. *See supra* Part I.B (discussing history of North Fork Tribe). This purchase of land is important, and likely dispositive in its own right, regarding whether the North Fork Tribe was "under Federal

---

[18] The Stand Up plaintiffs' notice of supplemental authority concedes that *Carcieri* "establishes that in order to qualify for trust land, a tribe must satisfy the definition of 'Indian' not 'tribe.'" Pls.' Supplemental Authority at 2. This fact is of somewhat diminished significance in any event, only because the relevant definition of "Indian" circularly depends upon individuals being "members of any recognized Indian tribe." *See* 25 U.S.C. § 479.

[19] Additionally, the fact that the North Fork Indians voted not to reorganize under the IRA in 1935 does not affect the Secretary's authority to acquire land into trust for the benefit of the North Fork Indians. As the Supreme Court acknowledged in *Carcieri*, a provision of the Indian Land Consolidation Act, 25 U.S.C. § 2202, "ensures that tribes may benefit from § 465 even if they opted out of the IRA pursuant to § 478, which allowed tribal members to reject the application of the IRA to their tribe." *Carcieri*, 555 U.S. at 394–95.

23

jurisdiction" in 1934. Historical DOI documents submitted in this case show that the 1916 purchase was made "for the use of the North Fork band of landless Indians." *See* Bethel-Fink Decl. Ex. A at 1. This document demonstrates two things. First, it demonstrates a clear jurisdictional relationship between the North Fork Tribe and the federal government prior to 1934. *See, e.g.*, *Carcieri*, 555 U.S. at 399 (Breyer, J., concurring) (stating that "a (pre-1934) congressional appropriation" would likely establish federal jurisdiction); COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02 (concluding that, *inter alia*, "provision of federal benefits" would establish federal jurisdiction within the meaning of the IRA). Second, this document establishes that the 1916 acquisition was for members of the North Fork *Tribe* because the acquisition was for "landless Indians" of "the North Fork band," which clearly falls within the IRA's expansive definition of "tribe." *See* 25 U.S.C. § 479 (defining "tribe" as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation").[20]

Although the IRA ROD states that "none of the lands within the exterior boundaries of the North Fork Rancheria are owned by, or held in trust for, the Tribe," IRA ROD at 391–92, this fact is largely irrelevant in determining whether the North Fork people are "Indians" within the meaning of § 479.[21] As stated previously, the broad definition of "tribe" in § 479 indicates that a formal tribal government is not necessary to be considered a "tribe" for purposes of the IRA. *See* 25 U.S.C. § 479. The fact that the North Fork people were, at least as early as 1916, an organized band of individual Indians is sufficient to conclude that the North Fork people were a "tribe" under the IRA. As a result, the 1916 purchase of land in trust for the "North Fork band of

---

[20] The Stand Up plaintiffs' supplemental authority states, *inter alia*, that lands purchased under the 1913 act "could be used for any landless California Indians," but the cited authority also clearly recognizes that some Rancherias, like the North Fork Rancheria in this case, were purchased for "specific band[s]" of landless Indians. *See* Pls.' Supplemental Authority Ex. C at 3.

[21] The North Fork Tribe "did not formally organize its government until 1996 when it officially adopted its constitution." Pls.' Mem. at 20.

landless Indians" establishes that the North Fork people are "Indians" within the meaning of the

IRA, and were treated as such in the special election in 1935.  Therefore, the Secretary logically

concluded that the North Fork Tribe was "under Federal jurisdiction" in 1934.[22]  The fact that

the Secretary did not cite the 1916 purchase specifically within the section analyzing his

statutory authority is unlikely to undercut this conclusion because the fact of the 1916 purchase

was clearly considered in the IRA ROD, *see* IRA ROD at 437, and a court's "task is to enforce a

standard of agency reasonableness, not perfection."  *Nw. Airlines, Inc. v. U.S. Dep't of Transp.*,

15 F.3d 1112, 1119 (D.C. Cir. 1994).

Two other interrelated questions left unanswered from *Carcieri*, which are relevant to the

soundness of the Secretary's decision in this case, are (1) what the meaning of "recognized

Indian tribe" is; and (2) whether a tribe must have been "recognized" in 1934 to be eligible for

trust land.  As to the first question, the Secretary has already formally discussed the

interpretation of the term "recognized Indian tribe" in a previous fee-to-trust decision that was

cited by the North Fork Tribe in the instant case.  *See* Intervenor's Opp'n at 9 nn.4–5.  In that

ROD, which was issued in December 2010 with respect to a trust acquisition for the Cowlitz

Indian Tribe, the Secretary noted two possible meanings of the word "recognized."  *See* BIA,

Record of Decision, Trust Acquisition of, and Reservation Proclamation for the 151.87-acre

Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe ("Cowlitz ROD") at

87, *available at* http://www.bia.gov/cs/groups/mywcsp/documents/text/idc012719.pdf (Dec. 17,

2010).  The word "recognized" could be used in the "'cognitive' or quasi-anthropological sense,"

which means that "'federal officials simply knew or realized that an Indian tribe existed."  *See id.*

(internal quotation marks omitted) (quoting William W. Quinn, *Federal Acknowledgement of*

---

[22] The Secretary's IGRA ROD also discussed numerous other historical facts that could reasonably indicate federal jurisdiction over the North Fork Indians prior to 1934, such as the fact that "the Tribe's predecessors were represented by signatories to the 1851 Treaty signed at Camp Barbour."  *See* IGRA ROD at 340–45.

*American Indian Tribes:  The Historical Development of a Legal Concept*, 34 AM. J. LEGAL

HIST. 331, 333 (1990)).  It could also be used "in a more formal or 'jurisdictional' sense to

connote that a tribe is a governmental entity comprised of Indians and that the entity has a unique

relationship with the United States."  *Id.*  In evaluating the legislative history of the IRA, the

Secretary observed that "[t]he members of the Senate Committee on Indian Affairs debating the

IRA appeared to use the term 'recognized Indian tribe' in the cognitive or quasi-anthropological

sense."  *Id.* at 88.

In the Cowlitz ROD, the Secretary ultimately determined that he "need not reach the

question of the precise meaning of 'recognized Indian tribe' as used in the IRA" because the

Cowlitz Tribe was "recognized" in both the cognitive and jurisdictional senses of the word.  *See*

*id.* 88–89.  Nevertheless, this discussion is instructive to the Court in interpreting the phrase

"recognized Indian tribe."  The Court agrees with the Secretary's interpretation of the legislative

history of the IRA, and the Court also observes that using the phrase "recognized Indian tribe" in

a jurisdictional sense would be redundant because the statute further modifies "recognized Indian

tribe" by the phrase "now under Federal jurisdiction."  *See* 25 U.S.C. § 479.  It is true that the

federal government established rigorous, formal criteria for being a federally recognized Indian

tribe in the 1970s, *see* 25 C.F.R. § 83.7, but as the Secretary noted in the Cowlitz ROD:  "There

would have been little need to insert an undefined and ambiguous phrase such as 'under federal

jurisdiction,' if the IRA had incorporated the rigorous, modern definition of federally recognized

Indian tribe."  Cowlitz ROD at 88.  The Secretary's thorough and validly reasoned interpretive

discussion of this ambiguous statutory term is entitled to "respect" even "if lacking power to

control" because it manifests a "a body of experience and informed judgment to which courts

and litigants may properly resort for guidance."  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140

26

(1944).  Thus, both based on the Secretary's interpretive discussion and the Court's own reading

of the statutory language, the Court concludes that the phrase "recognized Indian tribe" in the

IRA refers to recognition in the cognitive or quasi-anthropological sense.

