# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STAND UP FOR CALIFORNIA!, et al.,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, et al.,

        Defendants.

Civil Action No. 1:12-cv-02039-BAH

  Consolidated with:
  Civil Action No. 1:12-CV-02071-BAH

Honorable Beryl A. Howell

---

PICAYUNE RANCHERIA OF THE
CHUKCHANSI INDIANS,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA, et al.,

        Defendants.

## MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD AND COMPEL PRODUCTION OF A PRIVILEGE INDEX

Plaintiffs Stand Up For California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God-Madera and Dennis Sylvester ("Stand Up! Plaintiffs" or "plaintiffs") hereby move this Court for an order compelling defendants United States Department of the Interior ("DOI"), Sally Jewel,[1] in her official capacity as Secretary of the United States Department of the Interior (the "Secretary"), Bureau of Indian Affairs ("BIA"),

---

[1] On April 15, 2013 Sally Jewell replaced Kenneth Salazar as Secretary of the United States Department of the Interior. *See* Press Release, Department of Interior, Sally Jewell Gets to Work as Secretary of the Interior (April 15, 2013), http://www.doi.gov/news/pressreleases/sally-jewell-gets-to-work-as-secretary-of-the-interior.cfm.   Accordingly, under Federal Rule of Civil Procedure 25(d), Ms. Jewell was automatically substituted in place of Mr. Salazar as a party to this action.

and Kevin Washburn, in his official capacity as Assistant Secretary of Indian Affairs ("the Assistant Secretary") (collectively, DOI, Secretary, BIA, and Assistant Secretary shall be referred to as the "federal defendants") to produce a privilege index and supplement the administrative record in this action with the following documents that are adverse to the agency's decision:

1. Documents related to the North Fork Band of Mono Indians' ("North Fork Band Documents") incomplete petition for federal acknowledgment. The North Fork Band Documents include the following:

   a. Letter of Intent submitted to the Office of Federal Acknowledgement ("OFA") by the petitioner North Fork Band of Mono Indians (#90), dated September 7, 1983, (1 page).

   b. Documents received on May 15, 1990, in a Petition for Federal Acknowledgement ("Petition") by the OFA from the North Fork Band of Mono Indians.

   c. Letter of Obvious Deficiency dated October 28, 1991, of the North Fork Band of Mono Indians by the OFA.

2. North Fork Community Development Council ("CDC") master plan for the development of the Old Mill Site.

3. Three Letters from California Secretary of State Debra Bowen to Paula Hart, Director Office of Indian Gaming, United States Department of Interior ("DOI"), dated July 16, 2013, August 9, 2013, and November 20, 2013.

In support of this motion, plaintiffs rely upon the attached Memorandum of Points and Authorities, Declarations of Sean M. Sherlock, Brian A. Daluiso, and Cheryl Schmit, and plaintiffs' Request for Judicial Notice, which are filed herewith.  Oral argument is requested.

Plaintiffs have conferred with the federal defendants concerning this motion pursuant to Local Civil Rule 7(m). [*See* Declaration of Sean M. Sherlock ("Sherlock Decl."), ¶¶ 4, 7.] Defendants have indicated that they will oppose this motion. [Sherlock Decl.", ¶ 8, 9.]

Dated:     June 4, 2014                    By: */s/ Sean M. Sherlock*
                                              */s/ Benjamin S. Sharp*_____

                                                   Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C.  20005-3960
Telephone:   202.654.6200
Facsimile:   202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone:  602.382.6366
Facsimile:  602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com

***Attorneys for Plaintiffs Stand Up For California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God–Madera, and Dennis Sylvester***

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD AND COMPEL PRODUCTION OF A PRIVILEGE INDEX

### INTRODUCTION

In this action, the Stand Up! Plaintiffs challenge the federal defendants' trust acquisition of a 305-acre parcel (the "Madera Site") for the benefit of the North Fork Rancheria of Mono Indians (the "North Fork Tribe" or "Tribe"). After review of the administrative record, produced on April 29, 2014, and the revised administrative record produced on May 5, 2014, plaintiffs asked federal defendants to (1) supplement the record with a number of relevant documents identified by plaintiffs, and (2) provide a privilege index identifying any documents withheld from the administrative record.

Federal defendants have declined to supplement the administrative record with documents plaintiffs have identified as relevant to plaintiffs' claims under the Indian Reorganization Act ("IRA"), the Indian Gaming Regulatory Act ("IGRA"), and the National Environmental Policy Act ("NEPA"). The federal defendants have also refused to provide a privilege log or index identifying any documents that were withheld from the administrative record. Plaintiffs now move this court to compel the federal defendants to supplement the administrative record with the requested documents and to provide a privilege index.

This Court should grant plaintiffs motion for the following reasons:

1.      Plaintiffs have put forth credible, non-speculative evidence that the requested documents were known by the federal defendants at the time they made the challenged decisions. The North Fork Band Documents were in the Bureau of Indian Affairs ("BIA") files at the time of the decision. The North Fork Community Development Council's ("CDC") master plan was cited in the administrative record and relied on in making the challenged determination. The letters from the California Secretary of State were delivered to the federal defendants for the express purpose of aiding the Secretary of the Interior ("Secretary") in making a reasoned decision.

2.     The requested documents are all related to the challenged determinations. The North Fork Band Documents bear on the question of the tribal identity of the Indians at the North Fork Rancheria in 1934. The CDC master plan was cited as a key reason for rejecting the Old Mill Site as a reasonable alternative to the proposed casino project. The letters to the Secretary of State relate to whether the State of California had legally entered into the compact with the North Fork Tribe before the Secretary published the approval of the compact in the Federal Register.

