**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STAND UP FOR CALIFORNIA!, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>            Defendants. | Civil Action No. 1:12-cv-02039-BAH<br><br>  Consolidated with:<br>  Civil Action No. 1:12-cv-02071-BAH<br><br>Honorable Beryl A. Howell |
| PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS,<br><br>            Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>            Defendants. | |

**<u>REPLY MEMORANDUM IN SUPPORT OF MOTION TO SUPPLEMENT
ADMINISTRATIVE RECORD AND COMPEL PRODUCTION OF A PRIVILEGE
INDEX</u>**

The Court should grant plaintiffs' motion to supplement the administrative record with the North Fork Band Documents and the letters from the California Secretary of State.[1] All of these documents are relevant and adverse to the challenged decisions. Moreover, all of the documents are within the Department's own files. An agency cannot refuse to look within its own file cabinet when it knows that it contains documents relevant to its decision.

---

[1] The federal defendants have agreed to supplement the record with the CDC master plan. [Docket 89, p. 2 fn. 1.] Plaintiffs, therefore, respectfully ask the Court to set a date by which time the federal defendants must add this document, and any other documents the Court determines should be added, to the record.

In its memorandum opinion, this Court determined that the purchase of the North Fork Rancheria for the North Fork Band of landless Indians is relevant to resolving whether the North Fork Rancheria of Mono Indians ("North Fork Tribe" or "applicant Tribe") was under federal jurisdiction in 1934. The disputed documents address whether the applicant Tribe is the same group of Indians that resided at the North Fork Rancheria and voted under the Indian Reorganization Act ("IRA") in 1935 and the same Indians on whose behalf land was purchased in 1916. The federal defendants conclude, without explanation, that the applicant Tribe descends from the Indians at the North Fork Rancheria who voted in 1935, but the federal defendants also know that a group of Indians identified as the North Fork Band of Mono Indians ("North Fork Band") claims to descend from the North Fork Rancheria. The North Fork Band Documents undermine the conclusion that the applicant Tribe qualifies for trust land.

Similarly, the federal defendants concede that the letters from the California Secretary of State are relevant to the approval of the tribal-state gaming compact. These letters demonstrate that contrary to the Indian Gaming Regulatory Act's ("IGRA") requirements, the compact was approved before the State of California had legally entered into the compact.

Both the federal defendants' and the Tribe's bulwark against supplementation is their argument that none of the documents were before the decision makers at the time the decisions were made. They make the same arguments they made in opposition to plaintiffs' first motion to supplement the record, which the Court denied without prejudice in light of granting the remand and staying this litigation. But the procedural posture of this motion is different.

When the federal defendants successfully moved this Court for remand and stayed the litigation, the trust decision became not final, and the record was reopened for further action on remand. Therefore, all of the documents plaintiffs request in this motion were presented to the agency before a new final decision was made. In fact, in May 2014, the federal defendants added four categories of documents to the administrative record, including documents created long after the November 2012 trust decision challenged. The federal defendants cannot have it both ways. If the November 2012 decision is final, it must be adjudged on the record at that time,

including the Secretary's failure to comply with the Clean Air Act ("CAA"). Or, if the November 2012 decision was rendered not final by the Secretary's request for a remand to fix her trust decision, November 2012 is not the critical date.

Although the Court granted the federal defendants' motion to remand without vacatur, it is the Secretary's action on remand that generates the new final decision. The final agency action plaintiffs challenge is the trust acquisition for the Tribe for gaming. That action is based on a number of subsumed decisions, including compliance with NEPA, IGRA, and the CAA. None of these agency decisions are final or subject to APA challenge independently of the trust acquisition. The trust decision cannot stand without complying with the CAA, and the Secretary's CAA decision is not a final agency action that can be challenged apart from the trust acquisition.

The federal defendants have used the remand, where it has suited them, to not only correct their mistakes, but also to add documents favorable to decisions that had already been made. At the same time, the federal defendants have rejected the addition of documents in their own files that plaintiffs brought to their attention a year before the post- remand decision and the certification of the revised administrative record. It cannot be that an agency is allowed a remand to correct its mistakes without disturbing the decisions and in the process add support after-the-fact to those same decisions. An agency cannot skew the administrative record to exclude adverse documents. Accordingly, plaintiffs respectfully request this Court to grant their motion to supplement the administrative record.

Plaintiffs also request that the Court require the federal defendants to produce a privilege index identifying any documents withheld from the decision file. The federal defendants misstate the issue by claiming that they need not prepare a privilege log for deliberative documents. Plaintiffs do not argue that the federal defendants must include deliberative materials or documents not in the record in the privilege log; plaintiffs instead ask whether any whole documents were withheld from the record, and if so, what the basis of withholding is. The federal defendants redacted privileged information from 113 documents they produced as part of

the administrative record, but refuse to state whether any whole document has been withheld. The Secretary cannot unilaterally avoid the privilege log requirement by refusing to state whether any privileged documents have been withheld or by claiming wholesale that everything not produced is not part of the administrative record. Unless the federal defendants categorically represent to the Court that no documents were withheld from the record, they should be compelled to produce a privilege log.

## I.     SUPPLEMENTATION OF THESE ADVERSE DOCUMENTS IS APPROPRIATE AND NECESSARY FOR ADEQUATE JUDICIAL REVIEW[2]

Supplementation of the administrative record is proper in this circuit in at least three different circumstances: "(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review." *American Wild Horse Preservation Campaign v. Salazar*, 859 F. Supp. 2d 33, 42 (D.D.C. 2012) (quoting *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010)). Each of these circumstances is present here.

### A.     The North Fork Band Documents Are Adverse to the Agency's Determination and Were Improperly Excluded from the Administrative Record

#### 1.     The North Fork Band Documents were known to the agency at the time it made its decision

The federal defendants' argument that the North Fork Band Documents were not considered should be rejected. While the general rule states that the administrative record consists of documents considered by the agency, supplementation is appropriate where parties "'demonstrate unusual circumstances justifying departure from this general rule.'" *American Wild Horse*, 859 F. Supp. 2d at 42 (quoting *City of Dania Beach*, 628 F.3d at 590). In *American*

---

[2] For the Court's convenience, relevant materials from the administrative record are attached to this submission.

*Wild Horse*, this Court rejected the argument that the documents plaintiffs sought should not be part of the record because they were not considered by the agency in making its decision. *Id.* (finding that because the documents "were already known to the BLM, were directly related to and adverse to the decision, [they] *should have been considered as part of the AR*" (emphasis added)); *see also Fund for Animals v. Williams* (D.D.C. 2005) 391 F. Supp. 2d 191, 199 ("[T]he defendants cannot justify the exclusion of these highly relevant, adverse documents from the administrative record simply by claiming that the documents were not 'directly or indirectly considered' by the agency."). Based on all the factors in *American Wild Horse*, this Court found that  "[i]t thus seems highly unlikely that the Nevada State Director of the BLM, who requested that gelding be included in gather plans in Nevada, was not aware of the Expert Declarations that offered a strong critique of the practice of gelding." *Id.* at 44.

The federal defendants' contention that they were not aware of the North Fork Band Documents at the time of the decision is equally unlikely.

> a.      Plaintiffs informed the agency in a timely manner of the existence of the North Fork Band Documents

Both the federal defendants and the applicant Tribe attempt to distinguish this Court's ruling in *American Wild Horse* from this litigation by arguing that plaintiffs did not refer to the North Fork Band Documents in any comment and the documents "were not brought to the agency's decision at any point in the decisionmaking process." [Docket 88, p. 6; Docket 89, p. 14 ("The Court allowed supplementation because the plaintiffs 'specifically directed the agency to [reports] in their timely filed comments . . .'" (quoting *American Wild Horse*, 859 F. Supp. 2d at 45).] This Court, however, should find that plaintiffs did refer to the North Fork Band Documents in a timely manner.

Though plaintiffs filed their original complaint on December 19, 2012 [Docket 1], it took the federal defendants until April 26, 2013, to lodge and certify the administrative record. Plaintiffs first informed the federal defendants of the North Fork Band Documents and of the fact

that these documents were in BIA files on May 16, 2013 [Docket 58-1], less than a month after plaintiffs had their first look at the administrative record and a year before the post-remand decision was certified on May 5, 2014. On July 10, 2013, plaintiffs filed a motion to compel supplementation of the record with these documents. [Docket 58.] After plaintiffs informed the federal defendants of the existence of these relevant and adverse documents, which were in the federal defendants' own files, the federal defendants successfully moved for remand and a stay of this litigation to correct errors under the Clean Air Act [Docket 77 (granted December 16, 2013).] On the same day that the Court granted the federal defendants' motion, the Court denied plaintiffs' motion to supplement the administrative record, without prejudice "in light of the Court's" granting of the federal defendants' motion for remand. Minute Order of December 16, 2013.

The federal defendants' motion for remand asked for the opportunity to complete the trust decision, effectively conceding that the 2012 decision was not the final decision to be adjudged by the Court. *See* 5 U.S.C. § 704 (stating that the court may only review a "final agency action"). The fact that the Court remanded without vacating the 2012 decision does not affirm its finality, for if it did, the Secretary's CAA compliance, which post-dates 2012, could not be considered in this APA challenge. Having granted the federal defendants' request for remand to comply with the CAA, the decision was necessarily no longer final and the record no longer closed. The Secretary had the discretion on remand to deny the trust decision if the CAA or some other issue required it, just as the record was reopened to include documents submitted during remand, including but necessarily not limited to those on which the federal defendants now rely.

The revised administrative record did not simply add documents created in connection with the CAA, but also added documents predating the remand. Among these earlier documents, for example, is the Tribe's Amended and Restated Request for a Secretarial Two-Part Determination and accompanying exhibits seeking to establish the Tribe's connection to the Rancheria [AR NEW 0000125, 0000191.] In refusing to supplement the record with the North

Fork Band Documents, the federal defendants take the position that they are free to add documents favorable to their decision, but may exclude documents adverse to it. *See Fund for Animals v. Williams*, 391 F. Supp. 2d at 197 (stating that the agency "may not skew the record in its favor by excluding pertinent but unfavorable information").

The federal defendants' narrow view of the remand as related only to issuing the missing notices under the CAA is further weakened by the documents added pursuant to the CAA decision. For instance, the federally recognized Table Mountain Tribe did not receive the required notice under the CAA and was deprived of the opportunity to comment on the draft conformity determination. [Docket 71, p. 8] After receiving notice during the remand, Table Mountain provided extensive comments on the draft conformity determination and argued that the federal defendants must issue a new conformity determination based on updated standards. [AR NEW 0001573-0001585.]

Apart from Table Mountain's comments being added to the record, a response to those comments explaining why a new conformity determination was not required was also added to the record. [AR NEW 0001945-0001955.] By adding documents created in 2014 to justify a decision made in 2012, the federal defendants have acted, when it suited them, as though the administrative record was reopened and there was no final decision during the remand. Plaintiffs, thus, reject the federal defendants' characterization of the remand as merely allowing them to correct their own error and proceed with litigating the merits as though their error never occurred. The federal defendants have added documents in support of a 2012 decision related to the fee-to-trust transfer but have excluded documents adverse to that transfer.

For all practical purposes, this case is very similar to *Butte County, California v. Hogan*, 613 F.3d 190 (D.C. Cir. 2010), where the Court found the National Indian Gaming Commission violated the APA by ignoring documents submitted by Butte County that undermined the Commission's 2003 opinion that the land at issue qualified under the restored lands exception of IGRA. *Id.* at 193.  In 2006, Butte County submitted documents that challenged the opinion, and the final agency decision was not made until 2008. *Id.* The primary difference between *Butte*

*County* and this case is that Butte County created the documents and presented them to the agency two years before final decision (but three years after the issue was considered by the Solicitor); here, the documents were in the agency's files the entire time, some were created by the agency (not plaintiffs), and all were presented by plaintiffs to the Secretary at least one year before the new "final" decision.

Plaintiffs informed the federal defendants of the existence of the North Fork Band Documents at their earliest opportunity, and the federal defendants knew that any renewed motion to supplement the record would contain a request that this Court order the record supplemented with these documents. Therefore, if this Court finds that these documents are relevant and adverse, it should not allow the agency, which was given nearly five months to correct its own errors, to claim it was unaware of these documents.

        b.      Plaintiffs have put forth credible, non-speculative evidence that the North Fork Band Documents were known to the agency at the time of the decision

Even without considering the impact of the remand, the Court should find that the federal defendants knew of the North Fork Band Documents at the time the decision to take the Madera Site into trust was made.

In addition to informing the federal defendants of the North Fork Band Documents in a timely manner, plaintiffs have presented credible, non-speculative evidence that the federal defendants remained studiously ignorant. For reasons discussed at length in plaintiffs' motion, it seems highly unlikely that the BIA and the Secretary, experts in distinguishing among Indian groups [Docket 89, p. 9], were not aware of documents in their own files directly bearing on the issue of whether the applicant Tribe is in fact the North Fork Band of landless Indians for which the Rancheria was purchased and whether the applicant Tribe was in fact under federal jurisdiction in 1934.[3]

---

[3] The federal defendants misunderstand both Section 19 of the IRA and *Carcieri v. Salazar* in claiming that "case law provides no support for Stand Up's position that a petitioner 'must demonstrate that it, and not some other group, was under federal jurisdiction in 1934.'" [Docket, p. 7.] *Carcieri* makes clear that

A draft version of the IRA ROD in the administrative record states, "[T]he *historical evidence* and *contemporaneous federal records* unambiguously demonstrate that the Tribe is a recognized tribe which was under federal jurisdiction when the [IRA] was enacted in 1934." [AR 0000779.] It is unclear what contemporaneous federal records are referred to because the decision in the final IRA ROD was based solely on the Haas Report. [AR 0000779.] Nevertheless, the North Fork Band Documents contain precisely the type of "historical evidence" and "contemporaneous federal records" that the Secretary claims to have considered.

