**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STAND UP FOR CALIFORNIA!, *et al.*, | |
| Plaintiffs, | Civil Action No.  12-2039 (BAH) |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | Consolidated with: Civil Action No. 12-2071 (BAH) |
| Defendants, | |
| v. | Chief Judge Beryl A. Howell |
| NORTH FORK RANCHERIA OF MONO INDIANS, | |
| Intervenor-Defendant. | |

**Table of Contents**

I.   BACKGROUND...........................................................................................................7

   A.   HISTORY AND CURRENT STATUS OF THE NORTH FORK TRIBE .........................8

   B.   MADERA SITE ........................................................................13

   C.   ACTIONS UNDERLYING ADMINISTRATIVE DECISIONS....................................14

   D.   COMMENCEMENT OF INSTANT LAWSUIT............................................................18

   E.   PARTIAL REMAND AND SUBSEQUENT STATE AND AGENCY  ACTIONS.........19

   F.   SUPPLEMENTAL BRIEFING, CALIFORNIA LITIGATION AND  RELATED

   FILINGS .................................................................................................25

   G.   CALIFORNIA STATE COURT LITIGATION ............................................................29

   H.   PARTIES' POSITIONS ON RECENT DEVELOPMENTS ..........................................31

II.  LEGAL STANDARDS ..................................................................................................**34**

A.  MOTION FOR SUMMARY JUDGMENT ...................................................34

B.  ADMINISTRATIVE PROCEDURE ACT ...................................................35

III.  DISCUSSION ...............................................................................................................**39**

A.  STAND UP PLAINTIFFS' FIFTH AND SIXTH CLAIMS FOR RELIEF .....................41

B.  STAND UP PLAINTIFFS' CHALLENGES TO THE GOVERNOR'S  CONCURRENCE
        42

    1.  *Secretary's Two-Part Determination (IGRA ROD) ....................................44*

    2.  *California Governor's Concurrence ...........................................................45*

    3.  *Secretary's Land Acquisition Decision (IRA ROD) ...................................53*

C.  IGRA RECORD OF DECISION ................................................................57

    1.  *Historical Connection To The Madera Site ................................................59*

        a.   Camp Barbour Treaty Of 1851 ...............................................60

        b.   Occupancy Or Subsistence Use In The Vicinity ...................................63

    2.  *Impacts On The Surrounding Community ...................................................64*

        a.   Congressional Intent ....................................................65

            (i)   Section 2719(b)(1)(A)'s "Not Detrimental To The Surrounding Community"

            Requirement ...........................................................65

            (ii)   Section 2719(a)'s Preference For On-Reservation Gaming................................67

        b.   Community Benefits ..................................................69

        c.   Mitigation Measures ...............................................70

        d.   Community Harms..................................................73

            (i)   Economic Impact On The Picayune Tribe .......................................73

      (ii)   Problem Gamblers, Traffic And The Swainson's Hawk.....................................87

D.   IRA RECORD OF DECISION..........................................................................90

   *1.   Applicable Legal Framework*...................................................................*92*

   *2.   Secretary's Explanation Of Statutory Authority* ..........................................*95*

   *3.   Stand Up Plaintiffs' Arguments*.................................................................*98*

     a.   IRA Section 18 Election...........................................................102

     (i)   "Indians Residing On One Reservation" Constitute A Tribe............102

     (ii)   Alternative Definitions Of "Indian" In § 479 Need Not Be Considered ...........107

     (iii)   "Unified" Tribal Affiliation Is Not Necessary .................................108

     (iv)   North Fork Rancheria's Purchase Is Significant .............................112

     b.   North Fork Tribe's Continuing Tribal Existence ..................................116

     (i)   North Fork Rancheria Was Purchased For The North Fork Tribe ....................117

     (ii)   Speculation That IRA Voters Were Not North Fork Tribe Members Is Unfounded 122

     (iii)   North Fork Tribe Is A Federally-Recognized Indian Tribe ...............125

E.   NEPA COMPLIANCE ...............................................................................134

   *1.   Alternative Sites*...............................................................................*139*

     a.   Applicable Legal Principles ...........................................................140

     b.   Discussion Of Alternatives In The FEIS............................................142

     c.   Stand Up Plaintiffs' Arguments ....................................................144

     (i)   Properties "Along The SR-41 Corridor" And "Avenue 7" ................145

     (ii)   North Fork Rancheria....................................................................148

     (iii)   Old Mill Site ...............................................................................149

*2.   Impact on Crime* .......................................................................................... *153*

*3.   Mitigation Measures For Problem Gambling* ........................................................ *156*

F.   CAA CONFORMITY DETERMINATION .................................................. 159

*1.   Regulatory Overview* .................................................................................. *160*

*2.   Previously-Rejected Procedural Challenge* ............................................................ *161*

*3.   Previously-Rejected Challenge To Emissions Model Used* ....................................... *163*

*4.   Challenge To Emissions Estimates And Mitigation Measures* .................................... *164*

IV.  CONCLUSION .............................................................................................. 169

## MEMORANDUM OPINION

The North Fork Rancheria of Mono Indians (the "North Fork Tribe"), a federally-recognized American Indian tribe, plans to construct a casino-resort complex with a gaming floor offering up to 2,500 gaming devices, six bars, three restaurants, a five-tenant food court, a 200-room hotel tower, and 4,500 parking spaces on a 305.49-acre parcel of land located in Madera County, California ("Madera Site").  The casino will undoubtedly have a significant impact on the people and the land in that county, with the hope that it will benefit economically the Indian tribe undertaking its development.  The plaintiffs are residents of Madera County vehemently opposed to the casino's construction.  To stop the casino from coming to fruition, they have initiated both state and federal litigation as well as statewide political efforts over the last seven-plus years, setting, in their own words, "high legal and political hurdles."  This case is one of those efforts to halt the North Fork Tribe's casino development.  While the plaintiffs' many concerns about the impending casino development are understandable, the law is not on their side.

Here, six plaintiffs, Stand Up for California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God – Madera, and Dennis Sylvester (collectively, "Stand Up"), and the plaintiff Picayune Rancheria of the Chukchansi Indians ("Picayune Tribe" or "Picayune"), bring this consolidated action against the defendants United States Department of the Interior ("DOI"), Sally Jewell, in her official capacity as Secretary of the United States Department of the Interior ("Secretary"), Bureau of Indian Affairs ("BIA"), and Lawrence Roberts, in his official capacity as Assistant Secretary of Indian Affairs,[1] (collectively, "federal defendants"), and the intervenor-defendant North Fork Tribe, challenging, collectively, three separate but related decisions of the Secretary regarding the Madera Site, under five separate laws, namely:  the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*, the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461, *et seq.*, the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Clean Air Act ("CAA"), 42 U.S.C. § 7506.  *See generally* Third Amended Compl. ("TAC"), ECF No. 103; Picayune's Compl., Case No. 12-cv-2071, ECF No. 1.

The first decision, made in September 2011, pursuant to the IGRA, 25 U.S.C. § 2719(b)(1)(A), determined that the North Fork Tribe would be permitted to conduct gaming on the Madera Site.  *See generally* BUREAU OF INDIAN AFFAIRS, Record of Decision, Secretarial Determination Pursuant to the IGRA for the 305.49-Acre Madera Site in Madera County, California, for the North Fork Rancheria of Mono Indians (Sept. 1, 2011) ("IGRA ROD"), Jt. App. at 1443–1537, ECF Nos. 128-8 to -9.[2]  The second decision, made in November 2012

---

[1]       During the pendency of this lawsuit, Sally Jewell succeeded Kenneth Salazar as DOI's Secretary and Lawrence Roberts succeeded Kevin Washburn as Assistant Secretary of Indian Affairs.  Consequently, Ms. Jewell is automatically substituted in place of Mr. Salazar and Mr. Roberts is automatically substituted in place of Mr. Washburn as named parties to this action.  *See* FED. R. CIV. P. 25(d).
[2]       The over 42,000-page administrative record ("AR") in this case was filed in four parts.  First, the original AR was filed on April 26, 2013 with the Clerk of the Court on two DVDs.  *See* Lodging AR, ECF No. 51; AR Index, ECF No. 150.  Second, on May 5, 2014, the AR was supplemented, and another DVD was filed with the

pursuant to the IRA, 25 U.S.C. § 465, approved a fee-to-trust application submitted by the North

Fork Tribe, whereby the United States would acquire the Madera Site to hold it in trust for the

benefit of the North Fork Tribe.  *See generally* BUREAU OF INDIAN AFFAIRS, Record of Decision,

Trust Acquisition of the 305.49-acre Madera site in Madera County, California, for the North

Fork Rancheria of Mono Indians (Nov. 26, 2012) ("IRA ROD"), Jt. App. at 1611–79, ECF Nos.

128-9 to -10.  The Court previously addressed these two agency decisions in denying a motion

for a preliminary injunction brought by the Stand Up plaintiffs in January 2013.  *See Stand Up*

*for California! v. U.S. Dep't of Interior (Stand Up I)*, 919 F. Supp.2d 51, 54 (D.D.C. 2013).  The

third decision, made in October 2013, after this Court's denial of the preliminary injunction, is

the Secretary's non-action with respect to, and publication in the *Federal Register* of, a "Tribal-

State Compact" between the North Fork Tribe and the State of California, which compact is

required under the IGRA, 25 U.S.C. § 2710(d)(1)(C), to conduct class III gaming on Indian

lands.  *See* TAC ¶¶ 103–05, 115.

---

Clerk of the Court.  *See* Notice Filing Suppl. AR, ECF No. 83; Suppl. AR Index, ECF No. 151.  On or about November 3, 2014, the AR was supplemented a third time with documents pertaining to the "deemed approval of the North Fork Compact," and these supplemental documents were docketed on the Case Management/Electronic Case Files system ("CM/ECF").  *See* Corrected Notice Filing Suppl. AR, ECF No. 98; AR Deemed Approval North Fork Compact Index, ECF No. 98-2; Third AR, ECF Nos. 98-3 to 98-5.  Lastly, on November 7, 2014, the Court granted leave to the defendants to add two additional, missing documents to the AR and these documents were docketed on CM/ECF.  *See* Minute Order (Nov. 7, 2014) (granting Consent Mot. Leave File Suppl. AR, ECF No. 99); Fourth AR, ECF No. 100.  In accordance with local rules, since the record is so voluminous, the parties filed a Joint Appendix ("Jt. App.") containing copies of those portions of the AR cited or otherwise relied upon for the pending motions.  *See* LCvR 7(n); Notice Filing Jt. App., ECF No. 123.  The 2,457-page Joint Appendix is docketed in 72 separate docket entries, *see* ECF Nos. 124–130 (with attachments), and supplemented with 62 additional pages ("Suppl. Jt. App.") docketed separately, *see* ECF Nos. 134, 134-1.  Compounding the difficulty for the Court to locate and refer to relevant documents in the voluminous record, the parties' papers fail to cite to the Joint Appendix and/or Supplemental Joint Appendix, but rather refer only to Bates-stamped document numbers in the four-part, over 42,000-page AR.  For ease of reference, throughout this Memorandum Opinion, citations to documents in the AR include the name of the document, the page numbers of the Joint Appendix or Supplemental Joint Appendix on which the document appears, and the corresponding docket numbers.  Where a document is part of the AR but not included in the Joint Appendix, the Bates-stamped number is cited.  Accordingly, to facilitate public access to portions of the AR relied upon for the Court's reasoning, the parties are hereby ordered, within 30 days of entry of the order, jointly to supplement the appendices with the documents and/or pages of documents cited in this Memorandum Opinion that were not included in the joint appendices.

Pending before the Court are four cross-motions for summary judgment filed by all of the parties: (1) the Stand Up plaintiffs' motion for summary judgment ("Pls.' Mot."), ECF No. 106; (2) the plaintiff Picayune Tribe's motion for summary judgment, ECF No. 108; (3) the intervenor-defendant North Fork Tribe's cross-motion for summary judgment, ECF No. 111; and (4) the federal defendants' cross-motion for summary judgment, ECF Nos. 112, 114.  For the reasons detailed below, the plaintiffs' motions are denied, and the defendants' motions are granted in part and denied in part, but to the extent summary judgment is denied to the defendants on certain claims, those claims are dismissed.[3]

## I.    BACKGROUND

The factual and procedural background in this case is laid out in considerable detail in this Court's previous Memorandum Opinions denying the Stand Up plaintiffs' request for a preliminary injunction, *Stand Up I*, 919 F. Supp. 2d at 54–61, and granting in part and denying in part the Stand Up plaintiffs' motion to compel supplementation of the administrative record, *Stand Up for California! v. U.S. Dep't of Interior (Stand Up II)*, 71 F. Supp. 3d 109, 112–14 (D.D.C. 2014).  Since those rulings, however, several events have occurred with implications for the pending motions, including the filing of a third operative amended complaint, rejection of the Tribal-State Compact by California voters, court decisions in concurrent federal and state litigation, and the recent issuance of binding precedent by the D.C. Circuit.  Thus, the Court now draws from its earlier Memorandum Opinions and provides an updated, comprehensive background for consideration of the parties' arguments.

---

[3]    The parties have requested oral argument on the pending motions, but given the sufficiency of the parties' extensive written submissions, this request is denied.  *See* LCvR 7(f) (stating allowance of oral hearing is "within the discretion of the court").

### A.      HISTORY AND CURRENT STATUS OF THE NORTH FORK TRIBE

The North Fork Tribe is a federally-recognized American Indian tribe, *see* Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs, 81 Fed. Reg. 26,826, 26,829 (May 4, 2016) (listing "Northfork Rancheria of Mono Indians of California"), "consist[ing] of the modern descendants of Mono Indians using and occupying lands near and in the San Joaquin Valley," Letter from Larry Echo Hawk, Asst. Sec'y of Indian Affairs, to Jerry Brown, Governor of Cal. (Sept. 1, 2011) at 2, Jt. App. at 1391, 1392, ECF No. 128-7, as well as "the adjacent Sierra Nevada foothills," IGRA ROD at 56.

Many North Fork Tribe citizens trace their ancestry to an American settler named Joe Kinsman and his Mono Indian wife, "who settled along the Fresno River in 1849" at a time when "[a]ll of the settlements were in the foothills." IGRA ROD at 55–56 (quotations omitted). According to a contemporaneous Federal government observer, the Mono Indians generally inhabited "the higher mountains" during that time period and would "visit occasionally the plains and water-courses for the purposes of hunting and fishing." *Id*. at 56 (quotations omitted).

Accounts from ancestors of the North Fork Tribe describe the United States military's efforts in the 1850s to force them and other Indian groups out of their homes in the Sierra Nevada foothills, which were rich in resources and could be mined for gold. *See* GAYLEN D. LEE, WALKING WHERE WE LIVED: MEMOIRS OF A MONO INDIAN FAMILY 45–75 (Univ. of Okla. Press 1998) ("Lee Memoir"), Jt. App. at 75, 81–111, ECF No. 124-1. North Fork Indians, along with other Indian groups who lived in the mountains, scattered and hid as soldiers burned their settlements, *id*. at 57–62, until soldiers ultimately retreated to Camp Barbour, where they signed a treaty with "'friendly' Indians," *id*. at 62–63. This treaty, the Camp Barbour Treaty of 1851, purported to establish an Indian reservation in the San Joaquin Valley for a number of named tribes, including the "*mona* or wild portion of the tribes . . . which are still out in the mountains."

8

*Id*. at 63 (emphasis in original); Treaty with the Howechees, Etc., 1851 (Apr. 29, 1851), 4

INDIAN AFFAIRS: LAWS AND TREATIES 1085, 1087 (Charles J. Kappler ed., Gov't Printing Office

1929) ("Camp Barbour Treaty"), Art. 4, Suppl. Jt. App. at 55, 58, ECF No. 134-1.  The United

States ultimately refused to ratify the Treaty, however, and it "never became legally effective."

IGRA ROD at 57.  Instead, "Congress passed a separate statute which effectively extinguished

Indian title to land throughout the State of California by 1853, leaving the ancestors of the [North

Fork] Tribe, and all other California Indians, landless – without legal rights to their homelands

and without formal reservations."  *Id.*

In 1916, pursuant to appropriations acts authorizing the Secretary to purchase land in

California for Indians, *see* Act of May 18, 1916, ch. 125, § 3, 39 Stat. 62, AR at

NF_AR_0001034, 1042, the DOI purchased what became the North Fork Rancheria, comprised

of 80 acres of land near the town of North Fork, for the use and benefit of approximately 200

landless Indians belonging to the North Fork band, Letter from John T. Terrell, Special Indian

Agent, to Comm'r Indian Affairs (Apr. 4, 1916) ("Terrell Letter") at 1, AR at NF_AR_0001029;

Lipps-Michaels Survey of Landless Nonreservation Indians of California 1919–1920 (July 15,

1920) ("Lipps-Michaels Survey") at 50, Jt. App. at 1607, ECF No. 128-9; *see Stand Up I*, 919 F.

Supp. 2d at 68.  The land, which was "poorly located[,] . . . absolutely worthless as a place to

build homes on" and "lack[ed] . . . water for [both] domestic purposes and . . . irrigation," was

essentially uninhabitable.  Lipps-Michaels Survey at 50.  Nonetheless, as of June 1935, at least

six adult Indians lived on the North Fork Rancheria and were eligible to participate in a federal,

statutorily-required election held there by the Secretary, pursuant to Section 18 of the then-

recently enacted IRA.  IRA ROD at 55; Theodore H. Haas, Ten Years of Tribal Government

Under I.R.A. (1947) ("Haas Report") at 15, Jt. App. at 2140, 2157, ECF No. 129-9.  Four of the

six Indians voted to reject the application of the IRA to the North Fork Rancheria in the election, the repercussions of which are discussed in detail, *infra*, in Part III.D.2, 3.a.

In 1958, Congress passed the California Rancheria Act ("CRA"), which, "in keeping with the then-popular policy of assimilating Native Americans into American society, . . . authorized the Secretary to terminate the federal trust relationship with several California tribes . . . and to transfer tribal lands from federal trust ownership to individual fee ownership." *Amador Cty. v. Salazar*, 640 F.3d 373, 375 (D.C. Cir. 2011) (citing Act of Aug. 18, 1958, Pub. L. No. 85-671, 72 Stat. 619). On February 18, 1966, pursuant to the CRA, the Secretary issued a notice in the *Federal Register* providing that "[t]itle to the land on the North Fork . . . Rancheria[] has passed from the U.S. Government under the distribution plan[] approved April 29, 1960 . . . ." to one individual Indian, "Mrs. Susan Johnson," who was, at the time, 92 years old (born on March 8, 1874). Notice of Termination of Federal Supervision Over Property and Individual Members, 31 Fed. Reg. 2,911 (Feb. 18, 1966) ("Fed. Reg. Termination Notice"), AR at NF_AR_0001061, 1062, *available at* Pls.' Mot., Ex. 2, ECF No. 106-3.

Approximately seventeen years later, in a stipulated judgment entered in a federal lawsuit, *Hardwick v. United States*, No. C-79-1710-SW (N.D. Cal. Aug. 3, 1983), the United States, *inter alia*, agreed to "restore[] and confirm[]" the Indian status of "all those persons who received any of the assets of [seventeen] rancherias," including the North Fork Rancheria, "pursuant to the [CRA]." Stip. Entry J. ("*Hardwick* Stip. J.") ¶¶ 1–3, Jt. App. at 54, 55–56, ECF No. 124-1. The United States further agreed to recognize the North Fork Tribe as an Indian entity and to include the Tribe "on the Bureau of Indian Affairs Federal Register list of recognized tribal entities pursuant to 25 CFR, Section 83.6(b)," with entitlement "to any of the benefits or services provided or performed by the United States for Indian Tribes, Bands,

10

Communities or groups because of their status as Indian Tribes, Bands, Communities or groups." *Id.* ¶ 4, Jt. App. at 56–57.[4]  Lastly, in relevant part, the United States agreed that, within two years, the recognized Indian "entit[y]" of the North Fork Rancheria could "arrange to convey to the United States [certain] community-owned lands . . . to be held in trust by the United States for the benefit of [the] Tribe[], Band[], Communit[y] or group[] [of the North Fork Rancheria] . . . , authority for the acceptance of said conveyances being vested in the Secretary of the Interior under section 5 of the Act of June 18, 1934, 'The Indian Reorganization Act,' 48 Stat. 985, 25 U.S.C. §465 as amended by section 203 of the [ILCA] . . . and/or the equitable powers of this court." *Id.* ¶ 7, Jt. App. at 57–58.

A notice was subsequently published in the Federal Register memorializing the *Hardwick* judgment, Restoration of Federal Status to 17 California Rancherias, 49 Fed. Reg. 24,084 (June 11, 1984), and, in 1985, the DOI listed the "Northfork Rancheria of Mono Indians of California" as an "Indian Tribal Entit[y] Recognized and Eligible to Receive Services" from the BIA, Indian Tribal Entities Recognized and Eligible to Receive Services, 50 Fed. Reg. 6,055, 6,057 (Feb. 13, 1985), *available at* Pls.' Mot., Ex. 3, ECF No. 106-4.  The "Northfork Rancheria of Mono Indians of California"—*i.e.*, the North Fork Tribe in this case—has been listed as a recognized tribe in the Federal Register ever since.

---

[4]     Paragraph 4 of the *Hardwick* Stipulated Judgment provided, in full:
        The Secretary of the Interior shall recognize the Indian Tribes, Bands, Communities or groups of the seventeen rancherias listed in paragraph 1 [including the North Fork Rancheria] as Indian entities with the same status as they possessed prior to distribution of the assets of these Rancherias under the California Rancheria Act, and said Tribes, Bands, Communities and groups shall be included on the Bureau of Indian Affairs Federal Register list of recognized tribal entities pursuant to 25 CFR, Section 83.6(b).  Said Tribes, Bands, Communities, or groups of Indians shall be relieved from the application of section 11 of the California Rancheria Act and shall be deemed entitled to any of the benefits or services provided or performed by the United States for Indian Tribes, Bands, Communities or groups because of their status as Indian Tribes, Bands, Communities or groups.

The North Fork Tribe formally established a modern tribal government and adopted a tribal constitution in 1996 and, today, consists of over 1,750 citizens.  IGRA ROD at 53; North Fork Rancheria of Mono Indians Proposed Gaming Project Status Update (May 29, 2007) at 1, Jt. App. at 149, ECF No. 124-1; TAC ¶ 25; North Fork's Answer TAC ¶ 25, ECF No. 104. According to the DOI's American Indian Population and Labor Force Report in 2010, "more than 16 percent of the Tribe's potential labor force is unemployed."  IGRA ROD at 52.  As "[t]he Tribe has no sustained revenue stream that could be used to fund programs and provide assistance to Tribal members," the Tribe's membership has a high poverty rate and is highly reliant on Federal and State governments for social services.  BUREAU OF INDIAN AFFAIRS, Final Envtl. Impact Statement, North Fork Casino, North Fork Rancheria of Mono Indians Fee-to-Trust & Casino/Hotel Project (Feb. 2009) ("FEIS") at 1-10, Jt. App. at 204, 345, ECF Nos. 124-3, -6.  Without the potential casino project, the Tribe's only sources of revenue are government and California Revenue Sharing Trust Fund grants.  IGRA ROD at 53.

The North Fork Rancheria, located "approximately three miles east of the community of North Fork," is now held in trust by the United States for the benefit of individual members of the North Fork Tribe.  IGRA ROD at 9, 53–54.  Due to its location "on environmentally sensitive lands within the Sierra National Forest, . . . near Yosemite National Park," with "difficult" accessibility by car, the North Fork Rancheria is "currently used [solely] for residential purposes."  Id. at 61; see id. at 10 ("[M]ost of the Rancheria is undeveloped, with numerous and varied biological resources present throughout," except for "scattered . . . rural residences.").  While some land within the North Fork Rancheria is "technically eligible for gaming under the IGRA," much of it is not.  Id. at 9.

The United States also holds in trust for the North Fork Tribe a 61.5-acre tract of land "located on a steep hillside . . . in the small town of North Fork," California. *Id.* at 4, 54. This tract was placed in trust for the North Fork Tribe by the U.S. Department of Housing and Urban Development ("HUD") and the BIA, specifically for "low income Indian housing, an endangered species conservation reserve, and related uses." *Id.* at 4. The tract contains a community center, basic infrastructure (*i.e.*, roads, water, sewer), pads for nine single-family homes, and the North Fork Tribe's "current government headquarters." *Id.* at 4–5, 54.

### B.   MADERA SITE

The Madera Site "is located in the eastern plains of the San Joaquin Valley within 2.5 miles of the Fresno River, . . . near the Sierra Nevada foothills," on unincorporated land in southwest Madera County, California. IGRA ROD at 1, 55. Historically, the San Joaquin Valley "floor was an area of intertribal use and occupancy, where neighboring [aboriginal] bands hunted large game, fished in the waters of the San Joaquin River, and otherwise shared access to its resources during certain times of the year." *Id.* at 56. Today, the Madera Site is "immediately adjacent and west of State Route (SR) 99, which provides regional access to the area" and is largely "comprised of vacant agricultural lands which have never been developed" and "situated at a distance from residential and other sensitive areas between the only two cities in the County, Madera and Chowchilla," approximately 7.6 miles north of the City of Madera. IGRA ROD at 1, 9, 57, 63. The Site is approximately 36 miles away from the North Fork Tribe's HUD tract and government headquarters, and 38 miles away from the unincorporated community of North Fork and the North Fork Rancheria. IGRA ROD at 4–5, 54, 83–84. Although citizens of the North Fork Tribe live on the North Fork Rancheria or near the community of North Fork, "[s]eventy-three percent of the adult citizens of the Tribe are located closer to the [Madera] Site than to the [North Fork] Rancheria," "a majority (62 percent) of tribal citizens live within 50

13

miles of the Site, and a substantial number of tribal citizens live within 25 miles of the Site."

IGRA ROD at 9–10, 52, 83–84.

### C.   ACTIONS UNDERLYING ADMINISTRATIVE DECISIONS

In order "to meet its need for economic development, self-sufficiency, and self-governance, and to provide its quickly growing Tribal citizen population with employment, educational opportunities and critically needed social services," the North Fork Tribe has sought to construct and operate a gaming establishment on the Madera Site.  IGRA ROD at 1–2.  Since the Madera Site is not on the North Fork Tribe's reservation, the process to achieve this goal is long and arduous.  It requires, *inter alia*, in no certain order, (1) acquisition of the Madera Site in federal trust on behalf of the North Fork Tribe; (2) a Secretarial two-part determination that a casino on the Madera Site would be in the best interest of the Tribe and not detrimental to the surrounding community; (3) the Governor of California's concurrence in the Secretarial two-part determination; (4) compliance with statutory and regulatory requirements of the NEPA and the CAA; and (5) either a Tribal-State compact between the North Fork Tribe and the State of California, approved by the Secretary, or, in certain circumstances, procedures prescribed by the Secretary that are consistent with a proposed Tribal-State compact and other laws.

As part of this process, in March 2005, the North Fork Tribe submitted a fee-to-trust application to the BIA "request[ing] that the BIA issue a Secretarial Determination and transfer the [Madera Site] into Federal trust for the Tribe to conduct tribal government gaming," pursuant to the IRA and the IGRA.  *Id.* at 2, 11.  Over four months before this formal request was submitted, the BIA published a notice in the *Federal Register* announcing its intent to prepare an Environmental Impact Statement ("EIS") pursuant to the NEPA, 42 U.S.C. § 4332(2)(C), which requires the development of such statements as part of certain major Federal actions, for the North Fork Tribe's proposed trust acquisition of the Madera Site.  *See* Notice of Intent to Prepare

14

an Envtl. Impact Statement for the North Fork Rancheria's Proposed Trust Acquisition, 69 Fed. Reg. 62,721 (Oct. 27, 2004), AR at NF_AR_0001336.  This notice provided the opportunity for one month, until November 26, 2004, for public comment "on the scope and implementation of this proposal."  *Id.*  The "scoping" comment period was later extended for an additional six months, until May 6, 2005.  *See* Notice of Intent to Prepare an Envtl. Impact Study for North Fork's Project, 70 Fed. Reg. 17,461 (Apr. 6, 2005), AR at NF_AR_0001337.

In February 2008, the DOI distributed a Draft Environmental Impact Statement ("DEIS") regarding the proposed acquisition of the Madera Site "to Federal, tribal, state, and local agencies and other interested parties for a 45-day review and comment period."  IGRA ROD at 3; *see also* Draft Envtl. Impact Statement for the North Fork Rancheria's Proposed 305 Acre Trust Acquisition, 73 Fed. Reg. 8,898, 8,899 (Feb. 15, 2008), NF_AR_0001338–39 (providing notice that "[w]ritten comments on the scope and implementation of this proposal must arrive by March 31, 2008").  During the public comment period, the BIA received a total of 331 comment letters, and conducted a public hearing on March 12, 2008, at which 101 individuals spoke.  *See* IGRA ROD at 3–4; FEIS, apps. vol. IV, app. Y, Comments at 7–10, AR at NF_AR_0034984, 34990–93 (listing commenters at public hearing).[5]  Following the public comment period on the DEIS, on August 6, 2010, the BIA published a notice in the *Federal Register* announcing its intent to submit a Final Environmental Impact Statement ("FEIS") to the EPA.  *See* Final Envtl. Impact Statement for the North Fork Rancheria's Proposed 305-Acre Trust Acquisition, 75 Fed. Reg. 47,621 (Aug. 6, 2010), AR at NF_AR_0039003–04.  This notice also provided 30 days

---

[5]     The plaintiffs and their representatives were responsible for 40 comments, either written during the comment period or spoken at the public hearing, including three comments from representatives of the Chukchansi Gold Resort and Casino, which is owned and operated by the plaintiff Picayune Tribe.  *See id.* at 1–11.

within which to comment on the FEIS and stated that the FEIS was publicly available in a number of locations, including online. *See id.* at 47,621–22.

On September 1, 2011, after the FEIS had been published, then-Assistant Secretary of Indian Affairs, Larry Echo Hawk, issued a Record of Decision ("ROD") under the IGRA ("IGRA ROD"), making a "two-part determination" and concluding that "Alternative A," the North Fork Tribe's proposed gaming facility, which involved the development of "an approximately 247,182 square foot casino" and "a 200-room hotel" on the Madera Site, was the "Preferred Alternative." IGRA ROD at 1, 24–25, 89.[6] Alternative A, the proposed casino, was chosen from among five alternatives because it "will best meet the purpose and need for the Proposed Action, in promoting the long-term economic self-sufficiency, self-determination and self-government of the [North Fork] Tribe." *Id.* at 24–25; *see also id.* at 87–89. In reaching this conclusion, the Secretary further found that, under 25 C.F.R. Part 292, Alternative A was "in the best interest of the [North Fork] Tribe and its citizens," and "would not result in detrimental impact on the surrounding community." *Id.* at 83, 85. The Secretary's conclusions in the IGRA ROD were supported by an analysis of the alternative actions; consideration of the factors laid out in 25 C.F.R. Part 292, which the Secretary is required to consider (*e.g.*, economic impacts of development, impacts on the surrounding community, historical connection to the land); and the mitigation measures that would be taken to lessen any potential negative impacts on the surrounding community and others outside that community. *See id.* at 4–89. Generally, the IGRA ROD stated that the Secretary's decision was based on, *inter alia*, "thorough review and consideration of the [North Fork] Tribe's fee-to-trust application and materials submitted there

---

[6]     Although the IGRA ROD was authored by the Assistant Secretary for Indian Affairs, the Court will refer to the decision as that of the "Secretary," as that term is defined in IGRA regulations: "the Secretary of the Interior or authorized representative." 25 C.F.R. § 292.2.

within; . . . the DEIS; the FEIS; the administrative record; and comments received from the

public, Federal, state, and local governmental agencies; and potentially affected Indian tribes."

*Id.* at 1.

A year after the publication of the IGRA ROD, in August 2012, the North Fork Tribe and

Governor of California Edmund "Jerry" Brown executed a Tribal-State Compact ("Compact"),

witnessed by California's then-Secretary of State ("California Secretary"), Debra Bowen.

Tribal-State Compact Between the State of California and the North Fork Rancheria of Mono

Indians of California (Aug. 31, 2012) ("Tribal-State Compact") at 111, Jt. App. at 2224, 2343

ECF No. 130-4, -5.  Governor Brown also concurred in the Secretary's determination to place

the Madera Site in trust for the North Fork Tribe.  *See* Letter from Jerry Brown to Kenneth

Salazar, Sec'y, U.S. Dep't of the Interior (Aug. 30, 2012) ("Concurrence Letter") at 1–2, Jt. App.

at 1601–02, ECF No. 128-9.

On November 26, 2012, then-Assistant Secretary for Indian Affairs, Kevin Washburn,

issued a ROD under the IRA ("IRA ROD"), approving the North Fork Tribe's fee-to-trust

application for the proposed casino, "Alternative A," on the Madera Site.  *See* IRA ROD at 63.[7]

This ROD announced that "the Preferred Alternative to be implemented" is "Alternative A,

consisting of the acquisition of trust title to the 305.49-acre [Madera] site," construction of a

"casino-resort complex"  including "an approximately 247,180 square foot casino, 200-room

hotel, ancillary infrastructure, and mitigation measures presented in . . . the FEIS."  *Id.* at 1–2.

Similarly to the decision made under the IGRA, the IRA ROD determined that this Preferred

Alternative would "best meet[] the purpose and need of the Tribe and the BIA while preserving

the natural resources of the Madera [S]ite" by "promot[ing] the long-term economic vitality, self-

---

[7]        The Court will similarly refer to the IRA ROD as that of the "Secretary," as that term is defined in IRA
regulations:  "the Secretary of the Interior or authorized representative."  25 C.F.R. § 151.2(a).

sufficiency, self-determination and self-governance of the [North Fork] Tribe." *Id.* at 1, 25–26. Likewise, the IRA ROD analyzed alternative actions; environmental impacts and public comments; and mitigation measures to be taken, *see id.* at 4–52; and summarized the Secretary's consideration of the factors outlined in 25 C.F.R. Part 151, including an analysis of the Secretary's authority for the acquisition under the IRA, 25 U.S.C. § 465, *see id.* at 53–61.

Shortly after the issuance of the IRA ROD, the Secretary announced the decision to acquire the Madera Site by publishing a notice in the *Federal Register* on December 3, 2012. *See* Land Acquisitions; North Fork Rancheria of Mono Indians of California, 77 Fed. Reg. 71,611 (Dec. 3, 2012).

### D.      COMMENCEMENT OF INSTANT LAWSUIT

As discussed in *Stand Up I*, the plaintiffs in this consolidated action consist of two distinct groups.  The first group, the Stand Up plaintiffs, consists of various individual citizens and community organizations located in and around Madera, California.  TAC ¶¶ 5–10.  The other group, the Picayune Tribe, is a federally-recognized Indian Tribe located in Madera County that operates a class III gaming facility called the Chukchansi Gold Resort and Casino on its reservation lands, which are located approximately 30 miles from the Madera Site.  Picayune's Compl. ¶ 5.[8]  The two groups of plaintiffs filed suit separately in December 2012 challenging the

---

[8]      There are differing accounts of exactly how far the Picayune Tribe's gaming facility is from the Madera Site.  *See, e.g.*, TAC ¶ 37 ("The Picayune [Tribe] . . . conducts a legal tribal gaming operation on its historical and traditional lands which are approximately 39 miles from the Casino Parcel.").  Here, the Court cites to the allegations of the Picayune Tribe, as set forth in its Complaint.  In its briefing papers, the Picayune Tribe asserts that "the Madera Site sits 26.4 miles from the Picayune Rancheria."  Picayune's Mem. Supp. Mot. Summ. J. ("Picayune's Mem.") at 5, 18, ECF No. 108-1.  Notably, in the course of this litigation, the Picayune Tribe's gaming facility was apparently ordered closed by the National Indian Gaming Commission ("NIGC"), on October 14, 2014, for various regulatory violations.  *See* Intervenor North Fork's Mem. Supp. Mot. Summ. J. & Opp'n Pls.' Mots. Summ. J. ("North Fork's Mem.") at 5–6 & n.2, ECF No. 111-1 (citing *California v. Picayune Rancheria of Chukchansi Indians*, No. 14-CV-1593 (E.D. Cal. Oct. 29, 2014)).  It appears to have reopened, at least temporarily, however, as a result of a settlement agreement under certain conditions prescribed in a permanent injunction order issued by the United States District Court for the Eastern District of California.  *See California v. Picayune Rancheria of Chukchansi Indians*, No. 14-CV-1593, 2015 WL 9304835 (E.D. Cal. Dec. 22, 2015), *appealed*, No. 16-15096 (9th Cir. Jan. 22, 2016).

two separate but related IGRA and IRA RODs regarding the Madera Site, discussed *supra* in

Part I.C.  *See Stand Up I*, 919 F. Supp. 2d at 54–55; Compl., ECF No. 1; Picayune's Compl.  The

cases were consolidated on January 9, 2013.  *See* Minute Order (Jan. 9, 2013).[9]

The Stand Up plaintiffs, who raised numerous claims under the APA, the IRA, the IGRA,

and the NEPA, soon thereafter filed a motion for a preliminary injunction to enjoin the

defendants from transferring the Madera Site into trust pending resolution of the action on the

merits.  *Stand Up I*, 919 F. Supp. 2d at 54, 66; Pls.' Mot. Prelim. Inj., ECF No. 26.  The Court

denied the motion on January 29, 2013, concluding that the plaintiffs had not demonstrated a

likelihood of success on the merits of any of their claims, or a likelihood of irreparable harm that

would occur absent preliminary injunctive relief, and that the balance of equities and public

interest weighed against granting such relief.  *Stand Up I*, 919 F. Supp. 2d at 66, 81, 83–85.

Consequently, on February 5, 2013, the Madera Site was taken into trust for the North Fork

Tribe.  *See* Mem. & Order (Dec. 16, 2013) ("Partial Remand Order") at 4, ECF No. 77.  The

initial administrative record ("AR") in this case was lodged on April 26, 2013.  *See* Lodging AR,

ECF No. 51.

## E.     PARTIAL REMAND AND SUBSEQUENT STATE AND AGENCY ACTIONS

After the denial of preliminary injunctive relief, the Stand Up plaintiffs amended their

complaint, on June 27, 2013, *inter alia*, to add claims challenging the federal defendants'

compliance with certain portions of the CAA when "approving and supporting" the North Fork

Tribe's fee-to-trust application.  *See* First Amended Compl. ("FAC") ¶¶ 80–95 (Fourth Claim for

Relief), ECF No. 56; Partial Remand Order at 1; *see also* TAC ¶¶ 83–98 (Fourth Claim for

---

[9]     The defendants do not challenge the standing of the plaintiffs in this action, but the Court nonetheless
assured itself of jurisdiction in *Stand Up I*.  *See* 919 F. Supp. 2d at 56 n.7.

Relief).  The plaintiffs also added allegations that the Governor of California's August 2012

concurrence in the Secretary's two-part IGRA determination "is invalid."  FAC ¶ 65; *see id.* ¶ 60

("[I]n issuing his concurrence in the Secretary's two-part determination, the Governor of

California engaged in policy-making decisions that bound the state, constituting a legislative act

for which he lacked authority under California law, thereby rendering the Governor's

concurrence and the Secretary's action null and void."); *see also* TAC ¶¶ 63, 68 (same).  The

plaintiffs made the same allegations in a state lawsuit against, *inter alia*, the State of California

that is currently on appeal in California's Fifth District Court of Appeal, as discussed *infra* in

Part I.G.

 The same day that the plaintiffs amended their instant complaint, the California

Legislature ratified the Tribal-State Compact in California Assembly Bill No. 377.  *See* AB-277

Tribal gaming: compact ratification (2013-2014), Bill History, CAL. LEGIS. INFO.,

http://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=201320140AB277 (last

visited Mar. 13, 2016).  The bill was subsequently approved by Governor Brown and filed with

California Secretary Bowen on July 3, 2013.  *See* Assemb. Bill No. 877, Ch. 51 (Cal. 2013)

(codified at CAL. GOV'T CODE § 12012.25), Jt. App. at 2,222, ECF No. 130-4.

 By letter dated July 16, 2013, California Secretary Bowen "forward[ed]" a copy of the

Compact and the state legislation "ratifying" the Compact to Paula Hart, the Director of the

Office of Indian Gaming at the DOI.  Letter from Debra Bowen to Paula Hart (July 16, 2013)

("July 16, 2013 Transmittal Letter") at 1, Jt. App. at 2,199, ECF No. 130-1.  The transmittal

letter noted that the state legislation would not become "effective" until January 1, 2014, if at all,

but that California Secretary Bowen was statutorily obligated, under California law, "to forward

a copy of a compact upon receipt of the compact and the statute ratifying it." *Id.* at 1–2.[10]  The

transmittal letter cautioned that, under the California Constitution, the statute had a "delayed

effective date [to] provide[] adequate time" for California citizens to "to exercise [a state

constitutional] right to pursue a referendum process to approve or reject" the statute or part of the

statute.  July 16, 2013 Transmittal Letter at 1; *see* CAL. CONST., art. II, § 9 (referendum); *id.*, art.

IV, § 8(c)(1) (effective date of statutes).  In this regard, the transmittal letter advised that,

pursuant to the State's "constitutional authority," a referendum measure had been filed to

approve or reject the compact and that, if "the electorate rejects the statute" ratifying the

compact, "it is of no legal effect."  July 16, 2013 Transmittal Letter at 1–2.  Without citation to

legal authority, the letter opined that:

> It is, of course, a question of federal law whether this act of forwarding to the
> Secretary of the Interior a compact with a ratifying statute that is, as in this case,
> subject to the referendum power, constitutes submitting the compact within the
> meaning of 25 U.S.C. § 2710(d)(8)(C), and whether, prior to the exhaustion of the
> referendum process, such a compact has been entered into by the State of
> California within the meaning of 25 U.S.C. § 2710(d)(8)(A).

*Id.* at 2.

Under the IGRA, the type of gaming activities that the North Fork Tribe seeks to

conduct, class III gaming activities, may not be conducted on Indian lands unless, *inter alia*,

"conducted in conformance with a Tribal-State compact entered into by the Indian tribe . . . that

is in effect."  25 U.S.C. § 2710(d)(1)(C).  A Tribal-State compact "take[s] effect only when

notice of approval by the Secretary of such compact has been published by the Secretary in the

---

[10]     Indeed, California law provides that "[u]pon receipt of a statute ratifying a tribal-state compact negotiated and executed pursuant to subdivision (c), . . . the Secretary of State shall forward a copy of the executed compact and the ratifying statute, if applicable, to the Secretary of the Interior for his or her review and approval, in accordance with [25 U.S.C. § 2710(d)(8)]."  CAL. GOV'T CODE § 12012.25(f).  California law further instructs that compacts, such as the one in this case, are "ratified by a statute approved by each house of the Legislature, a majority of the members thereof concurring, and signed by the Governor, unless the statute contains implementing or other provisions requiring a supermajority vote, in which case the statute shall be approved in the manner required by the [California] Constitution."  *Id.* § 12012.25(c).

Federal Register." *Id.* § 2710(d)(3)(B).  When a Tribal-State compact is submitted to the Secretary for approval, the Secretary "has three choices[:]" (1) the Secretary "may approve the compact," *id.* § 2710(d)(8)(A); (2) the Secretary "may disapprove the compact, but only if it violates IGRA or other federal law or trust obligations, *id.* § 2710(d)(8)(B);" or (3) the Secretary "may choose to do nothing, in which case the compact is deemed approved after forty-five days 'but only to the extent the compact is consistent with the provisions' of IGRA, *id.* § 2710(d)(8)(C)." *Amador Cty.*, 640 F.3d at 377.  Here, in response to California Secretary Bowen's "forwarding" of the Compact, the Secretary took no action.

Meanwhile, in light of the plaintiffs' added CAA claims, the federal defendants requested that the instant action be stayed and partially remanded for the limited purpose of allowing them to comply with certain CAA notice requirements.  *See* Fed. Defs.' Mot. Stay Litig. & Partial Remand at 1–2, ECF No. 63; Partial Remand Order at 1, 3.  On December 16, 2013, the Court granted the federal defendants' motion, remanding the case without vacatur of the administrative action taken to date, to allow the defendants to undertake the notice process required by CAA regulations.  Partial Remand Order at 8.  This case was stayed until May 5, 2014, *see* Minute Order (Mar. 18, 2014), on which date a supplemental AR was filed with documents that had been "inadvertently omitted" from the first AR and "documents, communications, and other materials relating to the partial remand," *see supra* n.2.

During consideration of the federal defendants' motion for partial remand and another then-pending motion by the plaintiffs, *see* Pls.' Mot. Compel Production Privilege Index & Suppl. AR, ECF No. 58 (denied without prejudice in light of the Court's Partial Remand Order, *see* Minute Order (Dec. 16, 2013)), in October 2013, the Tribal-State Compact was deemed approved by operation of law, under 25 U.S.C. § 2710(d)(8)(C), because the Secretary took no

action.  Notice of Tribal-State Class III Gaming Compact taking effect, 78 Fed. Reg. 62,649

(Oct. 22, 2013).  The Secretary was then statutorily obligated to "publish in the Federal Register

notice of any Tribal-State compact that is approved, or considered to have been approved."  25

U.S.C. § 2710(d)(8)(D).  The Secretary published a notice in the *Federal Register*, upon which

notice the Compact "took effect."  *See* 78 Fed. Reg. at 62,649.

Shortly thereafter, the Stand Up plaintiffs again amended their complaint, adding a new

claim challenging, as arbitrary and capricious, the federal defendants' third decision, in October

2013, to take no action to disapprove, within the statutorily-allowed period, the Tribal-State

Compact between the North Fork Tribe and the State of California, thereby allowing the

Compact to become effective upon the agency's publication of the Compact in the *Federal

Register.  See* Second Amended Compl. ¶¶ 98–104 (Fifth Claim for Relief), ECF No. 84.

Specifically, the plaintiffs allege that "[t]he Secretary failed to disapprove a compact that has not

been validly entered into by the State of California" and invalidly published notice of the

approval in the *Federal Register.  Id.* ¶ 102; *see also* TAC ¶¶ 99–105 (Fifth Claim for Relief).

The Stand Up plaintiffs also moved to compel further supplementation of the AR, which motion

the Court partially granted on October 15, 2014.  *See Stand Up II*, 71 F. Supp. 3d at 114, 124;

Pls.' Mot. Compel Suppl. AR & Compel Production Privilege Index, ECF No. 85.  Accordingly,

on November 4 and 7, 2014, the federal defendants again, for the third and fourth times,

supplemented the AR.  *See supra* n.2; Corrected Notice Filing Suppl. AR, ECF No. 98;

Certification Suppl. AR, ECF No. 100.

On November 4, 2014, California voters rejected the California Legislature's approval of

the Tribal-State Compact.  *See* Debra Bowen, Statement of Vote, Nov. 4, 2014, General

Election, at 15, http://elections.cdn.sos.ca.gov/sov/2014-general/pdf/2014-complete-sov.pdf (last

visited Mar. 13, 2016); Official Voter Information Guide, Cal. General Election, Nov. 4, 2014, at 40–45, 74, http://vigarchive.sos.ca.gov/2014/general/en/pdf/ (last visited Mar. 13, 2016).

Approximately one month later, on December 3, 2014, the Stand Up plaintiffs filed their Third Amended Complaint, ECF No. 103, which is now the operative complaint for these plaintiffs, adding another claim for relief under the IRA, the IGRA and the APA based on the referendum, *see id.* ¶¶ 106–15 (Sixth Claim for Relief). Specifically, the plaintiffs allege that, due to the referendum, the State and the North Fork Tribe have not entered into a Tribal-State compact permitting class III gaming and, consequently, the basis for the Secretary's first two decisions in the IGRA ROD and the IRA ROD has been removed. *Id.* ¶¶ 106–15.[11]

The parties filed cross-motions for summary judgment, the briefing for which took almost six months from January until the end of May 2015 to complete. *See* Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem."), ECF No. 106-1 (filed January 9, 2015); Picayune's Mem. Supp. Mot. Summ. J. ("Picayune's Mem."), ECF No. 108-1; North Fork's Mem. Supp. Mot. Summ. J. & Opp'n Pls.' Mots. Summ. J. ("North Fork's Mem."), ECF No. 111-1; United States' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), ECF No. 112-1; Pls.' Reply Supp. Summ. J. & Opp'n Cross-Mots. Summ. J. ("Pls.' Reply"), ECF No. 115; Picayune's Reply Supp. Mot. Summ. J. ("Picayune's Reply"), ECF No. 116; North Fork's Reply Supp. Mot. Summ. J. & Opp'n Pls.' Mots. Summ. J. ("North Fork's Reply"), ECF No. 121; United States' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 122; Notice Filing Suppl. Jt. App., ECF No. 133 (filed May 27, 2015).

---

[11]     The Picayune Tribe never amended its complaint and, thus, its original complaint remains operative as to its claims.

F.   **SUPPLEMENTAL BRIEFING, CALIFORNIA LITIGATION AND RELATED FILINGS**

Notwithstanding the parties' arguments in ample briefing regarding the validity of the Tribal-State Compact, no party raised or addressed the issue of whether the State of California is a party required to be joined under Federal Rule of Civil Procedure 19 and, if so, the effect of California's absence on the plaintiffs' claims and the parties' positions. *See Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995) (holding that, where the validity of a tribal-state compact is at issue, the State is an indispensable party to the suit, reasoning that "the State . . . has an interest in the validity of a compact to which it is a party, and this interest would be directly affected by the relief" sought).   In light of binding precedent in this Circuit, *see id.* at 1495 n.3 (making clear that, given its import, the Court has a duty to raise the issue *sua sponte*), the Court subsequently ordered supplemental briefing to address this issue, Mem. & Order (Sept. 30, 2015), ECF No. 135, which briefing took an additional two months, from October to December 2015, to complete, *see* Pls.' Suppl. Br. Whether Cal. Must Joined Under Fed. R. Civ. P. 19 ("Pls.' Suppl. Brief"), ECF No. 139 (filed Nov. 4, 2015); Picayune's Resp. Court's Order Regarding Joinder Cal. ("Picayune's Suppl. Br."), ECF No. 140; North Fork's Opening Suppl. Br. Rule 19 ("North Fork's Suppl. Br."), ECF No. 137; United States' Suppl. Br. Regarding Order Sept. 30, 2015 ("Defs.' Suppl. Br."), ECF No. 138; Pls.' Reply Supp. Suppl. Br. ("Pls.' Suppl. Reply"), ECF No. 143; Picayune's Resp. Br. Regarding Joinder Cal. ("Picayune's Suppl. Reply"), ECF No. 144; North Fork's Reply Br. Supp. Suppl. Br. Rule 19 ("North Fork's Suppl. Reply"), ECF No. 141; United States' Reply Suppl. Brs. Regarding Order Sept. 30, 2015 ("Defs.' Suppl. Reply"), ECF No. 142 (filed Dec. 2, 2015).

Meanwhile, and relatedly, the North Fork Tribe initiated a federal lawsuit in the Eastern District of California against the State of California challenging the State's position, "[f]ollowing

the referendum, . . . that the compact ha[d] not been ratified in accordance with California law and that the State therefore ha[d] not entered into a compact with the Tribe." *North Fork Rancheria v. State of California*, No. 15-cv-419-AWI-SAB ("E.D. Cal. Case"), Compl. ("E.D. Cal. Compl.") ¶ 6, ECF No. 1, *available at* Pls.' Suppl. Br., Ex. 1, ECF No. 139-1; *see* E.D. Cal. Case, Answer ¶ 6, ECF No. 9 ("aver[ing] that it has been, and is, the State's position that that [sic] as a result of the statewide referendum . . . , the statute ratifying the North Fork Compact never took effect"); Pls.' Notice Related Cases, ECF No. 118. The IGRA "imposes upon the States a duty to negotiate in good faith with an Indian tribe toward the formation of a compact, § 2710(d)(3)(A), and authorizes a tribe to bring suit in federal court against a State in order to compel performance of that duty, § 2710(d)(7)," when, as here, the State has consented to suit. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 47 (1996); *see* CAL. GOV'T CODE § 98005 (consenting to federal court jurisdiction "in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith"). Pursuant to these statutory provisions, the North Fork Tribe alleged (1) "that the State failed to negotiate in good faith toward an[] enforceable compact – within the meaning of 25 U.S.C. § 2170(d)(7) – when it 'refus[ed] to honor the 2012 Compact based on the . . . referendum' vote" and (2) "that the State had a duty to continue negotiation after the referendum yet refused to enter into negotiations." E.D. Cal. Case, Order Cross Mots. J. Pleadings (Nov. 13, 2015) ("E.D. Cal. Order") at 8, ECF No. 25 (citing E.D. Cal. Compl. ¶¶ 72, 75–79), *available at* Pls.' Suppl. Reply, Ex. A, ECF No. 143-1. Notably, the parties to that suit, including the North Fork Tribe, the State of California,

and the Picayune Tribe, all agreed "that the State and the Tribe ha[d] not entered into an

enforceable compact." *Id.* at 12.[12]

Over the course of the supplemental briefing in the instant case, the Eastern District of

California court ruled in favor of the North Fork Tribe and, deciding only the second issue, held

"that the State failed to enter into negotiations with North Fork for the purpose of entering into a

Tribal-State compact within the meaning of § 2710," *id.* at 9, 23, by "flatly refus[ing] to

negotiate with the tribe regarding the Madera parcel" after the referendum, *id.* at 19.

Consequently, the court ordered the parties "to conclude a compact within 60 days . . . [,]" *id.* at

23, pursuant to an IGRA provision requiring a court to "order the State and the Indian Tribe to

conclude . . . a compact within a 60-day period," when "the court finds that the State has failed to

negotiate in good faith with the Indian tribe to conclude [such] a . . . compact," 25 U.S.C. §

2710(d)(7)(B)(iii).  The State of California did not appeal the court's decision and, thus, it is

final.  *See* North Fork's Notice Devs. Arising From Related Case ("North Fork's Notice") ¶ 7,

ECF No. 154; Defs.' Notice Proposed Compact Submission ("Defs.' Notice") at 1 n.1, ECF No.

155; Defs.' Notice Related Devs. ("Defs.' Second Notice") at 1, ECF No. 163.

When the parties failed to conclude a compact within the prescribed time, *see* E.D. Cal.

Case, Jt. Resp. Order Show Cause Why Court Should Not Order Parties Mediation Pursuant 25

U.S.C. § 2710(d)(7)(B)(iv) (Jan. 13, 2016), ECF No. 26, the court continued down the path of

the IGRA's "elaborate remedial scheme designed to ensure the formation of a Tribal-State

contract," *Seminole Tribe*, 517 U.S. at 50, and appointed a mediator to select a proposed compact

---

[12]     Notwithstanding this consensus position in the California litigation, the North Fork Tribe represented to
this Court that the Tribe's complaint in the Eastern District of California litigation "makes clear that it is challenging
the State's refusal either to honor the 2012 Compact or negotiate a new one in the wake of the referendum, and has
*not questioned the validity and effectiveness of the compact.*"  North Fork's Reply at 27 n.16 (emphasis added).
Indeed, the Picayune Tribe argues in this case that the North Fork Tribe, as a result of its litigation stance in the
Eastern District of California litigation, "is now judicially estopped from arguing here that the [Tribal-State]
[C]ompact was entered into or is in effect."  Picayune's Mot. Suppl. Briefing at 2, ECF No. 158.

and facilitate additional procedures, as prescribed by § 2710(d)(7)(B)(iv) through (vii) of the

IGRA, E.D. Cal. Case, Order Confirming Selection Mediator Pursuant 25 U.S.C. §

2710(d)(7)(B)(iv) & Requiring Parties Submit Their Last Best Offers Compact (Jan. 26, 2016),

ECF No. 30; *see also* North Fork's Notice ¶¶ 6–9.  The mediator selected the North Fork Tribe's

proposed compact and, since California "failed to give final and binding consent to the compact

selected," the mediator "provided notice to the U.S. Department of Interior that no agreement

was reached by the parties," pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii) (providing that the

mediator shall notify the Secretary if the State does not consent to the proposed compact selected

by the mediator within a 60-day time period).  North Fork's Notice ¶¶ 10–11; Defs.' Notice at 1.

   The IGRA then required "the Secretary [to] prescribe, in consultation with the Indian

Tribe, procedures [(1)] which are consistent with the proposed compact selected by the mediator

. . . , the provisions of [the IGRA], and the relevant provisions of the laws of the State, and [(2)]

under which class III gaming may be conducted on the Indian lands over which the Indian tribe

has jurisdiction."  25 U.S.C. § 2710(d)(7)(B)(vii).  On July 29, 2016, Lawrence S. Roberts,

Acting Assistant Secretary of Indian Affairs, notified the North Fork Tribe and the State of

California that, after reviewing the mediator's compact submission, "procedures under which the

[North Fork Tribe] may conduct Class III gaming consistent with IGRA" had been issued and,

thus, "Secretarial Procedures for the conduct of Class III gaming on the Tribe's Indian lands are

prescribed and in effect."  Defs.' Second Notice, Ex. A, Letter from Lawrence S. Roberts to

Maryann McGovran, Chairwoman, North Fork Rancheria of Mono Indians (July 29, 2016) at 1,

3, ECF No. 163-1; *see also id.*, Secretarial Procedures for the North Fork Rancheria of Mono

Indians (Draft, May 13, 2016) ("Secretarial Procedures"), ECF No. 163-1.  The Secretarial

Procedures provide that they constitute "the full and complete authorization by the Secretary of

the Interior for the Tribe to conduct class III gaming in its Indian lands pursuant to IGRA," and "supersede any prior agreements or understandings with respect to the subject matter hereof." Secretarial Procedures at 92, 99 (§§ 14.1, 18.2).  The Procedures further provide that, upon their effective date, "any and all prior tribal-state Class III gaming compacts entered into between the Tribe and the State shall be null and void and of no further force and effect."  *Id.* at 99 (§ 18.2).

Approximately one month before the Secretarial Procedures were issued, the Picayune Tribe filed, on July 1, 2016, another federal lawsuit in the Eastern District of California, against the same federal defendants in this case, asserting seven claims for relief.  *See* Defs.' Second Notice at 2; *Picayune Rancheria v. U.S. Dep't of the Interior*, No. 16-cv-950-AWI-EPG (E.D. Cal. July 1, 2016), Compl. ¶¶ 49–94, ECF No. 1.  In that case, the Picayune Tribe challenges, *inter alia*, the effectiveness of the Governor's concurrence in the August 31, 2012 IGRA ROD on three separate grounds, *see id.* at ¶¶ 53, 64, 69, the continuing validity and effect of the IGRA ROD, *see id.* ¶¶ 74, 81, and the Secretary's ability, in light of the referendum vote, to "prescribe any procedures under which class III gaming can occur on the Madera [Site]," *id.* at ¶ 86.

## G.   CALIFORNIA STATE COURT LITIGATION

In addition to the instant lawsuit and federal lawsuits in the Eastern District of California, the plaintiff Stand Up for California! brought a lawsuit in California Superior Court for the County of Madera against, *inter alia*, the State of California, challenging, as in this case, the Governor's authority, under California law, to concur in the Secretary's two-part IGRA determination.  Pls.' Mem. at 28 n.23; *see North Fork Rancheria of Mono Indians v. California*, No. 15-cv-419-AWI-SAB, 2016 WL 3519245, at *4 (E.D. Cal. June 27, 2016).  The North Fork Tribe intervened in that litigation as a defendant, as in this case, and, on February 27, 2014, asserted a cross-complaint against, *inter alia*, the State of California, "challenging the validity of the referendum" and "alleg[ing] that ratification of a tribal-state compact by the Legislature is

not subject to the power of referendum under the California Constitution, and [that] the referendum impermissibly conflicts with the federal compact approval process under IGRA." Pls.' Suppl. Br. at 5; *see id.*, Ex. 3 (Verified Cross-Compl. Intervenor-Def. North Fork Rancheria Declaratory Relief) ¶ 35 (seeking "[a] judicial determination and declaration as to the validity of the Referendum Petition and its impact on the current status and future effectiveness of the Compact"), ECF No. 139-3.

The lower California court found against both the plaintiff Stand Up for California! and the defendant-intervenor North Fork Tribe, in favor of the State of California.  With respect to Stand Up for California!'s complaint, the court held "that the Governor was authorized to concur [in the two-part IGRA determination] under the California Constitution . . . . because issuing the concurrence was necessary for him to negotiate and conclude a compact with the Tribe."  Pls.' Mem. at 28 n.23.[13]  The court also rejected the North Fork Tribe's position, finding, instead, that the ratified Tribal-State Compact was subject to the referendum and that the referendum was valid and did not conflict with the IGRA.  Pls.' Suppl. Br. at 5–6; *North Fork Rancheria v. California*, 2016 WL 3519245, at *4; *see generally* Pls.' Suppl. Br., Ex. 4 (Ruling Dems. Cross-Complainant's Cross-Compl. ("Cal. Super. Ct. Ruling")), ECF No. 139-4.[14]

Both Stand Up for California! and the North Fork Tribe appealed the lower court's rulings.  Pls.' Mem. at 28 n.23; *Stand Up for California v. California*, Case No. MCV062850

---

[13]        In another, unrelated state case challenging the Governor's concurrence authority under California law, the lower court similarly upheld the Governor's authority to concur.  That case is currently on appeal before California's Third District Court of Appeal.  *United Auburn Indian Cmty. v. Brown*, Case No. 34-2013-800001412 (Cal. Super. Ct. Sacramento Cty. Aug. 19, 2013), *appeal filed*, C075126 (Cal. 3d Dist. Ct. App. Oct. 17, 2013).

[14]        In holding "that California's referendum process does not conflict either with Cal. Gov. Code § 12012.25(f) or with IGRA's timing requirements," the court explained that California's "Secretary of State is not in receipt of a statute ratifying a compact . . . until that statute takes effect," indicating that, in this case, the Secretary of State's obligation to forward the statute ratifying the Tribal-State Compact to the Secretary of the Interior did not apply until at least the day after the referendum vote.  Cal. Super. Ct. Ruling at 12.  The court further explained, "[t]he fact that in this case the Secretary of State forwarded the statute to the Secretary of Interior before it was in effect does not change that result."  *Id.*

(Cal. Super. Ct. Madera Cty. Mar. 3, 2014), *appeal filed*, Case No. F069302 (Cal. 5th Dist. Ct. App. Apr. 11, 2014) ("Pls.' State Case"); *Stand Up for California v. California*, Case No. MCV062850 (Cal. Super. Ct. Madera Cty. June 26, 2014), *appeal filed*, Case No. F070327 (Cal. 5th Dist. Ct. App. Oct. 27, 2014).  The North Fork Tribe dismissed its appeal on June 2, 2016. *North Fork Rancheria v. California*, 2016 WL 3519245, at *4.  Stand Up for California!'s appeal, however, is still currently pending before California's Fifth District Court of Appeal. Pls.' Mem. at 28 n.23; *see also North Fork Rancheria v. California*, 2016 WL 3519245, at *4 (explaining that, in the decision "presently pending before California's Fifth District Court of Appeal," "[t]he Madera County Superior Court held that the Governor's authority to concur with the Secretary's determination is implicit in the Governor's authority to negotiate and conclude Tribal-State compacts on behalf of the state.").

### H.    PARTIES' POSITIONS ON RECENT DEVELOPMENTS

Before the issuance of the Secretarial Procedures, the parties disputed the effect of the related litigation and corresponding events on the instant suit.  While the North Fork Tribe predicted that the recent developments "may affect the resolution of Stand Up's fifth and sixth claims for relief, as both claims assume that North Fork is seeking to game on the basis of the 2012 Compact, and neither contemplates the possibility of Secretarial procedures," North Fork's Notice ¶ 13, the federal defendants bluntly posited that "Stand up's Fifth and Sixth claims for relief, which concern the deemed approved compact, . . . will be mooted when the Secretary issues procedures that supplant the deemed approved compact," Defs.' Notice at 2.

The Stand Up plaintiffs disagreed.  According to them, their "Fifth Claim . . . is not moot until the compact terminates under its own terms or the federal defendants affirmatively terminate the compact in some lawful manner," and their Sixth Claim would not be moot because it "does not challenge the validity of the compact, but rather the validity of the trust

acquisition and two-part determination." Pls.' Objs. Notice Devs. Arising From Related Case & Notice Proposed Compact Submission at 2–3, ECF No. 156. Yet, the Stand Up plaintiffs nonetheless suggested that "[t]he Court [could not] resolve plaintiffs' Sixth Cause of Action until such time as the Secretary prescribes procedures and the parties have the opportunity to brief the effect of those procedures on the challenged trust decision." *Id.* at 3. Accordingly, the Stand Up plaintiffs asked the Court to "disregard" recent events, "adjudicate plaintiffs' claims on the administrative record[,]" and "[i]n the event the Secretary prescribes procedures, the Court should order further supplemental briefing on the effect of such procedures." *Id.* at 4.

Seeking yet another reason for additional supplemental briefing in this long-standing litigation, the Picayune Tribe, joined by the Stand Up plaintiffs, requested a "briefing schedule to address the recent developments[,] . . . . the parallel litigation[,] . . . [and] the legal consequences here." Picayune's Mot. Suppl. Briefing at 1, ECF No. 158; Pls.' Joinder Picayune's Mot. Suppl. Briefing at 1, ECF No. 161. The Picayune Tribe also suggested the need for another "remand to the agency," especially because the newly established compact "has fundamental and voluminous changes from the prior compact, including the elimination of all mitigation to other tribes affected by the compact." Picayune's Mot. Suppl. Briefing at 1, 3–4.

On August 16, 2016, upon consideration of the recent developments and "to avoid additional delay in resolution of the pending motions," the Court denied the Picayune Tribe's motion for supplemental briefing, but directed the parties to submit a "brief summary . . . of their position on the effect, if any, on the claims pending in this case of the related developments." Minute Order (Aug. 16, 2016). The parties' positions are substantially the same. *See generally* Pls.' Summ. Positions Pending Cls. ("Pls.' Summ."), ECF No. 164; Pl. Picayune's Resp. Ct.'s Aug. 16, 2016 Order ("Picayune's Summ."), ECF No. 165; Defs.' Notice Regarding Order Aug.

16, 2016 ("Defs.' Summ."), ECF No. 167; North Fork's Resp. Order Concerning Effect Related

Devs. ("North Fork's Summ."), ECF No. 166.

The federal defendants assert that the Stand Up plaintiffs' Fifth and Sixth Claims for

Relief "and their associated issues are now moot" due to "the issuance of Secretarial Procedures

which rendered the prior Compact challenged by Stand Up 'null and void.'" Defs.' Summ. at 1,

4.  The North Fork Tribe agrees with the federal defendants that the Stand Up plaintiffs' Fifth

Claim for Relief is moot and, similarly, argues that "[t]he issuance of Secretarial procedures . . .

provides an additional reason to reject Stand Up's sixth claim for relief."  North Fork's Summ. at

1.

By contrast, the Stand Up plaintiffs maintain that "the related developments . . . have no

effect on any claims pending in this case, except to the extent that they demonstrate Plaintiffs'

entitlement to summary judgment on their challenges to the trust acquisition and the

authorization of gaming at the Madera Site."  Pls.' Summ. at 1.  They continue to argue that "the

Secretarial Procedures do not moot or otherwise invalidate" their Fifth and Sixth Claims for

Relief because "the Fifth Claim is not moot unless the federal defendants concede that in

publishing approval of the Compact in the Federal Register the Secretary violated the APA" and

the "Sixth Claim challenges the Secretary's 2011 and 2012 records of decision to acquire the

Madera [S]ite into trust for gaming, not the validity of the Compact," largely reiterating the

allegations in their Third Amended Complaint and corresponding arguments already made in

prior briefing.  Id. at 2–3; see generally id. at 3–10.  The Picayune Tribe, piggybacking on the

Stand Up plaintiffs' Sixth Claim for Relief, likewise argues that "the issuance of Secretarial

Procedures shows that the IRA and IGRA decisions must be vacated" because "the decisions

relied on a compact that never took effect." Picayune's Summ. at 1, 4–5. The parties'

arguments are addressed in more detail *infra* in Part III.A and B.[15]

*     *     *

The pending motions for summary judgment are ripe for review.

## II.   LEGAL STANDARDS

### A.   MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when

the court finds, based upon the pleadings, depositions, and affidavits and other factual materials

in the record, "that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861,

1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). "A

genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the

nonmoving party,' could support a reasonable jury's verdict for the non-moving party."

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v.

Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the

district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am.

Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).

---

[15]     With respect to the Picayune Tribe's recently-filed lawsuit in the Eastern District of California, the Stand
Up plaintiffs "take the position that [the Picayune Tribe's] recent suit . . . raises different issues" and, therefore,
"does not directly impact any of the claims before this Court." Pls.' Summ. at 3. The Picayune Tribe agrees that its
parallel lawsuit "has no effect on the pending cases here." Picayune's Summ. at 2; *see id.* at 11 ("Picayune's
additional lawsuit in the Eastern District of California does not overlap with any issues presented in this Court and
need not be taken into account in any respect here."). The federal defendants are "still determining" how to respond
to that lawsuit and state no position regarding the effect of that lawsuit in this Court, Defs.' Summ. at 7, and the
North Fork Tribe, similarly, takes no position relating to that lawsuit, *see generally* North Fork's Summ. at 1–13
(nowhere mentioning the parallel lawsuit). Given these positions, the Court will not address the effect, if any, of
that parallel federal litigation on this lawsuit.

Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in APA case, that "determining the facts is generally the agency's responsibility, not ours"); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." (quotations and citation omitted)). Judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (quotations and citations omitted; alteration in original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting, when applying arbitrary and capricious standard under the APA, "'[t]he focal point for judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))).

## B.    ADMINISTRATIVE PROCEDURE ACT

Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D); *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120–21 (D.C. Cir. 2014)

(citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004)).  The arbitrary or capricious provision, under subsection 706(2)(A), "is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs" of the APA.  *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.* (*ADPSO*), 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

The scope of review under the "arbitrary and capricious standard is 'highly deferential,'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008)), and "narrow," such that "a court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (quotations omitted); *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013). This "highly deferential" standard, which "presumes agency action to be valid," *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quotations and citation omitted), "is especially applicable [to] . . . 'technical determinations on matters to which the agency lays claim to special expertise,'" *Rosebud Mining Co. v. Mine Safety & Health Admin.*, Nos. 14-1285, 14-1286, 2016 WL 3606369, at *8 (D.C. Cir. July 5, 2016) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)).  Yet, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."  *Judulang*, 132 S. Ct. at 483–84.  Simply put, "the agency must explain why it decided to act as it did," *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and the reason for the agency's decision must be "both rational and consistent with the authority delegated to it by Congress," *Xcel Energy Servs. Inc. v. Fed. Energy Regulatory Comm'n*, 815 F.3d 947, 952 (D.C. Cir. 2016).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Nat. Res. Council,* 490 U.S. 360, 378 (1989) (quotations omitted) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013). "An agency acts arbitrarily or capriciously if it has relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation either contrary to the evidence before the agency or so implausible as to not reflect either a difference in view or agency expertise." *Defs. of Wildlife v. Jewell*, 815 F.3d at 9. When an agency "'fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'" *Cty. of L.A. v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "'an agency's failure to state its reasoning or to adopt an intelligible decisional standard is . . . glaring . . . we can declare with confidence that the agency action was arbitrary and capricious'" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))). At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "'rational connection between the facts found and the choice made.'" *Ark Initiative*, 816 F.3d at 127 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)); *Am. Trucking Ass'ns, Inc.*, 724 F.3d at 249 (same); *see also EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1602 (2014) (holding that agency "retained discretion to alter its course [under a regulation] provided

it gave a reasonable explanation for doing so"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343,

1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set

forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious

agency action." (quotations and citation omitted)).   "[C]onclusory statements will not do; an

agency's statement must be one of *reasoning*."   *Amerijet Int'l Inc.*, 753 F.3d at 1350 (quotations

omitted; emphasis in original).

   Moreover, when review of an agency's action is "bound up with a record-based factual

conclusion," the reviewing court must determine whether that conclusion "is supported by

substantial evidence."   *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (quotations omitted); *see

also Kappos v. Hyatt*, 132 S. Ct. 1690, 1695 (2012) (affirming review of "factual findings under

the APA's deferential 'substantial evidence' standard").   "Substantial evidence" is "enough

evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion

sought to be drawn is one of fact for the jury."   *Defs. of Wildlife v. Jewell*, 815 F.3d at 9

(quotations and citation omitted).   "An agency's factual findings must be upheld when supported

by substantial evidence in the record considered as a whole."   *Id.*; *see also Kaufman v. Perez*,

745 F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . .

'only if unsupported by substantial evidence on the record as a whole.'" (quoting *Chippewa

Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007))); *Dillmon v. Nat'l Transp. Safety

Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (noting that agency's factual findings may be adopted

"as conclusive if supported by substantial evidence . . . even though a plausible alternative

interpretation of the evidence would support a contrary view" (quotations omitted)).

### III.    DISCUSSION

In their Third Amended Complaint, the Stand Up plaintiffs challenge the three administrative decisions at issue in this case on eight grounds divided into six separate claims. *See generally* TAC.  Specifically, the Stand Up plaintiffs challenge:  (1) the federal "[d]efendants' determination that the Secretary is authorized to acquire land in trust for the [North Fork] Tribe under [the IRA,] 25 U.S.C. § 465[,]" in violation of the IRA and the APA, TAC ¶ 60; *see id.* ¶¶ 56–60 (First Claim for Relief); (2) the federal defendants' determinations, under the IGRA, 25 U.S.C. § 2719(b)(1)(A), "that the casino's detrimental impacts will be mitigated" and "that the proposed project will not be detrimental to the surrounding community," in violation of the IGRA and the APA, TAC ¶ 68; *see id.* ¶¶ 61–68 (Second Claim for Relief); (3) "the Secretary's decision to take the [Madera Site] into trust for the purpose of conducting class III gaming based on the [Governor of California's] invalid concurrence," in violation of the IGRA and the APA, *id.* ¶¶ 63, 68 (part of Second Claim for Relief); (4) the DOI's issuance of the IGRA ROD, IRA ROD and FEIS allegedly "without obtaining, considering and evaluating sufficient data" and in spite of "serious procedural defects during the review process," in violation of the NEPA and the APA, *id.* ¶ 70; *see id.* ¶¶ 69–82 (Third Claim for Relief); (5) the federal defendants' conformity determination, under the CAA, allegedly "utiliz[ing] . . . emissions estimates that were based upon manipulated and unsupported assumptions" and "fail[ing] to identify, describe, and adopt a process for implementation and enforcement of . . . mitigation measures," in violation of the CAA and the APA, *id.* ¶¶ 93–95; *see id.* ¶¶ 83–98 (Fourth Claim for Relief); (6) the Secretary's "fail[ure] to disapprove a [tribal-state] compact that has not been validly entered into by the State of California" and subsequent publication of notice of the approval of the compact in the Federal Register, in violation of the IGRA and the APA, *id.*

¶¶ 103–05; *see id.* ¶¶ 99–105 (Fifth Claim for Relief); (7) the federal defendants' "decision to

keep the [Madera Site] in trust," despite the November 4, 2014 referendum vote in which

California voters rejected the Tribal-State Compact, which referendum vote allegedly rendered

"the purpose for which the land was acquired into trust . . . no longer viable" and invalidated "the

grounds on which the [IGRA ROD], the FEIS, and the [CAA] determinations" were based, in

violation of the IRA, the IGRA, and the APA, *id.* ¶¶ 107, 115; *see id.* ¶¶ 106–15 (Sixth Claim for

Relief); and (8) the federal defendants' "decision to keep the [Madera Site] in trust," despite the

fact that, since a Tribal-State compact "no longer exists," the Governor of California's

concurrence in the two-part IGRA determination no longer applies, in violation of the IRA, the

IGRA, and the APA, *id.* ¶¶ 111, 115 (part of Sixth Claim for Relief).

The Picayune Tribe asserts two causes of action, challenging (1) the federal defendants'

alleged "fail[ure] to properly consider detrimental impacts on the Picayune Tribe" and "the

North Fork Tribe's lack of historical connection to the Madera Site," in violation of the IGRA

and the APA, Picayune's Compl. ¶¶ 50–51, *see id.* ¶¶ 49–53 (First Cause of Action); and (2) the

federal defendants' decision to acquire land under the IRA on behalf of the North Fork Tribe

based on the allegedly "invalid IGRA Decision," in violation of the IRA and the APA, *id.* ¶ 56;

*see id.* ¶¶ 54–59 (Second Cause of Action).[16]

---

[16]     The Picayune Tribe also asserted, as part of its Second Cause of Action, that "[t]he Assistant Secretary violated the APA, IGRA, and the IRA by relying on a purported concurrence from the Governor of California that is ultra vires and invalid under California law." *Id.* ¶ 57. During the course of the instant litigation, however, the Picayune Tribe initiated and lost a lawsuit in California state court against the Governor, and others, regarding the propriety of the Governor's concurrence, and the Picayune Tribe recently filed another federal lawsuit in the Eastern District of California challenging, *inter alia*, "the effectiveness of the Governor's concurrence in the two-part determination because it lacks legislative ratification." Picayune's Summ. at 11; *see supra* n.16; *Picayune Rancheria of Chuckchansi Indians v. Brown*, 229 Cal. App. 4th 1416, 1420–21 (2014) (holding that the Governor of California is not a "'public agency' subject to the requirements of the California Environmental Quality Act"). Since the Picayune Tribe nowhere in its ample briefing even mentions its allegation regarding the Governor's concurrence, the claim is deemed abandoned in this case. *See Hayes v. District of Columbia*, 923 F. Supp. 2d 44, 51 (D.D.C. 2013) (granting summary judgment to defendants where plaintiff, in opposition to summary judgment, "only affirmatively state[d] that she ha[d] not abandoned her negligence claim" and, thus, "apparently concede[d] the negligence claim"); *Brodie v. Burwell*, No. 15-cv-322 (JEB), 2016 WL

In light of the Secretarial Procedures prescribed by the Secretary under which the North Fork Tribe may conduct class III gaming on the Madera Site, the Stand Up plaintiffs' sixth and seventh challenges, as enumerated above, are effectively moot.  The Stand Up plaintiffs' third and eighth challenges implicate state action under state law, and thus, raise the issue of whether the State of California is required, yet unable, to be joined as a party in this suit, pursuant to Rule 19 of the Federal Rules of Civil Procedure.  The Court first addresses these claims, before turning to both groups of plaintiffs' challenges to the IGRA and IRA RODs, followed by the Stand Up plaintiffs' NEPA and CAA claims.

### A.      STAND UP PLAINTIFFS' FIFTH AND SIXTH CLAIMS FOR RELIEF

The Stand Up plaintiffs challenge the Secretary's actions with respect the 2012 Tribal-State Compact, executed by the North Fork Tribe and Governor Brown, *see supra* Part I.C, based on the Compact's alleged invalidity.  Specifically, in their Fifth Claim for Relief, the plaintiffs claim that the Secretary violated the APA and the IGRA by "fail[ing] to disapprove" the Compact upon receiving it from California Secretary Bowen, and thereafter publishing notice of approval in the *Federal Register*, TAC ¶¶ 103–05, because "[t]he compact between the North Fork Tribe and the State of California ha[d] not been validly entered into and [was] not binding on the State of California" pending the referendum vote in the November 2014 general election, *id.* ¶ 102.  Similarly, in their Sixth Claim for Relief, the plaintiffs claim that the Secretary violated the APA, the IGRA, and the IRA by deciding to keep the Madera Site in trust for the

---

3248197, at *14 (D.D.C. June 13, 2016) (granting summary judgment to defendants where plaintiff "in the 40 pages of his Opposition, . . . never discusse[d] his due process claims"); *see also Aliotta v. Blair*, 614 F.3d 556, 562 (D.C. Cir. 2010) ("[P]laintiffs cannot raise on appeal claims they allege in their complaint but abandon at the summary judgment stage."); *Shankar v. ACS–GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (per curiam) (affirming the district court's grant of summary judgment to defendant where appellant conceded his claims by failing to address them (citing LCvR 7(b)).  Regardless, however, the claim would be dismissed for the reasons discussed, *infra*, in Part III.B.2, because California is an indispensable party.  Accordingly, summary judgment is granted to the defendants as to the Picayune Tribe's allegation regarding the Governor's concurrence.

North Fork Tribe, *id.* ¶ 115, even though the "California voters, pursuant to their right of referendum, rejected the compact," in the November 2014 general election, and, consequently, "the State has not entered into a compact with the North Fork Tribe and the Tribe has no compact under which it can develop its proposed class III gaming facility for which the [Madera Site] was taken into trust," *id.* ¶ 107.

All parties agree that the 2012 Tribal-State Compact is not in effect and will not govern the North Fork Tribe's gaming operations at the Madera Site. *See* Pls.' Summ. at 4 ("[The] Compact . . . was never legally effective."); Picayune's Summ. at 4 ("[A] compact . . . was never in effect."); Defs.' Summ. at 5 ("The challenged Compact is now 'null and void' . . . ."); North Fork's Summ. at 6 ("Now that Secretarial procedures have been issues, . . . the 2012 Compact has been superseded . . . ."). As a result, the validity of the Compact is simply no longer at issue, and the plaintiffs' claims that are premised upon the Compact's alleged invalidity fail to provide a basis upon which relief can be granted. *See Boose v. District of Columbia*, 786 F.3d 1054, 1058 (D.C. Cir. 2015) (explaining "the relationship between mootness and the merits").

## B.    STAND UP PLAINTIFFS' CHALLENGES TO THE GOVERNOR'S CONCURRENCE

As part of their Second Claim for Relief, for violations of the IGRA and the APA, the Stand Up plaintiffs allege that Governor Brown's concurrence in the IGRA ROD "is invalid" because it was a "policy-making decision[] that bound the state, constituting a legislative act for which he lacked authority under California law." TAC ¶¶ 63, 68; *see also* Pls.' Mem. at 29 ("California law nowhere expressly authorizes the Governor to issue concurrences."). Similarly, as part of their Sixth Claim for Relief, for violations of the IRA, the IGRA, and the APA, the Stand Up plaintiffs allege that "a crucial ground" for the Governor's "concurrence no longer exists[,]" since the concurrence "was based on the development of a class III gaming facility at

42

the [Madera Site] pursuant to a compact between the State and the Tribe." TAC ¶ 111. As a result, the plaintiffs allege that "the Secretary's decision to take the [Madera Site] into trust for the purpose of conducting class III gaming," *id*. ¶ 68, and "the decision to keep the [Madera Site] in trust," are "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence," *id*. ¶ 115, "not in accordance with law, and, . . . must be set aside," *id*. ¶ 68; *see also* Pls.' Mem. at 28 ("The Secretary's approval of off-reservation gaming at the Madera [S]ite is invalid under IGRA because the Governor of California lacked the authority under California state law to concur in the Secretary's two-part determination. . . . [and], even if the Governor had authority to concur, the grounds upon which he concurred are no longer valid because of the referendum rejecting the compact."); *id*. at 19 ("[T]he Governor granted his concurrence specifically and only for a class III facility under the compact, which contained an agreement with the Wiyot Tribe to forego gaming on its land."); Pls.' Reply at 37 ("Plaintiffs argue that the Secretary's two-part determination is invalid because the concurrence was void *ab initio*."); Pls.' Summ. at 7 (asserting that certain Compact provisions "were the express grounds of the Governor's concurrence").

The plaintiffs conflate and, in effect, challenge, three separate actions: (1) the Secretary's two-part determination approving off-reservation gaming at the Madera Site, *i.e.*, the IGRA ROD; (2) the Governor's concurrence in the IGRA ROD; and (3) the Secretary's decision to acquire the Madera Site in trust on behalf of the North Fork Tribe, *i.e.*, the IRA ROD. The Court first addresses the plaintiffs' challenge to the Secretary's two-part determination, before addressing the plaintiffs' challenges to the Governor's concurrence and the Secretary's land acquisition decision.

1.    *Secretary's Two-Part Determination (IGRA ROD)*

As an initial matter, the North Fork Tribe appropriately points out that, with respect to the

IGRA ROD, the plaintiffs' "argument makes no sense" because "the Secretary's [two-part]

determination is not dependent on the Governor's concurrence, and necessarily comes *before* the

Governor even has a chance to concur."  North Fork's Mem. at 59–60 (emphasis in original); *see*

25 U.S.C. § 2719(b)(1)(A) (permitting gaming on lands acquired in trust by the Secretary if the

Secretary makes a two-part determination and the Governor concurs in that determination); 25

C.F.R. § 292.13(c)–(d) (same); *id.* § 292.22 (providing that "[i]f the Secretary makes a favorable

Secretarial Determination, the Secretary will send to the Governor of the State," *inter alia*, [a]

request for the Governor's concurrence in the Secretarial Determination").  As such, the IGRA

ROD in this case was issued in September 2011, and the Governor did not concur in that

decision until almost a year later, in August 2012.  *See* Concurrence Letter at 1–2.

The plaintiffs respond that "even though the Secretary makes the two-part determination

prior to requesting the concurrence, the Secretary has no authority to issue a final decision or

give legal effect to the two-part determination unless and until the governor concurs."  Pls.'

Reply at 39; *see also id.* at 38–39 (arguing that the "IGRA requires that the state approvals be in

place before the Secretary can take any action under federal law" because "Congress conditioned

. . . the [Secretary's] two-part determination on state approval"); *id.* at 39 ("Contrary to the

[North Fork] Tribe's assertion, the two-part determination is totally dependent upon the

concurrence."); Pls.' Summ. at 7 (maintaining that "the Secretary has no authority to issue a two-

part determination" without the Governor's concurrence).  The plaintiffs' reading of the law is

incorrect.

The Secretary's two-part determination is not contingent upon the Governor's

concurrence, but *gaming* on land acquired in trust by the Secretary after October 17, 1988, is

contingent upon the Governor's concurrence.  25 U.S.C. § 2719(a), (b)(1)(A); *see Confederated Tribes of Siletz Indians v. United States*, 110 F.3d 688, 696 (9th Cir. 1997) ("[T]he effect of the provision is that the Governor must agree that gaming should occur on the newly acquired trust land before gaming can in fact take place.").  Even the plaintiffs concede that, when making the two-part determination, "the Secretary was not bound at the time to inquire [in]to the legality of the [Governor's] concurrence in authorizing gaming at the Madera [S]ite."  Pls.' Mem. at 28.

Thus, to the extent that the "[p]laintiffs argue that the Secretary's two-part determination is invalid because the [Governor's] concurrence was void *ab initio*," and challenge the Secretary's approval of off-reservation gaming at the Madera Site, *i.e.*, the IGRA ROD, on those grounds, the defendants are entitled to summary judgment on the plaintiffs' claim.  Pls.' Reply at 37.  The validity of a Governor's concurrence simply does not affect the validity of a Secretarial two-part determination:  each is a separate requirement for gaming to take place on newly-acquired, non-reservation lands.[17]  As a result, contrary to the plaintiffs' assertion, even "if the concurrence . . . is determined to have been invalid, the [two-part] determination" need not "be rescinded."  *Id.* at 41.

## 2. *California Governor's Concurrence*

With respect to their challenge to the validity of the Governor's concurrence in the IGRA ROD, the Stand Up plaintiffs acknowledge that (1) "the Governor's authority to concur is an

---

[17]     The plaintiffs rely on the Seventh Circuit's interpretation of IGRA § 2719(b)(1)(A) in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States*, 367 F.3d 650, 656 (7th Cir. 2004), in which the court found that "[u]nless and until the appropriate governor issues a concurrence, the Secretary of the Interior has no authority under § 2719(b)(1)(A) to take land into trust for the benefit of an Indian tribe for the purpose of the operation of a gaming establishment." *Id.*; *see* Pls.' Reply at 39–40.  That statutory interpretation, not binding on this Court, appears to conflate the Secretary's authority, under the IRA, 25 U.S.C. § 465, to acquire land in trust on behalf of an Indian tribe, with the Secretary's authority, under the IGRA, 25 U.S.C. § 2719(c), to sanction gaming on lands acquired after October 17, 1988.  *See* 25 U.S.C. § 2719(c) ("Nothing in this section shall affect or diminish the authority and responsibility of the Secretary to take land into trust.").  The Governor's concurrence does not affect the Secretary's two-part determination under IGRA § 2719(b)(1)(A) but, rather, the Secretary's determination regarding whether to acquire land on behalf of a tribe under IRA § 465 and the applicable DOI regulations governing land acquisitions, 25 C.F.R. §§ 151.1–15.

issue of California state law," Pls.' Mem. at 28 n.24; Pls.' Reply at 38; (2) "[t]he issue of whether the Governor's concurrence was authorized under California law is currently before two different California courts of appeal," Pls.' Mem. at 28 n.23 (citing Pls.' State Case, and *United Auburn Indian Cmty.*, *supra*, n.13); *see supra* Part I.G, and (3) "the California Court of Appeal is the proper court to address plaintiffs' challenge to the validity of the concurrence under state law," Pls.' Reply at 37–38.  The plaintiffs also concede that in both cases pending in the California state court system, "the lower courts found that the Governor was authorized to concur[,] under the California Constitution," with the Secretary's two-part determination under the IGRA.  Pls.' Mem. at 28 n.23.

Set against these concessions, the plaintiffs nonetheless contend that "this [C]ourt's resolution of this state law issue is necessary for the relief plaintiffs seek under the APA," Pls.' Mem. at 28 n.24, and that "this [C]ourt may address issues of state law necessary" for the plaintiffs' "claim for relief under federal law," Pls.' Reply at 38.  Thus, despite the plaintiffs' pending challenges to the Governor's concurrence in California state court, which they admit is the proper forum and which they lost at the lower-court level, the plaintiffs "ask[] this Court to disregard that result and delve into the complexities of state law."  Defs.' Reply at 18.  According to the plaintiffs, they "must seek ultimate relief in federal court because the Secretary has already taken the land into trust based upon the Governor's invalid concurrence, and only a federal court may order the Secretary to take the land out of trust."  Pls.' Reply at 38.

For their part, the federal defendants contend that "[t]he Governor of California's concurrence with the Secretary's two-part determination is valid as a matter of federal law" and that there is no need to "delve into state law" because California permits class II and III gaming.  Defs.' Mem. at 24.

Contrary to the federal defendants' position, the Court agrees with the plaintiffs that a Governor's authority to concur in an IGRA two-part determination is an issue of state law, but disagrees with the plaintiffs that this Court may address the validity of the California Governor's concurrence under California law.  As another court explained,

> When the Governor exercises authority under IGRA, the Governor is exercising state authority. . . . The concurrence (or lack thereof) is given effect under federal law, but the authority to act is provided by state law. . . . [W]hen the Governor responds to the Secretary's request for a concurrence, the Governor acts under state law, as a state executive, pursuant to state interests.

*Confederated Tribes of Siletz Indians*, 110 F.3d at 697–98.  Thus, the plaintiffs are correct that, "if the Governor lacks authority under state law to concur, the concurrence is invalid."  Pls.' Reply at 40.  Still, the federal defendants aptly point out that "[t]o the extent that Stand Up seeks to have this Court declare the Governor's concurrence invalid, they have neglected to join the party that is purported to have acted unlawfully—the Governor of California."  Defs.' Mem. at 26.  Moreover, the State of California is missing from this lawsuit, and any challenge to the validity of the Governor's concurrence may not proceed in the State's absence.

Federal Rule of Civil Procedure 19 prescribes a three-part test for determining whether litigation may proceed in the absence of a particular party "who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction."  FED. R. CIV. P. (a)(1); *see Kickapoo Tribe*, 43 F.3d at 1494.  First, the Court must determine if the absent party is required (or, necessary) for a just adjudication, pursuant to Rule 19(a)(1), which "states the principles that determine when persons or entities must be joined in a suit," *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 862 (2008), including whether "in that person's absence, the court cannot accord complete relief among existing parties," or whether proceeding would either (i) impair the absent person's ability to protect an interest relating to the subject of the

litigation, or (ii) leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the absent person's interest in the action, FED. R. CIV. P. 19(a)(1).  Second, the Court must determine whether the person's joinder is feasible. FED. R. CIV. P. 19(b); *Kickapoo Tribe*, 43 F.3d at 1494.  Finally, if the absent person required as a party cannot be joined, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  FED. R. CIV. P. 19(b); *see Pimentel*, 553 U.S. at 862.

Rule 19(b) outlines a nonexclusive set of factors to be considered in making this last determination, including (1) the extent to which judgment rendered in the person's absence might be prejudicial to that person or existing parties; (2) the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping of relief, or other measures; (3) "whether a judgment rendered in the person's absence would be adequate;" and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  FED. R. CIV. P. 19(b)(1)–(4); *Pimentel*, 553 U.S. at 862.  If an analysis of these factors counsels that the action, or certain claims, should not proceed without the absent party, the absent party is considered to be "indispensable" and the case, or claims, must be dismissed. *See Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 360 (2d Cir. 2000) (applying a claim-specific Rule 19 analysis).[18]

In sum, "whether a party is indispensable for a just adjudication requires a determination regarding whether the absent party is necessary to the litigation; if so, whether the absent party can be joined in the litigation; and if joinder is infeasible, whether the lawsuit can nevertheless

---

[18]     Rule 19 used to contain the term "indispensable," but was amended, for stylistic purposes, to remove the term "as redundant" because it "express[ed] a conclusion reached by applying the tests" of the Rule.  FED. R. CIV. P. 19 advisory committee's note to 2007 amendment.

proceed 'in equity and good conscience.'" *Kickapoo Tribe*, 43 F.3d at 1494 (quoting FED. R. CIV. P. 19(b)).  The rule is "based on equitable considerations" and "the determination whether to proceed will turn upon factors that are case specific, . . . . consistent with the fact that the determination of who may, or must, be parties to a suit has consequences for the persons and entities affected by the judgment; for the judicial system and its interest in the integrity of its processes and the respect accorded to its decrees; and for society and its concern for the fair and prompt resolution of disputes." *Pimentel*, 553 U.S. at 863.  Actions may "proceed even when some persons who otherwise should be parties to the action cannot be joined," but "the decision whether to proceed without a required person . . . . 'must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests.'" *Id.* (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119 (1968)).  Indeed, "review otherwise available under the Administrative Procedure Act may be unavailable due to the impossibility of joining an indispensable party," particularly where a party enjoys sovereign immunity.  *Witchita & Affiliated Tribes v. Hodel*, 788 F.2d 765, 777, 778 n.14 (D.C. Cir. 1986).

"[T]he issue of joinder can be complex[,]" *Pimentel*, 553 U.S. at 863, and though no party in the instant case raised the issue of whether the State of California is an indispensable party under Rule 19, courts have an "independent duty to raise a Rule 19(a) issue *sua sponte*," *Cook v. FDA*, 733 F.3d 1, 6, 11 (D.C. Cir. 2013) (quotations and citation omitted); *Kickapoo Tribe*, 43 F.3d at 1495 n.3; *see Pimentel*, 553 U.S. at 861 ("A court with proper jurisdiction may . . . consider *sua sponte* the absence of a required person and dismiss for failure to join."); *see*

*also* FED. R. CIV. P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party.").[19]

Here, first, California unquestionably has an interest in its Governor's authority, under its own law, to comply with federal law, as well as in the continuing validity, in light of the withdrawal of the 2012 Tribal-State Compact and the newly-prescribed Secretarial Procedures, of its Governor's concurrence, pursuant to which gaming will be permitted on the Madera Site. California's interests would be directly affected by the relief sought by the plaintiffs, who ask this Court to make determinations about the propriety and continuing viability of Governor action significantly affecting the State's statutory obligations, relationship with its citizens and federally-recognized Indian tribes, and fiscal interests with respect to regulating Indian gaming within its borders under the IGRA. *Accord* Pls.' Mem. at 33 (arguing that the Governor's concurrence "effectively locked the Legislature out from weighing in on the decision" and "authorized the creation [of] new Indian land for gaming purposes without any legislative input"); Pls.' Summ. at 7–8 (asserting that the recently-prescribed Secretarial Procedures "eliminate all rights of the State to control the impacts and spread of off-reservation [gaming] under the Governor's concurrence provision" and "belittle the California electorate's unequivocal rejection of off-reservation gaming in California"). Thus, California is undoubtedly a necessary party to this lawsuit, to the extent that the plaintiffs challenge the Governor's concurrence. *See Kickapoo Tribe*, 43 F.3d at 1495.

---

[19]     As discussed, *supra*, Part I.F, the Court ordered the parties to brief the issue of "[w]hether the State of California is a party required to be joined under Federal Rule of Civil Procedure 19 and, if so, the effect on the parties' claims." Mem. & Order (Sept. 30, 2015).  No party's supplemental briefing addressed the effect of Rule 19 on the Stand Up plaintiffs' claims regarding the Governor's concurrence and, instead, focused only on the claims regarding the validity of the Tribal-State Compact.  Rule 19 applies equally to the claims regarding the Governor's concurrence, however.

Second, California cannot be joined in the lawsuit.  As a state sovereign, it is immune

from suit under the Eleventh Amendment of the U.S. Constitution, absent consent or waiver, *see*

*Seminole Tribe*, 517 U.S. at 54–55; *Kickapoo Tribe*, 43 F.3d at 1495–96; Pls.' Suppl. Br. at 16

(conceding that "joinder is likely infeasible because of the State's sovereign immunity"), and

"California has not waived its sovereign immunity with respect to the present litigation," North

Fork's Suppl. Br. at 8.[20]

Lastly, the plaintiffs' claims challenging the Governor's concurrence cannot "in equity

and good conscience" proceed.  *Pimentel*, 553 U.S. at 862.  Indeed, immunity is such a

compelling interest that the Rule 19 inquiry is "more circumscribed" with respect to assessing

whether a lawsuit can proceed in the absence of a necessary party that is also immune from suit,

such that, where the party would be unavoidably prejudiced by a judgment rendered in its

absence, grounds exist to dismiss the case "without consideration of any additional factors."

*Kickapoo Tribe*, 43 F.3d at 1496–98; *see id.* at 1497 n.9 ("The inquiry as to prejudice under Rule

19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action

will impair the absent party's ability to protect its interest.").  Such are the circumstances here.

Since California would be unavoidably prejudiced by a judgment rendered in its absence relating

to the Governor's concurrence, these claims are appropriately dismissed "without consideration

of any additional factors."  *Id.* at 1498; *see also Witchita & Affiliated Tribes*, 788 F.2d at 777

("The dismissal of this suit is mandated by the policy of . . . immunity.").

Despite the allegations in their Third Amended Complaint, *inter alia*, that "the Governor

of California engaged in policy-making decisions that bound the state, constituting a legislative

---

[20]     As the North Fork Tribe notes, California has waived its sovereign immunity to only certain suits brought
under the IGRA "by any federally recognized California Indian tribe."  CAL. GOV. CODE § 98005; North Fork's
Suppl. Br. at 8.

act for which he lacked authority under California law," TAC ¶ 63, the plaintiffs deny that they

are "directly challeng[ing] the Governor's action as unlawful." Pls.' Reply at 38 n.27. Thus, in

their view, "[t]here is no cognizable reason why plaintiffs were required to join the Governor

under Rule 19." *Id.* As support, they reason that the Governor "has no legal interest in the

challenge to the Secretary's approval of the compact," *id.* (citing *Pyramid Lake Paiute Tribe v.*

*Burwell*, 70 F. Supp. 3d 534 (D.D.C. 2014)), and "even if he did have such an interest, he is not

necessary and indispensable because the Secretary can adequately represent that interest here,"

*id.* (citing *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996)). This

reasoning defies logic.

 As explained *supra*, the Governor and the State of California have an immutable interest

in the plaintiffs' challenges regarding the Governor's authority and action in this case and,

contrary to the plaintiffs' assertion otherwise, the Secretary absolutely cannot represent the

interests of the California or its Governor, as "the Secretary [is] not in a position to champion the

State's position in view of his [or her] trust obligations to the Tribe." *Kickapoo Tribe*, 43 F.3d at

1499.

 The cases cited by the plaintiffs are inapposite. In both cases, the courts found that the

Secretary could adequately represent any interests of the nonparty Indian tribes. In *Ramah*

*Navajo School Board*, no conflict existed between the United States' interest and the nonparty

tribes' interests in the case. 87 F.3d at 1351; *see id.* (finding "no concern that the Tribes'

interests might conflict with one another and keep the Secretary from adequately representing

them all"). Similarly, in *Pyramid Lake*, the Secretary's interest "align[ed]" with the interests of

the absent tribes. 70 F. Supp. 3d at 541. Here, the Secretary cannot represent California's legal

and financial interests in the outcome of the plaintiffs' claims because the Secretary does not

share these interests and, as explained above, has a conflicting trust obligation to the North Fork

Tribe.  *Cf. Amador Cty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 193, 196 (majority op.) &

197 (Randolph, J., concurring) (D.C. Cir. 2014) (suggesting, without deciding, that the Secretary

could adequately represent an Indian tribe's interest in defending the Secretary's no-action

approval of its Tribal-State gaming compact against the County because of the Secretary's trust

obligations to the Indian tribe).

Accordingly, the plaintiffs' claims in any way involving the Governor's concurrence

must be dismissed due to the absence of an indispensable party.

### 3.     *Secretary's Land Acquisition Decision (IRA ROD)*

For the reasons discussed, *supra*, Part III.B.2, to the extent that the plaintiffs predicate

their challenge to the Secretary's decision to acquire the Madera Site in trust for the North Fork

Tribe, *i.e.*, the IRA ROD, on the basis of an invalid or no-longer-viable gubernatorial

concurrence, this challenge triggers an assessment of the legality of the Governor's concurrence

under California law and, again, Rule 19 poses "an insurmountable obstacle to [the plaintiffs']

claim." *Detroit Int'l Bridge Co. v. Gov't of Canada*, No. 10-cv-476 (RMC), 2016 WL 3460307,

at *7 (D.D.C. 2016) (citing *Kickapoo Tribe*, 43 F.3d at 1500).

The plaintiffs seek to avoid this result by acknowledging that "the Secretary is not

required to investigate the vagaries of California State law," and has the "authority to consider

the concurrence valid in order to give it effect under federal law," regardless of "the validity or

invalidity of action under state law."  Pls.' Reply at 23, 39.  Indeed, neither the IGRA nor the

IRA require the Secretary to determine the validity of the Governor's concurrence under

California law.  Thus, in light of Governor Brown's August 2012 letter explicitly concurring in

the Secretary's two-part determination, *see* Concurrence Letter, the Secretary's November 2012

land acquisition decision was reasonable, *see Detroit Int'l Bridge Co.*, 2016 WL 3460307, at *15–19.

At the same time, the plaintiffs strenuously argue that "if the concurrence upon which the Secretary relied is determined to have been invalid, the [IRA] determination" must be, at least, reconsidered and, possibly, "rescinded," Pls.' Reply at 41, or "remanded," *id.* at 2, 26; *see* 5 U.S.C. § 706(2)(C) (requiring courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997) (explaining, in the similar Tribal-State compact context, "that Congress did not intend to force the Secretary to make extensive inquiry into state law to determine whether the person or entity signing the compact for the state in fact had the authority to do so," but "that does not mean that consequences should not flow, such as a determination that the compact is invalid, if it turns out that the state has not validly bound itself to the compact"). As the plaintiffs point out, "[t]he core circumstances of the two-part determination have changed," Pls.' Reply at 26, since the Governor granted his concurrence to the North Fork Tribe's proposed off-reservation gaming establishment in exchange for "broad statewide benefits," which the State may not now receive, and the State may not have "intend[ed] to authorize . . . gaming . . . from which the [S]tate would receive no benefit," *id.* at 27–31.

Even assuming that the plaintiffs are correct, however, now is not the appropriate time, nor is this the appropriate lawsuit for resolution of that issue. The issue regarding the legality of the gubernatorial concurrence in the Secretary's two-part determination has not been finally resolved by the California state court system, the administrative record in this case provides no basis for this Court to evaluate any federal action in response to recent events, including the 2014

referendum vote and the issuance of the Secretarial Procedures and, most significantly, the State is not a party to this lawsuit to clarify its intent in the past or its position now, or to protect its significant interests at stake. Thus, any determination of the impact on the IRA ROD of a possible finding that the Governor's concurrence was invalid or has been rendered inapplicable is premature and inappropriate for this suit.

*     *     *

For the foregoing reasons, the Stand Up plaintiffs' Fifth and Sixth Claims for Relief, TAC ¶¶ 99–115, are dismissed as moot, and their claims regarding the Governor of California's concurrence in the Secretary's two-part IGRA determination, *see* TAC ¶¶ 63, 68, 111 (part of Second and Sixth Claims for Relief), are dismissed due to the absence of an indispensable party.

On a final note, both groups of plaintiffs attempt to inject yet another claim into this already long-lived lawsuit by contending that the IGRA and IRA RODs "must be vacated" because they are "predicated" on the "anticipated benefits" and mitigation measures outlined in the Tribal-State Compact, which benefits and mitigation measures are now "illusory" or "non-existent" in the Secretarial Procedures. Picayune's Summ. at 1–2, 4, 6–7, 9; Pls.' Summ. at 3–4 (referring to the Compact as "the heart of the records of decision"); *see also id.* at 8–9 (asserting that the recently-prescribed Secretarial Procedures "entirely erode the basis of the Governor's concurrence" by "expand[ing] gaming" and "fail[ing] to include even the insufficient mitigation the Compact and the FEIS provided"). Indeed, all parties acknowledge changes in the scope and mitigation measures authorized under the Compact versus the Secretarial Procedures but, not surprisingly, draw different conclusions regarding the import of those differences. For the plaintiffs, the differences are "material[,]" Pls.' Summ. at 4, and "dramatic," in abrogation of state interests, Picayune's Summ. at 7–8, while the defendants discount the changes made in the

Secretarial Procedures as merely reflecting changes in "some financial and administrative details," without any "core" changes warranting restarting the administrative process, North Fork's Summ. at 7–8; *see* Defs.' Summ. at 5 (noting that a "mediator determined that the Tribe's proposed compact best comported with the terms of the IGRA, any other Federal law, and the findings and order of the Court").  This most recent challenge to the IGRA and IRA RODs due to the Secretarial Procedures, which are perceived to be less favorable to the State and the plaintiffs' interests, has a certain irony that the consequence of all the plaintiffs' efforts has been to put them in a worse, rather than better, position than they started with under the much-maligned Compact.

In any event, neither ROD was based upon any particular Tribal-State Compact.  *See* North Fork's Summ. at 7–8 (noting that the RODs "were premised on projections and estimates from [a] 2008 Compact, and were made before the California Legislature ratified the 2012 Compact").  Both decisions mention Tribal-State compact requirements generally, to note that gaming on the Madera Site will be conducted in compliance with applicable federal and state law.  *See* IRA ROD at 2, 21–22; IGRA ROD at 2, 21, 64.  The IGRA ROD additionally mentions "Tribal-State Gaming Compact Revenue" and, in assessing governmental costs and revenues, provides that "[b]ecause the Tribe intends to conduct class III gaming at the Resort, it must execute a tribal-state gaming compact with the State of California prior to commencing gaming operations, and the Department must approve that agreement."  IGRA ROD at 74, 76.  This statement does not bind the North Fork Tribe to conduct gaming pursuant only to a Tribal-State compact, however, even though such a compact would have allowed the State to share in gaming revenues.  Rather, the North Fork Tribe is now permitted to conduct gaming pursuant to prescribed Secretarial Procedures.

Moreover, both RODs specifically identify and adopt all mitigation measures mentioned in the FEIS and, pursuant to the RODs, gaming on the Madera Site is "subject to implementation of the mitigation measures."  IGRA ROD at 51, 87; IRA ROD at 52–53, 61; *see also* North Fork's Summ. at 9–10 (describing how "[t]he mitigation provisions in the Secretarial procedures are substantial and consistent in all meaningful respects with the provisions in the 2012 Compact").  Thus, the lack of any Tribal-State compact does not affect the IGRA and IRA RODs.  Since "the purpose for which the land was acquired into trust," TAC ¶ 115, and the grounds on which the decisions were made, *i.e.*, for the North Fork Tribe "to conduct tribal government gaming authorized under IGRA" to promote tribal economic development and self-sufficiency, continue to apply, IGRA ROD at 2; IRA ROD at 2, the Secretary's decisions, as discussed *infra* in Part III.C and D, continue to be reasonable.

To the extent that the plaintiffs invite this Court to examine substantively the Secretarial Procedures, such a review would be, as discussed *supra*, Part III.B, premature for a variety of reasons.  In any event, the statutory imprimatur of legitimacy given to the Secretarial procedures, which the IGRA requires the Secretary to promulgate, consistent with the mediator's selected compact, after the Secretary receives notice that a state has not consented to that compact, *see* 25 U.S.C. § 2710(d)(7)(B)(iv), sets a high bar to attack these procedures in the guise of a challenge to the RODs for the Madera Site.  Lastly, both the Secretarial Procedures and the Compact authorized class III gaming on the Madera Site, with significant related development in terms of hotel, restaurant and transportation space.  Thus, in context, the differences cited between the two documents appear relatively insignificant.

## C.    IGRA RECORD OF DECISION

The IGRA was enacted "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong

tribal governments." 25 U.S.C. § 2702(1). Though the IGRA contains a general prohibition on "gaming . . . conducted on lands acquired by the Secretary in trust for the benefit of any Indian tribe after October 17, 1988," *id.* § 2719(a), an exception applies when, *inter alia*, "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes," makes a two-part determination (1) "that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and" (2) that it "would not be detrimental to the surrounding community," *id.* § 2719(b)(1)(A). The DOI regulations implementing, *inter alia*, this two-part determination exception, the most current of which regulations became effective on June 19, 2008, contain the agency procedures used to make the determination. Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,354 (May 20, 2008); *see* 25 C.F.R. §§ 292.1–292.26.

A two-part determination was made in this case, in the September 2011 IGRA ROD, to enable the North Fork Tribe to conduct gaming on the Madera Site, once acquired, despite the IGRA's general prohibition on conducting gaming on newly-acquired land. Based on "thorough review and consideration of the [North Fork] Tribe's fee-to-trust application and materials submitted there within; . . . the FEIS; the administrative record; and comments received from the public, Federal, state and local governmental agencies; and potentially affected Indian tribes," IGRA ROD at 1, the Secretary concluded that North Fork's proposed casino at the Madera Site "is in the best interest of the [North Fork] Tribe and its members" and "would not be detrimental to the surrounding community, or the Picayune Rancheria," *id.* at 83–84.

Both groups of plaintiffs challenge the second part of the Secretary's determination, arguing that the analysis of the proposed casino's anticipated impacts on the surrounding community and corresponding conclusion that the proposed casino "would not be detrimental to

the surrounding community," was arbitrary and capricious.  In particular, the Stand Up plaintiffs challenge the Secretary's consideration of (1) benefits expected to inure to the surrounding community from the proposed casino; (2) mitigation measures expected to alleviate expected harms to the surrounding community from the proposed casino; and (3) harms to the surrounding community expected to occur from the proposed casino.  The Picayune Tribe challenges the Secretary's consideration of the economic harm it is expected to face as a result of the proposed casino, as its own casino, Chukchansi Gold, located on the Picayune Tribe's reservation land, is forced to compete for business.  The Picayune Tribe additionally challenges the Secretary's analysis of the North Fork Tribe's "historical connection" to the Madera Site, which the Secretary considered in reaching the conclusion that the proposed casino will be in the North Fork Tribe's best interest.  *See id.* at 55–61.

The Picayune Tribe's challenge to the Secretary's "historical connection" analysis is addressed first, followed by the plaintiffs' respective challenges regarding the proposed casino's anticipated impact on the surrounding community.

### 1. *Historical Connection To The Madera Site*

The Picayune Tribe takes issue with the Secretary's finding that the North Fork Tribe had a "significant historical connection" to the Madera Site, arguing that this finding is unsupported and contradicted by the record.  Picayune's Mem. at 10–13.  Notably, unlike other exceptions to the IGRA's general gaming prohibition on lands acquired after October 17, 1988, such as the initial reservation exception, 25 U.S.C. § 2719(b)(1)(B)(ii), and the restored lands exception, *id.* § 2719(b)(1)(B)(iii), which require "[t]he tribe [to] demonstrate a significant historical connection to the land," 25 C.F.R. §§ 292.6, 292.12(b), the tribe need not have *any* historical connection to the land to develop a gaming establishment on newly acquired lands pursuant to the Secretarial two-part determination.  Instead, "in evaluating whether the proposed gaming

establishment is in the best interest of the tribe and its members and whether it would or would

not be detrimental to the surrounding community," *id.* § 292.21(a), IGRA regulations simply

require the Secretary to consider, among numerous other factors and information, "[e]vidence of

[the tribe's] significant historical connections, if any, to the land," *id.* § 292.17(i); *see id.* §

292.21(a) (requiring the Secretary to "consider all the information submitted under §§ 292.16–

292.19").  A significant historical connection exists where either (1) "the land is located within

the boundaries of the tribe's last reservation under a ratified or unratified treaty, or [(2)] a tribe

can demonstrate by historical documentation the existence of the tribe's villages, burial grounds,

occupancy or subsistence use in the vicinity of the land."  *Id.* § 292.2.

    While not required as part of the two-part determination, the Secretary nevertheless found

both definitions for a "significant historical connection" met in the instant case.  Specifically, the

IGRA ROD "conclude[d] that the Tribe has a significant historical connection to the [Madera]

Site" because (1) "[t]he Site is located within the [never-established] reservations contemplated

by the [unratified] San Joaquin Valley treaties for the Tribe's predecessors," including a "1851

Treaty signed at Camp Barbour on the San Joaquin River," and (2) "historical documentation . . .

demonstrates that [the North Fork Tribe] established a continuous presence in the vicinity of the

Site, through occupancy and subsistence activities, over a period of time."  IGRA ROD at 60–61.

As discussed below, the Picayune Tribe's objections to both the Secretary's treaty finding and

continuous presence finding are not persuasive.

### a.    *Camp Barbour Treaty Of 1851*

    The Picayune Tribe argues that the Secretary misread the relevant treaties, asserting that

"[t]he North Fork Rancheria have [sic] never been connected to" the 1851 Camp Barbour Treaty

and that the Secretary, without any evidentiary support, "conflate[d] the current Mono Indians

with the persons referred to as 'mona' in [the Treaty]."  Picayune's Mem. at 10–11; *see also* Picayune's Reply at 18 (arguing the IGRA ROD "erroneously equated the current Mono Indians with persons referred to ambiguously as 'mona' . . . in the Camp Barbour Treaty, without offering any evidence whatsoever for the linkage").[21]  The Picayune Tribe also argues that "the Madera Site is not even located within the reservation that was allegedly established by the 1851 Camp Barbour Treaty," asserting that it "is instead within the boundaries of . . . the Camp Belt Treaty."  Picayune's Mem. at 11.  The Picayune Tribe's arguments are undermined, however, by the same evidence that it claims "directly contradicts the Secretary's findings."  *Id.* at 12.

The 1851 Camp Barbour Treaty, which was never ratified, purported to establish an Indian reservation in the San Joaquin Valley for a number of named tribes.  Thus, the Madera Site, in the San Joaquin Valley, appears to be located squarely in the exact vicinity contemplated for a reservation.  Moreover, the issue of whether the North Fork Tribe was among the tribes designated to live on the reservation in the San Joaquin Valley is supported by the text of the Camp Barbour Treaty, which provides:

> it is also expressly understood that the *mona* or *wild portion* of the tribes herein provided for, which are still out in the mountains, shall, when they come in, be incorporated with their respective bands, and receive a fair and equal interest in the land and provisions hereinafter stipulated to be furnished for the whole reservation[.] . . .

Camp Barbour Treaty, Art. 4.

---

[21]      The Picayune Tribe highlights the undisputed fact that "the Mono Indians were not present at the . . . signing" of the 1851 Camp Barbour Treaty, Picayune's Mem. at 10; Picayune's Reply at 17–18; Defs.' Mem. at 38–39, but this is immaterial.  The IGRA ROD explains that the Treaty "specifically mentioned the Mono ancestors of the Tribe, who had not yet arrived from the foothills on the day the treaty was signed, and made them express beneficiaries of the reservation contemplated by that treaty."  IGRA ROD at 57.  Thus, the Picayune Tribe's reliance on the Mono Indians' absence from the treaty signing does nothing to advance its challenge to the Secretary's decision.  Similarly, the Picayune Tribe cites the fact that the 1851 Treaty "was never subsequently ratified by the United States Congress," Picayune's Mem. at 10, but ratification is likewise immaterial under the regulations, *see* 25 C.F.R. § 292.2 ("Significant historical connection means the land is located within the boundaries of the tribe's last reservation under a ratified or *unratified* treaty . . . ." (emphasis added)).

A scholarly report in the administrative record and relied upon by the Picayune Tribe explains that "[t]he Northfork Monos were and are part of a larger group of Indians referred to as the Western Mono or Monachi . . . . [who] spoke a Shoshonean language," and "an impartial judge would most likely conclude that the Shoshonean Monos *were* included in the treaty even if they were misidentified as portions of the [other] tribes." Robert F. Manlove, Report Concerning Lands Historically Associated with the Northfork Mono Indians at 2, 5, Jt. App. at 1, 2, 5, ECF No. 124-1 (emphasis in original). Further, according to the report, the reservation proposed by the Camp Barbour Treaty "*would* include the area of the proposed casino." *Id.* at 4 (emphasis added).

In addition to the Treaty itself, accounts from ancestors of the North Fork Tribe describe the United States military's efforts, in the 1850s, to force them and other Indian groups out of their homes in the Sierra Nevada foothills, culminating in the soldiers signing the Treaty at Camp Barbour, with "'friendly' Indians." *See* Lee Memoir at 45–75. Descendants of the North Fork Tribe acknowledge the lack of evidence that their leaders signed the Camp Barbour Treaty or that their ancestors were forced to disperse from their homeland in the mountains, but correctly point to the fact that "the treaty provided for their anticipated arrival," referring to them as the "*mona* or wild portion of the tribes . . . which are still out in the mountains." *Id*. at 63 (emphasis in original). In sum, contrary to the Picayune Tribe's assertions, these parts of the historical record provide evidentiary support for the Secretary's findings about the North Fork Tribe's historical connection to the Madera Site.

Accordingly, the Secretary's conclusion that the Madera Site is located within the boundaries of a reservation proposed for the North Fork Tribe under an unratified treaty has

support in the record and was properly considered as evidence of the North Fork Tribe's
"significant historical connections, if any, to the land."  25 C.F.R. § 292.17(i).

### b.   *Occupancy Or Subsistence Use In The Vicinity*

The Picayune Tribe also argues that the IGRA ROD's description of the nature of the
North Fork Tribe's contacts with Madera, including as "temporary" and "seasonal," reflect
"sporadic," "ephemeral and transactional contacts with the City of Madera" that are insufficient
to constitute the "occupancy or subsistence use" required to show significant historical
connection.  Picayune's Mem. at 12; Picayune's Reply at 18–19.  The Court disagrees.

"[S]ignificant historical connection" is "not limited to the tribe's exclusive use and
occupancy area," though it "require[s] something more than evidence that a tribe merely passed
through a particular area" or "something more than 'any' connection."  Gaming on Trust Lands,
73 Fed. Reg. at 29,366.  Here, in determining that the North Fork Tribe has a significant
historical connection to the Madera Site, the Secretary relied on evidence that, *inter alia*, in the
1850s, ancestors of the Tribe settled along the Fresno River, would "visit occasionally the plains
and water-courses for the purposes of hunting and fishing" and to assist other tribes in the plains
"in times of war," and "live[d] on, visit[ed], and recognize[d]" the Fresno River Farm, a
reservation located near the banks of the Fresno River "near or within the boundaries of the
modern day City of Madera," "as their home and headquarters."  IGRA ROD at 56–58.  The
Secretary additionally relied on primary documents and personal recollections of "[m]any of the
Tribe's oldest citizens" evidencing that, in the late nineteenth and early twentieth centuries,
ancestors of the Tribe "travel[ed] from the Valley floor – *often* passing through Madera to the
foothills and *back again* – as they herded sheep for local ranchers," would patronize a store
located within 600 yards of the border of Madera, and "worked picking grapes at . . . vineyards"

approximately five miles north of Madera, "in very close proximity to the Site." *Id*. at 59
(emphasis added).  Evidence also indicated that "likely a majority" of the members of the North
Fork Tribe, in or around 1916, would "temporarily leave their mountain habitations and go to the
rich San Joaquin Valley in proper seasons to secure work on the farms, hay meadows, vineyards
and orchards, as well as sheep-shearing in its season." *Id*. at 60 (alteration omitted).

This evidence of the North Fork Tribe's longtime, consistent use of land and resources in
or near Madera for food, employment, and livelihood provides sufficient support for the
Secretary's conclusion that the Tribe's use of the land in the vicinity of the Site amounted to
"something more than 'any' connection" or "merely passing through," notwithstanding the
generally seasonal use by the Tribe of this land.

### 2.  *Impacts On The Surrounding Community*

Both groups of plaintiffs challenge the Secretary's analysis and corresponding conclusion
for the second part of the IGRA "two-part determination" that the proposed casino "would not be
detrimental to the surrounding community."  The Stand Up plaintiffs argue that the Secretary
failed to apply the requisite "heavy scrutiny" in considering the impact of the proposed casino on
the surrounding community.  Pls.' Mem. at 24–26.  In particular, the plaintiffs criticize the
Secretary's evaluation of:  (1) the community benefits expected to be derived from the proposed
casino; (2) the mitigation measures; and (3) three identified community harms expected to result
from the proposed casino—problem gambling, traffic, and displacement of the Swainson's
Hawk.  The Picayune Tribe similarly challenges the Secretary's analysis of community harms,
with a primary focus on the Secretary's evaluation of the financial impact the proposed casino is
expected to have on the Picayune Tribe.  *See generally* Picayune's Mem. at 20–27.

Before turning to the plaintiffs' specific contentions, the Court first addresses the plaintiffs' threshold legal arguments that the IGRA ROD reflects an erroneous application of the statute and therefore conflicts with congressional intent.

### a.    *Congressional Intent*

Both groups of plaintiffs claim that the IGRA ROD conflicts with the legislative purposes of the IGRA:  the Stand Up plaintiffs challenge the decision with respect to Section 2719(b)(1)(A)'s requirement that "a gaming establishment on newly acquired lands . . . not be detrimental to the surrounding community," *see* Pls.' Mem. at 22–24, and the Picayune Tribe challenges the decision with respect to Section 2719(a)'s "preference for on-reservation gaming," Picayune's Mem. at 14–15.  The Court addresses each argument in turn.

### (i)    *Section 2719(b)(1)(A)'s "Not Detrimental To The Surrounding Community" Requirement*

The Stand Up plaintiffs reiterate their contention made in support of preliminary injunctive relief that the Secretary's finding regarding the proposed casino not being "detrimental to the surrounding community," IGRA ROD at 84, "is contrary to Congress'[] clear intent" because "[t]he Secretary arrived at this conclusion by weighing the benefits of the casino to the surrounding community against significant detrimental impacts that were found."  Pls.' Mem. at 22.  In other words, the plaintiffs read § 2719(b)(1)(A) to require that a gaming establishment result in "no detriment to the surrounding community" whatsoever, arguing that Congress did not intend for this particular provision of the IGRA to "serve IGRA's purpose of promoting economic development, self-sufficiency, and strong tribal governments," but, instead, intended it to "limit[] a tribe's ability to improve its economic condition through casino gambling."  *Id*. at 22–23.  Thus, the plaintiffs urge that § 2719(b)(1)(A) "be construed narrowly" because construing this provision "broadly – based on IGRA's purpose to promote economic

development, self-sufficiency, and strong tribal governments – would ignore the limits Congress set on gaming . . . ." *Id.* at 23.[22]

This Court previously explained that the plaintiffs' argument "misconstrue[s] the standard by which the Secretary must judge the potential negative effects of a gaming establishment under the IGRA," which simply "does not require that a new gaming development be completely devoid of any negative impacts." *Stand Up I*, 919 F. Supp. 2d at 73.  Since "[a]ll new commercial developments are bound to entail *some* costs," the Court previously reasoned that "the Secretary's duty under the IGRA is to determine whether those costs will be significant enough to be 'detrimental to the surrounding community.'"  *Id.* at 73–74 (emphasis in original) (quoting 25 U.S.C. § 2719(b)(1)(A)).  The plaintiffs' "cramped reading" of the IGRA would result in barring any new gaming establishments and, thereby, interpret the statutory phrase "'detrimental to the surrounding community'" as effectively "nullify[ing] the 'overarching intent' of the IGRA, which was 'in large part to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'"  *Id.* at 74 (quoting *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 468 (D.C. Cir. 2007)).  Acknowledging that "the plaintiffs may take moral umbrage with the goals and purposes of the IGRA," the Court directed "those policy grievances . . . to the political branches that enacted the law," since "[t]his Court has neither the power nor the competency to rewrite the purposes of duly enacted legislation."  *Id.* (citing

---

[22]     The plaintiffs confusingly posit inconsistent interpretations of the exception to the gaming prohibition in § 2719(b)(1)(A):  in reply, the plaintiffs indicate their interpretation does *not* "requir[e] the Secretary to find that there will be no detriment to the surrounding community whatsoever," Pls.' Reply at 34, yet simultaneously claim that the purpose of § 2719(b)(1)(A) "is to allow the community to express concerns about a casino development and *requires* the Secretary to address those concerns and *find that no detriment will result from [the] casino*," *id.* at 33 (emphasis added); *see also* Pls.' Mem. at 22 ("Without explanation and analysis as to . . . how specific mitigation measures will result in *no detriment* to the surrounding community, the Secretary's conclusion is contrary to Congress's clear intent." (emphasis added)).  This inconsistency is not helpful to their argument.

*Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.")).

Nothing presented in the plaintiffs' briefing on the current pending motions warrants disturbing the Court's prior reasoning.  Indeed, the plaintiffs' desired statutory interpretation is contrary to settled law in this Circuit.  *See Citizens Exposing Truth*, 492 F.3d at 469 ("IGRA was designed primarily to establish a legal basis for Indian gaming as part of fostering tribal economic self-sufficiency, not to respond to community concerns about casinos."); *id.* at 465, 468 (finding plaintiff non-profit anti-casino group "overemphasized" the "community protection provision of IGRA, 25 U.S.C. § 2719(b)(1)(A)," "in the overall structure of IGRA" in arguing that "IGRA was designed to help minimize the 'ill-effects of gambling,' protect surrounding communities from gaming on Indian lands, and prohibit gaming on after-acquired lands unless the Secretary and the State governor determine gaming will not have a detrimental effect on the surrounding host community"); *accord City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003) (rejecting plaintiff's characterization of the provisions of § 2719(a) as "laws disfavoring Indians" in finding that the plaintiff's "continue to overlook the role that IGRA's exceptions in § [2719(b)] play in the statutory scheme").[23]

### (ii)    Section 2719(a)'s Preference For On-Reservation Gaming

Similar to the Stand Up plaintiffs, the Picayune Tribe asserts that the Secretary violated "a fundamental tenet" of the IGRA, namely: "the promotion of on-reservation gaming instead of off-reservation gaming."  Picayune's Mem. at 14.  As support for this assertion, the Picayune

---

[23]     Though *Citizens Exposing Truth* involved the "initial reservation exception," 492 F.3d at 461; *see* 25 U.S.C. § 2719(b)(1)(B)(ii), and *City of Roseville* involved the "restored land exception," 348 F.3d at 1022; *see* 25 U.S.C. § 2719(b)(1)(B)(iii), the reasoning in these cases regarding the purposes of the IGRA applies equally to the two-part determination exception in § 2719(b)(1)(A).

Tribe points to what the Tribe characterizes as the IGRA's "broad prohibition against gaming on newly acquired land." *Id*.

Contrary to the Picayune Tribe's characterization, however, the IGRA's prohibition is not so broad.  While the IGRA does, indeed, provide a general prohibition that "gaming . . . shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," 25 U.S.C. § 2719(a), other parts of the same section provide multiple exceptions, *see id*. ("*Except as provided in subsection (b)* of this section, gaming . . . shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, *unless*-- . . . ." (emphasis added)); *see also Citizens Exposing Truth*, 492 F.3d at 468 ("Congress's primary purpose in enacting IGRA is evident as well from the inclusion of several exceptions to the gaming prohibition on after-acquired lands in order to allow newly acknowledged or restored tribes to engage in gaming on par with other tribes.").  While the Secretary has acknowledged that "the regulatory scheme established by IGRA favors on-reservation gaming to off-reservation gaming," and that Congress "favors tribal gaming on existing and former reservations, and on lands acquired in trust prior to October 17, 1988," IGRA ROD at 82, such Congressional intent does not undermine Congress' other clear intent to provide for off-reservation gaming on newly acquired lands pursuant to a Secretarial two-part determination, which it expressly incorporated into the IGRA.  *See* 25 U.S.C. § 2719(b)(1)(A). Consequently, the Picayune Tribe's blinkered view that the Secretary violated Congressional intent and the IGRA's preference for on-reservation gaming in making a two-part determination in this case ignores other parts of the same statutory provision and is, therefore, not persuasive.[24]

---

[24]     The Picayune Tribe makes the same argument against off-reservation gaming with respect to the IRA, citing an implementing regulation requiring the Secretary to "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" and "greater weight" to the concerns of state and local governments "having regulatory jurisdiction over the land to be acquired" when "the distance between the tribe's reservation and

**b.**       *Community Benefits*

Predicated on their faulty premise that § 2719(b)(1)(A) requires that the gaming

establishment result in zero negative impact to the surrounding community, *see supra* subpart

a(i), the Stand Up plaintiffs criticize the Secretary's "balancing test, concluding that the benefits

outweigh any detriments" and assert that "benefits to the surrounding community are irrelevant .

. . except to the extent that such benefits eliminate detriments."  Pls.' Mem. at 25; *see also id.* at

23 ("[P]roviding economic benefits to the surrounding community is not a purpose of IGRA[,]

nor . . . consonant with any of the articulated purposes." (emphasis omitted)); Pls.' Reply at 33–

34 (arguing that "a finding of no detriment to the surrounding [community] cannot be made by

claiming the benefits outweigh the detriments" because, generally, the larger the casino, the

greater the revenue/positive impact and the greater the negative impact).  In other words, the

plaintiffs take issue with the Secretary's consideration of the community benefits expected to be

derived from the proposed casino in evaluating its detrimental impact.

At the outset, determining whether "a gaming establishment on newly acquired lands . . .

would not be detrimental to the surrounding community," 25 U.S.C. § 2719(b)(1)(A), necessarily

requires a holistic evaluation of the impact of the proposed development, and properly

encompasses consideration of both the anticipated benefits the gaming establishment would

bring to the surrounding community and its potential adverse consequences.  A focus solely on

the detriments or the benefits would distort the overall goals of the statute.

---

the land to be acquired increases."  25 C.F.R. § 151.11(b), (d); *see* Picayune's Mem. at 15 (referring to the "IRA presumption[] against off-reservation gaming").  The IRA, similar to the IGRA, represents an "overall effort 'to rehabilitate the Indian's economic life'" and "functions as a primary mechanism to foster Indian tribes' economic development."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2211 (2012) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (2011)).  Accordingly, the IRA "'provid[es] lands sufficient to enable Indians to achieve self-support,'" *id.* (quoting *Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23, 31 (D.C. Cir. 2008)), and expressly contemplates that the Secretary will make "'off-reservation acquisitions' . . . 'for business purposes,'" *id.* (quoting 25 C.F.R. § 151.11(c)).  Consequently, the Picayune Tribe's similar IRA-related argument is also overly simplistic and unpersuasive.

In this regard, the plaintiffs mischaracterize the Secretary's conclusion.  Contrary to the plaintiffs' assertion, the Secretary did not "conclud[e] that the benefits outweigh any detriments," Pls.' Mem. at 25, or "suggest that the benefits to the surrounding community will compensate the community for any detriments," *id*. at 25 n.22.  Rather, the Secretary acknowledged the negative impacts that the proposed casino would have on the surrounding community and determined that these negative impacts would not be, overall, "detrimental to the surrounding community" within the meaning of the IGRA.  *See* IGRA ROD at 85 ("The weight of the evidence in the record strongly indicates that the Tribe's proposed gaming facility in Madera County would not result in detrimental impact on the surrounding community.").

### c.    *Mitigation Measures*

The Stand Up plaintiffs further criticize "[t]he Secretary's finding of no detrimental impact to the surrounding community" for failing to examine fully the mitigation measures outlined in the IGRA ROD, which adopted the analysis of these measures set out in the FEIS to address any adverse environmental impacts from the casino development.  *See* Pls.' Mem. at 26–27 (criticizing the lack of "discussion of the effectiveness of the mitigation measures, where, how, and when[] the measures will be used, or a discussion of the relationship between reduction and a finding of no detriment"); Pls.' Reply at 35–36 (arguing that the Secretary lacked regulatory authority to "merely adopt[]. . . . the findings of the FEIS . . . . without discussion or analysis").[25]  This criticism is unavailing.

---

[25]     To the extent that the Stand-Up plaintiffs contend that the Secretary erred in considering mitigation measures at all, since the need for mitigation suggests the presence of an adverse impact, which, standing alone, in the plaintiffs' view, should bar approval of the proposed casino under IGRA, *see* Pls.' Mem. at 27 (arguing that "[m]itigation is not the same as elimination"), this argument has been rejected, *supra* Part III.C.2.a(i).  To the contrary, IGRA regulations expressly require the consideration of mitigation measures in connection with the two-part determination.  *See* 25 C.F.R. § 292.18(a), (d) (requiring an IGRA off-reservation gaming application to contain information regarding "plans for mitigating adverse impacts," and "sources of revenue to mitigate" the "[a]nticipated costs of impacts to the surrounding community"); *id.* § 292.21(a) (requiring the Secretary to consider information submitted under § 292.18 in making the IGRA two-part determination).

IGRA implementing regulations expressly instruct the Secretary to incorporate the NEPA process into her determination.  25 C.F.R. §§ 292.18(a), 292.21(a) (requiring the Secretary to consider "[i]nformation regarding environmental impacts and plans for mitigating adverse impacts, including . . . an Environmental Impact Statement (EIS), or other information required by the [NEPA]"); *see also* Gaming on Trust Lands, 73 Fed. Reg. at 29,369 ("The Secretary must have the results of the NEPA analysis in order to consider whether or not there is detriment to the surrounding community.").  Furthermore, NEPA implementing regulations are aimed "to see that the decisionmaker considers and pays attention to what the NEPA process has shown." Implementation of Procedural Provisions, 43 Fed. Reg. 55,978, 55,985 (Nov. 29, 1978).  Thus, these regulations "require[] that relevant environmental documents, comments, and responses be part of the record [and] . . . accompany the proposal through existing agency review processes *so that agency officials use the statement in making decisions*," 40 C.F.R. § 1505.1(c)–(d) (emphasis added); *see also id.* § 1500.1(c) ("NEPA's purpose is not to generate paperwork— even excellent paperwork—but to foster excellent action.  The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.").  In accordance with these regulations, in the IGRA ROD, the Secretary reviewed and reasonably relied on the thorough analysis and discussion of mitigation measures contained in the FEIS, along with numerous other documents.  IGRA ROD at 1; *see also infra* n.26.  Thus, contrary to the Stand Up plaintiffs' assertion, not only was the Secretary acting properly within her regulatory authority, but also wholly appropriately, by relying on and adopting the findings in the FEIS.

To the extent that the plaintiffs dispute the sufficiency of various mitigation measures referenced in the FEIS to support the Secretary's two-part determination under IGRA, their

argument is not persuasive.  Specifically, the plaintiffs complain that "the FEIS merely lists the mitigation measures" without providing any "discussion of how effective the measures will be," Pls.' Mem. at 27; *see also* Pls.' Reply at 36 (arguing that the FEIS "fails to discuss how the significant impacts will be mitigated by the measures proposed" and "merely assumes that unexamined mitigation measures will suffice" to rebut the "detriment to the surrounding community").  Yet, this complaint blatantly ignores the FEIS' references to studies supporting the effectiveness of mitigation measures, *see, e.g.*, FEIS at 4.7-9, Jt. App. at 720, ECF No. 126-10 (citing an "Office of Problem Gambling study" finding that "problem gambling may be attenuated, or possibly reversed, through the expansion of problem gambling services"), and fails to account for the thousands of pages of quantitative and qualitative analyses, attached as appendices to the FEIS that provide the bases for other various mitigation measures listed and adopted in the IGRA ROD, *see, e.g.*, FEIS, apps. vol. I, app. M (Updated Traffic Impact Study, TPG Consulting (Oct. 2008)), AR at NF_AR_0031337–31800 (consisting of 424 pages of analysis, including hundreds of diagrams of projected traffic scenarios and data-based projections for "mitigated scenarios"); *id.*, apps. vol. II, app. N (Updated Traffic Impact Study Attachments, TPG Consulting), AR at NF_AR_0031804–33606 (consisting of 1,803 pages of, *inter alia*, "information on the traffic data collection, study methodology and assumptions" underlying proposed mitigation measures).[26]

---

[26]     The plaintiffs contend that adoption of the mitigation measures outlined in the FEIS is "inconsistent with [the] substantive mandate of [the IGRA]" because "NEPA allows projects to proceed despite a finding of detrimental impact[ and] IGRA does not." Pls.' Mem. at 26.  This contention is the same already-rejected argument in another form that the IGRA requires a finding of no harm whatsoever.  *See supra* n.25.  While the plaintiffs are correct that the NEPA is "essentially procedural" and "does not mandate particular results in order to accomplish its ends," *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (quotations and citations omitted), it requires "accurate documents as the basis for sound decisions," Implementation of Procedural Provisions, 43 Fed. Reg. at 55,980.  Accordingly, the final rule establishing the IGRA implementing regulations provides that "[t]he NEPA document will address the mitigation of significant impacts."  Gaming on Trust Lands, 73 Fed. Reg. at 29,374.  The fact that the mitigation measures set out in the FEIS were adopted wholesale as a condition for approval of the proposed casino in the IGRA ROD more than satisfied the Secretary's statutory

The plaintiffs' specific contentions regarding the adequacy of mitigation measures adopted for problem gambling, traffic and transportation, and the Swainson's hawk are addressed below in subpart d(ii).

### d.      *Community Harms*

Both groups of plaintiffs argue that the Secretary's determination that the proposed casino "would not be detrimental to the surrounding community," IGRA ROD at 84, is arbitrary and capricious based on the Secretary's alleged failure, in the IGRA ROD, to evaluate properly and adequately expected harms to the community.  The Picayune Tribe challenges the Secretary's analysis of the evidence of economic harm facing that Tribe as a result of the competition to its own casino, Chukchansi Gold.  *See generally* Picayune's Mem. at 20–27.  The Stand Up plaintiffs summarily claim that the Secretary failed to "analyze the acknowledged detrimental effects" of the proposed casino, and make only a passing, albeit specific, reference to the Secretary's analysis with respect to the creation of "approximately 531 new problem gamblers," the "significant traffic and transportation impacts," and the "loss of habitat for the Swainson's hawk."  Pls.' Mem. at 25–26.  These complaints about the Secretary's consideration of the potential harms from the casino development are addressed *seriatim* below.

### (i)      *Economic Impact On The Picayune Tribe*

The Picayune Tribe argues that the Secretary (1) was "required . . . to determine whether [the proposed casino] would be detrimental to the Picayune" because the Picayune Tribe is "part of the surrounding community according to the applicable regulations," and (2) "improperly ignored [allegedly uncontroverted] evidence of [substantial] detrimental financial impact to the

---

obligations. *See* IGRA ROD at 26 ("All practicable means to avoid or minimize environmental harm from the Preferred Alternative have been identified and adopted."); *id.* at 51 ("There are no mitigation measures listed in the FEIS for the Preferred Alternative that are not included in this ROD.").

Picayune," rendering the IGRA ROD "arbitrary and capricious as a matter of law." Picayune's Mem. 20–21; *see also id.* at 16 (arguing that the Secretary "employed a pattern of conflicting and arbitrary reasoning . . . to minimize or ignore the impacts to the Picayune"). The Court previously rejected these arguments in *Stand Up I*, 919 F. Supp. 2d at 75–76, and, after thorough review of the full, extensive administrative record, rejects them again now.

First, as the Court previously explained, "the Secretary was not required to consider the Picayune Tribe's concerns at all," *id.* at 75, because, contrary to the Picayune Tribe's assertion, it is *not* a "nearby Indian tribe" or part of the "surrounding community" under the applicable regulations, *see* Gaming on Trust Lands, 73 Fed. Reg. at 29,356 ("[I]f an Indian tribe qualifies as a nearby Indian tribe under the distance requirements of the definition, the detrimental effects to the tribes on-reservation economic interests will be considered. If the tribe is outside of the definition, the effects will not be considered."). The IGRA's implementing regulations define "surrounding community" as "local governments and nearby Indian tribes located within a 25-mile radius of the site of the proposed gaming establishment," 25 C.F.R. § 292.2; *see also id.* ("Nearby Indian tribe means an Indian tribe with tribal Indian lands located within a 25-mile radius of the location of the proposed gaming establishment."), and "the Picayune Tribe indisputably falls outside that radius because its lands are located 'approximately 39 miles from the [Madera] Site,'" *Stand Up I*, 919 F. Supp. 2d at 75 (quoting IGRA ROD at 85) (alteration in original).[27]

---

[27]     As mentioned, *supra* n.8, the Picayune Tribe asserts in its motion papers that "[t]he Madera Site sits only 26.4 miles [from] the Picayune Rancheria," Picayune's Mem. at 18, in contrast to the 30-mile distance alleged in its Complaint, Picayune's Compl. ¶ 5. The 26.4-mile distance is allegedly "the straight-line distance between the Picayune Rancheria and the Madera Site." Comments on Proposal of North Fork Rancheria ("North Fork") to Acquire land for Gaming Purposes in Madera County (Mar. 23, 2009) ("Picayune's Comment Letter") at 2, Suppl. Jt. App. at 21, 22, ECF No. 134-1. Despite the inconsistencies in the administrative record, as the North Fork Tribe points out, "all parties (including Picayune) agree that the distance is greater than 25 miles." North Fork's Mem. at 23 n.13.

The Picayune Tribe contends that it, nevertheless, should have been "considered part of the 'surrounding community' for purposes of the detrimental impact determination," because it submitted, on March 3, 2009, "a petition to the BIA . . . as provided for in 25 C.F.R. § 292.2." Picayune's Mem. at 21. The referenced regulation provides that a "nearby Indian tribe located beyond the 25-mile radius may petition for *consultation* if it can establish that its governmental functions, infrastructure or services, will be directly, immediately and significantly impacted by the proposed gaming establishment." 25 C.F.R. § 292.2 (emphasis added); *see also* Gaming on Trust Lands, 73 Fed. Reg. at 29,357 (explaining that the BIA "included a rebuttable presumption to the 25-mile radius" in IGRA's implementing regulations through the referenced regulation). Noting that "[t]he record does not appear to contain any direct response" from the BIA to its petition, the Picayune Tribe contends that the Secretary ignored its petition as well as the parties' "course of dealing [throughout the review process] indicating that the Picayune would be afforded the protections provided to the surrounding community," and, thereby, accuses the Secretary of "ignor[ing] the regulatory definition" of "nearby Indian tribe." Picayune's Mem. at 22.[28]

---

[28] To demonstrate the parties' "course of dealing," the Picayune Tribe relies on two documents, both of which pre-date its March 3, 2009 petition and apply only to the BIA's compliance with the NEPA. *See* Letter from Clayton Gregory, BIA Regional Dir., to Dustin Graham, Picayune Chairman (Mar. 7, 2007) at 1, Jt. App. at 148, ECF No. 124-1 ("recogniz[ing] the Picayune . . . as an affected Indian tribe" for the purpose of its participation in the "EIS process" under the NEPA); Letter from BIA Pacific Region Dir. to Joyce Burel, Picayune Chairperson (Feb. 7, 2005) at 2, Jt. App. at 132, ECF No. 124-1 & Suppl. Jt. App. at 1, ECF No. 134-1 ("[W]e recognize the Picayune Rancheria of Chukchansi Indians as an affected Indian tribe, as defined under NEPA."). The NEPA's implementing regulations require an agency to invite "any affected Indian tribe" to participate in the "open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action," 40 C.F.R. § 1501.7(a)(1), and, "before preparing a final environmental impact statement," request comments from "Indian tribes, when the effects may be on a reservation," *id.* § 1503.1(a)(2)(ii), or "those persons or organizations who may be interested or affected," *id.* § 1503.1(a)(4). "Affecting" in the context of the NEPA is defined very broadly, with no geographic limitation, to mean "will or may have an effect on." *Id.* § 1508.3; *see* North Fork's Mem. at 25 n.15 ("NEPA's definition is not geographically limited and includes all tribes that may experience any on-reservation effects."). Thus, the documents cited by the Picayune Tribe are irrelevant to the determination of that Tribe's status as part, or not part, of the "surrounding community" under IGRA regulations.

The BIA did not ignore the Picayune Tribe's petition, which requested "to be *consulted* as a nearby tribe and a 'surrounding community' with regard to North Fork's" application for the proposed casino.  Petition for Nearby Tribe Status as Relates to North Fork Proposed Fee-to-Trust Acquisition for Gaming Purposes (Mar. 3, 2009) at 1–2 ("Picayune's Petition Letter"), Suppl. Jt. App. at 15–16, ECF No. 134-1 (emphasis added).  Indeed, before the Picayune Tribe even submitted its petition, the BIA provided to the Picayune Tribe, on January 23, 2009, a courtesy copy of the consultation letter it was required to send to "[a]ppropriate State and local officials" and "[o]fficials of nearby Indian tribes" to solicit their comments on North Fork's application, 25 C.F.R. § 292.19(a)(1)–(2), pursuant to 25 C.F.R. §§ 292.19–20.  *See* Picayune's Petition Letter at 1.  The Picayune Tribe submitted extensive comments to the BIA in its petition letter and also in another 17-page letter to the BIA, on March 23, 2009, containing over 37 exhibits.  *See generally* Picayune's Petition Letter at 1–6, Suppl. Jt. App. at 15–20; Comments on Proposal of North Fork Rancheria ("North Fork") to Acquire land for Gaming Purposes in Madera County (Mar. 23, 2009) ("Picayune's Comment Letter"), Suppl. Jt. App. at 21–37, ECF No. 134-1.  The BIA, in turn, not only reviewed these submissions but also, in accordance with 25 C.F.R. § 292.19(c),[29] provided the Picayune Tribe's comments to the North Fork Tribe.  *See* IGRA ROD at 77 ("There are no nearby Indian tribes as defined under 25 C.F.R. § 292.2.  Nevertheless, . . . . [g]iven the relative proximity of Picayune to the Site, and the relative proximity of the Chukchansi Gold Casino to the Site[,] I have considered the comments submitted by Picayune in my evaluation of the North Fork Rancheria's application."); Letter from Dale Morris, BIA Regional Dir., to Judy E. Fink, North Fork Chairwoman (Apr. 27, 2009)

---

[29]     This regulation requires the Regional Director, "[a]fter the close of the consultation period, to "[p]rovide a copy of all comments received during the consultation process to the applicant tribe[,]" and "[a]llow the tribe to address or resolve any issues raised in the comments."  25 C.F.R. § 292.19(c).

at 1, AR at NF_AR_0039804.  By including the Picayune Tribe in the consultation process, the BIA essentially, informally provided the consultative role in the process requested in the Picayune's Tribe's petition.[30]

The BIA also properly applied the regulatory definition of "nearby Indian tribe."  The Picayune Tribe mistakenly believes that its petition somehow enabled it to become part of the "surrounding community," as defined in the applicable regulatory definitions, *see* Picayune's Mem. at 23–24 ("The agency's own definition of 'surrounding community' includes tribes that petition . . . ."), and that, as a result, the Secretary was required to make a specific finding regarding the "detrimental impact" of the proposed casino on the Picayune Tribe, *id*.  The Picayune Tribe is wrong.

As the Court previously explained, the conclusion that the Picayune Tribe rebutted the 25-mile radius presumption contained in IGRA regulations for the purposes of *consultation*, *see* 25 C.F.R. § 292.2, "only meant that the Secretary was required to consider the Picayune Tribe's comments *at all*, not that the Secretary was compelled to afford those comments a weight that was equal to all other comments," *Stand Up I*, 919 F. Supp. 2d at 75–76 (emphasis in original); *see also* North Fork's Mem. at 24–25 ("The regulations do not convert a tribe beyond the 25-mile radius into a 'nearby' tribe or member of the 'surrounding community' merely because the Secretary exercises her discretion to consult with the tribe and consider its concerns[,] [and]

---

[30]     The federal defendants contend that "[t]he Secretary never granted a 'petition for consultation' under IGRA and in order to do so, the Secretary would need to wiave [sic] the regulation."  Defs.' Mem. at 45 (citing Gaming on Trust Lands, 73 Fed. Reg. at 29,357); *see also id.* at 44 ("If a tribe petitions for consultation and establishes, to the satisfaction of the Secretary, that it will be directly, immediately and significantly impacted by the proposed establishment, and if the Secretary waives the regulation and exercises her discretion to grant the petition, it is included in the formal consultation process set forth in 25 C.F.R. § 292.19."); *id.* ("The Secretary has never, at any point, . . . waived the regulations."); Defs.' Reply at 2, 24–25 (asserting repeatedly that "the Secretary never granted Picayune's petition for consultation").  While the Secretary may not have formally granted a petition for consultation or waived any regulation regarding such consultation, the administrative record contains ample evidence that the Picayune Tribe's views were solicited and considered.

Picayune points to nothing in the text of the IGRA regulations or agency guidance that would support [a] contrary interpretation."). "The Secretary, in accord with [her] regulations, 'considers detrimental impacts on a case-by-case basis,' 73 Fed. Reg. at 29,356, and . . . need not accord equal weight to all comments regardless of the commenter's proximity to the proposed gaming establishment." *Stand Up I*, 919 F. Supp. 2d at 76.

Since the Secretary was not required to consider the Picayune Tribe to be part of the surrounding community under the applicable regulations, the Secretary was not required to determine whether the proposed casino would be detrimental to the Picayune Tribe. In any event, as the North Fork Tribe points out, the "IGRA requires the Secretary to make only a single determination" regarding whether the proposed facility would be detrimental to the surrounding community "as a whole." North Fork's Mem. at 26 (citing 25 C.F.R. § 292.21); *see* 25 C.F.R. § 292.21(a) ("The Secretary will consider all the information submitted under §§ 292.16–292.19 in evaluating whether the proposed gaming establishment is in the best interest of the tribe and its members and whether it would or would not be detrimental to the surrounding community."); *see also* North Fork's Reply at 14 ("The relevant question is whether the project would be 'detrimental to the surrounding community' as a whole, not whether the project would be detrimental to any particular member of the community[,] . . . . [which] makes good sense, since otherwise any potential adverse effect on a particular member of the community might block a project that could be highly beneficial to the community as a whole."). Thus, the Secretary was not necessarily required to make any specific finding regarding the proposed casino's "detrimental impact" on any single entity.

Nonetheless, contrary to the Picayune Tribe's assertion, the Secretary did make a specific finding regarding the Picayune Tribe: the Secretary expressly concluded that the North Fork

Tribe's "proposed gaming facility," which would exist "in an overlapping [highly competitive] gaming market," where the Picayune Tribe's casino had already "proven to be a successful operation," would not result in a detrimental impact to the Picayune Tribe.  IGRA ROD at 86.

In sum, the BIA considered the Picayune Tribe's comments and reasonably afforded those comments "some weight," IGRA ROD at 85–87, "based on the logical premise that '[t]he weight accorded to the comments of tribes and local governments outside the definition of "surrounding community" will naturally diminish as the distance between their jurisdictions and the proposed off-reservation gaming site increases,'" *Stand Up I*, 919 F. Supp. 2d at 75 (alteration in original) (quoting IGRA ROD at 85); *see id.* ("[I]t is rational and in keeping with congressional intent to accord weight to an entity's concerns in proportion to the entity's physical proximity to the development in question." (citing Gaming on Trust Lands, 73 Fed. Reg. at 29,356–57)); *see also* Gaming on Trust Lands, 73 Fed. Reg. at 29,357 (explaining the development of the 25-mile distance standard and that, "[b]ased on [the agency's] experience, a 25-mile radius best reflects those communities whose governmental functions, infrastructure or services may be affected by the potential impacts of a gaming establishment").

Nevertheless, the Picayune Tribe continues to press its argument that "[t]he geographic penalty applied to the Picayune is arbitrary and capricious, given that the North Fork Rancheria is even further from the Madera Site," asserting that the North Fork Rancheria is "at a straight-line distance from the Madera Site of 38.21 miles, roughly 12 miles farther than the Picayune reservation."  Picayune's Mem. at 18 (emphasis omitted).  The Picayune Tribe is particularly critical of "the Secretary's enthusiasm for the perceived . . . . benefit of the fact that '62 percent of [the North Fork Tribe's] tribal citizens live within 50 miles of the [Madera] Site,'" which "ignores the fact that 38 percent of the North Fork citizens must therefore live *more* than 50

miles away from the Madera Site," as well as the Secretary's reference to the 38-mile distance as

"'relatively short.'"  *Id*. at 18–19 (emphasis in original) (citing IGRA ROD at 52, 83).

These assertions conflate the two parts of the "two-part determination" that the Secretary

was required to make.  As the North Fork Tribe notes, "[t]he Secretary considered distances as

part of two distinct inquiries[:]  [s]he considered the . . . distance between the Madera Site and

the [North Fork] Tribe's headquarters in analyzing whether the facility would benefit the Tribe

through employment, job training and career development, . . . and was in the best interest of the

Tribe and its members" and, "[b]y contrast, . . . considered the distance between the Madera Site

and Picayune's casino in analyzing whether Picayune was [part of] the 'surrounding

community,'" under applicable regulations.  North Fork's Mem. at 32 (citing 25 C.F.R. §§

292.17(b), 292.21(a); IGRA ROD at 52, 77, 81, 83–86).[31]

Moreover, the Secretary noted that "[s]eventy-three percent of the adult citizens of the

[North Fork] Tribe are located closer to the [Madera] Site than [to] the original [North Fork]

Rancheria."  IGRA ROD at 52.  Perhaps more significantly, the Secretary also explained that

"[t]he employment opportunities generated by the [proposed casino] will provide an opportunity

for tribal citizens living far away to return to their community," which "will help correct the

lasting impacts of previous Federal Indian policy eras that encouraged tribal citizens to leave

---

[31]     The Picayune Tribe attempts to bolster its argument by citing an IRA implementing regulation providing that "as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" and "greater weight" to the concerns of state and local governments "having regulatory jurisdiction over the land to be acquired."  25 C.F.R. § 151.11(b), (d); *see* Picayune's Reply at 16.  The regulation requires "greater scrutiny" because, "as a general principle, the farther the economic enterprise . . . is from the reservation, the greater the potential for significant negative consequences on reservation life," including the inability of tribal members to "be able to take advantage of the job opportunities if they desire to remain on the reservation," particularly "[i]f the gaming facility is not within a commutable distance of the reservation."  Mem. from Carl Artman, DOI Asst. Sec'y, to BIA Regional Dirs., Guidance on taking off-reservation land into trust for gaming purposes (Jan. 3, 2008) at 3–4, Suppl. Jt. App. at 2, 4–5, ECF No. 134-1.  The Picayune Tribe's reliance on this regulation is misplaced since the Picayune Tribe is *not* a state or local government "having regulatory jurisdiction over the land to be acquired" and the regulation requires focus on the North Fork Tribe's "justification of anticipated benefits" from the proposed casino, not the Picayune Tribe's concerns.

their communities." IGRA ROD at 52, 83. Lastly, the Secretary referred to the "relatively short distance between the Tribe's seat of government and the proposed Resort" to support the "conclusion that the Tribe will be able to sufficiently regulate the conduct of class III gaming and exercise governmental power over the Site." IGRA ROD at 83–84. It was not unreasonable or inconsistent for the Secretary to consider geographic distances of differing lengths for these distinguishable purposes.

Turning to the Secretary's consideration of what the Picayune Tribe claims is the "substantial negative impact" that the North Fork Tribe's proposed casino will have on the Picayune Tribe and its casino, Chukchansi Gold, Picayune's Mem. at 25, the Court previously approved "the Secretary's conclusion that 'competition from the [North Fork] Tribe's proposed gaming facility in an overlapping gaming market is not sufficient, in and of itself, to conclude that it would result in a detrimental impact to Picayune,'" finding the Secretary's conclusion "was supported by the evidence in the record," *Stand Up I*, 919 F. Supp. 2d at 76 (alteration in original) (quoting IGRA ROD at 86). The Court discussed in detail the "'gravity model impact analysis,' performed by a gaming and entertainment consulting firm called Innovation Group," on which analysis the Secretary relied, and found that "the Secretary was likely rational in concluding that [the] competition [to Chukchansi Gold] would not be significantly detrimental to the Picayune Tribe." *Id*. The Court noted that the Picayune Tribe had "offer[ed] no concrete alternative analysis of Alternative A's economic impacts that would suggest that a gaming complex on the Madera Site would impair the Picayune Tribe's ability to remain profitable and self-sufficient," concluding that "absent any evidence supporting the prediction that development of the Madera Site would have a destructive competitive impact upon the Picayune Tribe, the

plaintiffs are unlikely to succeed in arguing that the Secretary's analysis of the economic effects on the Picayune Tribe was improper." *Id*. at 77.[32]

The Picayune Tribe offers little at this summary judgment stage to change the Court's view. The Picayune Tribe criticizes the Innovation Group's analysis, arguing that the "estimate of 19% loss of revenues to the Picayune Rancheria property *may* have underestimated the harm to Picayune Rancheria" for a variety of reasons, Picayune's Mem. at 25 (emphasis added), but, notwithstanding the massive record in this case, has pointed to no alternative analysis concluding that the proposed casino would put Chukchansi Gold out of business or have any "destructive competitive impact" on the Picayune Tribe.

Instead, the Picayune Tribe cites an economic analysis performed by Klas Robinson QED ("Klas Robinson"), another consulting organization, which "concluded that the Madera Site casino would reduce revenues at Chukchansi Gold at least 22.2%, with losses as high as 32.4%, depending on the scope of gaming activity at the Madera Site." Picayune's Mem. at 26 (citing Letter from Klas Robinson QED to Morris Reid (Mar. 13, 2008) ("Klas Robinson Letter") at 5, Suppl. Jt. App. at 6, 10, ECF No. 134-1). The Picayune Tribe provided this alternative analysis to the BIA with its comments on the North Fork Tribe's IGRA application, *see* Picayune's Comment Letter at 10–13, and the Secretary considered the analysis, *see* IGRA ROD at 86 (citing Picayune's Comment Letter and its projected loss of revenue). Notably, Klas Robinson's

---

[32]     The Picayune Tribe complains that the Innovation Group's analysis "was never cited in the IGRA Decision." Picayune's Reply at 13; *see also* Picayune's Mem. at 25 n.6 (claiming that the Secretary "made no reference . . . in the IGRA Decision" to the Innovation Group's finding that even a 20% decrease in revenue at Chukchansi Gold would not "'jeopardize[] its ability to remain open'" and that "there is no basis to infer that the Secretary considered that a 19% or 20% loss of revenues to the Picayune would not qualify as 'detrimental'" (quoting FEIS, apps. vol. III, app. R, Innovation Group Socioeconomic Assessment (Sept. 2008) at 21, Jt. App. at 182, 185, ECF No. 124-2). This argument overlooks that the IGRA ROD was "based on thorough review and consideration of . . . the FEIS," among numerous other documents, IGRA ROD at 1, and the FEIS clearly referenced the Innovation Group's analysis, *see* FEIS at 4.7-61, -62, Jt. App. at 772–73, ECF No. 127-1 (discussing, in detail, the "estimated impacts" of the proposed casino on Chukchansi Gold based on the Innovation Group's 2008 "gravity model impact analysis").

analysis does not "debat[e] the accuracy," Klas Robinson Letter at 6, of the BIA's conclusion

that the competitive impact of the North Fork Tribe's proposed casino would not "jeopardize[]

the [Chukchansi Gold Resort]'s ability to remain open," FEIS at 4.7-61, Jt. App. at 772, ECF No.

127-1.

A court "may not 'supplant the agency's findings merely by identifying alternative

findings that could be supported by substantial evidence.'" *Koch v. SEC*, 793 F.3d 147, 156

(D.C. Cir. 2015) (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).  As the D.C. Circuit

has repeatedly recognized, "an agency's conclusion 'may be supported by substantial evidence

even though a plausible alternative interpretation of the evidence would support a contrary

view.'" *Id*. (quoting *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994)).  Furthermore, the

D.C. Circuit recently emphasized the well-settled legal principle that "[a]n agency does not

engage in arbitrary or capricious decision-making by making 'predictive judgement[s]' or even

by relying on '[i]ncomplete data.'" *New York v. NRC*, 824 F.2d 1012, 1022 (D.C. Cir. 2016)

(alterations in original) (quoting *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005)).  Rather,

"such judgments are 'entitled to deference,'" *id*. (quoting *New York v. EPA*, 413 F.3d at 31),

"and a challenge to the agency's assumptions must be more than 'an effort by [a petitioner] to

substitute its own analysis' for the agency's," *id*. (alteration in original) (quoting *Transmission

Access Policy Study Grp. v. FERC*, 225 F.3d 667, 737 (D.C. Cir. 2000)); *see also Earthlink, Inc.

v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) ("'An agency's predictive judgments about areas that

are within the agency's field of discretion and expertise are entitled to *particularly deferential*

review, as long as they are reasonable.'" (emphasis in original) (quoting *In re Core Commc'ns,

Inc.*, 455 F.3d 267, 282 (D.C. Cir. 2006))); *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126,

1133 (D.C. Cir. 2001) ("[W]e must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency.").

Indeed, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Thus, in light of the Secretary's reasonable reliance on the Innovation Group's analysis "conclud[ing] that permitting a class III gaming establishment on the Madera Site would result in Picayune having a smaller slice of the larger gaming pie," *Stand Up I*, 919 F. Supp. 2d at 76, but nonetheless not impede the ability of Chukchansi Gold "to remain open and to continue to generate sustainable profits," FEIS at 4.7-62, Jt. App. at 773, ECF No. 127-1, the Court finds that the Secretary was rational in concluding that the competitive impact of the North Fork Tribe's proposed casino on the Picayune Tribe would not be significantly detrimental.

The Picayune Tribe's remaining arguments—regarding alleged internal inconsistencies in the Secretary's reasoning with respect to her consideration of (1) gaming revenue, employment, and tribal funding and (2) gaming competition—do not warrant any alteration in the Court's finding. It was not unreasonable or inconsistent for the Secretary to find that the proposed casino's "anticipated revenues, employment, and funding for Tribal programming" supported a conclusion that the proposed casino would be in the North Fork Tribe's best interest and also to find that the Picayune Tribe's expected loss in revenues, employment, and funding for tribal programing did not, by itself, support a conclusion that the proposed casino would have a detrimental impact on the surrounding community. Picayune's Mem. at 19–20.

Still, the Picayune Tribe insists that the "two distinct inquiries" in this case of whether the proposed casino would be (1) in the North Fork Tribe's best interest and (2) detrimental to the

84

surrounding community, *see* 25 U.S.C. § 2719(b)(1)(A), "hinge on the same issue:  the ability of each tribe's casino to provide for the tribe."  Picayune's Reply at 16–17 (quotations and citation omitted).  Accepting *arguendo* the validity of that assertion, substantial evidence in the record supports the Secretary's determination "that development on the Madera Site would allow North Fork to use gaming revenue to provide for its people, without impeding Picayune's ability to do the same," as the North Fork Tribe points out.  North Fork's Reply at 17–18.  For example, evidence in the record indicates that the proposed casino "would expand the local market, increasing total gaming expenditures at venues in the immediate market area by over $90 million," FEIS at 4.7-61, and that, since "the current . . . gaming market is not over-saturated[,] . . . multiple operators can successfully co-exist in the long run," *id.* at 4.7-62.  Evidence also indicates that the Picayune Tribe's casino "reaches capacity constraints during the summer tourism season," *id.*, apps. vol. III, app. R, North Fork Rancheria Competitive Impact Technical Mem. (Innovation Group, June 2008) at 7, Jt. App. at 1219, 1227, ECF No. 128-6, and that its market share may actually decline less than 19%, "depending on a number of factors, including [its] ability . . . to add features and effectively market [its] facilities," FEIS at 4.7-61.

The Picayune Tribe's argument that the Secretary arbitrarily and inconsistently evaluated the effects of gaming competition, by selectively considering such competitive effects only "when they support the selection and approval of the Madera Site"—an argument echoed by the Stand Up plaintiffs—is also unavailing.  Picayune's Mem. 17; *see also id.* at 16–17 (arguing that "competition from other tribal casinos played a major role" in the Secretary's elimination of proposed alternative sites and choice "among the alternatives that remained"); Picayune's Reply at 16 ("[T]he Secretary . . . treated competition inconsistently depending on whether competitive effects favored North Fork."); Pls.' Mem. at 39 (referring to the Secretary's "use of economic

competition" as "selective" and "self-serving" and arguing that "the Secretary uses IGRA to dismiss Picayune's concerns about unfair competition and then uses the FEIS in the same breath to reject sites for the fear of harming Picayune's interests").  The Secretary eliminated proposed alternative sites, including the HUD tract and "Avenue 7 and Avenue 9 Properties," for a variety of legitimate reasons.  Thus, any competitive effect on neighboring tribes of placing a gaming facility on those sites factored into the Secretary's reasoning only in part.  IGRA ROD at 4–5.

Specifically, the Secretary ruled out the HUD tract as a viable alternative site because of (1) the nearly $2.5 million of HUD funding that had already been expended to develop it for "tribal housing and related uses," (2) the difficulty of developing the tract for commercial purposes "due to the steep and varied topography and sensitive biological features," (3) the limited access and rural location which "would necessitate the development of a very small facility" creating "[f]ew jobs," and (4) "the proximity of *three* existing tribal gaming facilities *located within 20 miles*" of the tract, including the Picayune Tribe's gaming facility.  *Id.* (emphasis added).  The Secretary likewise ruled out the Avenue 7 and Avenue 9 Properties because (1) "[a]ccess to the properties was constrained by . . . train tracks," (2) the benefit of "development near Fresno would inure primarily to the residents of Fresno and not Madera County," in which county the North Fork Tribe's governmental headquarters and other land interests are located, (3) the development of a gaming facility at those sites "would be inconsistent with existing land uses, as most of the surrounding area was used for agriculture," and (4) gaming operations of *two* neighboring tribes, including the Picayune Tribe, would be impacted.  *Id.* at 5.

Similarly, the Secretary ruled out the development of a gaming facility on the North Fork Rancheria because, in part, "a market potential and facility sizing analysis for a development on

the North Fork site" concluded that, though a facility with "marginal potential for profitability"

could possibly be constructed on the North Fork Rancheria, the site's steep topography and

remote location "would make it difficult to successfully finance any casino on the site." *Id*. at 8.

The analysis reasonably considered "the level of competition in the market" to determine what

size facility, if any, would enable North Fork to receive returns on an investment. *Id*.  The North

Fork Rancheria was further eliminated because (1) the North Fork Tribe "would not be able to

conduct gaming on the North Fork Rancheria lands unless it was able to obtain beneficial title to

or a leasehold interest in those lands," which "are held in trust for individual Indians," and (2) a

facility on the North Fork Rancheria "would generate considerable political" and local

opposition "while doing little to advance the needs of many of its tribal citizens or of the

community." *Id*. at 9–10.

In light of the Secretary's reasoning, described above, the Court remains convinced that

the Secretary's evaluation of the Picayune Tribe's concerns of gaming competition and economic

harm was entirely reasonable.

*(ii)*     *Problem Gamblers, Traffic And The Swainson's Hawk*

The Stand Up plaintiffs contend that the Secretary improperly concluded, "with no

discussion or analysis," that three negative impacts of the proposed casino—specifically, the

creation of "531 new problem gamblers," "significant traffic and transportation impacts," and

"loss of habitat for the Swainson's hawk,"—"will be mitigated."  Pls.' Mem. at 25.  The Court

disagrees with this characterization of the Secretary's decision, which included an analysis of

each of the cited negative impacts, and reached varying determinations about how each would or

could be mitigated.

The Secretary's consideration of "the potential detrimental impact" of problem gambling was expressly limited, during final rulemaking, to "any anticipated costs of treatment programs." Gaming on Trust Lands, 73 Fed. Reg. at 29,373.  This approach is authorized under applicable regulations, which do not require the Secretary to consider the "social costs attributable to compulsive gamblers enrolled and not enrolled in treatment programs." *Id.*; *see also* 25 C.F.R. §§ 292.18(e), 292.21(a) (requiring the Secretary to consider only the "[a]nticipated cost, if any, to the surrounding community of treatment programs for compulsive gambling attributable to the proposed gaming establishment").  As discussed *infra* in Part III.E.3, the FEIS adequately addressed the mitigation of any significant impact of the costs of problem gambling, and "[t]he Secretary clearly considered this aspect of the problem in concluding that permitting gaming on the Madera Site would not be detrimental to the surrounding community," *Stand Up I*, 919 F. Supp. 2d at 72.

Similarly, contrary to the plaintiffs' assertion, the Secretary discussed and analyzed the negative impacts of the proposed casino on traffic and transportation, wildlife and habitats, and migratory birds in detail in the FEIS, *see* FEIS at 4.4-1 to -14, Jt. App. at 670–83, ECF Nos. 126-9, -10 (discussing effects on air quality, including traffic and transportation); FEIS at 4.5-1 to -4, Jt. App. at 696–99, ECF No. 126-10 (discussing effects on biological resources, including the Swainson's hawk, migratory birds, and other bird species), and reasonably relied on the FEIS' analysis in the IGRA ROD.  The IGRA ROD details specific mitigation measures that the North Fork Tribe will take to mitigate any negative impacts, *see* IGRA ROD at 26–51, which mitigation measures are derived from the FEIS and supported by the FEIS' comprehensive underlying documentation and appendices, *see id.* at 16 ("The evaluation of . . . project-related impacts included consultations with entities that have jurisdiction or special expertise to ensure

that the impact assessments for the FEIS were accomplished using accepted industry standard practice, procedures, and the most currently available data and models for each of the issues evaluated in the FEIS at the time of preparation.").

For traffic and transportation impacts, such mitigation measures include directives to the North Fork Tribe, *inter alia*, to provide a minimum of "six shuttles daily to major transit stations and multi-modal centers" and "transit amenities such as bus turnouts; shelter benches; street lighting, route signs, and displays in an around the transit shelter benches to encourage public use of the transit service;" "contribute to the dedication of land for off-site bicycle trails linking the project to designated bicycle commuting routes;" "provide amenities such as personal lockers and showers, bicycle lockers and racks, bus pack subsidies and flexible schedules for employees who walk, bike, or utilize public transit to work;" "provide electric vehicle charging facilities;" and to "pay for a proportionate share of costs" to restripe, widen, and add traffic signals to numerous roads. IGRA ROD at 33, 40–45. With respect to the Swainson's hawk, the IGRA ROD provides that, *inter alia*, the U.S. Fish and Wildlife Service will be consulted about active nests found and that "[i]mpacts within 10 miles of a Swainson's hawk nest site shall be mitigated by protecting or creating equally suitable foraging habitat elsewhere within the territory's 10-mile radius," on "Habitat Management (HM) lands," pursuant to the California Department of Fish & Game's policies and procedures. *Id.* at 36.

Accordingly, the Secretary's conclusion that "[a]ll identified impacts can be adequately mitigated," IGRA ROD at 24, is reasonable based upon the evidence and analysis reflected in the record.

*       *       *

For the foregoing reasons, the defendants are entitled to summary judgment on the Picayune Tribe's IGRA claim, *see* Picayune's Compl. ¶¶ 49–53 (First Cause of Action), and on the Stand Up plaintiffs' IGRA claim, *see* TAC ¶¶ 61–68 (Second Claim for Relief).[33]

### D.    IRA RECORD OF DECISION

While the IGRA authorizes and regulates gaming activities on certain land acquired in trust for Indians, the Secretary's authority to acquire land for Indians derives, instead, from the IRA, enacted, in 1934, "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (quotations and citation omitted); *see also Confederated Tribes of the Grand Ronde Cmty. v. Jewell (Confederated Tribes)*, No. 14-5326, 2016 WL 4056092, at *1 (D.C. Cir. July 29, 2016) ("The 1934 IRA was meant 'to promote economic development among American Indians, with a special emphasis on preventing and recouping losses of land caused by previous federal policies.'" (quoting *Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23, 31 (D.C. Cir. 2008))); *id.* ("Whereas a prior policy of allotment sought to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large, . . . Congress enacted the IRA, among other things, to conserve and develop Indian lands and resources." (quotations and citations omitted)).

Pursuant to that purpose, Section 5 of the IRA authorizes the Secretary, "in his discretion, to acquire . . . any interest in lands, water rights, or surface rights to lands . . . for the purpose of providing land for Indians," specifying that "[t]itle to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired."  25 U.S.C. § 465.  Under DOI regulations,

---

[33]    The Stand Up plaintiffs' claim regarding the validity of the Governor's concurrence, asserted as part of their Second Claim for Relief, *see* TAC ¶¶ 63, 68, is addressed, *supra*, in Part III.B.

promulgated pursuant to the IRA, "land may be acquired for a tribe in trust status" when, *inter alia*, "the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3(a)(3). In considering an application for the acquisition of off-reservation trust land, regulations require the Secretary to consider a number of factors, including "the existence of statutory authority for the acquisition and any limitations contained in such authority," the "need of the individual Indian or the tribe for additional land," the "purposes for which the land will be used," and "[t]he location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation." *Id.* §§ 151.10–11.

The November 2012 IRA ROD recorded the federal defendants' decision, upon consideration of the various factors, to acquire the Madera Site in trust for the North Fork Tribe, pursuant to Section 5 of the IRA, 25 U.S.C. § 465. IRA ROD at 3. Both groups of plaintiffs challenge this decision.

The Picayune Tribe's challenge is easily dismissed. The Picayune Tribe argues that the IRA ROD is "necessarily without a basis" because it "rests on the notion that the property was, in fact, authorized for tribal gaming under IGRA" and "the IGRA [ROD] was arbitrary, capricious, and contrary to law." Picayune's Mem. at 27–28; *see also* Picayune's Reply at 19 ("The IRA Decision is essentially a repackaging of the IGRA Decision, and exhibits the same legal flaws."). The Picayune Tribe concedes that its perfunctory challenge to "the IRA Decision must stand or fall with the IGRA Decision." *Id.* at 20. Accordingly, since the Picayune Tribe's challenges to the IGRA ROD are rejected, *see supra* Part III.C, so too is the Tribe's attack on the IRA ROD.

By contrast, the Stand Up plaintiffs contend that the IRA ROD failed to explain sufficiently the Secretary's statutory authority to acquire the Madera Site in trust for the North Fork Tribe because, according to the plaintiffs, members of the North Fork Tribe do not meet the requisite statutory definition of "Indian."  The Court discusses the applicable statutory framework, the Secretary's determination, and the plaintiffs' arguments *seriatim* below.

### 1.   *Applicable Legal Framework*

The IRA limits the Secretary to acquiring land, pursuant to 25 U.S.C. § 465, only "for Indians," and defines "Indian," in 25 U.S.C. § 479, to "include [(1)] all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, . . . [(2)] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . . [(3)] all other persons of one-half or more Indian blood." *Id.* § 479.  "[T]ribe," in turn, is defined broadly "to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." *Id.*

In *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009), the Supreme Court, discussing the first of the three definitions of "Indian," held that "the word 'now' in § 479 limits the definition of 'Indian,' and therefore limits the exercise of the Secretary's trust authority," *id.*, "to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934," *id.* at 382; *see id.* at 397 (Breyer, J., concurring) ("Congress expected . . . that the Secretary could employ § 465's power to take land into trust in favor only of those tribes in respect to which the Federal Government already had the kinds of obligations that the words 'under Federal jurisdiction' imply.").  In other words, *Carcieri* held that the Secretary does not have the authority to take land into trust for any Indian tribe that "was not under federal jurisdiction when the IRA was enacted." *Id.* at 382–83; *see Confederated Tribes*, 2016 WL 4056092, at *2 ("In *Carcieri v. Salazar*, the Supreme Court held

that the word, 'now,' unambiguously limits the first definition to members of those tribes that were under federal jurisdiction in the year 1934.").

*Carcieri*'s "holding reaches only the temporal limits" of the term "under Federal jurisdiction." *Confederated Tribes*, 2016 WL 4056092, at *4. It left unanswered the meaning of that term, as well as meaning of the term, "recognized." *Id.* at *2 ("[The Supreme Court] did not pass on the exact meaning of 'recognized' or 'under Federal jurisdiction.'"); *Mackinac Tribe v. Jewell*, No. 15-5118, 2016 WL 3902667, at *2 (D.C. Cir. July 19, 2016) ("The Court has not analyzed the meaning of the word 'recognized' nor has it determined whether recognition must have existed in 1934.").

The D.C. Circuit recently examined both terms in *Confederated Tribes*. There, the Court found the phrase "under Federal jurisdiction" to be "ambiguous," and sanctioned the Secretary's interpretation to find a tribe was under federal jurisdiction in 1934 upon "a sufficient showing in the tribe's history" (1) that the United States, in 1934 or prior, took "an action or a series of actions—through a course of dealings or other relevant acts for or on behalf of the tribe or in some instance tribal members—that are sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government," and (2) "the Federal-jurisdiction status remained intact in 1934." 2016 WL 4056092, at *8–9 (quotations and citations omitted). The Court further found it reasonable, "in light of the remedial purposes of the IRA," not "to require a formal, government-to-government relationship carried out between the tribe and the highest levels of the Interior Department," explaining that "[w]hether the government acknowledged federal responsibilities toward a tribe through a specialized, political relationship is a different question from whether those responsibilities in fact existed." *Id.* at *9. Significantly, for the purposes of the instant case, the *Confederated*

*Tribes* Court explained that "sometimes . . . one federal action . . . in and of itself will be sufficient" to show federal responsibilities toward a tribe, "and at other times . . . a variety of actions when viewed in concert" will show such responsibilities. *Id.* (quotations and citation omitted).

The *Confederated Tribes* Court likewise concluded that the phrase "recognized" was "ambiguous and susceptible to either" (1) an interpretation requiring a finding that a tribe was "recognized" in the year 1934, or (2) an interpretation requiring a tribe "only [to] be 'recognized' as of the time the Department acquires the land into trust" for the tribe. *Id.* at *5–6. Noting the "historical baggage" associated with the term "recognized," the Court explained that "[t]he concept of 'recognition' has been used at once in the cognitive or quasi-anthropological sense, in terms of knowing or realizing that a tribe exists, and alternatively in a political sense, to refer to a formalized, unique relationship between a tribe and the United States." *Id.* at *4. Finding legislative history also unclear "on when recognition must occur or what it entails," *id.* at *6, the Court deferred to the Secretary's interpretation "that 'the IRA imposes no time limit upon recognition,' . . . and 'the tribe need only be "recognized" as of the time the Department acquires the land into trust,'" *id.* at *4, 6–7 (citations omitted).

The agency interpretations upheld by the D.C. Circuit in *Confederated Tribes* are consistent with Justice Breyer's concurring opinion in *Carcieri*, which noted that "[t]he statute . . . imposes no time limit upon recognition" and suggests that "a tribe may have been 'under Federal jurisdiction' in 1934 even though the Federal Government did not believe so at the time," as reflected by instances of the DOI's "later recognition [of] earlier 'Federal jurisdiction.'" 555 U.S. at 397–99 (Breyer, J., concurring). Indeed, Justice Breyer's concurrence indicates that an Indian tribe "under Federal jurisdiction" may include a tribe that is "recognized"

post-1934 on the basis of a certain 1934-or-earlier government-to-government relationship, as

may be evidenced by "a treaty with the United States (in effect in 1934), a (pre-1934)

congressional appropriation, or enrollment (as of 1934) with the [BIA]." *Id.* at 399 (Breyer, J.,

concurring).  Justices Souter and Ginsburg agreed that "the statute imposes no time limit upon

recognition" and that, "consistent with established principles of statutory interpretation," the

concepts of "recognition and jurisdiction" may each be given "its own meaning," explaining that,

"in the past, the Department of the Interior has stated that the fact that the United States

Government was ignorant of a tribe in 1934 does not preclude that tribe from having been under

federal jurisdiction at that time." *Id.* at 400 (Souter, J., concurring).

The timely guidance of this binding authority is next applied to the instant challenge to

the Secretary's action in the IRA ROD at issue here.

## 2.     *Secretary's Explanation Of Statutory Authority*

In discussing "[t]he existence of statutory authority for the acquisition and any limitations

contained in such authority" in the IRA ROD, as required by 25 C.F.R. § 151.10(a), the

Secretary "evaluated the applicability of *Carcieri* to the [North Fork] Tribe's application and . . .

determined that the Secretary [was] authorized to acquire land in trust for the [North Fork] Tribe

under 25 U.S.C. § 465." IRA ROD at 54–55.  Notably, the Secretary did not engage in any

analysis regarding the concept of "recognition," but, rather, addressed only whether the North

Fork Tribe was "under Federal jurisdiction" in 1934. *See id.*  The Secretary explained that "a

majority of the adult Indians residing at the [North Fork] Tribe's Reservation voted to reject the

IRA at a special election duly held by the Secretary on June 10, 1935," as documented in a report

by Theodore H. Haas, the United States Indian Service Chief Counsel, in 1947 ("Haas Report").

*Id.* (citing Haas Report at 15).[34]  Indeed, the IRA, when enacted, contained an "opt-out

provision," codified at 25 U.S.C. § 478 (or, "Section 18" of the IRA), whereby "a majority of the

adult Indians" at a "reservation" could "vot[e] at a special election duly called by the Secretary . .

. within one year after June 18, 1934," *id.*, "to reject the application of the IRA to their tribe,"

*Carcieri*, 555 U.S. at 395.[35]  The deadline for calling elections was later extended to June 18,

1936.  Act of June 15, 1935, ch. 260, § 2, Pub. L. No. 74-148, 49 Stat. 378.  Thus, in this case,

the Secretary concluded that "[t]he calling of a Section 18 election at the [North Fork] Tribe's

Reservation conclusively establishes that the Tribe was under Federal jurisdiction for *Carcieri*

purposes."  IRA ROD at 55.[36]

    This Court, in *Stand Up I*, found the Secretary's conclusion to be "rational," 919 F. Supp.

2d at 67 ("[I]t was rational for the Secretary to conclude that the North Fork Tribe was 'under

---

[34]    The Haas Report contains "Table A," which is entitled "Indian Tribes, Bands and Communities Which
Voted to Accept or Reject the Terms of the Indian Reorganization Act, the Dates When Elections Were Held, and
the Votes Cast."  Table A lists each reservation by state and enumerates the total population, voting population,
"total yes" votes, "total no" votes, and "election dates" of each reservation.  Haas Report at 13–20.  "Northfork" is
listed as a reservation under the California "Sacramento Agency," with the total population column left blank, a
voting population of 6, a "total yes" of 0, a "total no" of 4, and an election date of "June 10."  *Id.* at 15.
[35]    Section 18 provides, in full:
        This Act shall not apply to any reservation wherein a majority of the adult Indians, voting at a
        special election duly called by the Secretary of the Interior, shall vote against its application. It
        shall be the duty of the Secretary of the Interior, within one year after June 18, 1934, to call such
        an election, which election shall be held by secret ballot upon thirty days' notice.
25 U.S.C. § 478.
[36]    An amendment to the IRA, in a provision of the Indian Land Consolidation Act, codified at 25 U.S.C. §
2202, later clarified that "[t]he provisions of section 465 of [the IRA] shall apply to all tribes notwithstanding the
provisions of section 478 of [the IRA] . . . . ," *id.*, to "ensure[] that tribes may benefit from § 465 even if they opted
out of the IRA pursuant to § 478," *Carcieri*, 555 U.S. at 394–95; *see id.* at 395 ("[Section] 2202 provides additional
protections to those who satisfied the definition of 'Indian' in § 479 at the time of the statute's enactment, but opted
out of the IRA shortly thereafter.").  Thus, the fact that the North Fork Indians voted against the IRA in 1935 does
not affect the Secretary's authority to acquire land into trust for their benefit, despite the plaintiffs' repeated
suggestion that the *outcome* of the Section 18 election at the North Fork Rancheria is somehow related to the North
Fork Indians' tribal status.  *See* Pls.' Mem. at 8 ("Since the adult Indians at the North Fork Rancheria voted to reject
the IRA under Section 18, they did not (could not) vote to organize as a tribe under Section 16, an option they
abandoned when they rejected the IRA."); Pls.' Reply at 13 (arguing that the Indians at the North Fork Rancheria do
not "qualify as a tribe by operation of the statute that they rejected"); *id.* at 20 ("[B]ecause the Indians at the
Rancheria rejected the application of the IRA and did not organize under Section 16, the mere fact of the Section 18
election cannot prove that a tribe was under federal jurisdiction in 1934. Any such determination must be the result
of a detailed factual inquiry."); *see also infra* Part III.D.3.a(i).

Federal jurisdiction' based solely on the 1935 IRA election and also because other evidence considered by the Secretary conclusively establishes that the North Fork Tribe was 'under Federal jurisdiction' in 1934."), and the fuller record on summary judgment confirms that the Secretary's conclusion is well-founded.  The holding of an election in 1935, required by a 1934 federal statute, at an Indian tribe's reservation, clearly "reflect[s] federal obligations, duties, responsibility for or authority over the tribe by the Federal Government" both before and after 1934.  *Confederated Tribes*, 2016 WL 4056092, at *8.  It reflects the United States' action before 1934 of creating a reservation for the North Fork Tribe, and shows that federal jurisdiction remained intact after 1934, when the election was held in 1935.

   The IRA ROD does not expressly refer to the concept of "recognition," but nevertheless the Secretary highlighted the United States' history of recognizing and acquiring land for the North Fork Tribe in the section of the IRA ROD discussing "[t]he need of the . . . Tribe for additional land," as required by 25 C.F.R. § 151.10(b).  IRA ROD at 55–56.  The Secretary discussed the purchase of the North Fork Rancheria with 1913 congressional appropriations, the "termination of Federal trusteeship of the North Fork Rancheria" in 1958, and, significantly, the 1983 judgment in the *Hardwick* litigation, "wherein the Tribe's status was restored and confirmed."  *Id*. at 55.  The Secretary also discussed the purchase, with HUD funds "for tribal housing," of the North Fork Tribe's HUD tract, which was "placed in trust by the United States of America in 2002."  *Id.* at 56.  Consequently, the IRA ROD evidences the Secretary's reliance on the longstanding federal acknowledgment and history of land acquisition for a now federally-recognized Indian tribe and provides a sufficient explanation of the Secretary's reasonable conclusion that land may be acquired for the North Fork Tribe under Section 5 of the IRA.

3.     *Stand Up Plaintiffs' Arguments*

The Stand Up plaintiffs argue that the Secretary's conclusion that the North Fork Tribe was under federal jurisdiction in June 1934 is arbitrary and capricious since it "goes against the clear intent of Congress and is inconsistent with other DOI determinations."  Pls.' Mem. at 6, 9. Specifically, the Stand Up plaintiffs assert that a Section 18 election "cannot, on its own, be conclusive evidence that a tribe was under federal jurisdiction," Pls.' Reply at 2; *see also id.* at 13 n.10 ("[T]he Section 18 election is not dispositive of federal jurisdiction over a tribe in 1934."); Pls.' Mem. at 6–10, relying on an unpersuasive interpretation of certain IRA provisions, as well as numerous historical administrative documents interpreting various provisions of federal Indian law, none of which are part of the already voluminous administrative record.  *See generally* Pls.' Mem. at 6–10; Pls.' Reply at 2–21; *id.*, Ex. 7 (six memoranda from DEP'T OF INTERIOR, OPINIONS OF THE SOLICITOR RELATING TO INDIAN AFFAIRS 1917–1974 (1979) ("Solicitor Ops.")), ECF No. 115-1; *id.*, Ex. 8 (Letter from O. H. Lipps, DOI Sacramento Indian Agency Field Office Superintendent, to Comm'r of Indian Affairs (July 24, 1934) ("Sacramento Indian Agency Letter")), ECF No. 115-2.[37]

---

[37]    "It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made" and "[t]he focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981); *see also James Madison Ltd.*, 82 F.3d at 1095.  The Court, nonetheless, considers the plaintiffs' reliance on these documents to the extent that the documents contain the federal defendants' historical interpretations of relevant statutes.  *See Udall v. Tallman*, 380 U.S. 1, 16 (1965) ("When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration[,] . . . . [p]articularly . . . when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." (quotations and citations omitted)); *see also United States v. Mead Corp.*, 533 U.S. 218, 227–28 (2001) ("The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance, . . . and we have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." (quotations and citations omitted)); *Watt v. Alaska*, 451 U.S. 259, 272–73 (1981) ("The [DOI]'s contemporaneous construction carries persuasive weight.").

As an initial matter, the plaintiffs' assertion is misplaced. The Court need not opine on whether the calling of a Section 18 election can, by itself, as a matter of law, conclusively establish the existence of an Indian tribe under federal jurisdiction within the meaning of the IRA, or whether it was rational for the Secretary to conclude so in this case, because the Secretary did not rely exclusively on the calling of a Section 18 election in considering the statutory authority to acquire land for the North Fork Tribe. Rather, the Secretary relied on "the calling of a Section 18 election *at the Tribe's Reservation*," expressly considering both the Section 18 election and the North Fork Tribe's possessive connection to its own "Reservation" at the North Fork Rancheria. IRA ROD at 55 (emphasis added).[38]

Moreover, significantly, while the plaintiffs frame their arguments under the guise of *Carcieri*, their challenge is not about federal jurisdiction—the main issue in *Carcieri*—but, instead, about federal recognition, the separate concept not addressed in *Carcieri*'s majority opinion. Indeed, the plaintiffs nowhere dispute that, in 1934, the federal government asserted

---

[38]     The placement of the Secretary's discussion of "the Rancheria's purchase in 1916" in the "IRA ROD analysis under 25 C.F.R. § 151.10(b) regarding the Tribe's need for additional land," rather than "in the IRA ROD as relevant to the *Carcieri* determination," is immaterial. Pls.' Mem. at 11; Pls.' Reply at 14–15; *see also Stand Up I*, 919 F. Supp. 2d at 69 (explaining that, though "the Secretary did not cite the 1916 purchase specifically within the section [of the IRA ROD] analyzing [the Secretary's] statutory authority," the Secretary clearly considered this purchase, "and a court's 'task is to enforce a standard of agency reasonableness, not perfection'" (quoting *Nw. Airlines, Inc. v. U.S. Dep't of Transp.*, 15 F.3d 1112, 1119 (D.C. Cir. 1994))). This part of the history of the North Fork Tribe undercuts the plaintiffs' assertion that "the Secretary relied *solely* on [the Haas Report] . . . to conclude that the applicant Tribe was under federal jurisdiction in 1934." Pls.' Mem. at 11 (emphasis added); *see id.* at 14; Pls.' Reply at 4–6, 14 n.10. Relatedly, the fact that an earlier, draft version of the IRA ROD inaccurately indicated that the June 10, 1935 election held at the North Fork Rancheria was conducted pursuant to Section 16, rather than pursuant to Section 18, is also immaterial. Pls.' Mem. at 8–9 nn.5–6, 13 n.12. The reasoning reflected in that draft version is not dependent on the type of IRA election held at the North Fork Rancheria but, rather, on the straight-forward fact that an "IRA election" was held. *See* BIA Decision Package (Jan. 2011), ch. 3, Decision to Acquire Trust Title at 5, Jt. App. at 25, 32, ECF No. 124-1 ("The Secretary exercised federal jurisdiction over the Tribe by causing the IRA election in 1935 to occur, based on the Tribe's recognized status. As the Interior Board of Indian Appeals has confirmed, the federal government's action in holding an IRA election within a rancheria community is determinative of the issue of whether the rancheria was recognized as a tribe prior to enactment of Rancheria Act." (citing *United Auburn Indian Cmty. v. Sacramento Area Dir.*, 24 IBIA 33 (May 28, 1993))); *see also United Auburn Indian Cmty.*, 24 IBIA at 24–43 (finding that "the Auburn Rancheria was a Federally recognized Indian tribe prior to enactment of the [California] Rancheria Act," in 1958, based on the same type of election that was held at the North Fork Rancheria—"an election held on June 14, 1935," in which "the Auburn Rancheria decided not to organize under the IRA by a vote of 5 to 16"); Haas Report at 15 (listing "Auburn" election results).

"jurisdiction" over those Indians who participated in Section 18 elections and, thus, the plaintiffs effectively concede that the people who voted at the Section 18 election held at the North Fork Rancheria in 1935 were "Indians" who were "under Federal jurisdiction" within the meaning of the IRA. Instead, the plaintiffs contend that the holding of a Section 18 election cannot be, by itself, conclusive evidence that the Indians who participated were members of any one particular "*tribe*," and criticize the Secretary for not making explicit findings in the IRA ROD that (1) the Indians who voted in the Section 18 election at the North Fork Rancheria, in 1935, were members of the same, single, Indian tribe, and that (2) the present-day North Fork Tribe is comprised of members or descendants of same Indian tribe. Pls.' Mem. at 11.[39]

These criticisms, which relate to the North Fork Tribe's tribal identity and existence, seek to cast doubt on the federal government's recognition of the North Fork Tribe. *Mackinac Tribe*, 2016 WL 3902667, at *1 (defining "federal recognition" as "a 'formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government'" (quoting *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008))); *see Confederated Tribes*, 2016 WL 4056092, at *9 ("Whether the government acknowledged federal responsibilities toward a tribe through a specialized, political relationship [(federal recognition)] is a different question from whether those responsibilities in fact existed [(federal jurisdiction)]."). Yet, the North Fork Tribe is formally listed as a federally-recognized Indian tribe, *see* Indian Entities

---

[39]    Consequently, the parties' dispute over the applicability and accuracy of reasoning articulated in a 2014 memorandum to the Secretary from the Solicitor of the DOI ("Solicitor"), cited by the defendants, regarding whether an IRA vote may "conclusively establish[] that the United States understood that [a] particular tribe was under federal jurisdiction in 1934," is of no moment. U.S. DEP'T OF INTERIOR, OFFICE OF THE SOLICITOR, M-37029, Mem. on The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act (Mar. 12, 2014) at 19–20, *available at* http://www.bia.gov/cs/groups/webteam/documents/text/idc1-028386.pdf; *see* Defs.' Mem. at 13, 16; North Fork's Mem. at 10–12, 11 n.4, 14; North Fork's Reply at 5–6. The memorandum, which explains how participation in an election can be indicative of federal jurisdiction, has little, if any, bearing on the issue of whether Indians on a Rancheria were a "tribe."

Recognized and Eligible to Receive Services, 81 Fed. Reg. at 26,829 (listing "Northfork Rancheria of Mono Indians of California"), and the D.C. Circuit recently held, in *Confederated Tribes*, that the Secretary's interpretation of the IRA as imposing no time limit upon recognition was reasonable, 2016 WL 4056092, at *6–7.  Consequently, since the North Fork Tribe was indisputably "recognized" at the time of the IRA ROD and subsequent acquisition of the Madera Site, the plaintiffs' questioning of the reasonableness of the Secretary's decision on this basis is fruitless.[40]

In any event, the plaintiffs do not merely challenge the IRA ROD as "arbitrary and capricious," but also claim that the decision was "not in accordance with law."  TAC ¶ 60.  To the extent that the plaintiffs allege that the Secretary lacked statutory authority to acquire land for the North Fork Tribe, *see, e.g.*, Pls.' Mem. at 6; Pls.' Reply at 2, no agency reasoning is needed for the Court's review, *Amador Cty.*, 640 F.3d at 382.  Either the Secretary has the authority, "in which case [the court] must reject the challenge," or the Secretary does not have the authority, "in which case [the court] must direct the Secretary" to remove the Madera Site from trust.  *Id.*; *see Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 4497 (D.C. Cir. 2010) ("It is a cardinal principle of administrative law that an agency may act only pursuant to authority delegated to it by Congress. . . . When an agency has acted beyond its delegated authority, a reviewing court will hold such action *ultra vires* . . . or a violation of the [APA]. . . ." (citations omitted)); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992)

---

[40]    Regardless, as this Court explained in *Stand Up I*, "whether an Indian tribe is required to have been 'recognized' prior to 1934 in order to be eligible to receive trust land under the IRA," is immaterial in this case "because the North Fork tribe was clearly 'recognized' in the cognitive sense of the word both before and after 1934, as evidenced by the 1916 trust acquisition of the North Fork Rancheria and the [1935] IRA election" held at the North Fork Rancheria.  919 F. Supp. 2d at 70.

("Agency actions beyond delegated authority are '*ultra vires*,' and courts must invalidate them.").

Thus, the Court addresses the plaintiffs' myriad arguments about the Section 18 election and the North Fork Tribe's continuing tribal existence *seriatim* below.  For the reasons explained, the plaintiffs' criticisms are unavailing.

### a.   *IRA Section 18 Election*

Contrary to the plaintiffs' assertion, the calling of a Section 18 election can, by itself, conclusively establish the existence of a tribe under federal jurisdiction within the meaning of the IRA for several reasons:  first, under the first definitional prong of "Indian" under § 479, "Indians residing on one reservation" constitute a "tribe"; second, the other two definitional prongs of "Indian" under § 479 need not be considered in this case; and, finally, the IRA does not require "unified" tribal affiliation.  Moreover, the purchase of the North Fork Rancheria is significant in confirming the Secretary's authority to acquire land on behalf of the North Fork Tribe.

### (i)   *"Indians Residing On One Reservation" Constitute A Tribe*

The plaintiffs employ a convoluted line of reasoning by contrasting the text of Sections 16 and 18 of the IRA, codified at 25 U.S.C. §§ 476 and 478, respectively.  As noted *supra*, Part III.D.2, Section 18 is an "opt-out provision" and provides, *inter alia*, that the IRA "shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary . . . , shall vote against its application."  25 U.S.C. § 478.  Section 16, by contrast, grants "[a]ny Indian tribe . . . the right to organize for its common welfare," and provides that any such tribe "may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when," *inter alia*, "ratified by a majority vote

of the adult members of the tribe or tribes at a special election authorized and called by the

Secretary under such rules and regulations as the Secretary may prescribe." *Id.* § 476(a)(1).  The

plaintiffs believe that the only type of IRA election that may, as a matter of law, conclusively

establish the existence of a tribe under federal jurisdiction, within the meaning of the IRA, is a

Section 16 election specifically resulting in an affirmative vote to organize.  In their view,

neither a Section 16 election resulting in a disapproving vote nor *any* Section 18 election fit the

bill.  *See* Pls.' Mem. at 7–9, 11 n.9.  Thus, according to the plaintiffs, the election held at the

North Fork Rancheria in 1935 is meaningless.

The plaintiffs repeatedly underscore the fact that Section 16, as opposed to Section 18,

contains the term "tribe."  Pls.' Mem. at 7–8.  *Compare* 25 U.S.C. § 476(a)(1) (providing "[a]ny

Indian *tribe*" with the "right to organize" and adopt a constitution, bylaws, and amendments

upon a "majority vote of the adult members of *the tribe or tribes*" (emphasis added)), *with id.* §

478 ("This Act shall not apply to *any reservation* wherein a majority of the adult Indians, voting

at a special election duly called by the Secretary of the Interior, shall vote against its

application." (emphasis added)).  Based on this distinction, and the fact that "Section 18

elections were for Indians at reservations, not tribes," Pls.' Reply at 11 n.7, the plaintiffs contend

that "[w]hile 'adult Indians' could vote under Section 16 to organize as a 'tribe' under the IRA, a

vote of 'adult Indians' under Section 18 does not change their status to a tribe," Pls.' Mem. at 7.

In other words, the plaintiffs insist that the Secretary's holding of "a Section 18 vote does not

establish that the Indians living on the reservation were a tribe[,] . . . . but rather only the

existence of a reservation with Indians living on it."  *Id.* at 8; *see also id.* at 10 ("Under Section

18, the only conclusion that can be drawn solely from the vote is that Indians voted."); Pls.'

Reply at 10 ("Section 18 elections were held without regard to tribal status.  The Act required the

Secretary to hold Section 18 elections on every reservation.  It was not an election for tribes.").
The plaintiffs accuse the Secretary of wrongfully "creat[ing] [the North Fork Tribe] through the
operation of Section 18."  *Id.*; *see also id.* at 6 ("[Section 18] elections did not create tribes by
operation of law, where none had existed prior thereto or where two or more distinct tribes
resided on a single reservation.").

The plaintiffs fail to acknowledge the plain text of § 479, which defines "tribe" to include
"any Indian tribe, organized band, pueblo, *or the Indians residing on one reservation*."  25
U.S.C. § 479 (emphasis added).  This text unambiguously indicates that Congress considered,
regardless of individual Indians' previous tribal affiliations, "the Indians residing on one
reservation" at the time of the IRA's enactment to be a "tribe."  *Id.*; *cf.* 1-3 COHEN'S HANDBOOK
OF FEDERAL INDIAN LAW § 3.03(5) (Mathew Bender & Co. 2015) [hereinafter COHEN'S
HANDBOOK] ("Congress has the power to define membership differently from the tribe when
necessary for administrative and other purposes." (citing *Del. Tribal Bus. Comm. v. Weeks*, 430
U.S. 73, 84–86 (1977), and *United States v. Rogers*, 45 U.S. 567 (1846))).  Thus, the six eligible
adult Indian voters residing on the North Fork Rancheria, four of whom voted in a Section 18
election held there by the BIA on June 10, 1935, Haas Report at 15, were, at the time, considered
together, under a plain reading of § 479's statutory language, to constitute a "tribe."  *See* Defs.'
Mem. at 12 ("[T]he adult Indians residing on the North Fork Rancheria who were eligible to vote
in the Section 18 election also constituted a tribe under federal jurisdiction for purposes of the
IRA."); North Fork's Reply at 2 ("Under the plain language of the IRA, the Indians residing on
the North Fork Rancheria, for whom the [BIA] held an election pursuant to § 18 of the IRA,
were a 'tribe.'").[41]

---

[41]     The plaintiffs accuse the federal defendants of taking "a directly contrary position" in a separate, unrelated
litigation involving the Cowlitz Indian Tribe, Pls.' Mem. at 10, which was addressed on appeal in *Confederated*

It reasonably and logically follows that, by virtue of the fact that the Secretary called a Section 18 election at the North Fork Rancheria, pursuant to § 478 of the IRA, the Indians who voted at the North Fork Rancheria were "members of a[] recognized Indian tribe" that was "under Federal jurisdiction" on June 18, 1934.  25 U.S.C. § 479; *see* Defs.' Mem. at 12 ("Simply put, if the North Fork Rancheria was not composed of 'Indians,' 'now under Federal jurisdiction,' residing on a 'reservation,' the Secretary would not have called a Section 18 election for it."); Defs.' Reply at 9–10 ("Because a Section 18 election was held on the North Fork Rancheria in 1935, North Fork inherently meets the first definition of Indian in the IRA because Section 19 . . . defines 'tribe' to include 'the Indians residing on one reservation.' Therefore, the adult Indians residing on the North Fork Rancheria who were eligible to vote in a Section 18 election also constituted a tribe under federal jurisdiction for purposes of the IRA."); North Fork's Mem. at 12 (explaining that the IRA did not draw any "distinction between a 'tribe'

---

*Tribes.* The plaintiffs in that case argued that the Cowlitz Tribe was not a recognized tribe under federal jurisdiction in 1934 because it was not accounted for on "the list of tribes that voted" and that list, the plaintiffs argued, "constitutes the entire universe of tribes that were eligible for benefits under the IRA." Pls.' Mot., Ex. 4 (Defs.' Mem. Opp'n Pls.' Mot. Summ. J. & Cross-Mot. Supp. Summ. J., *Confederated Tribes of the Grand Ronde Community v. Jewell*, Case No. 13-cv-849 (BJR)) at 23, ECF No. 106-5.  In response, the federal defendants emphasized that, under Section 18 of the IRA, "votes were conducted by reservation," reasoning that "[b]ecause the voting was conducted by reservation and not by tribe, the lists of reservations that voted to accept or reject the IRA's provisions are not *definitive*." *Id.* at 23–24 (emphasis added).  That position is not inconsistent with the federal defendants' position in this case.  The list of reservations holding Section 18 elections may not be an exhaustive or all-inclusive list of all recognized tribes under federal jurisdiction in 1934—due, for example, to the fact that some tribes and their members were then landless—but the list, nonetheless, may conclusively establish that the reservations that are listed each represent a recognized Indian tribe under federal jurisdiction in 1934. *See* North Fork's Mem. at 12 n.11 ("Nothing in the Cowlitz brief suggests that those groups for whom the Interior Department did hold Section 18 elections were not 'tribes' under the IRA.").  In the federal defendants' reasonable view, a Section 18 election is sufficient, but not necessary, to establish the existence of a "tribe now under federal jurisdiction" within the meaning of the IRA. *See* Defs.' Reply at 7 n.5 ("While participation in a Section 18 election conclusively establishes [']under federal jurisdiction,['] participation in a Section 18 election is not required to establish such status.").

The plaintiffs additionally accuse the Secretary of rewriting the ROD in the Cowlitz case in such a way that "was absolutely irrelevant to the Cowlitz [Tribe]" in order "to justify the Secretary's determination here" regarding the significance of the Section 18 election held at the North Fork Rancheria.  Pls.' Reply at 12–13.  Whatever the merits of this accusation, it is wholly irrelevant here, since the Secretary did not rely on the 2010 Cowlitz ROD in the IRA ROD in this case and the Cowlitz case plays no role in this Court's analysis regarding Section 18 of the IRA.  *Cf. Stand Up I*, 919 F. Supp. 2d at 69–70 (considering the "Secretary's interpretive discussion," in the 2010 Cowlitz ROD, "of the term 'recognized Indian tribe'").

and the 'adult Indians' on a 'reservation,'" and, "[r]ather, a § 18 vote of the adult Indians on a

reservation was by definition a vote of a 'tribe' under federal jurisdiction"); North Fork's Reply

at 5 ("Indians residing on a reservation were a 'tribe' within the meaning of the IRA, and the

BIA's action in holding a § 18 election constitutes an assertion of federal power over and

responsibility for that tribe.").  Indeed, *Carcieri* itself refers to those Indians who voted in a

Section 18 election as "*tribal* members" with the ability "to reject the application of the IRA to

their *tribe*."  555 U.S. at 395 (emphasis added) (citing verbatim the text of 25 U.S.C. § 478); *see*

*also* COHEN'S HANDBOOK § 4.04(3)(a)(i) ("Reflecting the new concern for *tribal* consent, the

IRA provided that it would not apply to any reservation if a majority of *tribal members* voted

against its application." (emphasis added)).

Similarly, the October 12, 1934 memorandum to the Secretary from the Solicitor of the

DOI ("Solicitor") to the Secretary, cited by the plaintiffs, Pls.' Reply at 7, reflects that Section 18

was intended to respect tribal sovereignty and protect tribes, as opposed to merely Indian lands

(reservations) or individual Indians.  The memorandum notes that the IRA "differs widely from

past policies," opines that "it must have been the feeling of Congress that the new policy should

not be imposed upon any Indian *tribe* against its will," and explains that "[t]he declared purpose

of this [Section 18] referendum provision was to protect and safeguard every *tribe* of Indians

against the possibility that the act might in some way deprive them of their existing rights . . . ."

Solicitor Ops. at 443–44 (Papago—Wheeler-Howard Act (Oct. 12, 1934)) (emphasis added).

Accordingly, the memorandum refers to Section 18 as a "*tribal* referendum."  *Id*. at 444

(emphasis added).  Notably, the memorandum also refers to the following "statement made on

the floor of the House by Congressman Howard" regarding Section 18:

> A few Indian *tribes* asked to be exempted from the provisions of the bill.  The
> committee have thought it unwise to force even home rule and appropriations on

> *tribes* unwilling to accept them, and for that reason section 19 provides for a
> popular referendum among the various *tribes* within 6 months after the passage
> and approval of the act.  The act shall not apply to any *reservation* wherein a
> majority of the adult Indians vote against its application.

*Id*. (emphasis added) (quoting 78 Cong. Rec. 11,732 (June 15, 1934)).  Thus, the October 12,

1934 memorandum, on which the plaintiffs rely, undermines rather than helps the plaintiffs'

statutory interpretation.

In sum, the fact that Section 18 does not contain the word "tribe" and does contain the

word "reservation" does not undercut the plain text of § 479, defining "tribe" to include "the

Indians residing on one reservation," or the purpose of Section 18, to respect and protect Indian

tribes, namely, the Indian tribes that were federally-acknowledged to exist at that time.

Accordingly, contrary to the plaintiffs' assertion, the Secretary's holding of a Section 18 vote at

the North Fork Rancheria is conclusive evidence that the Indians living on the Rancheria in 1935

were members of an Indian tribe.

> (ii)    *Alternative Definitions Of "Indian" In § 479 Need Not Be*
> *Considered*

The plaintiffs maintain "that those voting under Section 18 may have qualified as

Indians" under one of the other two definitions of Indian in § 479, but those definitions "do not

require any tribal affiliation," Pls.' Reply at 10, and therefore are not dispositive of "whether

those Indians were a single, unified tribe," *id*. at 8; *see also* Pls.' Mem. at 9 (emphasizing that

"[t]he term 'Indian'" in § 479 has "two other definitions unconnected to the term 'tribe'" and

asserting that, as a result, a Section 18 election could have included people who were not

members of any recognized Indian tribe under federal jurisdiction in 1934).  Contrary to the

federal defendants' position that "whether North Fork's members constituted a tribe is irrelevant

so long as North Fork's members were 'Indians' within the terms of the IRA," Defs.' Mem. at

14, the plaintiffs argue that the *Carcieri* standard, requiring the Secretary specifically to "determine that the applicant North Fork Tribe was a 'recognized Indian tribe . . . under federal jurisdiction' in 1934," must be met here because "the Secretary expressly purports in the ROD to have met the *Carcieri* standard," Pls.' Reply at 8–9.

Despite the unexplained, yet undisputed, premise in *Carcieri* "that the Secretary's authority to take the parcel in question into trust [for the Narragansett Tribe] depends on whether the Narragansetts are members of a 'recognized Indian Tribe now under Federal jurisdiction,'" 555 U.S. at 388,[42] the Supreme Court nevertheless recognized the Secretary's authority under § 465 to acquire land for "*tribes* . . . satisfying [any] one of the three § 479 definitions," *id.* at 392 (emphasis added).  This Court, therefore, agrees with the federal defendants that "the parties are wasting this Court's time if everyone agrees that [those who voted in the Section 18 election at the North Fork Rancheria] meet[] the definition of Indian in Section 19," Defs.' Reply at 10, and, accordingly, finds that there was no need for the Secretary to discuss § 479's alternative definitions of Indian in the IRA ROD.  Under *Carcieri,* it is ultimately irrelevant "which definition [of Indian in § 479] is applicable because[,] regardless, the Secretary has the authority to acquire land for [the] North Fork [Tribe] under the IRA."  *Id.*

### (iii) *"Unified" Tribal Affiliation Is Not Necessary*

Pointing out that "Section 18 does not limit the 'adult Indians' [who] voted at a reservation to those [who] were members of the same tribe," Pls.' Reply at 7, that "varied groups of Indians . . . resided on reservations when the IRA was enacted," and that "[i]ndividual Indians may have lived on a reservation without regard to tribal affiliation," *id.* at 2–3, the plaintiffs

---

[42]     According to the leading treatise of federal Indian law, "Congress['] use of the phrase 'shall include'" in § 479, "suggests that the Supreme Court erred in viewing this definition of 'Indian' as limiting."  COHEN'S HANDBOOK § 3.02(6)(d) n.115.

speculate that the North Fork Rancheria Indians who voted in the Section 18 election were not necessarily part of "a single, unified tribe," *id*. at 4.  To bolster their point, the plaintiffs cite to the Sioux Indians, the Fort Belknap Reservation, and the Quinault Reservation as examples that (1) the DOI did not, in 1936, consider either the Indians of the Lower Sioux Indian Community or those of the Prairie Island Indian Community to constitute a "tribe" even though the Secretary held an IRA election at both of these reservations, Pls.' Reply at 4–5; *see* Haas Report at 16; Solicitor Ops. at 618 (Sioux—Elections on Constitutions (Apr. 15, 1936)); (2) the DOI, in 1936, considered the Indians of the Fort Belknap Reservation to be "comprised of two historically different tribes" with "independent tribal histories," despite the fact that those Indians voted in the same IRA election, Pls.' Reply at 5; *see* Haas Report at 17; Solicitor Ops. at 613 (Ft. Belknap Land Purchase—Reorganization Act (Mar. 20, 1936)); and (3) "[i]t is . . . clear that in 1934 at least three other different Indian groups likely resided within the Quinault Reservation that were not members of the Quinault Tribe" and tribal members of each different group voted in the same IRA election held at that reservation, Pls.' Reply at 6; *see Halbert v. United States*, 283 U.S. 753, 760 (1931) (holding that members of the "Chehalis, Chinook and Cowlitz" groups were each "entitled to take allotments within the Quinaielt Reservation"); Haas Report at 19 (listing "Quinaialt" election results).  According to the plaintiffs, these three examples show that (1) the DOI did not, when implementing the IRA shortly after its enactment, consider a Section 18 election to "have the effect of making . . . groups [into] tribes," Pls.' Reply at 4–5; (2) "tribal formation is a choice made by the tribe, not the federal government," *id*. at 5; and (3) whether "Indians were a tribe cannot be determined by reference to the Haas Report alone," *id*. at 6.

   The plaintiffs' use of the foregoing historical examples reveals the plaintiffs' conflation of the two related, but nonetheless distinct, requirements—federal *jurisdiction* and federal

*recognition*. As discussed *supra*, the concept of federal jurisdiction implicates the federal government's "federal power and responsibility toward the tribe," COHEN'S HANDBOOK § 3.02(6)(d), and "generally reflect[s] federal obligations, duties, responsibility for or authority over the tribe by the Federal Government," *Confederated Tribes*, 2016 WL 4056092, at *8 (quotations and citation omitted), whereas federal recognition "is a 'formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government,'" *Mackinac Tribe*, 2016 WL 3902667, at *1 (quoting *Cal. Valley Miwok Tribe*, 515 F.3d at 1263); *see* H.R. Rep. No. 103-781 (Oct. 3, 1994) ("'Recognized' is more than a simple adjective; it is a legal term of art.  It means that the government acknowledges as a matter of law that a particular Native American group is a tribe by conferring a specific legal status on that group, thus bringing it within Congress' legislative powers.").

Though federal jurisdiction and federal recognition often go hand-in-hand, the Supreme Court and the D.C. Circuit have explained that a tribe may be federally recognized, yet not have been under federal jurisdiction in 1934, or vice-versa.  For example, in *Carcieri*, the Supreme Court noted that the Narragansett Tribe had gained "formal" recognition in 1983, upon the BIA's determination that it "ha[d] existed autonomously since first contact, despite undergoing many modifications."  555 U.S. at 384 (quotations and citation omitted).  "[B]oth the State and Federal Government considered the Narragansett Tribe as under *state*, . . . not under *federal*, jurisdiction in 1934," however.  *Id*. at 399 (Breyer, J., concurring) (emphasis in original).  By contrast, the Stillaguamish Tribe was federally recognized in 1976 based, in part, on "the fact that the Tribe had maintained treaty rights against the United States since 1855," and, thereby, was determined to have been under federal jurisdiction.  *Id*.  Thus, the DOI concluded that "land could be taken

in trust for the Tribe." *Id*. at 398.  Similarly, in *Confederated Tribes*, the D.C. Circuit discussed

the government's "sometimes mistaken[] . . . position that an Indian group does not constitute a

tribe" and explained that "the government's mistaken belief [in 1933] that the Cowlitz [Tribe]

had been absorbed into the greater population" speaks to "recognition – not whether the Tribe

was under Federal jurisdiction."  2016 WL 4056092, at *6–7, 9.  Noting that "the IRA does not

limit the benefits it confers only to tribes recognized as of 1934," the Court affirmed the

Secretary's authority to acquire land on behalf of the Cowlitz Tribe even though, "for decades[,]

federal Indian policy reflected a mistaken belief that [the Cowlitz Indians] no longer existed as a

distinct communal entity." *Id.* at *1, 6–7.

     *Carcieri* and *Confederated Tribes* indicate that the Secretary's calling of Section 18

elections, in and around 1934, was certainly an acknowledgment of federal power and

responsibility (*i.e.*, federal jurisdiction) toward any Indians associated with the reservations on

which the elections were called, including those Indians in the plaintiffs' historical examples,

regardless of whether the government then formally recognized, as distinct political groups, the

tribes to which those Indians belonged.  Since the government's acknowledgment of "federal

responsibilities toward a tribe through a special, political relationship is a different question from

whether those responsibilities in fact existed," *id.* at *9, to the extent that the plaintiffs challenge

the federal *recognition* of the Indians residing at the North Fork Rancheria in 1934 who voted in

the Section 18 election, that is a separate issue, addressed, *infra*, in Part III.D.3.b.

     In any event, despite the plaintiffs' efforts to show otherwise, nothing in the text of § 479

requires a tribe to be "single," "unified," or comprised of members of the same historically

cohesive or ethnographically homogenous tribe.  *See* 25 U.S.C. § 479 (defining tribe to include

"the Indians residing on one reservation"); *Stand Up I*, 919 F. Supp. 2d at 68 ("[T]he broad

definition of 'tribe' in § 479 indicates that a formal tribal government is not necessary to be considered a 'tribe' for purposes of the IRA.").  Notably, the leading treatise of Indian law explains:

> some federally recognized tribes are legal entities only.  Reflecting federal policies, a congressionally created confederated or consolidated tribe can be comprised of different tribes presently occupying the same reservation . . . . Other federally recognized entities represent fragments of previously unified peoples.

COHEN'S HANDBOOK § 3.02(2).  The treatise additionally notes that "considerations prompting [federal] recognition do not always reflect tribal understandings."  *Id*.  Thus, the fact that "[n]o conclusion regarding the specific . . . cultural make-up of the Indians at a listed reservation can be drawn from Table A [of the Haas Report] alone" is immaterial.  Pls.' Reply at 4.

### (iv)    *North Fork Rancheria's Purchase Is Significant*

In any event, substantial evidence in the record shows that the North Fork Tribe "existed as a tribe independent of the IRA's enactment," Pls.' Reply at 14, including the purchase of the North Fork Rancheria, in 1916, for "the North Fork band of landless Indians," *Stand Up I*, 919 F. Supp. 2d at 68 (quotations and citation omitted).  As discussed in *Stand Up I*, the Secretary's authority to acquire land for the North Fork Tribe is particularly clear in light of the fact that "[t]he North Fork Rancheria was originally established by purchase under the authority of the Interior's Appropriations Act of June 30, 1913," IRA ROD at 55, "in 1916—well before the IRA was passed[,] . . . . 'for the use of the North Fork band of landless Indians,'" 919 F. Supp. 2d at 68 (citation omitted).  This Court previously explained that the purchase of the North Fork Rancheria is "likely dispositive in its own right[] regarding whether the North Fork Tribe was 'under Federal jurisdiction' in 1934" because it "demonstrates a clear jurisdictional relationship between the North Fork Tribe and the federal government prior to 1934" and shows that "the North Fork people were, at least as early as 1916, an organized band of individual Indians."  *Id*.

This Court concluded that "the 1916 purchase of land in trust for the 'North Fork band of landless Indians' establishes that the North Fork people are 'Indians' within the meaning of the IRA, and were treated as such in the special election in 1935." *Id.*

In light of the Secretary's consideration of the North Fork Tribe's possessory connection to the Rancheria, *see* IRA ROD at 55 (referring to "[t]he calling of a Section 18 election at the *Tribe's* Reservation" (emphasis added)), the historical administrative documents cited by the plaintiffs to show the DOI's "[c]ontemporaneous practice," Pls.' Reply at 4, lend further support for the Secretary's decision. For example, the plaintiffs cite a November 7, 1934 Solicitor memorandum as comporting with their view that "[a] group of Indians residing on a single reservation" is not necessarily a "tribe," but may become a "tribe" by choosing to organize under Section 16. Pls.' Reply at 3 (emphasis omitted); *see* Solicitors Ops. at 478–80 (Tribal Organization and Jurisdiction—Definition of Tribe as Political Entity (Nov. 7, 1934)). The memorandum actually has little, if anything, to do with the plaintiffs' proposition and, instead, involves the question of whether, under an entirely unrelated provision of the IRA (*i.e.*, Section 4), "restricted Indian lands" may be devised only "to the Indians of the same reservation without regard to original tribal blood or affiliation." Solicitor Ops. at 478. In answering this question "in the negative," the Solicitor explained that "prior to tribal organization under Section 16[,] . . . . the question of what *tribal organization* has any jurisdiction over restricted allotted lands of individual Indians is a matter of some uncertainty," but that "the most significant criterion of jurisdiction, *where no constitution has been adopted*, is the historical test to what band, tribe, or group of tribes did the land in question belong at the time when it was allotted[.]" *Id.* at 479–80 (emphasis added).[43]

---

[43]    In the late 1800s, federal policy was to "allot" lands to individual Indian tribe members in order "to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at

This memorandum makes clear the DOI's contemporaneous view that "[a] tribe that did not vote to organize under the IRA was still a tribe," *i.e.*, a "tribal organization," and, thereby, directly refutes the plaintiffs' suggestion that the *outcome* of an IRA election is somehow related to tribal status, *see supra* n.36. The memorandum also makes clear that "a group of Indians [did not] need to have adopted a formal governmental organization prior to the enactment of the IRA to be considered a 'tribe' under the IRA." North Fork's Reply at 4. Indeed, the leading treatise on Indian law explains that before the federal government "began manipulating [tribal] governance structures," many tribal governments were "simple and largely decentralized" and "[m]any tribes were in fact largely independent villages or bands that would come together for collective purposes, but otherwise were bound only by common culture and kinship ties." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.04(1)–(2). Finally, the memorandum supports the notion that the "North Fork band of landless Indians," for whom the North Fork Rancheria was purchased in 1916, *see infra* Part III.D.3.b(i), was, at the time of the IRA's enactment, considered a "tribal organization" with its own "jurisdiction" over the North Fork Rancheria despite the fact that the North Fork Tribe never organized officially under the IRA. *See* Solicitor Ops. at 478–79 (explaining that "[a] tribe is . . . a political entity" that may have "a certain legal authority or jurisdiction" over "restricted Indian lands").

The plaintiffs' contention, based on a July 24, 1934 letter from the DOI Office of Indian Affairs field office in Sacramento, California, to the Commissioner of Indian Affairs in Washington, D.C. ("Sacramento Indian Agency Letter), which document is not part of the

---

large." *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 253–54 (1992). The General Allotment Act of 1887, codified as amended at 25 U.S.C. § 331 *et seq.*, "empowered the President to allot most tribal lands nationwide without the consent of the Indian nations involved." *Id.* at 254. Indeed, the IGRA ROD notes that "trust allotment patents . . . were issued by the United States to many ancestors of current citizens of the [North Fork] Tribe." IGRA ROD at 59. The passage of the IRA ultimately ended "[t]he policy of allotment," and marked a "[r]eturn[] to the principles of tribal self-determination and self-governance which had characterized the [previous] era." *Cty. of Yakima*, 502 U.S. at 255.

record, that the rancherias in California were not considered to be Indian reservations, is meritless.  Pls.' Reply at 4; *see* Sacramento Indian Agency Letter at 1.  Courts, including the D.C. Circuit, have widely recognized California rancherias as Indian reservations.  *See, e.g.*, *City of Roseville*, 348 F.3d at 1022, 1025, 1027, 1032 (referring to the Auburn Rancheria as the Auburn Tribe's "former reservation"); *id.* at 1022 ("In 1917, the federal government provided the Auburn Tribe with a small 20-acre reservation, . . . known as the Auburn 'Rancheria.'").  Additionally, the DOI treated rancherias as reservations in conducting Section 18 elections under the IRA shortly after its enactment.  *See* Haas Report at 15 (listing "Northfork" and other rancherias under the "reservation" table heading).  Moreover, notably, DOI regulations consider "rancheria" to fall under the definition of "tribe," *see* 25 C.F.R. § 151.2(b) ("Tribe means any [*inter alia*]. . . rancheria . . . , which is recognized by the Secretary as eligible for the special programs and services from the [BIA].");  Land Acquisitions, 45 Fed. Reg. 62,034, 62,036 (Sept. 18, 1980) (same, referring to earlier regulations in 25 C.F.R. § 120a.2).

The plaintiffs' reliance on the Sacramento Indian Agency Letter for the proposition that, in 1934, only "from four to twenty families," with "no tribal or business organization of any sort," lived on the "small Government owned Indian rancherias," is similarly unavailing. Sacramento Indian Agency Letter at 1; Pls.' Reply at 4.  A rancheria's lack of official "tribal or business organization" makes no difference in light of the IRA's definition of "tribe" as "the Indians residing on one reservation," which definition does not require any such organization, 25 U.S.C. § 479, and, in any event, as the North Fork Tribe notes, the letter is silent as to whether the resident families were nonetheless members of Indian tribes, North Fork's Reply at 3 n.2. Moreover, given the poor condition of the land set aside for rancherias, the small number of resident families carries no weight.  *See infra* subpart b(ii).

b.     *North Fork Tribe's Continuing Tribal Existence*

The plaintiffs challenge "the continuity of [the North Fork Tribe's] tribal identity" and criticize the Secretary for failing to make any determination "that the applicant Tribe is the same tribe that was purportedly under jurisdiction in 1934."  Pls.' Mem. at 11–12, 12 n.11.  They argue that (1) there is no evidence that the North Fork Rancheria was purchased for any one, particular tribe of Indians, Pls.' Notice Suppl. Auth. at 3, ECF No. 120 (citing Pls.' Mem. at 12–13; Pls.' Reply at 15–16); and (2) even if the North Fork Rancheria was, in fact, purchased for an Indian tribe, "[n]either the IRA ROD nor the administrative record establishes that the North Fork Rancheria was purchased for the *applicant* North Fork Tribe," Pls.' Mem. at 11–12, 12 n.11 (emphasis added); Pls.' Reply at 15; *see also* Pls.' Mem. at 13–14 ("There is simply no connection between the group for which the land was purchased in 1916 and the six Indians who received ballots in 1935 and the amalgamation of Indian groups organized in 1996 as the applicant North Fork Tribe."); Pls.' Reply at 17 ("[The] plaintiffs have sufficiently demonstrated that the administrative record does not establish that the connection between that 'band' and the applicant North Fork Tribe was inevitable or even likely."); *id*. at 18 (arguing that the Secretary wrongfully "assum[ed] – without any support or analysis in the administrative record . . . – that the applicant Tribe is necessarily the same as a 'tribe' purportedly under federal jurisdiction in 1934.").  For the reasons explained below, the plaintiffs' efforts to invalidate the North Fork Tribe's federally-recognized legal status by challenging what is, in essence, the federal recognition of the North Fork Tribe from the 1916 purchase of the North Fork Rancheria through the 2012 IRA ROD, are rejected.[44]

---

[44]     The plaintiffs appear to have, on summary judgment, dropped their allegation that an Indian tribe must have been formally recognized in 1934 to qualify for land acquisition under § 465.  *Compare* TAC ¶¶ 55, 57–58, 60 (alleging tribes must have been federally recognized "as of June 18, 1934, when the IRA was enacted"), *with*, Pls.' Reply at 13–14 n.10 ("If North Fork can show that it was a tribe under federal jurisdiction prior to 1934, that this

*(i)        North Fork Rancheria Was Purchased For The North Fork Tribe*

Arguing that "the North Fork Rancheria was not purchased for a tribe of Indians," Pls.'
Notice Suppl. Auth. at 3 (citing Pls.' Mem. at 12–13; Pls.' Reply at 15–16), the plaintiffs assert
that "'a tribe is not a geographical but a political entity,'" and claim that "documents in the
administrative record . . . speak only of a group of Indians in geographical terms." Pls.' Reply at
15 n.12 (quoting Solicitor Ops. at 478); *see also* Pls.' Mem. at 13.

Despite the plaintiffs' contention that "merely deeming a group of Indians in a region a
'band' does not confer tribal status on that group," Pls.' Reply at 15 n.12, substantial evidence
clearly demonstrates that the North Fork Rancheria was purchased for an "organized band" of
Indians, 25 U.S.C. § 479. Most significantly, the record contains a letter, dated April 4, 1916,
from John Terrell, a Special Indian Agent stationed in San Francisco, to the Commissioner of
Indian Affairs in Washington, D.C., describing "two propositions by [a landowner] to sell to the
Government suitable lands for a permanent Village Home for the Indians of the above
reference." Terrell Letter at 1. The top center of the page, *i.e.*, the "above reference," reads:
"(NORTHFORK INDIANS)." *Id.* In addition to this nomenclature, the letter refers to a "partial
census of the Indians of Northfork and vacinity [sic] . . . furnished by Coleman, one of the fairly
well educated and most intelligent half blood Indians of this band," noting "there is [sic] likely
more than 200 Indians properly belonging to the Northfork and vacinity [sic] band," and
describing interactions with certain Indians "belonging to the Northfork and vacinity [sic] band,"

---

jurisdiction remained intact in 1934, and that the applicant North Fork Tribe is the same tribe, then it may be entitled
to a trust acquisition under the IRA."). To the extent that the plaintiffs maintain this argument, *see, e.g.*, Pls.' Mem.
at 14 n.14; Pls.' Notice Suppl. Auth. at 2, the plaintiffs' interpretation of § 465 has been rejected in this Circuit,
*Confederated Tribes*, 2016 WL 4056092, at *4, 7; *see id.* at *1 (affirming Secretary's authority to acquire land on
behalf of the Cowlitz Tribe even though "for decades[,] federal Indian policy reflected a mistaken belief that [the
Cowlitz Indians] no longer existed as a distinct communal entity"); *supra* Part III.D.1.

117

including "as many as 150 of these Indians in [a] house of worship" where they "receive[d] the greater portion of the service through an interpreter." *Id.* at 1, 3, AR at NF_AR_0001031.

Record evidence confirms that the larger of the "two propositions" of land was indeed purchased "to provide homes for" those "200 Indians," and that land became the North Fork Rancheria. Lipps-Michaels Survey at 50 ("North Fork is credited with the largest Indian population [in Madera County] and here 80 acres of land was bought to provide homes for 200 Indians."); *see* Terrell Letter at 1 ("80 acres" including "40 acres, the S.W.¼ of the N.W.¼ Section 21,Tp.8,R.23 E.,M.D.M." and "the adjoining 40 acres to the east, viz: the S.E.¼ of the N.E.¼ Section 20, same township and range"); *Hardwick* Stip. J., Ex. A at 3, Jt. App. at 62, 64, ECF No. 124-1 ("The North Fork Rancheria, 80 acres, is located about two miles from the town of North Fork, Madera Country California. SE1/4NE1/4 Section 20, and SW1/4NW1/4 Section 21, T. 8 S., R. 23 E., Mount Diablo Meridian."); *see also* BIA Decision Package (Jan. 2011), ch. 3, Decision to Acquire Trust Title at 3, Jt. App. at 25, 30, ECF No. 124-1.[45]

Notwithstanding the substantial evidence that the North Fork Rancheria was purchased for the North Fork Tribe, the plaintiffs "argue that California Rancherias were purchased for the Indians of California generally rather than for particular tribes," Pls.' Notice Suppl. Auth. at 2 (citing Pls.' Mem. at 13 and Pls.' Reply at 3–4, 16), and that, even when "some of these Rancherias were purchased for named groups, the federal government did not consider these groups to be tribes," Pls.' Reply at 4. The plaintiffs reason that "no tribal restrictions applied to a Rancheria's use, and any individual California Indian could occupy any Rancheria parcel." *Id.*;

---

[45]     The plaintiffs complain that the IRA ROD nowhere mentions that the Rancheria was purchased for the North Fork band of landless Indians. Pls.' Mem. at 12 ("The IRA ROD does not . . . identify any entity for which the Rancheria was purchased."); Pls.' Reply at 14–15 (same). Yet, the Secretary plainly considered the North Fork Rancheria as the "Tribe's Reservation," IRA ROD at 55, even if the Secretary did not specify the means of purchase. An agency is not required to discuss in detail self-evident determinations. *See Troy Corp. v. Browner*, 120 F.3d 277, 289 (D.C. Cir. 1997) (holding the agency was not required to include justifications for its self-evident determination that "'pulmonary irritation is a serious health effect'").

*see also id.* at 15–16 ("[E]ven where a Rancheria was purchased for a specific group of Indians residing in a particular area, the deed was not restricted to use by those Indians; any California Indian could use Rancheria land."); Pls.' Mem. at 13 ("Even if the purchase had been for a particular tribe, there were no restrictions on Rancheria deeds limiting use to the group for which it was purchased; any homeless Indian could take up residence on a Rancheria.").  The plaintiffs rely on (1) an August 1, 1960 Solicitor memorandum about the California Rancheria Act ("CRA"), 72 Stat. 619, *see* Solicitor Ops. at 1882–86 (Rancheria Act of August 18, 1958 (Aug. 1, 1960)), and (2) *Mishewal Wappo Tribe of Alexander Valley v. Jewell*, 84 F. Supp. 3d 930 (N.D. Cal. 2015), *appeal docketed*, No. 15-15993 (9th Cir. Dec. 15, 2015), *see* Pls.' Notice Suppl. Auth. at 2 (arguing that *Mishewal Wappo* "supports the plaintiffs' arguments that the Section 18 election held at the North Fork Rancheria did not by operation of law create a tribe at the North Fork Rancheria, and, because the Indians at the Rancheria did not choose to organize under Section 16 of the IRA, the Section 18 election alone is not conclusive evidence of the existence of a tribe under federal jurisdiction at the Rancheria in 1934").  The plaintiffs' reliance on both the Solicitor Memorandum from over fifty years ago and the out-of-circuit case is misplaced.

First, the August 1, 1960 Solicitor memorandum addressed the CRA, which "in keeping with the then-popular policy of assimilating Native Americans into American society," authorized the Secretary "to terminate the federal trust relationship with several California tribes . . . and to transfer tribal lands from federal trust ownership to individual fee ownership." *Amador Cty.*, 640 F.3d at 375 (citing CRA).  Both Congress and the executive branch have, since then, expressly repudiated federal legislation and policies aimed at terminating the federal government's trust relationship with Indian tribes.  *See* COHEN'S HANDBOOK § 3.02(8)(a); *see*

*also* Federally Recognized Indian Tribe List Act of 1994 ("List Act"), Pub. L. 103-454, § 103(5), 108 Stat. 4791 (Nov. 2, 1994) ("Congress has expressly repudiated the policy of terminating recognized Indian tribes, and has actively sought to restore recognition to tribes that previously have been terminated.").  Consequently, the Solicitor memorandum's power to persuade is limited, particularly in light of the fact that the memorandum purports to justify and sanction Congress' disposition of rancheria properties at that time.  *See* Solicitor Ops. at 1885–86.  In any event, the memorandum lends little, if any, support to the plaintiffs' argument.

It is true that the legislation appropriating federal funds for the purchase of the California rancherias referred to "Indians in California," generally.  *See, e.g.*, Act of June 21, 1906, Pub. L. No. 59-258, 34 Stat. 325, 333 (appropriating "one hundred thousand dollars to purchase for the use of the Indians in California now residing on reservations which do not contain land suitable for cultivation, and for Indians who are not now upon reservations in said State, suitable tracts or parcels of land"); Act of June 30, 1913, 38 Stat. 77, 86 (appropriating funds "[f]or support and civilization of Indians in California . . . and for the purchase of small tracts of land . . . for the use and occupancy of Indians in California").  Thus, in the August 1, 1960 memorandum relied on by the plaintiffs, the Solicitor explained to the Commissioner of Indian Affairs that rancherias "were for the most part acquired or set aside by the United States for the Indians in California, generally, rather than for a specific group," and "could be used for any landless California Indians, and not merely for the specific band for whom purchased," reasoning that "neither the deed conveying the property to the United States nor the act appropriating the purchase money contained any limitation or provision as to what Indians should be settled thereon."  Solicitor Ops. at 1884 (quotations and citations omitted).

120

The Solicitor also acknowledged, however, that, in executing the appropriated funds, "the Secretary generally ordered the purchase of a particular California tract" for a specific band's use, using "[a] special form of 'proposal for sale of lands'" indicating that the purchase was "for the use and occupancy" of a specific Indian band. *Id*. Even more tellingly, "[t]he Government's voucher authorizing payment" to purchase a rancheria generally named the specific "band of homeless Indians" for whose use and benefit the tract of land was purchased. *Id*. In light of the acquisition process, particularly when viewed in conjunction with the record evidence in this case about the North Fork Rancheria's purchase, the plaintiffs' assertion that "the federal government did not consider these [named] groups [for whom the rancherias were purchased] to be tribes" is simply not persuasive as applied to the North Fork Tribe. Pls.' Reply at 4.

The plaintiffs' reliance on *Mishewal Wappo* is similarly unavailing. There, the court held that the plaintiff Mishewal Wappo Tribe's claims challenging its federally unrecognized tribal status were barred by the applicable statute of limitations because each claim "rel[ied] on one common alleged injury—termination of the Rancheria," under the CRA of 1958. *Mishewal Wappo*, 84 F. Supp. 3d at 932, 936–37. In rejecting the plaintiff Tribe's argument "against application of the statute of limitations based on its theory that the Government continues to owe it a fiduciary duty," the court reasoned that the "termination of the Alexander Valley Rancheria did not equate to the termination of Plaintiff's status as a federally-recognized tribe." *Id*. at 939–40. In a subsequent footnote, the court noted the importance of the fact that "the various California rancherias were not created for the use of particular Indian tribes," opining that "their establishment was not tethered to the federal recognition of any tribe." *Id*. at 940 n.12. Additionally, based on observations that issues "relat[ing] to Indian *lands*" and "relat[ing] to collective Indian *status*" are "distinct" and "do not *always* overlap," *id*. at 939–40 (third

emphasis added), the *Mishewal Wappo* court reasoned that "while the IRA permitted the Indians of the Alexander Valley Rancheria to organize themselves into a tribe in 1935 due to a common interest in the previously-established rancheria, this fact did not then render the existence of the tribe dependent on that of the Rancheria," *id.* at 940 n.12.

There, however, unlike in the instant case, "'[t]he Alexander Valley Rancheria . . . was purchased for landless California Indians,'" generally, and not for any particular tribe. *Id.* (quoting the administrative record); *see also id.* at 932 ("These parcels . . . were designated under the Indian Appropriations Act for the benefit of California Indians who wished to live there and eventually became known as the Alexander Valley Rancheria."). By contrast, as discussed *supra*, "[t]he North Fork Rancheria was purchased for the Indians of the North Fork Band." Defs.' Resp. Notice Suppl. Authority at 1, ECF No. 131. As the North Fork Tribe notes, "nothing in the *Mishewal* opinion purports to address the evidence that the North Fork Rancheria was purchased for the Indians of the North Fork band. . . . [or] to determine that the 45 recognized California Rancheria tribes were not actually tribes for the purposes of the IRA." North Fork's Reply at 7 n.5. Additionally, while the *Mishewal Wappo* court found that particular Indian tribe's existence to be independent from the existence of the Alexander Valley Rancheria, the court acknowledged that issues relating to Indian lands *may* overlap with issues relating to Indian status. 84 F. Supp. 3d at 939–40. Here, as discussed in more detail, *infra*, in subpart b(iii), since the North Fork Tribe has a demonstrated connection to the North Fork Rancheria, as well as a federally-recognized tribal existence, *Mishewal Wappo* is simply inapplicable.

(ii)   *Speculation That IRA Voters Were Not North Fork Tribe Members Is Unfounded*

The plaintiffs argue that "there is no evidence in the record of any connection between" the six Indians who voted in the 1935 IRA election at the North Fork Rancheria "and the 200

122

[Indians] for which the Rancheria was purchased," accusing the defendants in this case of "ignor[ing] DOI's understanding of the relationship between the purchase and use of Rancherias." Pls.' Reply at 16–17. The plaintiffs rely again, on the August 1, 1960 Solicitor memorandum, which states, with respect to California rancherias generally, that "[i]n actual practice, Indians occasionally moved onto the [rancheria] propert[ies] without any assignment, occupying a parcel abandoned or never assigned," and were "not disturbed since these occupants were also 'Indians of California' for whose use the land was acquired." Solicitor Ops. at 1883; *see* Pls.' Mem. at 13; Pls.' Reply at 16. To the extent that the plaintiffs rely on this statement to suggest that the Indians who voted in the 1935 election at the North Fork Rancheria may have been random, homeless Indians, unconnected to the North Fork Tribe, their speculation is unfounded.

In the same August 1, 1960 memorandum, the Solicitor acknowledged that the Secretary continuously controlled the use of the rancherias, noting that "the Secretary . . . permitted Indians living nearby, generally in groups, to occupy such tracts," and that "the consistent practice ha[d] been to select by administrative action the individual Indians who may use the land." *Id*. at 1882, 1884 (quotations and citation omitted). Moreover, the Secretary was responsible for calling and holding IRA elections under Section 18 and, according to a December 13, 1934 memorandum cited by the plaintiffs, around the time the elections were called, the Solicitor construed Section 18, "in order to carry out the intent of Congress," to allow for the voting participation of "those [Indians] who in some sense 'belong' on the reservation, *i.e.*, those who have some rights in the property or tribal affairs of the reservation" and "reside on the reservation." Solicitor Ops. at 486 (Wheeler-Howard Act—Interpretation (Dec. 13, 1934)). Thus, the historical documents cited by the plaintiffs present no reason to doubt that the Indians

who voted in the 1935 election at the North Fork Rancheria were, in fact, members of the

"Northfork band" of Indians for whom the Rancheria was purchased, *i.e.*, the North Fork Tribe.

To the extent that the plaintiffs emphasize the lack of documented residents at the North

Fork Rancheria as compared to the 200 Indians for whose use it was purchased, the lack of

documented residents is hardly surprising.  *See generally* Pls.' Mem. at 2, 13.  A DOI survey

conducted in 1920 noted that the North Fork Rancheria "tract is unoccupied," even though

"North Fork is credited with the largest Indian population [in Madera County]" and "80 acres of

land was bought to provide homes for 200 Indians."  Lipps-Michaels Survey at 50.  The survey

explained,

> The land is poorly located and absolutely worthless as a place to build
> homes on.  It is rough and broken up by a deep rocky canyon.  Not to exceed 40
> acres could be used for building purposes.
> There is a lack of water for domestic purposes and no water for irrigation,
> except a small amount that might be brought to a small part of this tract through
> an old abandoned minor's ditch.

*Id.*; *see also id.* at 3, AR at NF_AR_0041046 (referring to rancheria land as "unsuitable" and

explaining that "most of the California Indians for whom lands have been purchased by the

Government are for all practical purposes just as homeless today as they were before these lands

were bought" because "it is physically impossible for them to improve the land and construct

houses").  The Rancheria likely remained in similar shape in 1958, when a Senate Report noted

that "today only a mother and her 2 sons occupy the land as a rural homesite."  S. Rep. No. 85-

1874, at 33 (1958), *available at* Pls.' Mot., Ex. 1, ECF No. 106-2.  Similar to the 1920 DOI

survey, the 1958 Senate Report noted that the remotely-located land had "a very limited grazing

value" and no domestic water system.  *Id*.  Given the Rancheria's uninhabitable condition, the

low number of residents at the North Fork Rancheria at any given time cannot be in any way

indicative of the number of Indians belonging to the North Fork band of Mono Indians for whose

use the land was purchased.  *See, e.g.*, Solicitor Ops. at 1883 (noting that, as of 1933, "very few [Indians of Central California] had moved to these rancherias or had remained there"); H. Rep. No. 82-2503, at 869 (1952) ("There were seven Mono Indians on [the North Fork] reservation of 80 acres of tribal lands in Madera County, Calif., in 1950.")

*(iii)      North Fork Tribe Is A Federally-Recognized Indian Tribe*

The plaintiffs argue that "nothing in the administrative record supports" the North Fork Tribe's "claim[] to be the successors of th[e] unidentified 'band'" of Indians for whom the North Fork Rancheria was purchased, "nor did the Secretary make such findings in the record of decision."  Pls.' Mem. at 2.  Contrary to the plaintiffs' assertion, the Secretary was not required to analyze the North Fork Tribe's continuing tribal existence when assessing her authority to acquire land on the Tribe's behalf because the Tribe's continuing tribal existence is encompassed firmly within its legal status as a federally-recognized Indian tribe, and "[i]t is a 'bedrock principle of federal Indian law that every tribe is "capable of managing its own affairs and governing itself."'"  *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012) (quoting *Cal. Valley Miwok Tribe*, 515 F.3d at 1263).

As discussed, *supra*, federal recognition is a legal status, "a 'formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government.'"  *Mackinac Tribe*, 2016 WL 3902667, at *1 (quoting *Cal. Valley Miwok Tribe*, 515 F.3d at 1263).  Notably, however, "[t]he definition of 'recognition' has evolved over time."  *Id.* at *1–2.  "[H]istorically[,] the United States recognized tribes through treaties, executive orders, and acts of Congress," and, "even after the passage of the IRA," in 1934, "[r]ecognition by the federal government proceeded in an ad hoc manner, . . . with the [BIA] reviewing petitions for federal

125

recognition on a case-by-case basis." *Id.* (citing *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 211 (D.C. Cir. 2013)).  No official federal process to recognize tribes was developed until 1978, when the DOI "promulgated Part 83 of its regulations under the IRA (also known as the Federal Acknowledgment Process), which set out uniform procedures through which Indian groups could seek formal recognition." *Id.*  Pursuant to those procedures, groups that "successfully petition[]" are "added to the list of federally recognized Indian tribes published by [the DOI]." *Id.*; *see also Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 131 (D.D.C. 2015) (explaining that "tribal recognition law developed through centuries of disjointed theories, conflicting policies, and shifting attitudes of various branches of the United States government towards tribes" until "[f]ortunately, 'Congress, the administration, the national Indian organization, and many tribal groups' worked together to resolve this 'longstanding and very difficult problem'" with the DOI's promulgation of uniform procedures in 1978 (quoting 43 Fed. Reg. 39,361 (Sept. 5, 1978))), *aff'd*, 2016 WL 3902667.

DOI regulations initially provided for the publication of the list of federally recognized tribes in the Federal Register at least once every three years.  In 1994, Congress passed the List Act, requiring the Secretary annually to "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." § 4(a), codified at 25 U.S.C. § 479a-1.

While the plaintiffs cannot dispute that the North Fork Tribe is a federally-recognized Indian tribe, included on the annually-published list of recognized Indian tribes, they take issue with how the North Fork Tribe's federally-recognized legal status came about.  In a stipulated judgment entered in a federal lawsuit, *Hardwick v. United States*, No. C-79-1710-SW (N.D. Cal.

Aug. 3, 1983), the United States agreed, *inter alia*, to "recognize the Indian Tribes, Bands, Communities or groups of . . . seventeen rancherias," including "North Fork," "as Indian entities" and to include these entities "on the Bureau of Indian Affairs' Federal Register list of recognized tribal entities pursuant to 25 CFR, Section 83.6(b)." *Hardwick* Stip. J. ¶¶ 1, 4. The United States further agreed that, within two years, the recognized Indian "entit[y]" of the North Fork Rancheria could "arrange to convey to the United States [certain] community-owned lands . . . to be held in trust by the United States for the benefit of [the] Tribe[], Band[], Communit[y] or group[] [of the North Fork Rancheria] . . . , authority for the acceptance of said conveyances being vested in the Secretary of the Interior under section 5 of the Act of June 18, 1934, 'The Indian Reorganization Act,' 48 Stat. 985, 25 U.S.C. §465 as amended by section 203 of the [ILCA] . . . and/or the equitable powers of this court." *Id.* ¶ 7. The North Fork Rancheria is described with particularity as "80 acres . . . located about two miles from the town of North Fork, Madera County, California. SE1/4NE1/4 Section 20, and SW1/4NW1/4 Section 21, T. 8 S., R. 23 E., Mount Diablo Meridian," *id.*, Ex. A at 3, matching the description of the land purchased in 1916 for the Indians belonging to the North Fork band, *see* Terrell Letter at 1 ("80 acres" including "40 acres, the S.W.¼ of the N.W.¼ Section 21,Tp.8,R.23 E.,M.D.M." and "the adjoining 40 acres to the east, viz: the S.E.¼ of the N.E.¼ Section 20, same township and range"); *see also* IRA ROD at 55–56 (discussing *Hardwick* judgment "wherein the [North Fork] Tribe's status was restored and confirmed"). The *Hardwick* judgment is a formal and binding acknowledgment by the United States that the "North Fork band of landless Indians," for whom the North Fork Rancheria was purchased in 1916, is an Indian tribe, within the meaning of the IRA, that has continuously existed since that time. It is also a federal court order legally binding the United States to that acknowledgment.

Thus, contrary to the plaintiffs' assertion, the *Hardwick* litigation conclusively establishes "that the applicant Tribe is the same tribe as any tribe purportedly under jurisdiction in 1934," Pls.' Reply at 17.  As the federal defendants correctly explain, "[t]he determination that [the] North Fork [Tribe] was a recognized Indian tribe with a government-to-government relationship with the United States was established then [in the *Hardwick* litigation] and cannot be challenged by Plaintiffs now."  Defs.' Reply at 12; *see also id.* ("That membership in a tribe may have changed over time, and that [the] North Fork [Tribe] did not formally organize a tribal government pursuant to Section 16 . . . . certainly cannot trump the Department's recognition in 1983 that North Fork was improperly terminated and should be restored to its tribal status and added to the official Federal Register list of federally recognized Indian tribes.").  As a result, the Secretary was arguably legally barred from engaging in the very analysis that the plaintiffs claim is missing from the IRA ROD.  *See U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 889 (D.C. Cir. 2010) ("Once a stipulation of fact is made, 'the one party need offer no evidence to prove it and the other is not allowed to disprove it.'" (citing 9 WIGMORE, EVIDENCE § 2590 (Chadbourn rev. 1981))); *Verkouteren v. District of Columbia*, 346 F.2d 842, 844 n.2 (D.C. Cir. 1965) (noting "the importance and significance which courts customarily attach to stipulations of fact" and the "binding effect" of stipulations, that "has long been recognized" (citing authority)).

The plaintiffs argue that the *Hardwick* litigation does "not demonstrate that the applicant Tribe is the same as any tribe purportedly under federal jurisdiction in 1934."  Pls.' Reply at 17; *see also id.* at 18 (accusing the Secretary of "engaging in speculation by assuming – without any support or analysis in the administrative record or the California Rancheria Act – that the applicant Tribe is necessarily the same as a 'tribe' purportedly under jurisdiction in 1934"); Pls.'

Mem. at 18 ("*Hardwick* can in no way serve as evidence on its own that the North Fork Tribe, as it exists now, has any relation whatsoever to the North Fork band of landless Indians . . . ." (emphasis omitted)).  Instead, the plaintiffs assert that "[t]he [CRA] and *Tillie Hardwick* litigation demonstrate that the applicant Tribe did not exist prior to the [CRA]."  Pls.' Reply at 17.  The plaintiffs point to the 1966 "*Federal Register* notice terminating the North Fork Rancheria and the named individuals listed," pursuant to the CRA, and argue that it "is unequivocal evidence that the federal government understood that no tribe existed at the North Fork Rancheria at its termination."  *Id*. at 18–19 (citing Fed. Reg. Termination Notice); *see also id.* at 21 (arguing that the fact that the CRA "terminated the Rancheria's status as Indian land and Susan Johnson's status as an Indian . . . . demonstrate[s] that there is no connection between the applicant North Fork Tribe and any tribe purportedly under jurisdiction in 1934").  According to the plaintiffs, *Hardwick* served only to "restore[] . . . the Indian status of the [North Fork Rancheria's] sole distributee, Susan Johnson, and the Rancheria land itself."  Pls.' Mem. at 16.  Aside from that, the plaintiffs claim, the *Hardwick* stipulation wrongfully "provided for tribal creation" of an Indian entity (the present-day North Fork Tribe) that "was not based on any connection between the Indians for whom the land was purchased or who voted in the 1935 election."  *Id*. at 16–17; *see also id.* at 3 ("Despite there being no recognized tribal entity at the Rancheria prior to the Rancheria Act and the Rancheria property's being held in trust for individual Indians rather than a tribal entity, the North Fork Rancheria of Mono Indians was, in fact, added to the list [of federally-recognized Indian tribes].");  Pls.' Reply at 18–21.

The Court disagrees.  In the *Hardwick* judgment, the United States formally and legally recognized the Indian "Band[] . . . *of*" the North Fork Rancheria as a "tribal entit[y]," inherently acknowledging the connection between the "North Fork band of landless Indians" for whom the

North Fork Rancheria was purchased in 1916, the Indians who voted in the Section 18 election in 1935, and the descendants of those same Indians at the time of the judgment in 1983. *Hardwick* Stip. J. ¶ 4 (emphasis added). The precise interests that were terminated (or not) by the CRA, and the related *Federal Register* notice, is immaterial, since, as the North Fork Tribe accurately states, "the North Fork Tribe was a tribe prior to 1958 and was affirmed as a tribe with the same, pre-1958 status as a recognized tribe following *Tillie Hardwick*. Whether or not the [North Fork] Tribe was officially terminated between 1958 and 1983 is legally irrelevant." North Fork's Reply at 9 n.7 (citation omitted).[46]

"Congress delegated to the Secretary the regulation of Indian relations and affairs . . . including authority to decide in the first instance whether groups have been federally recognized in the past or whether other circumstances support current recognition." *Mackinac Tribe*, 2016 WL 3902667, at *3 (citations omitted). In entering the stipulated judgment in *Hardwick*, the executive branch of the United States determined that circumstances supported the official federal recognition of the North Fork Tribe, and the District Court Judge, in ordering the judgment, concurred. *See United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991) ("We generally accord Government records and official conduct a presumption of legitimacy."). As a result of the *Hardwick* litigation, two branches of government validated the existence of the North Fork Tribe and found the Tribe to qualify appropriately as a recognized Indian tribe. *Cf. Mackinac Tribe*,

---

[46]    Consequently, the plaintiffs' reliance on *Mishewal Wappo* as supplemental authority for the proposition that "the CRA did not terminate tribes but only the Indian status of [an] individual distributee" is of no moment. Pls.' Notice Suppl. Auth. at 3.

2016 WL 3902667, at *3 (requiring the administrative exhaustion of the recognition process where "no branch of government has determined whether the plaintiff Mackinac Tribe currently qualifies as a recognized tribe or as the tribe that was recognized in 1855").

A notice was subsequently published in the *Federal Register* memorializing the *Hardwick* judgment. Restoration of Federal Status to 17 California Rancherias, 49 Fed. Reg. 24,084 (June 11, 1984) ("The Indian tribes, bands, communities or groups of the seventeen Rancherias named above are Indian entities with the same status as they possessed prior to distribution of the assets of these Rancherias . . . and shall be deemed entitled to any of the benefits or services provided or performed by the United States for Indian tribes, bands, communities or groups because of their status as Indian tribes, bands, communities or groups."). In 1985, the DOI listed the "Northfork Rancheria of Mono Indians of California" as an "Indian Tribal Entit[y] Recognized and Eligible to Receive Services" from the BIA. Indian Tribal Entities Recognized and Eligible to Receive Services, 50 Fed. Reg. at 6,057; *see* Final Rule, 43 Fed. Reg. 39,361, 39,362–63 (Aug. 24, 1978) (DOI regulations requiring the Secretary to update and "publish in the Federal Register . . . a list of all Indian tribes which are recognized and receiving services from the [BIA]"). The "Northfork Rancheria of Mono Indians of California"—*i.e.*, the North Fork Tribe in this case, has been listed as a recognized tribe in the Federal Register ever since. Nork Fork's Mem. at 16.

Then, in 1994, Congress weighed in, implicitly sanctioning the North Fork Tribe's inclusion on the list of federally-recognized Indian tribes and prohibiting its removal. First, Congress amended the IRA, adding a "[p]rivileges and immunities of Indian tribes" provision to prohibit "[d]epartments or agencies of the United States" from "promulgat[ing] any regulation or mak[ing] any decision or determination pursuant to the [IRA], . . . or any other Act of Congress,

with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."  Technical Amendments: Indians Act, Pub. L. 103-263, 108 Stat. 707, § 5(b) (May 31, 1994), codified at 25 U.S.C. § 476(f).  Shortly thereafter, in the List Act, Congress expressed a number of important findings, including that " Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated "Procedures for Establishing that an American Indian Group Exists as an Indian Tribe;" or by a decision of a United States court" and that "a tribe which has been recognized in one of these manners may not be terminated except by an Act of Congress."  List Act § 103.

Legislative history reflects Congress' concern about the DOI's "growing and disturbing trend" to "derecognize" tribes, without the authority to do so.  H. Rep. No. 103-781 (Oct. 3, 1994).  The House Committee on Natural Resources expressed particular concern about the BIA's "indicat[ion] that it intended to differentiate between federally recognized tribes as being 'created' or 'historic'" and its "position that 'created' tribes do not possess all the powers of a sovereign tribal government."  *Id.*  Accordingly, "[t]he Committee [on Natural Resources] cannot stress enough its conclusion that the [DOI] may not terminate the federally-recognized status of an Indian tribe absent an Act of Congress.  Congress has never delegated that authority to the Department, or acquiesced in such a termination."  *Id.*  The Congressional Record additionally reflects the understanding that,

> The recognition of an Indian Tribe by the Federal Government is an acknowledgment that the Indian tribe is a sovereign entity with governmental authority which predates the U.S. Constitution . . . . Whatever the method by which recognition was extended, all Indian tribes enjoy the same relationship with the United States and exercise the same inherent authority.

140 Cong. Rec. 11,376, 11,377 (May 23, 1994) (statement of Rep. Richardson).

The above Congressional action took place long after the *Hardwick* litigation, when the North Fork Tribe had been included on the list of federally-recognized tribes for approximately ten years, and Congress' express findings indicate clearly its expectation that no tribe on the list be terminated or treated any differently than any other tribe.  As a result, the Secretary's authority to acquire land in trust for the North Fork Tribe, like any other federally recognized tribe that was under federal jurisdiction in 1934, was prescribed by the Executive's agreement and stipulation and the Judiciary's order in *Hardwick*, and then confirmed through Congress' enactment of the List Act.  As the defendants note, "if Plaintiffs wanted to challenge the Tillie Hardwick stipulation, North Fork's restoration, or the Secretary's decision to place North Fork on the Federal Register list of federally recognized tribes in 1985 and thereafter, the time for doing so has long since passed."  Def.'s Reply at 13.  The North Fork Tribe, as a federally recognized Indian tribe, has the benefit of land acquisition under § 465 of the IRA, like any other federally recognized tribe that can show it was under federal jurisdiction in 1934, unless or until the Tribe is terminated by an Act of Congress.  *See id.* at 12–13 ("There is simply no requirement in the IRA or in *Carcieri* for the Secretary to draw familial or other connections among the individuals that comprised [the] North Fork [Tribe] when the Rancheria was acquired in 1916, with the individuals that comprised North Fork in 1935, the individuals that comprised North Fork at the time of [the *Hardwick* litigation], and the individuals that comprise the Tribe today."); North Fork's Reply at 8 ("[T]he Secretary was not required to disprove Stand Up's contentions that the two entities—which share a name and location—are somehow discontinuous.").

Accordingly, the Secretary was not required to make factual findings regarding the North Fork Tribe's continuous existence from the purchase of the North Fork Rancheria in 1916 through the issuance of the IRA ROD in 2012, or to engage in the lengthy analysis regarding the North Fork Tribe's continuous existence that the plaintiffs' confusing arguments, *see generally* Pls.' Mem. at 11–18; Pls.' Reply at 13–21, have demanded of this Court, in order to conclude that the North Fork Tribe was under federal jurisdiction in 1934.  Indeed, it was nothing short of rational for the Secretary to decline to do so.  *See Timbisha Shoshone Tribe*, 678 F.3d at 938 ("'In reference to [matters of tribal recognition], it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs.'" (alteration in original) (quoting *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419 (1866))); COHEN'S HANDBOOK § 3.02(4) ("[C]lear indications from the political branches demonstrating federal recognition warrant judicial deference . . . ."); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").

*     *     *

For the foregoing reasons, the defendants are entitled to summary judgment on the Picayune Tribe's IRA claim, *see* Picayune's Compl. ¶¶ 54–59 (Second Cause of Action), and on the Stand Up plaintiffs' IRA claim, *see* TAC ¶¶ 56–60 (First Claim for Relief).

### E.     NEPA COMPLIANCE

The NEPA represents "a broad national commitment to protecting and promoting environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331), and was created, in part, for the purpose of "establish[ing] a set of 'action forcing' procedures requiring an environmental impact statement on any proposed major Federal action which could significantly affect the quality of the environment."  S. Rep. No. 94–152, at 3 (1975).  Accordingly, the NEPA requires federal agencies "to the fullest extent

possible" to prepare an EIS in "every recommendation or report on proposals for legislation and

other major Federal actions significantly affecting the quality of the human environment," 42

U.S.C. § 4332(2)(C); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 15–16 (2008),

and consider a number of factors, including "the environmental impact of the proposed action,"

"any adverse environmental effects which cannot be avoided should the proposal be

implemented," and "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(i)–(iii).  "The

statutory requirement that a federal agency contemplating a major action prepare such an [EIS]

serves NEPA's 'action-forcing' purpose in two important respects," *Robertson*, 490 U.S. at 349,

by (1) "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully

consider, detailed information concerning significant environmental impacts" and (2)

"guarantee[ing] that the relevant information will be made available to the larger audience that

may also play a role in both the decisionmaking process and the implementation of that

decision," *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 188 (D.C. Cir. 2013) (quoting

*Robertson*, 490 U.S. at 349); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31,

36–37 (D.C. Cir. 2015) ("NEPA's mandate, which incorporates notice and comment procedures,

serves the twin purposes of ensuring that (1) agency decisions include informed and careful

consideration of environmental impact, and (2) agencies inform the public of that impact and

enable interest persons to participate in deciding what projects agencies should approve and

under what terms.").

The NEPA is "'essentially procedural,'" intended "to ensure 'fully informed and well-

considered decisions' by federal agencies."  *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304,

1309–10 (D.C. Cir. 2014) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519,

558 (1978)).  Consequently, this law "requir[es] federal agencies to take a 'hard look' at their

proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Sierra Club*, 803 F.3d at 37.  The NEPA "does not[, however,] mandate particular results in order to accomplish its ends," *Del. Riverkeeper Network*, 753 F.3d at 1310 (internal quotation marks omitted), "require agencies to elevate environmental concerns over other appropriate considerations," *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)), or necessarily require "the best decision," *id.* (quoting *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012)); *see also Sierra Club v. FERC*, No. 14-1249, 2016 WL 3525562, at *5 (D.C. Cir. June 28, 2016) ("As a procedural statute, NEPA does not mandate any particular outcome.").  As the D.C. Circuit recently reiterated, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'"  *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)).

The Stand Up plaintiffs frame both procedural and substantive challenges under the NEPA by asserting, first, that the EIS in this case was prepared in order to justify the already-made decision to build a casino at the Madera Site, in violation of NEPA's implementing regulation at 40 C.F.R. § 1502.2(g), which provides that EISs "shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."  *See* Pls.' Mem. at 37–38.  The standard for proving predetermination is high. *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010); *see also Am. Wild Horse Pres. Campaign v. Vilsack*, 133 F. Supp. 3d 200, 222 (D.D.C. 2015) (citing *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011)).  Indeed, "NEPA does not require agency officials to be 'subjectively impartial,'" *Forest Guardians*, 611

F.3d at 712 (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289,

295 (8th Cir. 1972)), and "[a]n agency can have a preferred alternative in mind when it conducts

a NEPA analysis," *id.* (citing 40 C.F.R. § 1502.14(e)).  Thus, generally, courts have not found

predetermination except in cases where an agency has *committed* itself—for example, by

contract—to an outcome.  *Id.* at 713 ("[I]f an agency predetermines the NEPA analysis by

committing itself to an outcome, the agency likely has failed to take a hard look at the

environmental consequences of its actions due to its bias in favor of that outcome and, therefore,

has acted arbitrarily and capriciously.").  *Cf. Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d

174, 198 (4th Cir. 2005) (holding the district court "exceeded the proper scope of its inquiry

when it placed probative weight upon evidence of the [agency]'s subjective intent" and

"inappropriately indulged [the plaintiffs'] theory" that the agency "had irreversibly" made its

decision before beginning its environmental analysis).

Though the D.C. Circuit has not opined on the standard for finding agency

predetermination, the Tenth Circuit has explained:

> In order for us to conclude that an agency has engaged in predetermination, we
> must decide that the agency has *irreversibly and irretrievably* committed itself to
> a plan of action that is dependent upon the NEPA environmental analysis
> producing a certain outcome, *before* the agency has completed that environmental
> analysis.  We would not hold, therefore, that predetermination was present simply
> because the agency's planning, or internal or external negotiations, seriously
> contemplated, or took into account, the *possibility* that a particular environmental
> outcome would be the result of its NEPA review of environmental effects.

*Forest Guardians*, 611 F.3d at 714–15 (emphasis in original); *accord Metcalf v. Daley*, 214 F.3d

1135, 1145 (9th Cir. 2000) (holding defendants violated the NEPA because they "already had

made an 'irreversible and irretrievable commitment of resources' . . . before they considered [the

project's] environmental consequences").  The Tenth Circuit reasoned that "predetermination is

different in kind from mere 'subjective impartiality,' . . . which does not undermine an agency's

137

ability to engage in the requisite hard look at environmental consequences . . . ." *Forest Guardians*, 611 F.3d at 714 (citations omitted); *see also Nat'l Audubon Soc'y*, 422 F.3d at 199 ("Where an agency has merely engaged in post hoc rationalization, there will be evidence of this in its failure to comprehensively investigate the environmental impact of its actions and acknowledge their consequences."). The plaintiffs have pointed to no evidence in the record, and the Court can find none, indicating that the federal defendants were in any way committed, contractually or otherwise, to authorize gaming on the Madera Site or approve North Fork's fee-to-trust application before analyzing the environmental impact of these proposed actions.

To bolster their claim of predetermination, however, the plaintiffs emphasize that "[n]o evaluation of the FEIS should proceed without acknowledgement of one incontrovertible fact: Station Casinos, a development corporation, purchased the Madera site for the sole purpose of building and managing a casino, an activity it wishes to engage in purely for profit, irrespective of the Tribe's need for economic development and self-sufficiency . . . ." Pls.' Mem. at 38. This fact, even if "incontrovertible," is unavailing for several reasons. First, as the North Fork Tribe points out, *see* North Fork's Mem. at 4 n.1, IGRA expressly contemplates that tribes will enter into management contracts for the operation of gaming facilities, *see* 25 U.S.C. § 2710(d)(9) ("An Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman.").

Second, the plaintiffs present no reason why the identity of the owner of the Madera Site should have any bearing on the Court's determination of whether the Secretary complied with the NEPA by carefully considering the environmental impact of the proposed action. Other courts have expressly cautioned against "conduct[ing] far-flung investigations into the subjective intent of an agency" or "prob[ing] into the subjective predispositions of agency decisionmakers."

*Nat'l Audubon Soc'y*, 422 F.3d at 198.  Likewise, this Court declines the plaintiffs' invitation to "open a Pandora's box."  *Id*. at 198–99 ("Inquiries into subjective intent in the NEPA context open a Pandora's box that . . . . could restrict the open exchange of information within an agency, inhibit frank deliberations, . . . reduce the incentive to memorialize ideas in written form[,] . . . . [and] frustrate an agency's ability to change its mind or refocus its actions, the very effect that NEPA was designed to encourage.").  In short, the fact that the owner of the Madera Site seeks to develop a gaming establishment there in no way indicates that the federal defendants were in any way obligated, contractually or otherwise, to approve the development of a gaming establishment on the Madera Site before engaging in an environmental analysis under the NEPA.

In addition to the procedural challenge under the NEPA, the plaintiffs contend that the agency's environmental analysis was substantively flawed.  Specifically, the plaintiffs argue that the Secretary "failed to take a hard look at the environmental consequences of the proposed action," Pls.' Mem. at 38, because the Secretary (1) "eliminated alternatives from consideration based upon flawed findings" regarding, mainly, economic competition and political and community opposition, Pls.' Mem. at 38–42; (2) concluded arbitrarily and capriciously "the casino's impact on crime would be less than significant," *id*. at 42–43, and (3) erred in the analysis of the mitigation measures for problem gamblers, *id*. at 43–45.  None of these arguments is persuasive.

### 1.    *Alternative Sites*

The plaintiffs' "most forceful objection under the NEPA," with respect to their preliminary injunction motion, was "that the Secretary failed to give adequate consideration to a reasonable range of alternative sites for the proposed gaming establishment, as required by the NEPA."  *Stand Up I*, 919 F. Supp. 2d at 77 (citing 42 U.S.C. § 4332(2)(C)(iii) (requiring agencies to consider 'alternatives to the proposed action')).  They reiterate the same objection for

similar reasons now on summary judgment.  Notwithstanding the more extensive record before the Court now, the plaintiffs' objection again falls short of establishing a NEPA violation on this basis.

### a.    *Applicable Legal Principles*

An EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment," 40 C.F.R. § 1502.1, including all "technically and economically practical or feasible" alternatives which "meet the purpose and need of the proposed action," 43 C.F.R. § 46.420(b); *see* 40 C.F.R. § 1502.14; *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 69, 72 (D.C. Cir. 2011).  As explained in *Stand Up I*, the NEPA's implementing regulations provide that, in considering alternatives, an agency must, *inter alia* "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which are eliminated from detailed study, briefly discuss the reasons for their having been eliminated," 919 F. Supp. 2d at 77 (quoting 40 C.F.R. § 1502.14 (a)).  For those alternatives not eliminated from detailed study, the agency must "[d]evote substantial treatment to each alternative . . . so that reviewers may evaluate their comparative merits."  40 C.F.R. § 1502.14(b).

Courts "evaluat[e] an agency's choice of 'reasonable alternatives' in light of the objectives of the federal action," *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999), applying a two-part test.  First, courts determine "whether the agency has reasonably identified and defined its objectives," *id*., by "consider[ing] the needs and goals of the parties involved in the application [for federal action] . . . as well as the public interest," *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (quoting 43 C.F.R. § 46.420(a)(2)); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("When an

agency is asked to sanction a specific plan . . . the agency should take into account the needs and goals of the parties involved in the application." (citation omitted)).

Second, courts consider "whether a particular alternative is reasonable in light of these objectives," *Slater*, 198 F.3d at 867. "An alternative is 'reasonable' if it is objectively feasible as well as 'reasonable in light of the [the agency's] objectives.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (alteration in original) (quoting *Slater*, 198 F.3d at 867). Thus, the agency's "purpose and need for action . . . will determine the range of alternatives and provide a basis for the selection of an alternative in a decision." *Id.* at 72–73; *see also Citizens Against Burlington*, 938 F.2d at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives."). An agency's choice of and among alternatives does not take place in a vacuum but in the context of authorizing statutes, which reflect legislative purposes and intent regarding agency action. Thus, as the D.C. Circuit has explained, "[t]he agency should also 'always consider the views of Congress' to the extent they are discernible from the agency's statutory authorization and other directives." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73 (quoting *Citizens Against Burlington*, 938 F.2d at 196). "[A]n alternative is properly excluded from consideration" in the EIS "if it would be reasonable for the agency to conclude that the [particular] alternative does not bring about the ends of the federal action." *Slater*, 198 F.3d at 867 (quotations and citation omitted); *see also* 43 C.F.R. § 46.420(b) (defining "reasonable alternatives" as "alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action").

"Importantly, [courts] review both an agency's definition of its objectives and its selection of alternatives under a rule of reason," such that courts "generally defer to the agency's reasonable definition of objectives" "as long as the agency looks hard at the factors relevant to

the definition of purpose." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d at 73

(quotations and citations omitted). "If the agency's objectives are reasonable, [courts] will

uphold the agency's selection of alternatives that are reasonable in light of those objectives."

*Grunewald*, 776 F.3d at 904 (quoting *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73));

*see also id.* at 903–04 ("In reviewing an agency's selection of alternatives, we owe 'considerable

deference to the agency's expertise and policy-making role.'" (quoting *Slater*, 198 F.3d at 867)).

### b. *Discussion Of Alternatives In The FEIS*

Here, as the plaintiffs recognize, the FEIS, which was prepared by the BIA, "is governed

by the statement of 'purpose and need' . . . which relies on IGRA's purpose of promoting 'tribal

economic development, tribal self-sufficiency, and strong tribal government.'" Pls.' Mem. at 26

(citing FEIS at 1-10). Indeed, the FEIS identified that "[t]he proposed action would allow the

Tribe to take advantage of the financial opportunities provided by Congress through IGRA,

providing the Tribe with a long-term, viable, and sustainable revenue base," noting that

"[p]roviding a solid economic base for tribes represents one of the primary purposes behind

IGRA," FEIS at 1-10, which Congress enacted, in part, "to provide a statutory basis for the

operation of gaming by Indian tribes as a means of promoting tribal economic development, self-

sufficiency, and strong tribal governments," *id.* (quoting 25 U.S.C. § 2702). The FEIS also

identified that "[t]he purpose of the proposed action is to help provide for the economic

development of the Tribe," FEIS at 1-1, Jt. App. at 336, ECF No. 124-3, and, specifically, to

"assist the Tribe in meeting [five] . . . objectives:"

- Improve the socioeconomic status of the Tribe by providing an augmented revenue source that could be used to strengthen the Tribal Government, fund a variety of social housing, governmental, administrative, educational, health and welfare services to improve the quality of life of Tribal members, and provide capital for other economic development and investment opportunities.
- Provide employment opportunities to the Tribal community.

- Make donations to charitable organizations and governmental operations, including local educational institutions.
- Fund local governmental agencies, programs, and services.
- Allow the Tribe to establish economic self-sufficiency.

FEIS at 1-9 to -10, Jt. App. at 344–45, ECF No. 124-6.  Lastly, the FEIS identified that the North

Fork Tribe's "purpose for requesting the approval of the proposed management contract is to

team with SC Madera Management LLC to develop and manage a casino and hotel resort," FEIS

at 1-11, Jt. App. at 346, ECF No. 124-6, which "would assist the Tribe in obtaining funding for

the development of the proposed casino and hotel resort," *id*. at 2-5.

In line with these purposes, the FEIS was "prepared to analyze and document the

environmental consequences associated with the approval of the fee-to-trust acquisition and

resulting development of a casino and hotel resort."  *Id*. at 1-11.  In articulating objectives, the

FEIS did not presuppose approval of the proposed fee-to-trust acquisition, but rather, in

accordance with NEPA, "consider[ed] the views of Congress," and took "into account the needs

and goals of the parties involved."  *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72–73

(quotations and citations omitted).  The FEIS also considered the public interest, noting that the

proposed action would lessen the North Fork Tribe's "high reliance upon the Federal and State

governments for social services," "provide employment opportunities for Tribal members as well

as local non-Tribal residents," "increase[e] opportunities for local businesses and stimulat[e] the

local economy."  FEIS at 1-10 to -11.

In light of these objectives, the FEIS considered five alternatives in detail:  (1)

Alternative A was the full development of the Madera Site, as discussed, *supra*, in Part I.C; (2)

Alternative B was "a smaller-scale version of Alternative A, but without hotel or pool

components," FEIS at 2-37, Jt. App. at 387, ECF No. 124-10; (3) Alternative C was "a mixed-

use retail development" on the Madera Site that "would include several larger retail outlet stores

and smaller storefronts, including food and beverage establishments," but would not include any gaming, *id*. at 2-45, Jt. App. at 395, ECF No. 125-1; (4) Alternative D would be located on the North Fork Rancheria and would "consist of a smaller-scale version of Alternative A, without retail, high-limit gaming, entertainment, hotel, or pool components," *id*. at 2-54, Jt. App. at 404, ECF No. 125-1; and (5) Alternative E would have been the status quo, or the "no-action alternative" required to be considered under NEPA regulations, under which "neither site would be developed," *id*. at 2-67 to -68, Jt. App. at 417–18, ECF No. 125-3; *see* 40 C.F.R. § 1502.14(d) (requiring EIS to "[i]nclude the alternative of no action"). Certain sites, including the "Old Mill Site," "a 135-acre site that housed a working lumber mill between 1941 and 1994," and various properties listed for sale "along the SR-41 corridor" or "Avenue 7" were considered as potential alternatives, but were ultimately eliminated from further consideration and, therefore, are not discussed in detail in the FEIS. FEIS at 2-68, -73 to -75, -80 to -82, Jt. App. at 418, 423–25, 430–32, ECF Nos. 125-3, -4. The Madera Site, Alternative A, was selected as the preferred location for reasons fully laid out in the FEIS, which reasons are challenged by the Stand Up plaintiffs.

### c.    *Stand Up Plaintiffs' Arguments*

In the plaintiffs' view, the federal defendants' consideration of properties "along the SR-41 corridor" and "Avenue 7," the North Fork Rancheria, and the Old Mill Site was insufficient. Specifically, the plaintiffs argue that it was irrational (1) to eliminate from further consideration sites located "along the SR-41 corridor" or "Avenue 7" based on the North Fork's "concern for the potentially unfair competitive impact" on neighboring tribes, Pls.' Mem. at 38–39; (2) to reject as the preferred alternative the North Fork Rancheria, considered in detail as Alternative D, based on political and community opposition, *id*. at 40; and (3) to eliminate from further

consideration the Old Mill Site, based on political and community opposition, undiscovered

contamination, and the inability to acquire the land, *id.* at 40–41.

(i)     Properties "Along The SR-41 Corridor" And "Avenue 7"

The plaintiffs criticize the FEIS for "mak[ing] much of the Tribe's purported concern that

development along the SR-41 corridor as well as alternative sites, such as Avenue 7, along the

SR-99 corridor would potentially have a very detrimental competitive effect on the gaming

operations of the neighboring Tribes," particularly on the Picayune Tribe, whose gaming

"facility is located along SR-41 near Coarsegold," when the Madera Site "unquestionably would

have at the least an identical competitive impact," and the NEPA does not "expressly provide[]

nearby tribes with protections from detrimental impacts." Pls.' Mem. at 38–39 (quotations and

citation omitted).[47] The Court rejected the plaintiffs' similar argument in ruling on their

preliminary injunction motion, highlighting the plaintiffs' "fail[ure] to appreciate that the

purpose and need of a proposed action is a cornerstone of whether an alternative is reasonable

under the NEPA," noting also that "[t]he plaintiffs' argument . . . [did] not account for other

reasons cited in support of rejecting" certain sites. *Stand Up I*, 919 F. Supp. 2d at 78 & n.25.

---

[47]     The North Fork Tribe asserts that the plaintiffs "forfeited any objection that the Secretary wrongfully excluded [the SR-41 or Avenue 7] sites from further consideration" because "[d]uring the NEPA process, Stand Up failed to present arguments concerning the need to evaluate [those] sites and never argued that the EIS must not consider potential competitive impacts when evaluating alternatives." North Fork's Mem. at 65. In response, the plaintiffs claim that the North Fork "Tribe misconceives Stand Up's complaint . . . , which is with the Secretary's use of a double-standard – invoking the project's competitive impacts on nearby tribal casinos as grounds to reject alternative sites, while disregarding competitive impacts when they were raised in opposition to the Madera Site." Pls.' Reply at 48 n.35. The plaintiffs argue that, since "the Secretary's disregard of the competitive impact of the Madera Site appeared in the IGRA ROD, which was adopted . . . years after the adoption of the FEIS," "plaintiffs had no opportunity to raise this contradiction during the administrative process." *Id.* It thus appears that the plaintiffs effectively concede that they forfeited any objection to the FEIS' failure to consider potential SR-41 or Avenue 7 sites, *id.*, and as the North Fork Tribe explains in reply, "[t]his is not a NEPA argument, but instead reformulates the . . . IGRA argument that the BIA did not appropriately consider detrimental impact," North Fork's Reply at 29. The Court agrees with the North Fork Tribe, but will nonetheless address the merits of the plaintiffs' contention to the extent that it implicates the Secretary's compliance with the NEPA, which requires an analysis separate to that of the IGRA ROD. The plaintiffs' challenges to the IGRA ROD have already been discussed above. *See* Part III.C.2.

Likewise, on summary judgment, the plaintiffs fail to recognize that properties along the SR-41

corridor and Avenue 7 were rejected for several additional reasons, not solely because of the

potential competitive effect.  With respect to alternatives along the SR-41 corridor, the FEIS

explained that "most of the [SR-41] corridor situated in Madera County lies within the

environmentally sensitive foothills" and "[d]evelopment along much of the corridor would be in

conflict with the scenic nature of the corridor."  FEIS at 2-73.[48]  The FEIS further explained that

SR-41 "is a two-lane highway that runs form the south entrance of Yosemite south to Fresno,"

while "SR-99 is a four-lane highway (the only one in Madera Country) . . . that serves as the

primary traffic corridor through Madera County."  *Id*.  Thus, "proposing a development along

SR-41 would have raised not only environmental concerns, but also traffic concerns because of

the already overburdened two-lane system."  *Id*.  Lastly, the FEIS explained that, "based on its

proximity to Fresno, development along the southern portion of the corridor would have

primarily benefited Fresno County residents and had minimal impact on improving the lives of

Madera County residents."  *Id*.

With respect to Avenue 7 properties, the FEIS acknowledged that "[t]hese properties

were readily accessible from the large Fresno market, raised few environmental concerns, and

there was little concern about the commercial development of the sites."  *Id*.  The FEIS then

explained, however, that "[a]ccess to the properties was constrained by the train tracks that run

just east and parallel to SR-99."  *Id*. at 2-75.  The FEIS also noted "that a development near

---

[48]      The plaintiffs argue that "[t]he record contains no data or other evidence to assess" the FEIS' "invocation
of the 'environmentally sensitive' and 'scenic' foothills," contending that the "[d]efendants merely take it as a given
that the foothills are more 'environmentally sensitive' and difficult to develop than the valley, without addressing
how it is that other development (including other tribal casinos) have managed in these foothills."  Pls.' Reply at 49.
The plaintiffs have waived this new argument by asserting it for the first time in their reply brief.  *See Mich.
Gambling Opp'n*, 525 F.3d at 29 nn.3–4.  Regardless, however, the Court agrees with the North Fork Tribe that even
if other tribes have developed casinos in a particularly sensitive area, this does not mean that further development in
the same area does not raise significant environmental and traffic concerns, and the BIA was not unreasonable in
relying on those concerns.  *See North Fork's Reply at 29 n.19.*

146

Fresno would inure primarily to the residents of Fresno and not Madera County." *Id.* Lastly, the FEIS explained "that development of a facility along the southern stretch of SR-99 in Madera County would be inconsistent with existing land uses" because "[m]ost of the surrounding area was used for agriculture, including orchards, a horse ranch, vineyards, and various crops." *Id.*

In light of the above-stated reasons, the BIA acted reasonably in declining to consider in detail alternative sites along the SR-41 corridor and Avenue 7. The BIA properly considered the North Fork Tribe's wishes in formulating the goals of its proposed action to acquire lands into trust for the Tribe to operate a gaming facility. *See Citizens Against Burlington*, 938 F.2d at 199 ("Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action. Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be."). It is important to the North Fork Tribe that revenue from their gaming facility inure to the benefit of Madera County, particularly so that donations to local educational institutions and funding to local government agencies, programs, and services, from casino revenue, benefits the North Fork Tribe's members to the maximum extent possible, which is precisely what the IRA and the IGRA intend. It was thus reasonable for the BIA to conclude that, because properties along the SR-41 corridor and Avenue 7 would be more difficult to access and gaming operations on such properties would inure primarily to the benefit of Fresno County, federal action on those properties would not meet the purpose and need of the North Fork Tribe's application and those sites were not reasonable alternatives.[49]

---

[49]     Notably, the North Fork Tribe points out that "[t]he Madera Site is farther away from Clovis and Fresno—major markets for Picayune's casino located north along SR-41 in Coarsegold—than the Avenue 7 sites or certain southern sites along SR-41 are. A casino on SR-41 south of Coarsegold would thus have the opportunity to directly intercept traffic to Picayune's casino." North Fork's Mem. at 66 n.43.

*(ii)*     *North Fork Rancheria*

The plaintiffs criticize the FEIS for rejecting the North Fork Rancheria because of political and community opposition, without mentioning any such opposition with respect to the Madera Site "in the FEIS'[] decision to adopt Alternative A."  Pls.' Mem. at 40; *see also* Pls.' Reply at 48–49.  According to the plaintiffs, "[t]he FEIS treats the community opposition issue exactly backwards," asserting that "[c]ommunity opposition should weigh heavily in the analysis of off-reservation sites far from the Rancheria and should not weigh at all or weigh significantly less in the analysis of sites already under the Tribe's control or closer to such lands."  Pls.' Mem. at 40 n.29.

First and foremost, development of a casino on the North Fork Rancheria was fully analyzed as Alternative D in the FEIS.  *See* FEIS at 2-54 to -67, Jt. App. at 404–17, ECF No. 125-1 to -3.  Thus, to the extent that the plaintiffs challenge, under NEPA, the rejection, after full consideration, of the North Fork Rancheria as the preferred location for a gaming facility for the North Fork Tribe, this claim must fail because "NEPA . . . does not mandate particular results." *Robertson*, 490 U.S. at 350; *see also Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (per curiam) ("[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." (quotations and citation omitted)).  Accordingly, the "weight" that the FEIS afforded to community and political opposition in discussing the preferred alternative is immaterial to the determination of whether the BIA complied with the NEPA.  *See Robertson*, 490 U.S. at 350 ("If the adverse environmental effects

of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

Additionally, the plaintiffs again fail to acknowledge that the North Fork Rancheria was rejected for a variety of reasons, including, as the federal defendants note, "because it would produce reduced revenue, could not be financed, was more biologically sensitive, and was located further from existing development and infrastructure necessary to construct the casino." Defs.' Mem. at 51; *see* FEIS at 2-82 to -83, Jt. App. at 432–33, ECF No. 125-4 (explaining that an independent "market potential and facility sizing analysis for a development on the North Fork site" concluded that "challenges on the site (steep slope, potentially minimal soil depth to bedrock) . . . would make it difficult to successfully finance *any* casino on the site" (emphasis added)); *see also Stand Up I*, 919 F. Supp. 2d at 78 n.25 (recognizing "other reasons cited in support of rejecting the North Fork Rancheria . . . , including most notably the fact that the particularly varied and steep topography would inflate construction costs in that area, leading to the conclusion that a casino development in that area could not be successfully financed" (quotations and citation omitted)).

### (iii)    *Old Mill Site*

The plaintiffs criticize the FEIS for failing to consider the Old Mill Site as a viable alternative for the proposed action.  As explained in the FEIS, the Old Mill Site, "is a 135-acre site that housed a working lumber mill between 1941 and 1994[,] . . . . currently owned by the North Fork Community Development Council (CDC), a charitable nonprofit California corporation."  FEIS at 2-80.  The Court previously addressed the plaintiffs' argument that "the Secretary arbitrarily and capriciously erred to eliminate [the Old Mill Site] from further consideration as a reasonable alternative to the Madera Site" in ruling on their preliminary

injunction motion.  *Stand Up I*, 919 F. Supp. 2d at 78.  With respect to that motion, the plaintiffs

argued that neither the Secretary's "focus[] on environmental problems with the site" nor "the

purported claim that the site's owner would not sell the property for the purposes of developing a

casino . . . was a proper basis for eliminating [the Old Mill Site] alternative from consideration."

*Id*. (quotations and citation omitted).  This Court found that the plaintiffs' objections were

unlikely to succeed on the merits, explaining:

> First, the Secretary observed a number of potential environmental problems with
> developing the project on the Old Mill site, namely, that the soil on the site had
> been contaminated with various potentially harmful compounds such as
> petroleum hydrocarbons, asbestos, lead-based paint, and diesel fuels.  Although
> the plaintiffs note that the Secretary concluded that this contamination could be
> remedied through various clean-up efforts, the Secretary also observed that "the
> potential for the presence of unknown contamination related to past uses on the
> site remains[.]"  More importantly, the Secretary observed that the owners of the
> Old Mill site "sent two letters to the BIA stating that the site would not be sold for
> the development of a casino project."  The plaintiffs' argument that the owner's
> refusal to sell the site for gaming purposes "is insufficient to reject the site[]"
> makes little sense.  Although gaming was not the express purpose of the proposed
> action, it was a central focus of the proposed action because it was the use of the
> land that was most likely to provide the revenue needed to meet the purpose and
> need of the project, and therefore it was likely rational, for all of the reasons
> stated in the IGRA ROD, for the Secretary to reject the Old Mill site as a
> reasonable alternative.

*Id*. (citations omitted).  Now on summary judgment, the plaintiffs make essentially the same

objections, and the Court similarly finds that these objections fail.

In addition to criticizing the FEIS' reliance on political and community opposition in

considering the Old Mill Site, Pls.' Mem. at 40, 42, the plaintiffs argue that the "Secretary

offered no basis for th[e] speculative assertion" that "there is still a potential for liability based

on undiscovered contamination," *id*. at 40, and that the Secretary unreasonably determined that

the North Fork Tribe could not acquire the property, *id*. at 41.  These arguments are meritless.

First, as this Court recognized in *Stand Up I*, the BIA eliminated the Old Mill Site from consideration as an alternative for a variety of reasons, not solely because of political and community opposition.  In addition to the reasons recognized in *Stand Up I*—namely, the significant contamination problems and the inability to acquire the site for the development of a casino—the FEIS explained that the site's "relatively remote location near the Rancheria and HUD sites" would detract customers, "reducing the potential for job development and the ability of the project to create a revenue stream sufficient to fund Tribal programs."  FEIS at 2-81. Moreover, it was not unreasonable for the BIA to rely on representations from the CDC Board of Directors, which "represents a cross-section of the North Fork community" and "is comprised of representatives from eight separate community organizations," Letter from Steve Christianson, CDC Pres., to BIA Asst. Sec'y (May 20, 2008) at 1, Jt. App. at 160, ECF No. 124-1, that the concept of developing a casino on the Old Mill Site "received widespread community disapproval," FEIS at 2-82; *see also* Letter from Steve Christianson to Dale Morris, BIA Regional Dir. (June 8, 2008) at 1, Jt. App. at 172, ECF No. 124-2, and was, therefore, the basis for CDC's unwillingness to sell the site, *see* Defs.' Mem. at 53 ("The owner of the Old Mill Site cited community opposition as a reason not to sell the land; the Secretary relied on far more than that to reject the Old Mill Site.").  In other words, while community or political opposition to the development of a casino essentially made the Old Mill Site unavailable as an alternative, such opposition was simply not an issue for acquisition of the Madera Site, where the owners desired to develop a casino.  *See* North Fork Rancheria Land Acquisition Application (Mar. 1, 2005) at 6, Jt. App. at 1324, ECF No. 128-7.  Not surprisingly, therefore, the FEIS did not mention such opposition as a factor in consideration of alternative developments the Madera Site.

The plaintiffs' insistence that the BIA should have considered the Old Mill Site as a reasonable alternative despite receiving two letters from CDC "stating that the site would not be sold for the development of a casino project," FEIS at 2-81, now on a full administrative record, still makes little sense.  The plaintiffs' suggestion that somehow the fact that the North Fork Tribe is represented on the CDC, which is comprised of a cross-section of the community, including eight distinct community groups,[50] means that the North Fork Tribe could actually acquire the Old Mill Site, Pls.' Mem. at 41, does not rebut the written representations from CDC's President that CDC would not sell the land for gaming use.  The BIA reasonably relied on those letters, particularly in light of the other substantial evidence supporting the BIA's finding that the Old Mill Site is not a reasonable alternative.

Lastly, given the site's past use as a "long standing mill operation," the FEIS recognized that "the potential for unanticipated discoveries of contamination remains elevated and therefore potential liability remains for future remediation should such contamination be uncovered." FEIS at 2-80 to -81.  The BIA reasonably relied on the significant amount of discovered contamination and considerable clean-up efforts that would be required to prepare the site for development in declining to consider the site as a viable alternative.  *See id.* at 2-81 (explaining various contamination problems).  As the federal defendants aptly explain, "[t]he Secretary reasonably determined that the Old Mill Site was not feasible or reasonable because it would have required substantial decontamination efforts to remove a laundry list of contaminants. . . ." Defs.' Mem. at 52.

---

[50]     Specifically, CDC Board members include, in addition to one representative from the North Fork Tribe, one representative from the North Fork Chamber of Commerce, the North Fork Volunteer Fire Department Auxiliary, the North Fork Arts Council, the North Fork Boosters, the Chawanakee Unified School District, the North Fork Women's Club, and four members-at-large.  Letter from Steve Christianson to Dale Morris (June 8, 2008).

Accordingly, the Court finds that the Old Mill Site was properly excluded from consideration as an alternative.[51]

### 2.    *Impact on Crime*

The plaintiffs accuse the BIA of "engag[ing] in blatant deception" in the FEIS "in an effort to dismiss the indisputable impact that a casino will have on crime."  Pls.' Mem. at 42. Specifically, the plaintiffs argue that (1) "the FEIS advances a skewed analysis of crime statistics in other counties" by "conflating the crime rate in the entire unincorporated area of a county with that generated by a single facility within the county," Pls.' Mem. at 41–42; *see also* Pls.' Reply at 50 (arguing that "comparisons of crime at other tribal casinos with crime throughout the entirety of their host counties . . . . are meaningless given the size of the counties" and that "evaluating [crime] on a county-wide basis obscures the casino's impact on crime in the locality of the casino"); and (2) wrongly "equate[s] casinos with any other type of tourist attraction," "such as Lego Land or a museum of natural history," even though a "casino will generate more crime," including "driving under the influence, personal robbery, credit card fraud, auto thefts, disorderly conduct, and assault," Pls.' Mem. at 42–43 (quotations omitted).  In so arguing, the plaintiffs attempt to circumvent the Court's previous finding in relation to their challenge to the IGRA ROD in *Stand Up I* that the Secretary reasonably "relied upon and discussed the FEIS's findings [pertaining to crime] when discussing crime in his IGRA ROD."  919 F. Supp. 2d at 73.

---

[51]    The plaintiffs argue for the first time in their reply brief that that the FEIS "reject[ed] alternatives based on their alleged inability to generate sufficient jobs and revenues to meet the Tribe's purpose and need" but "never defin[ed] how much the Tribe needs."  Pls.' Reply at 50 (citing to the FEIS' discussion of the North Fork Rancheria and the Old Mill Site).  Arguments asserted for the first time in reply are waived.  *See Mich. Gambling Opp'n*, 525 F.3d at 29 nn.3–4.  Moreover, as the North Fork Tribe indicates, the Stand Up plaintiffs "waived this argument by failing to make it in . . . NEPA comments."  North Fork's Reply at 31; *see Confederated Tribes*, 2016 WL 4056092, at *12–13 (rejecting claims never raised to the agency "as forfeited").  In any event, NEPA applies "only, by definition, to matters environmental," *Citizens Against Burlington*, 938 F. 2d at 197 n.6, and a "Tribe's unmet needs" are not "environmental in nature," *Confederated Tribes*, 2016 WL 4056092, at *13.  Thus, as the D.C. Circuit recently explained, to the extent that the plaintiffs' "quarrel" is that the agency's alleged failure to define the Tribe's economic need "resulted in excluding from consideration reasonable alternatives located farther away from competing casino interests," "this particular complaint" is not "appropriately pursued" under the NEPA.  *Id.*

In *Stand Up I*, "the plaintiffs' argument that it is 'irrational' to focus on regional crime rates," was rejected "because the Court finds such a focus perfectly rational when considering potential detriment to a surrounding community." *Id.* The Court explained,

> The FEIS surveyed five other California communities "that have had Indian casinos within close proximity or in their jurisdiction for at least the past two years." FEIS at 4.7-6. Based on this survey and a review of literature regarding the link between casinos and crime, the FEIS concluded that there was "no definitive link between casinos and regional crime rates," and therefore "Alternative A's impact to crime would be less than significant." *Id.* at 4.7-8.

*Stand Up I*, 919 F. Supp. 2d at 73. Now, at the summary judgment stage, the Court continues to find the BIA's reliance on county crime statistics perfectly rational and, further, finds that the BIA fully complied with the NEPA by taking a hard look at the potential social effect of crime from the proposed action and rationally concluding that it "would be less than significant." FEIS at 4.7-8, Jt. App. at 719, ECF No. 126-10.

In addition to conducting the five California community surveys, the BIA contacted local law enforcement offices "to inquire about the impacts of the casinos and whether the facilities induced a higher incidence of crime," reviewed historical crime statistics "for a correlation between the presence of casinos and higher than average crime rates," contacted local social service agencies "to document any increase in social service demand since the opening of the casinos" and reviewed literature "on the topic of social impacts of casino gambling." *Id.* at 4.7-7, Jt. App. at 718, ECF No. 126-10. This thorough inquiry into the potential impact of crime revealed "an increase in law enforcement service demand as a direct result of the opening of a casino within [a] jurisdiction," including increases in calls for service related to drunk driving, personal robbery, credit card fraud, auto thefts, disorderly conduct, and assault—which the FEIS discloses. *Id.* at 4.7-7. Additionally, as the North Fork Tribe notes, the FEIS acknowledged that the proposed action's impact on local law enforcement services would be significant if not

mitigated.  North Fork's Reply at 32; *see* FEIS at lvii–lviii, Jt. App. at 278–79, ECF No. 124-3.

The BIA's inquiry also revealed, however, that "no [local law enforcement] department could

implicate the casino as the direct cause of the increase in crime.  Rather, each department

expressed that the increased concentration of people within the local area led to the increase on

crime."  FEIS at 4.7-7.  Indeed, several studies reviewed by the BIA found that the increase in

crime within an area after the opening of a new casino "was not much different than from the

opening of any other type of tourist attraction."  *Id.* at 4.7-8.  A comprehensive study "on the link

between casinos and crime" conducted by the National Opinion Research Center "found that

insufficient data exists to quantify or determine the relationship between casino gambling within

a community and crime rates."  *Id.*[52]  Thus, contrary to the plaintiffs' assertion, the FEIS

addressed in detail the casino's potential impact on local crime and did not merely evaluate

crime on a county-wide basis.  The plaintiffs effectively concede as much by noting that "[t]he

evidence of the project's impact on crime is right in front of [the BIA]" and *citing to the FEIS*.

Pls.' Reply at 51.

Accordingly, the Court has no doubt that the BIA considered the proposed action's

potential impact on crime, and "NEPA requires no more."  *Strycker's Bay Neighborhood*

*Council*, 444 U.S. at 228.

---

[52]      The plaintiffs take issue with the BIA's reliance on this study, asserting that the "defendants supported their
decision not with evidence but with the absence of evidence."  Pls.' Reply at 51.  This criticism makes little sense
given that the plaintiffs have pointed to no evidence or study conclusively establishing a link between casinos and
community crime rates.  *See* Defs.' Mem. at 55 (pointing out that the plaintiffs "offer[s] no citation for the[]
proposition" that "the EIS is wrong to compare" the casino opening to the opening of Lego Land).  An agency
cannot be expected to consider evidence which does not exist.  Thus, as the Court previously explained, "[t]hat the
plaintiffs speculate regarding what gaming may bring to their community cannot undercut the Secretary's reasonable
reliance on empirical socioeconomic data . . . ."  *Stand Up I*, 919 F. Supp. 2d at 73.

3. *Mitigation Measures For Problem Gambling*

In *Stand Up I*, the plaintiffs' challenge to the IGRA ROD on grounds that the Secretary failed to consider the impact of problem gambling on the surrounding community was rejected, in part, due to the mitigation measures planned. *See* 919 F. Supp. 2d at 72. Now, the plaintiffs challenge the adequacy of those mitigation measures under the NEPA, arguing "[t]he FEIS'[] analysis of mitigation measures for [problem gambling] is fatally flawed." Pls.' Mem. at 44. "To be sure, one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351; *see* 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1508.25(b)(3) (regulations requiring discussion of mitigation measures). Mitigation measures must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352; *see also Citizens Against Burlington v. Busey*, 938 F.2d at 206 ("[R]egulations and NEPA . . . compel only 'a reasonably complete discussion of possible mitigation measures.'" (quoting *Robertson*, 490 U.S. at 352)). The NEPA does not contain, however, "a substantive requirement that a complete mitigation plan be actually formulated and adopted. . . ." *Robertson*, 490 U.S. at 352; *see also New York v. NRC*, 824 F.2d at 1017 ("'NEPA does not require agencies to discuss any particular mitigation plans that they might put in place, nor does it require agencies—or third parties—to effect any.'" (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010)).

The FEIS assumed, based on "a study of problem gambling in California, which was conducted by the State Office of Problem Gambling," that the proposed casino "would increase the percentage of problem gamblers in the community by 0.5%," thereby increasing the number of adult problem gamblers in Madera County from 1,063 to 1,594, which would add 531 problem-gamblers to the existing adult population. FEIS at 4.7-8 to -9. Based on information

from the Assistant Director of Madera County Behavioral Health Services ("MCBHS"), the

FEIS assumed that 20 percent, or 106, of the new problem gamblers would seek professional

treatment, 85 of whom would seek treatment with MCBHS and the rest of whom would seek

treatment from private practitioners. *Id*. at 4.7-9. The increase in problem gambling treatment at

MCBHS was estimated to cost approximately $63,606, and the North Fork Tribe agreed to

contribute $50,000 per year to Madera County to supplement the budget for the treatment. *Id*.

The FEIS acknowledged that the annual $50,000 contribution would result in "$13,606 less than

the amount needed to fund the . . . treatment programs and would result in a potentially

significant impact." *Id*. Nevertheless, the FEIS concluded that additional mitigation measures

"would mitigate this effect to a less than significant level." *Id*.

Those additional recommended mitigation measures include an additional one-time

payment of $835,110 to Madera County prior to the opening of the proposed casino to account

"for fiscal impacts," as well as (1) a contract with a gambling treatment professional to train

management and staff to recognize and address customers who exhibit problem gambling

behavior; (2) refusing service to customers who exhibit problem gambling behavior; (3)

providing information about professional gambling treatment programs and self-help groups to

customers who exhibit problem gambling behavior; (4) implementing procedures to enable

gamblers to ban themselves from the establishment for a specified period of time; (5)

prominently displaying materials describing the risk and signs of problem gambling behavior and

available programs for those seeking treatment, including, but not limited to a toll-free hotline

telephone number; and (6) offering insurance coverage for problem gambling treatment

programs to casino employees. *Id*. at 5-26, Jt. App. at 1031, ECF No. 128-2. Additionally, the

North Fork Tribe is expected to make annual contributions of $1,100,000 to four foundations

created by an agreement between the Tribe and Madera County (the County MOU), which funds "would likely be used, at least in part, for various County services," including behavioral health services and, consequently, account for the $13,606 shortfall to fund problem gambling treatment at MCBHS. *Id.* at 4.7-21 to -22, Jt. App. at 732–33, ECF No. 127-1; *see* Defs.' Reply at 33 (explaining that the Tribe's annual contribution of $1,038,310 will cover the extra $13,606 needed annual for services to treat problem gamblers).

The plaintiffs argue that the FEIS "significantly underestimate[s]" the potential impact of problem gamblers by discussing only "the impact associated with the $13,606 shortfall in funding" and the approximately 100 problem gamblers who "will seek treatment from an underfunded MCBHS." Pls.' Mem. at 44–45. Thus, the plaintiffs argue that the FEIS fails to address the approximately 400 new problem gamblers who will not seek treatment. *Id.* at 45. In addition, the plaintiffs argue that "[t]he FEIS fails to discuss or present any data or evidence regarding whether [the recommended mitigation measures] have proven effective, and if so, to what degree, when employed in other Indian casinos." *Id.* As the North Fork Tribe notes in response, however, the NEPA "does not require proof that the impacts on problem gamblers will be fully mitigated," North Fork's Reply at 33, but, rather, only "a reasonably complete discussion of possible mitigation measures" for an adverse effect, *Robertson*, 490 U.S. at 352. An agency need not have "a fully developed plan that will mitigate environmental harm before an agency can act," because the "NEPA merely prohibits uninformed—rather than unwise— agency action." *Id.* at 352–53. Accordingly, the Court finds that the BIA met its obligations under the NEPA regarding the proposed action's possible impact on problem gambling in the community.

*         *         *

For the foregoing reasons, the defendants are entitled to summary judgment on the Stand Up plaintiffs' NEPA claim. *See* TAC ¶¶ 69–82 (Third Claim for Relief).

## F.   CAA CONFORMITY DETERMINATION

The Stand Up plaintiffs raise three challenges to the federal defendants' decision that the proposed casino development satisfies the requirements of the CAA, two of which challenges were previously rejected during consideration of the federal defendants' motion for partial remand. As discussed, *supra*, in Part I.E, the Court granted the motion brought by the federal defendants and partially remanded this action for the limited purpose of allowing the federal defendants to comply with certain CAA notice requirements, cited by the plaintiffs in claims brought in their First Amended Complaint. *See generally* Partial Remand Order. Specifically, the plaintiffs alleged, and continue to allege, *see* TAC ¶ 89; Pls.' Mem. at 46–47, that the federal defendants violated 40 C.F.R. § 93.155, which requires that, when making a declaration that a proposed government action conforms to a state's implementation plan under the Clean Air Act, a federal agency must provide to designated entities "a 30-day notice which describes the proposed action and the Federal agency's draft conformity determination on the action," *id*. § 93.155(a),[53] and then notify the same entities "within 30 days after making a final conformity determination," *id*. § 93.155(b). Upon determining that documentation establishing compliance with these regulatory subsections were not extant, the federal defendants requested that this Court partially remand, but "retain jurisdiction over the matter and decline to vacate the

---

[53]     This provision states in pertinent part that:
    A federal agency making a conformity determination . . . must provide to the appropriate EPA Regional Office(s), State and local air quality agencies, any federally-recognized Indian tribal government in the nonattainment or maintenance area, and, where applicable, affected Federal land managers, the agency designated under Section 174 of the [Clean Air] Act and the [Metropolitan Planning Organization], a 30-day notice which describes the proposed action and the Federal agency's draft conformity determination on the action.
40 C.F.R. § 93.155(a).

underlying conformity determination to avoid the disruption and burden that could result from an order that could require" the federal defendants to undo their action of taking the Madera Site into trust for North Fork.  Partial Remand Order at 3–4.  This requested relief was granted, over the plaintiffs' objections, which are now rehashed on summary judgment.  *See id.* at 4–8.

Following a brief review of the statutory and regulatory framework, the Court readdresses the plaintiffs' prior objections and then discusses the plaintiffs' new challenge to emissions estimates and mitigation measures.

###    1.    *Regulatory Overview*

The CAA requires each state to adopt and submit to the Environmental Protection Agency ("EPA") for approval an implementation plan that provides for the implementation, maintenance, and enforcement of national ambient air quality standards ("NAAQS") in a designated air quality region.  *See* 42 U.S.C. § 7410(a)(1).  "NAAQS are standards that say the air can safely contain only so much of a particular pollutant."  *Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22, 23 (D.C. Cir. 2016).  After a state implementation plan ("SIP") is approved and promulgated, the CAA provides that, "[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan . . . ."  42 U.S.C. § 7506(c)(1).  Thus, federal agency action must "conform" to a SIP, which generally means that the anticipated emissions from a proposed activity will not frustrate the SIP's purpose of attaining and maintaining NAAQS by, for example, "caus[ing] or contribut[ing] to any new violation of any standard in any area;" "increase[ing] the frequency or severity of any existing violation of any standard in any area;" or "delay[ing] timely attainment of any standard or any required interim emission reductions or other milestones in any area."  *Id.* § 7506(c)(1)(A)–(B).  EPA regulations further govern the determination of whether federal agency

action conforms to a SIP, *see* 40 C.F.R. §§ 93.150–93.165, and require that federal agencies "make a determination that Federal agency action conforms to the applicable implementation plan in accordance with [EPA regulations] . . . before the action is taken," *id*. § 93.150(b).

## 2. *Previously-Rejected Procedural Challenge*

The plaintiffs argue that by issuing the § 93.155 notices "nearly three years after they published the notices under 40 C.F.R. § 93.156 and adopted the Final Conformity Determination, defendants failed to comply with the letter and spirit of the Clean Air Act regulations." Pls.' Mem. at 47. Generally, the plaintiffs discount any activity that occurred on partial remand by complaining that the defendants' failure to comply with § 93.155 notice requirements before issuing the IRA ROD and acquiring the Madera Site into trust, and without rescinding the original final conformity determination, continues to taint the CAA conformity determination. Pls.' Mem. at 47; Pls.' Reply at 53–54 & n.39.[54] As before, the plaintiffs characterize the defendants' procedural violations as involving both notice and comment requirements and argue that the violations "necessitate[]" vacatur of the agency's conformity and fee-to-trust determinations, thereby requiring the federal defendants to repeat the entire process from the beginning. Pls.' Mem. at 51–52.

The Court again rejects the plaintiffs' arguments. First, the defendants were not required "to perform the entire Clean Air Act conformity determination again—from start to finish," because the Court specifically "ORDERED that the conformity determination at issue in this

---

[54]     In the plaintiffs' view, a lapse in meeting the notice requirements of § 93.155 has further repercussions and amounts to violations of both § 93.150(b), which directs that "[a] Federal agency must make a determination that a Federal action conforms to the applicable implementation plan in accordance with the requirements of this subpart before the action is taken," and § 93.154, which directs that "[i]n making its conformity determination, a Federal agency must follow the requirements in §§ 93.155 through 93.160 and §§ 93.162 through 93.165 and must consider comments from any interested parties." 40 C.F.R. §§ 93.150(b), 93.154. Since the Court concludes that any violation of § 93.155(b) was adequately remedied, the plaintiffs' reference to potential additional regulatory violations needs no further attention.

matter is REMANDED to the defendants WITHOUT VACATUR to allow the defendants to

undertake the notice process required by 40 C.F.R. § 93.155."  Partial Remand Order at 7–8.

Second, as the Court previously explained, the plaintiffs' requested remedy—vacatur of the

entire trust determination, of which the conformity determination is only a small piece—"is

simply not [required by] the law."  *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89,

98 (D.C. Cir. 2002); *see* Partial Remand Order at 6.  "[P]ublic notice and comment is not an

issue" here.  Partial Remand Order at 5.  Section 93.155 simply provides for notice; it does not

provide for comment, so the § 93.155 notice defect did not affect public participation.  *Id*.

Instead, "[t]he procedural defect, if [any] at all, only pertains to a small number of government

entities, not including those most likely to have substantive comments, namely, the local air

quality district and the regional EPA office, which [timely] received notice."  *Id*.

Additionally, on remand, the federal defendants cured any notice deficiency by notifying

the required government entities, *see* Notice of Availability, Draft Conformity Determination

(Jan. 23, 2014), Jt. App. at 1705–49, ECF Nos. 129-1 to -2, reviewing and responding to

comments submitted by the Picayune Tribe, the Table Mountain Rancheria, and Stand Up, which

is not even one of the entities entitled to notice under § 93.155, *see* Comment Letters, Jt. App. at

1750–59, 1901–05, 2091–2101, ECF Nos. 129-3 to -5, -9, and, upon determining that a revision

to the final conformity determination was not warranted, *see* Mem. from Amy Dutschke to Dir.,

DOI Office of Indian Gaming (Apr. 9, 2014), Jt. App. at 1916, ECF No. 129-8, reissuing the

final conformity determination to the required government entities as specified in § 93.155(b),

*see* Notice of Availability, Reissuance of Final Conformity Determination (Apr. 9, 2014), Jt.

App. at 1914–15, ECF No. 129-7.  Thus, the agency's mistake, if any, "did not affect the

outcome" nor "prejudice the petitioner," and "it would be senseless to vacate" the conformity

determination.  *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule." (quoting *PDK Labs. Inc.*, 362 F.3d at 799)); *Zevallos v. Obama*, 793 F.3d 106, 115 (D.C. Cir. 2015) ("We will not invalidate [an agency]'s decision based on procedural error unless the errors alleged could have affected the outcome."); *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) ("The APA requires petitioners to show prejudice from an agency procedural violation." (citing 5 U.S.C. § 706)).[55]

### 3.    *Previously-Rejected Challenge To Emissions Model Used*

The plaintiffs again argue, as they did in opposition to the defendants' motion for partial remand, that "[t]he conformity determination is not based upon the latest emission methods," in violation of 40 C.F.R. § 93.159(b).  Pls.' Mem. at 47–48; *see* Partial Remand Order at 7–8.  The plaintiffs "rely . . . on the new model for motor vehicle emissions set forth in 78 Federal Register 14533 (March 6, 2013), which requires the use of a new model for determining the effects of emissions," Partial Remand Order at 7; *see* Pls.' Mem. at 47–48, and argue that the defendants were required to use the latest model to estimate emissions when re-approving the final conformity determination in 2014, Pls.' Mem. at 48.  The Court already rejected this argument and rejects it again for the same reason:  "As the federal defendants correctly point out, these regulations apply only to the 'new . . . regional emissions analyses' begun after September 6,

---

[55]    The plaintiffs contend that the harmless error rule does not apply here because "the agency's failure to comply with required procedures makes it impossible to know what would have happened had it complied."  Pls.' Reply at 55–56.  This argument is unavailing.  The defendants supplemented the AR with the three comment letters received in response to the notices issued on partial remand and considered the comments, as well as "responses to comments prepared by the EIS consultant," before determining that revisions to the final conformity determination were "not warranted" and reissuing the final conformity determination.  Letter from Reggie Lewis, Picayune Tribal Chairman, to Amy Dutschke, DOI Regional Dir. (Feb. 24, 2014), Jt. App. at 1750–53, ECF Nos. 129-3 to -4; Letter from Cheryl A. Schmit, Exec. Dir., Stand Up for California, to Amy Dutschke (Feb. 25, 2014), Jt. App. at 1755–58, ECF Nos. 129-4 to -5; Letter from Timothy Jones, Att'y, Table Mountain Rancheria Tribe, to Amy Dutschke (Feb. 27, 2014), Jt. App. at 1901–05, ECF Nos. 129-5 to -6; Mem. from Amy Dutschke to Dir., DOI Office of Indian Gaming (Apr. 9, 2014), Jt. App. at 1916, ECF No. 129-8.  This record demonstrates that the compliance with the notice requirements earlier would have had the same result.

2013, meaning the new models are not required for the already instituted conformity

determination at issue here."  Partial Remand Order at 7–8 (ellipsis in original) (citing 78 Fed.

Reg. 14,533 (Mar. 6, 2013) at Part II.F).

### 4.      *Challenge To Emissions Estimates And Mitigation Measures*

Pursuant to CAA regulations, before making a conformity determination, an agency must

conduct what is called an "applicability analysis" to determine whether the total emissions

caused by the "proposed action would equal or exceed specified emissions levels or would

otherwise been deemed regionally significant." *Cty. of Del., Pa. v. Dep't of Transp.*, 554 F.3d

143, 145 (D.C. Cir. 2009); *see* 40 C.F.R. § 93.153(b)–(c), (i).  If the applicability analysis reveals

that the emissions levels caused by the proposed action would be at or below *de minimis* levels,

then the agency is exempt from making the conformity determination altogether.  *Cty. of Del.,*

*Pa.*, 554 F.3d at 145; *see* 40 C.F.R. § 93.153(c)(1)–(2).

The FEIS, published in February 2009, explained that "Madera County has been

designated a 'serious' nonattainment area for ozone" and that, consequently, the proposed action

would result in *de minimis* emission levels when, in relevant part, reactive organic gas ("ROG")

and nitrogen oxide ("$NO_x$") emissions are each less than 50 tons per year.  FEIS at 3.4-18, 4.4-

14, Jt. App. at 487, 683, ECF Nos. 125-9, 126-10.  The FEIS then represented that the proposed

action, which is estimated to result in 22.99 tons per year of ROG and 46.64 tons per year of

$NO_x$, would produce emissions under the *de minimis* thresholds and concludeed that "a

conformity determination is not required."  *Id.* at 4.4-14.  A conformity determination later

became necessary, however, when the San Joaquin Valley was reclassified as an "extreme

nonattainment area" in June 2010 and the emissions thresholds for ROG and $NO_x$ were lowered

to 10 tons per year.  BUREAU OF INDIAN AFFAIRS, Final Conformity Determination for the North

Fork Rancheria Casino/Hotel Resort Project ("FCD") at 1, 5, Jt. App. at 1347, 1349, 1353, ECF No. 128-7.

A draft conformity determination was published on May 6, 2011, and a final conformity determination was published on June 18, 2011. *See* Proof of Publication, Draft Conformity Determination Re: North Fork Rancheria Notice of Availability (May 6, 2011), Jt. App. at 1697, ECF No. 129-1; Proof of Publication, Final Conformity Determination Re: Trust Acquisition North Forth Rancheria (June 18, 2011), Jt. App. at 1700, ECF No. 129-1. The final conformity determination explained that, as mitigation measures, the North Fork Tribe will need "to purchase Emissions Reduction Credits (ERC) in the amount of 42 tons of NOx and 21 tons of ROG," "enter into a Voluntary Emissions Reduction Agreement (VERA) with the [San Joaquin Valley Air Pollution Control District]" to "provide funds . . . to be used . . . to fund emission reduction projects," or do a combination of both, prior to the operation of the casino to demonstrate conformity. FCD at 6, Jt. App. at 1354. Consistent with these mitigation measures, on June 17, 2011, the North Fork Tribe adopted a Resolution in which it "agrees to implement the Emissions Reduction Mitigation Measures in the Final General Conformity Determination prior to the operation of the project" and resolves to "provide the USEPA and other agencies with documentation necessary to support the emissions reductions through offset purchase prior to the project operation." Resolution 11-26 at 2–3, Jt. App. at 2047–49 ECF No. 129-1.

The plaintiffs argue that the final conformity determination fails to comply with CAA regulations in four ways, and only fully explain one. First, the plaintiffs argue that the defendants improperly assumed, when calculating the project's estimated air pollutant emissions, "that the average trip length by patrons to and from the casino will be only 12.6 miles," in order "to get the emissions estimates underneath the applicability analysis thresholds" in place at the

time.  Pls.' Mem. at 49–50.  According to the plaintiffs, "[n]o basis for this 12.6-mile assumption

appears in the record" and "the 12.6-mile trip length is at odds with the defendants' description

of the project . . . . as a 'destination resort,' which will increase visitors to the County, stimulate

the local tourist industry, and create an influx of non-resident consumers."  *Id.* at 49.  As a result

of the "unsupported 12.6-mile trip length," the plaintiffs argue that "the amounts of emissions to

be offset [by mitigation measures]" are incorrect.  *Id.* at 51.

Contrary to the plaintiffs' assertion, and as explained in the federal defendants' responses

to comments submitted during the partial remand, the 12.6-mile trip length assumption "was

based on project specific traffic data developed through the use of Fresno County Council of

Governments (FCCOG) and Madera County Transportation Commission (MCTC) model data."

Mem. to BIA from David Sawyer, North Fork Rancheria – Responses to the January 2014

Reissued Draft General Conformity Determination Comment Letters (Mar. 27, 2014) ("DCD

Comment Resp. Mem.") at 5, Jt. App. at 2091, 2095, ECF No. 129-9; *see also* FEIS at 4.4-1

("The average trip length was estimated using data from the Madera County Transportation

Commission (MCTC) traffic model.").[56]  Notably, the BIA received no comments regarding the

12.6-mile trip length during the original draft conformity determination comment period in 2011,

nor during the extensive NEPA process, not even from the San Joaquin Valley Air Pollution

Control District.  DCD Comment Resp. Mem. at 6, Jt. App. at 2096; *see also* Partial Remand

Order at 5 n.2.

---

[56]     The plaintiffs take issue with the fact that the FEIS mentioned only the MCTC traffic model and not the
FCCOG model, and complain that the data from those two models is not included in the administrative record.  Pls.'
Reply at 59–60.  The MCTC traffic model is, in fact, included in the administrative record and "contains in totality
the [FCCOG] model."  *See* Madera County Travel Forecasting Model, Model Documentation and User Manual
(Korve Engineering, Inc., Nov. 1, 2001) at 1, Jt. App. at 1680, ECF No. 129-1.

The defendants explain that the distances between the Madera Site and surrounding population centers range from 4.1 to 32.7 miles; that the North Fork Tribe has agreed to employ a large number of Madera County residents, "with a goal that 50% of new hires be residents of Madera County," DCD Comment Resp. Mem. at 6; and, that while the "trip length analysis . . . anticipates hundreds of daily trips from locations outside Madera and Fresno Counties" due to the casino's description as a "destination resort," "the greater number of shorter trips from within those counties" for employees and "other local residents who would use the resort to dine or shop" "pulls down the average length to 12.6 miles," North Fork's Mem. at 78; *see* DCD Comment Resp. Mem. at 5 (Table 1); *id.* at 6 (explaining that the consideration of employee trips would shorten the average trip length); *id.* at 4 (explaining that out-of-town patrons "will tend to visit both the casino and hotel in a single trip," a phenomenon known as "internal capture").[57] Accordingly, the Court finds that the defendants' use of a 12.6-mile trip length to calculate emissions estimates had a considered and reasonable basis.

The plaintiffs make their second, third, and fourth arguments in one sentence each, without explanation, and assert no reply to the defendants' opposition with respect to these arguments. *See* Pls.' Mem. at 50–51; Pls.' Reply.  Arguments briefed in such a cursory fashion are generally deemed waived. *See supra* n.16 (citing cases).  They are nonetheless meritless, as discussed briefly below.

---

[57]    The plaintiffs argue that the defendants' "explanation is demonstrably false" because "the emissions model output file [appended to the FEIS] . . . uses the same 12.6-mile trip length for employees, shoppers, customers, and others alike," and the table provided in the response to comments "assume[s] a trip length for employees . . . of 17.29 miles – not a value less than 12.6 miles that would pull down the average." Pls.' Reply at 60 & nn.42–43.  As the North Fork Tribe points out, however, it appears the 12.6-mile average trip length "was calculated from the number of casino visitors and workers in each of several categories who traveled from within the model area . . . and whose one way trip lengths ranged from 6.6 miles to 16.8 miles as shown in the modeling output files," North Fork's Reply at 37 n.24 (citing FCD, Attachment 1, URBEMIS Output Files at 18–19, Jt. App. at 2086–87, ECF No. 129-9), "or from 9.33 miles to 17.29 miles as shown on the table," *id.* (citing DCD Comment Resp. Mem. at 5 (Table 1)).  The Court finds this explanation in no way "demonstrably false."

The plaintiffs' second argument is that "the Tribe's resolution fails to identify precisely what the Tribe will be doing, and when, to ensure the conformity requirements are met," Pls.' Mem. at 50, in violation of 40 C.F.R. § 93.160(a), which requires that "[a]ny measures . . . intended to mitigate air quality impacts must be identified and the process for implementation and enforcement of such measures must be described, including an implementation schedule containing explicit timelines for implementation."  This argument is unavailing.  The Resolution contains verbatim the mitigation measures specified in the final conformity determination and the Tribe's agreement to implement those measures, and provide the documentation necessary to support such implementation "prior to the operation of the project."  Resolution 11-26 at 2.

Third, the plaintiffs argue that "the record contains no evidence that the approval of the fee-to-trust transfer was conditioned upon the Tribe meeting the mitigation measures," Pls.' Mem. at 50, in violation of 40 C.F.R. § 93.160(d), which requires that a "Federal agency . . . approving the action of another governmental or private entity" must condition such approval "on the other entity meeting the mitigation measures set forth in the conformity determination." This requirement was met here.  The Secretary's approval of the fee-to-trust transfer was, indeed, conditioned upon the North Fork Tribe meeting the mitigation measures, which were "adopted as a part" of the IRA ROD and set forth in that decision.  *See* IRA ROD at 26, 34–35.  Additionally, the IRA ROD provides that, "[w]here applicable, mitigation measures will be monitored and enforced pursuant to Federal law, tribal ordinances, and agreements between the Tribe and appropriate governmental authorities, as well as this decision."  *Id.* at 26.

Lastly, the plaintiffs argue that "the conformity determination fails to require the Tribe to offset emissions either in the same calendar year, or by a factor of 1.5:1, as required in Extreme nonattainment areas," in violation of 40 C.F.R. § 93.163(a), (b)(1)(i).  Pls.' Mem. at 50–51.

Section 93.163(a) provides that, "[t]he emissions reductions from an offset or mitigation measure used to demonstrate conformity must occur during the same calendar year as the emission increases from the action," except the reductions may occur in other years pursuant to certain conditions set forth in subsection (b). 40 C.F.R. § 93.163(a). Here, contrary to the plaintiffs' assertion, the conformity determination requires the North Fork Tribe to demonstrate conformity in the same calendar year as the emissions increases because it requires the Tribe to "provide the USEPA and other agencies with documentation necessary to support the emissions reductions through offset purchase, such as certification of [Emissions Reduction Credit] ERC purchase or a binding agreement requiring ERC purchase *prior to operation*." FCD at 6 (emphasis added); *see also* DCD Comment Resp. Mem. at 8 (explaining that ERCs "provide a perpetual right to emission reductions" which "means that the ERCs would reduce project emissions both in the year that the ERCs are purchased and in future years when the emissions would occur"). Thus, the conformity determination complies with 40 C.F.R. § 93.163.

*     *     *

The Stand Up plaintiffs' scorched earth effort to undermine the legitimacy of the IRA ROD by raising challenges to the defendants' CAA conformity determination are unavailing. Accordingly, the defendants are entitled to summary judgment on the Stand Up plaintiffs' CAA claim. *See* TAC ¶¶ 83–98 (Fourth Claim for Relief).

## IV.   CONCLUSION

For the foregoing reasons, the Stand Up plaintiffs' motion for summary judgment and the Picayune Tribe's motion for summary judgment are denied. The federal defendants' cross-motion for summary judgment and the North Fork Tribe's cross-motion for summary judgment are granted in part and denied in part. The defendants' cross-motions are granted as to all of the

Picayune Tribe's claims and as to all of the Stand Up plaintiffs' claims, except for the Stand Up plaintiffs' Fifth and Sixth Claims for Relief, which are dismissed as moot.  Any part of the Stand Up plaintiffs' claims predicated on challenges to the Governor of California's concurrence are dismissed for failure to join an indispensable party.

An appropriate Order accompanies this Memorandum Opinion.

Date:   September 6, 2016

Digitally signed by Hon. Beryl A. Howell
DN: cn=Hon. Beryl A. Howell, o=U.S. District Court for the District of Columbia, ou=Chief Judge, email=Howell_Chambers@dcd.uscourts.gov, c=US
Date: 2016.09.06 11:44:17 -04'00'

BERYL A. HOWELL
Chief Judge