In so concluding, the Court need not decide in this particular case the second question left

open by *Carcieri*:  whether an Indian tribe is required to have been "recognized" prior to 1934 in

order to be eligible to receive trust land under the IRA.  This is because the North Fork Tribe was

clearly "recognized" in the cognitive sense of the word both before and after 1934, as evidenced

by the 1916 trust acquisition of the North Fork Rancheria and the IRA election previously

discussed.  In sum, then, the Secretary's conclusion that he is "authorized to acquire land in trust

for the [North Fork] Tribe under Section 5 of the IRA," IRA ROD at 437, was supported by

substantial evidence, which the Secretary considered during his decision-making process.

Therefore, the plaintiffs are unlikely to succeed on the merits of their claim that the Secretary's

decision in this regard was either unsupported or arbitrary and capricious.

### 2.    *The Secretary's Failure to Send the "Entire Application Record"*

The Court now turns to the plaintiffs' procedural claim under the APA.  The plaintiffs

argue that "[t]he Secretary did not follow his own procedures (mandated by his *own* regulations)

in failing to send the California Governor a copy of the *entire record* when requesting the

Governor's concurrence in the Secretary's two-part decision."  Pls.' Mem. at 21.  Under the

regulations promulgated by DOI pursuant to the IGRA, "[i]f the Secretary makes a favorable

Secretarial Determination," the Secretary must send to the governor of the state where the

gaming will occur, *inter alia*, "[a] copy of the entire application record."  25 C.F.R. § 292.22.

Based on this language, the plaintiffs complain that the Secretary sent the Governor Concurrence

Request "almost a year *before* the Fee-to-Trust ROD was issued," and thus the concurrence

request did not include the Secretary's conclusions regarding acquisition of the Madera Site.  *See*

Pls.' Mem. at 22.  In support of their contention that "entire application record" includes the

Secretary's IRA decision, the plaintiffs point to a statement made by the DOI when it

promulgated the current IGRA regulations in 2008.  *See* Pls.' Reply in Supp. of Mot. for Prelim.

Inj. ("Pls.' Reply") at 12, ECF No. 36.  As the agency's *Federal Register* notice stated, during

the notice-and-comment period "[o]ne comment observed that, throughout the regulations,

'application' is used to refer both to the tribe's initial written request and to the subsequent

application package developed by the BIA Regional Office for submission to the Secretary,

creating confusion."  Gaming on Trust Lands Acquired After Oct. 17, 1988, 73 Fed. Reg.

29,354, 29,368 (May 20, 2008).  The agency responded that "[i]n consideration of the comment,

changes were made throughout the regulations accordingly."  *Id.*

> The plaintiffs' argument on this point falls short for two reasons.  First, the evidence cited

by the plaintiffs from the 2008 rulemaking record do not establish what the plaintiffs contend.

The comment and agency response were with respect to a different section of the regulations, 25

C.F.R. § 292.16, than the one requiring the "entire application record" to be sent to the

concurring governor, 25 C.F.R. § 292.22.  Furthermore, just because the agency made certain

unspecified changes "throughout the regulations accordingly" does not even come close to

establishing that the term "entire application record" was intended to include the Secretary's IRA

ROD.  More likely, this language referenced the fact that the DOI removed the phrases

"application package" and "complete application record" from the regulations to avoid the

confusion noted by the comment and amended the language of 25 C.F.R. § 292.16 to refer

unambiguously to "[a] tribe's application requesting a Secretarial Determination under

§ 292.13."  *Compare* 65 Fed. Reg. 55,471, 55,475–76 (Sept. 14, 2000) (Proposed Rule), *with* 73

Fed. Reg. at 29,378 (Final Rule).  None of this has anything to do with the Secretary's concurrence request under 25 C.F.R. § 292.22.

More fundamentally, the plaintiffs' argument misunderstands the simple fact that, in a case like this one, the Secretary's decision under the IGRA must logically be finalized *before* the Secretary's decision under the IRA can be made.  Permitting gaming on trust land would be essential to the Secretary's conclusion under the IRA that the acquisition meets the criteria listed in 25 C.F.R. Part 151, such as "[t]he need of the individual Indian or the tribe for additional land," and "[t]he purposes for which the land will be used."  *See* 25 C.F.R. § 151.10.  Similarly, the governor's concurrence is plainly required before gaming on trust land can be permitted.  *See* 25 U.S.C. § 2719(b)(1)(A).  Therefore, in this case, approving a trust acquisition under the IRA prior to the governor's concurrence would have been putting the proverbial cart before the horse: The Secretary would not yet have known whether gaming would be permitted and thus would have had no basis to ascertain whether the basic criteria for approving a trust acquisition had been met.  *See* Intervenor's Opp'n at 14–15 & n.18 (explaining why Secretary must "seek the Governor's concurrence" and "only then . . . make the final determination to take the land into trust"); *see also Sokaogon Chippewa Comm'y (Mole Lake Band of Lake Superior Chippewa) v. Babbitt*, 929 F. Supp. 1165, 1170 (W.D. Wis. 1996) ("Even if the secretary finds that the proposed off-reservation gaming establishment [meets the requirements of the two-part determination] and the governor concurs in that determination, the secretary must decide whether to exercise his discretion to acquire the land in trust . . . .").  Hence, the plaintiffs are unlikely to succeed on the merits of their argument regarding the Secretary's purported procedural error regarding the "entire application record."

### 3.     *The Secretary's Consideration of Impacts on the Surrounding Community*

The plaintiffs also contend that the Secretary's determination under the IGRA, that permitting gaming on the Madera Site would not be detrimental to the surrounding community, was arbitrary and capricious because it failed to consider comments regarding a number of detrimental impacts, including:  (1) "the destructive and ruinous impacts on families, employers, and community social services caused by gambling," (2) "increases in prostitution and other crimes," (3) "environmental and economic impacts on Fresno, Mariposa, Merced and Madera Counties," (4) "impacts on water supply and water wells on adjacent farms and homes," and (5) "infringement upon the tribal sovereignty of other indigenous people, including the North Valley Yokuts and the Picayune Rancheria."  Pls.' Mem. at 23.  For the reasons discussed below, however, none of these points is likely to succeed on the merits because the Secretary appears to have considered all aspects of the problem that he was required to consider under the IGRA, and this Court must confer significant deference to the Secretary's expertise.