3.     The Requested documents all are adverse to the challenged decisions. The North Fork Band Documents undermine the basis of the federal defendants' determination that the North Fork Tribe was under federal jurisdiction in 1934. The CDC master plan shows the Old Mill Site was rejected improperly. And the letters from the Secretary of State show that the Secretary had a duty to disapprove the compact and breached that duty by publishing the approval in the Federal Register.

Finally, the federal defendants have provided a list of administrative record documents that contain redactions. They have not, however, provided a privilege index of any documents that were withheld from the administrative record on grounds of privilege. Without such an index, neither plaintiffs nor the court can properly determine whether the federal defendants' assertion of privilege is legitimate. Therefore the Court should compel the federal defendants to provide plaintiffs with the requested index.

## STATEMENT OF FACTS[2]

The administrative record was originally lodged on April 26, 2013, and contained 41,211 pages of documents. [Docket 51.] After reviewing the administrative record and finding it lacking certain documents and a privilege index, plaintiffs attempted in good faith to resolve disputes over the administrative record. [Declaration of Sean M. Sherlock ("Sherlock Decl."), ¶ 4.] Unable to resolve disputes over the administrative record through the meet-and-confer process, on July 10, 2013, plaintiffs moved this Court to order defendants to supplement the

---

[2] Pursuant to Local Rule 7(n), relevant portions of the administrative record are attached as Exhibit E to the Declaration of Sean M. Sherlock.

administrative record and produce a privilege log. [Docket 58]. In response to plaintiffs' motion, defendants declined to supplement the record with the documents sought but stated that "within 30 days [defendants] will produce a privilege log for documents contained in the administrative record." [Docket 69, p. 2.]  On September 25, 2013, defendants provided plaintiffs with a list of administrative record documents that contained redactions. [Sherlock Decl., ¶ 5, Ex. A.] The defendants have not provided an index identifying documents that were withheld from the administrative record on the grounds of privilege. [Sherlock Decl., ¶ 5.]

While plaintiffs' motion was pending, the federal defendants moved the Court to stay the case for 90 days and remand to the agency to allow the federal defendants to comply with the notice requirements of the Clean Air Act. [Docket 63.] In light of the Court's granting the federal defendants' motion for stay and remand [Docket 77], the Court denied plaintiffs' motion to compel supplementation of the administrative record and production of a privilege index without prejudice. [Minute Order of December 16, 2013.]

The stay ended on May 5, 2014, and on that day, the federal defendants lodged a revised administrative record. [Docket 83.] The revised administrative record was certified by Paula Hart on May 5th, 2014. [Docket 83-1.] The revised administrative did not contain any of the documents plaintiffs sought to have added to the administrative record in its motion to compel supplementation of the administrative record. [Docket 58.] After further review of the revised administrative record, plaintiffs still seek certain documents from their previous motion and have discovered additional documents referenced in the administrative record that were not added following the stay. [Sherlock Decl., ¶ 6.] On May 23, 2014, plaintiffs sent a meet-and-confer letter identifying specific documents that should be included in the administrative record. [Sherlock Decl. ¶ 7, Ex. B.] On June 2, 2014, federal defendants' counsel stated that they continue to oppose adding the North Fork Band Documents to the administrative record and did not intend to provide a privilege index other than the list of redacted documents already provided. [Sherlock Decl., ¶ 8.]. On June 3, 2014, federal defendants' counsel stated that they opposed supplementing the administrative record with the CDC master plan and the three letters

from the California Secretary of State. [Sherlock Decl., ¶ 9, Ex. C.] Federal defendants' counsel further stated that they would not provide a privilege index for any deliberative materials that are not part of the administrative record. [Sherlock Decl., ¶ 9, Ex. C.]

Plaintiffs contend that the administrative record must be supplemented with the following documents:

1.      Documents related to the North Fork Band of Mono Indians' ("North Fork Band Documents") incomplete petition for federal acknowledgment. The North Fork Band Documents include the following:

   a.      Letter of Intent submitted to the Office of Federal Acknowledgement ("OFA") by the petitioner North Fork Band of Mono Indians (#90), dated September 7, 1983, (1 page).

   b.      Documents received on May 15, 1990, in a Petition for Federal Acknowledgement ("Petition") by the OFA from the North Fork Band of Mono Indians.

   c.      Letter of Obvious Deficiency dated October 28, 1991, of the North Fork Band of Mono Indians by the OFA.

2.      North Fork Community Development Council ("CDC") master plan for the development of the Old Mill Site.

3.      Three Letters from California Secretary of State Debra Bowen to Paula Hart, Director Office of Indian Gaming, United States Department of Interior ("DOI"), dated July 16, 2013, August 9, 2013, and November 20, 2013.

Plaintiffs obtained the North Fork Band Documents from the BIA under the Freedom of Information Act ("FOIA") request dated April 26, 2013 (FOIA Control No. BIA 2013 01111). [Sherlock, Decl., ¶ 12(1).] Plaintiffs obtained the CDC master plan from the CDC website. [Declaration of Brian A. Daluiso ("Daluiso Decl."), ¶ 3.] Plaintiffs obtained the documents from the California Secretary of State from the proponent of the referendum petition to challenge the

California Legislature's ratification of the compact. [Declaration of Cheryl Schmit ("Schmit Decl."), ¶¶ 5-7.]