As plaintiffs have already shown, there are numerous references in the administrative record to the Mono Indians' relationship with the federal government, the Rancheria's purchase for the North Fork Band of landless Indians, and the subsequent termination of the Rancheria. [Docket 85, pp. 8-11.] The North Fork Band Documents rely on those same facts but in reference to a different group of Indians. [Docket 85, pp. 9-10] Yet the federal defendants now protest that it is enough to simply assert they did not actually consider these documents contained in their own files when they determined that the Tribe was "unambiguously" under federal jurisdiction based on documents and records relating to the North Fork Band, Mono Indians, and the North Fork Rancheria. *See Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978) ("The agency may not . . . skew the record for review in its favor by excluding from that record information in its own files which has great pertinence to the proceeding in question" (internal quotations omitted)).

---

federal recognition of an Indian tribe does not mean that the applicant Tribe was under federal jurisdiction in 1934. The Narragansett Tribe became a federally recognized Indian tribe in 1983. *Carcieri v. Salazar*, 555 U.S. 379, 384 (2009). Nevertheless, the Tribe did not make the required showing that it was under federal jurisdiction in 1934. *Id.* at 395. Recent recognition is not part of the analysis on the jurisdiction issue. The Secretary is limited "to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934." *Id.* at 382. The North Fork Tribe claims to be members of a tribe under jurisdiction in 1934 based on the purchase of the Rancheria and the 1935 vote. For such a claim to be valid, it must be to the exclusion of any other group claiming ties to the Rancheria's purchase or the vote. Quite simply, the applicant Tribe must show that it is the same Tribe that was under jurisdiction in 1934. Absent such a showing, the Secretary cannot satisfy *Carcieri*'s mandate.

Finally, the federal defendants' assertion that the documents were not considered must be viewed with skepticism in light the agency's expertise. The federal defendants state that the agency "employs experts in the fields of history, anthropology and genealogy, to aid in determining tribal recognition." [Docket 89, p. 9 (quoting *James v. U.S. Dep't of Health and Human Services*, 824 F.2d 1132, 1138).] Consequently, "The Secretary can recognize the differences between two different groups." [*Id.* at p. 9.] This claim suggests that the decision makers knew or should have known of the North Fork Band Documents in determining the difference between the North Fork Band and the applicant Tribe,[4] or the differentiation that should have been made during the administrative process is being made by litigation counsel, after the fact, in opposition to plaintiffs' motion.

The federal defendants' position is contradictory. On the one hand, they expect the Court to defer to their expertise and uphold the presumption of regularity. On the other hand, they do not want to provide the Court with the facts to which this expertise was applied so that the Court can review their decision. *See James*, 824 F.2d at 1138 (stating that deference to the agency is appropriate to "provid[e] it with the opportunity to apply its expertise and create a "factual record . . . at the administrative level that would most assuredly aid in judicial review . . ."). The federal defendants are asking this Court to explain in litigation the justification that the Secretary failed to address in the IRA ROD.  Rather, the Court should find that the federal defendants

---

[4] The letter of intent to seek federal acknowledgement for the North Fork Band was sent to the BIA in 1983, the same year of the *Hardwick* stipulation, which resulted in the applicant Tribe's federally recognized status. Given the emphasis in this litigation on the Tribe's recognized status, which was purportedly terminated by the Rancheria Act and restored in the *Hardwick* case, it is difficult to imagine that such experts did not consider information in the North Fork Band Documents to distinguish between groups claiming ties to the Rancheria. Disputes regarding tribal identity in connection with a piece of land and disputes among different Indian groups claiming ties to the same Rancheria have not been uncommon, especially where the development of a casino is at issue. *See, e.g., Butte County v. Hogen*, 613 F.3d at 193 (discussing County's argument that the applicant tribe was not the same tribe as the historic tribe that allegedly occupied the gaming site); *Williams v. Gover*, 490 F.3d 785, 787 (9th Cir. 2007) (dispute over whether original group of Indians residing at the Rancheria was part of the federally recognized tribe at the Rancheria following *Tillie Hardwick*); *Pitt River Home and Agr. Co-op Ass'n v. U.S.*, 30 F.3d 1088 (9th Cir. 1994) (discussing a dispute over which Indian group was the rightful beneficial owner of land taken into trust in 1940).

knew of or should have known of these documents, and consequently, the documents must be included in the administrative record.

### 2.      The North Fork Band Documents are related to the decision

The North Fork Band documents are relevant to the tribal identity, if any, of the North Fork Band of landless Indians, for which the Rancheria was purchased, and the tribal identity, if any, of the Indians at the Rancheria that voted to reject the application of the IRA to the Rancheria in 1935. Plaintiffs do not claim that the North Fork Band is actually, or should be, a federally recognized tribe. Plaintiffs do not dispute or seek to alter the federally recognized status of the applicant North Fork Tribe. Plaintiffs do, however, reject both the federal defendants' and the Tribe's claim that the applicant Tribe was a recognized Indian tribe under federal jurisdiction in 1934.

According to the federal defendants, the North Fork Band Documents cannot be relevant because, "The *Tillie Hardwick* litigation conclusively establishes that the North Fork Rancheria was under federal jurisdiction in 1934." [Docket 89, p. 7.] The Tribe states, "It is beyond reasonable dispute that the North Fork Tribe that is participating in this litigation is the Tribe whose recognition was restored by [*Tillie Hardwick*] and which is now legally recognized by the United States." [Docket 88, p. 8.] Again, plaintiffs do not dispute that the Rancheria was under federal jurisdiction in 1934, nor do plaintiffs dispute that the Tribe is now legally recognized by the United States. Plaintiffs dispute the implication that the Tribe's restoration means that it is a recognized tribe under jurisdiction in 1934. Such an argument is neither legally nor factually accurate.

In making the decision to take the Madera Site into trust, the Secretary was required to determine that Tribe satisfied the first definition of "Indian" in Section 19 of the IRA. Under *Carcieri*, this requires determining that the applicant Tribe was a recognized tribe under federal jurisdiction in 1934. *Carcieri*, 555 U.S. at 382. Restoration of the Tribe's federal recognition, however, focuses on a different time period – the period surrounding termination under

California Rancheria Act ("CRA") and the restoration of "Indian" status following *Tillie Hardwick*. Not only are two separate time periods involved, but the Indians connected to each event might be made up of entirely different and unrelated groups.

As plaintiffs have already discussed, the CRA terminated "Indian" status rather than tribal status because the tribal make-up of Indians at Rancherias could not be determined. [Docket 85, p. 13.] The Department of the Interior ("DOI") took this same position in the Alexander Valley case and rejected the Mishewal Wappo Tribe's argument that the BIA violated its obligation to the tribe by failing to get the tribe's approval to terminate the Rancheria. "[T]ermination under the CRA did not depend upon establishing a tribal membership roll. . . . [T]ermination did not require consent of tribal members, as opposed to the approval of a majority of distributees" – the individual Indians residing at the Rancheria [RFJN, Ex. 2, p. 10.].

Under the CRA, the Indian status of the individual Indians residing at Rancherias was terminated, and the Rancheria property was distributed in fee to individuals, without regard for their tribal identity or for whatever group the Rancheria was originally purchased. *See Williams v. Gover*, 490 F.3d 785, 787 (9th Cir. 2007). The *Tillie Hardwick* litigation restored the Rancheria and the distributees "to the same status they possessed prior to the distribution of the assets of these Rancherias under the California Rancheria Act . . . ." [AR 0001065.]

The subsequent restoration of "tribal recognition" built upon the restoration of the status of the individuals residing at the Rancheria – the distributees. As pointed out by the DOI in the Alexander Valley case, restoration was really an independent recognition event that looked to the distributees under the CRA rather than back to any tribal identity that existed prior to the CRA. [RFJN, Ex. 2, p. 4 fn. 8 (stating that "such restoration [of a tribe] would need to *begin* with the descendants of those individuals whose Indian status was terminated under the CRA, not any larger group"). The DOI further pointed out, "by 1951 only one family and one non-Indian squatter lived on the Rancheria, and by the time of termination, there were only two adults who could receive Rancheria property. That evidence does not prove federal recognition of a tribal

entity apart from those individuals who resided on the Alexander Valley Rancheria." [RFJN, Ex. 2, p. 5.]

The restored tribe need not be the original group at the Rancheria that voted in 1935 or for which the Rancheria was purchased. These issues are independent of each other. This was the issue in *Williams*. In *Williams*, members of a group claiming to be the original Mooretown Rancheria tribe, for which the land was purchased and who voted in 1935, sued the BIA for its alleged role in depriving this group of membership status in the federally recognized Mooretown Rancheria tribe. The district court dismissed the case, and the Ninth Circuit affirmed. The dispositive principle in the case was the authority of an Indian tribe to define its own membership as it chose. *Williams*, 490 F.3d at 789.

Plaintiffs in *Williams* "claimed that they are descended from people who were named as members of the Mooretown Rancheria Indian tribe in either a 1915 census or a 1935 tribal voter list. *Id.* at 787. At the time of the CRA, however, two families that were not part of this original band were living on the Rancheria and voted for its termination. *Id.* at 788. In 1979, the Mooretown Rancheria became a plaintiff in the *Hardwick* case, and like the North Fork Rancheria, the Mooretown Rancheria was subsequently restored as part of the *Tillie Hardwick* stipulation. In 1987, the Mooretown Rancheria decided to form a tribal government, which "consisted of the four people to whom Mooretown Rancheria was distributed upon termination in 1959, their dependents, and lineal descendants of those distributees and their dependents." *Id.* at 788. This decision "locked out" the plaintiffs from tribal membership. *Id.* "[A]lthough plaintiffs are descended from people who have lived at Mooretown Rancheria for a very long time, they lack the rights of full members of the Mooretown Rancheria tribe." *Id.*

The nature of the "restoration" under *Tillie Hardwick* shows that there is no inevitable connection between a tribe restored and federally recognized as a result of *Tillie Hardwick* and the group of Indians that voted on the IRA in 1935 or for whom a Rancheria was originally purchased. The former and the latter need not be related at all.

Because the applicant North Fork Tribe's restoration does not speak to the time period at issue under *Carcieri*, the restoration does not make the North Fork Band Documents irrelevant as both the federal defendants and the Tribe contend. With that confusion stripped away, it is difficult to imagine how documents relating to a group separate from the applicant Tribe but claiming a connection to the Rancheria's purchase and termination are not relevant to determining whether the applicant Tribe – not some other group – is a recognized tribe under federal jurisdiction in 1934.

### 3.     The North Fork Band Documents are adverse to the determination

The determination at issue in this case was based on a single document, the Haas Report, which simply shows that four Indians at the Rancheria voted to reject the application of the IRA at the Rancheria. But as plaintiffs discussed, the Haas Report cannot carry this weight or serve as a convenient shortcut for making the required *Carcieri* determination. The connection between a tribe restored to federal recognition and the group of Indians that voted on the IRA in 1935 is not inevitable. *See Carcieri*, 555 U.S. 379; *Williams*, 490 F.3d 785. The history of Rancherias in California – from their purchase for landless Indians to their termination and restoration – shows that a currently recognized tribe is not necessarily comprised of "members of any recognized tribe under federal jurisdiction" in 1934. 25 U.S.C. § 479. Because the North Fork Band Documents show that the reliance on the Haas Report alone was unreasonable, they are adverse to the Secretary's determination.

Both the federal defendants' and the Tribes' response is to mischaracterize the DOI's position in the Alexander Valley case. In that case, the DOI argued that the only entity recognized by the 1935 election was the Rancheria. [RFJN, Ex. 3, p. 2 n. 5] To the extent that a tribe may have been recognized at the Rancheria, it was merely a group of adult Indians residing at the Rancheria, rather than any specific tribal group. [RFJN, EX. 3, p. 2.] No larger tribal group was recognized. [RFJN, Ex. 2, p. 4.] There is, therefore, no way to conclude that, because four Indians voted at the North Fork Rancheria in 1935, the applicant North Fork Rancheria of Mono

Indians, recognized in 1983 and organized in 1996, is a recognized tribe under federal jurisdiction in 1934. *See Carcieri*, 555 U.S. at 395 (stating that federal recognition of the Narragansett Tribe in 1983 was distinct and separate from whether the Tribe was under federal jurisdiction in 1934).

According to the federal defendants, "Stand Up makes a flawed argument that conflates a Rancheria with a potentially larger group of Indians." [Docket 89, p. 10] This, however, is exactly what the federal defendants are doing. They conflate the federally recognized North Fork Rancheria of Mono Indians, recognized in 1983, with the Indians residing at the North Fork Rancheria in 1935. Just as the Mishewal Wappo Tribe was not recognized as the result of the vote of the residents of the Alexander Valley Rancheria, the applicant North Fork Tribe could not have been so recognized. Unable to establish recognition in 1934, it is impossible to conclude that the applicant Tribe was a recognized tribe under federal jurisdiction in 1934 solely on the basis of the 1935 election.

The mere presence of a group on the Haas Report is insufficient to make the required determination. The North Fork Band Documents raise a significant question that a group of Indians other than the applicant Tribe was the group voting at the Rancheria in 1935.[5] More likely, the North Fork Band Documents show that there was no specific tribe under federal jurisdiction in 1934; there was a group of Indians residing at the North Fork Rancheria and no distinct tribe existed at that time.

---

[5] The Tribe's claim that the administrative record contains evidence that the Rancheria's purchase was for the North Fork Tribe [Docket 88, p. 7-8] further illustrates plaintiffs' point. The Tribe, for example, provided the federal defendants with excerpts from documents to show the 1916 "purchase of the North Fork Rancheria was on behalf of 200+ *North Fork Mono*." [AR 0041113 (emphasis added).] The North Fork Band also claims to be Mono, so even if there was such evidence – a contention that plaintiffs do not accept – it does not distinguish between groups of North Fork Mono or establish that such a group was in fact a tribe.