At the outset, it is important to recall that the DOI has interpreted the term "surrounding community" in the IGRA only to include "local governments and nearby Indian tribes located within a 25-mile radius of the site of the proposed gaming establishment."  25 C.F.R. § 292.2.  The plaintiffs in the instant action do not directly challenge the DOI's interpretation of this term, but they do complain that the Secretary failed to consider or "simply ignored" comments from the plaintiffs and other "members of the community" about the potential harms listed above.  Pls.' Mem. at 23.  Although the Secretary can, and likely should, consider comments from local citizens in making decisions under the IGRA, the statute and its implementing regulations only require that the Secretary consider "detriment[]" on "local governments and nearby Indian tribes

located within a 25-mile radius of the site of the proposed gaming establishment."  25 C.F.R.

§§ 292.2, 292.21(a).[23]

a)      *Problem Gambling*

First, as to "the destructive and ruinous impacts on families, employers, and community

social services caused by gambling," Pls.' Mem. at 23, the IGRA ROD addressed the potential

effects on the surrounding community stemming from what the parties have called "problem

gambling."  *See* Intervenor's Opp'n at 17.  The Secretary observed that "[w]hile operation of a

gaming facility could increase the percentage of problem gamblers in the surrounding

community, problem gambling may be attenuated, or possibly reduced, through the expansion of

problem gambling services offered by the Resort."  IGRA ROD at 347.  In this regard, the

Secretary also noted several ways in which the North Fork Tribe had agreed to help mitigate the

potential detrimental effects of "problem gambling."  The Tribe agreed to do so by, *inter alia*,

paying $50,000 to the Madera County Department of Behavioral Health Services "to supplement

its budget for alcohol education and the treatment and prevention of problem gambling and

gambling disorders," *id.* at 355, and implementing a number of training and precautionary

measures to "recogniz[e] and address[]" problem gambling on the premises, *id.* at 324–25.  The

FEIS concluded that these mitigation measures "would mitigate [the] effect [of problem

gambling] to a less than significant level."  FEIS at 4.7-9 (Feb. 2009), *available at*

http://northforkeis.com/documents/final_eis/report.htm.  The Secretary clearly considered this

aspect of the problem in concluding that permitting gaming on the Madera Site would not be

detrimental to the surrounding community.

---

[23] As a factual matter, the plaintiffs' contention that the Secretary "ignored" any comments appears to be unsupported by even the partial record before the Court, which indicates that the Secretary responded to each public comment letter.  *See* Intervenor's Ex. G, ECF No. 34-3 (DOI's responses to each public comment letter); *see also* IGRA ROD at 289 ("Responses to each public comment letter are also provided in Attachment II of this ROD.").

           *b)*       *Crime*

As to the "increases in prostitution and other crimes," the plaintiffs argue that the

Secretary's consideration of this potential problem was "illogical, irrational, and implausible."

Pls.' Mem. at 23.  The Secretary observed, relying on the FEIS, that "[t]he Resort will not result

in a significant increase in crime in the surrounding community" because "although an increase

in calls for service might be expected as would be the case with any large-scale development, the

Resort will not result in an increase regional crime rate."  IGRA ROD at 347.  In further support

of this conclusion, the Secretary cited the fact that the North Fork Tribe would be mitigating any

detrimental effect on local law enforcement resources by contributing $415,000 to fund the

creation of 5.5 new local law enforcement positions.  *See id.* at 355.  The plaintiffs complain that

"[t]he Secretary irrationally focuses on crime 'rates' and ignores not only the increased

concentration of crime that will occur around the casino . . . but also the potentially vice-related

and even violent types of crime associated with the proposed casino development and the

individuals such a development will attract."  Pls.' Mem. at 24.  They also contend that,

regardless of whether mitigation measures may lessen the potential negative effects of gaming,

"the inescapable conclusion is that the casino *will* have a detrimental impact on the surrounding

community" despite the fact that "[t]he Secretary seems to conclude that there is *no* detrimental

impact on the surrounding community simply because the Tribe may take *some* steps to lessen

the damaging effects of the $200 million casino."  *Id.* at 25.

First, the plaintiffs' argument that it is "irrational" to focus on regional crime rates is

peculiar because the Court finds such a focus perfectly rational when considering potential

detriment to a surrounding community.  Second, the plaintiffs' more generic concerns about

gaming and crime appear to be divorced from the facts considered by the Secretary, and based

instead on a speculative and biased assumption about the "types" of people and behavior that a

gaming establishment attracts.  The FEIS surveyed five other California communities "that have had Indian casinos within close proximity or in their jurisdiction for at least the past two years." FEIS at 4.7-6.  Based on this survey and a review of literature regarding the link between casinos and crime, the FEIS concluded that there was "no definitive link between casinos and regional crime rates," and therefore "Alternative A's impact to crime would be less than significant."  *Id.* at 4.7-8.  The Secretary relied upon and discussed the FEIS's findings in this regard when discussing crime in his IGRA ROD.  *See* IGRA ROD at 347.  That the plaintiffs speculate regarding what gaming may bring to their community cannot undercut the Secretary's reasonable reliance on empirical socioeconomic data, as well as the tangible mitigation efforts proposed by the North Fork Tribe, in concluding that a casino development would not be detrimental to the surrounding community.

Furthermore, the Court observes that the plaintiffs' argument appears to misconstrue the standard by which the Secretary must judge the potential negative effects of a gaming establishment under the IGRA.  The plaintiffs construct a straw man by arguing that "[t]he Secretary seems to conclude that there is *no* detrimental impact on the surrounding community simply because the Tribe may take *some* steps to lessen the damaging effects of the $200 million casino."  Pls.' Mem. at 25.  Contrary to the plaintiffs' apparent premise, the IGRA does not require that a new gaming development be completely devoid of any negative impacts.  Rather, the IGRA requires the Secretary, in consultation with state, local, and tribal governments, to determine that "a gaming establishment on newly acquired lands . . . would not be detrimental to the surrounding community."  25 U.S.C. § 2719(b)(1)(A).  All new commercial developments are bound to entail *some* costs, but the Secretary's duty under the IGRA is to determine whether those costs will be significant enough to be "detrimental to the surrounding community."  *See id.*

The plaintiffs' reading of the IGRA would essentially preclude any new gaming establishments, since every gaming establishment is highly likely to entail *some* negative impacts on the surrounding community.  Thus, such a cramped reading would have the phrase "detrimental to the surrounding community" nullify the "overarching intent" of the IGRA, which was "'in large part to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'" *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 468 (D.C. Cir. 2007) (quoting *Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 865 (D.C. Cir. 2006)). Although the plaintiffs may take moral umbrage with the goals and purposes of the IGRA, those policy grievances are best addressed to the political branches that enacted the law.  *See* Intervenor's Opp'n at 21 ("Plaintiffs may disagree with IGRA's policies and with [the] Secretary's ultimate decisions, but policy decisions are not for them or courts to make.").  This Court has neither the power nor the competency to rewrite the purposes of duly enacted legislation.  *See, e.g.*, *Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.").