I.   **THE ADMINISTRATIVE RECORD SHOULD BE SUPPLEMENTED TO PROVIDE A COMPLETE RECORD OF THE INFORMATION THAT WAS BEFORE THE AGENCY AT THE TIME OF ITS DECISION**

The "whole" or "complete" administrative record "consists of all documents and materials *directly or indirectly considered by the agency*" in reaching its decision. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (emphasis added); *see also County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 71 (D.D.C. 2008) ("The 'whole record' includes materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision."); *Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001). The agency "may not skew the record in its favor by excluding pertinent but unfavorable information." *Fund for Animals v. Williams*, (D.D.C. 2005) 391 F. Supp. 2d 191, 197. Additionally, the agency may not exclude information "on the grounds that it did not 'rely' on the excluded information in its final decision." *Id.*; *see also Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002); *Amfac Resorts,* 143 F. Supp. 2d at 12.

The D.C. Circuit has recognized three instances in which supplementation of an administrative record is appropriate: "(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review." *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010).

"[S]upplementation of the record may be necessary when an agency excludes information adverse to its position from the administrative record." *Public Citizen v. Heckler*, 653 F.Supp. 1229, 1237 (D.D.C. 1986) (citing *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 751 F.2d 1287, 13227 (D.C. Cir. 1984); *American Wildhorse Preservation Campaign v. Salazar*, 859 F. Supp. 2d. 33, 42. "A plaintiff can make a prima facie showing that an agency

excluded adverse information from the record by proving that the documents at issue (1) were known to the agency at the time it made its decision, (2) are directly related to the decision, and (3) are adverse to the agency's decision. *Fund for Animals*, 391 F. Supp. 2d at 198 (internal quotation marks omitted).

A.  **The North Fork Band Documents Were Improperly Excluded from the Administrative Record**

The federal defendants do not dispute that the "North Fork Band of Mono Indians" [*See* Sherlock Decl., ¶ 12(1). Ex. F, p. 59] and the applicant North Fork Tribe are different groups. The North Fork Tribe is a federally recognized Indian tribe. *See* 49 Fed. Reg. 24,084 (June 11, 1984). The North Fork Band is not. [*See* Docket 69, p. 5 (stating that the North Fork Band Documents are from an unrelated and unrecognized group); Docket 68, p. 7.[3]] The fact that these are separate Indian groups is relevant to the Secretary's *Carcieri* determination in the record of decision to acquire the Madera Site in trust ("IRA ROD").

Under *Carcieri v. Salazar*, the Secretary's authority to take land into trust on behalf of Indian tribes is limited to "those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934." 555 U.S. 379, 395 (2009) (emphasis added); *see also City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 161 (D.D.C. 1980) (noting that the "apparent purpose of limiting IRA benefits to tribes recognized in 1934 was to prevent new groups from coming together solely to exploit the IRA."). Thus, the applicant North Fork Tribe, must demonstrate that it, and not some other group, was under federal jurisdiction in 1934. *See Butte County, California v. Hogen*, 613 F.3d 190, 196-97 (D.C. Cir. 2010) (setting aside the Secretary's trust acquisition as a violation of the APA because the agency failed to consider

---

[3] In its opposition to plaintiffs' first motion to supplement the record with these documents, the Tribe offered a brief history of the representative of the North Fork Band who submitted the Petition. [Docket 68, p. 7 n. 2.] The Tribe also offered to submit a declaration regarding the North Fork Band's legitimacy as a separate tribe. Such a declaration for this Court, however, misses the point and underscores the failure of the Secretary to make a determination regarding the tribal identity of the Indians at the Rancheria in 1934. The evidence offered in such a declaration properly belongs in the administrative process, not in the Court's determination of whether substantial evidence in the administrative record supports the Secretary's determination.

evidence that showed the petitioning tribe "was not the same tribe as the historic tribe that allegedly occupied the gaming site"). Absent evidence of continuity between the applicant tribe and the tribe under jurisdiction in 1934, a recently organized and recognized tribe could impermissibly bootstrap itself "into formal 'tribal' status" to take advantage of "federal economic and legal benefits attendant on tribal status." *Pit River Home and Agr. Co-op. Ass'n v. U.S.*, (9th Cir. 1994) 30 F.3d 1088, 1096 (9th Cir. 1994).

The *Carcieri* issue in this case is whether the North Fork Tribe was under federal jurisdiction in 1934 and therefore eligible for a trust acquisition. The solitary question before the federal defendants, and now before this Court, is the Tribe's status in 1934, not its current status as a federally recognized Indian Tribe. While the presence of another group of Indians claiming common ancestry, common history, and ties the North Fork Rancheria has no relevance to the applicant Tribe's federal recognition as of the time of its fee-to-trust application, documents in the BIA's possession regarding such a group have tremendous relevance in addressing whether the North Fork Tribe and not some other group was under federal jurisdiction in 1934. The federal defendants "cannot justify the exclusion of these highly relevant, adverse documents from the administrative record simply by claiming that the documents were not 'directly or indirectly considered' by the agency." *Fund for Animals*, 391 F. Supp. 2d at 199.

> ## 1. The North Fork Band Documents were known to the agency at the time of the decision

The North Fork Band Documents were either submitted to the BIA or created by the BIA, and they are located in BIA files. *See Fund for Animals*, 391 F. Supp. 2d at 198 (finding plaintiffs made the required showing because the agency "knew of each of the documents: three of them were created by the agency itself, and the fourth . . . was . . . provided to agency after it was completed and is located in the [agency's] own files" (internal quotation marks omitted)).