**B.** **The Three Letters from the California Secretary of State Should Be Added to the Administrative Record**

The federal defendants concede that the requested letters are relevant to plaintiffs' new claim alleging the Secretary violated IGRA by publishing the approval of the tribal-state compact in the Federal Register. [Docket 89, p. 17]. Both the federal defendants and the Tribe, however, contend that plaintiffs' new claim is somehow an "unrelated claim that should not be used to slow down briefing on the land-into-trust dispute."[6] [Docket, 89 p. 17; Docket 88, p. 17.]

Production of documents relevant to the Secretary's decision to publish the approval will not "slow down" the briefing in this case. The record is far from voluminous, consisting of maybe a few hundred pages, most of which consist of the compact itself. Nor could the record be complex. There is no record of decision, and because there was no public comment period, very few letters, other than those plaintiffs asked to be included in the record, are likely to exist. The federal defendants cannot reasonably claim that production of these few hundred pages will delay these proceedings. Given that summary-judgment briefing has not begun, any delay would be of the federal defendants' own making. The letters plaintiffs asked to be added are properly part of the administrative record supporting the Secretary's decision to allow the compact to go into effect, and they must be produced.

The federal defendants now argue that they need not "supplement" the record with these documents because the compact claim has a separate record. That argument ignores the basic problem plaintiffs are trying to address – i.e., plaintiffs have filed an APA claim that requires the production of documents by the federal defendants, regardless of how the federal defendants want to characterize those documents. If plaintiffs considered these documents as part of the whole record needed to resolve their claims before the Court, rather than as a separate record as is now argued, it is only because federal defendants refused to clarify their position during the

---

[6] The federal defendants have not challenged plaintiffs' compact claim as an improper joinder of claims under Rule 18 of the Federal Rules of Civil Procedure.

"meet and confer." Indeed, the federal defendants still have not answered whether and when they intend to fulfill their legal obligation to produce documents relevant to the compact claim.

The arguments the federal defendants make ignore the practical problem plaintiffs are trying to address. For example, federal defendants cite to *Amador County v. Salazar* to argue that the Court not address plaintiffs' compact claim. [Docket 89, p. 17.] In *Amador County*, the D.C. Circuit held that that the Secretary's decision to allow a compact to be considered approved through inaction under 25 U.S.C. § 2710(d)(8)(C) constitutes a final agency action subject to judicial review under the APA. *Amador County, Cal. v. Salazar*, 640 F.3d 373, 383 ("[W]here . . . a plaintiff alleges that a compact violates IGRA, thus requiring the Secretary to disapprove the compact, nothing in the APA precludes judicial review of a subsection (d)(8)(C) no-action approval."). The case has nothing to do with the issue in dispute here. Plaintiffs' new claim is ripe for adjudication in the present action. The only thing preventing plaintiffs from briefing this claim is that federal defendants have not produced the administrative record since the notice of approval was published, and apparently, they refuse to do so while this motion is pending.

The Tribe takes a similar approach by citing a string of cases supposedly in support of the proposition that "when plaintiffs challenge multiple agency decisions in the same case, each decision has its own administrative record and is evaluated independently." [Docket, 88 p. 11 & fn. 4.] Again, this argument misses the point. The cases the Tribe cites only underscore the point that plaintiffs may litigate multiple decisions involving different records in the same proceeding, and that doing so involves efficiencies for all parties.[7] Plaintiffs' claims are properly joined; the

---

[7] The cases the Tribe cites do not support delaying resolution of the compact claims. *See WildEarth Guardians v. United States Office of Surface Mining Reclamation and Enforcement*, 2014 WL 503635 (D. Colo., Feb. 7, 2014, 1:13-CV-00518) ("The Complaint alleged 15 claims challenging various mining permits located in Colorado, Montana, and New Mexico"); *Western Watersheds Project v. Salazar*, 2009 WL 1299626 (D. Idaho, May 7, 2009, CIV 08-0516-E-BLW) ("WWP has challenged 18 Environmental Impact Statements (EISs) prepared by 18 separate BLM offices in six different states . . . ."). Other cases involve consolidation of separate cases that challenge agency actions on separate projects with separate administrative records. *See, e.g., Safari Club Intern. v. Jewell*, 960 F.Supp.2d 17 (D.D.C. 2013) ("This is a consolidated case with two sets of plaintiffs challenging two separate, but related FWS final rules . . . ."); *Habitat Educ. Center, Inc. v. Kimbell*, 250 F.R.D. 390 (E.D. Wis. 2008) (addressing request for consolidation of two new challenges to with challenges to two separate projects with cases challenging two other projects). Finally, in *Center for Biological Diversity v. Salazar*, 2010 WL 3924069 (D. Ariz.,

administrative record should be produced; and the documents plaintiffs identified should be added.

Other than by citing inapposite cases, neither the federal defendants nor the Tribe support their contention that plaintiffs' compact claim should not be part of this lawsuit or briefed with the other claims.[8] Rather than confronting these issues, the federal defendants and the Tribe focus on the delay between the publication of the compact's approval in the Federal Register and plaintiffs' Second Amended Complaint, suggesting that the addition of the new claim is a tactic to delay resolution on the fee-to-trust transfer issue. The facts, however, show otherwise.

Immediately following the California Secretary of State's submission of the compact to the Secretary, plaintiffs put the Secretary on notice that they would challenge the Secretary's decision to approve the compact. On August 4, 2013, plaintiff Stand Up for California! sent a letter to Secretary Jewell informing her that plaintiffs were aware that the California Secretary of State had forwarded the compact for approval. [Supplemental Declaration of Cheryl Schmit ("Schmit Supp. Decl."), ¶ 5, Ex. M.] The letter further informed the Secretary of the legal challenges pending against the proposed casino project, including this litigation, and stated that plaintiffs would view approval by inaction as a violation of IGRA. [Schmit Supp. Decl., ¶ 5, Ex. M.] That plaintiffs did not amend their complaint immediately following the publication of the notice of approval was a consequence of the federal defendants' motion for remand and the resulting stay of this litigation.

---

Sept. 30, 2010, CV 07-0038-PHX-MHM), the district court denied plaintiffs' motion to supplement their complaint with a new claim because "judgment has been entered, and the Plaintiffs' Complaint and this action have been dismissed." *Id* at *4.

[8] The Tribe's claim that the approval of the compact has nothing to do with the trust acquisition is an oversimplification. Plaintiffs also allege in this action that the Governor's concurrence is invalid because he lacked the authority under California law. [Docket 84, ¶¶ 62, 67 ] If the concurrence is invalid, then there can be neither class II or class III gaming at the Madera Site. This situation would greatly affect the trust status, as all the required determinations were gaming related. The only identifiable source of the Governor's authority under California law to concur is his authority to negotiate compacts. Cal. Const. art. IV, § 19(f). Plaintiffs dispute that the Governor has any such authority, but without a valid compact under state law, the validity of the concurrence becomes even less certain. The claim regarding the compact's approval is intertwined with the concurrence issue and therefore the trust transfer.

In August 2013, the federal defendants filed their motion for stay of litigation and partial remand. [Docket 63.] In opposition, plaintiffs argued for vacatur and removal of the Madera Site from trust. [Docket 71.] The notice of approval of the compact was published in the Federal Register on October 22, 2013, while the Court was still considering plaintiffs' arguments for vacatur and removal of the site from trust. The Court granted the federal defendants' motion on December 16, 2013, and stayed the case for 90 days until March 17, 2014 [Docket 77, p. 8], at which time federal defendants requested even more time to complete the administrative record. The Court continued the stay until May 5, 2014 – an extension of nearly two additional months. Minute Order of March 18, 2014. Only after the stay was lifted on May 5, 2014, were plaintiffs granted leave to file "any amended complaint" by May 26, 2014. Minute Order of March 18, 2014. Any delay on plaintiffs' part was the result of the remand and the stay.

As discussed above, the remand required a new final decision, the administrative record of which was certified on May 5, 2014. The letters from the California Secretary of State were received long before this new decision and certification, and the federal defendants had notice as early as August 2013 that plaintiffs would challenge the compact's approval. Whether treated as part of one administrative record or as a separate administrative record, the federal defendants' obligation remains the same – to produce the documents supporting its decisions to allow the litigation to proceed.

## II.    THE FEDERAL DEFENDANTS MUST PRODUCE A PRIVILEGE INDEX

In opposition to plaintiffs' motion, the federal defendants have created even more ambiguity than plaintiffs have already exposed. Plaintiffs' request is simple: If documents have been withheld, the federal defendants must say so and produce a log identifying the reasons for withholding. Plaintiffs have not asked, and do not ask, this Court to compel the federal defendants to produce "a log of every document ever generated by the Department of Interior." [Docket 89, p. 20.] Such hyperbole, however, does contribute to plaintiffs' concerns that the federal defendants are shielding documents from plaintiffs and the Court. Plaintiffs' request does

not mention deliberative process documents. Yet the federal defendants' opposition is entirely devoted to citing law that protects them from producing deliberative documents – documents plaintiffs did not request.

In regard to the particular question asked, whether any documents have been withheld, the federal defendants' response is still equivocal: "the administrative record consists of the documents certified by the agency as being part of the administrative record." [Docket 89, p. 20.] It would have been much simpler, as well as consonant with plaintiffs' request, to have said: "No documents that are part of the record have been withheld on the ground of privilege." But that is not what the federal defendants' response states. Their circular statement merely identifies the contents of the administrative record they provided. But the issue is whether documents that are properly part of the decisional, not the deliberative, record were withheld on grounds of privilege. The federal defendants fail to acknowledge this point and then proceed to distract the Court by focusing on the unrelated and irrelevant deliberative process issue.

Certifying the April 26, 2013, administrative record, Nancy Pierskalla stated, "Privileged and confidential information has been *redacted or withheld* from the documents and materials comprising the administrative record in this matter." [Docket 51-1, ¶ 3 (emphasis added).] Paula Hart's certification of the revised administrative record, dated May 5, 2014, stated that "confidential statements protected under the attorney-client privilege and non-record material, including discussions of other tribes, will continue to be redacted." [Docket 83-1, ¶5.] Hart also certified "that the index filed on April 26, 2013, and the documents attached hereto reflect, to the best of my knowledge, the complete administrative record . . . ." [Docket 83-1, ¶7.] The question, therefore, is still whether documents were withheld from the April 26 administrative record as Ms. Pierskalla's certification suggests they may have been. The federal defendants have yet to provide a simple, straightforward answer to this question.

This Court should compel the federal defendants to answer this question. If the federal defendants admit to withholding documents or decline to answer the question, the Court should compel the federal defendants to produce a privilege index.

**<u>CONCLUSION</u>**

For the foregoing reasons, plaintiffs respectfully request that the Court grant this motion and order the federal defendants to supplement the administrative record with the omitted documents. Plaintiffs also request this Court to order the federal defendants to produce the required privilege index.

Dated:      Jul 3, 2014                          By: */s/ Sean M. Sherlock*
                                                      */s/ Benjamin S. Sharp*

Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C. 20005-3960
Telephone:   202.654.6200
Facsimile:   202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6366
Facsimile: 602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com

***Attorneys for Plaintiffs Stand Up For
California!, Randall Brannon, Madera
Ministerial Association, Susan Stjerne,
First Assembly of God–Madera, and
Dennis Sylvester***

# SELECT PAGES FROM ADMINISTRATIVE RECORD

Although a majority of the small contingent of Tribal members who participated in the election decided not to organize under the IRA by a vote of 0 to 4, the outcome of the vote is of no consequence. In *Carcieri*, the Court noted that even tribes who voted to reject organizing under the IRA are still entitled to benefit from the provisions of the IRA pursuant to the later-enacted Indian Land Consolidation Act, 25 U.S.C. § 2202.[25]

The Secretary exercised federal jurisdiction over the Tribe by causing the IRA election in 1935 to occur, based on the Tribe's recognized status. As the Interior Board of Indian Appeals has confirmed, the federal government's action in holding an IRA election within a rancheria community is determinative of the issue of whether the rancheria was recognized as a tribe prior to enactment of Rancheria Act.[26] Here, the federal government recognized the Tribe as early as 1916 when the government used money appropriated by Congress to purchase 80 acres of land near the Presbyterian Mission School in North Fork for the collective use and benefit of the Tribe. The Tribe remained a recognized Indian tribe under the superintendence of the BIA until 1966, when its status was terminated pursuant to the Rancheria Act. The Tribe's status was subsequently restored in 1984 pursuant to the stipulated order in *Tillie Hardwick*, and the Tribe remains federally recognized to this day.[27]

*Conclusion*

Because the historical evidence and contemporaneous federal records unambiguously demonstrate that the Tribe is a recognized tribe which was under federal jurisdiction when the IRA was enacted in 1934, the Secretary is authorized to take land into trust for the Tribe.

**1.3    25 C.F.R. 151.10(B). THE NEED OF THE INDIVIDUAL INDIAN OR TRIBE FOR ADDITIONAL LAND**

Section 151.10(c) requires consideration of "the need of the the … tribe for additional land."

The Tribe needs the land to promote tribal economic development, tribal self-sufficiency, and strong tribal government. At present, the Tribe is not engaged in any tribal economic development activities. Also, at present, there are no lands owned by the Tribe in fee or held by the Secretary in trust for the benefit of the Tribe which are eligible for gaming.