c)      *Environmental and Economic Impacts*

Moving to the plaintiffs' third concern, the Secretary clearly considered the "environmental and economic impacts on Fresno, Mariposa, Merced and Madera Counties." Pls.' Mem. at 23.  Although the plaintiffs do not elaborate in their briefing what particular environmental or economic impacts were ignored, the Secretary's IGRA ROD considered both the potential economic impacts on surrounding local governments as well as potential environmental effects of the gaming establishment.  As with the potential negative impacts already discussed, the Secretary considered the possibility that a major commercial development

34

would put a financial strain on local governments and concluded that any potential impact would be mitigated by the North Fork Tribe's agreement to offset the impacts. *See* IGRA ROD at 369–70. Once again, the Secretary relied upon the thorough analysis of these costs provided in the FEIS, which analyzed the development's potential effects on everything from provision of water services to law enforcement to telecommunications to schools. *See, e.g.*, *id.* at 370; FEIS at 4.9-1 to 4.9-32 (analyzing impacts on public services from each alternative). After considering all of this evidence, the Secretary concluded that, based on the millions of dollars that would inure to local governments through increased tax revenue and offset payments from the North Fork Tribe, "the trust acquisition of the [Madera] Site, and the operation of class III gaming there, would not result in a significant cost increase for either Madera County or the adjacent local units of government" and also "would not result in a detrimental impact to the environment in the area." IGRA ROD at 369–70. Without more elaboration regarding what was missing from this analysis, the plaintiffs have done nothing to undercut the rationality of the Secretary's decision with regard to potential economic and environmental impacts.

*d)      Effects on Local Indian Tribes*

The plaintiffs' argument that the Secretary failed to consider "infringement upon the tribal sovereignty of other indigenous people, including the North Valley Yokuts and the Picayune Rancheria" is likewise vague and unelaborated. *See* Pls.' Mem. at 23. The plaintiff Picayune Tribe, however, has submitted a separate brief that "address[es] certain issues raised" by the Stand Up plaintiffs' motion. *See* Pl. Picayune Rancheria's Mem. Addressing Issues Raised by Pls.' Mot. for Prelim. Inj. ("Picayune Mem.") at 1, ECF No. 28. The Court will consider the Picayune Tribe's brief in elaborating upon the Stand Up plaintiffs' argument regarding "infringement upon . . . tribal sovereignty." *See* Pls.' Mem. at 23. In its brief, the Picayune Tribe argues first that the Secretary "arbitrarily accorded a 'diminished weight'

standard in considering" potential economic harms to the Picayune Tribe.  *See* Picayune Mem. at

5.  The Picayune Tribe also contends that the Secretary "discounted entirely the devastating loss

of revenue that Picayune would suffer from the proposed casino," *id.*, and that "[t]he competitive

harms [were] not taken into account" in the Secretary's ROD, *see* Tr. of Oral Argument at 35

(Jan. 25, 2013) (unofficial transcript).  Neither of these arguments, however, is likely to succeed

on the merits.

      First, the Picayune Tribe's criticism, that the Secretary "accorded a 'diminished weight'

standard" to the Picayune Tribe's concerns, is unavailing.  Picayune Mem. at 5.  Once again, it is

helpful to consult the IGRA and its implementing regulations to clarify the scope of the

Secretary's inquiry.  The IGRA's implementing regulations define "nearby Indian tribe" as any

tribe within a 25-mile radius of the proposed development, *see* 25 C.F.R. § 292.2, but the

Picayune Tribe indisputably falls outside that radius because its lands are located "approximately

39 miles from the [Madera] Site," IGRA ROD at 370.  Therefore, the Secretary was not required

to consider the Picayune Tribe's concerns at all, though the Secretary observed that "the relative

proximity of Picayune's lands, headquarters, and existing class III gaming facility to the Site has

led me to consider their comments in making my determination."  *Id.*  Although the Secretary

concluded that the aforementioned considerations "compel[led] [him] to accord some weight to

Picayune's concerns," the Secretary also concluded that "[t]hose comments must be accorded

less weight than comments submitted by communities and tribes that fall within the definition of

'surrounding community.'"  *Id.*  The weight accorded to the Picayune Tribe's comments was

based on the logical premise that "[t]he weight accorded to the comments of tribes and local

governments outside the definition of 'surrounding community' will naturally diminish as the

distance between their jurisdictions and the proposed off-reservation gaming site increases." *Id.* at 371.

Thus, the Picayune Tribe's contention that "[i]t was improper for the Assistant Secretary to accord anything other than full weight to" the Tribe's comments, *see* Picayune Mem. at 5, is erroneous because, as the DOI noted when it adopted its final IGRA regulations, it is rational and in keeping with congressional intent to accord weight to an entity's concerns in proportion to the entity's physical proximity to the development in question. *See* 73 Fed. Reg. at 29,356–57. Although the Picayune Tribe is correct that the Secretary concluded that the Tribe had rebutted the 25-mile radius presumption contained in the IGRA regulations, *see* 25 C.F.R. § 292.2, that conclusion only meant that the Secretary was required to consider the Picayune Tribe's comments *at all*, not that the Secretary was compelled to afford those comments a weight that was equal to all other comments. The Secretary, in accord with his regulations, "consider[s] detrimental impacts on a case-by-case basis," 73 Fed. Reg. at 29,356, and he need not accord equal weight to all comments regardless of the commenter's proximity to the proposed gaming establishment.

As to the Secretary's consideration of the financial impact that development of the Madera Site would have on the Picayune Tribe, the Secretary's conclusion that "competition from the [North Fork] Tribe's proposed gaming facility in an overlapping gaming market is not sufficient, in and of itself, to conclude that it would result in a detrimental impact to Picayune" was supported by the evidence in the record. IGRA ROD at 371. In particular, the FEIS cited a "gravity model impact analysis," performed by a gaming and entertainment consulting firm called the Innovation Group, which evaluated the gaming market in and around Madera County. *See* FEIS at 4.7-61. That analysis concluded that Alternative A on the Madera Site would result

in "a market share decline of approximately 19 percent at [the Picayune Tribe's casino]."  *Id.*
The analysis also predicted that the development of Alternative A would increase "total gaming
expenditures at venues in the immediate market area by over $90 million."  *Id.*  Most
importantly, the analysis observed that "[a] 19% revenue decline is . . . commonplace for
incumbents in expanding gaming markets," and "even in the worst case, should market share at
competing facilities decline by the above percentages, all of the facilities are expected to remain
open and to continue to generate sustainable profits for their tribal owners."  *Id.* at 4.7-61 to 62.