In refusing to supplement the record with these documents, the defendants seem to take the position that just because these documents were in BIA files somewhere that does not mean

that they were known to the agency at the time it made its determination. This argument must be rejected.

In *American Wild Horse,* a citizen group sued the Bureau of Land Management ("BLM") under the Administrative Procedures Act ("APA") challenging the BLM's decision to round up wild male horses in Nevada, castrate them, and return them to the wild. *America Wild Horse*, 859 F. Supp. 2d. at 35. In their motion for summary judgment, plaintiffs cited four expert declarations that they had submitted in a previously dismissed lawsuit involving a similar BLM program in Wyoming. *Id.* at 36. Defendants moved to strike all references to the expert declarations in the plaintiffs' motion on the grounds that they were not part of the administrative record. *Id.* at 37. The district court denied the defendants' motion to strike, finding that the expert declarations were properly part of the administrative record because they were known to the BLM at the time of the challenged decision, relevant to the decision, and adverse to the decision. *Id*. at 42. The Court found that "not only was the BLM in possession of the Expert Declarations from the dismissed lawsuit . . . in Wyoming, but the BLM also possessed the scientific evidence regarding the approach to wild horse management presented by the same Declarants in connection with BLM's proposed administrative actions" in other states. *Id.* at 43. To this the Court stated, "One part of an agency . . . may not simply remain studiously ignorant of material scientific evidence well known to the agency and brought directly to its attention in timely filed comments." *Id.*

While this case involves historical evidence rather the scientific evidence, the BIA, at best, chose to remain "studiously ignorant" of the North Fork Band Documents. Admittedly, unlike in *American Wild Horse*, plaintiffs did not submit comments challenging the IRA ROD, referencing the North Fork Band Documents. Nevertheless, plaintiffs submitted comments on the Draft Environmental Impact Statement ("DEIS"), referencing historical documents and events relied on in this case by the federal defendants and the applicant Tribe. [AR 0035270-71.]  But these same documents, it turns out, had been previously submitted to the BIA by a different

Indian group in support of its own attempt to demonstrate tribal unity extending from the 1800s through the present day.

The North Fork Band documents, already in BIA files at the time of the North Fork Tribe's application, cannot be distinguished from the documents used by the federal defendants and the applicant Tribe to show that the Tribe was under federal jurisdiction in 1934.

- Folder 6 in the Petition refers to an unratified treaty signed at Camp Barbour in 1851. Quoting from the document, Petitioner states, ""Under Article 4, the North Fork Mono were represented and recognized by the statement: 'And it is also expressly understood that the <u>mona</u> or wild portion of the tibes [sic.] herein provided for, which are still out in the mountains shall, when they come in be incorporated with their respective bands, and receive a fair and equal interest in the land . . ." [Sherlock Decl. ¶ 12(1), Ex. G, pp. 62-63.] This same language is found in the administrative record in reference to the applicant North Fork Tribe's historical background. [AR 0038119, North Fork Rancheria's Response to Two-Part Determination Consultation Comments ("Tribe's Response"); AR 0038504, BIA Memorandum analyzing North Fork's application to two-part determination ("BIA Memo"); AR 0040506, Record of Decision under Indian Gaming Regulatory Act ("IGRA ROD"); AR 0040404, Letter from Larry Echo Hawk to Governor Brown requesting Governor's concurrence ("Concurrence Request"); AR NEW 0000151, Tribe's Amended and Restated Request for a Secretarial Two-Part Determination ("Tribe's Amended Request").]
- Folder 16 in the Petition referrers to Joseph Mastas Kinsman who married a Mono woman and is the ancestor of many tribal citizens. [Sherlock Decl. ¶ 12(1), Ex. G, p. 68.] According to the administrative record, this same person is the ancestor of citizens of the applicant Tribe. [AR 0038118 (Tribe's Response); AR 0040404 (Concurrence Request); AR 0040504-05 (IGRA ROD).]

- Folder 21 in the Petition contains articles regarding the establishment of the Presbyterian Church in North Fork and roll records of the church. [Sherlock Decl. ¶ 12(1), Ex. G, p. 70.] This church is also referred to in this history of the North Fork Tribe. [AR 0038121 (Tribe's Response); AR 0039543 (Tribe's Fee-to-Trust Application).]

- Folder 25 in the Petition contains documents concerning the acquisition and distribution of the land and assets of the North Fork Rancheria and states that "The family and descendants of Mrs. Susan Johnson . . . are the current asset distributes." [Sherlock Decl. ¶ 12(1), Ex. G, p. 72.]The federal defendants were informed by plaintiff Stand Up for California that Susan Johnson was the sole Indian residing at the Rancheria when it was terminated pursuant to the Rancheria Act and her family now holds the beneficial interests in the Rancheria. [AR 0035270-71 (plaintiff Stand Up for California DEIS comment letter discussing purchase, termination, and restoration of Rancheria).] Also in the Public Hearing on the Final Environmental Impact Statement, North Fork Tribe member Leora Beihn informed the BIA that "the North Fork Rancheria, as you probably already know, is owned by individual family members and heirs of Susan Johnson. That is why we are indeed called a landless tribe. . . . That land does not belong to us." [AR 0035597.]