The only land held in trust for the Tribe is a 61.5 acre tract located in the small town of North Fork. The Department of Housing and Urban Development (HUD) provided the Tribe with funds to purchase the 61.5 acre tract in 2000 on the understanding that the Tribe would use the tract for tribal housing. The BIA subsequently placed the tract in trust for the Tribe several years later, also on the understanding that the Tribe would use the land for tribal housing. The housing tract is currently being used by the North Fork Rancheria Housing Authority to construct a

---

[25] *Carcieri v. Salazar*, 129 S.Ct. at 1067-1068.

[26] *See United Auburn Indian Community v. Sacramento Area Director*, IBIA No.92-186-A, 24 IBIA 33 (decided May 28, 1993).

[27] *See, e.g.*, Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs, 75 Fed. Reg. 60810, 60812 (October 1, 2010).

NF_AR_0000779

1   DAVID J. RAPPORT
    LESTER J. MARSTON
2   California Indian Legal Services
    200 West Henry Street
3   Post Office Box 488
    Ukiah, California  95482
4   Telephone:  (707) 462-3825

5   Attorneys for Plaintiffs

6   JOSEPH P. RUSSONIELLO
    United States Attorney
7   RODNEY H. HAMBLIN
    Assistant United States Attorney
8   PAUL E. LOCKE
    Assistant United States Attorney
9   450 Golden Gate Avenue, Box 36055
    San Francisco, California  94102
10  Telephone:  (415) 556-5134

11  Attorneys for Federal Defendants

12

13

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16  TILLIE HARDWICK, et al.,        )   No. C-79-1710-SW
                                    )
17              Plaintiffs          )   STIPULATION FOR ENTRY
                                    )   OF JUDGMENT
18          v.                      )
                                    )
19  UNITED STATES OF AMERICA, et al., )
                                    )
20              Defendants.         )
                                    )
21  _____)

22          The parties to the above-entitled action, recognizing

23  the uncertainties in law and the burden of further litigation,

24  and in order to make mutually beneficial settlement of these

25  actions, subject to approval of the Court pursuant to Federal

26  Rules of Civil Procedure, Rule 23(c), stipulate that the Court

27  may enter judgment as follows:

28  / / / / / / / /

RECEIVED

JUL 21 1983

WILLIAM L. WHITTAKER
CLERK, U. S. DISTRICT COURT.
NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL
FILED

AUG -2 1983

WILLIAM L. WHITTAKER
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1.   That the seventeen Rancherias which are the subject of the provisions of paragraphs 2 through 13 inclusive, of this stipulation, are as follows:

Big Valley

Blue Lake

Buena Vista

Chicken Ranch

Cloverdale

Elk Valley

Greenville

Mooretown

North Fork

Picayune

Pinoleville

Potter Valley

Quartz Valley

Redding

Redwood Valley

Rohnerville

Smith River

These rancherias are more fully described in the attached Exhibit "A", which is incorporated herein by reference as though set forth in full.

2.   The Court shall certify a class consisting of all those persons who received any of the assets of the rancherias listed and described in paragraph 1 pursuant to the California

/ / / / / / /

-2-

NF_AR_0001064

1  Rancheria Act 1/ and any Indian heirs, legatees or successors in
2  interest of such persons with respect to any real property they
3  received as a result of the implementation of the California
4  Rancheria Act.

5      3.  The status of the named individual plaintiffs and
6  other class members of the seventeen rancherias named and
7  described in paragraph 1 as Indians under the laws of the United
8  States shall be restored and confirmed.  In restoring and
9  confirming their status as Indians, said class members shall be
10 relieved from the application of Sections 2(d) and 10(b) of the
11 California Rancheria Act and shall be deemed entitled to any of
12 the benefits or services provided or performed by the United States
13 for Indians because of their status as Indians, if otherwise quali-
14 fied under applicable laws and regulations.

15     4.  The Secretary of the Interior shall recognize the
16 Indian Tribes, Bands, Communities or groups of the seventeen
17 rancherias listed in paragraph 1 as Indian entities with the same
18 status as they possessed prior to distribution of the assets
19 of these Rancherias under the California Rancheria Act, and said
20 Tribes, Bands, Communities and groups shall be included on the
21 Bureau of Indian Affairs' Federal Register list of recognized
22 tribal entities pursuant to 25 CFR, Section 83.6(b). Said Tribes,
23 Bands, Communities or groups of Indians shall be relieved from
24 the application of section 11 of the California Rancheria Act and
25 shall be deemed entitled to any of the benefits or services
26 provided or performed by the United States for Indian Tribes,

27
28 1/  Act of August 18, 1958, P.L. 85-671, 72 Stat. 69, as
   amended by the Act of August 11, 1964, 78 Stat. 390.

-3-

# MAIER PFEFFER KIM & GEARY, LLP

1440 Broadway, Suite 812
Oakland, CA 94612
Tel (510) 835-3020 x 304 | Fax (510) 835-3040 | jmaier@jmandmplaw.com

## MEMORANDUM

To:       Maria Wiseman, Office of the Solicitor, Department of the Interior

From:     John Maier

Date:     September 27, 2012

Subject:  North Fork Rancheria Two- Part Determination and Carcieri Analysis

---

Two-Part Determination

      In addition to the corrections noted in my September 24, 2012, memo to you, please note that the September 1, 2011, letter from former Assistant Secretary-Indian Affairs Larry EchoHawk, announcing and explaining his favorable two-part determination pursuant to Section 20(b)(1)(A) of the Indian Gaming Regulatory Act ("IGRA"), contains the following factual error:

1. The first paragraph in the section entitled "The 1850s Fresno River Farm" states the the Site is located within 7.6 miles of the City of Madera's northern boundary, in the vicinity of where the Fresno River Farm was located."

While section 3.5.1 of the EIS indicates that the Site is located approximately 7 miles north of the City of Madera, in reality, the Site is less than a mile from the northern boundary of the City. (The EIS may have been referring to the City center where the County and City offices are located.) The statement is otherwise correct.

Carcieri Analysis

      On January 11, 2011, I sent a memo to Chad Broussard, who at the time worked for Analytical Environmental Services, the environmental consultant who assisted the Bureau of Indian Affairs ("BIA") in the preparation of the extensive environmental impact statement ("EIS"), explaining my opinion as to why the Supreme Court decision in *Carcieri v. Salazar*, 129 S. Ct. 1058 (2009) does not affect the Secretary's authority to take land into trust for the Tribe. In that memo, I incorrectly cited the statutory authority which the Sacramento Agency of the BIA relied upon in conducting the June 10, 1935, election under the Indian Reorganization Act ("IRA"). The June 10 election was a vote to decide whether the IRA would apply to the reservation, and therefore was conducted pursuant to Section 18 of the IRA, 25 U.S.C. § 478. (I mistakenly cited the authority as Section16 of the IRA, 25 U.S.C. § 476.)

*Memo to M. Wiseman*
*September 28, 2012*
*Page 2*

Also, below are excerpts from the attached historical documents that may be helpful to fortify any Carcieri analysis which may be included in a final agency determination and/or record of decision on the proposed trust acquisition.

1.     In 1916, the purchase of the North Fork Rancheria was on behalf of 200+ North Fork Mono.

> Herewith please find enclosed two propositions by the owner, Mr. A.W. Frederick of Northfork, California, to sell to the Government suitable lands for a permanent Village Home for the Indians of the above reference [NORTHFORK INDIANS]....Also will be found what might be more properly termed, **partial** census of the Indians of Northfork and vicinity [sic]; as stated, having been furnished by Coleman, one of the fairly well educated and most intelligent half blood Indians of this band....
>
> While a number of these Indians have in the past secured more or less employment locally [in the North Fork vicinity], and will likely be able to continue to do so, quite a number, likely a majority, temporarily leave their mountain habitations and go to the rich San Joaquin Valleys in proper seasons to secure work on the farms, hay-meadows, vineyards and orchards, as well as sheep-shearing in its seasons. **These Indians, like most others of California, have from time to time, many years ago, been driven from their former homes in the rich valleys to these higher altitudes and poorer lands, so long ago that seemingly they have become reconciled, in fact in most cases could hardly be persuaded to return and make their homes permanently in the low large rich valleys.** A number of these Indians have from time to time secured allotments of lands in this mountain country, just the number and those so fortunate have not been able to ascertain. My information, through the Indians, Rev. Hood and the Foresters, that most of their allotments are poor lands and of little worth. As will be noted by reference to the enclosed census, which gives the children within and under the school age, i.e. 17 years and under, as 132, would suppose, counting their parents living and others above 17 years of age, there is likely more than 200 Indians properly belonging to the Northfork and vicinity band.

(4 April 1916, John J. Terrell to Commissioner Indian Affairs (emphasis added).) In an April 25, 1916, letter to Special Indian Agent J.J. Terrell, Assistant Commissioner E.B. Meritt acknowledged receipt of Terrell's letter relative to the desirability of purchasing land "for the benefit of approximately 200 Indians belonging to the Northfork band."

2.     On July 15, 1920, Superintendent O.H. Lipps and Special Supervisor L.F. Michaels conveyed to Commissioner of Indians Affairs Cato Sells a report, prepared over the course of 8 months beginning September of 1919, regarding the condition of landless, non-reservation Indians in California. The report included the following reference to the North Fork band:

Rancherias:  North Fork is credited with **the largest Indian population** and there 80 acres of land was bought to provide homes for 200 Indians.  The land is poorly located and absolutely worthless as a place to build homes on.  It is rough and broken by a deep rocky canyon.  Not to exceed 40 acres could be used for building purposes.  There is a lack of water for domestic purposes and no water for irrigation, except a small amount that might be brought to a small part of this tract through an old abandoned miner's ditch.  <u>The tract is unoccupied.</u>

(Report to Cato Sells, Commissioner of Indian Affairs from O.H. Lipps, Superintendent and L.F. Michaels, Special Supervisor (June 15, 1920), page 50.)

3.      In a letter dated March 2, 1934, to Dr. Clarence M. Leggett, a physician resident in North Fork California, Superintendent O.H. Lipps stated that

This will advise you that our health funds for the present fiscal year are practically exhausted, and because of this fact it will be impossible for us to continue to pay you [for medical services] at the rate of $50.00 per month for work among the Indians in the North Fork District.  Therefore, beginning February 1st, it will be necessary for us to reduce the amount paid you to $25.00 per month.

(2 March 1934, letter from Superintendent O.H. Lipps to Dr. Clarence Leggett.)

4.      In a letter dated August 18, 1934, to M. A . Benedict, Supervisor of the Sierra National Forest, Northfork California, District Medical Director J.F. Worley states that:

Authority has now been granted to Superintendent Lipps to take bids [for medical services] on the consolidated contract for Northfork and Coarsegold, which I discussed with you.  These proposals will be sent out soon by Mr. Lipps.

(18 August 1934, letter from M.A. Benedict to District Medical Director J.F. Worley.)

5.      In a letter dated September 6, 1934, to Dr. A. G. Atwood of Chochilla, California, Superintendent O.H. Lipps stated

Replying to your letter of the 4th instant regarding proposed contract for medical services for Indians in eastern Madera County, I have to advise that we have been authorized to secure bids for this service and proposals will be mailed out at an early date. ... [T]he great majority of Indians in Madera County are what is known as non-wards that is they do not live on an Indian Reservation and do not have allotments held in trust by the Federal Government.  We are permitted to give them what is known as expendable service – that it where we have a contract physician, it is permissible for such physician to make calls and render such services as he can without any additional expense.  We are not permitted to purchase drugs and medical supplies for non-ward Indians, or provide

hospitalization for them.  At most we will only be able to purchase a few simple drugs and supplies for the few war Indian in that section.

(6 September 1934, letter from Superintendent O.H. Lipps to A.G. Atwood.)



# AMENDED AND RESTATED
## REQUEST FOR
## A SECRETARIAL TWO-PART DETERMINATION

### SUBMITTED BY THE

## NORTH FORK RANCHERIA OF MONO INDIANS OF CALIFORNIA

**April 7, 2009**

NF_AR_NEW_0000125

## EXHIBITS

Exhibit A     Tribal Resolution 04-04 requesting fee-to-trust acquisition
Exhibit B     1916 authorization to purchase land
Exhibit C     31 Fed. Reg. 2911 (Feb. 18, 1966)
Exhibit D     1983 Stipulation for Entry of Judgment
Exhibit E     1987 Stipulation for Entry of Judgment
Exhibit F     Map of the Site and surrounding area
Exhibit G     May 20, 2008 North Fork Community Development Council letter to the Assistant
              Secretary regarding the Mill Site
Exhibit H     Tribal Resolution 09-02 authorizing submission of Request/Fee-to-Trust for gaming
Exhibit I     Gaming Ordinance and Tribal Resolution 09-19
Exhibit J     Constitution of the Tribe
Exhibit K     Revised Tabulation
Exhibit L     Tribal-State Compact between the State of California and North Fork
Exhibit M     Tribal-State Compact between the State of California and The Wiyot Tribe
Exhibit N     Governor's Press Release announcing Compacts
Exhibit O     Table 2-1 of DEIS detailing the size of the various Project components
Exhibit P     Management Agreement
Exhibit Q     Pro forma financial statements for class III gaming facility
Exhibit R     Summary of tribal labor force data
Exhibit S     North Fork Rancheria Project Support Update – April 24, 2008
Exhibit T     Memorandum of Understanding dated August 16, 2004, between the Tribe and the
              County of Madera
Exhibit U     Memorandum of Understanding dated October 18, 2006, between the Tribe and the
              City of Madera
Exhibit V     Memorandum of Understanding dated December 19, 2006, between the Tribe and the
              Madera Irrigation District
Exhibit W     Development Agreement
Exhibit X     1952 report from G. W. Barbour to Luke Lea
Exhibit Y     Camp Barbour treaty dated April 29, 1851
Exhibit Z     Map of the Boundaries of the San Joaquin Valley Treaties
Exhibit AA    July 1856 Indian Agent Report
Exhibit BB    August 1857 Indian Agent R eport
Exhibit CC    August 1958 Indian Agent Report
Exhibit DD    August 1859 Indian Agent Report
Exhibit EE    Allotment Patents
Exhibit FF    Mary Lewis Allotment Application
Exhibit GG    1924 letter and photographs of tribal ancestors at work in the Valley
Exhibit HH    Letter from John J. Terrell to Commissioner Indian Affairs, April 4, 1916
Exhibit II    Excerpt from Walking Where We Lived
Exhibit JJ    Federal Register October 27, 2004 Notice of Intent, April 6, 2005 Notice of Intent, and
              February 15, 2008 Notice of Availability
Exhibit KK    Letters and Congressional testimony regarding publication of DEIS
Exhibit LL    Labor Agreement
Exhibit MM    Checkcard Neutrality Agreement
Exhibit NN    2009 Madera County Property Tax bills
Exhibit OO    March 16, 2005 Madera County Resource Management Agency letter to BIA
Exhibit PP    2009 Madera Irrigation District Statements of Assessment Taxes
Exhibit QQ    Madera County Resolution No. 2005-169