In sum, the Innovation Group's analysis concluded that permitting a class III gaming
establishment on the Madera Site would result in the Picayune Tribe having a smaller slice of a
larger gaming pie, and that the net economic effect of the North Fork Tribe's entry into the
market would be that "the impact on the viability of operations" from the Picayune Tribe's
resulting market-share decline "is not one that jeopardizes the casino's ability to remain open."
*Id.* at 4.7-61.  From this economic analysis, the Secretary was likely rational in concluding that
such competition would not be significantly detrimental to the Picayune Tribe.  Furthermore, the
gaming compact between the North Fork Tribe and the State of California requires the North
Fork Tribe to pay the Picayune Tribe what will likely amount to millions of dollars each year
until 2020 "[t]o mitigate the potential economic impact of the Tribe's proposed Gaming
Facility."  *See* Tribal-State Compact Between the State of California and the North Fork
Rancheria of Mono Indians of California ("North Fork Compact") at 15–16 (Aug. 30, 2012),
*available at* http://gov.ca.gov/docs/Final_Compact_--__North_Fork.pdf.[24]

---

[24] These payments would, until gaming commences on the Madera Site, be equal to the amount that the Picayune
Tribe is obligated to pay to California under its own gaming compact (up to $768,750 per quarter). *See* North Fork
Compact at 15.  After gaming commences, these payments would be equal to between 2.5% and 3.5% of the North
Fork Tribe's net gaming profits. *Id.* at 16.  The compact also provides, however, that these mitigation obligations
shall be terminated if the Picayune Tribe "pursues in any way or finances, in whole or in part, directly or indirectly,
any lobbying, administrative, legal, judicial, or other challenge to the Secretary's decision to accept the 305-Acre
Parcel in trust for the Tribe." *Id.* at 17.

Although the Picayune Tribe clearly disagrees with the predictive analysis of the Innovation Group and believes that development of the Madera Site will be "devastating" to the Picayune Tribe's operations, *see* Picayune Mem. at 1, 3, 5–6, the Picayune Tribe offers no concrete alternative analysis of Alternative A's economic impacts that would suggest that a gaming complex on the Madera Site would impair the Picayune Tribe's ability to remain profitable and self-sufficient.  The IGRA was intended to allow Indian tribes like the North Fork "to engage in gaming on par with other tribes," *Citizens Exposing Truth*, 492 F.3d at 468, not to insulate Indian gaming from normal market forces.  Therefore, absent any evidence supporting the prediction that development of the Madera Site would have a destructive competitive impact upon the Picayune Tribe, the plaintiffs are unlikely to succeed in arguing that the Secretary's analysis of the economic effects on the Picayune Tribe was improper.

### 4.    *The Secretary's Compliance with the NEPA*

Finally, the Court will discuss the plaintiffs' arguments that the Secretary's determinations ran afoul of the requirements contained in the NEPA.

### a)    *Failure to Consider Reasonable Alternatives*

The plaintiffs' most forceful objection under the NEPA is that the Secretary failed to give adequate consideration to a reasonable range of alternative sites for the proposed gaming establishment, as required by the NEPA.  *See* Pls.' Mem. at 25–29; *see also* 42 U.S.C. § 4332(2)(C)(iii) (requiring agencies to consider "alternatives to the proposed action").  The NEPA's implementing regulations provide that, in considering alternatives, an agency must, *inter alia* "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which are eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14 (a).  For those alternatives not eliminated from detailed study, the agency must "[d]evote substantial treatment to each alternative . . . so that reviewers

may evaluate their comparative merits." *Id.* § 1502.14(b).  "An alternative is 'reasonable' if it is

objectively feasible as well as 'reasonable in light of the [the agency's] objectives.'"  *Theodore*

*Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011) (quoting *City of*

*Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999)); *see also* 43 C.F.R. § 46.420(b)

(defining "reasonable alternatives" as "alternatives that are technically and economically

practical or feasible and meet the purpose and need of the proposed action").

 In this regard, the Secretary considered five alternatives in detail:  (1) Alternative A was

the full development of the Madera Site, as discussed above; (2) Alternative B was "a smaller-

scale version of Alternative A, but without hotel or pool components," FEIS at 2-37;

(3) Alternative C was "a mixed-use retail development" on the Madera Site that "would include

several larger retail outlet stores and smaller storefronts, including food and beverage

establishments," but would not include any gaming, *id.* at 2-45; (4) Alternative D would be

located on the North Fork Rancheria and would "consist of a smaller-scale version of Alternative

A, without retail, high-limit gaming, entertainment, hotel, or pool components," *id.* at 2-54; and

(5) Alternative E would have been the status quo, or the "no-action alternative" required to be

considered under NEPA regulations, under which "neither site would be developed," *see id.* at 2-

67; 40 C.F.R. § 1502.14(d) (requiring EIS to "[i]nclude the alternative of no action").

 The plaintiffs have two primary claims regarding the Secretary's consideration of

alternative sites.  First, they argue that the Secretary failed to consider certain sites in detail that

the plaintiffs say were reasonable and viable alternatives.  *See* Pls.' Mem. at 26–29.  In

particular, the plaintiffs focus on a 135-acre tract of land, known as the "Old Mill site," which

"housed a working lumber mill between 1941 and 1994."  IGRA ROD at 291.  The plaintiffs

argue that the Old Mill site "is viable as a site for a casino," and the Secretary arbitrarily and

capriciously erred to eliminate it from further consideration as a reasonable alternative to the Madera Site. *See* Pls.' Mem. at 26. The plaintiffs observe that although "the Secretary focused on environmental problems with the site and the purported claim that the site's owner would not sell the property for the purposes of developing a casino," the plaintiffs nevertheless contend that "[n]one of these reasons . . . was a proper basis for eliminating this alternative from consideration." *Id.* at 27.

        None of the plaintiffs' objections, however, are likely to succeed on the merits. First, the Secretary observed a number of potential environmental problems with developing the project on the Old Mill site, namely, that the soil on the site had been contaminated with various potentially harmful compounds such as petroleum hydrocarbons, asbestos, lead-based paint, and diesel fuels. *See* IGRA ROD at 292. Although the plaintiffs note that the Secretary concluded that this contamination could be remedied through various clean-up efforts, *see* Pls.' Mem. at 27, the Secretary also observed that "the potential for the presence of unknown contamination related to past uses on the site remains," IGRA ROD at 292. More importantly, the Secretary observed that the owners of the Old Mill site "sent two letters to the BIA stating that the site would not be sold for the development of a casino project." *Id.* The plaintiffs' argument that the owner's refusal to sell the site for gaming purposes "is insufficient to reject the site," Pls' Mem. at 27, makes little sense. Although gaming was not the express purpose of the proposed action, it was a central focus of the proposed action because it was the use of the land that was most likely to provide the revenue needed to meet the purpose and need of the project, *see* IGRA ROD at 287 (listing purpose and need), and therefore it was likely rational, for all of the reasons stated in the IGRA ROD, for the Secretary to reject the Old Mill site as a reasonable alternative.