In addition, the administrative record is anything but consistent in referring to the applicant North Fork Tribe. The Tribe is often referred to by all parties as the North Fork Band. According to the federal defendants, the North Fork Rancheria was purchased in 1916 for the "North Fork band of landless Indians." [AR 0038508 (BIA Memo); AR 0035882 (FEIS Response to Comments); AR 0040407 (Concurrence Request).] The Tribe also makes the same claim. [AR 0041034, (Letter to DOI re Two-Part Determination); AR New 0000134, (Tribe's Amended Request).] The administrative record also contains other documents referring to the North Fork Tribe as the North Fork Band. [*See, e.g.*, AR 0035081 (comment letter in support of

casino project); AR 0035734 (comment letter against casino project).] But the North Fork Tribe did not apply for a two part determination as the North Fork Band. Nevertheless, where the purchase of the Rancheria is concerned, the federal defendants and the Tribe gladly refer to the North Fork Tribe as the North Fork Band.

This Court should find that the federal defendants were aware of the North Fork Band Documents at the time of the decision. To find otherwise would sanction the defendants' cherry picking documents in support of the decision while turning a blind eye to relevant documents in their own files adverse to the determination made. *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) ("An incomplete record must be viewed as a 'fictional account of the actual decision making process.'" (internal citation omitted)).

## 2.     The North Fork Band Documents are directly related to the decision

The Secretary determined that the applicant Tribe was a recognized tribe under federal jurisdiction in 1934 based on a single document. *See* Theodore H. Haas, Ten Years of Tribal Government Under the I.R.A. (1947) (the "Haas Report"). The Secretary concluded, "As indicated in the [Haas Report], a majority of the adult Indians residing at the Tribe's Reservation voted to reject the IRA at a special election duly held by the Secretary on June 10, 1935. The calling of a Section 18 election at the Tribe's Reservation conclusively establishes that *the Tribe* was under Federal jurisdiction for Carcieri purposes." [AR 0041198 (emphasis added).]

This Court, however, added an additional fact to the determination and found that the 1916 purchase of the Rancheria for the "North Fork Band of landless Indians" was relevant to the Secretary's determination. [Memorandum Opinion, Docket 42, pp. 23-24 ("[t]his purchase of land is important, and likely dispositive in its own right, regarding whether the North Fork Tribe was 'under Federal jurisdiction' in 1934." [Docket 42, pp. 23-24.] According to the Court, the document showing the purchase of the North Fork Rancheria "establishes that the 1916 acquisition was for members of the North Fork Tribe because the acquisition was for 'landless Indians' of 'the North Fork band.'"  [Docket 42, p. 24.] While plaintiffs respectfully disagree with the Court's conclusion that the purchase of the Rancheria in 1916 is dispositive of

jurisdiction in 1934, to be so, the applicant North Fork Tribe must necessarily have been the "North Fork Band of landless Indians" for which the Rancheria was purchased and also must have been the group of Indians that voted in the Section 18 election.[4]

The presence of another Indian group calling itself the North Fork Band and documenting a similar history as the applicant Tribe, common ancestors with the applicant Tribe, and a claim to the North Fork Rancheria is unquestionably relevant to the question of what group of Indians, if any, was the beneficiary of the 1916 purchase and was still under federal jurisdiction in 1934.

**3.      The North Fork Band Documents are adverse to the agency's decision**

"Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard." *Kansas City, Mo. v. Dep't of Housing & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991). The North Fork Band Documents undermine the conclusions in the IRA ROD by contradicting the evidence in the administrative record supporting the claim that the applicant Tribe was necessarily the North Fork Band of landless Indians and was the group that voted in the 1935 election.

The North Fork Band Documents could, for example, demonstrate that the North Fork Band and not the applicant Tribe was the beneficiary of the 1916 purchase and was under federal jurisdiction in 1934. The Letter of Obvious Deficiencies states, "The amount and types of supporting documentation submitted with the petition indicate that a satisfactory history of the identification of the North Fork Mono as a tribal entity could be presented, if the petition made adequate use of the available sources." [Sherlock Decl. ¶ 12(1), Ex. H, p. 98.] In other words, the same documents regarding the 1851 treaty, common ancestors, and the purchase of the Rancheria that were used by the applicant Tribe could establish that the separate North Fork Band has been a unified and coherent tribal group since at least 1851.

---

[4] Finding jurisdiction over the Tribe in 1916 would merely be part 1 of the two-part *Carcieri* analysis. Under the two-part *Carcieri* analysis, the purchase in 1916 cannot be dispositive because the Secretary must show that any jurisdictional status created in 1916 remained intact in 1934. [AR 0000777.]

Alternatively, and much more likely, the presence of two modern groups with the same history shows that no particular tribal identity existed at the Rancheria in 1934. Such a finding would be consistent with the historical difficulty of identifying specific tribal groups at California Rancherias. For example, when Congress made the decision in the 1950s to terminate the Rancherias, it expressly chose not to include Tribal rolls in the legislation: "The preparation of such rolls would be impracticable because the *groups are not well defined.* Moreover, *the lands were for the most part acquired or set aside by the United States for Indians in California generally*, rather than for a specific group of Indians." H.R. Rep. No. 85-1129 (1957) (emphasis added). This history alone demonstrates that facts relevant to this determination should be in the administrative record and the Secretary should have addressed them in the IRA ROD.