NF_AR_NEW_0000191

# WANGER JONES HELSLEY PC
## ATTORNEYS

OLIVER W. WANGER
TIMOTHY JONES*
MICHAEL S. HELSLEY
PATRICK D. TOOLE
SCOTT D. LAIRD
JOHN P. KINSEY
KURT F. VOTE
TROY T. EWELL
PETER M. JONES**
DEVON R. McTEER**
MARISA L. BALCH
JENA M. GRAYKOWSKI***
DAVID E. CAMERON
DAREN A. STEMWEDEL
JOSIAH M. PRENDERGAST
MICAELA L. NEAL

—————

* Also admitted in Washington
** Of Counsel
*** Also admitted in Wisconsin

265 E. RIVER PARK CIRCLE, SUITE 310
FRESNO, CALIFORNIA 93720

—————

MAILING ADDRESS
POST OFFICE BOX 28340
FRESNO, CALIFORNIA 93729

TELEPHONE
(559) 233-4800

FAX
(559) 233-9330



—————

OFFICE ADMINISTRATOR
LYNN M. HOFFMAN

—————

Writer's E-Mail Address:
tjones@wjhattorneys.com

Website:
www.wjhattorneys.com

February 27, 2014

Amy Dutschke
Regional Director, Pacific Region
DEPARTMENT OF THE INTERIOR
2800 Cottage Way
Sacramento, CA 95825

Re:   *Draft Conformity Determination Comments, North Fork Hotel/Casino Project*

Dear Ms. Dutschke:

On behalf of the Table Mountain Rancheria Tribe ("Tribe"), we offer these comments on the Bureau of Indian Affairs' ("BIA's") Draft Conformity Determination for the North Fork Rancheria's Proposed 305-Acre Trust Acquisition and Hotel/Casino Project (the "DCD").

The Tribe is a federally recognized Indian tribe located in the area commonly referred to as Friant, California. The Tribe operates a casino on its reservation lands in the western Sierra Nevada foothills, in Fresno County, approximately 8 miles northwest of the City of Fresno in the area commonly referred to as Friant, California, and within the San Joaquin Valley Air Basin. The Tribe opposes the application of the North Fork Rancheria of Mono Indians to operate an off-reservation casino on land near the City of Madera, adjacent to State Route 99, and nearly 25 miles from its Rancheria.

The Tribe has retained David M. Mitchell from First Carbon Solutions | Michael Brandman Associates to determine the adequacy of the DCD. In addition to other deficiencies in the DCD discussed below, Mr. Mitchell's review identified several areas in the DCD that contain inadequate, incomplete, or otherwise deficient procedures and analysis. We have the following comments on the Draft Conformity Determination:

1.   <u>The DCD uses outdated emission estimation techniques.</u> The United States Environmental Protection Agency ("US EPA") regulations at 40 C.F.R. Part 93, Subpart B (§93.150 et seq.) require that the conformity analysis be based upon "the latest and most accurate

{5609/032/00456827.DOC}

**WANGER JONES HELSLEY PC**
February 27, 2014
Page 2

emission estimation techniques available." 40 C.F.R. §93.159(b). For motor vehicle emissions, the most current version of the motor vehicle emissions model specified by the US EPA and available for use in preparation or revision of SIPs in that State must be used for the conformity analysis. 40 C.F.R. §93.159(b)(1). The most current version of the motor vehicle emissions model specified by the US EPA and available for use in preparation or revision of SIPs in California is EMFAC2011, which was approved by the US EPA in March, 2013. *See* 78 Fed. Reg. 14533 (March 6, 2013). The DCD is based upon an earlier version of EMFAC, EMFAC2007, which was approved by the US EPA on January 18, 2008. *See* 73 Fed. Reg. 3464.

> 2. The DCD fails to address emissions in all required years. Under the US EPA conformity regulations, the analyses must be based on the total of direct and indirect emissions from the action and must reflect emission scenarios that are expected to occur under each of the following cases: (1) The attainment year specified in the SIP, or if the SIP does not specify an attainment year, the latest attainment year possible under the Act; or (2) The last year for which emissions are projected in the maintenance plan; (3) The year during which the total of direct and indirect emissions from the action is expected to be the greatest on an annual basis; *and* (4) Any year for which the applicable SIP specifies an emissions budget. 40 C.F.R. §93.159(d). The DCD fails to comply with this requirement. The DCD evaluates the project's operational emissions in only a single year, and it does not specify which year. [DCD Attachment 1 at p. 2] The State's most recent SIP revisions for the federal 8-hour ozone standard specifies emissions budgets for 2011, 2014, 2017, 2020, and 2023. [Attachment 3 *(see* p. Appendix A-4)] Thus, the DCD fails to address emissions in all required years.

> 3. The emissions estimate is based upon unsupported trip generation assumptions. The URBEMIS output file indicates that BIA used a trip rate of 3.0 trips per room for the hotel portion of the project. The URBEMIS default trip rate for hotels is 8.71 trips per room, and no explanation is offered. [Attachment 4 *(see* p. 15)]

Additionally, the assumptions for trip generation and construction do not match the assumptions utilized in the EIS Traffic Impact Study. (See Letter from Dave Mitchell ["Mitchell Letter"] attached hereto as Exhibit "A," p. 1.) Specifically, the EIS estimates 12,359 trips per day while the DCD estimates 11,426 trips per day. *(Id.)* Also, the EIS indicates that the trip generation rates were adjusted in URBEMIS to exclude passby trips and diverted trips; however, the DCD already includes a passby trip reduction. Using the larger project size would result in higher emissions than reported in the DCD. Finally, the modeling analysis years (2010/2011) are no longer valid since they have already passed.

> 4. The emissions estimate is based upon unsupported trip length assumptions. At the time the Final Environmental Impact Statement ("FEIS") was prepared, Madera County was designated by the US EPA as a "serious" nonattainment area for ozone. [FEIS §4.4.2 at p. 4.4-14 (AR 30161)] The applicable thresholds for purposes of conformity determinations were 50 tons per year ("tpy") nitrogen oxides ("NOx") and 50 tpy reactive organic gases ("ROG"). [40 C.F.R. §93.153(b)(1); FEIS §4.4.2 at p. 4.4-14 (AR 30161)] The initial applicability analysis conducted under 40 C.F.R. §93.153(c) determined that project operation would generate 22.99 tpy of ROG and 46.6 tpy of NOx – conspicuously close to, but

{5609/032/00456827.DOC}

NF_AR_NEW_0001574

**WANGER JONES HELSLEY PC**
February 27, 2014
Page 3

less than the 50 tpy threshold. [40 C.F.R. §93.153(b)(1); FEIS §4.4.2 at p. 4.4-14 (AR 30161)]
    On that basis, the FEIS concluded that the project was exempt from the conformity determination. [FEIS §4.4.2 at p. 4.4-14 (AR 30161)]

    To arrive at the 46.6 tpy of NOx emissions, however, the emissions model assumed an average trip length of only 12.6 miles for workers and patrons. [FEIS Appdx S, p. 17 (AR 34299)] The FEIS states that this trip length "was estimated using data from the Madera County Transportation Commission (MCTC) traffic model." [FEIS §4.4.1, at p. 4.4-1 (AR 30148)] Neither the FEIS nor the DCD nor any other materials in the record explain what data are being relied upon, or how data from the MCTC traffic model could be used as a reliable basis for estimating trip length to a non-existent casino. Moreover, the 12.6 mile trip length assumption is at odds with the project description, which identifies the project as a "destination resort," which will increase visitors to the County, stimulate the local tourist industry, and cause an influx of non-resident consumers, because the project site is more than 20 miles from the County line. [Record of Decision, September, 2011, p. 52 (AR 40656)] Thus, the 12.6 mile trip length assumption is unsupported, and appears to have been reverse-engineered to ensure the project would not trigger conformity determination thresholds.

    Additionally, there is data contained in the FEIS that supports a much longer trip length. This data was examined in detail by Mr. Dave Mitchell (See Mitchell Letter, pp. 1-2.) Mr. Mitchell reviewed Appendix R of the FEIS, which includes a market study prepared by Innovations Group. The Market Study used a gravity model to identify the number and distribution of visits predicted for the project. Mr. Mitchell used the results of the model to determine a weighted average trip length that is more accurate than the method used for the DCD. In fact, this method is recommended by the SJVAPCD to determine project specific trip lengths. (Mitchell Letter, pg. 1.) Mr. Mitchell used this trip length method on at least 10 projects subject to Rule 9510 – Indirect Source Review that were approved by the SJVAPCD. (*Id.*)

    Calculating the weighted average trip length based on the distance to the seven market sub areas identified in the study and the projected number of visits from each market sub area resulted in a weighted average trip length of 28.2 miles. Moreover, the Market Study in the EIS analyzes the statewide gaming market and the fraction of the visits to the Project that would originate from outside of the local market area. Among other origins in the state, the Market Study estimates that 4.8% of the visits would originate from the "Coast" and 4.8% of the visits would originate from the "Bay Area." When these statewide trips were taken into account, the weighted average trip length increased over two hundred fifty percent (250%) from that analyzed in the DCD to 33.7 miles. (See Mitchell Letter, pg. 2.)

    Utilizing the shorter trip length based on trips from the local market area (28.2 miles) and using other modeling assumptions that were duplicated from the modeling performed for the Conformity Determination, the project emissions to be generated by the Project are 51.64 tpy of ROG and 102.52 tpy of NOx. (Mitchell Letter, pg. 2.) The project emissions under this analysis exceed the thresholds for ROG and NOx of 50 tpy. However, the DCD does not accurately reflect the project emissions and the effect of the Project.

{5609/032/00456827.DOC}

**WANGER JONES HELSLEY PC**
February 27, 2014
Page 4

Moreover, on May 5, 2010, the US EPA reclassified the San Joaquin Valley Air Basin as an "extreme" nonattainment area for the federal 8-hour ozone standard. As a result, the applicable conformity thresholds for NOx and ROG were lowered from 50 tpy to 10 tpy. [DCD, p. 5] Accordingly, BIA appears to have abandoned its prior determination that the project is exempt from the conformity determination requirement. Nevertheless, BIA continued to rely upon an emissions estimate based upon the unsupported 12.6 mile trip length assumption. [DCD, Attachment 1 at p. 18]

As a result of its reliance on the unsupported 12.6 mile trip length assumption, BIA has significantly underestimated the project's air quality emissions, and failed to require the applicant to mitigate all impacts as required under 40 C.F.R. §§93.158(d) and 93.160.

5.    The DCD fails to require sufficient emission offsets. BIA has chosen to require the applicant to purchase emission reduction credits ("ERCs") to demonstrate conformity. The DCD states that "[t]he proposed casino-resort complex would generate an estimated 42 tons of NOx and 21 tons of ROG. To mitigate these effects, the Tribe will purchase ERCs." [DCD at p. 7] Further, the DCD states that "enforceable ERCs will be purchased prior to the opening day of the casino-resort." [DCD at p. 7] These statements are incomplete and misleading in that the emissions model estimates the emissions in tons *per year*. [DCD Attachment 1 at p. 2] To merely require the applicant to mitigate 42 tons of NOx and 21 tons of ROG on a one-time basis, as appears from the DCD, will leave subsequent years' emissions unmitigated. The US EPA's conformity regulations are clear that "[t]he emissions reductions from an offset or mitigation measure used to demonstrate conformity must occur during the same calendar year as the emission increases from the action. . . ." (Mitchell Letter, pg. 2; 40 C.F.R. §93.163(a).) Only if the State approves emission reductions in years other than the year of emission may BIA allow it, and then by a ratio of 1.5:1 in extreme nonattainment areas such as the San Joaquin Valley Air Basin. (*Id*; 40 C.F.R. §93.163(b)(1)(i). The DCD does not indicate that BIA sought approval from the State for emission reductions in years other than the year of emissions.

The US EPA regulations require that the mitigation be identified and the process for implementation and enforcement of such measures must be described, including an implementation schedule containing explicit timelines for implementation. 40 C.F.R. §93.160(a). Moreover, written commitments to mitigation measures must be obtained prior to a positive conformity determination, and such commitments must be fulfilled. 40 C.F.R. §93.160(f). The DCD makes no provision for any such process, schedule, or commitments. The applicant has adopted Resolution 11-26, but that resolution merely makes a vague and generic commitment to perform required mitigation. It provides no details as to what will be done, and when. Together, the DCD and the applicant's Resolution 11-26 fail to meet the US EPA's standards for demonstrating conformity.