The plaintiffs also complain that the Secretary improperly rejected the North Fork
Rancheria and other sites closer to the North Fork Tribe's historic area.  They contend that the
reason for this "was ultimately about windfall profits" to the North Fork Tribe.  *See* Pls.' Mem.
at 28–29.  They also argue that the Secretary's analysis on economic impacts was inconsistent
because, on the one hand, sites near the North Fork Rancheria were rejected because of the
potential economic impact on neighboring tribal gaming operations, while on the other hand the
Picayune Tribe's economic concerns regarding development on the Madera Site were found to
be insufficient.  *See id.*  The plaintiffs' arguments in this regard are unlikely to lead to success on
the merits because they fail to appreciate that the purpose and need of a proposed action is a
cornerstone of whether an alternative is reasonable under the NEPA.[25]  *See, e.g.*, 43 C.F.R.
§ 46.420 (defining "reasonable alternatives" as "alternatives that are technically and
economically practical or feasible and *meet the purpose and need of the proposed action*"
(emphasis added)).  Thus, it was rational for the Secretary to reject potential alternatives if they
would not, in the Secretary's informed judgment, allow for a large enough development to
provide the North Fork Tribe with revenues that would meet the purpose and need of the
proposed action.  It was not inconsistent with this rationale for the Secretary to refuse to
eliminate the Madera Site because, although it would meet the purpose and need of the proposed
action, it would have a competitive economic impact on neighboring gaming operations.  In sum,
based upon the partial administrative record currently before the Court, the Secretary appears to
have considered a reasonable range of alternatives and provided a rational and concise
explanation of why each potential alternative was rejected from further consideration.

---

[25] The plaintiffs' argument also does not account for other reasons cited in support of rejecting the North Fork
Rancheria and other nearby sites, including most notably the fact that the "particularly varied and steep topography"
would inflate construction costs in that area, leading to the conclusion that a casino development in that area "could
not be successfully financed."  *See* IGRA ROD at 295.

b)      *Failure to Take "Hard Look" at Environmental Impacts*

The plaintiffs also contend that the Secretary "failed to take a 'hard look' at the impacts of the proposed action," as required by the NEPA.  Pls.' Mem. at 30.  In this regard, the plaintiffs either rehash the same arguments they made regarding the Secretary's consideration of detriment to the surrounding community (*e.g.*, crime, problem gambling, impacts on local governments, environmental impacts), *see supra* Part III.B.3, or they offer conclusory statements about the Secretary "stack[ing] the deck in favor of the [Madera Site]" and "minimiz[ing] how the proposed mega-casino development will negatively impact water resources, protected species and associated critical habitat and air quality and land resources," Pls.' Mem. at 31.  This sort of cursory, undeveloped argument does not state a colorable claim that an agency violated the NEPA, particularly in this case where the Secretary's two RODs discussed at some length the exact issues the plaintiffs say were minimized.  *See* IGRA ROD at 300–09 (discussing environmental impacts); IRA ROD at 397–406 (same).

c)      *Adequate Public Participation*

The plaintiffs also argue briefly that "the BIA failed to allow adequate participation by the general public" throughout the North Fork Tribe's application process.  Pls.' Mem. at 30.  They argue that the "public hearing facility" was "too small," that seating and speaking preference was given to the North Fork Tribe and other proponents of the casino development, and that the BIA has "attempted to evade public scrutiny for its unlawful decision by making it difficult for interested parties to review the Secretary's decision."  *Id.*  None of these arguments has any likely merit.  The public comment period in this case was robust, allowing for hundreds of written comments as well as 101 spoken comments at the public hearing.  *See* Defs.' Ex J (listing all public comments).  Written comments came from a variety of sources, including 62 comments from government agencies, 21 comments from businesses and non-governmental

agencies, 109 comments from individuals, and even 39 comments that were accepted after the close of the comment period. *See id.* Most notably, although the plaintiffs claim that the public hearing was biased, the record demonstrates that the plaintiffs accounted for seventeen spoken comments, while the North Fork Tribe accounted for only twelve.[26] *See id.* at 7–10. The plaintiffs' contention about the availability of the IRA ROD likewise appears unsupported. It appears that the IRA ROD has been made available to the public via the website dedicated to the North Fork casino development, http://northforkeis.com/. That site contains all of the relevant documents related to the Secretary's decision to take the Madera Site into trust, including the DEIS, FEIS, *Federal Register* notices, and the IRA ROD. From all of this, it appears clear that the plaintiffs "had a substantial opportunity to comment on the proposals before they were approved." *Natural Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 121 (D.D.C. 2007).

d)      *Conflict of Interest*

Finally, the plaintiffs argue that the Secretary violated the NEPA by having the FEIS "prepared in violation of the conflict of interest provisions of 40 C.F.R. § 1506.5." Pls.' Mem. at 30. The cited provision provides that "any [EIS] prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency," and "[i]t is the intent of these regulations that the contractor be chosen solely by the lead agency . . . to avoid any conflict of interest." 40 C.F.R. § 1506.5(c). The regulation goes on to require that "[c]ontractors shall execute a disclosure statement prepared by the lead agency . . . specifying that they have no financial or other interest in the outcome of the project." *Id.* The plaintiffs' objection stems from the fact that the contractor that prepared the FEIS in this case—a firm called Analytical Environmental Services ("AES")—was retained by the North Fork Tribe to

---

[26] The seventeen comments included three comments from representatives of the Chukchansi Gold Resort Casino, which is owned and operated by plaintiff Picayune Tribe. *See* Defs.' Ex. J, at 9.

conduct an environmental assessment prior to the EIS process, implying that AES may have had a conflict of interest and a plain motive or incentive to please its tribal client.

The Court is satisfied, however, that the plaintiffs are unlikely to succeed on the merits of their conflict-of-interest argument regarding AES's involvement in the preparation of the EIS for the Madera Site.  First, the North Fork Tribe, AES, and the BIA all signed a disclosure agreement prior to the development of the EIS, which stated, in compliance with 40 C.F.R. § 1506.5(c), that "AES has no financial interest in the results of the environmental analysis or the BIA's decision regarding the approvals for the project" and that "North Fork Rancheria will be solely responsible for payment of all AES fees."  Defs.' Ex. L, at 1, ECF No. 30-12.  Second, the D.C. Circuit has held that "there is no cause to invalidate [an] EIS" unless "any error in the selection of the contractor . . . compromise[d] the objectivity and integrity of the NEPA process," which requires demonstrating "substantive flaws in the EIS itself."  *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 686–87 (D.C. Cir. 2004) (internal quotation marks omitted).  As discussed above, the Court has concluded that none of the purported substantive flaws identified by the plaintiffs are likely to succeed on the merits, and therefore, the plaintiffs have failed to demonstrate any likely prejudice that could have resulted from an error in the selection of AES as the contractor in this case.  Thus, the Court need not determine whether the DOI erred in selecting AES in the first place.  *See id.* at 686 (concluding that, without any showing of "substantive flaws" in the EIS, "[w]e need not determine the [agency's] precise role in [the contractor's] selection").