Contrary to the Secretary's conclusory reliance on the Haas Report, the Haas Report fails to resolve this historical difficulty and cannot serve as convenient shortcut. This is demonstrated in the document itself. Also on the Haas Report is the Alexander Valley Rancheria. Haas Report, p. 15. On June 11, 1935, fourteen Indians at Alexander Valley Rancheria unanimously voted to accept the application of the IRA. *Id.*

Under arguments presented in this litigation by the federal defendants and the findings of this Court in denying plaintiffs' motion for preliminary injunction, a modern group of Indians claiming to be the beneficiaries of the Alexander Valley Rancheria's purchase would qualify as a "recognized Indian Tribe . . . under federal jurisdiction in 1934," *see* 25 U.S.C. § 479, based on its appearance in the Haas Report. The federal defendants, for example, have argued that in calling the election at the Rancheria, the Secretary recognized the Indians at the North Fork Rancheria as a tribe. [Docket 30, p. 14.] In addressing whether a tribe must have been recognized in 1934, this Court found "the North Fork Tribe was clearly 'recognized' in the cognitive sense of the word both before and after 1934, as evidenced by the 1916 trust acquisition of the North Fork Rancheria and the [Section 18] IRA election . . . ." [Docket 42, p. 27.]  But none of these statements connects the applicant Tribe to the historical tribe, and the Department of Interior

("DOI") has shown itself quite aware of this disconnect in a dispute with the Indians at the Alexander Valley Rancheria.

In recent litigation between the DOI and the Mishewal Wappo Tribe of the Alexander Valley Rancheria, the DOI rejected the above arguments.  On motion for summary judgment, the Mishewal Wappo Indians argued that "[o]n June 11, 1935, the federal government recognized the Wappo Indians as a tribe, now known as the Mishewal Wappo Tribe of Alexander Valley." [Request for Judicial Notice (filed concurrently herewith) ("RFJN"), Ex. 1, p. 4.] The DOI countered that any tribal identity conferred by the Section 18 election on June 11, 1935, was merely that of "'Indians residing on one reservation.'" [RFJN, Ex. 2, p. 4 (quoting 25 U.S.C. § 479).] According to the DOI, "The Alexander Valley Rancheria existed as a 'tribe' within the meaning of . . . 25 U.S.C. § 479 only to the extent it consisted of Indians living at the Rancheria." [RFJN, EX. 3, p. 2.]  Furthermore, "the Alexander Valley Rancheria was the only entity recognized under the IRA." [RFJN, EX. 3, p. 2 n.5.]

Despite the North Fork Tribe's current federal recognition and the Mishewal Wappo Tribe's lack thereof, the DOI's position in the Alexander Valley case is inconsistent with the federal defendants' position in this case regarding what the Section 18 election shows. Here, the Secretary used the Haas Report to determine the applicant Tribe was unquestionably a tribe under federal jurisdiction in 1934.  Under the view expressed in the Alexander Valley case, the Haas Report can only show that a Rancheria was recognized under the IRA and that the only tribal identity that can be determined is that of "Indians residing at one Reservation" rather than that of a specific "Indian tribe" or "organized band." *See* 25 U.S.C. § 479.

The North Fork Band Documents undermine the Secretary's *Carcieri* determination because they confirm the position of the DOI in the Alexander Valley case – the Section 18 election as evidenced by the Haas Report cannot show that the applicant Tribe, rather than merely a group of Indians residing at a Rancheria, was under federal jurisdiction in 1934. The presence of two unrelated modern Indian groups having the same claims to history suggests that there was no specific tribal identity at the Rancheria between 1916 and 1935. This developed

later. There is no shortcut via the Haas Report for the Secretary or the Tribe. The Secretary must

make a determination of the type required under 25 C.F.R Part 83, not for purposes of gaining

federal acknowledgement, but rather for proving the applicant Tribe was in fact the group of

Indians under federal jurisdiction in 1934.

**B.** **The CDC Master Plan Was Indirectly Before the Agency and Relied on by the Agency**

Under NEPA, an environmental impact statement ("EIS") must include a range of

reasonable alternatives to the proposed project, which include[s] those that are *practical or*

*feasible from the technical and economic standpoint* . . . rather than simply desirable from the

standpoint of the applicant."  CEQ Forty Questions, 46 Fed. Reg. 180206 (March 23, 1981)

(emphasis added). An EIS that fails to include a viable alternative must be found inadequate.

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999); *Surfrider*

*Found. v. Dalton*, 989 F. Supp. 1309, 1326 (S.D. Cal. 1998), *aff'd sub nom.* 196 F.3d 1057 (9th

Cir. 1999) NEPA prohibits agencies from using an EIS simply to "justify[ ] decisions already

made." 40 C.F.R. § 1502.2(g); *see also National Audubon Society v. Department of the Navy*,

422 F.3d 174, 199 (4th Cir. 2005) (stating that where an EIS shows evidence of post hoc

rationalization of a decision already made, the court should find the EIS inadequate under

NEPA.).

The Final Environmental Impact Statement ("FEIS") rejected the Old Mill Site near the

town of North Fork as a reasonable alternative to the Madera Site because of possible

environmental contamination, limited prospects to generate a "sufficient revenue stream," and

the North Fork Community Development Council's ("CDC") statements about refusing to sell

for gaming purposes. [AR 0029908-0029910, FEIS, pp. 2-80 - 2-82.] According to the FEIS, the

CDC, which now owns the site, intends to develop the site in accordance with a master plan

adopted in 1998. [AR 0029908.] The FEIS goes on to list the various uses outlined in the master

plan. [AR 0029908.] Despite specifically referring to the master plan and relying on it in the

FEIS, the federal defendants failed to include the master plan in the administrative record. *See*

*Fund for Animals*, 391 F. Supp. 2d at 196 ("[T]he record must include all documents that the agency 'directly or indirectly considered.'" (quoting *Bar MK ranches*, 994 F.2d at 739 )).