6.    The DCD fails to discuss PM10 and PM2.5. The DCD is required to analyze PM10 and PM2.5 because the SJVAB was designated nonattainment for fine particulate matter (PM10) at the time of preparation of the Draft Conformity Finding. (Mitchell Letter, pg. 2.) The SJVAB is currently designated as a Maintenance area for PM10; however, Conformity

NF_AR_NEW_0001576

**WANGER JONES HELSLEY PC**
February 27, 2014
Page 5

Determinations are still required for Maintenance areas. (*Id.*) The SJVAB is also designated nonattainment for the PM2.5 standard that applies to particulate less than 2.5 micrometers in diameter. (*Id.*)

The DCD limited its discussion of nonattainment pollutants of NOx and VOC. The EIS includes a discussion indicating PM10 and PM2.5 were de minimis and not subject to a conformity determination; however, no mention of the de minimis finding was included in the DCD (*Id.* at pp. 2 and 3.) Although the modeling results provided as an attachment to the DCD include emissions of PM10 and PM2.5, without discussion of these criteria pollutants, the public is not adequately informed of the potential impact on attainment. (*Id.* at pg. 3.) Therefore, the Conformity Determination must be revised to address PM10 and PM2.5 emissions. (*Id.*)

7.     Finally, the BIA's issuance of the Draft Conformity Determination does not comply with the procedures contained in the US EPA's regulations at 40 C.F.R. Part 93, Subpart B (§93.150 et seq.). The Notice of Availability ("NOA") issued by BIA's Pacific Regional Office, dated January 23, 2014, states that a copy of the Draft Conformity Determination is available at http://www.NorthForkEIS.com. The link on that website to "Draft Conformity Determination" leads to an outdated Notice of Availability which states that comments must be received by June 6, *2011*. [Attachment 1] Moreover, the link on that website to "Final Conformity Determination" reveals a copy of the Final General Conformity Determination for the North Fork Rancheria Casino/Hotel Resort Project." [Attachment 2] Thus, BIA is issuing the DCD after having already issued the Final Conformity Determination, contrary to the US EPA regulations, and contrary to its statement in the DCD – i.e., "The Final Conformity Determination on the proposed action will be issued no sooner than 30 days after the release of the DCD." To ensure compliance with the US EPA regulations, BIA must withdraw its prior Final Conformity Determination and the current DCD, prepare a current conformity analysis, issue a new DCD, and provide notice and opportunity to comment to the public under 40 C.F.R. §93.156(b), prior to adopting a Final Conformity Determination.

For all of these reasons, the BIA's efforts fail to comply with the Clean Air Act section 176 and the US EPA regulations.

Sincerely,

Timothy Jones

Attachment

{5609/032/00456827.DOC}



North America I Europe I Australia I Asia
www.brandman.com

February 25, 2014

Troy Ewell
Wanger Jones Helsey, PC
265 E. River Park Circle, Suite 310
Fresno, CA 93720

**Re: Review of North Fork Rancheria Casino and Resort Project Draft General Conformity Determination**

Dear Mr. Ewell:

FirstCarbon Solutions I Michael Brandman Associates (FCS) has reviewed the Draft General Conformity Determination prepared for the North Fork Rancheria Casino and Resort Project (Project) to determine its adequacy. The Project was required to prepare a Draft General Conformity determination in accordance with 40 CFR 92.155(a). The public review period for the Project ends February 27, 2014.

**Review Results**

**Review of Modeling Results.** FCS reviewed the modeling prepared with the URBEMIS 2007 emission model. The assumptions for trip generation and construction do not match those used in the EIS Traffic Impact Study. The EIS estimates 12,359 trips per day while the Conformity Determination estimates 11,426 trips per day. The difference seems to be caused by differences in project size (268,480 square feet for casino in TIS and 247,180 square feet for casino in the URBEMIS modeling output). The EIS indicates that the trip generation rates were adjusted in URBEMIS to exclude passby trips and diverted trips; however, the Conformity Determination includes a passby trip reduction. Using the larger project size would result in higher emissions than reported in the Conformity Determination. The modeling analysis years (2010/2011) are no longer valid since they have already passed.

The project uses a trip length for customers of 12.6 miles. This trip length is short considering the size of the project market area and the amount of tourist based travel from outside of Madera County anticipated for the project. Compelling data is included in the EIS that supports a much longer trip length and a much higher impact from mobile sources of emissions. The EIS Appendix R includes a market study prepared by Innovations Group that used a gravity model to identify the number and distribution of visits predicted for the project. The results of the analysis can be used to determine a weighted average trip length that is more accurate than the method used for the Conformity Determination. This method is recommended by the SJVAPCD to determine project specific trip lengths. I have used this trip length method on at least 10 projects subject to Rule 9510 – Indirect Source Review that were approved by the SJVAPCD. In order to determine the potential impact of using trip lengths based on the project market area, a weighted average trip length based on the distance to the seven market sub areas identified in the study and the projected number of visits from each market sub area. For example, the Fresno/Clovis metropolitan area provides 43 percent of the projected visits to the casino. The distance from the project site to an approximate center of Fresno (N. Blackstone Avenue and E. Ashlan Avenue) using Mapquest is 27 miles. Trip length estimates were assigned to each market sub area. The resulting weighted average trip length using this method is 28.2 miles.



North Fork Rancheria Conformity Determination Review

The Market Study also provided an analysis of the fraction of the statewide gaming market that would be attracted to the project. This analysis included market areas more distant from the project such as Sacramento and the Bay Area. Using data from this analysis resulted in a weighted average trip length of 33.7 miles. The spreadsheet used to estimate project trip lengths is provided as an attachment to this letter.

To identify the potential impact of using a market based trip length, the project emissions were estimated using the URBEMIS model used for the Conformity Determination. The shorter trip length based on trips from the local market area (28.2 miles) was used in modeling because the visitor data is unambiguous. Other modeling assumptions were duplicated from the modeling performed for the Conformity Determination except for modeling year (2012). No mitigation measures were applied in the modeling. The results of the modeling are presented below:

ROG:    51.64 tons/year

NOx:    102.52 tons/year

PM10:   49.79 tons/year

PM2.5:  11.83 tons/year

The Conformity Determination reported ROG emissions of 21.01 tons/year and NOx emissions of 42.04 tons/year. The use of a more accurate trip length more than doubles the project emissions. To make the Conformity Determination acceptable, the modeling must be revised using trip lengths reflecting the market area. The distances to each market sub area can be refined from what was used in this analysis, but the overall result can be expected to result in similar results. A copy of the URBEMIS modeling results is provided as an attachment to this letter.

**Project Mitigation Measures.** The Project is required to mitigate 100 percent of it NOx and VOC emissions. The Draft Conformity Determination includes three options for mitigating the impact. These include purchase of emission reduction credits (ERC) from neighboring air basins that contribute to nonattainment in the SJVAB, purchase of ERC generated in SJVAB, and purchase of emission reductions through a Voluntary Emission Reduction Agreement (VERA) through the SJVAPCD.

Banked ERCs used to offset project emissions must provide permanent reductions by definition. In addition, per 40 CFR 93.163(b)(1)(i), emission reductions from offsets or mitigations used to demonstrate conformity must occur during the same calendar year unless the reductions are greater than the emission increases by a ratio of 1.5:1 in Extreme nonattainment areas such as the San Joaquin Valley. The Conformity Determination does not indicate how the project will comply with this regulatory requirement.

Emission reductions obtained through a VERA normally require a project to mitigate its emissions for 10 years. The mitigation measure should be explicit regarding how many years of emissions will be mitigated with a VERA if that option is chosen. If the Project only purchases VERA reductions for a single year (42 tons of NOx and 21 tons of VOC), the long term impacts would not be fully mitigated. In addition, the requirement to mitigate at a ratio of 1.5:1 would apply to the VERA if the projects provided to mitigate the emissions occur in years other than the years the project will operate.

**Analysis did not discuss PM10 and PM2.5.** (1) The Draft Conformity Determination was required to analyze PM10 and PM2.5 because the San Joaquin Valley Air Basin (SJVAB) was designated nonattainment for fine particulate matter (PM10) at the time of preparation of the Draft Conformity Finding. The SJVAB is currently designated as a Maintenance area for PM10; however, Conformity Determinations are still required for Maintenance areas. The SJVAB is also designated nonattainment for the PM2.5 standard that applies to particulate less than 2.5 micrometers in diameter. (2) The Draft General Conformity Determination limited its discussion of nonattainment pollutants to the ozone precursors oxides of nitrogen (NOx) and volatile organic compounds (VOC). The EIS includes a discussion indicating PM10 and PM2.5 were de minimis and not subject

2

North Fork Rancheria Conformity Determination Review

to a conformity determination; however, no mention of the de minimis finding was included in the Draft General Conformity Determination.  (3)  Although the modeling results provided as an attachment to the Determination include emissions of PM10 and PM2.5, without discussion of these criteria pollutants, the public is not adequately informed of the potential impact on attainment.  Therefore, the Conformity Determination must be revised to address PM10 and PM2.5 emissions.

If you have any questions, please call me at 559.246.3732, or via email at dmitchell@brandman.com.

Sincerely,

*David M. Mitchell*

David M. Mitchell, Air Quality Services Manager
**FirstCarbon Solutions | Michael Brandman Associates**
1234 "O" Street
Fresno, CA 93721

Attachments:

FCS North Fork Rancheria Casino Trip Length Analysis

FCS URBEMIS Modeling Output for North Fork Rancheria Casino Using Weighted Average Trip Length

3

NF_AR_NEW_0001580

**North Fork Rancheria Casino Trip Length Analysis**

| Local Market | Gaming Visits Full Casino | Fraction of Market | Estimated Trip Length | Weighted Trip Length |
|---|---|---|---|---|
| Madera Primary | 680,413 | 0.064901947 | 8 | 0.5192156 |
| Fresno Primary | 3,714,403 | 0.354302443 | 27 | 9.566166 |
| Primary South | 2,289,981 | 0.218432373 | 7 | 1.5290266 |
| Secondary South | 249,094 | 0.023760107 | 30 | 0.7128032 |
| Secondary Northwe | 1,779,893 | 0.169777065 | 30 | 5.0933119 |
| Tertiary North | 342,268 | 0.032647612 | 50 | 1.6323806 |
| Tertiary South | 321,312 | 0.030648701 | 50 | 1.532435 |
| Sacramento | 58,823 | 0.005610897 | 150 | 0.8416345 |
| Coast | 503,968 | 0.048071546 | 100 | 4.8071546 |
| Tertiary East | 36,470 | 0.003478731 | 50 | 0.1739366 |
| Bay Area | 507,082 | 0.048368578 | 150 | 7.2552867 |
| | 10,483,707 | 1 | | 33.663351 |
| Tourist Total | 1,808,439 | | | |
| | 12,292,146 | | | |

Total Visits Including Proximate Facilities
| | | | | |
|---|---|---|---|---|
| Total | 10,483,707 | | | |
| Total with Tourists | 12,292,146 | | | |

Source:  NFR EIS Appedix R Innovation Group Socioeconomic Report Technical Memorandum

**Projected Local Market Patronage**

| | Visits | Fraction | Estimated Trip Length | Weighted Trip Length |
|---|---|---|---|---|
| Fresno | 72,093 | 0.431929974 | 27 | 11.662109 |
| Primary East | 9,914 | 0.059397636 | 8 | 0.4751811 |
| Secondary Northwe | 46,442 | 0.278247428 | 20 | 5.5649486 |
| Secondary South | 14,020 | 0.083997867 | 20 | 1.6799573 |
| Tertiary Northwest | 16,463 | 0.098634585 | 50 | 4.9317293 |
| Teritiary South | 3,043 | 0.018231491 | 50 | 0.9115746 |
| Coast | 4,934 | 0.029561018 | 100 | 2.9561018 |
| | 166,909 | 1 | | 28.181602 |
| | | | | |
| Tourist | 12,705 | | | |

Source: NFR EIS Appedix R Innovation Group Socioeconomic Report

NF_AR_NEW_0001581

Page: 1
**2/24/2014 3:57:32 PM**

Urbemis 2007 Version 9.2.4

Combined Annual Emissions Reports (Tons/Year)

File Name:

Project Name: North Fork Rancheria Alt A Longer Trip Length

Project Location: Madera County

On-Road Vehicle Emissions Based on: Version : Emfac2007 V2.3 Nov 1 2006

Off-Road Vehicle Emissions Based on: OFFROAD2007

Summary Report:

AREA SOURCE EMISSION ESTIMATES

|  | ROG | NOx | CO | SO2 | PM10 | PM2.5 | CO2 |
|---|---|---|---|---|---|---|---|
| TOTALS (tons/year, unmitigated) | 0.43 | 0.59 | 0.78 | 0.00 | 0.00 | 0.00 | 711.79 |

OPERATIONAL (VEHICLE) EMISSION ESTIMATES

|  | ROG | NOx | CO | SO2 | PM10 | PM2.5 | CO2 |
|---|---|---|---|---|---|---|---|
| TOTALS (tons/year, unmitigated) | 51.21 | 102.52 | 648.23 | 0.56 | 49.79 | 11.83 | 56,837.50 |

SUM OF AREA SOURCE AND OPERATIONAL EMISSION ESTIMATES

|  | ROG | NOx | CO | SO2 | PM10 | PM2.5 | CO2 |
|---|---|---|---|---|---|---|---|
| TOTALS (tons/year, unmitigated) | 51.64 | 103.11 | 649.01 | 0.56 | 49.79 | 11.83 | 57,549.29 |

NF_AR_NEW_0001582

Page: 2

**2/24/2014 3:57:32 PM**

Area Source Unmitigated Detail Report:

AREA SOURCE EMISSION ESTIMATES Annual Tons Per Year, Unmitigated

| Source | ROG | NOx | CO | SO2 | PM10 | PM2.5 | CO2 |
|---|---|---|---|---|---|---|---|
| Natural Gas | 0.04 | 0.59 | 0.50 | 0.00 | 0.00 | 0.00 | 711.28 |
| Hearth | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Landscape | 0.02 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.51 |
| Consumer Products | 0.00 | | | | | | |
| Architectural Coatings | 0.37 | | | | | | |
| TOTALS (tons/year, unmitigated) | 0.43 | 0.59 | 0.78 | 0.00 | 0.00 | 0.00 | 711.79 |

Area Source Changes to Defaults

Operational Unmitigated Detail Report:

OPERATIONAL EMISSION ESTIMATES Annual Tons Per Year, Unmitigated

| Source | ROG | NOX | CO | SO2 | PM10 | PM25 | CO2 |
|---|---|---|---|---|---|---|---|
| Hotel | 2.42 | 3.89 | 24.87 | 0.02 | 1.87 | 0.44 | 2,138.77 |
| Casino | 48.79 | 98.63 | 623.36 | 0.54 | 47.92 | 11.39 | 54,698.73 |
| TOTALS (tons/year, unmitigated) | 51.21 | 102.52 | 648.23 | 0.56 | 49.79 | 11.83 | 56,837.50 |

Operational Settings:

Includes correction for passby trips

Does not include double counting adjustment for internal trips

Analysis Year: 2012  Season: Annual

NF_AR_NEW_0001583

Page: 3

2/24/2014 3:57:32 PM

Emfac: Version : Emfac2007 V2.3 Nov 1 2006

## Summary of Land Uses

| Land Use Type | Acreage | Trip Rate | Unit Type | No. Units | Total Trips | Total VMT |
|---|---|---|---|---|---|---|
| Hotel | | 3.00 | rooms | 200.00 | 600.00 | 11,640.96 |
| Casino | | 43.80 | 1000 sq ft | 247.18 | 10,826.48 | 298,437.44 |
| | | | | | 11,426.48 | 310,078.40 |

## Vehicle Fleet Mix

| Vehicle Type | Percent Type | Non-Catalyst | Catalyst | Diesel |
|---|---|---|---|---|
| Light Auto | 37.7 | 1.1 | 98.6 | 0.3 |
| Light Truck < 3750 lbs | 16.7 | 2.4 | 90.4 | 7.2 |
| Light Truck 3751-5750 lbs | 20.5 | 1.0 | 98.5 | 0.5 |
| Med Truck 5751-8500 lbs | 11.4 | 0.9 | 99.1 | 0.0 |
| Lite-Heavy Truck 8501-10,000 lbs | 2.6 | 0.0 | 73.1 | 26.9 |
| Lite-Heavy Truck 10,001-14,000 lbs | 1.1 | 0.0 | 45.5 | 54.5 |
| Med-Heavy Truck 14,001-33,000 lbs | 1.0 | 10.0 | 20.0 | 70.0 |
| Heavy-Heavy Truck 33,001-60,000 lbs | 2.4 | 0.0 | 0.0 | 100.0 |
| Other Bus | 0.1 | 0.0 | 100.0 | 0.0 |
| Urban Bus | 0.0 | 0.0 | 0.0 | 0.0 |
| Motorcycle | 4.7 | 57.4 | 42.6 | 0.0 |
| School Bus | 0.2 | 0.0 | 0.0 | 100.0 |
| Motor Home | 1.6 | 0.0 | 87.5 | 12.5 |

NF_AR_NEW_0001584



Analytical Environmental Services
1801 7th Street, Suite 100
Sacramento, CA 95811
(916) 447-3479 | FAX (916) 447-1665
www.analyticalcorp.com

# MEMORANDUM

| | | | |
|---|---|---|---|
| **TO:** | Bureau of Indian Affairs<br>Attn: Chad Broussard, Environmental<br>Protection Specialist,<br>2800 Cottage Way, Room W2820<br>Sacramento, CA 95825 | **FROM:** | David Sawyer |

**PHONE:** (916) 978-6165

| | | | |
|---|---|---|---|
| **RE:** | North Fork Rancheria – Responses to the<br>January 2014 Reissued Draft General<br>Conformity Determination Comment Letters | **DATE:** | March 27, 2014 |

On May 6, 2011, the Bureau of Indian Affairs (BIA) released a draft general conformity determination (2011 DCD) for the North Fork Rancheria casino/hotel resort project (Proposed Project) initiating a 30-day public review and comment period in accordance with 40 CFR Part 51. Two comment letters were received during the public comment period. A final general conformity determination was then released on June 18, 2011 (2011 FCD). The BIA reissued the 2011 DCD on January 24, 2014 to insure notice to recipients pursuant to 40 CFR 193.55 for an additional 30-day public review and comment period.

During this second comment period, the BIA received comment letters from the following parties:

1) Table Mountain Rancheria (February 27, 2014);
2) Picayune Rancheria of the Chukchansi Indians (February 24, 2014); and
3) Stand Up for California (February 25, 2014).

The following responses are provided to the seven comments within the Table Mountain Rancheria letter. The comments raised in the Picayune Rancheria and Stand Up for California letters are very similar to those in the Table Mountain Rancheria letter, and therefore they are not directly responded to.

1

## Response to Comment #1 - Outdated emission estimation techniques

The emissions estimates included in the 2011 DCD were prepared in December 2010, which was prior to the March 2013 release of the EMFAC2011 emissions factors inventory list noted in the comment. The U.S. Environmental Protection Agency's (USEPA's) latest and most accurate emission estimation technique at the time of the preparation of the 2011 DCD was not motor vehicle emissions model (MOVES), rather it was the Mobile6.2 model and/or the URBEMIS 9.4.2 model. These models were most appropriate for preparation of emissions estimates for projects in the State of California. These emissions models used EMFAC2007, the emissions factors inventory in use prior to the issuance of EMFAC2011.

URBEMIS 9.4.2 was used to calculate project-related emissions in the 2011 DCD rather than Mobile6.2 because the URBEMIS 9.4.2 model provided regional meteorology and allows for more site specific inputs. The use of URBEMIS 9.4.2 along with EMFAC2007 produced the latest and most accurate emission estimations then available. Consequently, the analysis provided in the 2011 DCD was in conformance with 40 CFR 93.159(b) at the 2011 DCD release date.

The January 2014 reissued DCD did not include changes to the air model used to estimate project-related emissions. As stated by the commenter, the current MOVES model which uses the EMFAC2011 emissions factors inventory was not approved by the USEPA until March 2013, over two years after the 2011 FCD release date.

### 2011 DCD Comment Period
This comment was not provided in response to the 2011 DCD or provided during the public comment period for the February 2008 North Fork Rancheria Draft Environmental Impact Statement (DEIS).

### Revisions to the 2011 DCD
No revisions are required as project-related emissions were estimated using the latest and most accurate emission estimation techniques available at the time of the 2011 DCD and 2011 FCD.

## Response to Comment #2 - Failure to address emissions in all required years

The 2011 DCD is in compliance with all emissions scenarios required under 40 CFR 93.159 (d). The following provides the requirements set forth in 40 CFR 93.159 (d) and how the 2011 DCD complies with this subpart:

2

1. <u>The attainment year specified in the State Implementation Plan (SIP).</u> The EIS provides emission estimates for the year 2030 (EIS 2030 cumulative analysis scenario), which provides a conservative emission estimate that encompasses the attainment year 2023, as provided in the SIP. The DCD emissions estimates are based on the analysis in the EIS.

2. <u>The last year for which emissions are projected in the maintenance plan.</u> A maintenance plan has not been developed by the San Joaquin Valley Air Pollution Control District (SJVAPCD) or approved by the USEPA.

3. <u>The year during which the total of direct and indirect emission from the action is expected to be the greatest on an annual basis.</u> The year with the greatest project-related emission estimate was 2011 (estimated opening year). Project-related emissions estimates for the year 2011 are provided in the 2011 DCD as Attachment 1.

4. <u>Any year for which the applicable SIP specifies an emission budget.</u> The emission budget years provided in the SIP are 2011, 2014, 2017, 2020, and 2023. Project-related emissions were estimated for the years 2011 and 2030 in the EIS to encompass the full range of years to be analyzed. The DCD emissions estimates are based on the analysis in the EIS. Due to the anticipated implementation of transportation emission reducing regulations and the advancement in emission control technology, it is anticipated that air quality in the region will improve over time and therefore 2030 estimated emissions in the EIS are much lower than 2011 emissions estimates. The 2011 and 2030 EIS emission estimates provide a similar emissions scenario to the SIP budget years, which show a decrease in emissions as the air basin moves towards attainment. Therefore, project-related emission estimates in the EIS and DCD for the period of 2011 to 2030 bracket and encompass the emission budget years for 2011, 2014, 2017, 2020, and 2023.

As described above, the 2011 DCD appropriately reflects the project-related emission scenarios provided in the SIP. Therefore, the emission estimates provided in the EIS and 2011 DCD reflect applicable emissions scenarios necessary to comply with 40 CFR 93.159 (d).

***2011 DCD Comment Period***
This comment was not provided in response to the 2011 DCD or provided during the public comment period for the EIS.

***Revisions to the 2011 DCD***
No revisions are required as the project-related emission estimates provided in the 2011 DCD and the EIS reflect appropriate emission scenarios in the applicable SIP, in compliance with 40 CFR 93.159.

NF_AR_NEW_0001947

**Response to Comment #3 – Unsupported trip generation assumptions**

The commenter states that a URBEMIS default value for hotel trip generation rate of 8.71 trips per room per day, as provided in the URBEMIS user's guide, should have been used in the 2011 DCD emissions estimates.

The project-specific hotel trip generation rate of 3.0 trips per room per day used in the 2011 DCD was the result of information provided on page 117 of the 2008 Traffic Impact Study (TIS) prepared for the Proposed Project (TPG Consulting Inc., 2008) and included on page 4.8-2 of the FEIS. The TIS is provided as Appendix M of the FEIS.   The main difference between the commenter's suggested hotel trip generation rate (8.71 trips per room per day) and the hotel trip generation rate used in the 2011 DCD (3.0 trips per room per day) is the internal capture reduction between the casino component of the Proposed Project and the associated hotel development. Internal capture is a phenomenon that recognizes that patrons will tend to visit both the casino and hotel in a single trip, as opposed to making individual trips to first the casino and then a second trip to the hotel. Counting separate trips to the casino and the hotel would be "double counting" trips. Taking into account the internal capture rate between the casino and hotel as provided in the TIS, an appropriate trip generation rate of 3.0 trips per room per day was determined. Consequently, project-specific input data used in the URBEMIS model provides a more relevant information source than the use of default inputs when analyzing a specific project.

The Notice of Availability (NOA) for the 2011 DCD and the reissued 2014 NOA described the proposed development as a 472,000 square feet (sf) hotel/casino development. Both NOAs list the development features as: casino, hotel, food and beverage services, retail space, banquet/meeting space, and administration facilities. The 472,000 sf noted within the NOA and analyzed in the DCD does not include the approximately 21,300 sf central plant because the central plant is not a significant trip generator. This reduction in square footage of trip-generating building area results in the corresponding reduction in the calculated trips from 12,359 to 11,426 trips per day. DCD trip generation and emissions estimates were appropriately based on Proposed Project land use development areas associated with patrons and employees trips. With the exception of building square footage, the URBEMIS inputs for the DCD were the same as those used in the EIS.

The 2010/2011 modeled year is consistent with the year the DCD was issued.

4

*2011 DCD Comment Period*

A similar comment was received previously when the DCD was distributed in April 2011 and a response to this comment was included in the 2011 FCD.

*Revisions to the 2011 DCD*

No revisions are required as the project-specific hotel trip generation rate of 3.0 that was used to estimate emissions from the hotel was derived from the TIS, and this land use specific value is more applicable to the Proposed Project than the URBMEIS 8.7.1 default hotel trip generation rate. The trip generation and emissions estimates provided in the 2011 DCD are appropriately based on the total square footage of proposed hotel/casino development without the inclusion of the auxiliary central plant.

## Response to Comment #4 - Unsupported trip length assumptions

The air quality analysis provided in the DEIS, FEIS, and 2011 DCD was based on project specific traffic data developed through the use of Fresno County Council of Governments (FCCOG) and Madera County Transportation Commission (MCTC) model data. Proposed Project average trip length was estimated using the latest and most accurate data available in the MCTC traffic model at the time of the transportation and air quality analysis in the DEIS (2005). A description of the Proposed Project was provided to FCCOG and MCTC by TPG Consulting, Inc. (the traffic engineers who developed the EIS TIS). Model outputs files provided by the FCCOG and MCTC were then used by TPG Consulting, Inc. to create **Table 1** (below).

| Table 1 -Trip Length Proposed Project -Alternate A | | | | | | |
|---|---|---|---|---|---|---|
| Trip Type | Model Trips (1 dir) | Trip Length (Miles) | | | Total Trips (Daily) | 6,180 | 6,180 |
| | (1 dir) | (1-dir) | | **Trips to/from Madera County** | | |
| HBW | 3,334 | 17.29 | within model area | **from Casino zone** | 5,386 | 5,386 |
| HBS | 2,336 | 11.04 | within model area | | | |
| HBO | 2,638 | 11.07 | within model area | | In Bound | Out Bound |
| NHB | 8,667 | 9.33 | within model area | To/From | | |
| IX | | | | Fresno County & areas South | 555 | 555 |
| XI | 414 | 59.02 | outside model area | Merced/Stanislaus & areas N/W | 239 | 239 |
| TOTAL | 17,399 | 12.57 | | | | |

Notes: *Includes Intrazonals, i.e. trips that stay internal to the Project TAZ; HBW = Home Base Work, HBS = Home Base Shop, HBO = Home Base Other, NHB = Non Home Base, XI = External/Internal.*
Source: FCCOG, 2005.

5

Using the FCCOG and MCTC model data, an average trip length of 12.6 miles was determined, and this data was used in Proposed Project emissions estimates in the EIS and 2011 DCD. An explanation of how specific trip length values were developed is explained on page 4.4-1 of the DEIS and FEIS.  This average trip length was not commented on by any government agencies, Tribal governments, or individuals throughout the NEPA process nor during the 2011 DCD comment period.

For additional context regarding appropriate average trip lengths, distances between the Proposed Project site and surrounding population centers are provided below.

- Madera (West 4th St / North Gateway Drive)           4.1 miles
- Bonadelle Ranchos (Avenue 12 / Road 36)           13 miles
- Chowchilla (North 2nd St / East Robertson Blvd)           13.6 miles
- Fresno (Van Ness Ave / Fresno St)           24.9 miles
- Clovis (Shaw Ave / Clovis Ave)           32.7 miles

Given that the metropolitan Fresno area has a population of over 650,000 (U.S. Census, 2010), and that there are several other casinos in the vicinity that may be more conveniently accessed by more distant patrons, an average trip length of 12.6 miles is appropriate.  In addition, during the NEPA process the Tribe entered into a Memorandum of Understanding (MOU) with Madera County, in which the Tribe agreed to work in good faith to employ qualified residents of the County, with a goal that 50% of new hires be residents of Madera County.  This requirement would also lead to a shorter average trip length once employee trips are considered.

The trip length suggested by FirstCarbon Solutions (provided as an attachment to Table Mountain Rancheria's comment letter) appears to have been extrapolated from a gravity study included as a section of a Competitive Impact Analysis (FEIS Appendix R; Innovation Group, 2008) developed for the Proposed Project in June 2008, four months after the release of the DEIS.  The gravity study provided in the Competitive Impact Analysis was intended to estimate the number of prospective customers who may patronize the Proposed Project.  It was not prepared to analyze trip lengths, traffic impacts, or project related air quality impacts.  For these reasons, the Competitive Impact Analysis is not applicable to the traffic and air quality analyses.

The commenter notes that the methodology provided by FirstCarbon Solutions is recommended by the San Joaquin Valley Air Pollution Control District (SJVAPCD) and was used in at least 10 projects subject to Rule 9510 – Indirect Source Review.  No comments regarding trip length methodology were provided in the SJVAPCD comment letter received during the public comment period for the 2011 DCD.  Further, this methodology was not identified or explained, and the Tribe is not under the jurisdiction of the SJVAPCD or bound by Rule 9510.  The air

6

quality analysis provided in the Proposed Project's air quality analysis is properly based on USEPA federal air quality standards associated with the Clean Air Act.

The commenter is correct that at the time the DEIS and FEIS were prepared, the USEPA designation for Madera County was "serious" nonattainment for ozone. The *de minimus* level for ozone precursors (ROG and NOx) was 50 tons per year (tpy). Emissions estimates in the DEIS and FEIS determined that initial project operation would generate 22.99 tons per year (tpy) of ROG and 46.6 tpy of NOx and on this basis the Proposed Project was determined to be exempt from conformity. However, as noted in the comment, on May 2, 2010 the USEPA redesignated the San Joaquin Valley Air Basin (SJVAB) as extreme nonattainment for ozone and as a result the *de mininis* level was changed from 50 tpy to 10 tpy of ozone precursors. With this reduced *de mininis* level, after the release of the FEIS and before the release of the Record of Decision (ROD), the BIA determined that Proposed Project related operational emissions for ozone precursors exceeded the 10 tpy *de mininis* level establish under 40 CFR 93.153 (b)(1), and therefore the 2011 DCD was prepared. The BIA reevaluated conformity based on the reductions in the *de minimis* levels of ozone precursors using the existing air quality analysis, consistent with its previous NEPA analysis. The reissuance of the 2011 DCD is not based on abandoning of the previous determination. Rather the 2011 DCD was reissued in 2014 consistent with a court order related to the notice process. The BIA relied on a reasonable, consistent, and supported trip length of 12.6 miles, and the BIA has not underestimated the project's air quality emissions or failed to require the Tribe to mitigate all impacts as required under 40 CFR 93.158 (d) and 93.160.

### 2011 DCD Comment Period
This comment was not provided in response to the 2011 DCD or the DEIS. A response to this comment was additionally not included in the 2011 FCD.

### Revisions to the 2011 DCD
No revisions are required as the trip length used to estimate project-related emissions is accurate and reflected the latest and most accurate data available at the time of DCD preparation.

## Response to Comment #5 - Failure to require sufficient emissions offsets

Emission reduction measures included in the DCD require North Fork Rancheria to purchase real, surplus, permanent, quantifiable, and enforceable emission reduction credits (ERCs) to demonstrate conformity. The 2011 DCD statement that North Fork Rancheria will purchase ERCs is not misleading or incomplete. Through the issuance of a Tribal Resolution dated June 17, 2011, North Fork Rancheria agreed to comply with the air quality reduction measures included in the EIS and 2011 FCD, including the purchase of ERCs (North Fork Rancheria of

7

Mono Indians, 2011). ERCs, unlike other emission reduction instruments such as allowances, provide a perpetual right to emission reductions. A perpetual right to emission reductions means that the ERCs would reduce project emissions both in the year the ERCs are purchased and in future years when the emissions would occur. It should be noted that ERCs are the only approved form of credit in all nonattainment areas in California with the exception of the South Coast AQMD. 40 CFR 163(a) requires that the demonstration of conformity must occur during the same calendar year as the emission increases. Therefore, because ERCs offset emissions starting during the year of purchase, the commitment to purchase ERCs shows compliance with 40 CFR 163(a). Given this approach to ERCs, the 1.5 to 1.0 ratio of offsets suggested by FirstCarbon Solutions is not applicable. Additionally, the SJVAPCD, in its comment letter on the 2011 DCD, found the purchase of 42 tons of NOx and 21 tons of ROG ERCs as acceptable mitigation to sufficiently reduce emissions impacts to a net zero level.

North Fork Rancheria is not required to obtain the State's approval of its ERCs because the Proposed Project is located on federal trust land. The DCD document is not required to establish the enforceability or the method for which the ERCs will be purchased, rather the FCD is the document which provides the process for implementation and enforcement of the ERC mitigation measure to fully reduce project-related NOx and ROG emissions in compliance with 40 CFR 93.160 (a).

It should be noted that North Fork Rancheria has committed to the purchase of ERCs to reduce project related NOx and ROG emissions in the NEPA ROD for the Proposed Project, which was issued by BIA and which is enforceable by the BIA and the USEPA pursuant to the Clean Air Act on federal trust property. Providing firm commitments for implementation and enforcement of the ERC mitigation has occurred. This approach is consistent with 40 CFR 93.160 (f).

*2011 DCD Comment Period*
This comment was not provided in response to the 2011 DCD or provided during the public comment period for the DEIS.

*Revisions to the 2011 DCD*
No revisions are required as the commitments for purchase of 42 tons per year of NOx and 21 tons per year of ROG ERCs would fully offset project-related NOx and ROG emissions in conformance with 40 CFR Part 93.

## Response to Comment #6 - Failure to discuss PM10 and PM2.5

The DCD was issued in regards to project-related criteria air pollutants which exceed *de minimis* levels set forth in 40 CFR 93. These criteria air pollutants were identified and appropriately

8

analyzed in Section 4.4.2 of the FEIS for the Proposed Project. After USEPA redesignation in May 2010, project-related operational emissions of NOx and ROG were estimated to exceed *de minimis* levels of 10 tons per year; therefore, 40 CFR Parts 51 and 93 require that a conformity determination be conducted for ozone precursors.

The SJVAB is classified "nonattainment" with a designation of "maintenance" for $PM_{10}$ and classified "nonattainment" for $PM_{2.5}$. Currently the USEPA has not determined a designation for the severity of the $PM_{2.5}$ "nonattainment" classification. Accordingly, the *de minimis* levels applicable to the Proposed Project for $PM_{10}$ and $PM_{2.5}$ at the time of the preparation of the 2011 DCD were 100 tons per year. Operational project-related $PM_{10}$ and $PM_{2.5}$ emissions estimates in the EIS were 19.62 and 4.64 tons per year, respectively, which do not exceed *de minimis* levels. Table 4.4.3 of the FEIS on page 4.4.11 provides a comparison of project related emissions to *de minimis* levels. Therefore, in accordance with 40 CFR 93.153(b), these criteria pollutants were not required to be included in the 2011 DCD. As identified on page 4.4.14 of the FEIS, estimated construction emissions for NOx, ROG, $PM_{10}$, and $PM_{2.5}$ do not exceed *de minimis* levels.

### *2011 DCD Comment Period*
This comment was received previously in response to the 2011 DCD, and a response to this comment was included in the 2011 FCD.

### *Revisions to the 2011 DCD*
No revisions are required because the DCD includes an analysis of all appropriate criteria air pollutants identified as exceeding *de minimis* levels for which a conformity determination is required in accordance with 40 CFR Parts 51 and 93.

## Response to Comment #7 – Procedural Issues

The BIA's reissuance of the 2011 DCD complies with the procedures contained in the USEPA's conformity regulations including 40 CFR 93.150. The reissuance of the DCD is only due to a potential procedural issue associated with the 2011 NOA.

The BIA's January 23, 2014 Notice of Availability (2014 NOA) correctly identifies the location of the DCD on the website http://www.NorthForkEIS.com, and it does not direct the reader to the 2011 NOA. The 2014 NOA correctly provides a date for which comments on the reissued DCD must be received by the BIA.

The commenter correctly states that the website where the 2011 DCD is located has a link to the 2011 FCD. However the 2014 NOA does not direct the reader to the FCD link. The DCD was issued on May 6, 2011 and the previously released FCD was issued in June 2011, more than 30

NF_AR_NEW_0001953

days after the 2011 DCD. As stated in the 2014 NOA, the only conformity determination the BIA is reissuing is the DCD. The current DCD is a reissuance; therefore, the BIA did not inappropriately issue a FCD prior to the DCD.

*2011 DCD Comment Period*
This comment was not provided in response to the 2011 DCD or provided during the public comment period for the DEIS.

*Revisions to the 2011 DCD*
No revisions are required because the reissuance of the DCD complies with the procedures contained in the USEPA's conformity regulations including 40 CFR 93.150.

# References

Bureau of Indian Affairs, 2008. Draft Environmental Impact Statement North Fork Casino North Fork Rancheria of Mono Indians Fee-to Trust and Casino/Hotel Project. Release February 15, 2008. Available online at: http://www.northforkeis.com/documents/draft_eis/report.htm.

Bureau of Indian Affairs, 2010. Final Environmental Impact Statement North Fork Casino North Fork Rancheria of Mono Indians Fee-to Trust and Casino/Hotel Project. Release August 6, 2010. Available online at: http://www.northforkeis.com/documents/final_eis/report.htm.

Bureau of Indian Affairs, 2011a. Draft General Conformity Determination for the North Fork Rancheria Casino/Hotel Resort Project. Available online at: http://www.northforkeis.com/documents/dcd/Draft_Conformity_Determination.pdf.

Bureau of Indian Affairs, 2011b. Final General Conformity Determination for the North Fork Rancheria Casino/Hotel Resort Project. Available online at: http://www.northforkeis.com/documents/fcd/Final_Conformity_Determination.pdf.

Bureau of Indian Affairs, 2012. Record of Decision -Trust Acquisition of the 305.49-acre Madera site in Madera County, California, for the North Fork Rancheria of Mono Indians. Signed November 26, 2012. Available online at: http://www.northforkeis.com/documents/rod/ROD.pdf.

Innovation Group, 2008. North Fork Rancheria Competitive Impact Technical Memorandum. June 2008. . Available online at: http://www.northforkeis.com/documents/final_eis/files/appendices/vol3/Appendix_R.pdf.

Madera County, 2004. Memorandum of Understanding between Madera County and the North Fork Rancheria of Mono Indians. Signed August 16, 2004. Available online at: http://www.northforkeis.com/documents/draft_eis/files/appendices/vol1/C.pdf.

NF_AR_NEW_0001954

North Fork Rancheria of Mono Indians, 2011. Resolution 11-26 regarding Emissions Reduction Mitigation. Signed June 17, 2011.

TPG Consulting, Inc., 2008. *North Fork Traffic Impact Study.* October 2008. TPG Consulting, Inc. Dallas, Texas and Visalia, California.  Available online at: http://www.northforkeis.com/documents/final_eis/files/appendices/vol1/Appendix_M.pdf.

United States Census Bureau (U.S. Census), 2010.  Fresno Metropolitan Area Population.  Available online at: http://www.quickfacts.census.gov/qfd/states/06/06039.html.  Accessed March 17, 2014.

NF_AR_NEW_0001955

## CERTIFICATE OF SERVICE

I certify that on July 3, 2014, the foregoing **Reply Memorandum in Support of Motion to Supplement Administrative Record and Compel Production of A Privilege Index** was filed electronically through the Court's ECF system, which distributes an electronic copy to all counsel of record.

Dated:  July 3, 2014

By: */s/ Sean M. Sherlock*
_____

Benjamin S. Sharp (D.C. 211623)
Elisabeth C. Frost (D.C. 1007632)
PERKINS COIE, LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211
BSharp@perkinscoie.com
EFrost@perkinscoie.com

Heidi McNeil Staudenmaier
SNELL & WILMER, LLP
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6366
Facsimile: 602.382.6070
HStaudenmaier@swlaw.com

Sean M. Sherlock
(*Admitted Pro Hac Vice*)
SNELL & WILMER L.L.P.
Plaza Tower
600 Anton Boulevard
Suite 1400
Costa Mesa, California 92626
Telephone: 714.427.7000
Facsimile: 714.427.7799
ssherlock@swlaw.com

*Attorneys for Plaintiffs Stand Up For California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God – Madera, and Dennis Sylvester*