* * *

As the foregoing discussion establishes, the Court concludes that the plaintiffs have not established a likelihood of success on the merits of any of their claims against the defendants.

45

Nevertheless, in keeping with the traditional "sliding scale" consideration of the preliminary injunction factors, the Court will proceed to analyze the likelihood of irreparable harm, the balance of harms, and the public interest in determining whether to grant the plaintiffs' request for preliminary injunctive relief.

### C.   <u>Irreparable Harm</u>

Although the plaintiffs' failure to establish a likelihood of success on the merits weighs heavily in the preliminary injunction calculus, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A CHARLES ALAN WRIGHT, *et al.*, FEDERAL PRACTICE & PROCEDURE § 29481.1 (3d ed. 2012). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "The moving party must show 'the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Additionally, as the term "*irreparable* injury" implies, "the injury must be beyond remediation." *Id.*

In this case, the plaintiffs contend that they are likely to suffer irreparable harm if the fee-to-trust transfer is not enjoined because "[i]t is unclear whether a transfer into trust can be reversed," thereby rendering inevitable the irreparable harm associated with the construction and operation of the casino complex (*e.g.*, environmental and aesthetic changes to the land and surrounding community). *See* Pls.' Mem. at 35–38. Additionally, the plaintiff raise the concern that the Court may lack jurisdiction to enjoin construction or gaming activities on the Madera Site once the land is transferred into trust because the North Fork Tribe will then be able to

"claim that any suit to enjoin the development on the [Madera Site] or to reverse the trust acquisition is barred by tribal sovereign immunity." *Id.* at 39; *see also* Tr. of Oral Argument at 22 (unofficial transcript) (counsel for Stand Up plaintiffs stating that "we believe most of the harms are to the plaintiffs' ability to fully adjudicate this case"). Thus, there are two potential irreparable injuries that could, according to the plaintiffs, occur if the Court does not enjoin the transfer before it is consummated on February 1, 2013: (1) the loss of any available remedy to prevent the physical alteration of the Madera Site post-transfer; and (2) actual physical alteration of the Madera Site.[27]

The Court will first address the plaintiffs' concern with the potential "inability of the Court to remedy this [fee-to-trust-transfer] down the road." Tr. of Oral Argument at 22 (unofficial transcript). Following the Supreme Court's decision in *Patchak*, there remains a level of uncertainty regarding how courts are to approach challenges to the transfer of land into trust under the IRA. The *Patchak* Court suggested, without holding, that courts would retain jurisdiction to vacate a trust transfer after it is consummated. *See Patchak*, 132 S. Ct. at 2204, 2212 (permitting petitioner-plaintiff's post-trust-transfer APA claim to proceed where "the suit now effectively seeks to *divest* the Federal Government of title to the [Indian trust] land" (emphasis added)). This conclusion makes sense because, as the *Patchak* Court held, the

---

[27] The plaintiffs also argue that they "are entitled to an order mandating that the Secretary adhere to his regulations and stay the trust transfer during the pendency of this case." Pls.' Reply at 2. This argument is based on the Secretary's refusal to comply with DOI's stated policy to self-stay the trust transfer upon timely initiation of litigation challenging the validity of the fee-to-trust determination. *See supra* BIA HANDBOOK at 15. Specifically, the plaintiffs contend that "25 C.F.R. § 151.12(b) imposes a non-discretionary duty the Secretary is required to follow and which the Court may order him to follow, *as an alternative to entering a preliminary injunction*." *Id.* at 7 (emphasis added). Although the Court fully appreciates the plaintiffs' frustration with the Secretary's staunch refusal to self-stay the transfer and permit an adjudication of the plaintiffs' claims based upon the full administrative record, the plaintiffs simply have no basis to contend that the Court can order the Secretary to stay the transfer "as an alternative to entering a preliminary injunction." *Id.* The plaintiffs did not raise the Secretary's refusal to self-stay in their Complaint, and they have not filed a motion for injunctive relief, independent of a preliminary injunction, that is based on the Secretary's refusal to self-stay. *See* FED. R. CIV. P. 7(b) ("A request for a court order must be made by motion."). Therefore, the Court will not consider the plaintiffs' request for injunctive relief based solely on the Secretary's refusal to self-stay.

government can no longer avoid such post-transfer relief on the ground of sovereign immunity, *see id.* at 2212, and the IRA makes clear that the title to all lands held in trust are in the name of the United States, *see* 25 U.S.C. § 465.  Therefore, the Court sees no cognizable limit to its jurisdiction that would preclude a future order vacating the trust transfer in this case after the transfer has already been made.  Also, for what it is worth, the government has repeatedly assured the Court, both in its briefs as well as at oral argument, that "the Department of the Interior will take the land out of trust if ordered to do so by the Court."  Defs.' Opp'n at 39.

Furthermore, although tribal sovereign immunity might in some circumstances prevent a court from enjoining tribal activities on lands held in trust for an Indian tribe, the North Fork Tribe has provided an explicit waiver of its sovereign immunity as it relates to the claims in the instant action.  According to the North Fork Tribe, it "understands that the limited waiver of sovereign immunity effected by its intervention would make it subject to any permanent injunctive relief that might be entered by the Court . . . including relief that would prevent or limit activities on the property or require the United States to transfer the land out of trust." Intervenor's Opp'n at 39; *see also* Tr. of Oral Argument at 16 (unofficial transcript) (government counsel stating that North Fork Tribe "are going into this with their eyes wide open").  The plaintiffs are perhaps justified in their concerns, on a general level, because "[a]ny waiver of a tribe's sovereign immunity, whether by Congress or by the tribe itself, 'cannot be implied but must be unequivocally expressed.'"  *Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1498 (D.C. Cir. 1997).  Even so, the North Fork Tribe's waiver of immunity in this case, although somewhat limited, has been unequivocally expressed and would, by its terms, extend to any future order of this Court that the Tribe cease construction or gaming activities on the land.  *See* Intervenor's Opp'n at 39 (waiving sovereign immunity as to "*any* permanent injunctive relief

that might be entered by the Court . . . including relief that would prevent or limit activities on the property or require the United States to transfer the land out of trust" (emphasis added)). Thus, the plaintiffs have not demonstrated a likelihood that they will be deprived of any future remedies to enjoin the fee-to-trust decision or any construction or gaming activities on the trust land absent preliminary injunctive relief.[28]

Similarly, the plaintiffs have also not demonstrated a likelihood that any tangible alteration to the Madera Site will take place if no preliminary injunctive relief is granted.  The plaintiffs focus heavily upon what the North Fork Tribe will have the *ability* to do once the land is transferred.  *See, e.g.*, Pls.' Mem. at 38 ("If the Secretary is allowed to take the land into trust, the Tribe *may* immediately begin offering gambling or begin construction." (emphasis added)); *id.* at 40 ("Here, the Tribe has *full authority and power* to commence development and construction of the casino immediately after the fee-to-trust transfer occurs . . . ." (emphasis added)); Pls.' Reply at 20 ("Once the [Madera Site] goes into trust, the Tribe will have *sovereign authority* to alter the land . . . ." (emphasis added)).  Yet, the Supreme Court has clearly held that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22. The North Fork Tribe has also represented numerous times that, once the transfer is completed, a number of steps will need to be taken before any actual construction or gaming activities can