The CDC master plan was not only before the agency and relied on by the agency, but is also adverse to the agency's determination. *See Fund for Animals v. Williams* 391 F. Supp. 2d at 197 ("The agency may not skew the record in its favor by excluding pertinent but unfavorable information."). In determining that the Old Mill need not be considered because the CDC would not sell for gaming purposes, the Secretary relied on letters from the CDC president Steve Christianson regarding casino development being inconsistent with the master plan. The FEIS states, "According to the CDC, the idea of locating a casino at the site was discussed with the community during the preparation of the Master Plan. Apparently, the concept 'gained no public support to speak of (including from the Rancheria), and actually received widespread community disapproval.'" [AR 0029910.]

The CDC's 1998 master plan, however, does not show that such discussions ever occurred. [Daluiso Decl., ¶ 3, Ex. I.] It identifies numerous possible uses that were discussed, but casino gaming is not mentioned. [Daluiso Decl., ¶ 3, Ex. I, pp. 115, 116, 118-123.] Furthermore, the North Fork Tribe is represented on the CDC [AR 0009399] and made clear that it wanted the casino in the valley. [AR 0009402.] Thus, the master plan was not only excluded from the record but is also contrary to the purpose for which the federal defendants appropriated it and was used merely to justify a decision that was already made. Accordingly, it must be added to the administrative record.

### C. The Letters from the California Secretary of State Were Improperly Excluded from the Administrative Record

Under IGRA, "the Secretary is authorized to approve any Tribal-State compact *entered into* between an Indian Tribe and a State . . . 25 U.S.C. § 2710(d)(8)(A) (emphasis added). The Secretary must either approve or disapprove a compact within 45 days of receipt; after the expiration of the 45-day period, the compact is considered approved. 25 U.S.C. § 2710(d)(8)(C). The compact goes into effect under IGRA when the Secretary publishes the approval in the

Federal Register. 25 U.S.C. § 2710(d)(8)(D). "The Secretary may disapprove a compact" if it violates a provision of IGRA. 25 U.S.C. § 2710(d)(8)(B). The D.C. Circuit has interpreted Section 2710(d)(8)(B) as imposing a mandatory duty on the Secretary to affirmatively disapprove a compact that violates IGRA. *Amador County v. Salazar*, 640 F.3d 373, 381 (D.C. Cir. 2011) ("The Secretary *must* disapprove of a compact if it would violate any of the three limitations in [Section 2710(d)(8)(B)]." (emphasis added)).

In their Second Amended Complaint, plaintiffs allege that the Secretary had a duty to affirmatively disapprove the class III gaming compact between the North Fork Tribe and the State of California because under no circumstances would the compact be legally entered into by the state of California within the 45 period. [Docket 84, ¶¶ 98-104.] Under IGRA the compact cannot be approved and given federal effect before it has been legally entered into by the state. *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1555 (10th Cir. 1997) ("[T]he 'entered into' language [of IGRA] imposes an independent requirement that the compact must be validly entered into by a state *before it can go into effect, via Secretarial approval* . . . ." (emphasis added)). In publishing the approval of the compact in the Federal Register, 78 Fed. Reg. 62649 (October 22, 2013), the Secretary took affirmative action to give the compact effect before it had been legally entered into. Therefore, this action clearly violated IGRA.

On July 16, 2013, California Secretary of State Debra Bowen ("Bowen") forwarded the compact between the State of California and the North Fork Tribe to Paula Hart, Director of Indian Gaming, United States Department of Interior ("DOI"). [Schmit Decl. ¶ 5, Ex. J.] In the letter accompanying the compact, Bowen informed the DOI that because the compact was approved by statute, under California law the statute approving the compact would not take effect until January 1, 2014, if at all. [Schmit Decl. ¶ 5, Ex. J, p. 138.] Bowen further informed the DOI that under California law, electors may challenge a statute by referendum, and if a referendum petition qualifies for the ballot, the statute will not go into effect until the day following the election, if at all. [Schmit Decl. ¶ 5, Ex. J, p. 138-139.] Finally, Bowen informed the DOI that a referendum measure was underway to challenge the California Legislature's

approval of the compact. [Schmit Decl. ¶ 5, Ex. J, p. 139.] Again in a letter dated August 9, 2013, Bowen informed the DOI about the referendum measure. [Schmit Decl. ¶ 6, Ex. K, p. 140.] On November 20, 2013, Bowen informed the DOI that a referendum had qualified for the November 4, 2014, California General Election and stated that the "statutes implementing the compacts are stayed until the voters act to adopt or reject the compacts in November 2014." [Schmit Decl. ¶ 7, Ex. L, p. 142.]

There can be no question that the defendants knew of the July 16 and August 9 letters at the time the decision was made to let the compact be considered approved by inaction on October 22, 2013. *See* 78 Fed. Reg. 62649 (October 22, 2013). The letters are also clearly adverse to the Secretary's decision to allow the 45 day window to expire. Because the compact was not yet entered into by the State of California, and the Secretary was aware of this fact, the Secretary's publication of approval in the Federal Register was in violation of IGRA.

In rejecting plaintiffs' request to add these letters to the record, the federal defendants claim that the documents post-date the final decision in this case and cannot be in the record for that reason. [Sherlock Decl., ¶ 9, Ex. C, p. 9.] That is not correct. When the federal defendants successfully moved to remand this matter to revisit their Clean Air Act compliance, there was no longer a final decision. The federal defendants reopened the administrative record to add documents created during the remand. The letters from the California Secretary of State were clearly received before a new decision was made in the case and a revised administrative record was certified by federal defendants in May of this year. The APA does not permit the federal defendants to reopen the record to add documents that support the decision, but exclude timely received documents that undermine the decision.

## II.   **THE FEDERAL DEFENDANTS MUST PRODUCE A PRIVILEGE INDEX**

This Circuit "'requires a formal claim of privilege by the head of the department with control over the information' and 'must include a description of the documents involved, a statement by the department head that she has reviewed the documents involved, and an assessment of the consequences of disclosure of the information.'" *Earthworks v. U.S. Dept. of*

*the Interior*, 279 F.R.D. 180, 193 (D.D.C. 2012).  "[T]he line of decisions in this Circuit concerning the privilege evince a 'strong theme' that 'an agency will not be permitted to develop a body of secret law, used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege . . . .'" *Citizens for Responsibility and Ethics in Washington v. National Archives and Records Admin*., 715 F. Supp. 2d 134, 140 (D.D.C. 2010). The Department of Interior's "Standardized Guidance on Compiling a Decision File and an Administrative Record" specifically requires that "a separate privilege index [] be generated if the agency is withholding any protected or privileged information." [*See* Sherlock Decl., ¶ 10, Ex. D, p. 24.]

The federal defendants' position is unclear and evasive regarding whether documents that are part of the administrative record were withheld. In certifying the April 26, 2013, administrative record, Nancy Pierskalla stated, "Privileged and confidential information has been redacted or withheld from the documents and materials comprising the administrative record in this matter." [Docket 51-1, ¶ 3.] In response to plaintiffs' previous motion to compel production of a privilege index [Docket 58], the federal defendants seemed to have agreed to provide such an index. "Federal Defendants have reconsidered their position and within 30 days will produce a privilege log for documents contained in the administrative record." [Docket 69, p. 2.] After this promise, plaintiffs received a list of documents in the administrative record that contained redactions and the reasons for the redactions. [Sherlock Decl., ¶ 5, Ex. A.] But plaintiffs have yet to receive a log of documents that were withheld from production of the administrative record.

If, in fact, documents comprising the administrative have been withheld, the federal defendants must provide a privilege index.  But whether documents have or have not been withheld is unclear. From an administrative record of well over 40,000 pages, developed over nearly ten years, the federal defendants appear to represent to plaintiffs and this Court that no documents that are part of this massive record were withheld. The federal defendants have not, however, unequivocally stated that no documents that are part of the administrative record were withheld. Paula Hart's certification of the revised administrative record dated May 5, 2014, states

that "confidential statements protected under the attorney-client privilege and non-record material, including discussions of other tribes, will continue to be redacted." [Docket 83-1, ¶5.] Unlike the April 26, 2013, certification, the May 5, 2014, certification does not indicate that documents have been withheld.

Plaintiffs are concerned that the federal defendants are shielding documents from plaintiffs and this Court without accountability by asserting that unidentified documents need not be listed if they claim that they are not a part of the record. See *Earthworks v. U.S. Dept. of the Interior,* 279 F.R.D. 180, 193 (D.D.C. 2012), 279 F.R.D. at 193 (ordering defendants to submit the documents to the court for in-camera review along with a proper declaration from the head of the agency and an index that provides the titles of the individuals identified in the privilege log). Therefore, this Court should require the federal defendants to produce an index of all documents that are being withheld from the agency's decision file.

In their June 3 letter declining to produce a complete privilege log, the federal defendants claim that plaintiffs asked for a privilege log for documents that are not part of the record, and then seek to divert the Court by citation to authority that certain deliberative process documents should not be included in the administrative record. [Sherlock Decl. ¶ 9, Ex. C, p. 10.] Plaintiffs asked whether any whole documents were withheld in light of the fact that a log lists myriad redactions of claimed privileged material. Federal defendants refuse to answer that question. Plaintiffs' position is quite simple: If documents have been withheld, federal defendants must say so and produce a log identifying the reasons for withholding. The fact that some deliberative materials may not be deemed part of the record does not excuse federal defendants from their obligation to acknowledge to plaintiffs and the Court whether decisional documents have been withheld and the ground for their withholding.

//

//

//

//

**<u>CONCLUSION</u>**

For the foregoing reasons, plaintiffs respectfully request that the Court grant this motion and order the federal defendants to supplement the administrative record with the omitted documents. Plaintiffs also request this Court to order the federal defendants to produce the required privilege index.

Dated: June 4, 2014

By: */s/ Sean M. Sherlock*
    */s/ Benjamin S. Sharp*

Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C.  20005-3960
Telephone:   202.654.6200
Facsimile:    202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone:  602.382.6366
Facsimile:  602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com

***Attorneys for Plaintiffs Stand Up For
California!, Randall Brannon, Madera
Ministerial Association, Susan Stjerne,
First Assembly of God–Madera, and
Dennis Sylvester***

## CERTIFICATE OF SERVICE

I certify that on June 4, 2014, the foregoing **Motion to Supplement Administrative Record and Compel Production of a Privilege Index** was filed electronically through the Court's ECF system, which distributes an electronic copy to all counsel of record.

Dated:  June 4, 2014                          By:  */s/ Sean M. Sherlock*

Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C.  20005-3960
Telephone:   202.654.6200
Facsimile:    202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
SNELL & WILMER, LLP
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone:  602.382.6366
Facsimile:  602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com

*Attorneys for Plaintiffs Stand Up For California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God – Madera, and Dennis Sylvester*