---

[28] The Court's conclusion that it would have jurisdiction to vacate a transfer of trust land or to enjoin the North Fork Tribe from engaging in construction or gaming activities on the Madera Site does not preclude the possibility that, in the event the government is ordered to take the Madera Site out of trust, the government may have to contend with legal claims against it by third parties, including, for example, claims by the North Fork Tribe for interference with their right to the beneficial use of the Madera Site or a breach of the government's fiduciary duties as a trustee of the land.  *See, e.g.*, *Hydaburg Co-op Ass'n v. United States*, 667 F.2d 64, 68 (Ct. Cl. 1981) ("[T]he 'trust' established by section 5 of the [IRA] imposes . . . a duty on the United States to hold the acquired Indian lands so as to prevent continued alienation."); *Chase v. McMasters*, 573 F.2d 1011, 1017–19 (8th Cir. 1978) (recognizing Indian's "right under [25 U.S.C.] § 465 to enjoy the beneficial use of land held in trust" and holding that Indian could state claim for infringement of that right under 42 U.S.C. § 1983).

feasibly begin.  *See, e.g.*, Intervenor's Opp'n at 37 ("Under the most optimistic assumptions, the Tribe could not begin actual operation of a casino for many months."); *id.* at 38 ("[T]here are many steps to be taken after the land is taken into trust but before construction could begin."). The plaintiffs have offered nothing more than speculation and mere possibility to rebut the Tribe's representations in this regard.

As a result, the Court concludes that the plaintiffs have failed to demonstrate a likelihood of irreparable harm that would occur absent preliminary injunctive relief.  Despite the plaintiffs' insufficient showing of irreparable harm, the Court is mindful that, once the transfer occurs, the likelihood of irreparable harm will increase as this litigation continues.  Therefore, the Court will require, during the pendency of this case, that the North Fork Tribe provide notice to the parties and the Court at least 120 days prior to any physical alteration of the land at the Madera Site.  To be clear, "physical alteration" includes anything that could reasonably be considered construction activities, the breaking of any ground at the site, or the destruction of any structures that presently exist on the land.

### D.    Balance of Harms

Having concluded that the plaintiffs have demonstrated neither a likelihood of success on the merits of their claims nor a likelihood of irreparable harm absent injunctive relief, the Court is persuaded that the grant of preliminary injunctive relief would be unwarranted.  *See Davis*, 571 F.3d at 1295 ("Because the [plaintiffs] have failed to demonstrate either a substantial likelihood of success on the merits or irreparable harm, we affirm the district court's denial of a preliminary injunction.").  Nevertheless, the Court will also consider the other two preliminary injunction factors—the balance of harms and the public interest—lest the Court run afoul of the D.C. Circuit's admonition that district courts "consider meaningfully [all of] the preliminary

injunction factors." *See Gordon*, 632 F.3d at 725; *see also Winter*, 555 U.S. at 26 ("Despite the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction, the District Court addressed these considerations in only a cursory fashion.").

As already discussed above, little if any harm would inure to the plaintiffs if no preliminary injunctive relief were granted. This conclusion is buttressed by the Court's directive that the North Fork Tribe provide 120 days' notice before any physical alteration of the Madera Site. Absent a preliminary injunction, the transfer of the trust lands will occur on February 1, 2013, and the North Fork Tribe will continue on its odyssey to make its long-awaited gaming complex a reality. Yet, none of the tangible harms identified by the plaintiffs (*e.g.*, traffic congestion, increased crime, problem gambling, environmental effects) would be remotely likely to occur for some time. Indeed, the plaintiffs would have four months' notice before any such harms ever commenced, which would provide ample opportunity for them to renew their request for preliminary injunctive relief if this case is still pending.

On the other side of the scale, the intervenor-defendant North Fork Tribe will be at least incrementally harmed by the grant of preliminary injunctive relief. As recited in the Tribe's briefing, the North Fork people are in "dire economic straits" with higher than a 16% unemployment rate, and any preliminary injunctive relief would bring to a screeching halt the process of the Tribe obtaining the economic benefits contemplated by the IGRA. *See* Intervenor's Opp'n at 42–43. Comparing the relative tangible harm that would be imposed upon the North Fork Tribe if a preliminary injunction were granted with the purely symbolic injury suffered by the plaintiffs if a preliminary injunction were not granted, the Court concludes that the balance of equities tips in favor of not granting a preliminary injunction.

### E.   Public Interest

Finally, the Court must also consider whether the granting of an injunction would be in the public interest.  First, in evaluating the public interest, it is important to observe that the government defendants have compelled the Court to consider the merits of the Secretary's "extraordinary assertion of power,"[29] which was over seven years in the making, on a less-than-full administrative record.  This clearly puts the plaintiffs and the Court at a disadvantage in evaluating the potential merits of the plaintiffs' arguments, particularly in the face of a statute (the IGRA) that expressly disfavors the type of off-reservation Indian gaming that will result if the Secretary's determinations are ultimately upheld.  *See* 25 U.S.C. § 2719(a) (prohibiting off-reservation gaming on lands acquired in trust after October 17, 1988 unless certain exceptions are satisfied); *see also* IGRA ROD at 367 (noting "the intent of Congress, which favors tribal gaming on existing and former reservations, and on lands acquired in trust prior to October 17, 1998").  Thus, the litigation strategy of the government defendants, in refusing to self-stay for a period sufficient to afford submission and consideration of the full administrative record, disserves the public interest.

Nevertheless, absent a demonstrated likelihood that the Secretary has acted improperly in transferring the Madera Site into trust for the purpose of developing a gaming establishment, enjoining that agency action would not be in the public interest.  Since the agency's actions were ostensibly in furtherance of Congress' judgment that Indian tribes must, in appropriate circumstances, be given the opportunity to pursue economic self-sufficiency and strong tribal government through gaming, the Court would be remiss to stand in the way absent a showing that the agency has acted in likely contravention of its statutory responsibilities.  Therefore, the

---

[29] *See* Transcript of Oral Argument at 36, *Carcieri*, 555 U.S. 379 (No. 07-526), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/07-526.pdf.

Court concludes that, on balance, the public interest would not be served by a grant of preliminary injunctive relief.

## IV.    CONCLUSION

As the foregoing discussion makes plain, all four of the preliminary injunction factors weigh against the granting of a preliminary injunction in this case.  Therefore, the Court will deny the plaintiffs' motion for preliminary injunction.  Additionally, for the reasons discussed above, the Court will deny the government defendants' motion to transfer venue.

An appropriate Order accompanies this Memorandum Opinion.


Date: January 29, 2013


  /s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge